# EXHIBIT

# B

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

DISH NETWORK CORP.; DISH NETWORK LLC; AND DISH NETWORK SERVICE LLC,

Petitioners

v.

ENTROPIC COMMUNICATIONS, LLC

Patent Owner.

_____

PTAB Case No. IPR 2023-00391

Patent No. 7,130,576

_____

**PETITION FOR *INTER PARTES* REVIEW OF U.S. PATENT NO. 7,130,576**

_____

EXHIBIT B

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................1

II.   MANDATORY NOTICES ....................................................................3

    A.   Real Party-in-Interest ..............................................................3

    B.   Related Matters .........................................................................3

    C.   Counsel and Service Information..............................................3

III.   REQUIREMENTS FOR *INTER PARTES* REVIEW.................................4

    A.   Grounds For Standing ..............................................................4

    B.   Overview of Challenges and Requested Relief.........................4

        1.   Identification of prior art................................................4

        2.   Ground for Challenge .....................................................5

IV.   STATE OF THE ART AND APPLICANT ADMITTED PRIOR ART (AAPA).................................................................................5

V.   OVERVIEW OF THE '576 PATENT ...................................................8

    A.   The Alleged Invention..............................................................8

    B.   The Prosecution History.........................................................16

        1.   Original Prosecution ....................................................16

        2.   Reexamination of the '576 Patent................................17

    C.   The Alleged Priority Date.......................................................18

VI.   CLAIM CONSTRUCTION .................................................................18

VII.   LEVEL OF ORDINARY SKILL ........................................................19

VIII.   DESCRIPTION OF THE PRIOR ART ................................................19

    A.   Williams-873...........................................................................19

    B.   Pugel ......................................................................................23

IX.   GROUND FOR CHALLENGE ...........................................................24

    A.   Ground 1: Claims 14-23, 34-42 and 8-13 are Obvious over Williams-873 in view of Pugel. .......................................25

## TABLE OF CONTENTS
### (continued)

Page

1.    Motivation to Combine ...................................................................25

2.    Independent Claim 14 .................................................................29

3.    Dependent Claim 15 ....................................................................46

4.    Dependent Claim 16 ....................................................................50

5.    Dependent Claim 17 ....................................................................51

6.    Dependent Claim 18 ....................................................................53

7.    Dependent Claim 19 ....................................................................55

8.    Dependent Claim 20 ....................................................................56

9.    Dependent Claim 21 ....................................................................56

10.   Dependent Claim 22 ....................................................................57

11.   Dependent Claim 23 ....................................................................57

12.   Dependent Claim 34 ....................................................................57

13.   Dependent Claims 35 and 36 ..................................................58

14.   Dependent Claim 37 ....................................................................59

15.   Dependent Claim 38 ....................................................................61

16.   Dependent Claim 39 ....................................................................62

17.   Dependent Claim 40 ....................................................................62

18.   Dependent Claim 41 ....................................................................63

19.   Dependent Claim 42 ....................................................................64

20.   Independent Claim 8 .................................................................65

21.   Dependent Claim 9......................................................................72

22.   Dependent Claim 10 ....................................................................72

23.   Dependent Claim 11 ....................................................................74

24.   Dependent Claim 12 ....................................................................74

25.   Dependent Claim 13 ....................................................................74

X.    INSTITUTION SHOULD BE GRANTED.............................................75

EXHIBIT B

## TABLE OF CONTENTS
### (continued)

| | | Page |
|---|---|---|
| A. | The Board Should Not Decline Institution under § 325(d) | 75 |
| B. | The Board Should Not Decline Institution under § 314(a) | 77 |
| XI. | CONCLUSION | 77 |

EXHIBIT B

PTAB Case No. IPR 2023-00391
U.S. Pat. No. 7,130,576

## EXHIBIT LIST

| Ex.1001 | U.S. Patent No. 7,130,576 ("'576 patent") |
|---|---|
| Ex.1002 | Declaration of Dr. Dan Schonfeld ("Schonfeld") and Appendix A Thereto (CV) |
| Ex.1003 | U.S. Patent No. 6,493,873 ("Williams-873") |
| Ex.1004 | U.S. Patent No. 2003/0165200 to Pugel ("Pugel") |
| Ex.1005 | U.S. Patent No. 5,278,837 (Kelley) |
| Ex.1006 | File History - U.S. Patent No. 7,130,576 File History (family member of '715 patent) ("'576 FH") |
| Ex.1007 | File History - U.S. Patent No. 7,130,576 Reexamination History (family member of '715 patent) ("'576 Reexam") |
| Ex.1008 | U.S. Patent No. 5,959,592 to Petruzzelli ("AAPA-Petruzzelli") |
| Ex.1009 | U.S. Patent No. 6,134,419 to Williams ("AAPA-Williams-419") |
| Ex.1010 | Lewis, Communication Services Via Satellite, Butterworth-Heinemann Ltd (1992), excerpts |
| Ex.1011 | U.S. Patent No. 5,073,930 ("Green") |
| Ex.1012 | Telstar, Wikipedia (2022), https://en.wikipedia.org/wiki/Telstar |
| Ex.1013 | U.S. Patent No. 4,455,651 ("Baran") |
| Ex.1014 | Dan Logan, The Scoop on the Dish, Los Angeles Times (1996), https://www.latimes.com/archives/la-xpm-1996-09-07-hm-41715-story.html |
| Ex.1015 | U.S. Patent No. 4,675,732 ("Oleson") |
| Ex.1016 | European Patent No. EP0740434B1 ("Carnero") with Certified English Translation with Translator's Affidavit |
| Ex.1017 | Alan V. Oppenheim et al., Discrete-Time Signal Processing, Prentice Hall (1999), excerpts ("Oppenheim") |
| Ex.1018 | IEEE 802.11, Wikipedia (2022), https://en.wikipedia.org/wiki/IEEE_802.11 |
| Ex.1019 | Customer Experience, What is the Difference Between RG59 and RG6?, Sewell Direct (2019), https://sewelldirect.com/blogs/learning-center/what-is-the-difference-between-rg59-and-rg6 |

EXHIBIT B

PTAB Case No. IPR 2022-01450
U.S. Reissue Pat. No. RE38,806

| Ex.1020 | Site Editor, RG6 vs RG59: Which Should You Buy?, Foshan New King Cable Industrial Co., Ltd. (2020), https://newkingcable.com/rg6-vs-rg59-which-one-to-choose.html |
| Ex.1021 | U.S. Patent Application Publication No. 2002/0154055 ("Davis") |
| Ex.1022 | U.S. Provisional Patent Application No. 60/284,593 ("Davis Provis.") |
| Ex.1023 | U.S. Patent No. 6,697,603 ("Lovinggood") |
| Ex.1024 | Virtual Channel, Wikipedia (2022), https://en.wikipedia.org/wiki/Virtual_channel |
| Ex.1025 | U.S. Patent No. 7,376,387 ("Eck") |
| Ex.1026 | Stephen P. Dulac & John P. Godwin, Satellite Direct-to-Home, 94 PROCS. OF THE IEEE 158, (Jan. 2006) |
| Ex.1027 | U.S. Patent No. 6,441,797 ("Shah") |
| Ex.1028 | Tim Hentschel, et al., The Digital Front-End of Software Radio Terminals, IEEE PERS. COMMC'NS 6 (Aug. 1999) |
| Ex.1029 | Reserved |
| Ex.1030 | S.J. Crowley, "Capacity Trends in Direct Broadcast Satellite and Cable Television Services," National Association of Broadcasters, National Religious Broadcasters, and National Black Religious Broadcasters (2013) https://www.nab.org/documents/newsroom/pdfs/100813_capacity_trends_in_dbs_and_cable_tv_services.pdf |
| Ex.1031 | DVB-S, Wikipedia (2022), https://en.wikipedia.org/wiki/DVB-S |
| Ex.1032 | B.R. Elbert, Introduction to Satellite Communication. Artech House, Third Edition, 2008 |
| Ex.1033 | Walt Kester (ed.), Ch. 1, Data Converter History, in ANALOG-DIGITAL CONVERSION, (2004) |
| Ex.1034 | Rajendra Kumar et al., Signal Processing Techniques for Wideband Communication Systems, MILCOM 1999, IEEE MILITARY COMMS. CONF. PROCS. 452 (1999) |
| Ex.1035 | *Entropic Communications v. DirectTV, LLC*, Case No. 2:22-cv-07775-JWH-JEM, C.D. Cal., Plaintiff's Claim Construction Statement, December 1, 2022 |

Petitioners DISH Network Corp., DISH Network LLC, and Dish Network Service LLC ("DISH") respectfully request *inter partes* review ("IPR") of claims 8-23 and 34-42 of U.S. Patent No. 7,130,576 ("'576 patent").

## I.  INTRODUCTION

The '576 patent addresses an age-old problem within video distribution systems: how to efficiently deliver video signals to more than one integrated receiver decoder ("IRD" or "set-top box" ("STB")) within a multiroom building such as a house or hotel. But as the '576 patent expressly acknowledges, this problem was already solved by techniques for selecting and combining multiple signals into a single composite signal which enabled efficient transmission of video from an outdoor unit (ODU) to multiple IRDs—the exact same idea that Patent Owner Entropic Communications, Inc. ("Patent Owner" or "Entropic") now boldly declares as its own. (Ex.1001-'576 patent, 2:8-48.)

To obtain its patent, Entropic mischaracterized U.S. Patent No. 6,493,873 ("Williams-873")—an anticipatory reference relied on by the examiner as disclosing the composite signal—by amending its claims and arguing that Williams-873's signal processing altered the signal's modulation whereas "the applicant's invention does not." (Ex.1006-'576 FH, 83, 85.) But when read in full, it is abundantly clear that Williams-873 discloses an embodiment where the broadband signals are not altered. (Ex.1003-Williams-873, 4:57-60, 7:15-23, 15:15-27.) The Examiner erred

PTAB Case No. IPR 2023-00391
U.S. Pat. No. 7,130,576

by not realizing the import of Willliam-873's express disclosure and ultimately allowing the claims.

Almost immediately after issuance, an *ex parte* reexamination challenged the validity of the patent. Once again, the Patent Office determined that claims for creating a composite signal without altering the signal's modulation were anticipated, this time by the "*Eutelsat Installer Guide.*" (Ex.1007-'576 Reexam, 276, 289-92.) Entropic responded by shape-shifting its claims yet again, amending them to require that the received broadband signals be "*digitized*" prior to signal selection and combination. (Ex.1007-'576 Reexam, 289-92.) But the '576 claims cannot be saved by merely replacing long-used analog signal processing applications with their known digital counterparts.

Entropic will undoubtedly claim that the '576 patent is "gold-plated" because it survived reexamination. But if there was ever a patent whose validity warrants scrutiny and a fully informed review, it's the '576 patent. Not only did the Entropic lead the examiner into material errors during the original prosecution, but the Patent Office also erred during reexamination when it failed to appreciate it was not novel to limit the claims to the digital domain. With the benefit of Dr. Schonfeld's testimony and the digital domain teachings of Pugel, neither of which were available to the examiner or Patent Office, there is no question that the '576 patent claims are invalid and must be canceled.

EXHIBIT B

PTAB Case No. IPR 2023-00391
U.S. Pat. No. 7,130,576

## II.    MANDATORY NOTICES

### A.    Real Party-in-Interest

DISH Network Corporation, and its subsidiaries, including DISH Network LLC and Dish Network Service LLC, are the real parties-in-interest for this Petition.

### B.    Related Matters

Patent Owner asserts that Petitioners infringe the '576 patent along with two others, U.S. Patent Nos. 7,542,715 ("'715 patent") and 8,792,008 ("'008 patent"), in a district court lawsuit captioned *Entropic Communications, LLC v. DISH Network Corp. et al*, No. 2:22-cv-07959-JWH-JEM (C.D. Cal.) (transferred from No. 2:22-cv-75 (E.D. Tex.) on November 3, 2022).

The current Petition seeks cancelation of claims 8-23 and 34-42 of the '576 patent. Petitioners are filing petitions for *inter partes* review challenging both the '008 and '715 patents in IPR 2023-00393 and IPR 2023-00392, respectively.

### C.    Counsel and Service Information

**Lead Counsel**

Amy E. Simpson                    Phone: 858-720-5702
PERKINS COIE LLP                  Fax: 858-720-5799
11452 El Camino Real, Suite 300   Simpson-ptab@perkinscoie.com
San Diego, CA 92130               USPTO Reg. No. 54,688

**Back-up Counsel**

David St. John-Larkin             Phone: 303-291-2365
PERKINS COIE LLP                  Fax: 303-291-2457

EXHIBIT B

| | |
|---|---|
| 1900 Sixteenth Street, Suite 1400 | st-john-larkin-ptab@perkinscoie.com |
| Denver, CO 80202 | USPTO Reg. No. 56,924 |

| | |
|---|---|
| Adam Hester | Phone: 650-838-4311 |
| PERKINS COIE LLP | Fax: 650-838-4350 |
| 33 East Main Street, Suite 201 | Hester-ptab@perkinscoie.com |
| Madison, WI 57303 | *Pro Hac Vice* to be filed |

Petitioners consent to electronic service. All services and communications to the attorneys listed above may be sent to PerkinsDishIPRs@perkinscoie.com. A Power of Attorney is filed with this Petition.

## III.   REQUIREMENTS FOR *INTER PARTES* REVIEW

### A.   Grounds For Standing

Petitioners certify that the '576 patent is available for IPR and that Petitioners are not barred or estopped from requesting IPR challenging the claims of the '576 patent on the grounds presented here. This Petition is filed less than one year after Petitioners were served with a complaint alleging infringement.

### B.   Overview of Challenges and Requested Relief

Pursuant to Rules 42.22(a)(1) and 42.104(b)(1)-(2), Petitioners request cancelation of claims 8-23 and 34-42 of the '576 patent under pre-AIA 35 U.S.C. § 103.

#### 1.   Identification of prior art

In this Petition, Petitioners rely on the patents listed in the Table of the Exhibits, including:

| Exhibit No. | Prior Art Basis |
|---|---|
| Ex. 1003: (Williams-873) U.S. Patent No. 6,493,873 | Williams-873 was filed on January 20, 1998 and published upon issuance on December 10, 2002, and is prior art at least under pre-AIA 35 U.S.C. § 102(e). |
| Ex. 1004: (Pugel) U.S. Published Patent App. No. 2003/0165200 | Pugel was filed on August 30, 2001 and published on September 4, 2003 and is prior art under pre-AIA 35 U.S.C. § 102(e). |

### 2.    Ground for Challenge

The table below summarizes the grounds challenging the independent and dependent claims:

| Ground for Challenge | | |
|---|---|---|
| Ground 1 | Ind. Claims 8, 14 Dep. Claims 9-13, 15-23, 34-42 | Obvious over Williams-873 in view of Pugel. |

This Petition is supported by the declaration of Dr. Dan Schonfeld ("Schonfeld") which is attached as Ex. 1002 and demonstrates a reasonable likelihood that Petitioners will prevail with respect to the cancelation of at least one challenged claim. *See* 35 U.S.C. § 314(a).

## IV.   STATE OF THE ART AND APPLICANT ADMITTED PRIOR ART (AAPA)

In the Background Section of the '576 patent, the applicant described the state of the art and problems allegedly solved by referencing and incorporating two prior art patents—U.S. Patent Nos. 5,959,592 ("AAPA-Petruzzelli") and 6,134,419

("AAPA-Williams-419")—and directed the reader to a "general" "descri[ption]" of "[s]atellite systems" in a textbook titled "Communication Services via Satellite" (collectively "AAPA").[1] The AAPA establishes that the '576 patent claims conventional components and functionality including at least ODUs, STBs, LNBs, signal selectors and combiners, and frequency translators. (*See generally* Ex.1002-Schonfeld, ¶¶35-86.) Petitioners and Dr. Schonfeld rely on the AAPA throughout this Petition in accordance with the PTAB's June 9, 2022 "Updated Guidance on the Treatment of Statements of the Applicant in the Challenged Patent in *Inter Partes Review* under Section 311" at least to establish background knowledge possessed

---

[1]The Williams-873 patent used as the basis for Ground 1 in this Petition is a continuation-in-part ("CIP") of AAPA-Williams-419 incorporated by reference in the '576 patent. (Ex.1001-'576 patent, 2:8-33.) Importantly, as a CIP, Williams-873 contains additional disclosure—not found in Williams-419—of an alternative embodiment teaching a use case where transmodulation is not required and instead selected signals are "shift[ed] ... to different frequencies for transmission over the cable network 26." (Ex.1003-Williams-873, 4:57-60, 7:15-23, 15:15-27.) Based in part on this additional disclosure, Williams-873 in view of Pugel render the claims obvious.

by a POSITA, to furnish a motivation to combine, to assess whether a patent's claims would have been obvious, and/or to supply a missing limitation. While Dr. Schonfeld provides a detailed description of the state of the art and AAPA in his Declaration, the chart below summarizes technology concepts that the '576 applicant admitted were prior art. (Ex.1002-Schonfeld, ¶87.)

| Concepts Relevant to Challenged Claims | Disclosure of Concept in State of Art as Shown in AAPA and Prosecution History |
|---|---|
| Receiving and down-converting broadband satellite signals at an ODU. | Ex.1001-'576 patent, 1:19-555 (Background); Ex.1008-AAPA-Petruzzelli, 1:21-62, 2:11-21, 2:54-65, 4:23-45, 4:58-5:15, 5:1-15, 5:61-6:21; Ex.1009-AAPA-Williams-419, 2:11-40; Ex.1027-Shah, 1:64-3:6, Figs. 1, 4 (Ex.1006-'576 FH, 96); "Eutelsat Installers Guide," Figs. 8, 11 (Ex.1007-'576 Reexam, 276-77); Ex.1015-Oleson, 4:35-50. |
| Selecting transponder signals from broadband satellite signals based on request information. | **Analog:** "Eutelsat Installers Guide," 19, 26, Figs, 7, 11 (Ex.1007-'576 Reexam, 277-79). **Digital:** Ex.1023-Lovinggood, Figs. 2-3, 5:3-25; Ex.1004-Pugel, ¶¶6, 18. |
| Frequency translating selected transponder signals. | **Analog:** Ex.1008-AAPA Petruzzelli, Abstract, 5:45-6:50, 7:64-8:39; Ex.1027-Shah, 2:66-3:3, 4:61-67, Figs. 1, 4 (Ex.1006-'576 FH, 96); "Eutelsat Installers Guide," 15, 19, Figs. 7, 11 (Ex.1007-'576 Reexam, 281-82); Ex.1015-Oleson, 1:14-58, 7:21-35. **Digital:** |

| Concepts Relevant to Challenged Claims | Disclosure of Concept in State of Art as Shown in AAPA and Prosecution History |
|---|---|
|  | Ex.1023-Lovinggood, Figs. 2-3, 5:3-25; Ex.1004-Pugel, ¶22. |
| Combining selected transponder signals for distribution. | **Analog**:<br><br>Ex.1008-AAPA Petruzzelli, Abstract, 5:45-6:50, 7:64-8:39; Ex.1027-Shah, 3:55-4:38, Figs. 1, 4 (Ex.1006-'576 FH, 96-97); "Eutelsat Installers Guide," 15, 19, 27, Figs. 7, 11 (Ex.1007-'576 Reexam, 281-82, 284-85); Ex.1015-Oleson, 1:14-58, 7:21-35.<br><br>**Digital:**<br><br>Ex.1023-Lovinggood, 9:58-67; Ex.1004-Pugel, ¶26. |
| Distributing selected transponder signals in the same modulation as received in broadband satellite signals. | Ex.1008-AAPA Petruzzelli, Abstract, 5:45-6:50, 7:64-8:39; Ex.1015-Oleson, 1:14-58, 7:21-35; "Eutelsat Installers Guide," Fig. 7 (Ex.1007-'576 Reexam, 281-82). |
| Maintaining and distributing information about frequency locations for selected transponder signals. | Shah, 4:28-52 (Ex.1006-'576 FH, 98); "Eutelsat Installers Guide," 27 (Ex.1007-'576 Reexam, 287); Ex.1025-Eck, 1:21-35, 1:54-64, 2:10-25. |

## V.   OVERVIEW OF THE '576 PATENT

### A.   The Alleged Invention

The '576 patent addresses how to efficiently deliver satellite video signals to more than one IRD within a multiroom building such as house or hotel. A conventional satellite video distribution system including an ODU and multiple IRDs is depicted below in Figure 1 of the '576 patent.



**Figure 1 - Video Signal Distribution System (AAPA).**

The '576 patent explains that under the "conventional" approach, requiring separate cables between the ODU and each IRD was inconvenient when adding additional IRDs to new locations within a building. (Ex.1001-'576 patent, 1:44-54.) As Dr. Schonfeld notes, the '576 patent's purported solution draws on known techniques, including those summarized in the table above, to transmit desired channels as a combined signal that is outputted to all IRDs. Specifically, the '576 patent teaches "selecting" requested satellite signals (*e.g.*, selecting transponder signals from a broadband LNB output signal), "translating" those transponder

PTAB Case No. IPR 2023-00391
U.S. Pat. No. 7,130,576

signals to various frequencies for transmission within an intermediate frequency

("IF") signal, and "combining" the selected, translated transponder signals into a

composite IF signal for output to all IRDs. (Ex.1001-'576 patent, 2:54-3:4; Ex.1002-

Schonfeld, ¶89.)

The '576 patent's process for creating a "composite signal" is illustrated in

Figure 5 below.



**Figure 5 - The '576 Patent's Composite Signal**

Here, each numbered frequency block represents a transponder channel

having a transponder signal comprising one or more television channels. The

transponder channels are grouped together into four satellite signals (*i.e.*, broadband

EXHIBIT B

LNB outputs), labeled A-D, that correspond to the satellite hardware (*i.e.*, transponder) and signal polarization (*i.e.*, left- or right-polarity) of the satellite signals received by the feedhorns on the satellite antenna. (Ex.1002-Schonfeld, ¶91.) Upon receiving these four satellite signals, selected transponder channels from the broadband LNB output signals are combined into a "composite" IF signal having a frequency range of 950 to 1450 MHz. (Ex.1001-'576 patent, 7:32-39.) Figure 9 depicts system components for selection, translation, and combination to create the composite IF signal. (Ex.1002-Schonfeld, ¶91.)



**Figure 9 - Tuners and Upconverters Used to Select and Combine Channels.**

Figure 9 illustrates that each LNB output signal carries frequencies corresponding to particular satellite transponder channels that communicate video data. Desired transponder channels are selected by tuners 930. (Ex.1001-'576 patent, 8:65-9:25.) The frequency range for selected satellite transponder channels is shifted by up converters 940. (Ex.1001-'576 patent, 8:65-9:25.) Finally, all channels selected for distribution are combined into a composite signal for distribution over cable 970. (Ex.1001-'576 patent, 8:65-9:25.)

The '576 patent teaches that the tuning, upconverting, and combining depicted in Figure 9 is performed in the "digital domain"—that is, by a digital signal processor performing functions that are the digital equivalent of long-used analog signal processing techniques.[2] (Ex.1001-'576 patent, 10:60-63; Ex.1002-Schonfeld, ¶93.) However, nearly a decade before the '576 patent's 2001 priority date, the book "Communication Services Via Satellite" (1992)—part of the AAPA—touted the

---

[2] Importantly, the concept of selecting, extracting, and combining the broadband signal in the *digital domain* was not recited by the '576 application claims during prosecution. Instead, the claims were amended during reexamination to recite "*digitizing the plurality of satellite broadband signals*" to distinguish over prior art. (*See* §V.B.2, *infra*.)

"considerable advantages gained by changing to the digital concept," including to increase bandwidth, minimize error, and optimize distribution. (Ex.1010, 104-05; Ex.1002-Schonfeld, ¶93.) Moreover, the '576 patent expressly recognizes that conventional distribution system already operated in the digital domain. For example, QPSK—a digital signal modulation technique—was the "dominant modulation type in direct broadcast satellite systems" (Ex.1001-'576 patent, 1:54-57), and the received transponder channels carried multiplexed streams of video programs encoded using MPEG, a digital encoding method (Ex.1001-'576 patent, 9:26-33; Ex.1002-Schonfeld, ¶93.)

The '576 patent purports to use what it expressly admits are known digital equivalents of analog signal processing, including digital filtering to select a signal instead of tuning (which the patent describes as "well known"), digital mixing to frequency shift a signal instead of analog mixing via an oscillator, and digitally combining to create a composite signal in lieu of an analog signal combiner such as a summer. (Ex.1001-'576 patent, 5:12-6:18; Ex.1002-Schonfeld, ¶94.) As Dr. Schonfeld explains, and as admitted by the '576 applicant, each of these digital equivalents were known in the art and within the skill of a POSITA to incorporate into digital signal processing. (Ex.1002-Schonfeld, ¶94 & §§IV.E-F; *see* §IV, *supra*.)

PTAB Case No. IPR 2023-00391
U.S. Pat. No. 7,130,576



FIG. 9

EXHIBIT B



**FIG. 3**

**Figures 3 and 9 - Signal Selection, Frequency Translation, and Signal Combination in the Analog (Fig. 9) and Digital (Fig. 3) Domains.**

Because the transponder signals are received on an analog carrier, the digital signal processing embodiment requires the step of creating a digital representation of the analog signal. (Ex.1002-Schonfeld, ¶95.) And because the existing IRDs were configured to receive transponder signals in the format output by the LNB (*i.e.*, as an analog carrier signal typically modulated in QPSK), the digital signal processing further required converting the digital signal back to analog. (Ex.1002-Schonfeld, ¶95.) These steps are shown in Figure 3 by the "analog to digital" ("A/D") and "digital to analog" ("D/A") converters 330 and 350, respectively. (Ex. 1002-Schonfeld, ¶95.)

PTAB Case No. IPR 2023-00391
U.S. Pat. No. 7,130,576

## B.   The Prosecution History

The '576 patent claims priority to multiple provisional patent applications, the earliest of which was filed November 7, 2001. (Ex.1001-'576 patent, Cover.)

### 1.   Original Prosecution

The Examiner initially rejected all claims as anticipated by Williams-873, and/or rendered obvious by Williams-873 in combination with U.S. Patent No. 6,493,873 ("Seo"). (Ex.1006-'576 FH, 85.) The applicant distinguished over Williams-873 by arguing that "[a]n important distinction between applicant's invention and the Williams reference is that Williams uses transmodulation where the applicant's invention does not transmodulate." (Ex.1006-'576 FH, 85-86.) Applicant also distinguished over Williams-873 by amending the claims to require "wherein the modulation of the transponder signal is not altered by the steps of selecting, combining, and transmitting." (Ex.1006-'576 FH, 83, 85.)

Apparently persuaded by these arguments, the examiner dropped Williams-873 as a primary reference and rejected all claims as either anticipated by Shah (U.S. Patent No. 6,441,767), or obvious in view of Shah and other references, including Williams-873 for various dependent claims. (Ex.1006-'576 FH, 96-104.) Once again, applicant amended the claims to distinguish over the Shah-based rejections. In pertinent part, the claim amendments included "*in the ODU, selecting a <u>plurality of</u> transponder signals <u>extracted from the received satellite broadband signals,</u>*

EXHIBIT B

*wherein the selecting is* responsive to the transponder request signals." (Ex.1006-'576 FH, 111.) An examiner interview occurred in June 2006 and the claims were subsequently allowed without any further explanation. (Ex.1006-'576 FH, 141-47, 154 (notice of allowance); *see also* Ex. 1002-Schonfeld, ¶¶97-99.)

## 2.    Reexamination of the '576 Patent

In 2007, RF Magic filed an *ex parte* reexamination challenging the validity of the '576 patent. During reexamination, the Patent Office agreed that the "*Eutelsat Installer Guide*" anticipated the '576 patent claims. (Ex.1007-'576 Reexam, 276, 289-92.) Unable to distinguish over *Eutelsat*, Patent Owner was forced to narrow its claims to avoid a finding of invalidity. (Ex.1007-'576 Reexam, 318 (admitting that "the Eutelsat references teach reception systems performing channel selection and combining" including via "reception architectures" that do not involve remodulation, such as "IF-IF conversion"); *see also id.*, 320-21.) This time, Patent Owner amended the claims to recite "digitizing the plurality of satellite broadband signals." (Ex.1007-'576 Reexam, 311.) Patent Owner argued that *Eutelsat* did "not teach or suggest broadband digitization of the incoming signal combined with channel selection from that digitized signal in the digital domain," including the step of "extracting selected channels from the digitized broadband signals in the digital domain." (Ex.1007-'576 Reexam, 320-21.) Claims 1-23 were then found patentable as amended, and new claims 24-42 were added.

Had the Patent Office revisited Williams-873—prior art of record as anticipating the '576 patent claims—it was abundantly clear that Willaims-873 disclosed a broadband signal distribution system embodiment that did <u>not</u> alter the modulation of the transponder signal. (Ex.1003-Williams-873, 4:57-60, 15:15-27; *See* Ex. 1002-Schonfeld, ¶¶148-52.) In light of the general knowledge of a POSITA and conventional techniques and applications of analog signal processing in the digital domain, the '576 patent claims should not have survived reexamination. (*See* Ex. 1002-Schonfeld, ¶¶70-84 and ¶¶100-102.)

### C.    The Alleged Priority Date

For the purposes of this proceeding only, Petitioners assume the '576 patent's priority date is November 7, 2001.

## VI.   CLAIM CONSTRUCTION

Except for the means-plus-function terms recited in claims 8-13 and addressed in Ground 1 below, Petitioners interpret the claims terms according to their plain and ordinary meanings as understood by a POSITA at the time of the invention in view of the specification and the prosecution history. 37 C.F.R. § 42.100 (b); *Phillips v. AWH Corp.*, 415 F.3d 1302, 1312-13 (Fed. Cir. 2005). In the district court litigation, Patent Owner proposed that all terms in asserted claims 14-19, 20-22, 34, and 36-42 be given their plain and ordinary meanings. (Ex.1035-Claim Construction Statement.) Petitioners reserve the right to respond if Patent Owner changes its

PTAB Case No. IPR 2023-00391
U.S. Pat. No. 7,130,576

construction or otherwise defines the "plain and ordinary meaning" associated with a term.

## VII.   LEVEL OF ORDINARY SKILL

As of the alleged November 7, 2001 priority date, a POSITA is a person having at least: i) a bachelor-level degree in electrical engineering, computer engineering, or a related field, and three or more years of experience working in television signal processing and satellite communications; ii) a Master's-level degree in electrical engineering, computer engineering, or a related field, and at least one year of experience in the television signal processing and satellite communications; or iii) a Ph.D.-level degree in electrical engineering, computer engineering, or a related field, and at least some experience in television signal processing and satellite communications. Additional education may substitute for professional experience, and significant work experience may substitute for formal education. (Ex.1002-Schonfeld, ¶¶33-34.)

## VIII.   DESCRIPTION OF THE PRIOR ART

### A.   Williams-873

Williams-873 describes and solves the same problem as the '576 patent—how to deliver video signals to a plurality of IRDs using the same signal. (Ex.1003-Williams-873, Abstract, Fig. 1; Ex.1002-Schonfeld, ¶104.) Williams-873 sought to improve conventional limits on the bandwidth available for video transmission over

EXHIBIT B

"typical cables" and the inability of the prior art to "broadcast a large number of transponder signals associated with one or more satellites over the same cable line." (Ex.1003-Williams-873, 2:36-3:32; *compare with* Ex.1002-'576 patent, 1:55-62; Ex.1002-Schonfeld, ¶104.)

| '576 Patent's Video Distribution Sys. | Williams-873's Video Distribution Sys. |
|---|---|



Williams-873's solution placed a transmodulator between two video sources—a satellite receiver and cable network receiver—that selected and combined signals into a composite signal for transmission over a single cable line for distribution via a cable network 26 within a multi-dwelling unit ("MDU"). (Ex.1002-Schonfeld, ¶105.)

EXHIBIT B

PTAB Case No. IPR 2023-00391
U.S. Pat. No. 7,130,576



**Figure 1 - Signal Distribution System of Williams-873.**

In Williams-873, the transmodulator 20 receives input audio and video signals from a plurality of sources, including broadband satellite television signals 22 and 24 received by antenna 14 and down-converted by LNBs 16. (Ex.1003-Williams-873, 5:59-6:11; *compare with* Ex.1001-'576 patent, 4:28-50.) The transmodulator receives a plurality of transponder request signals from the IRDs located in within the MDU. (Ex.1003-Williams-873, 16:5-11; *compare with* Ex.1001-'576 patent, 3:10-19; Ex.1002-Schonfeld, ¶106.) Each requested transponder signal is selected in and processed by a transmodulator channel of the transmodulator 20. (Ex.1003-Williams-873, 4:16-39; *compare with* Ex.1001-'576 patent, 8:61-63, Fig. 8;

Ex.1002-Schonfeld, ¶106.) An exemplary set of transmodulator channels having a tuner, decoder, packetizer, cable encoder, and upconverter are shown below in Figure 3.



**Figure 3 - Transmodulator 20 Contains a Plurality of Transmodulator Channels.**

The output of each transmodulator channel is shifted to a distinct frequency before being summed by summer 68, and the resulting signal is distributed to the cable network of an MDU over a single cable. (Ex.1003-Williams-873, 10:34-39; *compare with* Ex.1001-'576 patent, 5:31-42, 5:55-6:19, Figs. 14-15; Ex.1002-

Schonfeld, ¶107.)

Importantly, although Williams-873 teaches exemplary transmodulator channels capable of changing the modulation of the selected signal, Williams-873's system does not require transmodulation. For example, Williams-873 explains that "in some cases in which only a few of the selected signals are being distributed, the transmodulator may not need to remodulate the selected signals but may, instead, send these signals over the cable network 26 at the received modulation scheme." (Ex.1003-Williams-873, 7:14-20.) The transmodulator 20 instead can "shift selected ones of the[] [received] signals to different frequencies for transmission over the cable network" without changing modulation. (Ex.1003-Williams-873, 15:15-27; Ex.1002-Schonfeld, ¶108.)

## B.   Pugel

Pugel discloses simultaneously processing a plurality of extracted satellite signals in a digital domain for distribution as a combined signal. (Ex.1004-Pugel, Abstract, ¶6; *compare with* Ex.1001-'576 patent, 4:51-6:19; Ex.1002-Schonfeld, ¶109.) Pugel's receiver 100 "comprises a direct broadcast satellite (DBS) receiver" including an analog processing section 110, for processing the received signal in the 950-1,450 MHz range. (Ex.1004-Pugel, ¶¶15-17; Ex.1002-Schonfeld, ¶109.) The output is then fed to an A/D converter 12 that "receives all … 16 channels" of the received signal "simultaneously and produces at its output a digital bit stream S3

that is representative of the 16 channels in a digital format." (Ex.1002-Pugel, ¶18; *compare with* Ex.1001-'576 patent, 4:51-64, 7:23-31; Ex.1002-Schonfeld, ¶109.) Channel processors 130 receive the digital signal and extract data associated with a particular one transponder channel (*i.e.*, extract a transponder signal). (Ex.1004-Pugel, ¶¶21-26; *compare with* Ex.1001-'576 patent, 5:12-30; Ex.1002-Schonfeld, ¶109.) Pugel teaches that all received transponder channels are processed by the channel processors 130 and combined in a manner for more efficient distribution (*i.e.*, through a network). Alternatively, a subset of received channels are processed by a smaller number of channel processors, the subset selected based on the needs of the system at the time. (Ex.1004-Pugel, ¶¶23, 37-39; *compare with* Ex.1001-'576 patent, 4:48-50, 5:31-42, 5:55-6:19, Figs. 14-15; Ex.1002-Schonfeld, ¶109.)

Pugel teaches several advantages to its digital channel processing receiver 100. For example, it removes the "typical analog conversion stage found in a direct conversion receiver," and "[s]pecifically [avoids] analog mixers and oscillators." (Ex.1004-Pugel, ¶51; Ex.1002-Schonfeld, ¶110.) It also advantageously avoids the "high-cost tuning and processing arrangement" associated with simultaneous channel processing in the analog domain. (Ex.1004-Pugel, ¶52; Ex.1002-Schonfeld, ¶110.)

## IX.    GROUND FOR CHALLENGE

Independent claims 8 and 14 are directed to a system and method for

distributing received satellite signals. Claims 9-13 depend from claim 8, and claims 15-23 and 34-42 depend from claim 14. Because claim 14 and most of its dependents are asserted by Patent Owner in the district court litigation, Petitioners present those claims first.

### A.   Ground 1: Claims 14-23, 34-42 and 8-13 are Obvious over Williams-873 in view of Pugel.

#### 1.   Motivation to Combine

A POSITA would have been motivated to combine the teachings of Williams-873 and Pugel. Both Williams-873 and Pugel are directed to satellite television signal distribution systems and address the same problem—how to optimally process and distribute received signals in view of user needs at a given point in time. (Ex.1003-Williams-873, Abstract; Ex.1004-Pugel, ¶¶3-4.) Moreover, both Williams-873 and Pugel describe receiving, selecting, combining, and distributing satellite signals. Thus, a POSITA would look to these similar and related references to efficiently process and distribute received satellite television channels to multiple users. (Ex.1002-Schonfeld, ¶112.)

Portions of Williams-873's signal distribution system are performed in the digital domain. Specifically, Williams-873 teaches decoding, packetizing, and cable encoding, performed on digital data in the "packet" form that is conventionally used to transmit data over a digital network. (Ex.1003-Williams-873, 9:39-10:39;

PTAB Case No. IPR 2023-00391
U.S. Pat. No. 7,130,576

Ex.1002-Schonfeld, ¶113.) However, the front portion of Williams-873's system, including the tuning (*i.e.*, channel selection), frequency translating, and signal combining, are not conducted in the digital domain. (Ex.1002-Schonfeld, ¶¶113.)

Nevertheless, in view of Pugel, a POSITA would have been motivated to move the point of digitization earlier in Williams-873's distribution system so the digitization would occur prior to channel selection and after an LNB has down-converted received satellite signals so that at least signal selection (and subsequent processing) is performed in the digital domain. (Ex.1002-Schonfeld, ¶¶114-117.)



**Figure 3 - Moving the Point of Digitization in Williams-873 Transmodulator 20 in View of Pugel 120**

EXHIBIT B

More particularly, a POSITA would have been motivated to use the A/D Converters 120 of Pugel—and apply them prior to Williams-873's switches 53 and certainly before tuners 54 (collectively, "signal selection"). (Ex.1002-Schonfeld, ¶¶114-119.) A POSITA would have been further motivated to use known digital signal processing equivalents for the analog signal selection and frequency translation functions taught by Williams-873, including those taught in Pugel. (Ex.1002-Schonfeld, ¶120-21.)

Pugel teaches that the only processing performed prior to the use of A/D Converter 120 is by "analog processor 110" that "produce[s] an output signal S2 suitable for processing by the A/D converter 120." (Ex.1004-Pugel, ¶16.) Therefore, a POSITA would have been motivated to use the teaching of Pugel to insert an analog-to-digital converter (such as A/D Converter 120) as early as possible in Williams-873's signal distribution system, and to substitute in known digital equivalents to the switches 53 and tuners 54 in Williams-873 to obtain the benefits Pugel teaches regarding processing in the digital domain. (Ex.1002-Schonfeld, ¶¶116-19.) Modifying Williams-873 to include A/D converters after down-conversion (as shown above in Figure 3) would have been an obvious location to perform digitization while ensuring compatibility with commonly used satellite receiver/LNBs. (Ex.1002-Schonfeld, ¶¶118-19.)

Pugel teaches that digitizing a received satellite signal prior to channel

selection leads to advantages and efficiencies, including avoiding a "high cost" for analog "tuning and processing arrangement[s]," as the number of channel selectors ("transmodulator channels" in Williams-873) increase. (Ex.1004-Pugel, ¶52; Ex.1002-Schonfeld, ¶119.) Specifically, Pugel teaches that because "[a]ll of the N down-converted channels are included within a digital bit stream," it can be "processed digitally to recover in parallel any of the N original transponder channels." (Ex.1004-Pugel, ¶52.) In contrast to this efficient parallel processing in the digital domain, Pugel teaches that "[i]n an analog system," such capability requires the use of N analog tuners "that cannot be split" and would need to be "ganged together." (*Id.*) This disclosure in Pugel would further motivate a POSITA to implement in the digital domain the functionality of Williams-873 analog switches 53, tuners 54, and variable frequency upconverter 66, because such a skilled artisan would have known that the digital equivalent of each were generally more efficient, reliable, flexible, and less expensive than their analog counterparts, as taught in Pugel. (Ex.1002-Schonfeld, ¶¶120-22 (discussing undergraduate-level textbook authority from the 1990's).)

Digitizing before signal selection and performing signal selection and translation functions in the digital domain were within the general knowledge of a POSITA and would have been implemented by a POSITA with a reasonable expectation of success using known components to make Williams-873's system

– 28 –

more economical. (Ex.1002-Schonfeld, ¶122.) Indeed, during the *ex parte* reexamination, the Office found that "using a[n] … analog to digital converter would have been part of the ordinary capabilities of a skilled artisan and there would have been a reasonable expectation of success based on similar uses of" analog to digital converters "in the same technological area." (Ex.1007-'576 Reexam, 297; Ex.1002-Schonfeld, ¶122).)

## 2.    Independent Claim 14

*14[pre] "A method of communicating a plurality of transponder signals from a satellite outdoor unit (ODU) that receives a plurality of satellite broadband signals to an integrated receiver decoder (IRD) over a single cable connected to the ODU, the method comprising the steps of:"*

To the extent the preamble is limiting, Williams-873 teaches it.

Williams-873 discloses a *method of communicating a plurality of transponder signals from a satellite ODU that receives a plurality of satellite broadband signals*. (Ex.1002-Schonfeld, ¶124.) Williams-873 discloses that main signal receiver 14 and transmodulator device 20—collectively the *satellite ODU*—are responsible for receiving and processing a plurality of satellite signals 22/24 and then communicating a composite signal to an IRD in a multi-dwelling unit. (Ex.1003-Williams-873, Abstract (system includes "a main receiving antenna that receives a broadband video/audio/data signal having a number of individual program multiplex signals therein."), 3:50-4:3 ("[A] receiving antenna receives a broadband signal

from, for example, a satellite … [a] transmodulator … transmits this transmodulated signal … a communication channel, such as a cable"), 5:59-6:11 ("The signal distribution system 10 includes a main signal receiver 14 disposed on, for example, the roof of an MDU or any other location capable of receiving a signal transmitted by a satellite or other signal source."), Fig. 1.)



**Figure 1 - Williams-873's Signal Distribution System.**

Figure 1 of Williams-873 further illustrates that the *communicated transponder signals* are directed to *at least one IRD* (*i.e.*, MDU IRDs 30, 32, 34, 36,

EXHIBIT B

38 or 40) *over a single cable connected to the ODU*.[3] (Ex.1002-Schonfeld, ¶125.) "The transmodulator 20" places "transponder signals on a cable plant or cable network 26 within an MDU for distribution to a number of IRDs." (Ex.1003-Williams-873, 6:12-34, 10:24-39 ("A summer 68 then combines these upconverted transmodulated signals with each other … for propagation over the cable network 26 of Fig. 1."), claim 14 ("The signal distribution system of claim 9, wherein the main transmitter transmits the combined signal to the individual receivers over a cable …").)

Accordingly, Williams-873 discloses this limitation.

---

[3] In its infringement contentions in co-pending district court litigation, Patent Owner appears to interpret "over a single cable to the ODU" to mean that the composite signal is first transmitted from the ODU into a house/MDU over a single cable before being "split" onto multiple other cables connecting each IRD to the ODU, meaning that in direct contrast to the express claim language—at least two cables are required. While DISH does not necessarily agree with this applied construction, DISH applies it for the purposes of this IPR, since the Williams-873 configuration mirrors it exactly.

*14[a] "communicating a transponder request signal to the ODU
from the IRD;"*

Williams-873 discloses this limitation. (Ex.1002-Schonfeld, ¶127.) Williams-873's *IRDs* "receive[] satellite signal requests from a user and then send[] requests to the transmodulator 20" of the ODU "to have the requested transponder signals … transmitted to the IRD via cable network 26" (*i.e.*, *communicate transponder request signals*). (Ex.1002-Williams-873, Figure 1 elements 30, 32, 34, 36, 38 or 40, 16:5-11, Abstract ("receiver units send requests for user-selected ones of the individual program multiplex signals to the transmodulator device"), 4:33-38 ("The signal distribution system also includes a request receiver that receives a request signal from each of the individual receivers, ...").) Specifically, *the transponder request signals* are received by a transmodulator control unit 72 of *the ODU*, which may be a microprocessor that controls subsequent signal processing by the transmodulator 20. (Ex.1003-Williams-873, 10:53-11:21; Ex.1003-Schonfeld, ¶127.)

*"in the ODU …"*

Each of limitations 14[b][1]-[3] is performed by Williams-873's transmodulator 20 as modified in view of Pugel. Williams-873's receiver 14 and transmodulator 20 are the claimed ODU, such that each of elements recited in limitation14[b][1]-[3] are performed in the ODU. *See* limitation 14[pre], *supra*.

During prosecution of the '576 patent, applicant attempted to distinguish

Williams-873 based on a narrow interpretation of the claimed *ODU*. (Ex.1006-'576 FH, 85-86; Ex.1002-Schonfeld, ¶¶129-30.) To the extent Patent Owner repeats that argument here, the combination of Williams-873 and Pugel would nonetheless render that interpretation obvious.

Specifically, Applicant stated that "[d]ue to the complexity, size, and power consumption of the Williams-873 approach, it is not suitable for installation in the outdoor unit (ODU), where applicant's invention is installed in the outdoor unit"—apparently contending that the claimed ODU must be integrated in the signal receiver (*i.e.*, dish) to perform the claimed signal selection and combination. (Ex.1006-'576 FH, 85-86; Ex.1002-Schonfeld, ¶130.) Under this interpretation, it would have been obvious in the modified system of Williams-873 in view of Pugel to include the transmodulator within a single integrated receiver. (Ex.1002-Schonfeld, ¶130.) As Pugel recognizes, switching from analog tuners (taught in Williams) to digital tuners reduces complexity, prevents "high cost," and thus avoids issues related to power necessary to amplify and split a signal between multiple analog tuners. (Ex.1004-Pugel, ¶52; Ex.1002-Schonfeld, ¶130.) Indeed, Pugel teaches that its entire signal processing system, including analog to digital converter, digital tuner, and digital frequency translator, is part of a single satellite receiver 100. (Ex.1004-Pugel, ¶15, Ex.1002-Schonfeld, ¶130.) A POSITA would have been motivated by Pugel to integrate the signal processing steps within a single receiver

to reduce components and potential fault points and would have had a reasonable expectation of success in doing so. (Ex.1002-Schonfeld, ¶130.) Accordingly, to the extent Williams-873 alone does not meet the narrower interpretation of an ODU, it would have been obvious based on the combination of Williams-873 and Pugel.

### 14[b][1] *"digitizing the plurality of satellite broadband signals"*

This limitation would have been obvious to a POSITA based on Williams-873 in view of Pugel. As discussed, Williams-873 does not expressly disclose digitizing the plurality of satellite broadband signals, but Williams-873's system does operate in the digital domain when it decodes into digital data packets the signals selected by the analog tuner. (§IX.A.1, *supra*; Ex.1002-Schonfeld, ¶131.) Nevertheless, in view of Pugel, it would have been obvious to modify Williams-873 to *digitize the plurality of satellite broadband signals* (*i.e.*, all of the signal received by a satellite dish) before any signal processing, including signal selecting. (Ex.1002-Schonfeld, ¶131.)

Pugel teaches using analog to digital converters for "directly converting a plurality of carrier signals," *satellite broadband signals*, "into a digital data stream." (Ex.1004-Pugel, ¶6; Ex.1002-Schonfeld, ¶132.) Analog-to-digital converters (A/Ds) allow for conversion of all received signals for subsequent digital processing, which, as Pugel explains, provides cost and complexity advantages by allowing filtering for select signals in the digital domain, relative to a system using filtering select signals

in the analog selection like Williams-873. (Ex.1004-Pugel, ¶¶18, 52; Ex.1002-Schonfeld, ¶132.) It was generally known to a POSITA that performing signal processing in the digital domain would lead to well known advantages, including but not limited to (1) increased distribution bandwidth, (2) error minimization, and (3) optimized distribution. Indeed, the '576 patent admits that these digitization advantages were well within the knowledge of a POSITA and used in satellite distribution systems a decade before its priority date. (Ex.1009-AAPA-Communication Services Via Satellite, 104-05; Ex.1002-Schonfeld, ¶133.) Even during reexamination of the '576 patent, the Office recognized the benefits and predictable success of using analog-to-digital converters in the context of communications and signal processing. (Ex.1007-'576 Reexam, 297). Indeed, Williams-873 expressly teaches chips and integrated circuits capable of digitizing a received analog QPSK signal that are used in the transmodulator 20, but only after signal selection. (Ex.1003-Williams-873, 12:48-65; §IX.1.A, *supra*; Ex.1002-Schonfeld, ¶133.) Therefore, as Dr. Schonfeld opines, a POSITA would have had a reasonable expectation of success of digitizing the plurality of satellite broadband signals received by Williams-873's system before selecting, extracting and combining the selected transponder signals ultimately transmitted. (Ex.1002-Schonfeld, ¶133.)

Accordingly, *digitizing the plurality of satellite broadband signals* would

PTAB Case No. IPR 2023-00391
U.S. Pat. No. 7,130,576

have been obvious to a POSITA based on the combination of Williams-873 and Pugel.

> *14[b][2] "selecting and extracting a plurality of transponder signals from the received satellite broadband signals, wherein the selecting is responsive to the transponder request signals;"*

Williams-873's transmodulator includes a plurality of tuners 54 that are part of the "transmodulator channel" and responsible for *selecting and extracting* a *transponder signal from the received satellite broadband signals*. (Ex.1003-Williams-873, 4:16-39, 9:28:39.)



**Figure 3 - Each Row of Processing is a Transmodulator Channel of Williams-873's Transmodulator 20.**

EXHIBIT B

In Williams-873's Figure 3, tuners 54 *select and extract* the transponder signals. Specifically, each tuner 54 "tunes to one of the transponder signals associated with" the received digital broadband satellite signals. (Ex.1003-Williams-873, 9:40-48.) Williams-873 described in detail that each tuner selects a transponder from either the RHCP 22 or LHCP 24 signal, each a *received satellite broadband signal*. (Ex.1003-Williams-873, 9:40-48; Ex.1002-Schonfeld, ¶136.) The tuner simultaneously "filter[s] out the other 15 transponder signals within that band, to produce a 24 MHz-wide, QPSK-modulated signal corresponding to a *selected* one" of the received *transponder signals*. (Ex.1003-Williams-873, 9:40-48 (emphasis added); Ex.1002-Schonfeld, ¶136.)

In the modified system of Williams-873 and Pugel, each of the *received satellite broadband signals* is digitized prior to tuning, and thus digital tuners (such as the mixer 132 and decimator/filter 134 taught in Pugel) are used in place of Williams-873's analog tuners 54. Both the digital mixer 132, which uses a numerically controlled oscillator (NCO) signal, and the digital decimator/filter 134, were known in the art for performing the digital equivalent of tuning/filtering functions even before they were disclosed in Pugel. (Ex.1002-Schonfeld, ¶137.)

As explained above and by Dr. Schonfeld, a POSITA would have been motivated to obtain the advantages of digital tuning and would have had a reasonable expectation of success incorporating the digital tuners into Williams-873's

distribution system. (§IX.A.1, limitation 14[b][1], *supra*; Ex.1002-Schonfeld, ¶138.) Indeed, Pugel expressly teaches using digital tuners to "extract from the digital data stream data carried by" a carrier signal (*i.e.*, from the digitized *satellite broadband signals*). (Ex.1004-Pugel, ¶¶5-6; Ex.1002-Schonfeld, ¶138.) This is the same purpose for *extracting* as described in the '576 patent: taking digital data associated with a subset of a complete signal for further processing without the rest of the signal. (Ex.1001-'576 patent, 3:5-9 ("LNB outputs can be sampled by a broadband A/D converter and filtered with a digital filter to select a transponder channel. Alternatively, a tuner can select a transponder channel. The selecting process extracts from the wide band LNB output a narrow band transponder channel."); Ex.1002-Schonfeld, ¶138.) And use of a digital tuner to select and extract transponder signals would not alter the modulation of the selected transponder signals, as is required in limitation 14[d]. (Ex.1002-Schonfeld, ¶138.)

Williams-873 further teaches that the transponder signal selection *is responsive to the transponder request signals*. (Ex.1002-Schonfeld, ¶139.) Williams-873's transmodulator 20 and its control unit 72 "receive[] and decode[] requests for … satellite signals" (*transponder request signals*) "from each of the IRDs 30-40 that are active." (Ex.1003-Williams-873, 6:35-42.) Under the control of control unit 72, tuners 54 then "tune[] to … only those selected satellite or transponder signals." (Ex.1003-Williams-873, 6:35-42, 10:53-11:5 ("control unit 72

… preferably controls … the tuners 54."), 11:6-16 ("[T]he control unit 72 assimilates all of the satellite signal requests received from the IRDs 30-40, determines which of the satellite signals or transponder signals must be decoded to satisfy these requests and controls a different one of the transmodulator channels" which process the "so-determined transponder signals for transmission over the cable network 26.").) As part of modifying Williams-873 to include a digital tuner (as taught in Pugel), a POSITA would have been motivated to maintain that transponder signal selection *is responsive to the transponder request signals* to ensure that IRDs receive desired transponder signals while avoiding further processing of signals that are not desired (which would have been wasteful). (Ex.1002-Schonfeld, ¶139.)

Accordingly, the combination of Williams-873 and Pugel renders obvious *selecting and extracting a plurality of digitized transponder signals from the received satellite broadband signals, wherein the selecting is responsive to the transponder request signals*.

> 14[b][3] *"combining extracted selected transponder signals into a composite signal;"*

Williams-873's "summer 68 [] *combines*" the *extracted selected* "*signals* with each other and with any desired frequency-shifted or non-frequency-shifted terrestrial signals (delivered by a level shifter 70) for propagation over the cable network 26 of FIG. 1." (Ex.1003-Williams-873, 10:24-39 (emphasis added); 4:29-

PTAB Case No. IPR 2023-00391
U.S. Pat. No. 7,130,576

33 ("A combiner combines the multiplicity of transmodulated signals at different carrier frequency bands to produce a combined signal and a transmitter transmits the combined signal over the communication channel to the individual receivers."); *see also* Ex.1002-Schonfeld, ¶141.). As shown Willaims-873's Figure 3, summer 68 of transmodulator 20 combines all selected transponder signals into a composite signal. (Ex.1002-Schonfeld, ¶141.).



**Figure 3 - Transmodulator 20 Includes Summer 68.**

The output of summer 68 is the claimed *composite signal*. (Ex.1002-Schonfeld, ¶142.)

EXHIBIT B