Because Williams-873's IRDs are configured to receive analog RF, and not digital, signals, the composite signal transmitted to the IRDs must be an analog RF signal. (Ex.1002-Schonfeld, ¶143.). A POSITA would have understood when combining Williams-873 and Pugel that there are two options to ensure that the digitized selected and extracted transponder signals were provided for distribution as analog RF signals. First, a POSITA could use Williams-873's analog summer 68 but would need to convert each selected and extracted transponder signal from digital to analog prior to summing. (Ex.1002-Schonfeld, ¶143.) Second, and alternatively, a POSITA would have known to replace Williams-873's summer 68 with a digital combiner—as taught in Pugel—and convert the output of the digital combiner into an analog RF signal for distribution. (Ex.1004-Pugel, ¶45; Ex.1003-Schonfeld, ¶143.) Each implementation would have been well within a POSITA's general knowledge and would provide tradeoffs and advantages. (Ex.1002-Schonfeld, ¶143.) As Dr. Schonfeld explains, the first option permits use of Williams-873's analog summer but requires a plurality of digital-to-analog converters prior to summation, while the second option requires replacing the summer with a digital equivalent (as taught in Pugel), but beneficially requires only one digital to analog converter following signal summation. Either of these options would have been obvious implementation and design choices, and neither would result in altering the modulation of the selected transponder signals, as is required in

limitation 14[d]. (Ex.1002-Schonfeld, ¶143.)

Accordingly, *combining extracted selected transponder signals into a composite signal* is obvious over Williams-873 and Pugel.

> *14[c] "transmitting the composite signal over the single cable from the ODU to the IRDs,"*

Williams-873's transmodulator 20 transmits its output containing the selected transponders "over a communications channel, ***such as a cable***, … to a number of individual receiver units [IRDs] within [a multi-dwelling unit]." (Ex.1003-Williams-873-873, 3:40-4:3 (emphasis added).) The transmission originates at the summer 68 in transmodulator 20, which is part of the ODU or would have been obvious to include in the ODU. (*See* limitations 14[*a*]-[*b*], *supra*; Ex.1004, 10:24-39, Fig. 3; Ex.1002-Schonfeld, ¶145.) The transmission reaches the individual IRDs via a cable network 26 within a multi-dwelling unit, also called a cable plant. (Ex.1003-Williams-873, 10:24-39, Ex.1002-Schonfeld, ¶145.) Figure 1 of Williams-873 shows the transmission by the transmodulator 20 to a plurality of MDU IRDs originating on a single cable. *See* Footnote 3, *supra*.



**Figure 1 - Signal Distribution System of Williams-873.**

The transmission taught in Williams-873 would not result in altering the modulation of the selected transponder signals transmitted on the composite signal, as is required in limitation 14[*d*]. (Ex.1002-Schonfeld, ¶146.)

Accordingly, Williams-873 discloses *transmitting the composite signal over the single cable from the ODU to the IRDs.*

> 14[d] *"wherein the modulation of the transponder signal is not altered by the steps of selecting, combining, and transmitting."*

In direct contrast to applicant's mischaracterization of Williams-873 during prosecution of the '576 patent, Williams-873 does in fact expressly disclose a broadband signal distribution system that **does not *alter*** *the modulation of the*

*transponder signal.* While Williams-873 teaches various embodiments where selected signals are transmodulated prior to combining in many instances, Williams-873 also expressly discloses an alternative embodiment where transmodulation is not required. For example, Williams-873 expressly states that "in some cases, [where] only a few of the selected channels are being distributed, the transmodulator may not need to remodulate the selected signals." (Ex.1003-Williams-873, 7:15-23 (emphasis added).) Williams-873 further explains that "transmodulator 20 need not remodulate the received transponder signals, but may, instead, shift selected ones of these signals to different frequencies for transmission over the cable network 26." (Ex.1003-Williams-873, 4:57-60, 15:15-27; Ex.1002-Schonfeld, ¶148.)

Williams-873 goes on to articulate the tradeoffs associated with the alternative embodiment and explained that:

> This configuration only reduces the bandwidth used by the signals transmitted over the cable network to the extent that it eliminates some of the received satellite transponder signals. Thus, the more received satellite transponder signals that are to be sent to the IRDs 30-40, i.e., the more transmodulator channels there are, the less viable this option becomes.

(Ex.1003-Williams-873, 15:20-27.) In other words, transmission of the selected signals by shifting the frequency bands, but without remodulation, benefits from bandwidth reduction by the selection of the received signals only and does not gain any further bandwidth reduction due to the remodulation scheme employed.

(Ex.1002-Schonfeld, ¶149.) Therefore, Williams-873's alternative embodiment is only possible in circumstances when the available bandwidth is sufficient to accommodate a limited number of selected signals in their existing modulation format; however, as Dr. Schonfeld explains, the "limited number" of selected signals could easily encompass twenty-plus transponder signals, each containing a plurality of television programs. (Ex.1002-Schonfeld, ¶¶149.) The use cases are, as Williams-873 use of the word "few" might otherwise suggest, not so narrow.

Williams-873 also explains that, although this alternative approach may not realize the potential bandwidth reduction offered by remodulation, it benefits from having a simpler, lower-cost system because, "in this case, each transmodulator channel would [only] need to include a tuner and a frequency shifter" and would not require the complexity associated with remodulation. (Ex.1003-Williams-873, 15:18-20.) This is consistent with the goal of Williams-873 which states that "[t]he present invention relates to a low-cost system and method for distributing a set of programs multiplexed A-V signals ... to a multiplicity of receiver units within one or more MDUs using an MDU cable network or other transmission channel." (Ex.1003-Williams-873, 3:50-54.)

In the '576 prosecution history, the applicant completely ignored that this alternative embodiment does not require remodulation when the number of users is relatively small. In fact, the rationale that it provided for the advantages of the

EXHIBIT B

alleged claimed invention compared to Williams-873 (simplicity of hardware and reduced cost with a small number of users) is precisely the reason a POSITA would be motivated to use the alternative non-remodulating embodiment in Williams-873 in the same circumstances. (Ex.1002-Schonfeld, ¶151.)

When read in full and dismissing the '576 Applicant's mischaracterizations, Williams-873 undeniably discloses a system *wherein the modulation of the transponder signal is not altered by the steps of selecting, combining, and transmitting.* (Ex.1002-Schonfeld, ¶152.) And, as discussed above in limitations 14[b][2], 14[b][3], and 14[c], and by Dr. Schonfeld, the modifications made in view of Pugel–the use of a digital tuner/filter to select and extract, and possibly a digital combiner to combine selected extracted transponders in the digital domain–likewise do not alter modulation. (Ex.1002-Schonfeld, ¶152.)

In conclusion, independent claim 14 is rendered obvious based upon the combination of Williams-873 and Pugel.

### 3.    Dependent Claim 15

*The method of claim 14 wherein the step of selecting and extracting a transponder signal comprises the step of: filtering a transponder signal with a band pass filter having a bandwidth ranging from 5% to 100% wider than the bandwidth of the transponder signal.*

Pugel teaches using decimator/filter 134 as part of channel selection to "remove" "non-desired channel energy" to "retain only the channel energy

associated with a specific desired channel." (Ex.1004-Pugel, ¶23.) Because Pugel's signal selection occurs in the digital domain, a POSITA would understand decimator/filter 134 is a digital filter. (Ex.1002-Schonfeld, ¶154.) A POSITA would also understand Pugel's disclosure of decimator/filter 134 to be a bandpass filter (specifically, a "*low pass filter*"), as it allows the transponder signal located at baseband to pass through but filters out signals at a higher frequency. (Ex.1002-Schonfeld, ¶154.)

As discussed above in limitation 14[b][1], a POSITA would have known to replace Williams-873's analog tuner 54 with Pugel's digital bandpass filter. Williams-873 already teaches that as part of selecting and extracting in the analog domain, transmodulator 20 "filter[s] out the other 15 transponder signals within that band" leaving a single signal "corresponding to a selected" one transponder signal. (Ex.1003-Williams-873, 9:40-48.) The filtering by Williams-873's analog tuner 54 is the equivalent in the analog domain to Pugel's mixer 132 decimator/filter 134 operating in the digital domain. (Ex.1002-Schonfeld, ¶155.*)* After incorporating Pugel's teaching of digitizing the broadband satellite signal prior to selecting and extracting, it would have been obvious (if not necessary) to modify Williams-873's filter to operate as digital bandpass filter. (Ex.1002-Schonfeld, ¶155.) A POSITA would have had a reasonable expectation of success in incorporating a digital bandpass filter as part of channel selection. (Ex.1002-Schonfeld, ¶155.)

To be sure, the '576 patent concedes that "digital filtering," including "applying a band pass filter transfer function to the broadband signal to isolate a single transponder channel," used "known digital architectures" and was "well known in the digital signal processing field." (Ex.1001-'576 patent 5:12-29.) And during the *ex parte* reexamination, the Office also acknowledged that "using a digital filter … would have been part of the ordinary capabilities of a skilled artisan and there would have been a reasonable expectation of success based on similar uses of" digital filters in the "same technological area." (Ex.1007-'576 Reexam, 297.)

It would have further been obvious to modify Williams-873 so that the *digital bandpass filter* adopted from Pugel has *a bandwidth ranging from 5% to 100% wider than the bandwidth of the transponder signal* being selected. A POSITA would have been motivated to leave a buffer to ensure that the entire transponder signal is selected as insurance against potential signal processing inconsistencies upstream (*e.g.*, down-converting inconsistencies by the LNB whereby it shifts a desired transponder signal to a slightly different center frequency than desired). (Ex.1002-Schonfeld, ¶157.) Setting the filter at least 5% wider than the transponder signal bandwidth would accomplish this goal. (Ex.1002-Schonfeld, ¶157.) As Dr. Schonfeld explains, typically there is an empty frequency band on either side of a transponder (a "guard band") to avoid interference, so filtering for a frequency range slightly broader than the transponder signal could be performed without selecting

any part of an adjacent transponder signal. (Ex.1002-Schonfeld, ¶157.) Indeed, the '576 patent explains that "typically" a 500 MHz satellite signal contains 16 transponder signals of 24 MHz, leaving 118 MHz for guard bands, approximately 7.25 MHz per transponder (30% of transponder bandwidth). (Ex.1001-'576 patent, 1:44-54; Ex.1002-Schonfeld, ¶157.)[4] Pugel teaches guard bands of 5.16 MHz, approximately 21% of transponder signal bandwidth. (Ex.1004-Pugel Figs. 2A-2B; Ex.1002-Schonfeld, ¶157.)

Accordingly, claim 15 is obvious over Williams-873 in view of Pugel.

---

[4]In response to an office action rejecting claim 15 based on Williams-873, applicant misrepresented to the Patent Office that "[t]he bandpass filtering of Williams-873 is 500 MHz wide and spans all transponders output from one polarization of the LNB." (Ex.1006-'576 FH, 88-89.) As noted above, Williams at 9:40-48 discloses that transmodulator 20 filters out all but a selected transponder signal, meaning that Williams teaches a filter of approximately the size of a transponder channel (on the order of 20-30 MHz), not 500 MHz. (Ex.1002-Schonfeld, ¶157, n. 3.)

PTAB Case No. IPR 2023-00391
U.S. Pat. No. 7,130,576

### 4. Dependent Claim 16

*The method of claim 14 wherein the step of combining comprises frequency translating the selected and extracted transponder channels to a variable frequency before combining.*

In Williams-873, the output of a plurality of transmodulator channels—each row of Figure 3 including selection and extraction of a transponder signal by a tuner 54—ultimately reaches a "*variable frequency* upconverter 66." (Ex.1003-Williams-873, 9:28-39, 10:24-39.)



**Figure 3 - Transmodulator 20 Includes Variable Frequency Upconverter 66.**

Variable frequency upconverter 66 "upconverts each of up to eight groups of

EXHIBIT B

… signals to a different carrier frequency band." (Ex.1003-Williams-873, 10:24-39; Ex.1003-Schonfeld, ¶160.) Williams-873 teaches that variable frequency upconverter 66 may be under the control of control unit 72, which "control[s] the frequencies at which the [] signals … are transmitted over the cable network 26," *i.e.*, on the composite signal. (Ex.1003-Williams-873, 11:36-40; Ex.1002-Schonfeld, ¶160.) The variable frequency converter 66 is part of the *step of combining*, as it sits between one set of summers 64 (*combiners*) and the final summer 68, which combines selected and extracted transponder signals to form the *composite signal*. (Ex.1002-Schonfeld ¶160.) Accordingly, claim 16 is obvious over Williams-873 in view of Pugel.

### 5. Dependent Claim 17

*The method of claim 15 further comprising frequency translating the selected transponder channels to a predetermined frequency before combining.*

Williams discloses this limitation in two ways. First, Williams-873 teaches that as part of selecting and extracting (*i.e.*, before combining), each tuner 54 "may shift the tuned 24 MHz-wide, QPSK-modulated signal down to baseband." (Ex.1003-Williams-873, 9:47-48.) A POSITA would understand translation to baseband (*i.e.*, a frequency near zero) is a *translation of the selected transponder signals to a predetermined frequency*. (Ex.1002-Schonfeld, ¶161.)

Second, Williams-873 teaches that each *selected transponder signal* is

PTAB Case No. IPR 2023-00391
U.S. Pat. No. 7,130,576

frequency translated by an upconverter 62 *prior to being combined* by summers 64 and 68. Williams-873 explains that each upconverter 62 "shifts" the selected transponder signal "to an intermediate frequency (IF), preferably comprising one of four different carriers IFs used by the transmodulator 20." (Ex.1003-Williams-873, 10:16-23.) As shown in Figure 3, each summer 64 is fed by four transmodulator channels (*i.e.*, each row in Figure 3). (Ex.1002-Schonfeld, ¶162.)



**Figure 3 - Each Transmodulator Channel of Transmodulator 20 includes Upconverter 62.**

In view of this disclosure, a POSITA would understand that Williams-873

EXHIBIT B

preferably teaches that each of the four transmodulator channels feeding a given summer 64 upconverts (*frequency translates*) to a fixed one of the four carrier IFs, and thus, to a *predetermined frequency before combining*. (Ex.1002-Schonfeld, ¶163.) Accordingly, claim 17 is obvious over Williams-873 in view of Pugel.

### 6.    Dependent Claim 18

*The method of claim 14 further comprising the step of splitting the composite signal inside a home and distributing to a plurality of IRDs.*

Williams-873 teaches that its "combined signal" (*composite signal*) is transmitted over a "communications channel" (*e.g.*, coaxial cable) to a plurality of "individual receivers" (*IRDs*) within a multi-dwelling unit, defined as "any [] type of building or structure in which multiple signal receivers may be located." (Ex.1003-Williams-873, 4:22-32, 4:50-5:5, 5:57-58.) As shown in Figure 1, the composite signal enters the MDU plant (the network of cables within the MDU, such as a home) on a single cable. (Ex.1003-Williams-873 3:50-54; Ex.1002-Schonfeld, ¶164; *see also* Footnote 3, *supra*.)



**Figure 1 - Williams-873's Video Distribution System.**

A POSITA would understand that for the signal originating on the single cable to be distributed to a plurality of IRDs within the home, was usually over transmitted over multiple cables inside the multi-dwelling unit—one terminating at each IRD. Using a splitter to duplicate the signal for output to a plurality of other IRDs was well known in the art. (Ex.1002-Schonfeld, ¶165; *see also* Footnote 3, *supra*.) Accordingly, claim 18 is obvious over Williams-873 in view of Pugel.

### 7.    Dependent Claim 19

*The method of claim 14 wherein the transponder request signal is transmitted over the cable from an IRD and all IRDs receive the same composite signal.*

Consistent with Patent Owner's interpretation of single cable in its infringement contentions (*see* n.3), Williams-873 also discloses that "satellite signal requests" (*transponder request signals*) are transmitted over the cable (*i.e.*, the cable connecting the transmodulator 20 and cable plant 26) from each IRD. (Ex.1003-Williams-873, 10:53-11:5; Ex.1002-Schonfeld, ¶166.) Specifically, Williams-873 teaches that "satellite signal requests may be transmitted from the IRDs 30-40 over the cable network [*i.e.*, plant] 26 at, for example, a dedicated frequency." (Ex.1003-Williams-873, 7:24-47 ("the IRD sends a request to the transmodulator 20 to tune to" and "transmit the requested signal over the cable network 26. This request may be sent via the cable network 26 … the request signal may be sent to the transmodulator using the well-known Multi-Media Cable Network System (MCNS protocol), which provides communication over the same cable as the video signals.").) Because the cable network 26 is connected to the transmodulator 20, a POSITA would understand that transponder request signals from the IRDs are transmitted over the network, particularly in view of Williams-873's disclosure of MCNS. (Ex.1002-Schonfeld, ¶166.)

Williams-873 further discloses that all IRDs receive the same composite

signal. (Ex.1002-Schonfeld, ¶167.) As taught in Williams-873, the "combined signal" is sent by a "transmitter" "over the communication channel" (*i.e.*, cable) "to the individual receivers" (IRDs). (Ex.1003-Williams-873, 4:22-32, 4:60-5:5 ("a further aspect of the present invention" is "a method of distributing a subset of a plurality of individual signals associated with a composite signal to multiple individual receivers.")) Because the composite signal is created based on the requests of the various IRDs (see claim 14, *supra*), a POSITA would understand this disclosure to mean that the composite signal is provided to each IRD so that each receives its requested signal. (Ex.1002-Schonfeld, ¶167.) Accordingly, claim 19 is obvious over Williams-873 in view of Pugel.

### 8.    Dependent Claim 20

*The method of claim 14 wherein the transponder request signal is transmitted over a wireless link to the ODU.*

Williams-873 discloses that the "request to the transmodulator 20 to tune to" a "requested signal" (*transponder request signal*) may be transmitted to the transmodulator 20 "via any desired wireless network." (*i.e., transmitted over a wireless link to the ODU*). (Ex.1003-Williams-873, 7:24-47, 10:53-11:5; Schonfeld ¶168.) Accordingly, claim 20 is obvious over Williams-873 in view of Pugel.

### 9.    Dependent Claim 21

*The method of claim 14 further comprising the steps of: frequency translating the selected transponder channels to a*

> *variable frequency before combining; and splitting the composite signal inside a home and distributing to a plurality of IRDs.*

*See* claims 16 and 19, *supra.*

### 10.    Dependent Claim 22

> *The method of claim 21 wherein the transponder request signal is transmitted over the cable from an IRD.*

*See* claims 14 and 19, *supra.*

### 11.    Dependent Claim 23

> *The method of claim 21 wherein the transponder request signal is transmitted over a wireless link to the ODU.*

*See* claim 20, *supra.*

### 12.    Dependent Claim 34

> *The method of claim 14, wherein selecting and extracting comprises applying a pass band filter transfer function to the digitized broadband signal.*

*See* claim 15, *supra.*

As Dr. Schonfeld explains, to the extent "pass band filter transfer function" has meaning to a POSITA that can be understood in light of the specification, it refers simply to the digital application of a bandpass filter on a digital signal. (Ex.1002-Schonfeld, ¶173; *see also* Ex.1001-'576 patent at 5:12-15 ("Digital filtering 340 is used to select one or more of the transponder output signals. The digital filter may operate by applying a band pass filter transfer function to the

broadband signal to isolate a single transponder channel.").) Pugel discloses using a digital bandpass filter on a digital signal as part of selecting and extracting a signal from a digitized broadband signal, and the '576 patent refers to this "filtering technique" as "well known in the digital signal processing field." (*See* claim 15, *supra*.) It would have been obvious to modify Williams-873's teaching of an analog filter and replace it with a digital band pass filter to process the digitized broadband signal and gain the well known advantages associated with digital processing of satellite television signals. (Ex.1002-Schonfeld, ¶173.) Accordingly, this claim is obvious over Williams-873 in view of Pugel.

### 13.   Dependent Claims 35 and 36

> *35. The method of claim 14, further comprising converting the selected signal to an analog signal using a digital to analog converter prior to combining.*

> *36. The method of claim 14, wherein the combining is performed in the digital domain.*

*See* limitation 14[*b*], *supra*.

Whether to combine selected transponders in the analog domain as taught in Williams-873 (which first requires converting the selected signal to an analog signal using a digital to analog converter prior to combining) or to modify Williams-873 to combine in the digital domain (as taught in Pugel) is an implementation decision within the skill and knowledge of a POSITA, with each option providing well known

advantages and disadvantages relative to the other option. (Ex.1002-Schonfeld, ¶175; *see* limitation14[b], *supra*.) As such, these claims are obvious over Williams-873 in view of Pugel.

### 14.        Dependent Claim 37

*The method of claim 17, wherein frequency translating comprises using a digital mixer to apply a rotating phasor to the data samples to translate their frequency.*

Pugel teaches the user of mixers 132 which "operate[] to perform a frequency rotation function," which is a digital operation allowing a desired part of a digital signal (*e.g.*, a selected transponder signal) to be translated to a desired frequency. (Ex.1004-Pugel, ¶22; Ex.1002-Schonfeld, ¶¶176.) Specifically, Pugel's *digital mixers* 132 operate on the digital signal from the A//D converter, which are *data samples*. (Ex.1004-Pugel, ¶¶18-19 ("The A/D converter 120 comprises a high-speed analog-to-digital converter operating at a sampling rate of FS."), 25 ("In an exemplary embodiment, the A/D converter 120 operates using an 8 bit sample."); Ex.1002-Schonfeld, ¶176.) The mixers "mix[] the digital signal S3 with a respective numerically controlled oscillator (NCO) signal to produce respective in-phase I and quadrature Q signal components," allowing the mixer to "*rotat[e]*" a "selected channel to baseband from the under-sampled digital signal S3." (Ex.1004-Pugel, ¶22 ("This may be accomplished by using a numerical table to extract (or rotate) the desired channel frequency from the digital signal comprising all available

frequencies processed by the A/D converter 120.").) A POSITA would understand this disclosure to teach the application of a *rotating phasor to the data samples to translate their frequencies*. (Ex.1002-Schonfeld, ¶176.)

A POSITA would have been motivated to further modify Williams-873 to employ the digital mixers of Pugel. As discussed above in claims 16 and 17, Williams-873 teaches frequency translating selected, extracted transponder signals before combination via a variable frequency upconverter 66. (Ex.1003-Williams-873, 10:24-39; Ex.1002-Schonfeld, ¶177.) Williams-873 does not disclose what circuitry or components make up the variable frequency upconverter 66, although it teaches the use of "standard … mixer circuitry" for other frequency translation operations. (Ex.1003-Williams-873, 10:40-52; Ex.1002-Schonfeld, ¶177.) In view of Pugel, it would have been obvious to further modify Williams-873 (in addition to the obvious modifications discussed in claim 14) so that the variable frequency upconverter 66 is a digital mixer. To obtain further advantages from processing in the digital domain, a POSITA would have been motivated to additionally perform frequency translation in the digital domain, especially where the signals have already been digitized prior to transponder selection. (Ex.1002-Schonfeld, ¶177.) Pugel expressly recognizes the benefits of its digital frequency translating: "avoid[ing]" the need for "analog mixers." (Ex.1004-Pugel, ¶51; Ex.1002-Schonfeld, ¶177.) And a POSITA would have had a reasonable expectation of success modifying Williams-

873 to use digital mixers, which were well known in digital signal processing before the '576 patent's priority date. (Ex.1002-Schonfeld, ¶177.)

### 15.    Dependent Claim 38

*The method of claim 14, further comprising frequency translating the digitized broadband signal prior to selecting and extracting transponder signal.*

Pugel teaches that each mixer 132 "mixes the digital signal S3" (*digitized broadband signal*) "with a respective numerically controlled oscillator (NCO)" wherein "[t]he respective NCO frequency is selected to derotate a desired signal or channel" to "baseband." (Ex.1004-Pugel, ¶¶22.) That is, the entire *digitized broadband signal* is *frequency translated* in such a way (derotated) that a desired transponder signal is translated to a near-zero frequency *prior to selection and extraction*. (Ex.1002-Schonfeld, ¶178.) A POSITA would have understood that rotating a signal to baseband prior to selection and extraction simplifies the filtering operations necessary to select and extract a transponder signal. With the selected transponder signal rotated to baseband, only a "high-pass filter" is needed to filter out frequencies above the selected transponder signal; otherwise, a "low-pass filter" would also be necessary to tune out lower frequencies. (Ex.1002-Schonfeld, ¶178.)

It would have been obvious to additionally incorporate this aspect of Pugel into Williams-873. Williams-873 teaches that its analog tuner 54 "may shift the tuned 24 MHz-wide, PSK-modulated signal down to baseband," but only after

selection occurs (Ex.1003-Williams-873, 9:47-48.) A POSITA would have been motivated to further modify Williams-873 such to shift the entire broadband signal (which is digitized, *see* claim 14) so that the desired transponder signals are located at baseband prior to selection and extraction, as in Pugel, to obtain the advantages discussed in the preceding paragraph. (Ex.1002-Schonfeld, ¶179.) Accordingly, this claim is obvious over Williams-873 in view of Pugel.

### 16.    Dependent Claim 39

*The method of claim 38, wherein frequency translating comprises translating the original digitized broadband signal to locate a selected transponder channel at baseband.*

A POSITA would have been motivated to modify Williams-873 to include Pugel's teaching of frequency translating comprises translating the original digitized broadband signal to locate a selected transponder channel at baseband. (*See* claim 38, *supra*.; *see also* Ex.1002-Schonfeld, ¶¶178-80.)

### 17.    Dependent Claim 40

*The method of claim 14, further comprising maintaining a channel translation table at the outdoor unit, the channel translation table specifying assigned frequency slots for transponder channels in the composite signal.*

Williams-873 teaches "generat[ing] an information signal, known as side data, which may include … frequency index set-up information," "frequency assignments," and "information … indicating the carrier frequencies, etc., of the … signals that are on the cable network 26." (Ex.1003-Williams-873, 4:40-45, 15:53-

16:21.) A POSITA would understand that Williams-873's side data includes a *channel translation table* that *specifies assigned frequency slots for transponder channels in the composite signal*. (Ex.1002-Schonfeld, ¶181.)

The side data (*channel translation table*) is maintained by the transmodulator 20, which is part of the *outdoor unit* (or would have been obvious to include in the ODU). (*Id.*, 15:53-16:4 ("[T]he transmodulator 20 may actively signal the channel locations, ordering, frequency assignments, etc. of the transmodulated satellite signals … using side data."); *see also* Ex.1002-Schonfeld, ¶182 (discussing POSITA knowledge and state of art regarding assigning transponder channel frequencies within a composite signal).) Accordingly, claim 40 is obvious over Williams in view of Pugel.

### 18.    Dependent Claim 41

> *The method of claim 38, further comprising providing the channel translation table to the IRD to allow the IRD to tune to a desired selected translated transponder channels.*

The transmodulator 20 of Williams (part of the ODU) maintains side data, which is a *channel translation table* specifying assigned frequency slots for transponder channels in the composite signal. (*See* claim 40, *supra*.) The transmodulator 20 communicates the side data to IRDs. (Ex.1003-Williams-873, 16:5-21 (IRDs receive "information from the transmodulator 20 indicating the carrier frequencies, etc. of the … signals that are on the cable network 26.")) A

PTAB Case No. IPR 2023-00391
U.S. Pat. No. 7,130,576

POSITA would understand that the side data *allows the IRDs to tune to a desired selected translated transponder* signal located at a particular frequency *channel*, because the side data contains information relating to the channel frequencies on the composite signal. (Ex.1002-Schonfeld, ¶183.) Accordingly, claim 41 is obvious over Williams-873 in view of Pugel.

### 19.   Dependent Claim 42

*The method of claim 14, wherein selecting and extracting comprises low-pass filtering the translated digitized broadband signal thereby substantially removing signal information from non-selected transponder channel.*

*See* claims 15 and 38-39.

Pugel discloses *translating digitized broadband signal* so that a selected transponder channel is located at baseband. (*See id.*) Pugel further discloses using a filter/decimator 134 on the translated digitized broadband signal "to retain only the channel energy associated with [the] specific desired channel" located at baseband (*i.e.*, *substantially removing signal information from non-selected transponder channels*). (*See* claim 15, *supra*; Ex.1002-Schonfeld, ¶185.) Pugel's filter is a *low pass filter* because it allows to pass the selected transponder signal (located effectively around 0 MHz), while removing signal information from the non-selected transponder signals at higher frequencies. (Ex.1002-Schonfeld, ¶185.)

A POSITA would have been motivated to incorporate the baseband

translation and low-pass filter aspects of Pugel in the place of Williams-873's analog filter and would have had a reasonable expectation of success to achieve known benefits from filtering digitally in so doing. (*See* claims 15, 38-39, *supra*.) Accordingly, claim 42 is obvious over Williams-873 in view of Pugel.

### 20. Independent Claim 8

### a. Construction of Means-Plus-Function Terms

Independent claim 8 and its dependent claims 9-13 are not asserted in the co-pending district court litigation and Patent Owner has not advanced any construction for these claims. Because the claim limitations either recite the term "means … for" and/or other well known "nonce" words (*i.e.*, "unit"), Petitioners contend that these terms require construction pursuant to 35. U.S.C. § 112, ¶6. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015) (*en banc*) (internal citations omitted), *Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*, 899 F.3d 1291, 1301 (Fed. Cir. 2018). Additionally, the phrase "means in the first unit for" appears in four different limitations in claim 8 and is associated with different functions. The phase "*means in the second unit for*" appears twice and is likewise associated with different functions. Therefore, Petitioners consolidate its proposed claim construction and detailed description of how Willaims-873 on a limitation-by-limitation basis below.

> 8[pre] *A signal distribution system for distributing signals comprising a plurality of satellite transponder channels of a*

PTAB Case No. IPR 2023-00391
U.S. Pat. No. 7,130,576

*broadband signal from a plurality of sources between a first unit and a second unit over a communication medium comprising:*

*See* limitation 14[pre]. To the extent the preamble is limiting, it is disclosed in Williams-873. Williams-873's Figure 1 discloses a *satellite distribution system.* Williams-873 *distributes signals* comprising a plurality of "transponder signals" (*plurality of transponder channels*) selected and extracted from a received "broadband K-u-band satellite signal (comprising up to 32, QPSK-modulated transponder signals transmitted from one or more satellites."). (Ex.1003-Williams-873, Abstract, 3:50-4:3, 5:59-6:1, 15:15-27.) The signals are distributed from Williams-873's ODU (*first unit*) to one or more IRDs disposed within a multi-dwelling unit (*second unit(s)*) over a single cable (*see* n.3) and an MDU cable plant (*communication medium*). (Ex.1003-Williams-873, Abstract, 3:50-4:30, 6:12-34; Ex.1002-Schonfeld, ¶188.) The recited "first unit" and "second unit" are addressed below and incorporated here. In short, Williams-873 disclose claim 8's preamble.

*8[a] means in the first unit for digitizing the broadband signal from each of the plurality of sources;*

**"Means in the first unit for"**

- **Function:** digitizing the broadband signal from each a plurality of sources.

- **Corresponding Structure:** an ODU is the "first unit" including analog to digital converters. (Ex.1001-'576 patent, 3:5-9, 4:56-

– 66 –
103

EXHIBIT B

5:3, 7:5-31, 8:45-47, 11:3-12, Figs. 6-9; Ex.1002-Schonfeld, ¶189.)

*See* limitation14[b][1], *supra.* As Dr. Schonfeld explains, it would have been obvious to incorporate the analog-to-digital converters of Pugel into the transmodulator 20 of Williams-873. The analog-to-digital converters of Pugel function to "directly convert[] a plurality of carrier signals," *i.e.*, *broadband signals from each of the plurality of sources*, "into a digital data stream." (Ex.1004-Pugel, ¶6; Ex.1002-Schonfeld, ¶189.) Accordingly, this limitation is obvious over Williams-873 in view of Pugel.

> *8[b] means in the first unit responsive to information transmitted by the second unit for extracting selected channels from the digitized broadband signals in the digital domain, and*

**"Means in the first unit for"**

- **Function:** extracting selected channels from the digitized broadband signals in the digital domain in response to information transmitted for extracting selected channels.

- **Corresponding Structure:** an ODU including a controller and digital filters, the filters "tuned by programming a set of filter coefficients to select a specific pass band." (Ex.1001-'576 patent, 3:5-9, 4:29-34, 5:12-42, 8:49-51, 8:52-60; Ex.1002-Schonfeld, ¶190.)

PTAB Case No. IPR 2023-00391
U.S. Pat. No. 7,130,576

*See* limitation 14[b][2] and claims 15, 34, *supra.* As Dr. Schonfeld explains, it would have been obvious to substitute the digital filters of Pugel into Williams-873's transmodulator 20 in place the analog tuners, which is part of the ODU of Williams-873 (*first unit*). (Ex.1002-Schonfeld, ¶190.) Pugel's digital tuners are used to "extract from the digital data stream data carried by" a carrier signal (*i.e.*, to *extract selected* transponder *channels from the digitized satellite broadband signals*). (Ex.1004-Pugel, ¶¶5-6; *see* limitation 14[*b*][2], *supra.*) The tuners of Williams-873 perform selections under direction of control unit 72 (a controller, as in the '576 patent), which receives the "requests for … satellite signals" transmitted "from each of the IRDs" (*second unit(s)*), and a POSITA would have been motivated to retain the request-based selection after incorporating Pugel's digital tuners (Ex.1003-Williams-873, 6:35-42; Ex.1002-Schonfeld, ¶190.) Accordingly, this limitation is obvious over Williams-873 in view of Pugel.

> *8[c] means in the first unit for combining the selected channels into a composite signal without demodulating channels and without changing the modulation of the channels and transmitting the composite signal over the medium; and*

**"Means in the first unit for"**

- **Function 1:** combining the selected channels into a composite signal without demodulating channels and without changing the modulation of the channels.

PTAB Case No. IPR 2023-00391
U.S. Pat. No. 7,130,576

- **Function 2:** transmitting the composite signal over a medium.

- **Corresponding Structure:** an ODU including a signal summer (such as 380, 670, 950, or 1740) output to a cable. (Ex.1001-'576 patent, 4:29-34, 5:31-42, 6:32-46, 8:49-51, 8:65-9:13, 11:50-57, Figs. 8-9, 17; Ex.1002-Schonfeld, ¶191.)

*See* limitations 14[b][3], 14[c]-[d], *supra*. Summer 68 of Williams-873 (also called "combiner") "combines" *selected channels* "with each other … for propagation over the cable network 26" as a *composite signal*. (Ex.1003-Williams-873 10:24-39, 4:29-33, Fig. 3; Ex.1002-Schonfeld, ¶191.) As Dr. Schonfeld describes the process of combining selected channels in Williams-873 wou*ld not involve demodulating channels or changing the modulation of the channels*. (Ex.1002-Schonfeld, ¶191.) Like the '576 patent's signal summer, the summer/combiner in Williams-873 outputs the *composite signal* and connecting to a cable (*medium*) to the output of the summer, *transmits the composite signal* over that *medium*. (Ex.1002-Schonfeld, ¶191.) Williams-873 discloses this limitation.

*8[d] means in the second unit for receiving the composite signal and demodulating and decoding at least one channel, and*

**"Means in the second unit for"**

- **Function 1:** receiving the composite signal and demodulating and decoding at least one channel.

EXHIBIT B

PTAB Case No. IPR 2023-00391
U.S. Pat. No. 7,130,576

- **Corresponding Structure:** IRD including a tuner and cable decoder. (Ex.1001-'576 patent, 6:62-66, 9:20-25, 9:34-10:18, 10:48-51; Ex.1009-AAPA-Williams-419, 14:4-67 (incorporated into the '576 patent); Ex.1002-Schonfeld, ¶192.)

The '576 disclosure is sparse as to the corresponding structure performing these claimed functions beyond the fact that they are performed by an IRD/STB (*e.g.,* Ex.1001-'576 patent, 6:64-66.) However, AAPA Williams-419 provides a detailed description of typical IRD components responsible for *demodulating and decoding at least one channel*: a tuner (for tuning "to the frequency associated with a selected" channel), and a cable decoder, such as a "standard DVB cable decoder" which "includes a … demodulator that demodulates" the tuned channel, and an "R-S decoder" to perform decoding. (Ex.1009-AAPA Williams-419, 14:27-54, 16:28-32; Ex.1002-Schonfeld, ¶192.) Williams-873 contains the identical disclosure of AAPA Williams-419 as to the cable decoder, and similar disclosure regarding the tuner, and thus discloses this limitation. (*Compare* Ex.1003-Williams-873, 16:6-56 *with* Ex.1009-AAPA-Williams-419, 14:11-43; Ex.1002-Schonfeld, ¶192.)

> *8[e] means in the first unit and second units for bi-directionally communicating control information between the second unit and the first unit.*

**"Means in the first and second units:"**

- **Function 1:** bi-directionally communicating control information

EXHIBIT B

PTAB Case No. IPR 2023-00391
U.S. Pat. No. 7,130,576

between the second unit and first unit.

▪ **Corresponding Structure:** communications interfaces of an ODU (*first unit*) and IRD(s) (*second unit(s)*) for communication via cable, wireless RF, and/or wireless IR. (Ex.1001-'576 patent, 3:10-19, 4:28-41, 9:5-13; Ex.1002-Schonfeld, ¶193)

*See* limitations 14[a], 8[b], claims 40-41, *supra*. The transmodulator 20 of Williams-873 (part of the ODU/*first unit*) communicates to the IRDs (*second unit(s)*) *control information* it calls "side data," specifying "frequency index set-up information," "frequency assignments," and "which transponder signals are being … transmitted over the cable network 26 and the frequencies at which the … transponder signals are located on the cable network." (Ex.1003-Williams-873, 4:40-45, 11:22-35, 15:53-16:35 (IRDs receive "information from the transmodulator 20 indicating the carrier frequencies, etc. of the … signals that are on the cable network 26.").) The IRDs communicate *control information* constituting "requests for … satellite signals" to the ODU that the control unit of the ODU uses for channel selection. (Ex.1003-Williams-873, 6:35-42, 11:22-35; Ex.1002-Schonfeld, ¶193; *see* limitation 8[b], *supra*.) The *bi-directional communication* of *control information* is performed via "the cable network 26" or using "any other wire or wireless network." (Ex.1003-Williams-873, 7:24-47, 11:22-35; Ex.1002-Schonfeld, ¶193.) Thus, Williams-873 discloses this limitation, and claim 8 is obvious over Williiams-

EXHIBIT B

PTAB Case No. IPR 2023-00391
U.S. Pat. No. 7,130,576

873 in view of Pugel.

### 21.    Dependent Claim 9

*The signal distribution system of claim 8 wherein the control information comprises channel selection requests originating from the second unit and the control information comprises channel mapping information originating from the first unit.*

*See* limitation 8[e]. The IRD (*second unit*) transmits *control information* that is a "requests for … satellite signals" from the ODU (*channel selection requests*), and the ODU (*first unit*) transmits *control information* that "specifi[es] which transponder signals are being … transmitted over the cable network 26 and the frequencies at which the … transponder signals are located on the cable network." (*channel mapping information*). (*Id.*; Ex.1002-Schonfeld ¶194.) Accordingly, claim 9 is obvious over Williams-873 in view of Pugel.

### 22.    Dependent Claim 10

*The signal distribution system of claim 8, further comprising a means in the first unit for carrier offset correction.*

**"Means in the first unit for"**

- ▪ **Function:** carrier offset correction

- ▪ **Corresponding Structure:** an ODU is the "first unit" including two filters, power measurement circuitry, and a rotating phasor (Ex.1001-'576 patent, 7:38-8:4; Ex.1002-Schonfeld, ¶¶195-97.)

It would have been obvious to a POSITA to modify the ODU of Williams-873 to include means for carrier offset correction in view of Pugel. Correction of carrier offset, which refers to the deviation of the analog RF carrier frequency band from the range at which it was communicated, is a standard and routine procedure in most communications systems. (Ex.1002-Schonfeld, ¶¶195-96.) Without some means to account for potential variations in the frequency band of a received RF signal, satellite distribution systems such as Williams-873 and Pugel would be susceptible to selecting and distributing only portions of received television signals. And because offset impacts the entire received broadband signal, *see* Ex.1001-'576 patent, 7:38-8:4, failure to account for it could render ineffectual distribution of any desired transponder signals. A POSITA would have known to perform a correction on the entire broadband signal prior to performing transponder signal selection and found it desirable to do so in order to, for example, simplify signal selection. (Ex.1002-Schonfeld, ¶196.)

Pugel discloses structures that can be used for carrier offset on a digitized broadband signal: programmable digital filters and numerically controlled oscillators (to apply a rotating phasor). (Ex.1004-Pugel, ¶¶21-23; Ex.1002-Schonfeld, ¶197.) A POSITA would have had a reasonable expectation of success using these structures to perform carrier offset correction using any of the "several know[n] techniques" following digitization in the modified system of Williams-873.

(Ex.1001-'576 patent, 7:38-8:4; Ex.1002-Schonfeld, ¶197.) Accordingly, claim 10 is obvious over Williams-873 in view of Pugel.

### 23. Dependent Claim 11

*The signal distribution system of claim 8 wherein the first unit is a satellite outdoor unit and the second unit is a satellite integrated receiver decoder unit.*

*See* claim 8, *supra*. The '576 patent teaches, and Williams-873 discloses, that the structure of the *first unit is a satellite outdoor unit* and the structure of the *second unit is a satellite integrated receiver decoder unit* (IRD). For the reasons set forth in claim 8, this claim is obvious over Williams-873 in view of Pugel.

### 24. Dependent Claim 12

*The signal distribution system of claim 11 wherein the communication medium consists of a single coaxial cable connected to the satellite outdoor unit.*

*See* claims 8, 11, *supra*. The '576 patent specification teaches, and the Williams-873 reference discloses, that the structure of the *communication medium consists of a single coaxial cable connected to the satellite outdoor unit* and the cable network 26. (*See* limitation 8[pre], *supra*.) For the reasons set forth in claims 8 and 11, this claim is obvious over Williams-873 in view of Pugel.

### 25. Dependent Claim 13

*The signal distribution system of claim 12 wherein the means for communicating uses the same communication medium as the composite signal.*

*See* claim 8, *supra*. Williams discloses that among the *communications medium* that its ODU (*first unit*) and STBs (*second unit(s)*) use to communicate *control information* (*see* limitation 8*[e])* is cable network 26 over which the ODU transmits the composite signal (*see* limitation 8[*c*], *supra*.) A POSITA would understand that the communication medium also includes the cable connecting the ODU and the cable network 26. (Ex.1002-Schonfeld, ¶200.) Accordingly, claim 13 is obvious in view over Williams-873 in view of Pugel.

## X.   INSTITUTION SHOULD BE GRANTED

### A.   The Board Should Not Decline Institution under § 325(d)

The Board should not deny this Petition under § 325(d). The combination of Williams-873 and Pugel was never considered during the prosecution or reexamination of the '576 patent. The examiner did rely on Williams-873 as anticipatory art to reject the independent claims during prosecution of the '576 patent. *See* §IV.B.1, *supra*. However, Petitioners have established that the examiner erred in a manner material to the patentability of the challenged claims by misapprehending undisputable disclosure in Williams-873 of a broadband signal distribution system embodiment that does **not** alter the modulation of the transponder signal. *Advanced Bionics, LLC v. Med-El Elektromedizinische Geräte GMBH*, IPR2019-01469, Paper No. 6 at 8 (PTAB Feb. 13, 2020) (precedential) (setting forth two-part test for § 325(d) denial).

EXHIBIT B

During original prosecution, the '576 patent applicant incorrectly argued that "[a]n important distinction between applicant's invention and the Williams[-873] reference is that **Williams**[-873] **uses transmodulation where the applicant's invention does not transmodulate.**" (*See* §IV.B.1, *supra* and 14[d], *supra*.) Both the applicant and examiner overlooked Williams-873's teaching of an alternative embodiment recommending that "**in some cases, [where] only a few of the selected channels are being distributed, the transmodulator may not need to remodulate the selected signals**" (Ex.1003-Williams-873, 7:15-23 ("**may, instead, shift selected ones of these signals to different frequencies for transmission over the cable network 26**.") (emphasis added), 4:57-60, 15:15-27; Ex.1002-Schonfeld, ¶¶148-152.) Nothing in the prosecution history, including the examiner's reasons for allowance, demonstrates that the examiner was aware of Williams-873 non-transmodulation embodiment, which Petitioner established clearly discloses "modulation of the transponder signal is not altered by the steps of selecting, combining, and transmitting"–the exact limitation added by the '576 patent applicant to overcome Williams-873. *See* §IX.A.2, *supra*. The additional facts and evidence presented in this Petition, along with Dr. Schonfeld's declaration prove that the Examiner overlooked and misapprehended Williams-873's teachings. (*See* §§V.B.1-2, IX.A.2, limitation 14[d]; Ex.1002-Schonfeld, ¶¶148-152, 99.)

Second, during reexamination, the Patent Office also erred by overlooking the

EXHIBIT B

combination of Williams-873 and Pugel. As presented herein, Williams-873 discloses all limitations of independent claims except for *digitizing the plurality of satellite broadband signals* which was added during reexamination. The Patent Office did not have evidence of Pugel or Dr. Schonfeld's testimony and therefore misapprehended and overlooked how a POSITA would have understood these disclosures and how a POSITA would have been motivated to combine Williams's signal distribution system with Pugel's digital converter for digitizing satellite broadband signals. (IX.A.1-2, V.B.2; Ex.1002-Schonfeld, ¶¶70-84, ¶¶112-123, 131-133.) Since Williams and Pugel disclose all limitations of the challenged claims, the Patent Office's errors are material to patentability.

## B.     The Board Should Not Decline Institution under § 314(a)

Consistent with the Director's June 21, 2022 Guidance, Petitioners agree not to proceed in the related district court litigation against the challenged claims on the same grounds included in the Petition or any grounds that could have reasonably been raised if the Petition is instituted.

## XI.    CONCLUSION

For the above reasons, claims 8-23 and 34-42 are invalid and should be canceled.

PTAB Case No. IPR 2023-00391
U.S. Pat. No. 7,130,576

Dated: February 21, 2023                    Respectfully submitted,


                                            /Amy E. Simpson/
PERKINS COIE LLP                            Lead Counsel
11452 El Camino Real, Ste 300               Amy E. Simpson, Reg. No. 54,688
San Diego, California 92130-2080
858.720.5700 (phone)                        Back-up Counsel
858.720.5799 (fax)                          David St. John-Larkin, Reg. No. 56,924
                                            Adam Hester, Pro-Hac Vice

                                            Attorneys for Petitioners

EXHIBIT B

PTAB Case No. IPR 2023-00391
U.S. Pat. No. 7,130,576

# LISTING OF CLAIMS

## Independent Claim 8

8[*pre*] A signal distribution system for distributing signals comprising a plurality of satellite transponder channels of a broadband signal from a plurality of sources between a first unit and a second unit over a communication medium comprising:

8[*a*] means in the first unit for digitizing the broadband signal from each of the plurality of sources;

8[*b*] means in the first unit responsive to information transmitted by the second unit for extracting selected channels from the digitized broadband signals in the digital domain, and

8[*c*] means in the first unit for combining the selected channels into a composite signal without demodulating channels and without changing the modulation of the channels and transmitting the composite signal over the medium; and

8[*d*] means in the second unit for receiving the composite signal and demodulating and decoding at least one channel, and

8[*e*] means in the first unit and second units for bi-directionally communicating control information between the second unit and the first unit.

## Dependent Claim 9

The signal distribution system of claim 8 wherein the control information comprises channel selection requests originating from the second unit and the control information comprises channel mapping information originating from the first unit.

## Dependent Claim 10

The signal distribution system of claim 8, further comprising a means in the first unit for carrier offset correction.

EXHIBIT B

PTAB Case No. IPR 2023-00391
U.S. Pat. No. 7,130,576

## Dependent Claim 11

The signal distribution system of claim 8 wherein the first unit is a satellite outdoor unit and the second unit is a satellite integrated receiver decoder unit.

## Dependent Claim 12

The signal distribution system of claim 11 wherein the communication medium consists of a single coaxial cable connected to the satellite outdoor unit.

## Dependent Claim 13

The signal distribution system of claim 12 wherein the means for communicating uses the same communication medium as the composite signal.

## Independent Claim 14

14[*pre*] A method of communicating a plurality of transponder signals from a satellite outdoor unit (ODU) that receives a plurality of satellite broadband signals to an integrated receiver decoder (IRD) over a single cable connected to the ODU, the method comprising the steps of:

14[*a*] communicating a transponder request signal to the ODU from the IRD;

14[*b*][*1*] digitizing the plurality of satellite broadband signals

14[*b*][*2*] selecting and extracting a plurality of transponder signals from the received satellite broadband signals, wherein the selecting is responsive to the transponder request signals;

14[*b*][*3*] combining extracted selected transponder signals into a composite signal;

14[*c*] transmitting the composite signal over the single cable from the ODU to the IRDs,

14[*d*] wherein the modulation of the transponder signal is not altered by the steps of selecting, combining, and transmitting.

EXHIBIT B

## Dependent Claim 15

The method of claim 14 wherein the step of selecting and extracting a transponder signal comprises the step of: filtering a transponder signal with a band pass filter having a bandwidth ranging from 5% to 100% wider than the bandwidth of the transponder signal.

## Dependent Claim 16

The method of claim 14 wherein the step of combining comprises frequency translating the selected and extracted transponder channels to a variable frequency before combining.

## Dependent Claim 17

The method of claim 15 further comprising frequency translating the selected transponder channels to a predetermined frequency before combining.

## Dependent Claim 18

The method of claim 14 further comprising the step of splitting the composite signal inside a home and distributing to a plurality of IRDs.

## Dependent Claim 19

The method of claim 14 wherein the transponder request signal is transmitted over the cable from an IRD and all IRDs receive the same composite signal.

## Dependent Claim 20

The method of claim 14 wherein the transponder request signal is transmitted over a wireless link to the ODU.

## Dependent Claim 21

The method of claim 14 further comprising the steps of: frequency translating the selected transponder channels to a variable frequency before combining; and splitting the composite signal inside a home and distributing to a plurality of IRDs.

EXHIBIT B

PTAB Case No. IPR 2023-00391
U.S. Pat. No. 7,130,576

**<u>Dependent Claim 22</u>**

The method of claim 21 wherein the transponder request signal is transmitted over the cable from an IRD.

**<u>Dependent Claim 23</u>**

The method of claim 21 wherein the transponder request signal is transmitted over a wireless link to the ODU.

**<u>Dependent Claim 34</u>**

The method of claim 14, wherein selecting and extracting comprises applying a pass band filter transfer function to the digitized broadband signal.

**<u>Dependent Claim 35</u>**

The method of claim 14, further comprising converting the selected signal to an analog signal using a digital to analog converter prior to combining.

**<u>Dependent Claim 36</u>**

The method of claim 14, wherein the combining is performed in the digital domain.

**<u>Dependent Claim 37</u>**

The method of claim 17, wherein frequency translating comprises using a digital mixer to apply a rotating phasor to the data samples to translate their frequency.

**<u>Dependent Claim 38</u>**

The method of claim 14, further comprising frequency translating the digitized broadband signal prior to selecting and extracting transponder signal.

**<u>Dependent Claim 39</u>**

The method of claim 38, wherein frequency translating comprises translating the original digitized broadband signal to locate a selected transponder channel at baseband.

EXHIBIT B

PTAB Case No. IPR 2023-00391
U.S. Pat. No. 7,130,576

## **Dependent Claim 40**

The method of claim 14, further comprising maintaining a channel translation table
at the outdoor unit, the channel translation table specifying assigned frequency
slots for transponder channels in the composite signal.

## **Dependent Claim 41**

The method of claim 38, further comprising providing the channel translation table
to the IRD to allow the IRD to tune to a desired selected translated transponder
channels.

## **Dependent Claim 42**

The method of claim 14, wherein selecting and extracting comprises low-pass
filtering the translated digitized broadband signal thereby substantially removing
signal information from non-selected transponder channel.

EXHIBIT B

PTAB Case No. IPR 2023-00391
U.S. Pat. No. 7,130,576

## CERTIFICATE OF WORD COUNT UNDER 37 CFR § 42.24(D)

Under 37 C.F.R. § 42.24(d), the undersigned certifies that the word count for this *Petition for Inter Partes Review* totals 13,496, excluding the parts exempted by 37 C.F.R. § 42.24(a).

The word count was made using the built-in word count function in the Microsoft® Word software used to prepare this document.

Dated: February 21, 2023

Respectfully submitted,

PERKINS COIE LLP
11452 El Camino Real, Ste 300
San Diego, California 92130-2080
858.720.5700 (phone)
858.720.5799 (fax)

/Amy E. Simpson/
Lead Counsel
Amy E. Simpson, Reg. No. 54,688

Back-up Counsel
David St. John-Larkin, Reg. No. 56,924
Adam Hester, Pro-Hac Vice

Attorneys for Petitioners

EXHIBIT B

PTAB Case No. IPR 2023-00391
U.S. Pat. No. 7,130,576

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that true copies of this PETITION FOR

*INTER PARTES* REVIEW OF U.S. PATENT NO. 7,130,576 and supporting

materials (Exhibits 1001-1035 and Power of Attorney) have been served by FedEx®

delivery service on Patent Owner at the correspondence address for the attorney of

record for the '576 Patent shown in USPTO records:

MCANDREWS HELD & MALLOY, LTD
500 WEST MADISON STREET
SUITE 3400
CHICAGO, IL 60661
UNITED STATES

and via electronic mail to the attorneys of record for Plaintiff in the related litigation

matter:

K&L Gates
Brian Paul Bozzo - Brian.Bozzo@klgates.com
Darlene F Ghavimi-Alagha - Darlene.Ghavimi@klgates.com
Devon C Beane - Devon.Beane@klgates.com
George C Summerfield - George.Summerfield@klgates.com
Jason A Engel - Jason.Engel@klgates.com
Jim A Shimota - Jim.Shimota@klgates.com

Ward Smith & Hill
J Wesley Hill - wh@wsfirm.com

EXHIBIT B

PTAB Case No. IPR 2023-00391
U.S. Pat. No. 7,130,576

Dated: February 21, 2023

Respectfully submitted,

PERKINS COIE LLP
11452 El Camino Real, Ste 300
San Diego, California 92130-2080
858.720.5700 (phone)
858.720.5799 (fax)

/Amy E. Simpson/
Lead Counsel
Amy E. Simpson, Reg. No. 54,688

Back-up Counsel
David St. John-Larkin, Reg. No. 56,924
Adam Hester, Pro-Hac Vice

Attorneys for Petitioners

EXHIBIT B