Christina Goodrich (SBN 261722)
Christina.goodrich@klgates.com
Connor J. Meggs (SBN 336159)
connor.meggs@klgates.com
K&L Gates LLP
10100 Santa Monica Boulevard
Eighth Floor
Los Angeles, CA 90067
Telephone: +1 310 552 5000
Facsimile: +1 310 552 5001

[*Additional counsel on signature page*]

**ATTORNEYS FOR PLAINTIFF
ENTROPIC COMMUNICATIONS, LLC**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENTROPIC COMMUNICATIONS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>DIRECTV, LLC and<br>AT&T SERVICES, INC.,<br><br>Defendants. | Civil Action No. 2:22-cv-07775-JWH-JEM<br><br>Case Transferred from E.D. Texas (2:22-cv-75-JRG)<br><br>JURY TRIAL DEMANDED<br><br>**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF** |
| ENTROPIC COMMUNICATIONS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>DISH NETWORK CORPORATION,<br>DISH NETWORK L.L.C., and<br>DISH NETWORK SERVICE L.L.C.,<br><br>Defendants. | |

---

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

# **TABLE OF CONTENTS**

I.    INTRODUCTION ......................................................................................... 1

II.   FACTUAL BACKGROUND ....................................................................... 1

    A.   '576 Patent ......................................................................................... 2

    B.   '715 Patent ......................................................................................... 4

    C.   '008 Patent ......................................................................................... 6

III.  JUDICIAL STANDARD ............................................................................ 9

IV.   ARGUMENT ............................................................................................ 10

    A.   PERSON OF ORDINARY SKILL IN THE ART ................................. 10

    B.   CONSTRUCTIONS OF TERMS ......................................................... 10

        i.   '576 Patent ............................................................................... 10

            1.   "digitizing the plurality of satellite broadband signals" ........................................................................ 10

            2.   "integrated receiver decoder (IRD)" ............................. 11

            3.   "a transponder request [signal] . . . the transponder request signals" / "from the IRD . . . to the IRDs" / "a plurality of transponder signals . . . the transponder signal" ........................................................ 13

            4.   "transponder request signals" ........................................ 16

            5.   "selected [and extracted] transponder channel[s]" ........ 17

        ii.  '715 Patent ............................................................................... 22

            6.   "local area network" ...................................................... 22

            7.   "RF Signals" ................................................................... 24

            8.   "decodes specific programs" .......................................... 27

        iii. '008 Patent ............................................................................... 30

            9.   "an entire television spectrum" ...................................... 30

            10.  "signal having a bandwidth that spans from a first frequency, $F_{lo}$, to a second frequency, $F_{hi}$" ................ 34

            11.  "a source of said received signal" .................................. 35

V.    CONCLUSION ......................................................................................... 37

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*01 Communique Lab'y, Inc. v. LogMeIn, Inc.*,
  687 F.3d 1292 (Fed. Cir. 2012) ........................................................... 15

*Atlas IP, LLC v. Medtronic, Inc.*,
  809 F.3d 599 (Fed. Cir. 2015) ............................................................. 30

*Aventis Pharma S.A. v. Hospira, Inc.*,
  675 F.3d 1324 (Fed. Cir. 2012) ........................................................... 16

*Bio-Rad Lab'ys, Inc. v. Int'l Trade Comm'n*,
  998 F.3d 1320 (Fed. Cir. 2021) ........................................................... 16

*Bose Corp. v. JBL, Inc.*,
  274 F.3d 1354 (Fed. Cir 2001) .............................................................. 9

*Dayco Prod., Inc. v. Total Containment, Inc.*,
  258 F.3d 1317 (Fed. Cir. 2001) ........................................................... 11

*Energizer Holdings Inc. v. Int'l Trade Comm'n*,
  435 F.3d 1366, 77 USPQ2d 1625 (Fed. Cir. 2006) ........................ 9, 17

*Fenner Invs., Ltd. v. Cellco P'ship*,
  778 F.3d 1320 (Fed. Cir. 2015) ........................................................... 30

*Gart v. Logitech, Inc.*,
  254 F.3d 1334 (Fed. Cir. 2001) ............................................................. 9

*Georgia-Pacific Corp. v. US Gypsum Co.*,
  195 F.3d 1322 ....................................................................................... 30

*Golden Bridge Tech., Inc. v. Apple Inc.*,
  758 F.3d 1362 (Fed. Cir. 2014) ........................................................... 34

*Kara Tech. Inc. v. Stamps.com Inc.*,
  582 F.3d 1341 (Fed. Cir. 2009) ........................................................... 16

*Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*,
  628 F.3d 1359 (Fed. Cir. 2010) ............................................................. 9

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996)..................1, 9

*Nature Simulation Sys. Inc. v. Autodesk, Inc.*,
   50 F.4th 1358 (Fed. Cir. 2022) ............................................................28

*Nobel Biocare Servs. AG v. Instradent USA, Inc.*,
   903 F.3d 1365 (Fed. Cir. 2018), *as amended* (Sept. 20, 2018) ....................24, 35

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ......................................................9, 12

*SynQor, Inc. v. Artesyn Techs., Inc.*,
   709 F.3d 1365 (Fed. Cir. 2013) ......................................................24, 35

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,
   853 F.3d 1272 (Fed. Cir. 2017) ........................................................16

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

## I.   **INTRODUCTION**

Plaintiff Entropic Communications, LLC ("Entropic") brought these now consolidated cases against Defendants DirecTV, LLC and AT&T Services, Inc. (together, "DTV"), and DISH Network Corporation, DISH Network L.L.C., and DISH Network Service L.L.C. (collectively "DISH")[1] for the infringement of U.S. Patent Nos. 7,130,576 (the "'576 Patent"); 7,542,715 (the "'715 Patent"); and 8,792,008 (the "'008 Patent") (collectively, the "Patents-in-Suit")[2].

Consistently throughout, Entropic believes the terms should be given their plain and ordinary meaning as would be understood to a person of ordinary skill in the art ("POSITA") in light of the claims, specification, and prosecution history. Entropic does not seek to import limitations or change the meaning of any of the terms. However, this is not a case where a plaintiff seeks to use plain meaning to loosen the claim scope to stretch the patents. The Patents-in-Suit were invented at leading companies in the satellite and cable technology market (Entropic and MaxLinear). The infringement in this case rests squarely in the middle of the claims, which need not be enlarged to suit the infringement case.

Meanwhile, Defendants' positions are quite plainly attempts to win the case via *Markman*. Given the nature of the patents and their provenance, Defendants cannot propose reasonable claim construction positions that afford a path to avoiding infringement. This is why Defendants so frequently do not support one another's positions, why a quarter of the proffered "constructions" are indefiniteness, and why the actual constructions put forth rewrite the claims with new limitations from the specification.

## II.   **FACTUAL BACKGROUND**

The Patents-in-Suit generally disclose and claim innovations in the distribution and monitoring of satellite broadband signals. *See* '576 Patent, Abstract; '715 Patent,

---

[1]   Defendants DTV and DISH will be collectively be referred to herein as Defendants.
[2]   The '576 Patent is attached as Exhibit 1, the '715 Patent is attached as Exhibit 2, and the '008 Patent is attached as Exhibit 3.

**1**

Abstract; '008 Patent, Abstract. The '576 and '715 Patents are related and ultimately claim priority to U.S. Provisional Application 60/345,965, which was filed on November 7, 2001. '576 Patent, cover; '715 Patent, cover. The '008 Patent claims priority at least back to U.S. Provisional Application 61/532,098, which was filed on September 8, 2011. '008 Patent, cover.

### A.   <u>'576 Patent</u>

The '576 Patent, titled "Signal Selector and Combiner for Broadband Content Distribution" relates generally to a satellite receiving system where signals of interest (*e.g.*, video programming) are selected from the satellite broadband signals. '576 Patent, cover. Those signals of interest are then re-combined with other signals of interest to create a composite signal that is output for transmission from an outdoor unit ("ODU") to an integrated receiver decoder ("IRD"), using a single cable. *See* '576 Patent, Abstract. The '576 Patent explains that "[a] problem with the conventional approach to connecting an outdoor unit to IRDs is that multiple cables are required to be run from the outdoor unit: one cable for each room where an IRD is located." *Id.* at 1:55–62. Multiple cables were needed because the content of the broadband signals received from satellite(s)—consisting of numerous video channels—was too much for a single wire connection to transport. *See id.*

The '576 Patent solved this problem with an innovative system where a subset of the available signals are chosen. *See id.* at 2:54–57. Not every video channel available will be needed by a customer at a given moment. *See id.* at 3:10–11. The '576 Patent discloses selecting the signals of interest, extracting them from the broadband spectrum, and moving them around in frequency location (if necessary) to form a new composite signal containing the programming of interest. *Id.* at 2:54–3:32. Because this composite signal contains less information, it is suitable for transport over a single wire. *Id.*

Specifically, the '576 Patent describes a digital "channel selecting and combining solution" that involves selecting one or more transponder channels from each LNB output. *Id.* at 2:54–56. A transponder is a device for receiving a radio signal and

automatically transmitting a different signal. *E.g.*, Ex. 4, <u>Transponder (satellite communications)</u>, WIKIPEDIA, (May 11, 2023, 5:00 PM) https://en.wikipedia.org/wiki/Transponder_ (satellite_communications). "The selected transponder channels are combined to form a composite signal," which is then transmitted over a cable to the IRDs. '576 Patent, 2:59–66.

Fig. 2 shows an exemplary satellite TV installation according to the present invention. The received transponder channels are delivered to a Signal Selector (and Combiner) **250**:



FIG. 2

'576 Patent, Fig. 2[3]; *see also* Akl Decl. ¶¶ 47–49[4].

In turn, Fig. 5 depicts the functionality of the Signal Selector, illustrating the process of selecting transponder channels and moving those transponder channels among frequencies as necessary, and finally combining them to create a "composite signal." Akl Decl. ¶ 50. DISH's expert's annotation of Fig. 5 is shown below:

---

[3] All emphasis and annotations added unless otherwise noted.

[4] The Rebuttal Expert Declaration of Dr. Robert Akl, D.Sc. Regarding Claim Construction is attached as Exhibit 5.



FIG. 5

*See* Steffes Decl. ¶ 29[5]. The corners of the figure illustrate four sources from satellite reception equipment (LNBs). *Id.* Certain signals of interest (colored) are selected and extracted from the inputs. *Id.* The signals are then shifted in frequency as needed to avoid overlap. *Id.* Finally, they are combined into the Composite Signal in the center. *Id.* This Composite Signal thus contains the signals of interest (perhaps at new frequencies) and is suitable for transmission over a single wire. *See* '576 Patent, 2:60–63.

**B.   '715 Patent**

The '715 Patent, also titled "Signal Selector and Combiner for Broadband Content Distribution" is a continuation of the '576 Patent. '715 Patent, cover. The '715 Patent relates generally to a signal distribution system for distributing a plurality of LNB output signals from a satellite ODU to equipment (such as set top boxes) within the customer's premises. *See id.* at Abstract.

The '715 Patent describes a deficiency of conventional systems at the time—the required use of multiple cables from the ODU to the various indoor equipment. '715 Patent, 1:56–62. In view of that deficiency, the '715 Patent discloses a signal

---

[5]   The Expert Declaration of Dr. Paul G. Steffes Regarding Claim Construction is attached as Exhibit 6.

1    distribution system involving a gateway, which accepts signals from an ODU and

2    distributes desired content to consuming devices. '715 Patent, 2:62–63, 3:18–25. The

3    gateway also works with the sophisticated ODU claimed by the '576 Patent. *Id.* The

4    gateway controls the ODU by sending transponder selection information, so that signals

5    of interest are selected and placed into the Composite Signal. *E.g.*, *id.* at 2:53–55. This

6    architecture allows user equipment to receive any signals of interest for any satellite

7    input, while also requiring no more than a single cable to be routed from the ODU to

8    inside the building or to a gateway. *Id.* at 3:26–40.

9        Figure 11, shown below, illustrates an example of this improved architecture.[6]

10   *See id.* at Fig. 11. In relevant part, ODU **1110** is configured to send a composite signal

11   to gateway **1160**. *See id.* Gateway **1160** is capable of decoding specific programs and

12   distributing program information over a digital local area network ("LAN") **1170** to

13   STBs **1180**. *Id.* at 9:23–48. The '715 Patent also explains the various ways the STBs

14   **1180** communicate with the ODU **1110**. *E.g.*, *id.* at 9:49–10:4. For example, STBs **1180**

15   can communicate with a signal selector and combiner in the ODU **1110** via gateway

16   **1160** to send channel requests:

17

18

19

20

21

22

23

24

25

26

27

28   [6]   Figure 11 also illustrates legacy equipment co-existing with the new gateway
     architecture.



FIG. 11

'715 Patent, Fig. 11; *see also id*. at 9:49–10:4.

In response to channel requests (*e.g.*, transponder select information) transmitted via the gateway, the signal selector and combiner in the ODU combines selected transponder signals from different LNB polarizations into a composite signal. *Id*. at 7:24–31; *see also* Fig. 5 above.

## C.   '008 Patent

The '008 Patent, titled "Method and Apparatus for Spectrum Monitoring" relates to methods and apparatuses for monitoring cable or satellite television signals. *See, e.g.*, '008 Patent, Abstract, Fig. 1A, Fig. 1C, 2:34–3:4 (discussing a cable embodiment), 4:51–5:11 (discussing a satellite embodiment).

A problem with prior art network-based services (*i.e.*, television services) was that, if network parameters fell outside of acceptable ranges, the quality of those services would suffer. *Id.* at 1:34–36. Service providers desired a way to monitor their network to ensure quality of the television services provided. *See id.* Conventional methods of monitoring, however, were "too costly and impractical for use in customer-premises equipment (CPE)" (*id.* at 1:42–45), which limited the ability of service providers to troubleshoot issues, particularly at customer premises.

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

1   To solve this problem, the '008 Patent discloses methods and apparatuses for
2   monitoring signals that can be used in the equipment TV providers deploy at the
3   customer premises. '008 Patent, Abstract. The providers are then able to monitor the
4   signal that actual customers are receiving, remotely, without service visits. *See id.* The
5   deployed equipment is designed to receive and digitize a cable/satellite television
6   signal, determine a characteristic of the digitized signal, and report the determined
7   characteristic back to the source of the signal (*i.e.*, the service providers). *Id.*

8   Specifically, the '008 Patent discloses apparatuses that are capable of performing
9   spectrum monitoring. *See, e.g.*, *id.* at Fig. 1B. The disclosed monitoring apparatus is
10  capable of (1) receiving and digitizing full spectrum signal in a front-end **158**;
11  (2) selecting specific portions of the outputs of the front-end **158** using a channelizer
12  **152**; and (3) concurrently outputting one portion to a monitoring device and another
13  portion to a data processing device. *Id.* In this way, monitoring of the actual signal
14  conditions is possible, while the signals are also provided to the equipment processing
15  the content. *Id.* at 4:45–50. This allows uninterrupted service, while monitoring, if
16  desired.

17  Starting with receiving and digitizing the spectrum, the front-end **158** (shown in
18  red below) receives a signal that spans an entire television spectrum (*e.g.*, signal S,
19  including the entire signal from the lowest frequency "$F_{lo}$" to the highest frequency
20  "$F_{hi}$"). *See* '008 Patent, 2:44–59, 3:11–16, 4:45–50, 5:45–65. This signal is digitized
21  using one or more analog-to-digital converters (ADCs) located in the front-end **158**,
22  which generates a digital signal (D). *See id.* A channelizer (shown in blue) selects
23  portions of the digitized signal D to concurrently output to a signal monitor or analyzer
24  **154** (shown in green) and to a data processor **156** (shown in yellow):
25  Akl Decl. ¶ 101; *see also* '008 Patent, 4:7–10, 4:16–25, 4:28–50, 6:19–36, 3:20–32,
26  Figs. 1C, 3.

27  The signal monitor or analyzer 154 determines a characteristic of the received
28  signal S that is pertinent to the performance of the communication system. '008 Patent,

**7**

3:5–60; *see also id.* at 5:12–47, 6:19–36, Figs. 1C, 4. Once this characteristic of the signal S is determined, the '008 Patent discloses, throughout the multiple embodiments provided in the specification, different mechanisms of communicating this characteristic back to the source of the received signal. *Id.* at 3:51–60.

In one example embodiment, as depicted in Fig. 1C below, the monitoring apparatus is incorporated into the satellite dish assembly **172** (specifically its "subassembly" **174**):



FIG. 1C

*Id.* at Fig. 1C; *see also id.* at 4:51–53. However, "[i]n another example embodiment, the monitoring module **154** and/or data processing module **156** may reside in the gateway **196**." *Id.* at 4:59–62.

Regardless of where the monitoring takes place, the gateway **196** is able to communicate the monitored characteristic back to the source of the signal by "transmit[ting] data onto . . . the WAN 192 (via broadband connection **188**)." *Id.* at 5:7–9. Thus, in this embodiment, the monitoring data is returned to the operator by the

broadband connection **188**, instead of being uplinked back to the sending satellites. *See id.* In this way, the '008 Patent discloses methods and apparatus that allow service providers to monitor their content distribution networks remotely. *See id.*

## III.   <u>JUDICIAL STANDARD</u>

Courts construe claims as a matter of law. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996). Claim construction begins with the words of the claims themselves as they define the scope of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). "Claim [language] is generally given its 'ordinary and customary meaning,' that is, 'the meaning that the language would have to a person of ordinary skill in the art in question at the time of the invention.'" *Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 628 F.3d 1359, 1368 (Fed. Cir. 2010) (quoting *Phillips*, 415 F.3d at 1312–13). When construing claims, courts consult the intrinsic record, which includes the patent specification (written words and accompanying figures) and the prosecution history (the written record of proceedings before the USPTO). *Phillips*, 415 F.3d at 1315–17. Claim construction "is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims." *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1339 (Fed. Cir. 2001) (quoting *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000)).

Only if the scope of a claim would not be reasonably ascertainable by those skilled in the art, does the lack of an antecedent basis result in invalidity. *Energizer Holdings Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 77 USPQ2d 1625 (Fed. Cir. 2006) (holding that "anode gel" provided by implication the antecedent basis for "zinc anode"). Moreover, antecedent basis for an element may be provided by inherent components of other claim elements. *See Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1359 (Fed. Cir 2001) (holding that recitation of "an ellipse" provided antecedent basis for "an ellipse having a major diameter" because "[t]here can be no dispute that mathematically an inherent characteristic of an ellipse is a major diameter").

**IV.   ARGUMENT**

    **A.   PERSON OF ORDINARY SKILL IN THE ART**

Claim terms are viewed from the perspective of a POSITA. *Lazare Kaplan*, 628 F.3d at 1368. With respect to the Patents-in-Suit, a POSITA would possess a bachelor's degree in electrical engineering, computer engineering, computer science, or a related field, and two to three years of experience in the design and development of telecommunications systems. *See* Akl Decl. ¶ 24. Additional graduate education could substitute for professional experience, or significant experience in the field could substitute for formal education. *Id.* It appears the parties are essentially in agreement. *See* Steffes Decl. ¶¶ 64–65.

    **B.   CONSTRUCTIONS OF TERMS**

        **i.   '576 Patent**

            *1.   "digitizing the plurality of satellite broadband signals"*

| Claim Term | Entropic's Construction | Defendants' Construction |
|---|---|---|
| "digitizing the plurality of satellite broadband signals" ('576 Patent, cl. 14) | Plain and ordinary meaning. No construction necessary. | "digitizing the complete bands of satellite broadband signals received at the ODU" |

The Court should give the term its plain and ordinary meaning because:

- Defendants' construction impermissibly inserts "complete bands" into the claim.

Both Defendants agree with Entropic that the words "digitizing" and "satellite broadband signals" do not require construction. *See* ECF No. 195, Joint Claim Construction Statement at A-1. The dispute between the parties is whether it is proper to alter the text of the claim with a narrowing phrase. *See id.* The claim reads, "digitizing the ***plurality*** of satellite broadband signals," but Defendants alter the claim to read "digitizing the ***complete bands*** of satellite broadband signals received at the ODU."

*See* '576 Patent, cl. 14. Nothing in the intrinsic record supports the proposed claim redrafting.

As an initial matter, starting with claim 14 itself, the term "the plurality of satellite broadband signals" derives its antecedent basis from the preamble, which states in part, "a satellite outdoor unit (ODU) that receives ***a plurality of satellite broadband signals***." *Id.* The disputed "satellite broadband signals" therefore ***are*** the signals that are received by the satellite ODU, so importing "received at the ODU" into the construction is unnecessary. *Id.* Whatever satisfies "a plurality of satellite broadband signals" in the prior element, applies to the present element as well, as clear antecedent basis. *Id.*

Turning to the real dispute, it centers over whether the Court should insert into the claim "***complete bands.***" Defendants propose that ***each and every*** satellite broadband signal that might be received by the ODU must be digitized. *See* ECF No. 195 at A-1. That is the purpose of Defendants including "complete bands" in their constructions. *Id.* But this redrafting of the claim is contrary to the well-settled meaning of "plurality": a plurality is two or more, not all. *See Dayco Prod., Inc. v. Total Containment, Inc.*, 258 F.3d 1317, 1327–28 (Fed. Cir. 2001) ("[W]e have held that "plurality," when used in a claim, refers to two or more items, absent some indication to the contrary."). The claim could have been written to require "all" or "complete bands," but it was not.

Therefore, the plain and ordinary meaning of "digitizing the plurality of satellite broadband signals" should therefore be adopted.

2.   *"integrated receiver decoder (IRD)"*

| Claim Term | Entropic's Construction | DTV's Construction |
|---|---|---|
| "integrated receiver decoder (IRD)" ('576 Patent, cls. 14, 18, 19, 22, 41) | Plain and ordinary meaning. No construction necessary. | "device capable of at least receiving and decoding data and generating an output video signal" |

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

The Court should give this term its plain and ordinary meaning because:

- Entropic, DISH, and both technical experts in the case agree they understand what "integrated receiver decoder (IRD)" is: it is a device that receives and decodes, in one unit. *See* Steffes (DISH expert) Decl. ¶ 87; Akl (Entropic expert) Decl. ¶ 41.
- DTV (but not DISH) improperly rewrites "integrated receiver decoder" to "integrated receiver decoder *and video signal generator*" by inventing the requirement of "generating an output video signal."

The plain language term "integrated receiver decoder" is an (1) integrated device that (2) receives and (3) decodes. *See* '576 Patent, cl. 14. DISH appears to agree, not construing the term. *See* ECF No. 195 at A-2. Furthermore, both claim construction experts agree that a POSITA would understand that "an integrated receiver decoder (IRD)," is simply a device capable of performing *receiving* and *decoding* functionalities, *integrated* into one device. *See* Steffes (DISH expert) Decl. ¶ 87; Akl (Entropic expert) Decl. ¶ 41.

Standing alone, DTV's construction inserts the phrase "generating an output video signal" into the claim. *Compare* ECF No. 195 at A-2, *with* '576 Patent, cl. 14. DTV seems to rely upon the general background description of a prior art IRD to support its position. *Id.* The '576 Patent Background states, referring to Fig. 1: "The [prior art] IRD **180** tunes one transponder channel, demodulates the IF signal from the LNB down to base band, provides channel selection, conditional access, decodes the digital data to produce a video signal, and generates an RF output to drive a television." *See* '576 Patent, 1:39–43. DTV selectively chooses from among the various functions a prior art IRD might do, cherry picks one, and seeks to introduce it into the claim. DTV's construction conflates what functions an IRD *might* perform with *what an IRD is*. *See* ECF No. 195 at A-2 ("device *capable of at least* receiving and decoding data and generating an output video signal").

1    The experts agree that the imposition of functions beyond "receiving" and

2    "decoding" are not part of the definition of "integrated receiver decoder." *See* Steffes

3    (DISH expert) Decl. ¶ 87; Akl (Entropic expert) Decl. ¶ 41. The specification is

4    consistent with the experts' understanding. The Summary and Detailed Description of

5    the Invention, as opposed to the Background, refer to IRDs more broadly. *Compare*,

6    '576 Patent, Background *with id.* at Summary, Detailed Description of the Invention.

7    For example, the specification repeatedly describe IRDs of various capability, including

8    "[a] simplified IRD" that, for example, "tune the desired transponder channel[]" or

9    "tune to a single selectable IF frequency." *Id.* at 2:65–67, 9:20–22; *see also id.* at 6:67–

10   7:2.

11    DTV is thus improperly reading limitations into the claim. *See Phillips v. AWH*

12   *Corp.*, 415 F.3d 1303, 1320 (Fed. Cir. 2005).

13    3.    *"a transponder request [signal] . . . the transponder request*

14          *signals" / "from the IRD . . . to the IRDs" / "a plurality of*

15          *transponder signals . . . the transponder signal"*

| Claim Term | Entropic's Construction | DTV's Construction |
|---|---|---|
| "a transponder request [signal] . . . the transponder request signals"<br><br>"from the IRD . . . to the IRDs"<br><br>"a plurality of transponder signals . . . the transponder signal"<br>('576 Patent, cl. 14) | 1. Is not indefinite.<br>2. Plain and ordinary meaning. No construction necessary. | Indefinite |

**13**

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

The Court should give these terms their plain and ordinary meaning because:

- DTV's argument, apparently resting upon alleged incongruence between singular/plural references, does not even approach the standard of indefiniteness. DISH appears to agree with Entropic.

- Plain grammatical principles establish that the claim uses singular to discuss a ***particular*** IRD (among potentially several), but uses plural when discussing the ODU function, to leave open the possibility that multiple IRDs are connected to the single ODU.

DTV's position here implicates claim language all across the claim. *See* ECF No. 195 at A-3. DTV argues these elements are indefinite because of a supposed disagreement of singular/plural usage. *Id.* But the context, both of the claim and the specification, reveals everything is congruent and sensible.

Before turning to the language itself, consider the context of the claim. The '576 Patent discloses that multiple IRDs (red) may reside at a premises, each attached to the same outdoor unit (ODU):



FIG. 2

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

'576 Patent, FIG. 2. Each IRD must be able to obtain its desired content (a transponder signal): Claim 14 says that each IRD does so by sending "a transponder request to the ODU." '576 Patent, cl. 14. Because the context is an individual IRD, the singular form of IRD is used. But the claim recognizes that there may be multiple IRDs, so when discussing how the **ODU** will respond to the request, the claim uses the plural form of signals in the second element: "wherein the selecting is responsive to the transponder signals." *Id.*

This singular/plural grammar is consistent across the claim language DTV proposes for construction, as diagrammed below. The claim focuses on the singular form for a particular transaction (request/provision) with a particular IRD. *See id.* The claim then uses the plural form when discussing the ODU's responses in the abstract, because the ODU is expected to respond to requests from multiple IRDs if present.

14. A method of communicating a plurality of transponder signals from a satellite outdoor unit (ODU) that receives a plurality of satellite broadband signals to an integrated receiver decoder (IRD) over a single cable connected to the ODU, the method comprising the steps of:

communicating a transponder request to the ODU from the IRD;

in the ODU, *digitizing the plurality of satellite broadband signals,* selecting *and extracting* a plurality of transponder signals [extracted] from the received *digitized* satellite broadband signals, wherein the selecting is responsive to the transponder request signals;

combining *extracted* selected transponder signals into a composite signal;

transmitting the composite signal over the single cable from the ODU to the IRDs, wherein the modulation of the transponder signal is not altered by the steps of selecting, combining, and transmitting.

| Context:<br>a particular IRD | Context:<br>the ODU |
|---|---|
| **an IRD**<br>**the IRD**<br>a particular one of one or more | |
| **a transponder request**<br>SINGULAR | **the transponder request signals** (from any IRD)<br>PLURAL |
| **the transponder signal** (being returned to the IRD)<br>SINGULAR | **a plurality of transponder signals** (for any IRD)<br>PLURAL |

'576 Patent, cl. 14.

A POSITA reading claim 14 would have little trouble understanding what is meant from the grammar, especially in view of the specification. Thus, a POSITA would easily be able to ascertain the boundaries of the claim. *See 01 Communique Lab'y, Inc. v. LogMeIn, Inc*., 687 F.3d 1292, 1297 (Fed. Cir. 2012) (citing *TiVo, Inc. v. EchoStar Commc'ns Corp*., 516 F.3d 1290, 1303 (Fed. Cir. 2008) ("As a general rule, the words 'a' or 'an' in a patent claim carry the meaning of 'one or more.'")).

### 4.    *"transponder request signals"*

| Claim Term | Entropic's Construction | DISH's Construction |
|---|---|---|
| "transponder request signals" ('576 Patent, cls. 14, 19, 22) | Plain and ordinary meaning. No construction necessary. | "a signal identifying and requesting a particular transponder signal" |

The Court should give this term its plain and ordinary meaning because:

- Entropic and DTV appear to agree upon plain and ordinary meaning, with no construction necessary.
- DISH's construction is designed to require a very particular content format for the "transponder request signals," whereas the specification is not so limited.

First, Entropic notes that the claim language does not require "***identifying*** … a particular transponder signal." *Compare* ECF No. 195 at A-4, *with* '576 Patent, cls. 14, 19. DISH's attempt to impose a requirement of "identifying" is immediately suspicious. *See Bio-Rad Lab'ys, Inc. v. Int'l Trade Comm'n,* 998 F.3d 1320, 1331 (Fed. Cir. 2021) ("Inventors are masters of their claims, and the words they use to describe and claim their invention are decisive and binding."). The suspicions are confirmed by the intrinsic record.

The '576 Patent specification describes a transponder request signal thus: "[e]ach IRD communicates the channels it needs to receive, ***directly or indirectly***, to the signal selector." '576 Patent, 3:10–11. The next sentence in the specification confirms that no particular format is required: "***This information*** is used to select the transponder channel to combine in the signal selector output signal." '576 Patent, 3:11–13. The '576 Patent consistently describes the transponder request signal contents in generic terms, referring to transponder request signals as "channel information" (3:13–17, 9:31–33), "channel selection information" (4:45–47), and "channel select information" (9:6–13).

DISH's construction requiring the transponder request signal "identify[]" a particular transponder signal appears to be a straightforward attempt to narrow a broad, generic disclosure of the information content of the "transponder request" signal. This is legal error. *See Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012) (confirming there is a "stringent standard for narrowing a claim term beyond its plain and ordinary meaning"); *see also Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1347–48 (Fed. Cir. 2009) (declining to construe a broad claim term narrowly because "[t]he patentee is entitled to the full scope of his claims"); *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1281 (Fed. Cir. 2017) ("If the intrinsic record supports several definitions of a term, the term may be construed to encompass all such consistent meanings.").

The '576 Patent never discusses the generic information content of a "transponder request signal" as having to directly identify the desired transponder—what exactly does DISH mean by its construction? Would a translation table be sufficient? Is a reference to a given frequency required? Would a channel number or other identifier be sufficient? DISH's construction is contrary to the intrinsic evidence and sows confusion.

5.   *"selected [and extracted] transponder channel[s]"*

| Claim Term | Entropic's Construction | Defendants' Construction |
|---|---|---|
| "selected and extracted transponder channels" ('576 Patent, cls. 16, 17, 21, 39, 41–42) | 1. Is not indefinite. 2. Plain and ordinary meaning. No construction necessary. | Indefinite |

The Court should give this term its plain and ordinary meaning because:

- The Defendants' indefiniteness argument regarding antecedent basis fails, and there is no actual dispute over the claim terms themselves.
- A POSITA understands that by selecting and extracting a signal (base claim 14), the channel associated with that signal is also selected/extracted.

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

There is no actual dispute over the meaning of the claim term. Defendants' argument instead is that there is an alleged lack of antecedent basis such that it would confuse a POSITA and renders the claim invalid as indefinite. Dependent claim 16 refers to "the" selected and extracted transponder "channels." Independent claim 14, which claim 16 depends from, introduces "a plurality of transponder signals." *See* '576 Patent, cls. 14, 16. Because the identical words are not used, Defendants argue a lack of antecedent basis. *See* ECF No. 195 at A-5; *see also* Steffes Decl. ¶¶ 69–80.

Legally, a claim is not indefinite merely because a term lacks antecedent basis. *Energizer Holdings Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 77 USPQ2d 1625 (Fed. Cir. 2006). Thus, Defendants' indefiniteness challenge actually rests upon the argument that a POSITA would be hopelessly confused by the use of "channel" in the dependent claim and "signal" in the independent claim, and thus unable to reasonably ascertain the claim's scope.[7] In support, Defendants as well as DISH's expert argue that signals and channels are not identical—signals are the content of channels. *See* Steffes Decl. ¶ 81.

But this does not confuse the POSITA, because in the '576 Patent, "signals" and "channels" are inevitably intertwined—when signals are selected, or extracted, or translated, or combined, the channels carrying them are as well. Akl Decl. ¶¶ 76–80. That is how the '576 Patent works. *Id*. Therefore, a POSITA understands that the process of selecting transponder signals (in claim 14) is the process of selecting the transponder channels carrying those signals. *Id*.; *see also* Akl Decl. ¶¶ 72, 83, 84, 86, 88.

---

[7] While Defendants and Dr. Steffes include claims 39, 41, and 42 in their antecedent basis argument, they ignore that claims 39 and 41 explicitly recite "*a* selected [] transponder channel," and that claim 42 refers to "non-selected transponder channels." None of Defendants' argument can apply to these claims.

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

This linkage—selecting signals includes selecting their channels—is throughout the '576 Patent. For example (red = channels, blue = signals):

### SUMMARY OF THE INVENTION

A channel selecting and combining solution is used in the outdoor unit where one or more transponder channels are selected from each LNB output. The transponder channel or channels needed from each LNB are selected by a filter. Each selected transponder signal may be translated to a new channel frequency. The selected transponder channels are combined to form a composite signal. All of the selected,

'576 Patent, 2:54–60. When "transponder channels" are selected, that also selects the corresponding "transponder signals." Akl Decl. ¶¶ 76–80. Those channels are then combined into the composite "signal." *Id*. This is also described in the Detailed Description: "Each transponder **channel** may be frequency translated to the desired new carrier frequency, then filtered to produce a single transponder **signal** that can be combined with other similarly **selected transponder channels**." '576 Patent, 6:14–18.

Given the technical basis linking signals and channels in the functioning of the '576 Patent, the specification consistently links signals and channels, essentially interchangeably. Akl Decl. ¶ 78. For example, in the textual description of Fig. 13:

FIG. **13** shows the frequency spectrum of signals at various points in the signal processing.

\*          \*          \*

FIG. **13** shows the frequency spectrum of a sample stream as it is processed. The original spectrum **1** is frequency translated to locate the selected transponder channel at the desired frequency, as shown in spectrum **2**. A band pass filter then passes one transponder channel and removes signal information from the other transponders channels, shown in spectrum **3**. This filtering operation selects one transponder. In this example transponder channel B is selected. The sample stream for the selected channel is added to the sample stream from other filtering sections, represented in spectrum **4**, to produce a composite sample stream in spectrum **5**. Other selected channels are represented by channels labeled **X**.

'576 Patent, 4:12–13, 6:10–31.

And in the description of Fig. 16:

> Referring to FIG. **16**, another application of the present invention is to provide selected transponder signals along with other services transmitted on the same cable wiring. The selected transponder signals can be transmitted in unoccupied regions of the cable, such as above, below, or between broadband satellite signals. The number of transponder channels transmitted can be adapted to the available spectrum. In one example, 950 MHz to 1450 MHz is used by one conventional LNB output signal; 1550 MHz to 2050 MHz is used by another conventional LNB output, leaving 1450 MHz to 1550 MHz available. One or more selected transponder channels from any LNB can be inserted into this region. Suitable guard bands need to be provided to prevent interference, for example 3 transponder channels at 31.25 MHz spacing uses 93.75 MHz. Another example of this application is to combine a standard CATV signal occupying 50 to 750 MHz with selected satellite transponder channels that are combined and transmitted at frequencies above the CATV band.

'576 Patent, 10:27–45. And in Fig. 16 itself:



'576 Patent, FIG. 16.

In summary, the intrinsic record is overwhelming. Selecting and extracting "channels" in claim 16 corresponds to selecting and extracting "signals" in claim 14. *See* Akl Decl. ¶ 72. That is simply the way the '576 Patent works—signals (content) are selected by selecting the channels carrying them. *See*, *e.g.*, '576 Patent, 6:19–31 and FIG. 13.

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

In terms of extrinsic evidence, the experts agree about this crucial linkage. Dr. Akl, Entropic's expert agrees. *See* Akl Decl. ¶ 51 ("the selected [and extracted] ***transponder channel[s]***" are an inherent component of "***transponder signals***" because a POSITA understands that by selecting a channel, the signals associated with that channel are also selected.). Defendants' sole expert Dr. Steffes likewise agreed at his deposition:

> Q.    The patent is referring to the filtering operation as the selection of transponder ***channel*** B; correct?
>
> A.    That's correct.
>
> Q.    And whatever ***signal*** information is contained on channel B would also still be in that channel; correct?
>
> A.    ***It would be included, yes***.

Ex. 7, Steffes Tr. at 58:9–17. In his declaration, Dr. Steffes also agrees that the process by which transponder signals are selected involves selecting and extracting the transponder channels. Steffes Decl. ¶¶ 29–30.

In the end, there really is no dispute here. All the evidence confirms that the way the '576 Patent selects "signals" is by selecting the "channels" that carry them. The claims match the description. Claim 16's "selected and extracted transponder channels" refers to those channels selected as part-and-parcel of claim 14's "selecting and extracting transponder signals." The POSITA would not be confused, and Defendants cannot carry their burden of establishing a lack of reasonable certainty in the disputed claim language.

ii.     **'715 Patent**

6.     *"local area network"*

| Claim Term | Entropic's Construction | Defendants' Construction |
|---|---|---|
| "[a digital] local area network" ('715 Patent, cl. 9) | Plain and ordinary meaning. No construction necessary. | "a group of devices at a single site connected by cables that allow a device in the network to interact with any other on the network" |

The Court should give this term its plain and ordinary meaning because:

- Defendants' proposed construction reads in a preferred embodiment (wired connection) while reading out another (wireless connection).
- Defendants' additional requirements of "single site" and "allow a device in the network to interact with any other on the network" are plain attempts to add limitations to the claim.

The '715 Patent makes abundantly clear that "a digital local area network" as claimed and described in the specification includes both wired and wireless LANs and is not limited to "cables" as proposed by Defendants. *Compare* '715 Patent, 9:44–48, cl. 9, *with* ECF No. 195 at A-6. For example, the embodiment of asserted claim 9 is described with respect to Fig. 11 and the corresponding text of the specification. This text explains that the server/gateway **1160** "distributes the program information in packetized MPEG over a digital local area network (LAN)." '715 Patent, 9:44–48. The specification goes on to state that "Ethernet *or other LAN technology* is suitable for this function." *Id*. A POSITA would have been well-aware that both wired LANs (Ethernet; IEEE 802.3) and wireless LANs (Wi-Fi; IEEE 802.11) were available at least four years before the priority date of the '715 Patent. *See* Ex. 7, Steffes Tr. at 113:3–13 ("Q. Do you agree that [wireless] was a known LAN technology in 2001? A. It was a known technology for LANs at extremely low rates."); *see also* Ex. 8, 802.11-1997 -

IEEE Standard for Wireless LAN Medium Access Control (MAC) and Physical Layer (PHY) specifications, IEEE, https://ieeexplore.ieee.org/document/654749/ versions (identifying 802.11 is the standard for wireless local area networks and listing versions of the standard as far back as 1997); *also* Ex. 9, 802.3-2022 - IEEE Standard for Ethernet, IEEE, https://ieeexplore.ieee.org/document/9844436/versions (listing versions of the standard as far back as 1984). Therefore, a POSITA would understand that the plain and ordinary meaning of "local area network" includes wired embodiments (*i.e.*, "connected by cables") and wireless embodiments. *See* '715 Patent, 9:44–48, FIG. 11.

Turning to the remaining issues, it is unclear what Defendants mean by "at a single site," and Defendants have yet to articulate why that phrase should be read into the claim. *See* ECF No. 195 at A-6. Defendants also improperly assert that nothing qualifies as a local area network unless every device can communicate with every other device. *Id*. Defendants phrase this requirement as "allow[ing] a device in the network to interact with ***any other on the network***." *Id*. There are two problems here. *First*, it is unclear how Defendants intend to argue that a LAN which places limitations upon the communication of its constituent devices ceases to be a LAN. There are any number of scenarios where this could occur. Security restrictions, for example, could restrict communication among certain devices. LANs do not cease to be LANs if some nodes cannot communicate with every other node. *Second*, claim 9 itself states the required connectivity, and it is not what Defendants seek. Claim 9 simply requires the gateway to distribute programs to the STBs over the LAN. It does not require the STBs to be able to interact or communicate with the other STBs over the LAN.

Therefore, the disclosure of the '715 Patent is consistent with the plain and ordinary meaning of "local area network," and no construction is necessary.

*7. "RF Signals"*

| Claim Term | Entropic's Construction | DISH's Construction |
|---|---|---|
| "RF signals" ('715 Patent, cl. 9) | Plain and ordinary meaning. No construction necessary. | "analog carrier RF signals" |

The Court should give this term its plain and ordinary meaning because:

- Entropic and DTV agree that RF signals are not restricted to analog signals.
- The specification clearly describes examples of signal processing in the ***digital*** domain.
- DISH's expert agrees that the '715 Patent describes signal processing in the digital domain.

DISH ignores embodiments described in the specification in its attempts to limit "RF signals" in claim 9 to "***analog*** carrier signals." *See* ECF No. 195 at A-7. Digital signals are possible, and described. First, however, note the context of the claims. "RF signal" is used twice in claim 9. RF signals are (1) the result of frequency translation, and (2) also the subject of being combined:

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

**9**. A signal distribution system for distributing a plurality of low noise amplifier and block converter (LNB) output signals from a satellite outdoor unit (ODU) comprising:

   a gateway in communication with the ODU and at least one set top box (STB);

   a signal selector that receives a plurality of broadband LNB signals comprising a plurality of transponder signals, the signal selector is responsive to transponder select information transmitted by the gateway and selects a plurality of transponder signals from at least one broadband LNB signal based on the transponder select information;

   a frequency translator coupled to the signal selector that is capable of shifting the selected transponder signals to new carrier frequencies to produce RF signals; and   ← the result of frequency translation

   a signal combiner coupled to at least one frequency translator capable of combining at least two RF signals to   ← signals to be combined produce a composite signal;

   wherein the modulation of the composite signal is the same as the modulation of the broadband LNB signals and wherein the composite signal is transmitted to the gateway and the gateway receives the composite signal, decodes specific programs, and distributes the programs over a digital local area network (LAN) to STBs.

'715 Patent, cl. 9.

In the '715 Patent, these operations, and the RF signals upon which they are performed, can be digital, as demonstrated by two such examples:

### Frequency translation in the digital domain:

Referring again to FIG. **3**, the selected transponder channel is then frequency translated to a new carrier frequency. The selected and frequency translated digital signal is converted to an analog signal using a D/A converter for the I and Q components. One approach is to convert the digitally filtered signal to the analog domain using a D/A converter **350**, then using a quadrature modulator with mixers **360**, phase splitter **388**, LO **386**, and summer **380**. Alternatively, this can be done by a digital mixing operation where a rotating phasor is multiplied by the data samples to translate their frequency, then converting the frequency shifted digital signal to an analog signal with a D/A.

'715 Patent, 5:26–37.

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### An alternative method, again translating in the digital domain:

Alternatively, a single transponder channel can be selected by translating the spectrum down in frequency to place the selected channel at base band then applying a low pass filter transfer function to isolate a single channel. The translation can be done by a digital mixing operation wherein the sample data is multiplied by a data sequence representing a carrier frequency. A post-mixing filter rejects the undesired mixing terms.

'715 Patent, 5:42–49.

Likewise, the specification and Fig. 17 illustrates both translating and combining in the **_digital_** domain:

Two basic approaches to combining are possible. One approach is to combine digitally filtered signals in the digital domain. This can be achieved with all filtered transponder channels to be combined presented at a sample rate equal to the composite output rate. The other approach is to combine



FIG. 17

'715 Patent, 5:63–67, FIG. 17. Thus, the '715 Patent repeatedly discloses operating in the digital domain on RF signals—including the translation and combining steps of the

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

claim where "RF signals" appear. DISH's attempt to exclude digital forms of RF signals cannot be correct.

Although expert testimony cannot overcome this clear intrinsic record, it is reassuring that DISH's expert concedes that RF signals exist in the digital domain and are disclosed in the patent specification. *See* Ex. 7, Steffes Tr. at 52:14–17 (confirming that Fig. 17 is an example of tuning and frequency translation and filtering and summing in the digital domain).

In summary, the claimed frequency translating and combining aspects of claim 9 may be performed in the ***digital*** domain. This means the RF signals upon which those operations are performed are themselves digital. DISH's proposed construction specifically excludes preferred embodiments, violating the strong presumption against a claim construction that excludes a disclosed embodiment. *See Nobel Biocare Servs. AG v. Instradent USA, Inc.*, 903 F.3d 1365, 1381 (Fed. Cir. 2018), *as amended* (Sept. 20, 2018) ("There is a strong presumption against a claim construction that excludes a disclosed embodiment."); *see also SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1378–79 (Fed. Cir. 2013) ("A claim construction that 'excludes the preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support.'").

8.     <em>"decodes specific programs"</em>

| Claim Term | Entropic's Construction | DISH's Construction |
|---|---|---|
| "decodes specific programs" ('715 Patent, cl. 9) | 1. Is not indefinite. 2. Plain and ordinary meaning. No construction necessary. | Indefinite |

The Court should give this term its plain and ordinary meaning because:

- The meaning of "decodes" is well-known to a POSITA, as confirmed by the intrinsic and extrinsic evidence and DISH's expert. DTV appears to agree, not adopting DISH's indefiniteness position.

- DISH's expert ultimately agreed that DISH's alternative ground of indefiniteness—regarding "which" programs are decoded—is not, in fact, unclear.

There is no dispute that the term "decodes" is a term that has a plain and ordinary meaning to a POSITA. Notably, DTV does not believe the term requires construction. *See* ECF No. 195 at A-8. And although DISH alleges indefiniteness, DISH's expert agrees that a POSITA would understand that "an IRD can descramble a received signal, demodulate it, and demultiplex a transponder signal to obtain a specific video stream, *e.g.*, an MPEG video of a television program—[such that] each of these is a form of decoding in the satellite signal distribution and processing context." Steffes Decl. ¶ 87. The specification of the '715 Patent is consistent with this plain meaning, describing how an "MPEG transport stream demultiplexer **1020** extracts a specific video program that is combined by data combiner **1030**. Several MPEG streams are multiplexed as needed, and packets are formatted for transmission on a digital network." '715 Patent, 9:16–20. The specification further explains that "in FIG. 11, server/gateway **1160** receives the composite transponder signal, **decodes** specific programs, and distributes the program information in packetized MPEG over a digital local area network (LAN) **1170** to STBs **1180**." '715 Patent, 9:44–47. This description is consistent with the plain language of the claim, which recites that "the gateway receives the composite signal, decodes specific programs, and distributes the programs over a digital local area network (LAN) to STBs." '715 Patent, cl. 9.

DISH merely objects that a specific *type* of decoding is not specified in the claims. As DISH's expert states the argument: "no specific process for decoding or distributing by the gateway is disclosed in the '715 [Patent] specification. It would not be clear to a POSITA whether *one, some, all, or more of these types of decoding* is required to infringe the claims." Steffes Decl. ¶ 87. Pause to consider this position— DISH's expert knows that the plain meaning of decoding encompasses several "types," but nevertheless argue that the claims are indefinite because all such types fall within

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

the claim. DISH actually objects to the **scope** of the claim, not to any difficulty in determining that scope. However, broad is not indefinite.

DISH's other argument is that a POSITA would not know "**which programs** are decoded and whether the programs that are distributed are only specific (*i.e.*, a subset of) programs or all programs." Steffes Decl. ¶ 85. However, this objection did not survive deposition. There, DISH's expert agreed that the claim language is clear, and "the programs … that are decoded by the gateway are the same ones that are distributed over the LAN." *See* Ex. 7, Steffes Tr., 95:4–13, 95:21–96:2. Dr. Steffes also agreed that the specific programs that are decoded "are contained within the composite signal" received by the gateway. *Id*. at 100:10–19. DISH's expert arrived at this correct conclusion for good reason. The claim language itself is clear, and the specification provides examples of programs being decoded. '715 Patent, 9:44–47 ("Also in FIG. 11, server/gateway **1160** receives the composite transponder signal, decodes specific programs, and distributes the program information in packetized MPEG over a digital local area network (LAN) **1170** to STBs **1180**."), 9:16–20 ("MPEG transport stream demultiplexer **1020** extracts a specific video program that is combined by data combiner **1030**. Several MPEG streams are multiplexed as needed, and packets are formatted for transmission on a digital network."). This cannot be a sufficient ground for indefiniteness. *Nature Simulation Sys. Inc. v. Autodesk, Inc.*, 50 F.4th 1358, 1364 (Fed. Cir. 2022) ("Patent claims are viewed and understood in light of the specification, the prosecution history, and other relevant evidence, as 'would have allowed a skilled artisan to know the scope of the claimed invention with reasonable certainty.'").

In summary, DISH's objection to a claim covering the full scope of its plain meaning is not a legal ground for indefiniteness. Thus, the Court should find claim 9 of the '715 Patent definite, and agree with Entropic and DTV that no construction of "decodes specific programs" is necessary.

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

### iii.   **'008 Patent**

9.   *"an entire television spectrum"*

| Claim Term | Entropic's Construction | Defendants' Construction |
|---|---|---|
| "an entire television spectrum" ('008 Patent, cl. 1) | Plain and ordinary meaning. No construction necessary. | "all of the one or more television signals received by a front-end" |

The Court should give this term its plain and ordinary meaning because:

- Defendants remove this phrase from its context, including the "comprising" language that is part of the claimed phrase.
- Defendants replace the claim element television "***spectrum***" (a block of frequencies) with "***signals***" (the content).
- Defendants rewrite the point of reference—the claim element speaks to the signal operated upon by the ***analog-to-digital converter***, not the signal received "by a ***front end***."

Defendants surgically construe only a short and incomplete phrase from the claim. They seek to define it alone, divorced of its essential context and the "comprising" portion of the phrase itself. But claim construction is not an exercise in replacing words and certainly not an exercise in replacing only certain words divorced from the rest of the claim. The full context of the first claim element is:

**1**. A system comprising:
an analog-to-digital converter operable to digitize a received signal spanning an entire television spectrum comprising a plurality of television channels, said digitization resulting in a digitized signal;



**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

'008 Patent, cl. 1. Grammatically the claim requires an analog-to-***digital*** converter (ADC) to operate on a "received" signal. *Id*. That received signal is then described as "spanning an entire television spectrum comprising a plurality of television signals." *Id*. Note two important points by the plain language of the claim: (1) the "signal" digitized by the ADC is the signal ***the ADC*** receives, and (2) the entire spectrum that "comprises a plurality of television channels" is not referring ***only*** to the received signal, it describes an ***aspect*** of the "received signal." *Id*. Defendants' construction runs afoul of both of these truths.

The specification supports Entropic's construction and describes the operation of an ADC upon received signals spanning an entire television spectrum, consistent with the straightforward grammar of the claim. *See* '008 Patent, 5:58–65 ("In an example embodiment, the ADC 256 may be capable of digitizing a signal S wherein $F_{lo}$ to $F_{hi}$ is 1 GHz or higher. Accordingly, for cable television/DOCSIS, the ADC 256 may be operable to digitize the entire cable downstream (e.g., from ˜55 MHz to ˜1002 MHz). Similarly, for satellite television, the ADC 256 may be operable to digitize the received signal at the input of the LNB, and/or the downconverted signal (e.g., from ˜1 GHz to ˜2 GHz) at the output by an LNB."). Hence there is no need to reinterpret the claim.

In proffering a construction, Defendants extract four words from the claim while discarding essential claim language. *See Fenner Invs., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1322–23 (Fed. Cir. 2015) ("The terms used in patent claims are not construed in the abstract, but in the context in which the term was presented and used by the patentee, as it would have been understood by a person of ordinary skill in the field of the invention on reading the patent documents."); *see also Atlas IP, LLC v. Medtronic, Inc.*, 809 F.3d 599, 605 (Fed. Cir. 2015) ("We generally give words of a claim their ordinary meaning in the context of the claim and the whole patent document."). While it is not entirely clear why Defendants ignore the plain language of the claim, Defendants' rewrite of the claim language is undoubtedly in pursuit of an undisclosed non-infringement position.

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

The first part of the claim that Defendants discard is part of the construed phrase itself. *Compare* ECF No. 195 at A-9, *with* '008 Patent, cl. 1. While proposing for construction only "an entire television spectrum," the full phrase is actually quite different: "an entire television spectrum ***comprising a plurality of television signals***." '008 Patent, cl. 1. Omitting the "comprising" portion is a bold attempt to alter the claim, in two ways. *First*, the claim does not require the spectrum to comprise "all" television signals received at a "***front-end***" as Defendants propose. The claim expressly requires only that the "entire television spectrum" comprise ***two or more*** television channels, ***not everything*** received at the arbitrary point of a "front-end." *Id*. A front-end is an apparatus with components that alter a signal before the signal reaches an ADC, which is illustrated, for example, in Fig. 2B:



**FIG. 2B**

'008 Patent, FIG. 2B. Illustrated in this particular front-end are an amplifier **252**, and then a filter **254**. *Id*. at 5:50–52. The signal S that enters the front end is different than the signal that enters the ADC. *Id*.; *see also id.* at 5:41–57. The claim at issue does not reference a front-end. *See* '008 Patent, cl. 1. Instead, the reference point is the ***ADC***, which operates on the signals in the claim, and indeed is the subject of the entire claim element at issue. *Id*. Nothing in the claim or specification requires the ADC operate on "all of the one or more television signals received by a ***front end*.**" *Id*. Thus Defendants' insertion and reliance on "front-end" as the point of reference is at odds with the disclosure as well as the plain language of the claim, which does not include the language.

**32**

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

*Second*, ignoring the "comprising" part of the claim alters what else is permitted in the "entire television spectrum." As a "comprising" element, the television spectrum is permitted to have contents beyond the television signals. *See Georgia-Pacific Corp. v. US Gypsum Co.*, 195 F.3d 1322, 1327 ("The transitional term 'comprising' … is open-ended and does not exclude additional, unrecited elements or method steps."). Indeed, the specification confirms that the received signal may comprise other kinds of information, such as DOCSIS channels (cable internet). '008 Patent, 2:49–54; 3:11–15 ("The signal S may be the result of a plurality of television *and/or DOCSIS channels* being frequency division multiplexed into a single signal."), 4:45–47. Defendants may, or may not, intend their definition to exclude content beyond television signals—it could be read that way—but if they do so intend, that is error.

Turning from the portion of the claim following "an entire television spectrum" that Defendants ignore, the claim language preceding it is also ignored by Defendants, namely—the "received signal" (green):

> **1**. A system comprising:
> an analog-to-digital converter operable to digitize a received signal spanning an entire television spectrum comprising a plurality of television channels, said digitization resulting in a digitized signal;

'008 Patent, cl. 1. The "entire television spectrum" is not a signal itself, it is a qualifier that the claim applies to "received signal." *Id*. A "signal" refers to *content*, whereas a "spectrum" is a block of frequency—the *location* for signals. *See* Supra Section V.A. ("The '576 Patent also refers to transponder request signals as 'channel information' (3:13–17, 9:31–33), 'channel selection information' (4:45–47), and 'channel select information' (9:6–13)."); *see also* '008 Patent, cl. 1 ("a data processor operable to process a television channel to recover content carried on the television channel"). As written, the claim thus makes perfect sense. The claim requires the content ("a received

signal") span over a location—an entire block of frequency ("spectrum"). What block
of frequency? The one containing at least "a plurality of television channels."

In contrast, if Defendants' construction is used, the claim becomes confusingly
self-referential—a "signal" spanning "signals" (red text = Defendants' definition in
place of "an entire television spectrum"):

> **1**. A system comprising:
> an analog-to-digital converter operable to digitize a
>    received signal spanning all of the one or more television signals received by a front-end
>    comprising a plurality of television channels, said digi-
>    tization resulting in a digitized signal;

'008 Patent, cl. 1 (modified). This is not merely a confusing result. By re-defining the
noun "spectrum" (a location) as "signals" (content), Defendants redraft the claim, which
would then read as content spanning content. This substitution changes the role of the
"spectrum" phrase from ***describing an aspect*** of the signal, to ***defining*** the signal.

In summary, Defendants' construction is a puzzle piece whose shape does not fit
the claim. This is unsurprising because it ignores both the language preceding, and
following, the four words chosen by Defendants for construction. For all the foregoing
reasons, the plain and ordinary meaning of "an entire television spectrum" should be
adopted instead of Defendants' confusing attempt to fundamentally alter the claim
language.

> *10.    "signal having a bandwidth that spans from a first*
> *frequency, $F_{lo}$, to a second frequency, $F_{hi}$"*

| Claim Term | Entropic's Construction | DISH's Construction |
|---|---|---|
| "signal having a bandwidth that spans from a first frequency, $F_{lo}$, to a second frequency, $F_{hi}$" ('008 Patent, cls. 3, 11) | Plain and ordinary meaning. No construction necessary. | "Plain and ordinary meaning, which is a signal that includes all continuous frequencies from $F_{lo}$ to $F_{hi}$" |

The Court should give this term its plain and ordinary meaning because:

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

1    • All parties agree the term is plain meaning, and Entropic and DTV agree
2        nothing more is necessary.

3    The parties agree this term is understood to have its plain and ordinary meaning,
4    but DISH alone then presses for a construction anyway. It remains unclear why DISH
5    seeks to define a term agreed to have a plain meaning, and Entropic will address in its
6    reply any point of dispute DISH elucidates in its opening briefing.

7                        *11.    "a source of said received signal"*

| Claim Term | Entropic's Construction | DISH's Construction |
|---|---|---|
| "a source of said received signal" ('008 Patent, cls. 1, 3, 11) | Plain and ordinary meaning. No construction necessary. | "the equipment, e.g., a cable headend or satellite transmitter, that transmitted the received signal" |

14    Each of the independent claims 1, 3, and 11 of the '008 Patent, recites in part,
15    "report said determined characteristic to *a source of said received signal*." The Court
16    should adopt Entropic's proposed construction because:

17    • Entropic and DTV agree no construction is necessary.
18    • DISH's construction strictly limits the claim to reporting monitoring
19        information to specific equipment, in contravention of the specification,
20        and would thus exclude disclosed embodiments.
21    • DISH's expert Dr. Steffes confirms that "a source" could be the satellite
22        operator generally (as opposed to a specific piece of equipment).

23    It seems to be undisputed that the point of the '008 Patent is to provide
24    cable/satellite operators with remote monitoring of the equipment they deploy at
25    customer premises. The only question is whether the claim is limited to returning that
26    monitoring data to the operator exclusively by means of a specific piece of equipment.
27    DISH (but not DTV) takes the position that if a certain "satellite transmitter" beams
28    down satellite signals to a customer premises, any monitoring data must be returned

**35**
**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

back to ***that satellite equipment***. It cannot, using DISH's construction, be returned to any other equipment the operator controls, nor be returned by another path, such as the Internet.

This position is directly contravened by the specification. The '008 Patent discloses both a cable embodiment, and a satellite embodiment. In the satellite embodiment, a gateway **196** either performs signal monitoring itself ('008 Patent, 4:59–62), or receives the monitoring data from an apparatus in the satellite subassembly **174** (*id.* at 4:53–56). In turn, gateway **196** is connected to a broadband connection **188**, interfacing to wide area network (WAN) **192**. *Id.* at 5:6–9; *see also* Akl Decl. ¶ 114. This is shown below in Fig. 1C:



**FIG. 1C**

'008 Patent, Fig. 1C (excerpt). Thus, the gateway is provided a broadband connection **188**, to WAN **192**, to return monitoring information to the operator. *Id*. This is consistent with the plain meaning of "source" being broadly the satellite/cable operator, and not the specific satellite equipment which sent the downlink signal. Nothing in the specification even suggests the monitoring information must be sent back up to the orbiting satellite that provided the source signal.

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

The extrinsic evidence is in accord. Dr. Steffes, DISH's own expert, confirms that "the cable operator or the satellite operator" themselves (*i.e.*, equipment under the control of DISH and/or DTV), more generally, could be "a source of said received signal." Ex. 7, Steffes Dep Tr. at 127:25–128:5; *see also* Akl Decl. ¶¶ 107, 119. DISH does not argue that the patentee has acted as its own lexicographer, nor does DISH argue disavowal. Thus, the plain meaning should apply. *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014). Moreover, Dr. Steffes also confirms the details. At his deposition Dr. Steffes discussed how satellite operators utilize wide area networks (WANs) to collect information from customer premises and how that information is provided to operators' uplink centers. *See* Ex. 7, Steffes Dep Tr. at 118:21–119:2, 120:20–121:2. This return path to the operator is the same one disclosed in the '008 Patent (*see* Fig. 1C above). This is also confirmed by Entropic's expert Dr. Akl, who explained a "POSITA would not interpret the patent as ***requiring*** a transmission path back to the transmitting satellite while ignoring the broadband connection **188**." Akl Decl. ¶ 116.

Therefore, because DISH's proposed construction of "a source of said received signal" is contrary to the plain meaning, and would exclude embodiments illustrated and disclosed in the '008 Patent, DISH's construction should not be adopted. *See Nobel Biocare Servs.*, 903 F.3d at 1381; *see also SynQor*, 709 F.3d at 1378–79.

## V.   <u>CONCLUSION</u>

Therefore, the plain and ordinary meaning should be adopted for all terms that Defendants propose for construction.

Dated: May 12, 2023

By: */s/ Christina N. Goodrich*
Christina N. Goodrich (SBN 261722)
Connor J. Meggs (SBN 336159)
**K&L GATES LLP**
10100 Santa Monica Blvd., 8th Fl.
Los Angeles, CA 90067
Tel: (310) 552-5547
Fax: (310) 552-5001
christina.goodrich@klgates.com
connor.meggs@klgates.com

James Shimota
(admitted *pro hac vice*)
Jason Engel
(admitted *pro hac vice*)
George Summerfield
(*pro hac vice* application pending)
Katherine L. Allor
(admitted *pro hac vice*)
**K&L GATES LLP**
70 W. Madison Street, Suite 3300
Chicago, IL 60602
Tel.: (312) 372-1121
Fax: (312) 827-8000
jim.shimota@klgates.com
jason.engel@klgates.com
george.summerfield@klgates.com
katy.allor@klgates.com

Nicholas F. Lenning
(admitted *pro hac vice*)
**K&L GATES LLP**
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
(206) 623-7580
(206) 370-6006 (fax)
nicholas.lenning@klgates.com

Darlene F. Ghavimi (admitted *pro hac vice*)
Matthew Blair (admitted *pro hac vice*)
**K&L GATES LLP**
2801 Via Fortuna, Suite #650
Austin, TX 78746
(512) 482-6919
(512) 482-6859
Darlene.ghavimi@klgates.com
Matthew.blair@klgates.com

**ATTORNEYS FOR PLAINTIFF
ENTROPIC COMMUNICATIONS,
LLC**