1  Jason C. Lo, SBN 219030
2  jlo@gibsondunn.com
   GIBSON, DUNN & CRUTCHER LLP
3  333 South Grand Avenue, Suite 5400
   Los Angeles, CA 90071-3197
4  Telephone: 213.229.7000
   Facsimile: 213.229.7520
5

6  **ATTORNEY FOR DEFENDANTS DIRECTV, LLC AND AT&T SERVICES, INC.**

7  Matthew C. Bernstein, Bar No. 199240
   MBernstein@perkinscoie.com
8  PERKINS COIE LLP
   11452 El Camino Real, Ste 300
9  San Diego, California 92130-2080
   Telephone: +1.858.720.5700
10 Facsimile: +1.858.720.5799

11
   **ATTORNEYS FOR DEFENDANTS DISH NETWORK CORPORATION, DISH
12 NETWORK L.L.C., AND DISH NETWORK SERVICE L.L.C.**

13 *Additional Counsel Listed on Signature Block*

14
15                   UNITED STATES DISTRICT COURT
                     CENTRAL DISTRICT OF CALIFORNIA
16

17 | ENTROPIC COMMUNICATIONS, LLC, | No. 2:22-cv-07775-JWH-JEM |
18 |          Plaintiff, | **DEFENDANTS' JOINT OPENING CLAIM CONSTRUCTION BRIEF** |
19 |     v. | |
20 | DIRECTV, LLC and AT&T SERVICES, INC., | **Hon. John W. Holcomb** |
21 |          Defendants. | |

22
23 | ENTROPIC COMMUNICATIONS, LLC, | No. 2:22-cv-07959-JWH-JEM |
24 |          Plaintiff, | Case Transferred from E.D. Texas (2:22-cv-76-JRG) |
25 |     v. | |
26 | DISH NETWORK CORPORATION, DISH NETWORK L.L.C., and DISH NETWORK SERVICE L.L.C., | |
27 |          Defendants. | |
28

# TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................................1

II. LEGAL PRINCIPLES .........................................................................................1

    A.  Claim Construction ..................................................................................1

    B.  Indefiniteness ...........................................................................................3

III. INTRODUCTION TO SATELLITE TV DISTRIBUTION ................................3

IV. THE EXPERT WITNESSES ...............................................................................6

V.  U.S. PATENT NO. 7,130,576 ..............................................................................8

    A.  The '576 Patent .........................................................................................8

        1.  Summary Of The '576 Patent ........................................................8

        2.  Relevant Prosecution History Of The '576 Patent .....................10

        3.  Person Of Ordinary Skill In The Art ...........................................11

    B.  Disputed Terms Of The '576 Patent .......................................................12

        1.  "digitizing the plurality of satellite broadband signals" ('576 patent, cl. 14) ..................................................................12

            a.  The claim requires "digitizing … *complete* [received] bands*"* ...............................................................................13

            b.  What is digitized are the *received* satellite broadband signals" ....................................................................15

        2.  "integrated receiver decoder (IRD)" ('576 patent, cls. 14, 18, 19, 21, 22, 41) ..............................................................................16

        3.  "selected [and extracted] transponder channel[s]" ('576 patent, cls. 16, 17, 21, 39, 41-42) .........................................................17

        4.  "transponder request signals" ('576 patent, cls. 14, 19, and 22) ......21

        5.  "a transponder request [signal] ... the transponder request signals" / "from the IRD ... to the IRDs" / "a plurality of transponder signals ... the transponder signal" ('576 patent, cl. 14) ..................................................................22

VI. U.S. PATENT NO. 7,542,715 ............................................................................25

    A.  The '715 Patent .......................................................................................25

    B.  Disputed Terms Of The '715 Patent .......................................................26

        1.  "RF signals" ('715 patent, cl. 9) .................................................27

        2.  "decodes specific programs" ('715 patent, cl. 9) ........................29

        3.  "local area network" ('715 patent, cl. 9) ....................................31

VII. U.S. PATENT NO. 8,792,008 ...........................................................................35

A.  The '008 Patent.........................................................................35

1.  Summary Of The '008 Patent............................................35

2.  Prosecution History Of The '008 Patent...........................38

3.  Person Of Ordinary Skill In the Art ('008 Patent) ...........38

B.  Disputed Terms For The '008 Patent .........................................39

1.  "an entire television spectrum" ('008 patent, cls. 1-2)....................39

2.  "signal having a bandwidth that spans from a first frequency, $F_{lo}$, to a second frequency, $F_{hi}$" ('008 patent, cls. 3, 11.)............................41

3.  "a source of said received signal" ('008 patent, cls. 1, 3, 11) ..........43

VIII.  CONCLUSION ..................................................................................45

# TABLE OF AUTHORITIES

**CASES**

*ACTV, Inc. v. Walt Disney Co.*,
346 F.3d 1082 (Fed. Cir. 2003) ....................................................13, 32

*Adv. Display Sys., Inc. v. Kent State Univ.*,
212 F.3d 1272 (Fed. Cir. 2000) .............................................................8

*Advanced Tech. Incubator, Inc. v. Sharp Corp.*,
No. 07-cv-468, 2009 WL 4403314 (E.D. Tex. Jun. 26, 2009)...........18

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
299 F.3d 1336 (Fed. Cir. 2002) .............................................................3

*Arista Networks, Inc. v. Cisco Sys., Inc.*,
908 F.3d 792 (Fed. Cir. 2018) .............................................................28

*Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*,
813 F. App'x 522 (Fed. Cir. 2020) ......................................................25

*CA, Inc. v. Netflix, Inc.*,
No. 2:21-cv-80, 2021 WL 5323413 (E.D. Tex. Nov. 16, 2021) ........20

*Chimie v. PPG Indus., Inc.*,
402 F.3d 1371 (Fed. Cir. 2005) ...........................................................16

*Clearstream Wastewater Sys., Inc. v. Hydro-Action, Inc.*,
206 F.3d 1440 (Fed. Cir. 2000) ...........................................................40

*Energizer Holdings, Inc. v. ITC*,
435 F.3d 1366 (Fed. Cir. 2006) ...........................................................18

*Eon Corp. IP Holdings v. Silver Spring Networks, Inc.*,
815 F.3d 1314 (Fed. Cir. 2016) .............................................................2

*Fenner Invs., Ltd. v. Hewlett-Packard Co.*,
No. 08-cv-273, 2009 WL 3734102 (E.D. Tex. Nov. 4, 2009) ........3, 42

*FutureLogic, Inc. v. TransAct Techs., Inc.*,
No. CV-0503754, 2007 WL 9700700 (C.D. Cal. Nov. 19, 2007) ....34

*Halliburton Energy Servs., Inc. v. M-I LLC*,
514 F.3d 1244 (Fed. Cir. 2008) .............................................................3

*Imperium (IP) Holdings, Inc. v. Apple, Inc.*,
   920 F. Supp. 2d 747 (E.D. Tex. 2013)..................................................................25

*Info-Hold, Inc. v. Applied Media Techs. Corp.*,
   783 F.3d 1262 (Fed. Cir. 2015) ...........................................................................29

*Intel Corp. v. Qualcomm Inc.*,
   121 F.4th 801 (Fed. Cir. 2021) ...........................................................................29

*Intel Corp. v. Qualcomm Inc.*,
   21 F.4th 784 (Fed. Cir. 2021) .......................................................................15, 29

*Intex Rec. Corp. v. Team Worldwide Corp.*,
   860 F. App'x 717 (Fed. Cir. 2021) ......................................................................14

*Nautilus, Inc. v. Biosig Instrs., Inc.*,
   572 U.S. 898 (2014)........................................................................................3, 23

*Nichia Corp. v. Vizio, Inc.*,
   No. 16-cv-545, 2018 WL 11350040 (C.D. Cal. May 29, 2018) ........................20

*Northpeak Wireless, LLC v. 3Com Corp.*,
   No. 09-cv-00602, 2015 WL 5117020 (N.D. Cal. Aug. 28, 2015)........................3

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008) ...............................................................1, 2, 27

*Omega Eng'g, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003) ............................................................................2

*OpenTV, Inc. v. Apple, Inc.*,
   2015 WL 3544845 (N.D. Cal. June 5, 2015).....................................................14

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (*en banc*).................................................passim

*Serio-US Indus., Inc. v. Plastic Recovery Techs. Corp.*,
   459 F.3d 1311 (Fed. Cir. 2006) ..........................................................................12

*Sw. Software, Inc. v. Harlequin Inc.*,
   226 F.3d 1280 (Fed. Cir. 2000) ..........................................................................23

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
   574 U.S. 318 (2015)............................................................................................34

No. 2:22-cv-07775-JWH-JEM
DEFENDANTS' OPENING MARKMAN BRIEF

*TF3 Ltd. v. Tre Milano, LLC*,
   894 F.3d 1366 (Fed. Cir. 2018) ...........................................................................14

*UniRAM Tech, Inc. v. Monolithic Sys. Tech., Inc.*,
   No. 04-cv-1286, 2006 WL 825460 (N.D. Cal. Mar. 30, 2006) .........................30

*Wonderland Nurserygoods v. Baby Trend, Inc.*,
   No. 5:14-cv-1153-JWH-SPX, 2020 WL 13680678 (C.D. Cal. Dec. 30,
   2020) ....................................................................................................................1

**STATUTES**

America Invents Act, Pub. L. No. 112-29 ..................................................................3

**OTHER AUTHORITIES**

Eastern District of Texas Patent Local Rule 4-2(b) ...................................................7

Manual of Patent Examining Procedure (9th ed., July 2020)..................................18

No. 2:22-cv-07775-JWH-JEM
DEFENDANTS' OPENING MARKMAN BRIEF

**Index For Appendix Of Exhibit To Defendants' Opening Markman Brief**

| Exhibit | Description |
|---|---|
| **A** | U.S. Patent No. 7,130,576 ("'576 patent") |
| **B** | U.S. Patent No. 7,542,715 ("'715 patent") |
| **C** | U.S. Patent No. 8,792,008 ("'008 patent") |
| **D** | Excerpts from Reexamination File History for '576 patent [page numbers added] |
| **E** | File History for '008 patent [page numbers added] |
| **F** | Expert Declaration of Dr. Paul G. Steffes Regarding Claim Construction ("Steffes Decl.") |
| **G** | Excerpts from Transcript of Deposition of Dr. Paul G. Steffes (April 18, 2023) ("Steffes Dep. Tr.") |
| **H** | Excerpts from the Rebuttal Expert Declaration of Dr. Robert Akl, D.SC. Regarding Claim Construction ("Akl Decl.") |
| **I** | Excerpts from Transcript of Deposition of Dr. Robert Akl (April 20, 2023) ("Akl Dep. Tr.") |
| **J** | U.S. Patent No. 5,959,592 to Petruzzelli ("Petruzzelli") |
| **K** | U.S. Patent No. 6,134,419 to Williams ("Williams") |
| **L** | Slattery, B., "Advanced Digital Video Encoders", Analog Dialogue, 30-4 (1996) [DTV_ENTROPIC-0585651 – 0585654] |
| **M** | Excerpt from Microsoft Computer Dictionary (5th ed 2002) (Definition of "LAN") [DTV_ENTROPIC-0585659 – 0585661] |
| **N** | Excerpt from Microsoft Internet & Networking Dictionary (2003) [DTV_ENTROPIC-0585674 – 0585677] |
| **O** | Excerpt from Dictionary of Computer Science, Engineering, and Technology (2001) [DTV_ENTROPIC-0585655 – 0565658] |
| **P** | Excerpt from Comprehensive Dictionary of Electrical Engineering (1998) [DTV_ENTROPIC-0585670 – 0585673] |

# I. INTRODUCTION

Plaintiff Entropic seeks to avoid any constructions that clarify the scope of the asserted claims in its newly acquired '008, '576, and '715 patents.  For every one of the disputed terms, Entropic states that "no construction is needed" and proposes only the "plain and ordinary meaning."  But Entropic never explains what it believes the plain and ordinary meanings of any terms *are*, even as its infringement contentions make clear that it applies many terms in unusual and counterintuitive ways.  Moreover, because parties rarely agree on the plain meaning of a term, courts recognize that it is often legal error to find that a term should be given its "plain meaning" and leave unresolved the parties' dispute as to what that meaning may be.  *See, e.g.*, *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008); *Wonderland Nurserygoods v. Baby Trend, Inc.*, No. 5:14-cv-1153-JWH-SPX, 2020 WL 13680678, at *3 (C.D. Cal. Dec. 30, 2020) ("Contrary to [the] approach of simply asserting 'plain and ordinary meaning,' however, to resolve the underlying dispute, the Court must articulate that plain meaning.").  For exactly that reason, the Court should assist the parties by providing constructions here or, for several of the terms, finding them indefinite.

# II. LEGAL PRINCIPLES

## A.   Claim Construction

The methodology for construing claim terms is governed by the Federal Circuit's *en banc* decision in *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*).  "[T]he words of a claim are generally given their ordinary and customary meaning … to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Id.* (internal quotation and citations omitted).  "Properly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent" (*id.* at 1321)—that is, the specification, including the claims and written description (*id.* at 1314-17).

Although claim terms are generally construed according to their ordinary meaning, as described above, there are important exceptions, such as:

[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs. In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive.

*Id.* at 1316 (citations omitted).

"[A] Court should also consider the patent's prosecution history, if it is in evidence." *Phillips*, 415 F.3d at 1317 (citations and quotation omitted). As with the specification, any "clear and unambiguous disavowal of claim scope" by the patentee during prosecution (for example, to secure a patent by distinguishing its invention from the prior art) will be enforced to "narrow[] the ordinary meaning of the claim." *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323-26 (Fed. Cir. 2003) (internal quotations omitted).

In addition to the specification and file history, which are "intrinsic" to the patent, the Court may also consult "extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314. Examples of extrinsic evidence include "expert and inventor testimony, dictionaries, and learned treatises." *Id.* at 1317.

Furthermore, and importantly here, "[a] determination that a claim term 'needs no construction' or has [a] 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro*, 521 F.3d at 1360-61 (when the parties dispute the proper scope of claim terms, "the court, not the jury, must resolve that dispute"); *see also Eon Corp. IP Holdings v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1319 (Fed. Cir. 2016) ("[A] district court's duty at the claim construction stage is, simply … to resolve a dispute about claim scope that has been raised by the parties."). Additionally and separately, failing to construe a technical claim term that is outside a lay juror's understanding may also "risk falling short of the Court's duty to 'ensure that the jury fully understands the court's claim construction rulings and what the patentee covered by the

claims.'" *Northpeak Wireless, LLC v. 3Com Corp.*, No. 09-cv-00602, 2015 WL 5117020, at *11 (N.D. Cal. Aug. 28, 2015); *see also Fenner Invs., Ltd. v. Hewlett-Packard Co.*, No. 08-cv-273, 2009 WL 3734102, at *6 (E.D. Tex. Nov. 4, 2009) (construing term because "claim construction is necessary to insure [*sic*] that a jury will understand what is claimed").

## B.   Indefiniteness

Pre-AIA[1] 35 U.S.C. §112, ¶2 states, "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention." This statutory provision is called the "definiteness" requirement. *Nautilus, Inc. v. Biosig Instrs., Inc.*, 572 U.S. 898, 901 (2014). Patent claims, viewed in light of the specification and prosecution history, must inform those skilled in the art about the scope of the claimed invention with "reasonable certainty." *Id.* at 901, 910. Patents must provide "clear notice" of what is claimed, thereby "appris[ing] the public of what is still open to them." *Id.* at 909 (internal quotations omitted); *see also Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008) ("[T]he patent statute requires that the scope of the claims be sufficiently definite to inform the public of the bounds of the protected invention ….").

Indefiniteness renders a claim (and its dependent claims) invalid, and courts may not rewrite the claim to preserve its validity. *See Nautilus*, 572 U.S. at 902; *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002).

## III.   INTRODUCTION TO SATELLITE TV DISTRIBUTION

Distributing television content (and other information) via satellite to customer premises on the ground (*e.g.*, houses, hotels, or businesses) was well known at the time of the alleged inventions, and the asserted patents do not purport to improve on the distribution process. Nor do they suggest improvements in the known process for

---

[1]   35 U.S.C. §112 was amended, and its subsections were renamed, by the America Invents Act, Pub. L. No. 112-29 ("AIA"), which took effect on September 16, 2012. The asserted patents are governed by pre-AIA §112.

1   receiving these signals at a customer's premises.  However, some background in these
2   areas is helpful to understand the technical subject matter of the alleged inventions.

3   Satellite television distribution starts on the ground.  Specifically, a collection of
4   television content is combined at an "uplink center" and transmitted as a signal to a
5   satellite in geostationary orbit.  To communicate the content to the satellite, uplink centers
6   generate physical electromagnetic waves over a broad range of frequencies in the "radio
7   spectrum" ("radio frequency" or "RF") and "modulate" the physical signal to include
8   information such as television content.  Broadly speaking, modulation refers to changing
9   the physical signal in a manner that a recipient will understand corresponds to information
10   (like a code).  For example, "amplitude modulation" ("AM") is a type of modulation
11   scheme used by radio stations to broadcast information that a car radio can "de-modulate"
12   to isolate the information (*e.g.*, music, advertisements).  In both the satellite and AM radio
13   contexts, the physical RF waves "carry" the information (*i.e.*, a signal) through the air
14   and so are sometimes referred to as "carrier waves."[2]

15   Each satellite receives signals originating from one or more uplink centers on
16   Earth.  The pieces of hardware on the satellite that receive and process these signals, and
17   transmit processed signals back to the ground, are called "transponders."  Satellites
18   typically have several transponders, each of which generates "transponder signals" that
19   may include, in the television context, one or more television programs, including
20   programs on multiple television channels (*e.g.*, ESPN, TBS, HBO—in other words,
21   "channels," as viewers or jurors likely understand the term).[3]

22
23   [2]   The RF carrier wave is an analog signal, but it may carry audio and video television
         program data that is digitized and that may be decoded by particular hardware (such
24       as a set-top box, discussed below).  (*See* Ex. A ('576 patent) at 1:19-43.)

25   [3]   In the common specification of the '576 and '715 patent, "channel" generally does
         not have this colloquial meaning, but instead refers to a defined frequency range
26       through which signals travel.  But it is important to note that "signal" and "channel"
         may have different meanings in various contexts.  As one example, the '576 patent
27       may refer to what is received from a satellite as a "signal," although as discussed in
         this section, that "signal" actually includes a plurality of transponder channels through
28       which constituent transponder signals pass.  The '008 patent, by contrast, may use

Although related concepts, "transponder signals"—*i.e.*, the signals themselves, which can be comprised of multiple television programs—are fundamentally distinct from "transponder channels," which can be thought of for purposes of the '576 and '715 patents as the conduit through which the signals travel. DISH's expert, Dr. Steffes, analogizes the relationship between channels and signals in this context to the banks of a river (the channel) and the water flowing between those banks (the signals, although other things can pass between the riverbanks with the water/signals). (*See* Ex. F, ¶81.)

The satellite combines the transponder signals to generate a signal spanning a broad frequency spectrum (appropriately referred to as a "***broad***band" signal) that the satellite broadcasts down to Earth on a modulated RF carrier wave. To create a broadband signal, each transponder signal is assigned to a distinct frequency range within the frequency spectrum used for the broadcast to avoid interference, *e.g.*, each occupies a distinct range of 24 MHz within a 500 MHz spectrum. (*See* Ex. A ('576 patent) at 1:44-54.) The broadband signal may include a plurality of transponder channels within each of which there may be at least one or more transponder signals. It is also typical for the broadband signal to include other information, such as identifying information for each of the transponder signals.

Back on the ground, each customer premise receives these broadband signals from satellites at an outdoor receiver, commonly known as a "satellite dish" or "outdoor unit" ("ODU"). Each dish has one or more "feed horns," which, like an antenna, are specially designed to capture broadband satellite signals from the air. (*See id.* at 1:19-54.) The range of frequencies used to transmit the signals from their sources in orbit to the ground is not suitable, however, for distribution over physical cables or other solid media. Thus, dishes include low-noise amplifier and block-down converters ("LNBs"), which convert the received signals to signals in a frequency range suitable for distribution over cables (an "intermediate frequency," or "IF"). LNBs also typically amplify received signals to

---

terms like "signal" slightly differently.

recover signal power that naturally degrades during transmission from orbit to Earth. (*See id.*)

The LNB output signal can then be distributed over physical cable(s) into a customer's premises, where it can be received by hardware capable of extracting the information from the signal. This familiar hardware is commonly called a "set-top box" ("STB") but is also occasionally (particularly historically) referenced by the term "integrated receiver-decoder" ("IRD"). The STB/IRD's job is to output the signals that it receives to a display as television programming. (*See id.* at 1:29-44.)

The generation, transmission, reception, and processing of satellite signals discussed throughout this section can be entirely done in the "analog domain," *i.e.*, by performing signal processing operations directly on the carrier signals using long-known signal processing techniques such as filters, mixers, and oscillators (all referenced throughout the '576 patent). Alternatively, the same kinds of signal processing could be performed by creating a digital representation of the analog carrier signal through "sampling," *i.e.*, capturing information about properties of the analog signal at discrete points in time to generate a digital approximation of the signal. (*See* Ex. F (Steffes Decl.), ¶34.)

## IV.   THE EXPERT WITNESSES

In support of certain claim constructions, DISH provides a declaration from Dr. Paul Steffes, Professor Emeritus at Georgia Tech University and renowned expert in satellite technologies. In addition to Dr. Steffes's 40+ years' experience at the School of Electrical and Computer Engineering, where he has delivered lectures on satellite communications for 20+ years. Dr. Steffes has served as a principal investigator on numerous research projects related to satellites and satellite communications. (Ex. F (Steffes Decl.), ¶¶4-8.) He and his colleagues were responsible for coordinating the video feeds through satellites for the broadcast of the 1996 Olympic Games in Atlanta. Dr. Steffes also worked with NASA since the late 1970s, including as principal investigator on a project to introduce a type of channel access method on ACTS (Advanced

Communications Technology Satellite) in a commonly used satellite frequency band, the first in the world to accomplish this feat, and he is currently working on a project for the Italian Space Agency.  (Ex. G (Steffes Dep. Tr) at 61-62.)

In response to Dr. Steffes's declaration, Entropic provided a rebuttal declaration by Dr. Robert Akl.  Unlike Dr. Steffes, Dr. Akl is not a satellite communications expert and freely admits he has carved out his "niche" in cellular communications.  (Ex. I (Akl Dep. Tr.) at 38-41.)  As a student, Dr. Akl did not take any course dedicated to satellite technologies and, as a professor, he has never taught one.  (*Id*. at 26-27.)  Indeed, Dr. Akl has only ever worked on a single satellite communications-related research project—and that was as a student, in a group, nearly 30 years ago.  (*See id*. at 33-34, 41.)  Unsurprisingly, Dr. Akl's proposed definition of a person of ordinary skill in the art ("POSITA") would be satisfied by general experience in "wireless communications" and not necessarily experience in the specialized field of satellite communications.  (*See* Ex. H (Akl Decl.), ¶¶23-24.)  At deposition, Dr. Akl repeatedly declined to offer more than a single example (if he offered examples at all) about how a POSITA would understand the plain meaning of basic satellite communications terminology, like "broadband" and "outdoor unit," or even for claim terms he opined about in his report.  (*See, e.g.*, Ex. I (Akl Dep. Tr.) at 97-101, 107-109, 131-38.)[4]

---

[4]  While Dr. Akl's lack of satellite communications experience is reason alone to give his testimony little to no weight, Entropic also waived its right to rely on it by failing to disclose him in accordance with Eastern District of Texas Local Patent Rule 4-2(b), thus his testimony should be set aside entirely.  Specifically, Entropic did not identify any expert witness with its preliminary proposed constructions, let alone provide a "brief description" of any relevant expert testimony as required under the rule.  *See* E.D. Tex. L.R. 4-2(b).  Instead, a month later, Entropic notified Defendants that it might rely on Dr. Akl (but did not describe the substance of his anticipated testimony) and then it served Dr. Akl's rebuttal declaration on April 7, weeks after it received Dr. Steffes's declaration, without explanation or excuse.  (*See* Dkt. No. 176, ¶4.)  For the same reason, Entropic should be unable to rely on other extrinsic evidence that it failed to timely disclose pursuant to L.R. 4-2(b).  This includes at least dictionary definitions for the disputed term "local area network," which Entropic first disclosed March 15, weeks after its L.R. 4-2(b) disclosure.

1

## V.   U.S. PATENT NO. 7,130,576

2
**A.   The '576 Patent**

3
     The '576 patent, entitled "signal selector and combiner for broadband content

4
distribution," was filed as Application No. 10/289,011 on November 5, 2002 and issued

5
on October 31, 2006.  It claims priority to provisional applications: 60/345,965 (filed

6
November 7, 2001); 60/333,722 (filed November 27, 2001); and 60/358,817 (filed on

7
February 22, 2002).  Entropic asserts that Defendants infringe claims 14-19, 21, 22, 34,

8
and 36-42 of the '576 patent.

9
    **1.   Summary Of The '576 Patent**

10
     The alleged point of novelty of the '576 patent has shifted over time as prior patent

11
owners have needed to distinguish various prior art references during multiple patent

12
office proceedings.  (*See generally* Ex. F (Steffes Decl.), ¶¶35-43.)  But, at least according

13
to the '576 patent specification, its novelty is to allow for "[m]ultiple set-top boxes" (*i.e.*,

14
IRDs or STBs) to "receive independent signals ***over a single cable from the outdoor***

15
***unit***."  (Ex. A ('576 patent) at Abstract.)  The prior art purportedly required that a separate

16
cable connect the "outdoor unit" (*e.g.*, a satellite dish and associated electronics that are

17
outdoors) to each IRD, which made adding IRDs to an existing configuration

18
inconvenient.  (*See id.* at 1:44-62; *see also* Ex. F (Steffes Decl.), ¶¶25-28.)

19
     Rather than distribute all signals received at the satellite dish over independent

20
cables, the '576 patent describes distributing a selected subset of signals in a "composite

21
signal" on a single cable based on received signal selection information (*e.g.*, from an

22
IRD).  The '576 patent recognizes that it was known in the art to distribute signals

23
received from multiple satellites as a composite signal and incorporates by reference (in

24
their entirety)[5] multiple other prior art disclosures: U.S. Patent No. 5,959,592 to

25

26
[5]  When patents are incorporated by reference in the specification of another patent, all
of their contents are considered as if expressly set forth in the specification, and they

27
are part of the intrinsic record for claim construction and other purposes.  *See, e.g.*,
*Adv. Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000); *see*

28
*also Phillips*, 415 F.3d at 1314 (specification is part of intrinsic record).

Petruzzelli ("Petruzzelli"), and U.S. Patent No. 6,134,419 to Williams ("Williams").  (*See* Ex. A ('576 patent) at 2:8-47.)

Importantly, these incorporated prior art references originate from Defendants in this case.  Petruzzelli is a patent of DISH predecessor EchoStar, and Ed Petruzzelli (its sole inventor) is one of DISH's witnesses in this case.  Likewise, Williams is a patent of DIRECTV predecessor Hughes Electronics, and Jim Williams (its sole inventor) is one of DIRECTV's witnesses in this case.

Petruzzelli describes generating a signal including at least two LNB output signals by shifting the frequency of one output so that it does not overlap with the other, ensuring the signals can be distributed together without interference.  (*See id.* at 2:34-47.) Williams, according to the '576 patent, describes changing the modulation of multiple LNB output signals so that each occupies a smaller frequency band in a combined signal, and thus multiple output signals can be distributed together.  (*See id.* at 2:8-33.)

The process for generating the composite signal disclosed in the '576 patent involves "selecting" portions of the received signal, "translating" what is selected to distinct frequencies within the IF band, and "combining" what it selected and translated into a composite signal for output to IRDs.  (*See id.* at 2:54-3:4.)  Figure 5 of the '576 patent includes a visual depiction of selecting, translating, and combining, which is reproduced below with annotations and shading.

As illustrated to the right, each depicted block refers to a transponder channel (*see supra* §III), which Dr. Steffes explains is a "defined frequency range through which signals traverse," (Ex. F (Steffes Decl.), ¶30), and which can contain one or more transponder signals.  The selected transponder channels (colored) are each translated such that they can be distributed as a single composite signal in the same frequency range (950-1450 MHz) as



FIG. 5

the various LNB output signals from which they were selected. Other embodiments (and the only independent claim from the '576 patent that is asserted) teach selecting "transponder signals" that are "the signal payload of one or more transponder channels" and include "one or more television [*i.e.*, not transponder] channels." (*Id.*) The selection may be performed based on signals received from IRDs requesting particular transponders (*e.g.*, those containing programs that viewers would like to watch on displays associated with each IRD). (Ex. A ('576 patent) at 7:32-8:4.)

The '576 patent states that the selecting, translating, and combining steps can be performed in some combination of the analog and digital domains. (*See, e.g.*, *id.* at 10:60-11:2.) A satellite broadband signal (made up of multiple transponder channels and signals) is received via an analog RF carrier and can be processed to select, translate, and combine portions of the signal entirely using traditional analog signal processing techniques. (*See, e.g.*, *id.* at Fig. 9, 8:65-9:25.) Alternatively, some or all processing can be performed in the "digital domain" by sampling the analog signal. (*See* Ex. F (Steffes Decl.), ¶34; *see also supra* §III.) The signal can then be processed by, for example, a computer, and regenerated on an analog RF carrier for distribution. (*See id.*)

## 2. Relevant Prosecution History Of The '576 Patent

Because there is a plethora of prior art disclosing the "single cable" concept that the specification describes as the novel aspect of the invention, the applicant was required to narrow the claims of the '576 patent during a reexamination filed in 2007. Specifically, in that reexamination proceeding, the examiner rejected the existing claims based on prior art disclosing the "single cable" concept but that did not specify that the selection and combining of signals could occur in the digital domain. The prior patent owner thus added limitations to the claims to require digitization of the signals to overcome this prior art and survive reexamination.

Relevant to this litigation, the applicant amended claim 14 with the phrase "digitizing the plurality of satellite broadband signals." (*See* Ex. D ('576 Reexam) at 43.) In its remarks, the applicant clarified: "digitization of the broadband signal—i.e.,

digitizing a complete band." (*Id.* at 49; *see also id.* at 52-53.)   In other words, the applicant specifically used the abbreviation "i.e." to define "digitization of the broadband signal" as "digitizing the complete band."   As the applicant explained, "digitizing a complete band allows the avoidance of channel-by-channel digitization, which would require duplication of hardware to perform this digitization for each channel," "enables an architecture that can be implemented without the costly, large and maintenance-intensive matrix switches," and "allows frequency translation to be performed using digital mixing without requiring multiple local oscillators to convert a transponder channel to its position in the composite signal." (*Id.* at 50.)   The applicant argued that these features resulting from digitizing the complete band are meaningful distinctions from the cited references. (*Id.*)   The examiner accepted these explanations and issued the reexamination certificate.

### 3.   Person Of Ordinary Skill In The Art[6]

As Dr. Steffes explains, a POSITA at the time of the alleged inventions of the '576 patent (about November 2001) would have had at least: i) a bachelor's degree in electrical engineering, computer engineering, or the equivalent and three or more years of experience with television signal processing and satellite communications; ii) a master's degree in electrical engineering, computer engineering, or a related field and one or more years of experience in television signal processing and satellite communications; or iii) a doctoral degree in electrical engineering, computer engineering, or a related field, and at least some experience in television signal processing and satellite communications. (*See* Ex. F(Steffes Decl.), ¶64.)

Dr. Steffes reached this definition because the subject matter of the '576 patent is satellite communications, and "[s]atellite communications is a specialized area of

---

[6]   Defendants' proposed definitions for the person of ordinary skill in the art differ slightly between the '008 patent, on one hand, and the '576 and '715 patents, on the other.   This is, in part, because the '008 patent has a priority date about a decade later than the '576 and '715 patents.

technology today, and it was in 2001." (*Id.*, ¶65.)  Thus, "without specialized focus on satellite technology, and without significant work or specialized training," a person "would not have [had] ordinary skill" in the subject matter of the '576 patent.  (*See id.*)

Consistent with his own experience (rather than the subject matter of the asserted patents), and as he did for the '008 patent, Dr. Akl proposed a POSITA definition that could be satisfied by telecommunications systems experience generally (*i.e.*, cellular), without specialization or experience in satellite systems (or even cable) specifically.  (Ex. H (Akl Decl.), ¶24.)  The Court should reject this results-driven approach.

## B.    Disputed Terms Of The '576 Patent

The parties dispute five terms from the asserted claims of the '576 patent.  In three terms ("digitizing the plurality of satellite broadband signals," "integrated receiver decoder," and "transponder request information"), Defendants propose a construction,[7] whereas Entropic points to an unspecified "plain and ordinary meaning."  But because Entropic's infringement allegations are inconsistent with any plain meaning of which Defendants are aware,[8] the Court should affirmatively construe the terms.  The two remaining "terms" (one of which is actually several inconsistent portions of claim 14) contain ambiguities that render the claims in which they are found indefinite.

### 1.    "digitizing the plurality of satellite broadband signals" ('576 patent, cl. 14)

| Defendants' Proposal | Entropic's Proposal |
|---|---|
| "digitizing the complete bands of satellite broadband signals received at the ODU" | Plain and ordinary meaning. No construction necessary. |

---

[7]   Some terms were initially proposed by both Defendants while others are proposed by only DIRECTV or DISH.  This is shown at the beginning of each section in color-coded tables (purple for terms for both Defendants; blue for DIRECTV terms only; and red for DISH terms only).  For clarity, however, DISH joins in the arguments made by DIRECTV, and DIRECTV joins in the arguments made by DISH.

[8]   *Serio-US Indus., Inc. v. Plastic Recovery Techs. Corp.*, 459 F.3d 1311, 1319 (Fed. Cir. 2006) ("[A] trial court may consult the accused device for context that informs the claim construction process.").

Defendants' proposed construction clarifies that the digitization of the plurality of satellite broadband signals must (1) digitize the complete bands of the satellite broadband signals and (2) apply to the satellite broadband signals received at the ODU. This construction is compelled by the plain meaning of the claims, the specification, and the prosecution history. Specifically, the applicant amended the claims during a reexamination proceeding to add "digitizing the plurality of satellite broadband signals" and explained in the comments that the claims cover "digitization of the broadband signals—i.e., digitizing a complete band."

### a. The claim requires "digitizing ... *complete* [received] bands*"*

Claim 14 itself requires that the digitizing of the satellite broadband signals must be of the complete bands of received satellite broadband signals. The claim construction inquiry "must begin, and remain centered, on the language of the claims themselves." *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003). Here, the digitization of the plurality of satellite broadband signals must be on the complete band because the "transponder signals" in claim 14 are then "select[ed] and extract[ed]" from the digitized signals. In order for all of the transponder signals to be available in the digitized signal for selection, the entire band of each received satellite broadband signal must have been digitized.

The specification of the '576 patent confirms this construction. In the disclosure regarding "digitiz[ing] the *entire* LNB output signal," the specification explains the reason why this must be done is so "*all* transponder channels are available in the sampled data." (*See* Ex. A ('576 patent) at 7:25-30 (emphases added).) Because "all" of the transponder channels must be available in the resulting digitized signal, the complete bands of satellite broadband signals must be digitized so that all channels are available.

The prosecution history further supports Defendants' construction. During reexamination proceedings, in an effort to avoid a prior art rejection, the applicant amended claim 14 to add the phrase "digitizing the plurality of satellite broadband signals"—the very phrase that Defendants are seeking to construe. (*See* Ex. D ('576

Reexam) at 43.)  In its accompanying remarks, the applicant used "i.e." to provide the examiner with a definition, stating "digitization of the broadband signal—*i.e.*, digitizing a **complete band**."  (*Id.* at 49 (emphasis added).)  The Federal Circuit has stated that the "usage of 'i.e.' ... signals an intent to define the word to which it refers."  *TF3 Ltd. v. Tre Milano, LLC*, 894 F.3d 1366, 1372 (Fed. Cir. 2018) (citing *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1334 (Fed. Cir. 2009) (adopting as construction language behind an "i.e." definition in specification)); *OpenTV, Inc. v. Apple, Inc.*, 2015 WL 3544845, at *3 (N.D. Cal. June 5, 2015).  Here, as in *TF3*, the applicant used the abbreviation "i.e." to define "digitization of the broadband signal" as "digitizing the complete band."  Based on applicant's own definition, it equated "the broadband signal" with "a complete band."  Thus, it follows that "the plurality" of broadband signals would simply mean the complete "bands," which is exactly what Defendants have proposed.

Importantly, the applicant added this limitation, and explicitly defined it, to distinguish the prior art cited by the examiner.  As the applicant explained, "digitizing a complete band allows the avoidance of channel-by-channel digitization, which would require duplication of hardware to perform this digitization for each channel," "enables an architecture that can be implemented without the costly, large and maintenance-intensive matrix switches," and "allows frequency translation to be performed using digital mixing without requiring multiple local oscillators to convert a transponder channel to its position in the composite signal."  (Ex. D ('576 Reexam) at 50.)  The applicant argued that these features resulting from digitizing the complete band are meaningful distinctions from the cited references.  (*Id.*)  The examiner accepted the explanations and allowed the patent.  Defendants' proposed construction simply holds the applicant to the positions that it took during reexamination to secure entry of its amendments and obtain issuance of the reexamination certificate.  *See Intex Rec. Corp. v. Team Worldwide Corp.*, 860 F. App'x 717, 722 (Fed. Cir. 2021) (determining that applicant's definition of term, accepted by examiner, can provide construction).

1

### b.   What is digitized are the "*received* satellite broadband signals"

2   Moreover, the digitization must be of the satellite broadband signals received ***at***

3   ***the ODU***—not the digitization of just any broadband signal at any point in the chain, such

4   as the signal after down-conversion by an LNB.   Again, beginning with the claim

5   language, the claim's preamble, which recites that "a satellite outdoor unit (ODU) ...

6   receives a plurality of satellite broadband signals," provides the antecedent basis for

7   "satellite broadband signals" and the context necessary to understand that the satellite

8   broadband signals being digitized are the ones received at the ODU.   The Federal Circuit

9   has cautioned against interpreting a term out of context.   In *Intel Corp. v. Qualcomm Inc.*,

10   21 F.4th 784, 791 (Fed. Cir. 2021), the Federal Circuit reiterated that "it is not always

11   appropriate to break down a phrase and give it an interpretation that is merely the sum of

12   its parts."   In applying this principle, the Federal Circuit determined that "radio frequency

13   input signal" should not be read in a vacuum to refer to any signal in the RF spectrum

14   that is input into a circuit.   *Id.*   Instead, the term had to be read in the context of "the

15   surrounding claim language," which used the "radio frequency input signal" to reference

16   the "carrier frequency signal received at the antenna."   *Id.* at 792.   As a result, the court

17   concluded that the phrase referenced "incoming carrier signals before downconversion"

18   and not as the output of the downconversion.   *Id.* at 793.   Similarly here, the satellite

19   broadband signals are not to be read out of context to be just any broadband signals from

20   a satellite.

21   The specification also supports this interpretation.   In the background section, the

22   patentee incorporates Petruzzelli by reference.   Petruzzelli specifies that the received RF

23   signal is the signal received before being down converted.   (Ex. J at 2:57; *see also id.* at

24   7:50-65.)   The satellite broadband signals are therefore signals received at the ODU.

25

26

27

28

1

2

### 2.   "integrated receiver decoder (IRD)" ('576 patent, cls. 14, 18, 19, 21, 22, 41)

3

| DIRECTV's Proposal | Entropic's Proposal |
|---|---|
| "device capable of at least receiving and decoding data and generating an output video signal" | Plain and ordinary meaning. No construction necessary. |

6

7

8

9

10

11

12

13

14

15

Integrated receiver decoder ("IRD") is a key claim term recited in the only asserted independent claim and from which all of the other asserted claims depend. The words of a claim are given "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). But it is unlikely that a lay juror has ever heard of an "IRD," much less knows what the term means. DIRECTV's proposed construction provides the necessary details so that a lay juror knows what meaning this technical term would have been to a POSITA at the time of the invention, consistent with the intrinsic and extrinsic evidence, while Entropic's proposal of plain and ordinary meaning would leave the jury in the dark. "IRD" therefore requires construction.

16

17

18

19

20

Although claim construction typically centers on the language of the claims themselves, "[w]hen the claim language itself lacks sufficient clarity to ascertain the scope of the claims, we look to the written description for guidance." *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1377 (Fed. Cir. 2005). Because the claim itself does not provide guidance on the definition of "IRD," we turn next to the specification.

21

22

23

24

25

26

In the context of the '576 patent, "IRD" refers to a device capable of receiving and decoding data and generating a video output signal in a form suitable for presentation on a display, such as a TV. The specification supports DIRECTV's proposed construction and consistently describes the IRD as a device that is capable of receiving and decoding data and generating an output video signal. The '576 patent discloses that an IRD must "decode[] the digital data to produce a ***video signal***, and generate[] an RF output to drive

27

28

a television." (*See* Ex. A ('576 patent) at 1:29-43 (emphasis added); *see also id.* at Fig. 2 (shown to the right, annotated.)) Further, the specification states that the "standard STB [set-top box] hardware can receive the new composite signal and demodulate and **decode the video and audio signals**." (*Id.* at



FIG. 2

6:62-7:2 (emphasis added).)   DIRECTV's proposed construction, which simply articulates the requirements disclosed by the patentee, is therefore consistent with the specification.

The extrinsic evidence also supports DIRECTV's proposed construction.   A scientific article published around the time of the '576 patent specified that an IRD "convert[s] the digital data into standard TV signal." (Ex. L (Analog Dialogue) at 9.)   As the article explains, "[t]he received digitally coded TV signal must first be converted back to the traditional NTSC or PAL signal, capable of being understood by the standard TV," and discloses that the IRD implements this function.   *Id.*   Thus, both the intrinsic and extrinsic evidence supports the construction that the IRD must have the capability to receive and decode data and generate an output video signal.   The Court should therefore adopt DIRECTV's proposed construction.

**3.      "selected [and extracted] transponder channel[s]" ('576 patent, cls. 16, 17, 21, 39, and 41-42)**

| Defendants' Proposal | Entropic's Proposal |
|---|---|
| Indefinite. | 1. Is not indefinite. |
| | 2. Plain and ordinary meaning. No construction necessary. |

It is black letter law that claims 16, 17, 21, 39, and 41-42 are invalid as indefinite because they refer to particular "selected and extracted transponder channels" that are nowhere previously defined for those claims.

Taking a step back, independent claim 14 of the '576 patent includes a step of "selecting and extracting a plurality of transponder *signals* from the received digitized satellite broadband signals" based on requests from IRDs.  When the claimed method discusses "selecting" or "extracting," it only does so in the context of transponder *signals*. There is no recitation of a method step for "selecting" or "extracting" a transponder *channel*, let alone the criteria for doing so, in either claim 14 or any claim that depends from claim 14.   Nonetheless, dependent claims 16, 17, 21, 39, and 41-42, refer to "selected" or "selected and extracted" "transponder channels."

Because selecting and extracting transponder *signals* and transponder *channels* are different (as discussed in Section III above), and selecting transponder signals is neither equivalent to nor necessarily results in selection of the entire transponder channels, the dependent claim recitation of "selected [and extracted] transponder channel[s]" lacks an antecedent basis, *i.e.*, the preceding portion of the claim (including those from which it depends) does not refer to or explain what "*the* selected [and extracted] transponder channel[s]" are (emphasis added).  *See Advanced Tech. Incubator, Inc. v. Sharp Corp.*, No. 07-cv-468, 2009 WL 4403314, at *25 (E.D. Tex. Jun. 26, 2009) (collecting cases finding claims invalid for lack of antecedent basis); MANUAL OF PATENT EXAMINING PROCEDURE ("MPEP") §2173.05(e) (9th ed., July 2020) (providing example of potentially indefinite claim term that refers to "said lever" or "the lever," without any "earlier recitation or limitation of a lever").  This is not permissible, and it renders these dependent claims ambiguous because the claim language fails to inform a POSITA as to their scope with reasonable certainty.  Moreover, the sole exception to the rule that claim terms are indefinite for lack of antecedent basis—"if the scope of a claim would be reasonably ascertainable by those skilled in the art"—does not apply here.  *See Energizer Holdings, Inc. v. ITC*, 435 F.3d 1366, 1370-71 (Fed. Cir. 2006) (stating

-18-

exception to general rule).  Claims 16, 17, 21, 39, and 41-42 are accordingly indefinite.

Entropic presumably intends to attempt to sidestep this glaring problem with its asserted claims by arguing that "the selected [and extracted] transponder channel[s]" finds antecedent basis in claim 14's requirement of "selecting and extracting a plurality of transponder signals."  But "transponder channel[s]" and "transponder signal[s]" (or even "a plurality of transponder signals") are ***not*** synonymous, as the claims, specification, and extrinsic evidence all make clear.

For instance, as Dr. Steffes explains, transponder signals "are not synonymous or equivalent to the transponder 'channels' described by the '576 patent," and would not be understood as similar by a POSITA.  (Ex. F (Steffes Decl.), ¶81.)  Further, "selecting a transponder signal" does not imply the selection of a transponder channel, as Dr. Akl suggests (*see* Ex. H, ¶73).  Selecting a transponder signal is a selection of only ***some*** of the information within a transponder channel.  (Ex. F (Steffes Decl.), ¶¶81-82.)  To carry forward Dr. Steffes's example of riverbanks (transponder channel) and the water in between (signal) the edges of a channel may contain multiple signals (*i.e.*, separate currents in the river), as well as noise and other physical effects from transmission (*i.e.*, logs and debris).  (Ex. G (Steffes Dep. Tr.) at 127.)  So, while selecting a transponder channel could theoretically imply the selection of a plurality of transponder signals within that channel, the inverse—which is claimed in claim 14 of the '576 patent—is not necessarily true.  Even Entropic's expert, Dr. Akl, admitted that there are "nuances" and "differences" between selecting transponder signals versus channels, although he was unable at his deposition to explain the plain and ordinary meaning to confirm the extent of those differences.  (*See* Ex. I (Akl Dep. Tr.) at 131-38, 149-50.)

Further, the patentee conveyed that selecting transponder channels (i.e., the transponder signal(s), and everything more that is in the channel) is meaningfully distinct from just selecting transponder signals by using different words in similar limitations across different claims.  Claim 8 of the '576 patent, for example, describes a "signal distribution system for *distributing signals comprising a **plurality of satellite***

*transponder channels of a broadband signal*," *i.e.*, of the entire broadband signal received from the satellite (including multiple transponder channels that each can contain multiple transponder signals), and includes a "means in [a] first unit responsive to information transmitted by the second unit for extracting selected *channels from the digitized broadband signals* in the digital domain" (emphasis added).  When "different words or phrases are used in separate claims, a difference in meaning is presumed." *See, e.g., Nichia Corp. v. Vizio, Inc.*, No. 16-cv-545, 2018 WL 11350040, at *14 (C.D. Cal. May 29, 2018) (rejecting construction of "diffuses" that would limit diffusion to "scatter[ing] by reflection" because other independent claims taught "reflecting light," which "support[ted] the conclusion that the patent application understood a distinction between" diffusing and reflecting) (*quoting Nystrom v. TREX Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005)).  The specification, although not consistent in its approach for this issue, recognizes the difference between transponder "signals" and "channels,"—a difference that Dr. Steffes explains is "substantial."  (Ex. A ('576 patent) at 5:55-62 ("A low pass filter then passes one transponder channel and removes signal information from the other transponder channels …"), 6:11-19 ("Each transponder channel may be frequency translated to the desired new carrier frequency, then filtered to produce a single transponder signal …"); Ex. F (Steffes Decl.), ¶¶69, 80-82.)  Because selecting and extracting transponder "signals" is not the same as selecting and extracting transponder "channels," the former cannot provide an antecedent basis for the latter.

Dr. Akl opines that, because claims 39, 41 and 42 do not introduce the selected transponder channels with the word "the," then at least that subset of claims is not necessarily indefinite.  (*See e.g.,* Ex. H (Akl Decl.) ¶84.)  The fact that a claim term is introduced using "a" rather than "the" is not a get-out-of-jail free card to avoid indefiniteness even for that subset of claims, however.  *See, e.g., CA, Inc. v. Netflix, Inc*., No. 2:21-cv-80, 2021 WL 5323413, at *31-*32 (E.D. Tex. Nov. 16, 2021) (claim reciting "a third system" indefinite because of ambiguity in specification regarding use of terms "system" and "device" and claim's other recitations of systems and devices).  For each

of claims 39 and 41-42, a POSITA still would not know which transponder channels are (or are not) selected, nor the criteria or basis for selection, because neither the claims themselves nor the specification provides insight on how a second selection (of transponder channels) would occur following a first selection (of transponder signals). (*See* Ex. G (Steffes Dep. Tr.) at 83-84.)

Accordingly, the Court should find dependent claims 16, 17, 21, 39, and 41-42 invalid as indefinite.

### 4. "transponder request signals" ('576 patent, cls. 14, 19, and 22)

| DISH's Proposal | Entropic's Proposal |
|---|---|
| "a signal identifying and requesting a particular transponder signal" | Plain and ordinary meaning. No construction necessary. |

In claim 14 of the '576 patent, a "transponder request" is "communicated" "to the ODU from the IRD," and then a plurality of satellite broadband signals are selected and extracted "in the ODU," "wherein the selecting is responsive to the transponder request signals." "Transponder request" and "transponder request signal" are not terms used in the '576 patent specification, nor are they terms that had a common meaning to a POSITA. To provide clarity, Defendants therefore propose that the term "transponder request signals" be construed to mean "a signal identifying and requesting a particular transponder signal."[9] Defendants' construction gives meaning to each word in the term in view of the surrounding claim language and specification. Meanwhile, from what little DISH can gleam from Entropic's infringement contentions, Entropic appears to rely on requests for specific television programs, not entire transponder signals, as being within the scope of this term, which defies any possible "plain and ordinary meaning" to a POSITA. The Court should resolve the parties' dispute and find that transponder request signal refers to a request for a particular transponder signal.

---

[9] DISH inadvertently phrased this construction in the singular ("a signal …"), even though the claim term ("transponder request signals") is framed in the plural. DISH would not object to the Court fixing this mismatch by adopting a construction that also begins in the plural (i.e., "signals identifying and requesting …").

The '576 patent specification discloses distinct parts of a received satellite television signal that may be "request[ed]" by and distributed to an IRD—transponder signals and television programs associated with TV channels (of which there may be many in a single transponder signal, *see supra* §3). With respect to programs associated with TV channels, the specification explains that, within a transponder channel, there may be an "MPEG transport stream" that can be de-multiplexed to "extract a specific video program." (Ex. A ('576 patent) at 9:26-33.) Williams (*see supra* §VI.A.1, n.5) more generally explains that "[i]n current digital satellite systems, each transponder typically contains a number of individual channels multiplexed into a single data stream, commonly referred to as a program multiplex." (Ex. K at 1:48-59.) Thus, a transponder signal within fa channel may include a plurality of programs associated with various TV channels, but transponder signals and the constituent TV programs are not the same.

Because the asserted claims of the '576 patent all select and extract ***transponder signals*** based on the transponder request information, a POSITA would understand that the requests identify a particular transponder signal, rather than a specific program. Although the specification teaches an embodiment where the individual programs are "extract[ed]" (Ex. A ('576 patent) at 9:26-33), that embodiment plainly falls outside the asserted claims. Nonetheless, to resolve the parties' dispute regarding the scope of this term, the Court should clarify that "transponder request signals" expressly identify particular transponder signal(s), as DISH's proposed construction does.

### 5. "a transponder request [signal] ... the transponder request signals" / "from the IRD ... to the IRDs" / "a plurality of transponder signals ... the transponder signal" ('576 patent, cl. 14)

| DIRECTV's Proposal[10] | Entropic's Proposal |
|---|---|
| Indefinite | 1. Is not indefinite. |
| | 2. Plain and ordinary meaning. No |

---

[10] Although DISH did not originally identify this term in its proposed preliminary constructions, in view of the full briefing set forth herein, DISH joins DIRECTV in proposing that the term renders claim 14 indefinite.

| | construction necessary. |
|---|---|

Claim 14 of the '576 patent also contains three internal instances of lack of antecedent basis, which together render the claim indefinite because the scope is not "reasonably certain" to those skilled in the art.  *See Nautilus*, 572 U.S. at 901, 910. Specifically, for three limitations—transponder request signal[s], transponder signal[s], and IRD[s]—claim 14 inexplicably switches between the singular and the plural, leaving it unclear whether the claim requires more than one of each of these elements.  The claim fails to provide "clear notice" of what is claimed and is therefore indefinite.

These claim limitations are illustrated below in context, with recitations in the singular with a single underline and recitations in plural with a double underline.

As illustrated, claim 14 first requires "a transponder request" to be communicated to the ODU.  Later, the claim recites a selecting step, "wherein the selecting is responsive to the transponder request signals."  There is no antecedent basis for "the transponder request signals."  At best, a POSITA could infer that where the claim recites "a transponder request," it was meant to recite "a transponder request signal"—as the claim recited before reexamination.[11]  But

> **14.** A method of communicating a plurality of transponder signals from a satellite outdoor unit (ODU[1]) that receives a plurality of satellite broadband signals to an integrated receiver decoder (IRD) over a single cable connected to the ODU, the method comprising the steps of:
> communicating a transponder request to the ODU from the IRD;
> in the ODU, *digitizing the plurality of satellite broadband signals*, selecting *and extracting* a plurality of transponder signals [extracted] from the received *digitized* satellite broadband signals, wherein the selecting is responsive to the transponder request signals;
> combining *extracted* selected transponder signals into a composite signal;
> transmitting the composite signal over the single cable from the ODU to the IRDs, wherein the modulation of the transponder signal is not altered by the steps of selecting, combining, and transmitting.

---

[11] Prior to reexamination of the '576 patent, the first limitation of claim 14 recited "communicating a transponder request ***signal*** to the ODU from the IRD."  (Ex. A ('576 patent) at 13:9-10.)  Following reexamination, despite the patentee not amending this limitation, the first limitation recites "communicating a transponder request to the ODU from the IRD"—*i.e.*, without the word "signal."  (*Id. Ex Parte* Reexamination Certificate at 2:11-12.)  It is of no import whether the error is that of the PTO or the applicant.  *See Sw. Software, Inc. v. Harlequin Inc.*, 226 F.3d 1280, 1296 (Fed. Cir. 2000) ("[I]t does not seem to us to be asking too much to expect a patentee to check a patent when it is issued in order to determine whether it contains any errors that require the issuance of a certificate of correction.").

even then, "a transponder request signal" is singular, whereas "the transponder request signals" is plural, creating a mismatch between the earlier-recited and later-recited limitations.

Compounding the ambiguity, the selecting step recites "selecting and extracting a plurality of transponder signals" (plural), but later the claim recites "modulation of the transponder signal" (singular), leaving it unclear whether the modulation limitation applies to all of the earlier-recited "plurality of transponder signals" or just one of those signals, and if just one, which one. Further confusing things, the last limitation requires a composite signal to be transmitted "from the ODU to the IRDs" (*i.e.*, to more than one IRD), yet there is no antecedent basis for these multiple IRDs. At most, the claim earlier recites "an integrated receiver decoder (IRD)" and "the IRD" (both singular).

In sum, the claim leaves one skilled in the art with three open and unresolvable questions:

1.   whether one or more than one transponder request signal must be sent to the ODU;

2.   whether one or more than one IRD must communicate a "transponder request" and then receive the final "composite signal"; and

3.   whether all transponder signals are subject to the "modulation" limitation—*i.e.*, whether modulation of all transponder signals must not be altered by the steps of selecting, combining, and transmitting.

These unresolved questions have a substantial impact on the infringement analysis, leaving it unclear whether a given method lays inside or outside of the claim. The claim accordingly leaves those skilled in the art without "clear notice" of what does and does not infringe, rendering the claim indefinite.

Resort to the specification does not resolve this ambiguity. For example, the specification discloses embodiments with multiple IRDs connected to an outdoor unit and teaches that each one can communicate with the ODU to make requests. (*See* Ex. A ('576 patent) at 9:34-10:18, Fig. 11.) Likewise, the specification discloses embodiments with a single IRD receiving a composite signal and others with multiple IRDs receiving a signal. (*See id.* at 9:39-43, 11:34–39, Figs. 2, 11, 12.) The specification is thus broad

enough to encompass a single request signal from a single IRD as well as multiple request signals from multiple IRDs.  Accordingly, even when the claim is read in light of the specification, unresolved antecedent basis problems remain.

Courts hold claims indefinite for lack of clear antecedent basis where, as here, they inconsistently state claim terms in singular and plural.  *See, e.g.*, *Imperium (IP) Holdings, Inc. v. Apple, Inc.*, 920 F. Supp. 2d 747, 759 (E.D. Tex. 2013).  For example, in *Imperium*, the claim at issue first recited a "group of pixels" including "a red pixel having an output" but later recited an "analog-to-digital converter" that "convert[s] the output of the red pixel*s*." 920 F. Supp. 2d 747 at 751 (emphasis added).  The court held the claim indefinite due to the "discrepancy" between "pixel" (singular) and "pixels" (plural), explaining that there was an ambiguity as to "whether the outputs of multiple pixels are converted into one digital signal per pixel or are instead combined into one digital signal for all pixels." *Id.* at 757; *see also Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*, 813 F. App'x 522, 526 (Fed. Cir. 2020) (holding claim indefinite where "singular/plural mismatch further confuses an already confused claim").  Just as in *Imperium*, the singular/plural mismatches in claim 14 create unresolvable ambiguities.  Indeed, in *Imperium*, just one singular/plural mismatch rendered the claim indefinite—here, there are three.

Because the scope of claim 14 is not reasonably clear to those skilled in the art, the claim is invalid as indefinite.

## VI.   U.S. PATENT NO. 7,542,715

### A.   The '715 Patent

The '715 patent is a continuation of the '576 patent and has the same title and specification.  While the asserted claims of the '715 patent (claims 9-12) also require selection, translation, and combination of transponder signals to create a composite signal, the process may occur entirely in the analog domain (which the patent office found during reexamination of the '576 patent to be known in the prior art).  Thus, to the extent these claims are novel, the novelty rests in the use of a claimed "gateway" that "receives the composite signal, decodes specific programs, and distributes the programs over a

digital local area network (LAN) to STBs." (*See* Ex. B ('715 patent), claim 9.)  This "gateway" is described in a single embodiment of the '715 patent across five lines of specification text, which provides little additional detail beyond the claim language:

> Also in FIG. 11, server/gateway 1160 receives the composite transponder signal, decodes specific programs, and distributes the program information in packetized MPEG over a digital local area network (LAN) 1170 to STBs 1180. Ethernet or other LAN technology is suitable for this function.

(*See id.*, 9:44-48; *see also* Ex. F (Steffes Decl.) ¶¶47-48.)   The local area network connects the gateway and a plurality of STBs, as shown in Figure 11:



The '576 and '715 patents share a common specification and priority date, so the same POSITA definition apply to both.  (*See id.*, ¶64.)

## B.    Disputed Terms Of The '715 Patent

The parties dispute three terms from the asserted claims of the '715 patent.  Two ("RF signals" and "local area network") are technical terms that have plain meanings to POSITAs.  Although Entropic offers no express explanation of what the terms mean, Entropic's position in its infringement contentions is inconsistent with that plain meaning.  The Court should construe the terms because there is a dispute between parties, and construction would also aid the jury to understand these technical terms.  Defendants' constructions reflect the plain meanings and should be adopted.  The third term ("decodes specific programs") renders claims 9-12 indefinite.

Notably, Dr. Akl does not provide any opinions on the '715 patent, let alone regarding the indefinite "decodes specific programs" term, so Dr. Steffes's testimony

stands unrebutted.

1.      **"RF signals" ('715 patent, cl. 9)**

| DISH's Proposal | Entropic's Proposal |
|---|---|
| "analog carrier RF signals" | Plain and ordinary meaning.  No construction necessary. |

DISH proposes that this term should be construed to mean "analog carrier RF signals."  This is the plain meaning of the term in view of the claim language and the disclosure of the '715 specification.  Entropic advocates for plain and ordinary meaning, but it is clear from its infringement contentions that its view of "plain and ordinary meaning" is inconsistent with the claims and the specification.

Unlike the asserted claims of the '576 patent, the asserted '715 claims do not expressly recite digitizing signals for purposes of selecting, translating, and combining of transponder signals in the "digital domain."  This is consistent with the '715 specification, which states that any combination of these steps can be performed in the digital domain, but also that none of them need be performed digitally.  (*See* Ex. B ('715 patent) at 8:55-92, 11:23-32.)  But the asserted '715 claims do require that frequency translation results in, and the combining step combines, "RF signals," invoking the examples in the specification of combining in the analog domain.  (*See, e.g., id.* at 5:59-62, 8:55-9:2, Figs. 6-9 (showing digital-to-analog converters (DACs) prior to summer), 14.)  As such, reference to "RF signals" means "analog carrier RF signals" and not a digital representation of a signal having a frequency in RF band.  (*See supra* §III (discussing difference between analog signals and digital representations thereof).)  But, while Entropic advocates for the "plain and ordinary meaning," its infringement contentions allege that Defendants infringe this claim by combining signals in the ***digital***, rather than analog, domain.  Thus, there is a dispute that the Court should resolve.  *See O2 Micro*, 521 F.3d at 1360-61.

References to "RF" or "RF signals" in the '715 patent consistently refer to an analog signal carrying information (*e.g.*, transponder signals) in the radio frequency band.

-27-

(*See, e.g.,* Ex. B ('715 patent) at 1:40-45, 2:12-25, 3:54-58, 6:55-57, 10:55-60.)   The consistent use of phrases or concepts to explain or clarify claim terms in the specification warrants including the clarification in a construction.   *See, e.g., Arista Networks, Inc. v. Cisco Sys., Inc*., 908 F.3d 792, 798 (Fed. Cir. 2018) (construing "broadcast" to mean "a transmission to one or more devices using a multicast address" based on "the specification's consistent focus on broadcasting via a multicast address").   While the '715 specification does not use the phrase "RF signals," when it refers to "RF," it is discussing the signals received by satellite receivers, or those transmitted to (or from) IRDs, which are analog signals carrying information in the RF band.   (*See, e.g.,* Ex. B ('715 patent) at 1:40-45, 2:12-25, 3:54-58.)   When introducing an embodiment where received analog signals are digitized, the specification describes how the analog-to-digital ("A/D") converters "can accept a signal from any LNB output through an RF crossbar switch."   (*See id.* at 10:55-60.)   And the '715 patent also discusses, in an "analog-combining embodiment," converting a previously digitized signal back to a "desired RF frequency" that is "compatible with standard set top box [] hardware," *i.e.*, an analog signal carrying information.   (*See id*. at 6:55-57.)   Additionally, Petruzzelli, which is incorporated by reference into the '715 patent (*see supra* §VI.A.1, n.5), repeatedly uses the term "RF signal" or "RF" more generally to describe analog signals carrying information transmitted by a satellite to the receiver or from the receiver to STBs.   (*See, e.g.,* Ex. J at 1:10-17, 1:62-2:26, 2:51-3:4, 3:42-57.)   Conversely, neither the '715 patent, nor Petruzzelli or Williams, discuss the concept of "RF" or an "RF signal" in the context of processing a digitized representation of a signal.

DISH's construction of "RF signals" is also consistent with the term's use in the claims.   *See Phillips*, 415 F.3d at 1313-17.   For example, the frequency translator of claim 9 "shift[s] the selected transponder signals to ***new carrier frequencies*** to produce RF signals" (emphasis added).   This makes clear that what is produced is an analog carrier signal in the radio frequency band.

DISH's construction is not, as Entropic may argue, improperly limiting the asserted

claims of the '715 patent to an embodiment from the specification. *Cf. Info-Hold, Inc. v. Applied Media Techs. Corp.*, 783 F.3d 1262, 1267 (Fed. Cir. 2015). By describing what is combined as "at least two RF signals," rather than by reference to just the "transponder signals" that were selected and translated earlier in the claim, the '715 patent claim makes clear that the combination is performed on analog signals. To conclude otherwise would effectively read out of the claim the term "RF" in "RF signal," which is "highly disfavored." *See Intel Corp. v. Qualcomm Inc.*, 121 F.4th 801, 809-10 (Fed. Cir. 2021) (claim term "hardware buffer" "must mean something more than just a 'buffer implemented in hardware,'" as contended, because "every buffer in our (physical) world is ultimately implemented on a physical device (*i.e.*, hardware)"). For example, at the time of the alleged invention in the asserted claims, "satellite transponder signals [were] received" by a satellite receiver "via an analog RF carrier" (Ex. F (Steffes Decl.), ¶34), and were ultimately distributed to STBs in analog carrier signals in the RF range between 950 and 2000 MHz (*see generally* '715 patent "Background," at 1:21-2:47). Transmission and distribution of satellite signals necessarily involved signal frequencies in the RF band, so—as in *Intel*—reference to "RF" in the claim must do more than refer to the frequency of the signals.

Accordingly, in light of the specification and the remainder of the claim, "RF signal" must refer to an analog signal carrying information in the RF band, *i.e.*, an analog carrier RF signal.

### 2. "decodes specific programs" ('715 patent, cl. 9)

| Defendants' Construction | Entropic's Construction |
|---|---|
| Indefinite. | 1. Is not indefinite. 2. Plain and ordinary meaning. No construction necessary. |

The asserted claims of the '715 patent, read in light of the specification, fail to provide reasonable certainty as to the scope of the term "decodes specific programs." The term "decodes" is itself extremely broad and covers virtually any signal processing

operation.  Combined with the complete lack of guidance as to which programs are the "specific programs" to be decoded, a POSITA would be unable to determine the boundaries of what would or would not fall within the ambit of these claims, rendering them indefinite.  Dr. Steffes agrees with Defendants and explains, from the perspective of a POSITA, the uncertainty resulting from the ambiguous claim language.  (*See* Ex. F, ¶85.)  Tacitly acknowledging the ambiguities of this claim term, Entropic's counsel did not even ask Dr. Akl to offer opinions about it.  (Ex. I (Akl Dep. Tr.) at 245.

Claims 9-12 of the '715 patent include a gateway that receives a composite signal generated by selecting, translating, and combining transponder signals.  (*See* Ex. A ('715 patent) at claim 9.)  After receiving the composite signal, the claimed gateway "decodes specific programs" and distributes "the programs" over a digital local area network.  The specification provides virtually no clarity regarding the term "decodes specific programs," as it appears just once, in a passage that largely mirrors the claim language.  (*Compare id.* ("wherein the composite signal is transmitted to the gateway and the gateway receives the composite signal, decodes specific programs, and distributes the programs …"), *with id.* at 9:44-48 ("server/gateway 1160 receives the composite transponder signal, decodes specific programs, and distributes the program information…"); *see also UniRAM Tech, Inc. v. Monolithic Sys. Tech., Inc.*, No. 04-cv-1286, 2006 WL 825460, at *12 (N.D. Cal. Mar. 30, 2006) ("said capacitor trench" indefinite for lack of antecedent basis, and "[t]he specification provides no guidance to the court" to resolve an express lack of antecedent basis since "the term 'capacitor trench' is only used once in a section that paraphrases the claims").

Attempting to understand the scope of "decodes specific programs" by understanding of the constituent words only reinforces the ambiguity of the term.  First, as to "decoding," Dr. Steffes explains that it is a "broad term in the art" and is commonly understood to refer to converting coded messages into intelligible language.  (Ex. F, ¶87; *see also* Ex. G (Steffes Dep. Tr.) at 91-92.)  Because "effectively all communications" in this context are "coded message[s]" (*see id.*), converting the messages in some form

(which requires decoding) is a necessary step for signal processing. The ambiguity is compounded because the claim, viewed in light of the specification, does not provide guidance for which "specific programs" in a composite signal are decoded by the gateway. (*See id.*, ¶88.) There are various sets of (television) programs that **could** meet the criteria of "specific programs": those in transponder signals received in the composite signal, those made available to the gateway via another source (*e.g.,* from the internet or "over-the-air" television), or those stored locally (*e.g.,* with a DVR) and available to the gateway (which the patent also calls a "server," which would be understood to have data storage functionality). (*See id.*; *see also* Ex. G (Steffes Dep. Tr.) at 93-94.) And even within the composite signal, are the "specific programs" **all** of those in the composite's transponder signals, or a subset? And where a selected transponder signal contains multiple programs "multiplexed" together, are the "specific programs" all of the multiplied programs, or just a subset? The claim and specification provide no guidance. This ambiguity renders the claim indefinite.

### 3. "local area network" ('715 patent, cl. 9)

| Defendants' Proposal | Entropic's Proposal |
|---|---|
| "a group of devices at a single site connected by cables that allow a device in the network to interact with any other on the network" | Plain and ordinary meaning. No construction necessary. |

The term "local area network" in claim 9 of the '715 patent requires construction and should be construed to mean a group of devices connected by cables (*i.e.*, with a **wired** connection), consistent with both the intrinsic and extrinsic evidence.

The words of a claim are given "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). A lay juror today may not know what a local area network is today, and certainly cannot be expected to understand what this technical term meant to those skilled in the art **two decades ago**. To ascertain the meaning at that time, the Court must look to "those sources available to the public that

show what a person of skill in the art would have understood disputed claim language to mean." *Id.* (internal quotation marks omitted). Here, those sources—*i.e.*, the intrinsic and extrinsic evidence—demonstrate that a person of skill in the art would have understood a "local area network" to have the definition proposed by Defendants, which excludes the wireless networks on which Entropic seeks to read this claim limitation.

As the claim construction inquiry "must begin, and remain centered, on the language of the claims themselves," *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003), the analysis begins with the disputed claim. Claim 9 of the '715 patent recites, among other requirements, "a gateway in communication with [a] [satellite outdoor unit (ODU)] and at least one set top box (STB)." (Ex. A ('715 patent) at 12:15-18.) According to the claim, the gateway receives a "composite" signal from the ODU containing multiple transponder signals, each comprising one or more programs. (*Id.* at 12:34-36.) The gateway "decodes specific programs" and then "distributes the programs over a digital local area network (LAN) to STBs." (*Id.*) Nothing in the claim suggests that the distribution of programs by the gateway over the LAN can be wireless.

The specification of the '715 patent describes the distribution of programs from a gateway to an STB ***exclusively*** as wired; it gives no examples of wireless transmission. Starting in the Summary of the Invention, it explains that "[m]any newer homes have coaxial cable installed that runs to a central location" and that "[i]n the present invention a gateway is located at the central location that receives the combined signal from the outdoor unit and distributes the signals to the IRDs" (*i.e.*, STBs). (*Id.* at 3:18-22.) Indeed, given the specification's focus on reducing the number of cables by using a single cable as its inventive aspect, it seems self-evident that the applicant would have mentioned the elimination of wires entirely, had it contemplated wireless transmission. In short, the distribution from the gateway to the STBs in the '715 patent is over ***wired*** coaxial cable.

The only embodiment in the Detailed Description of the Invention that includes a "gateway" is the embodiment in Figure 11. As shown below, Figure 11 shows an embodiment "using a server/gateway." (*Id.* at 4:7-9.) In this embodiment:

-32-

> [S]erver/gateway 1160 receives the composite transponder signal, decodes specific programs, and distributes the program information in packetized MPEG over a ***digital local area network (LAN)*** 1170 to STBs 1180. ***Ethernet or other LAN technology*** is suitable for this function.

(*Id.* at 9:44-48 (emphases added).)  The only example of a LAN is Ethernet, which was a known wired technology at '715 priority date.  Figure 11, which shows only solid lines from "Server / Gateway" (1160) to STBs (1180) over LAN (1170), confirms this.



In short, every embodiment in the '715 patent depicts the LAN between the gateway and the STBs to be wired, and there is no suggestion of a wireless LAN.

The only disclosure of wireless communications in the '715 patent has nothing to do with a local area network.  Specifically, the '715 patent explains that "channel select information" that gets sent from the STBs can be sent over a "wireless RF link."  (*Id.* at 8:63-66; *see also id.* at 3:11-15, 3:23-25 ("The RF communication can be in the cable connecting the IRD to the gateway or a wired or wireless signal.").)  Nowhere does the '715 patent say that this wireless communication occurs over a "LAN."  The communication of channel select information upstream (*i.e.*, from the STBs to the gateway) is in the opposite direction of the claimed downstream distribution of content from gateway to the STBs.  Thus, this disclosure of wireless communications has nothing to do with the LAN in claim 9, which connects a gateway to multiple STBs.

-33-

1     The usage of "LAN" in the claims of the '715 patent is consistent with its usage in

2   the art at the relevant time.  Specifically, numerous technical dictionaries defined "LAN"

3   to be limited to **wired** connections of devices.  For example, the Microsoft Computer

4   Dictionary (5th ed. 2002) defined "LAN" (local area network) to refer to

5          [a] group of computers and other devices dispersed over a relatively
       limited area and connected by a communications link that enables any
6          device to interact with any other on the network....  The devices on a
       LAN are known as nodes, and **the nodes are connected by cables**
7          through which messages are transmitted.

8   (Ex. M at 304 (emphasis added); *see also* Ex. N (Microsoft Internet & Networking

9   Dictionary (2003)) at 15 (same).)  Similarly, the Dictionary of Computer Science,

10  Engineering, and Technology (2001) defines a "local area network" as

11         a network of computers and connection devices (such as switches and
       routers) that are located on a single site.  The **connections are direct**
12         **cables** … rather than telecommunication lines.

13

14  (Ex. O at 282 (emphasis added); Ex. P (Comprehensive Dict. of IIEE (1998)) at 377

15  (same).)

16     Defendants' proposed construction tracks these contemporaneous definitions.

17  Consultation of dictionaries is especially appropriate here, where the Court must "look

18  beyond the patent's intrinsic evidence and consult extrinsic evidence in order to

19  understand ... the meaning of a term in the relevant art during the relevant time period."

20  *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015).  Whether a LAN in

21  2023 encompasses a wireless LAN is not relevant; the evidence is clear that a LAN in

22  2002 was understood by those skilled in the art to cover only **wired** connections between

23  nodes.  *See FutureLogic, Inc. v. TransAct Techs., Inc.*, No. CV-0503754, 2007 WL

24  9700700, at *11 (C.D. Cal. Nov. 19, 2007) ("[I]t is appropriate to look to a dictionary

25  definition of that term to establish its ordinary meaning to one skilled in the art.").

26     The Court should therefore adopt Defendants' proposed construction of "local area

27  network," consistent with the intrinsic and extrinsic evidence.

28

1

## VII. U.S. PATENT NO. 8,792,008

2

**A.    The '008 Patent**

3      The '008 patent, entitled "method and apparatus for spectrum monitoring," was

4 filed as Application No. 13/607,916 on September 10, 2012 and issued on July 29, 2014.

5 It claims priority to Provisional Application No. 61/532,098 filed on September 8, 2011.

6 Entropic asserts claims 1-5, 7, 9-13, 15, 17 and 18 of the '008 patent.

7

**1.    Summary Of The '008 Patent**

8      The '008 patent is directed to signal monitoring to identify signal characteristics of

9 incoming television signals to determine their signal quality. (*See* Ex. C ('008 patent) at

10 1:29-30, 3:33-45.)   The background section of the '008 patent concedes that signal

11 monitoring processes are conventional but asserts that such conventional methods and

12 apparatuses were "too costly" and "impractical" for use in customer-premise equipment.

13 (*Id*. at 1:42-45.)   To address these alleged problems, the '008 patent describes

14 incorporating specific signal processing circuitry—called a "monitoring module"—into

15 a customer's STB to measure "one or more characteristics such as signal-to-noise ratio."

16 (*Id*. at 3:57-60, 4:16-25.)   In the '008 patent, the measured characteristics are then

17 reported "back to a source of the received signal." (*Id.* at 3:55–57.)

18      In addition to the monitoring module, the '008 patent discusses a conventional data

19 processing module of the type common to conventional STBs and well known at the time

20 of the alleged invention, which processes incoming signals to prepare them for output as

21 a viewable television channel. (*Id*. at 3:61-4:3.)   The '008 patent specifies that the

22 monitoring module and the data processing module are organized in parallel, so that the

23 monitoring module can "determin[e] [] signal and/or channel characteristics without

24 having to interrupt service to user equipment [via the data processing module]." (*Id.* at

25 4:7–10.) The '008 patent explains that this parallel arrangement allows both modules to

26 operate simultaneously.

27      Figure 1B, reproduced below with color added, depicts the circuitry of the '008

28 patent.  As shown, an RF "front-end" 158 receives an incoming, multi-channel analog

signal "S." (*Id.* at 3:5-19.)  The RF front-end 158 digitizes the multi-channel analog signal and outputs a multi-channel digitized signal "D" to a channelizer 152. (*Id.* at 3:11-19.)  This channelizer selects two different bands of the digitized signal "D" and concurrently outputs one band to a monitoring module 154 and  the other to a data



processing module 156.  (*Id.* at 3:20-28.)  The '008 patent expressly contemplates that the circuitry of Figure 1B can be incorporated in both cable and satellite systems and recites claims directed to each. (*See, e.g.*, *id.* at Fig. 1A, Fig 1C, 8:1-9, 8:43-51.)

Figure 2B of the '008 patent, below, depicts a particular RF front-end of a receiver that includes an analog-to-digital converter ("ADC," 256) to digitize a received TV spectrum (*e.g.*, an entire cable or satellite TV bandwidth).  (*See id.* at Fig. 2B.)



In particular, the '008 patent explains that the RF front-end can digitize a signal having a bandwidth of ~1 GHz, which comprises an entire cable TV downstream or an entire satellite TV bandwidth.  (*Id.* at 4:11-19, 6:58-65.)  Specifically, the '008 patent discloses that the RF front-end can perform full band or "full-spectrum" capture (*id.* at 6:43-47) and digitize the entire cable or satellite TV spectrum.  (*Id.* at 6:58-65.)

Figure 4, reproduced below with color added, is a flowchart illustrating the alleged invention, including the functions of receiving and digitizing the received signal in the RF front-end (in orange), channelizing the signal (*i.e.*, putting it in channels, shown in red), and simultaneously passing a first portion of the channelized signal to a data processor to recover data (in blue) and a second portion of the channelized signal to a signal monitoring module (in purple). (*See* '008 patent at Fig. 4, 6:29-36.)  Specifically, the receiver receives a frequency division multiplexed ("FDM") signal in step 404, digitizes the signal across an entire band from $F_{lo}$ (*i.e.*, a low frequency) to $F_{hi}$ (*i.e.*, a high frequency) in step 406, and then, in step 408, uses a channelizer to separate (channelize) the digitized signal into one or more bands.  (*Id*. at Fig. 4, 6:19-28.)  The channelizer concurrently outputs a first portion of the signal to a data processing module in step 410 and a second portion to a monitoring module in step 412.  (*Id*. at Fig. 4, 6:28-36.)



### 2.   Prosecution History Of The '008 Patent

The terms of the '008 patent that Defendants seek to construe were highly relevant to the examiner's decision to allow the '008 patent claims.  Specifically, the examiner rejected the originally presented claims as obvious, but noted that the independent claims would be allowable if rewritten to include the limitations of dependent claims 5 and 14, namely the limitations of: "analyzing said first portion to determine a characteristic of said received signal" and "reporting said determined characteristic *to a source of said received signal*."  (*See* Ex. E ('008 File History) at 55 (1/16/14 Non-Final Rejection), 100 & 102 (original claims 5 and 14); *see also id.* at 40-42 (4/10/2014 Response to Non-Final Rejection (amending claims 3 and 11 following rejection)).)   In addition to these limitations, the applicant also needed to amend claim 1 to add a recitation of a digitization process that resulted in a digitized signal.  (*Id.* at 50-52 (1/16/14 Non-Final Rejection); *see also id.* at 40 (amending claim 1), 44 ("[T]o expedite disposition of the Instant Application, independent claims … are amended to recite limitations substantially similar to previously presented … Claims 5 and 14.").)   The examiner only allowed the claims after the applicant made these changes.  (*Id.* at 28-30 (5/14/2014 Notice of Allowance).)  The process of reporting a determined characteristic to "a source of said received signal," therefore, secured allowance of the claims and is core to their patentability.  (*See id.*; Ex. F (Steffes Decl.), ¶¶61-62.)

### 3.   Person Of Ordinary Skill In the Art ('008 Patent)

As Dr. Steffes explains, a POSITA at the time of the alleged invention of the '008 patent (about September 2011) would have had at least: i) a bachelor's degree in electrical engineering or the equivalent and three or more years of experience in cable and/or satellite TV signal processing and communication systems; ii) a master's degree in electrical engineering or a related field and one or more years of experience in of cable and/or satellite TV signal processing and communication systems; or iii) a doctoral degree in electrical engineering or a related field, and at least some experience in cable and/or satellite TV signal processing and communication systems.  (*Id.*, ¶¶65-67.)

Dr. Akl self-servingly proposed a competing definition that would not require any specialization or experience in cable or satellite systems, just telecommunications systems generally. (Ex. H, ¶¶23-24.) But the relevant subject matter of the '008 patent is extremely specific to cable and satellite systems, and a POSITA would need to have substantive experience in at least one to fully understand the technology. (*See* Ex. C ('008 patent) at 4:11-25 (discussing only cable and satellite television signals).) Dr. Akl points to unspecified interactions with generic "engineers" in support of his POSITA definition, but does not identify any problems encountered in the art, prior art solutions, or other factors a factfinder would consider in analyzing the appropriate level of skill for a POSITA. (*See* Ex. H, ¶¶23, 29.) The definition of a POSITA proffered by Dr. Steffes, not Dr. Akl, should therefore be adopted.

## B.    Disputed Terms For The '008 Patent

The parties dispute three terms for the '008 patent. Two relate to aspects of the signal received by the satellite dish, and the third relates to the source of that signal. Specifically, Defendants propose constructions to capture the appropriate scope of "an entire television spectrum" and "signal having a bandwidth that spans from a first frequency, $F_{lo}$, to a second frequency, $F_{hi}$" in the context of the claims in which each appears. The terms are different, but Entropic is apparently (and improperly) treating them as the same, which is why the Court should construe each. DISH also proposes a construction for "a source of said received signal" that captures the meaning ascribed to it in the specification, namely that the characteristics of a digitized signal are reported back to the equipment that originally transmitted the signal.

### 1.    "an entire television spectrum" ('008 patent, cls. 1-2)

| Defendants' Proposal | Entropic's Proposal |
|---|---|
| "all of the one or more television signals received by a front-end" | Plain and ordinary meaning. No construction necessary. |

Defendants propose that "an entire television spectrum" should be construed to mean "all of the one or more television signals received by a front-end," which is circuitry

that initially receives and processes RF signals (as described in the preceding section). This is the plain meaning of the term in view of the claim language and the disclosure of the '008 patent specification.  Entropic, on the other hand, contends that no clarification or construction is appropriate, ignoring that the claims themselves (and Entropic's application of the claims in its infringement arguments) creates uncertainty about the meaning of this phrase.  Entropic's expert expressly equates this term with distinct terms in other asserted claims and was unwilling to explain further at his deposition.  (Ex. H, ¶102a; Ex. I (Akl Dep. Tr.) at 218-19.)  Moreover, Entropic's allegations related to this term in the '008 patent are plainly inconsistent with its allegations for the '576 and '715 patents.  On one hand, Entropic accuses Defendants' STBs of receiving "selected" television signals (i.e., transponder signals) distributed in a composite signal, as required in the asserted claims of the '576 and '715 patents; on the other hand, Entropic alleges the **same STBs** receive "an entire television spectrum," which obviously must be more than just selected signals.  Entropic seeks to have its cake and eat it, too, by keeping uncertain the scope of this claim term as long as possible.  Defendants' proposed construction of "an entire television spectrum" is accordingly necessary to distinguish the asserted independent claims and resolve the parties' dispute.

While all of the independent claims recite a received "signal," the language surrounding "signal" varies between the asserted independent claims.  Independent claim 1 recites "a received signal spanning an entire television spectrum" (Ex. C at 7:16-18), while, by contrast, independent claims 3 and 11 recite "a signal having a bandwidth that spans from a first frequency, $F_{lo}$, to a second frequency, $F_{hi}$" (*id.* at 7:37-41, 8:19-23).  Federal Circuit decisions make it clear that different terms in different claims are presumed to have different meanings.  *See, e.g.*, *Clearstream Wastewater Sys., Inc. v. Hydro-Action, Inc.*, 206 F.3d 1440, 1446 (Fed. Cir. 2000) ("Under the doctrine of claim differentiation, it is presumed that different words used in different claims result in a difference in meaning and scope for each of the claims.").

The '008 specification makes it further apparent that, the claimed terms "entire

television spectrum" and "a signal having a bandwidth that spans from a first frequency, $F_{lo}$, to a second frequency, $F_{hi}$" have specific and different meanings. (*See* Ex. C at Fig. 4, 4:11-15 (discussing, on one hand, a signal that is a TV signal bandwidth, and, on the other hand, a signal that is a MoCA or multimedia over coax alliance bandwidth, which may include TV signals but also other types of signals (such as data)), 5:41-47 (discussing full band or "full-spectrum" capture), 5:48-65 (digitizing entire cable downstream or entire output of satellite LNB), 6:19-36.)

Further, while the '008 specification does not use the term "entire television spectrum" outside of the abstract and claims, it does commonly use the associated phrases "television channels" (seemingly referring to "channels" as ordinary viewers under the term—*e.g.*, ESPN, HBO, Nickelodeon) and "television signals" (which, while undefined, presumably refers to a signal including programs associated with television channels). (*See, e.g.*, *id.* at 2:46-54, 3:12-15.) The '008 specification also discusses filtering circuits where components of an incoming signal may be filtered out before being digitized. (*See, e.g., id.* at 5:24-26 ("Each filter module 2141 may be operable to bandpass filter the band 1 to remove/attenuate frequencies outside band 1.").) Such filtered components may include television signals and, in fact, many of DISH's products do filter out television signals at various stages. In view of this disclosure, a POSITA would understand that the scope of the "entire television spectrum" would exclude scenarios where at least one incoming television signal is filtered out before a resultant signal is digitized, even though the digitized signal may still span from $F_{lo}$ to $F_{hi}$ (as in claims 3 and 11). Therefore, a POSITA would understand that the phrase "a received signal spanning an entire television spectrum" refers to all received *television* signals at the RF front-end. Defendants' construction should therefore be adopted.

### 2. "signal having a bandwidth that spans from a first frequency, $F_{lo}$, to a second frequency, $F_{hi}$" ('008 patent, cls. 3, 11.)

| DISH's Proposal | Entropic's Proposal |
|---|---|
| Plain and ordinary meaning, which is "a signal that includes all continuous | Plain and ordinary meaning. No |

| frequencies from $F_{lo}$ to $F_{hi}$." | construction necessary. |

When compared with claim 1, which relates to a received "entire television spectrum," claims 3 and 11 discuss the received signal as "having a bandwidth that spans from a first frequency $F_{lo}$, to a second frequency, $F_{hi}$." All parties apparently agree that the claim term should be given its plain and ordinary meaning, but disagree as to what that is. Entropic argues that no construction is necessary, while Defendants expressly explain that meaning: "a signal that includes all continuous frequencies from $F_{lo}$ to $F_{hi}$." Because it provides clarity and simplifies the issue for a potential jury, Defendants' proposed construction should be adopted. *See, e.g.*, *Fenner Invs.*, 2009 WL 3734102, at *6 (construing term consistently with plain and ordinary meaning to ensure jury will understand what is claimed). Additionally, as discussed above, Entropic's conflation of this term and the prior term requires distinct, clarifying constructions.

There are two key aspects of the claim phrase in question. First, the received signal of claims 3 and 13 does not specify that what is received is a television signal, as claim 1 does. (*See supra* §VII.B.1.) Second, the language in claims 3 and 13 requires that the received signal has a continuous bandwidth due to the use of the word "spans." The word "spans" is generally understood to mean something that extends from end-to-end. Since the claim language specifies that the received signal "***spans*** from a first frequency $F_{lo}$, to a second frequency, $F_{hi}$," a POSITA would understand that this phrase, based on the common understanding of "spans," refers to a signal that consists of all of the continuous frequencies between a first frequency $F_{lo}$ and a second frequency $F_{hi}$, and not necessarily all received signals. But to give "spans" meaning, it must encompass all signals within the frequency range defined by $F_{lo}$ and $F_{hi}$.

The '008 patent provides several examples of a signal being digitized over a continuous bandwidth between two frequencies. For example, the '008 patent states that "[i]n an example embodiment, signal S may be a cable television signal with $F_{lo} \approx 55MHz$, $F_{hi} \approx 1002MHz$." (Ex. C at 4:11-12, 5:60-62.) In another embodiment, signal S may be a

MoCA signal (which, as discussed above, refers to distributing multimedia over coaxial cable) with a bandwidth from a first frequency $F_{lo} \approx 1150$MHz to a second frequency $F_{hi} \approx 2100$MHz. (*Id*. at 4:12-14.) Other embodiments can encompass a satellite TV signal from the output of an LNB with a first frequency $F_{lo} \approx 1$GHz to a second frequency $F_{hi} \approx 2$GHz. (*Id*. at 5:62-65.) Since the claim language does not specify a particular type of signal and uses the word "spans," it is clear that the signal recited in the affected claims includes all TV and non-TV signals within a continuous spectrum.

Even Dr. Akl agrees. For example, he admitted that a "full spectrum received input signal," which he calls the signal S received at the front end (158), would be "the signal with all its components in a way … that has not been truncated or [that does not have] some frequency [removed] from it." (Ex. H, ¶¶101-02; Ex. I (Akl Dep. Tr.) at 217-19.) In other words, Dr. Akl confirmed that the receiver's front end receives and digitizes the entire continuous bandwidth of an incoming signal, consistently with Defendants' construction.

It is unclear why Entropic resists providing clarification to the jury, but DISH's construction should be adopted.

### 3. "a source of said received signal" ('008 patent, cls. 1, 3, 11)

| DISH's Proposal | Entropic's Proposal |
|---|---|
| "the equipment, *e.g.*, a cable headend or satellite transmitter, that transmitted the received signal" | Plain and ordinary meaning. No construction necessary. |

Claims 1, 3, and 11 of the '008 patent each recite determining a "characteristic" of the received signal (such as a peak-to-average ratio) and "report[ing]" the determined one or more characteristics of the received signal to "a source of said received signal." This claim language plainly requires reporting the results of the signal monitoring/signal analysis (*i.e.*, the determined "characteristic(s)") back to the same equipment that originally transmitted the signal, as reflected in DISH's proposed construction: "the equipment, *e.g.*, a cable headend or satellite transmitter, that transmitted the received

signal." The patent examiner for the '008 patent required the claim language "reporting said determined characteristic to a source of said received signal" be included in the independent claims during prosecution of the '008 patent, as discussed above. (*See supra* §VII.A.2.) The examiner's insistence on the addition of this phrase makes this term a key component of the claims' patentability, which mitigates in favor of a construction that ensures juror understanding.

The meaning of the term "source" is plainly evident under the language of the claims (*see, e.g.,* Ex. C at 7:23-24 ("a source of said received signal")) and specification. Notably, the only embodiment in the specification describing the reporting of a measured characteristic "back to a source" is to the transmitting equipment: "conveying measured/determined characteristics back to a source of the received signal (e.g., back to a cable headend)." (*Id.* at 3:55-57; *see also id.* at Fig. 1A (showing connection between STBs and cable headend for reporting).) While the specification disclosure relates to signals distributed and received in a (wired) cable network, the process for distribution in a satellite context was known and is not in dispute here: an uplink center transmits a transmitted from Earth, a satellite receives one or more signals from uplink centers, and broadcasts a signal back to Earth. Thus, the satellite transmitting the signal is necessarily a "source," and the uplink center may be a "source," too, if the signal it transmits is rebroadcasted by the satellite back to Earth.

Even Dr. Akl agrees that the source(s) for the signal received by an ODU are the equipment where there is the "first appearance" of the signal (*i.e.*, where it is generated), and any equipment that subsequently transmits that signal. (Ex. I (Akl Dep. Tr.) at 190-91.) In the satellite context, where one satellite may receive TV programs from multiple uplink centers on the ground and broadcast them together as a single signal back to Earth, the "first appearance" of the signal received at a customer premises comes from the satellite, and not earlier. The only other possible alternative for the source is the uplink center on Earth that transmitted a signal to the satellite for rebroadcast to receivers. (*See* Ex. I (Akl Dep. Tr.), 192-93 ("So it can go from the headend to an Earth station to a

satellite dish up to the satellite ….”))

It also makes sense that information about the signal, such as signal strength, would be transmitted back to its source (such as a satellite): such information can allow “the transmitting equipment … to adapt based on the measurement data provided back to it.” (*See* Ex. F (Steffes Decl.) ¶94.)

Despite the plain language of the claim and disclosure of the specification, Entropic disputes DISH’s construction through Dr. Akl, but Dr. Akl’s declaration both talks past DISH’s construction and is inconsistent with Dr. Akl’s deposition testimony.  Primarily, Dr. Akl takes the position that “the claim language and specification do not limit” the source to “the same piece of hardware that transmitted the signal.”  (Ex. H, ¶¶111-12.) But, at his deposition, Dr. Akl acknowledged that “source” in the claims refers to nothing more than the equipment along the path of a signal from which the signal came from (*i.e.*, transmitting equipment), consistent with the plain English meaning of the term.  (*See* Ex. I (Akl Dep. Tr.), 192-93, 210.)  This means exactly what Defendants say above—*i.e.*, in the satellite context, the sources are the satellite or possibly also the uplink center transmitting signals to the satellite.  Dr. Akl also suggests that the specification describes “that monitoring information may be sent upstream to the operator by ‘broadband connection 188’” (*i.e.*, over the Internet). (Ex. H, ¶114 (citing ’008 patent, 5:6-9).)  But the cited portion of the ’008 patent does not disclose sending “monitoring information” via a broadband connection, and in any event, Defendants’ construction does not exclude that such monitoring information may be sent over a broadband connection to an uplink center, so long as that uplink center is the ***source of the received signal***.

For all of these reasons, the Court should adopt DISH’s proposed construction for “a source of said received signal” as “the equipment, *e.g.*, a cable headend or satellite transmitter, that transmitted the received signal.”

## VIII. Conclusion

For the foregoing reasons, the Court should adopt Defendants’ proposed constructions or find specified claims to be indefinite.

-45-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Dated:  May 12, 2023

By: /s/ *Jason C. Lo*

Jason C. Lo, SBN 219030
jlo@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue, Suite 5400
Los Angeles, CA  90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Benjamin Hershkowitz (*pro hac vice*)
bhershkowitz@gibsondunn.com
Katherine Q. Dominguez (*pro hac vice*)
kdominguez@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:   212.351.4035

Brian Buroker (*pro hac vice*)
bburoker@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
Telephone: 202.955.8500

Nathan R. Curtis (*pro hac vice*)
ncurtis@gibsondunn.com
Audrey Yang (*pro hac vice*)
ayang@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Ave., Suite 2100
Dallas, TX 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900

**ATTORNEYS FOR DEFENDANTS DIRECTV,
LLC AND AT&T SERVICES, INC.**

By: /s/ *Amanda Tessar*

MBernstein@perkinscoie.com
PERKINS COIE LLP
11452 El Camino Real, Ste 300
San Diego, California 92130-2080
Telephone: +1.858.720.5700
Facsimile: +1.858.720.5799

Amanda Tessar (*pro hac vice*)
ATessar@perkinscoie.com
Trevor Bervik (*pro hac vice*)
TBervik@perkinscoie.com
PERKINS COIE LLP
1900 Sixteenth Street, Suite 140
Denver, Colorado 80202-5255
Telephone: +1.303.291.2300
Facsimile: +1.303.291.2400

Daniel T Keese, Bar No. 280683
DKeese@perkinscoie.com
PERKINS COIE LLP
1120 NW Couch Street 10th Floor
Portland, OR 97209-4128
Telephone: +1.503.727.2000
Fax: +1.503.727.2222

Adam G. Hester, Wisconsin 1128794
AHester@perkinscoie.com
PERKINS COIE LLP
33 East Main Street Suite 201
Madison, WI 53703-3095
Tel: (650) 838-4311
Fax: (650) 838-4350

**ATTORNEYS FOR DEFENDANTS
DISH NETWORK
CORPORATION, DISH
NETWORK L.L.C., AND DISH
NETWORK SERVICE L.L.C.**