# EXHIBIT H

R. AKL, D.SC.
4-20-23
**Exhibit 2**
D Bengs, CSR, RPR, CRR

Christina N. Goodrich (SBN 261722)
christina.goodrich@klgates.com
K&L Gates LLP
10100 Santa Monica Boulevard
Eighth Floor
Los Angeles, California 90067
Telephone: +1 310 552 5000
Facsimile: +1 310 552 5001

ATTORNEYS FOR PLAINTIFF
ENTROPIC COMMUNICATIONS, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| ENTROPIC COMMUNICATIONS, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>DIRECTV, LLC and AT&T SERVICES, INC.,<br><br>Defendants. | Case No. 2:22-cv-07775-JWH-JEM<br>(Lead Case) |
| ENTROPIC COMMUNICATIONS, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>DISH NETWORK CORPORATION, DISH NETWORK L.L.C., and DISH NETWORK SERVICE L.L.C.,<br><br>Defendants. | Case No. 2:22-cv-07959<br>(Member Case)<br><br>**REBUTTAL EXPERT DECLARATION OF DR. ROBERT AKL, D.SC. REGARDING CLAIM CONSTRUCTION** |

## IV.   LEVEL OF ORDINARY SKILL IN THE ART

23.    In rendering the opinions set forth in this Declaration, I was asked to consider the patent claims and the prior art through the eyes of a person of ordinary skill in the art ("POSITA"). The "art" is the field of technology to which a patent is related. In my Declaration, I use the term POSITA and skilled person to refer to the same hypothetical person of ordinary skill in the art. I considered factors such as the educational level and years of experience of those working in the pertinent art; the types of problems encountered in the art; the teachings of the prior art; patents and publications of other persons or companies; and the sophistication of the technology. I understand that a POSITA is not a specific real individual, but rather a hypothetical individual having the qualities reflected by the factors discussed above.

24.    Taking these factors into consideration, a POSITA would have had a bachelor's degree in electrical engineering, computer engineering, computer science, or a related field, and two to three years of experience in the design and development of telecommunications systems. Additional graduate education could substitute for professional experience, or significant experience in the field could substitute for formal education.

25.    I understand that DISH has proposed the following set of qualifications for the '715 and '576 Patents "i) a bachelor's degree in electrical engineering, computer engineering, or the equivalent and three or more years of experience with television signal processing and satellite communications; ii) a master's degree in electrical engineering, computer engineering, or a related field and one or more years of experience in television signal processing and satellite communications; or iii) a doctoral degree in electrical engineering, computer engineering, or a related field, and at least some experience in television signal processing and satellite communications. Additional education may substitute for professional experience, and significant work experience may substitute for formal education." Steffes Decl. ¶ 64.

**REBUTTAL EXPERT DECLARATION OF DR. ROBERT AKL, D.SC. REGARDING CLAIM CONSTRUCTION**

26.    I understand that DISH has proposed the following set of qualifications for the '008 Patent "i) a bachelor's degree in electrical engineering or the equivalent and three or more years of experience in cable and/or satellite television signal processing and communication systems; ii) a master's degree in electrical engineering or a related field and one or more years of experience in of cable and/or satellite television signal processing and communication systems; or iii) a doctoral degree in electrical engineering or a related field, and at least some experience in cable and/or satellite television signal processing and communication systems. Additional education may substitute for professional experience, and significant work experience may substitute for formal education." Steffes Decl. ¶ 65.

27.    I am qualified to provide opinions concerning what a POSITA would have known and understood at that time, and my analysis and conclusions herein are from the perspective of a POSITA as of that date and would apply under either party's proposed set of qualifications.

28.    As of approximately 2002, I was at least as qualified as the POSITA identified above. Thus, I understand the perspective of a POSITA as of at least as early as 2002, which I have applied in my analysis.

29.    I am also well aware of the qualifications of a POSITA because I have worked with, supervised, and taught engineers with similar capabilities. Many of my colleagues, in my numerous roles discussed above, possessed at least a B.S. in the relevant fields and had several years of experience in cable and or satellite TV signal processing, satellite communications and communications systems more generally.

## V.    LEGAL STANDARDS RELATING TO CLAIM CONSTRUCTION

30.    I am not an attorney or a patent attorney, and offer no opinions on the law. I have, however, been informed by counsel regarding various legal standards that may apply to this case, and I have applied those standards where necessary in arriving at my conclusions.

**REBUTTAL EXPERT DECLARATION OF DR. ROBERT AKL, D.SC.
REGARDING CLAIM CONSTRUCTION**

in the ODU, digitizing the plurality of satellite broadband signals, selecting and extracting a plurality of transponder signals [extracted] from the received digitized satellite broadband signals, wherein the selecting is responsive to the transponder request signals;

combining extracted selected transponder signals into a composite signal;

transmitting the composite signal over the single cable from the ODU to the IRDs, wherein the modulation of the transponder signal is not altered by the steps of selecting, combining, and transmitting.

73.     The specification consistently uses the phrases selecting and extracting transponder signals and selecting and extracting transponder channels, such that a POSITA would understand that the reference to "selecting and extracting a plurality of transponder signals" in claim 14 refers to a process which necessarily includes selecting and extracting the corresponding transponder channels, which in turn are referred to in the dependent claims 16-17, 21, 39, and 41-42.

74.     This process is described in the specification, where "signal selector 250, part of satellite outdoor unit 210, extracts the needed transponder channels from each of the LNB outputs and combines the channels into one composite signal transmitted onto cable 220." '576 Patent, 4:29-32. The specification goes on to discuss frequency translating the selected transponder channels at a desired frequency prior to forming the composite signal:

An example of a digital combining embodiment, a 500 msps broadband sampling of the LNB output could be filtered to produce a 500 msps output stream representing one or more transponder channels. Each transponder channel may be frequency translated to the desired new carrier frequency, then filtered to produce a single transponder signal that can be combined with other similarly selected transponder channels.

FIG. 13 shows the frequency spectrum of a sample stream as it is processed. The original spectrum 1 is frequency translated to locate the selected transponder channel at the desired frequency, as shown in spectrum 2. A band pass filter then passes one transponder channel and removes signal information from the other transponders channels, shown in spectrum 3. This filtering operation selects one transponder. In this example transponder channel B is selected. The sample stream for the selected channel

25

record supports the plain and ordinary meaning such that the transponder channels that are selected are those that are associated with the selected transponder signals that form the composite signal. Similarly, there is no ambiguity as to which transponder channels are not selected. The intrinsic record supports a POSITA's understanding that the transponder channels that are not selected are the transponder channels associated with the transponder signals that are not selected to form the composite signal.

81.   I have also reviewed claims 16, 17, 21, which Dr. Steffes also asserts are indefinite. *See* Steffes Decl. ¶ 80. I disagree.

82.   Claim 16 recites "The method of claim 14 wherein the step of combining comprises frequency translating the selected and extracted transponder channels to a variable frequency before combining."

83.   As described above, a POSITA would understand that the "selected and extracted transponder channels" are selected and extracted as part of the process of selecting and extracting of the transponder signals to form the composite signal as recited in claim 14.

84.   Moreover, and most notable, Claim 16's requirement that the transponder channels are selected and extracted prior to combining to form the composite signal further confirms a POSITA's natural understanding that the transponder channels are selected and extracted as part of selecting and extracting the transponder signal to form the composite signal.

85.   Claim 17 recites "The method of claim 15, further comprising frequency translating the selected transponder channels to a predetermined frequency before combining." Claim 15 recites "The method of claim 14 wherein the step of selecting and extracting a transponder signal comprises the step of: filtering a transponder signal with a band pass filter having a bandwidth ranging from 5% to 100% wider than the bandwidth of the transponder signal."

86.   Again, a POSITA would understand that the "selected transponder channels" are selected as part of the selecting and extracting of the transponder signals

98.     The '008 Patent relates to "Spectrum Monitoring," within a "cable television" or "satellite" system / "cable system." *See e.g.*, '008 Patent, Title, Abstract, 1:28-30, 1:66-67, FIG. 1A.

99.     The systems described include, for example, a "Headend" "108" (*id.* at 2:34-59) that is connected to "customer premise equipment (CPE)" via for example, a "hybrid fiber-coaxial (HFC) network" / "HFC" "118." *Id.* at 2:34-59, FIG. 1A.

100.     Below, I have reproduced an exemplary system diagram from Figure 1A of the '008 Patent, where I have highlighted the above-mentioned "HFC" (Hybrid Fiber Coaxial) "118" network and "Headend" "108" elements:



'008 Patent, FIG. 1A (annotated).

101.     The '008 Patent discloses an invention based on a number of signal processing data flows and functions. These are shown in Figure 1B and Figure 4, which I have reproduced below:

31



'008 Patent, FIG. 1B (annotated and highlighted).



'008 Patent, FIG. 4 (highlighted).

**REBUTTAL EXPERT DECLARATION OF DR. ROBERT AKL, D.SC.
REGARDING CLAIM CONSTRUCTION**

102.   As shown and annotated above in Figure 1B and flowchart Figure 4, the invention of the '008 Patent includes, for example, the following key aspects:

a.   *Received and Digitized Full Spectrum Signal*

As shown above in red, a full spectrum signal that spans an entire television spectrum is received (*e.g.*, signal "S," comprising the entire signal from the lowest frequency "$F_{lo}$" to the highest frequency "$F_{hi}$") by the analog-to-digital converter (ADC) and digitized into a fully digital (D) full spectrum signal. *See* '008 Patent, 2:44-59, 3:11-16, 4:45-50, 5:45-65.

b.   *Channelized Concurrent Outputs*

In turn, and as shown in blue above, the received and fully digitized signal (D) is then channelized and concurrently output for processing of the combined signals. *See* '008 Patent, 4:28-50, 6:19-36; *see also* 3:20-32, FIG. 1C, FIG. 3.

c.   *Spectrum Signal Monitoring/Monitor*

As shown in green above, an additional aspect of the '008 Patent is signal monitoring, and more specifically, "Spectrum Monitoring" in order to output information related to "analyz[ing] a signal to determine a characteristic of the signal." '008 Patent, Title, Abstract. The '008 Patent explains that the spectrum signal monitoring analysis output is for:

> "measur[ing]/determin[ing] characteristics such as, for example, signal power level vs. frequency, delay vs. frequency, phase shift vs. frequency, type and/or amount of modulation, code rate, interference levels, signal to noise ratio, a transfer function of the channel of over which the signal was received, an impulse response of the channel over which the signal was received, and/or any other characteristic that may help assess characteristics of the channel over which the signal was received, assess characteristics of the transmitter that sent the signal and/or any otherwise be pertinent to performance of the communication system …"

*Id.* at 3:5-60; *see also* 5:12-47, 6:19-36, FIG. 1C, FIG. 4.

d.   *Data Processing/Processor*

As shown in orange above, yet another aspect of the '008 Patent is "data processing" / "data processor" to, for example, "recover data present in one or more television

33

**REBUTTAL EXPERT DECLARATION OF DR. ROBERT AKL, D.SC. REGARDING CLAIM CONSTRUCTION**

channels." '008 Patent, Abstract, 3:61-4:6. With respect to the recovery of one or more television channels, the '008 Patent states that the "data processing" / "data processor" may include/perform certain processes:

> The data processing module 156 may … for example perform synchronization, equalization, and decoding. The data processing module 156 may output processed data (e.g., MPEG transport stream packets and/or Internet Protocol packets) to end systems 126, perhaps via an interface such as an HDMI interface and/or an Ethernet interface (not shown). The data processing module 156 may also be operable to generate one or more control signals 162 for configuring the channelizer 102 and/or the receive front-end 158.

*Id.* at 3:61-4:6.

> FIG. 4 is a flow chart … In step 410, a first one or more of the bands are conveyed to a ***data processing module***. In step 412 a second one or more of the bands are output to a monitoring module. In step 414, the ***data processing module processes one or more of the first one or more bands to recover data on those bands*** while the monitoring module concurrently processes the second one or more bands to determine characteristics of all or a portion of the frequency bands from $F_{lo}$ to $F_{hi}$.

*Id.* at 6:19-36; *see also* Abstract, 3:61-4:6.

> e.     *Network Management Messages Related to a Monitored Parameters*

As a result of the above-mentioned Spectrum Signal Monitoring/Monitor, the '008 Patent provides "***network management*** / maintenance ***message*s**" / "network status update" "messages." '008 Patent, 2:61-3:4, 3:45-60. The specification of the '008 Patent states that these "network management messages" are sent "back to the "source of the received [full spectrum] signal." '008 Patent, 3:51-60. Per the '008 Patent, the monitored characteristics/parameters relate to the network management messages include, for example, the following:

> The monitoring module may also be operable to generate … for example, network status updates indicating whether one or more communication parameters of one or more received television or DOCSIS channels are outside acceptable bounds, and/or conveying measured/determined characteristics back to a source of the received signal (e.g., back to a cable headend). In an example embodiment, the monitoring module 174 may be operable to demodulate signals for measuring one or more characteristics such as signal-to-noise ratio, code rate."

'008 Patent, 3:45-60.

34

**REBUTTAL EXPERT DECLARATION OF DR. ROBERT AKL, D.SC.
REGARDING CLAIM CONSTRUCTION**

1  content that operators place onto their cable networks for distribution to the customer

2  premises.)

3      109.  Dr. Steffes begins by explaining the parties' positions with respect to the

4  term, including that Entropic contends that the phrase has a plain and ordinary meaning.

5  *See* Steffes Decl. ¶ 90. He then gives his opinion, which is that "the receiver-side's

6  signal monitor/signal analyzer sends data regarding characteristics of the received

7  signal ***to the same equipment that transmitted the signal*** and that could potentially

8  modify the transmission." Steffes Decl. ¶ 91.

9      110.  DISH's proposed construction seems meant to capture this position,

10 limiting the claims to sending the determined characteristics back to a "cable headend

11 or satellite transmitter." While the specification does describe sending the determined

12 characteristics back via a cable headend (*see* '008 Patent, 3:55-57), this is only one of

13 the two embodiments—the cable embodiment. It appears that Dr. Steffes and DISH are

14 ignoring the satellite embodiment, and excluding it from the claims. I do not think a

15 POSITA would understand the claims as so limited, and disagree in various places with

16 Dr. Steffes chain of logic to arrive at such a position.

17     111.  First, I note that Dr. Steffes' opinion is based on his incorrect

18 characterization of the claim language: "The claims recite digitizing a received signal,

19 that the digitized signal is monitored or analyzed to determine characteristics of the

20 digitized signal, and that the determined characteristics of the digitized signal are

21 reported to ***the*** source of the received signal." Steffes Decl. ¶ 91.

22     112.  Claim 1 actually recites: "a signal monitor operable to: analyze said

23 digitized signal to determine a characteristic of said digitized signal; and report said

24 determined characteristic to ***a*** source of said received signal." While I agree that the

25 signal monitor ***may*** report the characteristic back to the same piece of hardware that

26 transmitted the signal, the claim language and specification do not limit it to sending

27 the determined characteristic there.

28

**REBUTTAL EXPERT DECLARATION OF DR. ROBERT AKL, D.SC.
REGARDING CLAIM CONSTRUCTION**

113.   Second, Dr. Steffes' opinion is based on his inaccurate statement that the "[t]he '008 patent describes transmitting equipment, i.e., a cable or **satellite headend**, as 'a source of the received signal' that can receive messages from a signal monitoring module." Steffes Decl. ¶ 96. In fact, a POSITA would not consider a satellite system as disclosed in Figure 1C to have a "headend" in the same sense that a cable system has a "headend." Rather, a satellite system has an uplink center located on the ground, which receives content, processes the content, and then transmits those signals via an uplink channel to the satellite transmitters in orbit; the satellite transmitters then transmit signals to the customer premises.

114.   Third, and most importantly, the '008 Patent discloses alternatives excluded by the DISH-Steffes limitation. The patent discloses that monitoring information may be sent upstream to the operator by "broadband connection 188." (Fig. 1C and '008 Patent, 5:6-9). At the time of the invention (and today), the broadband connection most commonly known—and the one that a POSITA would understand is being referred to—is the Internet. For cable-only embodiments, where there exists an HFC (hybrid fiber-coaxial) network, the HFC might be included as an interface with internet. Fig. 1A shows, for example, connecting to the Internet 106 through the HFC 118. *See also* '008 Patent, 2:34-43.

115.   For satellite systems, there is no HFC portion to the delivery system, and hence the connection to the Internet is shown directly. For example, Fig. 1C shows the gateway 196 (including the monitoring function) attached to a "broadband connection 188" which in turn is attached to WAN 192. *See* '008 Patent, Fig. 1C below; *see also* 5:6-11. The reference to a "broadband connection" via the WAN is a simple Internet connection.

**REBUTTAL EXPERT DECLARATION OF DR. ROBERT AKL, D.SC. REGARDING CLAIM CONSTRUCTION**

1    I hereby declare that all statements made are of my own knowledge are true and

2    that all statements made on information and belief are believed to be true. I further

3    declare that these statements were made with the knowledge that willful false statements

4    and the like so made are punishable by fine or imprisonment, or both, under Section

5    1001 of the Title 18 of the United States Code and that such willful false statements

6    may jeopardize the validity of this proceeding.

7

8

9    Dated: ____April 7, 2023____          By: _____

10                                              Dr. Robert Akl, D.Sc.

11                                              Dallas, Texas

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

41

**REBUTTAL EXPERT DECLARATION OF DR. ROBERT AKL, D.SC.
REGARDING CLAIM CONSTRUCTION**