# EXHIBIT

# I

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE CENTRAL DISTRICT OF CALIFORNIA
 2                      SOUTHERN DIVISION

 3    ENTROPIC COMMUNICATIONS,    )
      LLC.,                       )
 4     Plaintiff,                 )
                                  ) CA NO.
 5    VS.                         ) 2:22-cv-07775-JWH-JEM
                                  )
 6    DIRECTV, LLC and AT&T       )
      SERVICES, INC.,             )
 7     Defendants                 )
      _____ )
 8    ENTROPIC COMMUNICATIONS,    )
      LLC.                        )
 9     Plaintiff,                 )
                                  ) CA NO.
10    VS.                         ) 2:22-cv-07959-JWH-JEM
                                  )
11    DISH NETWORK CORPORATION,   )
      DISH NETWORK L.L.C. and     )
12    DISH NETWORK SERVICE L.L.C. )
       Defendants.
13          *****************************************

14            ORAL, VIDEOTAPED, TELEPHONIC, AND

15               REAL-TIME DEPOSITION OF

16                  ROBERT AKL, D.SC.

17                   APRIL 20, 2023

18          *****************************************
                   ORAL, VIDEOTAPED, TELEPHONIC, AND
19    REAL-TIME DEPOSITION OF ROBERT AKL, D.SC., produced
      as a witness at the instance of the Defendants DISH
20    Network Corporation, DISH Network L.L.C., and Dish
      Network Service L.L.C., and duly sworn by me, was
21    taken in the above-styled and numbered cause on
      APRIL 20, 2023, from 8:56 a.m. to 5:00 p.m., before
22    DIANA BENGS, CSR, RPR, TCRR, CRR, Texas
      Certification No. 4907, in and for the State of
23    Texas, reported by machine shorthand, at the
      offices of Perkins Coie, LLP, 500 North Akard,
24    Dallas, Texas, pursuant to the Federal Rules of
      Civil Procedure and provisions stated on the record.

25
```



```
 1                A P P E A R A N C E S

 2

 3     FOR THE PLAINTIFFS:

 4         KATHERINE L. ALLOR (Real-time Connection)
           - AND -
 5         JASON ENGEL (Telephonic and Real-time Connection)
           K&L Gates
 6         70 West Madison Street, Suite 3100
           Chicago, Illinois 60602
 7         312.372.1121 (Office)
           katy.allor@klgates.com

 8

 9
       FOR THE DEFENDANTS DISH NETWORK CORPORATION, DISH
10     NETWORK L.L.C., AND DISH NETWORK SERVICE L.L.C.:

11         ADAM HESTER (Real-time Connection)
           Perkins Coie, LLP
12         33 East Main Street, Suite 201
           Madison, Wisconsin 53703
13         650.838.4311 (Office)
           AHester@perkinscoie.com

14

15     VIDEOGRAPHER:
           KIM BENGS
16

17

18

19

20

21

22

23

24

25
```



```
 1                            INDEX

 2                                             PAGE

 3   Appearances                                 2

 4

 5   ROBERT AKL, D.SC.

 6   EXAMINATION BY MR. HESTER                    6

 7

 8   CHANGES AND SIGNATURE                      254

 9

10   REPORTER'S CERTIFICATION                   256

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                          EXHIBITS

 2   NO. DESCRIPTION                                    PAGE

 3

 4   1   DISH Defendants' Notice of Deposition of      10

 5       Dr. Robert Akl

 6   2   Rebuttal Expert Declaration of Dr. Robert     11

 7       Akl, D.SC., Regarding Claim Construction

 8   3   United States Patent No. 7,130,576 B1,        22

 9       Date of Patent:  October 31, 2006

10   4   United States Patent No. 8,792,008 B2,        176

11       Date of Patent:  July 29, 2014

12   5   United States Patent No. 7,542,715 B1,        245

13       Date of Patent:  June 2, 2009

14   6   Expert Declaration of Dr. Paul G. Steffes     247

15       Regarding Claim Construction

16

17

18

19

20

21

22

23

24

25
```



1    A.  I wouldn't characterize it that way.
2  Sometimes -- definitely satellite communication is
3  part of wireless communication, but there are
4  courses on telecommunications in general that I --
5  that also cover aspects of like coding and decoding
6  that is used in satellite communication, but it's
7  not limited to wireless communication.
8           So because of that, I wouldn't
9  limit -- definitely wireless communication is a --
10  is a part of satellite communication, but
11  telecommunications in general in coding -- in
12  coding the signal, decoding the signal.
13           So there is other aspects of getting a
14  signal ready for satellite -- for communication
15  over a satellite that would also apply whether it
16  is wireless or not.
17    Q.  Did any of classes you took as a student,
18  were they devoted solely to satellite communications?
19    A.  I don't recall if a class had the title
20  satellite communication or is devoted only to
21  satellite communication.  But there are definitely
22  at least multiple chapters in courses that would be
23  related to satellite communications.  So there
24  would be at least a chapter specifically on
25  satellite communication, but it wouldn't be the



ROBERT AKL D.SC.                                              April 20, 2023
ENTROPIC COMM. vs DIRECTV                                                 27

```
 1    title of the course.
 2        Q.   Do any of the classes that you teach now
 3    as a professor or have taught as a professor, are
 4    they solely devoted to satellite communications?
 5        A.   No.  They would apply not just to
 6    satellite communication but they would -- so I
 7    don't have a class with a title of satellite
 8    communication, but there are chapters on satellite
 9    communications.  So there would be a chapter with
10    that title but not a course with that title in the
11    courses that I've taught.
12        Q.   What other kinds of communications other
13    than satellite communications are in the courses
14    that you've taught?
15        A.   Can you repeat the question, please?
16        Q.   Absolutely.
17             What other kinds of communications
18    other than satellite communications have you taught
19    in your coursework as a professor.
20        A.   I mean, I don't have an exhaustive list;
21    so I would say they would fall under two
22    categories, wireless and wireline.
23             Wireless would include -- or can
24    include satellite communication, can include
25    cellular communication, can include like Bluetooth,
```



```
 1              Have you had a research project that
 2    was specifically related to satellite communication
 3    systems.
 4         A.   Yes.
 5         Q.   Okay.  What was that project?
 6         A.   I was -- I've looked at and I've done a
 7    couple of research projects on -- one was supported
 8    by McDonnell Douglas, which was later acquired by
 9    Boeing; and they funded research related to
10    communication between satellites, because
11    satellites move in a fixed pattern, but they are
12    not all visible at the same time and they aren't
13    all visible to each other.
14              So I was working on a routing program
15    because of how satellites go in and out of view
16    from other satellites, but it is in a deterministic
17    manner.  So that work was funded by McDonnell
18    Douglas and Boeing.
19         Q.   When -- what period of time were you
20    engaged in the research project for McDonnell
21    Douglas and Boeing?
22         A.   That was in the mid '90s, '96, '97.
23         Q.   So you weren't a professor at that point?
24         A.   That's correct.
25         Q.   Okay.  You were -- you were a student?
```





1    A.    Yes.

2    Q.    And how long -- over what period of time

3  were you engaged in that research project?

4    A.    Over two years.

5    Q.    Was that research project through your

6  university while you were a student?

7    A.    Yes.  At the time, I believe McDonnell

8  Douglas wasn't yet -- McDonnell Douglas had a big

9  research facility in St. Louis; and I went to

10  school in St. Louis.  So they were interested in

11  funding the research that I was doing at the time

12  in the field of wireless communication and routing.

13  So that's the time frame that I had an active grant

14  specifically focused and limited to satellite

15  communications.

16    Q.    Any other research projects, as a student

17  or professor, that were specifically limited to

18  satellite communications?

19    A.    No, not specifically limited to satellite

20  communication.  But, like I said, my research is --

21  would be applicable in a satellite system.  And a

22  satellite system encompasses, you know,

23  communication, not just to and from the satellite

24  but also core network that is part of a satellite

25  system.  And a lot of my research focuses on those



1 │ are applicable to -- they are applicable to not

2 │ just the satellite antenna.  That's the point that

3 │ I am making.

4 │     Q.   So it was general communications research.

5 │ Is that fair to say?  Or the experience you just

6 │ described relates generally to communications?

7 │     A.   Yes.  So it would relate to -- so more

8 │ recently, my research focused on MIMO, multi-input,

9 │ multi-output, having multiple antennas at the

10 │ transmitter or the receiver.

11 │          I look at relaying information, packet

12 │ loss, channel quality, how you can do flow control,

13 │ which is the process of a receiver informing a

14 │ transmitter of the quality of the communication.

15 │          So that technology -- and we will see

16 │ some of that technology in some of the asserted

17 │ patents.  That's what some of my research has

18 │ focused on.

19 │     Q.   And the research that you were doing

20 │ related to the concepts you just listed, was that

21 │ in the cellular communications context?

22 │     A.   I think that's fair.  I -- I do do a lot

23 │ of work in the cellular field.  I enjoy it; and --

24 │ like 2G, 3G, 4G, 5G currently.  So I do have

25 │ extensive publications in the cellular field; but,



1  again, my research isn't limited to the cellular

2  field.

3      Q.   What percentage of your publications are

4  in the cellular field?

5      A.   I would say more than 50 percent.  Because

6  as a professor, you need to build a niche for

7  yourself or an area that it is easier to get

8  funding or -- so in that field -- in that sense, I

9  have published extensively in the cellular field.

10          And a lot of my students that

11 I've advised and taught and mentored have gone out

12 and worked for companies like AT&T and Ericsson and

13 Qualcomm, as examples that I -- that I can recall.

14     Q.   So the niche you've kind of carved for

15 yourself is in the cellular field?

16     A.   I would say it is wireless communication,

17 and I have used cellular communication as an

18 example for the applications.  So cellular

19 communication would be the application that I have

20 chosen to demonstrate the technology in the

21 wireless field that I have worked on.

22          But, again, it is also applicable to

23 satellite communication; but I think cellular is

24 more exciting, at least to me, because the

25 technology moves faster when compared to, like,



1    cable network standards.

2           So when I compare DOCSIS standards and

3    how they change over time and you compare that with

4    3GPP standards, cellular standards and how those

5    change over time, to me those are more exciting

6    because they evolve faster.  So there are greater

7    opportunities for research in those fields.

8       Q.   Would you say that more than 50 percent of

9    your research is devoted to cellular communication?

10      A.   I would say it is definitely wireless

11   communication with cellular communication being the

12   application of choice.

13      Q.   So more than 50 percent would involve

14   cellular communication as the application of

15   choice, your research, that is?

16      A.   That's fair.

17      Q.   Okay.  Be fair to say more than 75 percent

18   of your research?

19      A.   No, because I also do -- I think 50 is

20   good, unless I go back and -- because there is a

21   lot of research on Wi-Fi.  I've done research on

22   Bluetooth.  I've also written papers on the camps

23   that I've done.  I'm very proud of summer camps to

24   recruit middle school and high school students, and

25   those relate to gaming.



1          So there are other aspects of my

2   research; but, you know, over 50 percent is what I

3   would classify my -- my focus using cellular as an

4   application.  I would probably say 7- -- you know,

5   your question, 75 percent would be more general

6   wireless communication, where there is 25 percent

7   that's really focusing on wireless communication

8   without having cellular being the application of

9   choice, like Wi-Fi, like Bluetooth, where I'm

10  looking at those applications specifically.

11     Q.   And other than your research for McDonnell

12  Douglas in the mid '90s, none of your other

13  projects have focused on satellite communications

14  as the application.  Is that fair to say?

15     A.   I have not worked on a specific grant that

16  is limited to satellite communication.  That's how

17  I would phrase it.  But I have worked -- I have

18  received funding and grants that relate to wireless

19  communication that would be applicable.

20          So I've received NSF funding, National

21  Science Foundation.  And because it is not funded

22  by a specific company, you are looking at more

23  fundamental concepts than -- when my work was

24  funded, for example, by McDonnell Douglas, I was

25  specifically looking and researching a problem for



```
 1   what Figure 2 and the specification related to
 2   Figure 2 are saying.
 3       Q.   Is the line that you have added for
 4   clarity important to your opinions today?
 5       A.   I don't think I used that figure again
 6   when I start providing my opinions regarding the
 7   disputed claim terms.  So I don't think I
 8   specifically relied on that line for the opinions
 9   that I have here today.
10       Q.   Okay.  Taking you back up to paragraph 47
11   on the prior page, you used a few times -- excuse
12   me -- the word "outdoor unit."  What are you
13   referring to when you say "outdoor unit"?
14       A.   Outdoor.
15       Q.   Are you searching your report for
16   "outdoor"?
17       A.   No.  I am searching the patent for
18   "outdoor."
19       Q.   Okay.
20       A.   And the '576 patent uses the word "outdoor
21   unit" 26 times.
22       Q.   Okay.
23       A.   So I'm referring to the same outdoor unit,
24   which we have the acronym ODU for the satellite
25   receiver outdoor unit in the patent.
```



1      Q.    Okay.  So turning you back to paragraph 67

2   of your report, what do you mean when you use the

3   term "outdoor unit" in paragraph 47?

4      A.    I'm referring to those words as used in

5   the specification.

6      Q.    And what do those words mean to a person

7   of skill in the art?

8      A.    They would have plain and ordinary

9   meaning.

10     Q.    What is the plain and ordinary meaning of

11  outdoor unit?

12     A.    I have not articulated a definition.

13     Q.    Can you articulate a definition sitting

14  here today as a person of skill in the art?

15     A.    No.

16     Q.    Why not?

17     A.    For the same reason that I'm not

18  articulating any definitions other than -- for any

19  terms other than the terms that are disputed to the

20  extent I have provided a definition.

21          So you will have the same answer for

22  any other set of words that you probably will ask

23  me.  And I can repeat my answer or I can refer you

24  back to my previous response.

25     Q.    When you say that you are not articulating



1    any definitions, does that mean that you are

2    incapable of articulating definitions?

3                   MS. ALLOR:  Object to the form.

4        A.   It means I am not articulating definitions

5    today.  I don't have opinions, and I'm not going

6    outside the scope of my declaration.

7        Q.   (BY MR. HESTER)  Are you capable of

8    rendering opinions about what certain terms mean to

9    persons of skill in the art?

10                  MS. ALLOR:  Object to the form.

11       A.   I am not capable today because I would not

12   have done that analysis; but if I am asked to do

13   such analysis in the future, I may be able to do an

14   analysis and articulate a definition.  But as of

15   today, I don't have opinions.

16       Q.   (BY MR. HESTER)  But I'm asking you to do

17   that analysis today.  Why are you unwilling to do

18   it?

19                  MS. ALLOR:  Object to the form.

20       A.   You are mischaracterizing my testimony.  I

21   am not saying I am unwilling to do it.  I am saying

22   I don't have the time bandwidth or -- to be able to

23   render an opinion on the fly for an opinion that is

24   not already in my declaration.  I have -- so as a

25   result, I don't have -- I cannot provide you an



ROBERT AKL D.SC.                                      April 20, 2023
ENTROPIC COMM. vs DIRECTV                                      100

 1  answer on the fly.

 2       Q.   (BY MR. HESTER)  If I were a student of

 3  one of your classes and I asked you what an outdoor

 4  unit is, what would you tell me?

 5            MS. ALLOR:  Object to the form.

 6       A.   I don't know.

 7       Q.   (BY MR. HESTER)  You don't know how you

 8  would teach your student about an outdoor unit?

 9            MS. ALLOR:  Object to the form.

10       A.   I don't necessarily recall whether outdoor

11  unit in this context -- what I would have said, so

12  I -- I don't have an answer for you.

13       Q.   (BY MR. HESTER)  When you say "in this

14  context," do you mean in this satellite

15  communications context?

16       A.   No.  I mean in a different setting where I

17  can be describing something in my class versus I'm

18  describing something under oath in a deposition.

19  So the context here I am -- is in a litigation

20  matter where I am under oath and I want to make

21  sure my answers are as accurate as possible.

22            And as such, if I don't have an

23  opinion in my declaration, I am -- I don't know if

24  I am capable or not to be able to come up with an

25  opinion on the fly.  So as such, I don't have an



1   answer for you.

2       Q.   So you are -- the reason you don't have an

3   answer for me is simply because you are under oath?

4       A.   No.  You are mischaracterizing what I

5   said.

6       Q.   Can you as accurately possible tell me

7   right now what the plain and ordinary meaning of

8   "outdoor unit" is?

9       A.   No.  I have not articulated a definition

10  for that term, and that is a term that also appears

11  in the claims, and I'm not doing claim construction

12  on those words.

13      Q.   Right.  But I'm not asking you to claim

14  construct.  I'm asking you to give me plain and

15  ordinary meaning as accurately as you can.  Can you

16  do that?

17      A.   No.

18      Q.   How much time do you think it would take

19  for you to come up with an accurate explanation of

20  what an outdoor unit is to a person of skill?

21            MS. ALLOR:  Object to form.

22      A.   Days.

23      Q.   (BY MR. HESTER)  In Figure 2 of the '576

24  patent, a copy of which is in your report following

25  paragraph 48, is the Signal Selector 250 part of



 1 | "broadband" to refer to?
 2 |     A.    Broadband is a term that also appears in
 3 | the patent.
 4 |     Q.    Okay.
 5 |     A.    I'm giving it its plain and ordinary
 6 | meaning.  I'm not rendering -- or articulating a
 7 | definition for it.
 8 |     Q.    Without articulating a definition, can you
 9 | tell me what are the properties of -- what can be
10 | the properties of a broadband signal?
11 |               MS. ALLOR:  Object to the form.
12 |     A.    It is fast.  That could be an example.
13 |     Q.    (BY MR. HESTER)  Does the term "broadband"
14 | have to do with the range of carrier frequencies
15 | that are used?
16 |     A.    I don't have an opinion on that today.
17 |     Q.    Can you form an opinion on that for me
18 | right now?
19 |               MS. ALLOR:  Object to form.
20 |     A.    No.  It is a term that appears in the
21 | claims, and I'm not providing claim construction on
22 | that term.
23 |     Q.    (BY MR. HESTER)  How long would it take
24 | you to come up with an explanation for whether
25 | broadband relates to the range of carrier



 1   frequencies?

 2        A.    Days.

 3        Q.    At least in paragraph 41 you use the term

 4   "broadband" three times.  Do you see that,

 5   lines 10, 11, and 15?

 6        A.    Yes.

 7        Q.    When you use the word "broadband" three

 8   times in paragraph 41, what information were you

 9   intending to convey by the use of the term

10   "broadband"?

11        A.    Plain and ordinary meaning.

12        Q.    Okay.  And you are not going to -- you are

13   refusing to provide for me what the plain and

14   ordinary meaning is?

15             MS. ALLOR:  Object to the form.

16        A.    I disagree with that characterization.

17        Q.    (BY MR. HESTER)  What is the plain and

18   ordinary meaning of broadband?

19        A.    I don't have an opinion other than I have

20   not articulated a definition.  This is a word that

21   appears in the claim.

22             I wouldn't want to do a claim

23   construction on the fly.  I wouldn't want my

24   definition to be too narrow or too broad.  I would

25   need to do an analysis.



1          And so I disagree that you are saying I am

2     refusing to answer a question.  I am providing you

3     a response.  I just don't have a response.  I don't

4     have a definition that I can give you on the fly.

5          And that's going to be my response.  I

6     mean, we can keep doing this all day; and I'm happy

7     to.  It is your seven hours, but it is going to get

8     old after a while.

9          Q.   Can you tell me anything about the plain

10    and ordinary meaning of broadband on the spot right

11    now as a person of skill?

12         A.   I gave you an example.  I said it's

13    usually fast.

14         Q.   Okay.  So other than that it is usually

15    fast, can you give me any more information about a

16    broadband signal, the plain and ordinary meaning of

17    broadband signal?

18         A.   No.

19         Q.   And you only use the word "broadband" in

20    the context of paragraph 41 because that's the word

21    used in the patent.  Is that fair to say?

22         A.   Yes.  And in the claims.

23              Is this a good time to break for

24    lunch?  I don't know if lunch is here or not but --

25         Q.   Awfully close.  It got here literally two



1  means to extract a transponder channel versus what

2  it means to select a transponder channel?

3      A.   I have not rendered an opinion on that

4  here today.

5      Q.   Can you render an opinion for me right

6  now?

7      A.   No.

8      Q.   Why not?

9      A.   Because I have not done an analysis on

10  those differences between selecting and extracting,

11  and those are terms that appear in the claim.  My

12  understanding is those words would have a plain and

13  ordinary meaning.  So beyond the plain and ordinary

14  meaning, I do not have a -- I have not articulated

15  a definition for the claims.

16      Q.   With respect to extracting, what is the

17  plain and ordinary meaning of extracting a

18  transponder channel?

19      A.   I have not articulated a definition for

20  it.

21      Q.   Can you explain for me what it means to

22  extract a transponder channel separate from

23  defining it?

24      A.   No.  It would be difficult to -- to do so

25  in vacuum without articulating some sort of



1   definition or construction, and I am not providing

2   claim construction on extracting in vacuum or

3   extracting a transponder signal or extracting a

4   transponder channel as a phrase other than

5   disagreeing with regard to indefiniteness.

6            But I -- but my understanding is those

7   words have plain and ordinary meaning and the

8   parties have agreed -- or at least there is not a

9   dispute from either party that the words have their

10  plain and ordinary meaning.

11       Q.   And what is your basis for saying that

12  there is a not a dispute between the parties that

13  the words transponder -- "selecting and extracting

14  a transponder channel" have their plain and

15  ordinary meaning?

16       A.   I think there is a quote, based on my

17  understanding, and it is somewhere in my

18  declaration, that defendants' expert is also not

19  disputing that.

20           And I would be happy to try to -- it

21  is in -- let's see.  I can -- I can find you where

22  that quote is, if you want.

23       Q.   It is a quote from you, though; right?

24  You are the one who is saying you understand there

25  is no dispute; right?



1      A.    Paragraph 59.  So in paragraph 59, I

2  provide an opinion saying, "In addition, the term

3  'selecting and extracting' appears elsewhere in the

4  claims, such as in Claim 14, which recites

5  'selecting and extracting a plurality of

6  transponder signals.'  I understand that neither

7  DISH nor Dr. Steffes" -- capital S-t-e-f-f-e-s --

8  "contends that this phrase requires construction."

9      Q.    I was referring to selecting and

10  extracting transponder channels, not signals.  The

11  sentence you just read refers to transponder

12  signals.

13            I'm asking for the plain meaning of

14  selecting and extracting a transponder channel.

15      A.    It would still have the plain and ordinary

16  meaning.

17      Q.    And what is the plain and ordinary

18  meaning?

19      A.    I have not articulated a definition.

20      Q.    Is there a definition?

21      A.    I don't know.  I have not been asked to

22  articulate a definition.

23      Q.    You mean by counsel you haven't been asked

24  to articulate a definition?

25            MS. ALLOR:  Objection, form.



1      A.    I've not been charged and I don't believe

2   there is dispute in terms of what those words mean,

3   is my understanding in this matter.

4      Q.    (BY MR. HESTER)   How do you know there is

5   no dispute if you haven't articulated what you

6   believe it means and you haven't seen what

7   Dr. Steffes articulates it means?

8      A.    That is my understanding from counsel that

9   the dispute is not with regard to that those words

10  require construction.

11           The dispute is with regard to if there

12  is antecedent basis and whether, in the absence,

13  they may or may not be indefinite to a POSITA when

14  we get to the dependent claims.  So that is my

15  understanding of the dispute from counsel.

16     Q.    Okay.

17     A.    And because of that, my charge from

18  counsel was to provide an opinion whether those

19  words are indefinite or not.  My charge was not to

20  provide or articulate a construction but to use the

21  plain and ordinary meaning of those words.

22     Q.    I'm not asking you to articulate a

23  construction, but I am going to ask you this:  Can

24  you tell me what the plain meaning of the phrase

25  "selected transponder channels" is?



```
 1         A.   No, because --
 2              MS. ALLOR:  Object to form.
 3         A.   -- as now I have answered such a question
 4    many times, and I will continue to provide a
 5    similar response if asked a similar question.
 6              I would be doing claim construction,
 7    and those words would have the plain and ordinary
 8    meaning, and claim construction is not something
 9    that I take lightly.  I would not want the
10    definition to be too narrow or too broad.
11              It is not something I can do on the
12    fly and that was not something that I was asked to
13    do today, or for my declaration that I am answering
14    questions on today.
15         Q.   (BY MR. HESTER)  In your declaration,
16    above paragraph 57, there is a section heading,
17    "Selected [and extracted] transponder channel[s]."
18              What is the plain and ordinary meaning
19    of that phrase in quotes that's in your
20    declaration?
21         A.   I have not rendered such an opinion.
22         Q.   Why not?
23         A.   Because I was not asked to.  I don't
24    believe there is a dispute on the plain and
25    ordinary meaning.
```



1          I -- under that section heading, I

2     provide -- it is my understanding that DISH asserts

3     that the term is indefinite because the phrase

4     lacks antecedent basis.  It is not my understanding

5     that there is a dispute on what the plain and

6     ordinary meaning is.

7          Q.   Okay.  And can you tell me what the plain

8     and ordinary meaning is today?

9               MS. ALLOR:  Object to the form.

10         A.   No, because I was not asked to do so and

11    because I would be doing claim construction.  And I

12    don't take claim construction lightly, and I would

13    not want -- that my construction to be too narrow

14    or too broad.  And so because of that, I would not

15    be able to provide you a construction on the fly.

16         Q.   (BY MR. HESTER)  Would you be able to tell

17    me a plain and ordinary meaning today?

18              MS. ALLOR:  Object to the form.

19         A.   You just asked me that question, and my

20    answer is on the record.

21         Q.   (BY MR. HESTER)  You didn't actually use

22    the word "plain and ordinary meaning" in your

23    answer, so that's why I'm asking for some clarity.

24              Would you be able to tell me the plain

25    and ordinary meaning today?  It is either, "Yes, I



1  can tell you the plain and ordinary meaning"; or

2  "No, I cannot tell you the plain and ordinary

3  meaning."  Which is it?

4              MS. ALLOR:  Object to the form.

5      A.   No, I would not be able to provide a

6  definition of what the plain and ordinary meaning

7  for the reason that I gave previously, which is

8  that I would be doing claim construction; and I

9  would not want the claim construction to be too

10  narrow or too broad.

11              And because of that, I cannot sit here

12  today and articulate a definition or give you a

13  definition of what the plain and ordinary meaning

14  because I would be doing claim construction.

15      Q.   (BY MR. HESTER)  In your more than one

16  year since you looked at the '576 patent, have you

17  considered what the plain and ordinary meaning of

18  selected and extracted transponder channels is?

19      A.   I gave them the plain and ordinary

20  meaning.

21      Q.   When you say "them," who is them?

22      A.   The words "selected and extracted

23  transponder channels."  So the individual words, I

24  gave those words plain and ordinary meaning.

25      Q.   Okay.  And when you say you gave them



1  plain and ordinary meaning, what plain and ordinary

2  meaning did you give them?

3       A.   I can put myself in the shoes of a

4  POSITA -- and we can do this all day -- and provide

5  an opinion without articulating a definition of the

6  plain and ordinary meaning.

7            So to the extent you are asking me to

8  articulate a definition, I cannot do that today

9  because I would be doing claim construction.  And I

10 don't take this task lightly, and I wouldn't want

11 my analysis to be too broad or too narrow with

12 regard to what the claim construction is for those

13 words.

14      Q.   If you are asked at the technology

15 tutorial to provide a plain and ordinary meaning of

16 selected and extracted transponder channels, will

17 you have an opinion then?

18            MS. ALLOR:  Object to the form.

19      A.   I -- I don't know.  If counsel asks me to

20 think about examples or then -- between now and

21 then, I might do that analysis; but as of now, I

22 have not been asked to do so; and I have not

23 articulated or was -- or determined what that

24 definition is.

25      Q.   (BY MR. HESTER)  And sitting here today,



1   Claim 8.

2       A.   So I see the word "selected," I see the

3   word "signal," I see the word "transponder"; but I

4   don't see them in that specific order.

5       Q.   (BY MR. HESTER)  Do you see the words

6   "transponder signal" at all?

7       A.   I see the word "transponder" and I see the

8   word "signal" but I don't see them next to each

9   other.

10      Q.   What is the difference between selecting

11  transponder channels and selecting transponder

12  signals?

13          MS. ALLOR:  Object to the form.

14      A.   This is not a simple "yes" or "no."  I

15  mean, there are similarities; and there are

16  differences; and I would be happy to go through;

17  but this is going to be a long answer.

18          So I just want to -- because I

19  describe those and the similarities and differences

20  in how a POSITA would understand that over multiple

21  pages, so --

22      Q.   (BY MR. HESTER)  Can I ask a narrower

23  question, then?

24      A.   Yes.

25      Q.   You would agree with me that they have



1  differences, though -- right? -- between selecting

2  transponder signals and selecting transponder

3  channels?

4      A.   Well, I agree that the words are different

5  and there might be nuances to those phrases that

6  are different; but there is also a lot that is in

7  common.  And a POSITA would understand that signals

8  in this context or in this claim language, you

9  know.  The signals are on channels, so there is an

10  inherency of you do need to have channels if you

11  have signals.

12           And I can stop here, but I can expand

13  depending on what your follow-up questions are.

14      Q.   I actually want you to tell me more about

15  the nuances to those phrases that are different.

16  What are those nuances?

17      A.   Sure.

18      Q.   And if you are looking at a part of your

19  report, let me know.

20      A.   Yes, I am.  So I'm going through --

21  because I spent multiple pages describing the --

22  how the phrases are understood by a person of

23  ordinary skill in the art.  So I am trying to

24  find -- so a good place to start would be

25  paragraph 63.



 1   signal from the satellite, but it is very expensive
 2   to transmit to the satellite.
 3              So what this figure is showing -- and
 4   you can see the thick line on the left part and
 5   going out 188.  So it is not uncommon to receive a
 6   signal from the satellite and transmit a signal
 7   back to the headend using the Internet.
 8              So it is in a way not showing -- it is
 9   showing both received communication and transmitted
10   communication from the house where the received
11   communication comes from the satellite and the
12   transmitted communication would go over the
13   Internet or over a wide area network.
14      Q.   Over the Internet to the headend?
15      A.   Yes.
16      Q.   Okay.  So and then the headend is the
17   source of the signals that the satellite is
18   rebroadcasting to the end user.  Is that fair?
19      A.   The headend is where the first appearance
20   of the signal appears.  I know you used the word
21   "source," and that is a disputed term.  So the
22   dispute here is, what is the source of said
23   received signal?
24              And my understanding is that's --
25   we're going into now my opinion that defendants



```
 1   have a narrow construction of what that is.  And I
 2   disagree that that should be -- I agree that the
 3   headend would be an example of a source; but I
 4   don't believe the construction should be limited,
 5   when we look at the source, to the headend.  That's
 6   why those words would have a plain and ordinary
 7   meaning, because the signal itself is going to be
 8   repeated and relayed at different points.
 9              So it's my opinion that it should not
10   be limited to the construction that was proposed by
11   defendants where it says the equipment, example, a
12   cable headend or satellite transmitter, that
13   transmitted the received signal to be the
14   definition of a source of said received signal.
15      Q.   Coming back a bit to my question, though.
16   If we kind of imagine at a high level, you've got
17   your customer premises; and a satellite is
18   broadcasting a signal to the premises.  You agree
19   to that?
20      A.   Yes.
21      Q.   And in the context at least of satellite
22   television and Internet, that satellite is getting
23   the signal originally from some headend on the
24   ground?
25      A.   Or some device or some other satellite
```



1   dish that is connected directly or indirectly to

2   the headend.

3       Q.   Okay.  So something that the headend is

4   using to broadcast to the satellite, whether it is

5   a dish or something else?

6       A.   Well, it may not be in the headend.  So

7   the headend, it could be in communication with an

8   Earth station that has a satellite that would be

9   transmitting sig- -- sorry -- that has a dish that

10  is transmitting a signal to the satellite.

11              So the first appearance of the signal

12  is coming from the headend, but that signal can be

13  repeated and replicated at different points.

14              So I wouldn't -- when we look at the

15  claim language which refers to a source, a source,

16  I wouldn't limit the source to the very beginning

17  of the signal.  Which an example of that would be

18  the headend, because, like I said, the signal is

19  going to be replicated and relayed at different

20  stages.

21              So it can go from the headend to an

22  Earth station to a satellite dish up to the

23  satellite, or it could go through intermediate

24  networks.  But there is a satellite at some

25  point -- there is a satellite dish at some point



1   that's going to send it to the satellite.  And

2   there is a satellite dish at another point that's

3   going to receive it from the satellite that

4   normally -- the receiving satellite's small.  It

5   sits on the customer's roof or somewhere, and the

6   satellite dish that's sending the signal is much

7   larger with a lot more power.

8        Q.   Okay.  I believe you mentioned that one

9   way in which a customer premises site can

10  communicate with a headend is over a wide area

11  network, such as 192; is that right?

12       A.   Yes.

13       Q.   Okay.  Can a customer premises communicate

14  with a headend via the satellite dish that's on its

15  roof?

16       A.   I don't think so.  I don't think the

17  satellite dish on the roof transmits to the

18  satellite in the sky.

19       Q.   How does satellite Internet work, then?

20       A.   Satellite Internet works in an asymmetric

21  way.  I actually had satellite Internet in the '90s

22  with Hughes.  And you receive the -- you receive

23  your downlink from a satellite.

24       Q.   Okay.

25       A.   So I had a satellite dish outside my



1   destination and we look at the source of the signal

2   at the destination, the -- the last link or couple

3   links along the way, those all are sources because

4   they receive, they regenerate, they can correct

5   along the way, and they send.

6           So my opinion is that a source -- any

7   source along the way of the signal would meet the

8   claim language of a source.  And this is why it

9   should have a plain and ordinary meaning and it

10  would not -- it should not be limited to the

11  equipment; example, a cable headend or satellite

12  transmitter that transmitted the received signal.

13          Because, I mean, again, the satellite

14  transmitter is in the sky.  So the -- in any of

15  these situations here, you are not sending the

16  signal back to the satellite transmitter.  You

17  don't have the capability.

18      Q.   Why do you say that?

19      A.   The -- the -- I'm sorry?

20      Q.   I said why do you say that you don't have

21  the capability?

22      A.   The -- the -- any of the equipment in this

23  setting, you know, the little satellite dish that

24  users put on their houses that is being described

25  in the '008 for television, those do not have the



ROBERT AKL D.SC.                                    April 20, 2023
ENTROPIC COMM. vs DIRECTV                                    217

1       A.   Yes.

2       Q.   Why did you annotate S so that it says

3    "full spectrum received input signal"?

4       A.   I'm using language from the patent.

5       Q.   Okay.

6       A.   So this is what -- the patent is

7    describing the input.  Those are words from the

8    specification.

9       Q.   Do you have an understanding of what those

10   words mean to a person of ordinary skill?

11      A.   They would have plain and ordinary

12   meaning.

13      Q.   And what is the plain and ordinary meaning

14   of "full spectrum received input signal"?

15      A.   So spectrum refers to bandwidth.  And full

16   spectrum would be -- you know, you are looking at

17   an entire bandwidth.  So this is not -- so this is

18   the -- the signal with all its components in a

19   way -- or an example would be a signal having --

20   that has not been truncated or you have not removed

21   some frequency from it, as an example.

22            It is like whole -- whole -- whole

23   milk.  You haven't skimmed it, yes.  It's --

24   it's -- it has all the frequencies in it.

25      Q.   And that whole-milk signal, so to speak,



1   is what gets digitized by the RF receive front

2   end 158?

3       A.   Yes.  And I also rely on Figure 4, which

4   is just below it; and I highlight two steps, 404

5   and 406.  And those two steps are being carried in

6   Block 158, as an example.

7       Q.   Are there other steps being carried out in

8   158 that you are aware of?

9       A.   Those are the two that I also annotate --

10  or highlight in red as I try to map Figure 4 to --

11  as steps to the blocks in Figure 1B --

12      Q.   Okay.

13      A.   -- and I map all four colors in both

14  cases.

15      Q.   In paragraph 102A, which I think you

16  pointed me to a minute ago, there's reference to

17  spanning an entire television spectrum -- strike

18  that.  Let me go back a little bit.

19           There is reference to a full spectrum

20  signal that spans an entire television spectrum is

21  received.  What do you mean by the phrase "spans an

22  entire television spectrum"?

23      A.   I think those words are -- they would have

24  their plain and ordinary meaning.  Those are words

25  that appear in the claim.



1          I'm not rendering opinions on them.

2     And they also appear, I think, partly in the spec.

3     So they would have the plain and ordinary meaning.

4          Q.   And what is the plain and ordinary meaning

5     of "spans an entire television spectrum"?

6          A.   I have not provided a construction for the

7     reasons we've discussed multiple times before.

8          Q.   Can you provide for me an explanation

9     today of what the plain and ordinary meaning of

10    "spans and entire television spectrum" is?

11              MS. ALLOR:   Object to the form.

12         A.   No.

13         Q.   (BY MR. HESTER)  How long would it take

14    you to form an opinion regarding the plain and

15    ordinary meaning of that term?

16              MS. ALLOR:   Object to the form.

17         A.   Days.

18         Q.   (BY MR. HESTER)  Multiple hours?

19         A.   Yes.  Well, I mean, multiple days where I

20    think about it and I sleep on it and I think about

21    it.  That's kind of my process.

22         Q.   And you think that process collectively

23    might take a couple of hours?

24         A.   Over multiple days, I think that's -- that

25    could be an estimate.  I don't know.  I mean, I



```
 1  copy of the '715 patent.
 2              (Exhibit No. 5 was marked.)
 3              MS. ALLOR:  I'm going to object to
 4  scope.  He hasn't opined on this patent.
 5              MR. HESTER:  Okay.
 6      Q.   (BY MR. HESTER)  Dr. Akl, have you
 7  reviewed, at some time prior to today, the
 8  U.S. Patent No. 7,542,715?
 9      A.   Yes.
10      Q.   Okay.  When did you first review this
11  patent?
12      A.   About a year ago.
13      Q.   Similar time with the other patents?
14      A.   Yes.
15      Q.   Okay.  And you have, of course, reviewed
16  Dr. Steffes' declaration related to claim
17  construction.  Yes?
18      A.   I've -- I've read his declaration.  I am
19  providing opinions only on two claim terms.
20      Q.   Okay.  So your declaration is a rebuttal
21  to Dr. Steffes' declaration; is that right?
22      A.   It is a rebuttal to two opinions that
23  counsel asked me to rebut.  That doesn't mean I
24  agree with other stuff in it.  It just means that I
25  am only providing an opinion regarding two terms.
```

