Jason C. Lo, SBN 219030
jlo@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue, Suite 5400
Los Angeles, CA  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

**ATTORNEY FOR DEFENDANTS DIRECTV, LLC AND AT&T SERVICES, INC.**

Matthew C. Bernstein, Bar No. 199240
MBernstein@perkinscoie.com
PERKINS COIE LLP
11452 El Camino Real, Ste 300
San Diego, California 92130-2080
Telephone:  +1.858.720.5700
Facsimile:   +1.858.720.5799

**ATTORNEYS FOR DEFENDANTS DISH NETWORK CORPORATION, DISH NETWORK L.L.C., AND DISH NETWORK SERVICE L.L.C.**

*Additional Counsel Listed on Signature Block*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENTROPIC COMMUNICATIONS, LLC,<br><br>             Plaintiff,<br><br>        v.<br><br>DIRECTV, LLC and<br>AT&T SERVICES, INC.,<br><br>        Defendants. | No. 2:22-cv-07775-JWH-JEM<br><br>**DEFENDANTS' JOINT RESPONSE CLAIM CONSTRUCTION BRIEF**<br><br>Hon. John W. Holcomb |
| ENTROPIC COMMUNICATIONS, LLC,<br><br>             Plaintiff,<br><br>        v.<br><br>DISH NETWORK CORPORATION, DISH NETWORK L.L.C., and DISH NETWORK SERVICE L.L.C.,<br><br>        Defendants. | No. 2:22-cv-07959-JWH-JEM<br><br>Case Transferred from E.D. Texas (2:22-cv-76-JRG) |

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................1

II.   ALL DEFENDANTS ARE ALIGNED, AND NONE SUPPORT ENTROPIC'S
      CONSTRUCTIONS ..............................................................................................2

III.  U.S. PATENT NO. 7,130,576...............................................................................3

      A.   The '576 Patent ......................................................................................3

      B.   Disputed Terms Of The '576 Patent.........................................................5

           1.   "digitizing the plurality of satellite broadband signals" ('576 patent,
                cl. 14) .............................................................................................5

           2.   "integrated receiver decoder (IRD)" ('576 patent, cls. 14, 18, 19, 21,
                22, 41) ............................................................................................7

           3.   "selected [and extracted] transponder channel[s]" ('576 patent, cls.
                16, 17, 21, 39, and 41–42) .............................................................10

           4.   "transponder request signals" ('576 patent, cls. 14, 19, and 22)......13

           5.   "a transponder request [signal] ... the transponder request signals" /
                "from the IRD ... to the IRDs" / "a plurality of transponder signals ...
                the transponder signal" ('576 patent, cl. 14) ....................................15

IV.   U.S. PATENT NO. 7,542,715...............................................................................18

      A.   Disputed Terms Of The '715 Patent.........................................................18

           1.   "RF signals" ('715 patent, cl. 9) .....................................................18

           2.   "decodes specific programs" ('715 patent, cl. 9) ..............................21

           3.   "local area network" ('715 patent, cl. 9) .........................................25

V.    U.S. PATENT NO. 8,792,008...............................................................................29

      A.   The '008 Patent ....................................................................................29

      B.   Disputed Terms For The '008 Patent .......................................................29

           1.   "an entire television spectrum" ('008 patent, cls. 1–2) ...................29

           2.   "signal having a bandwidth that spans from a first frequency, $F_{lo}$, to
                a second frequency, $F_{hi}$" ('008 patent, cls. 3, 11)............................33

           3.   "a source of said received signal" ('008 patent, cls. 1, 3, 11) .........35

VI.   CONCLUSION .................................................................................................38

## TABLE OF AUTHORITIES

**CASES**

*1 Energy Sols., Inc. v. Nicholas Holiday, Inc.*,
    No. 13-cv-5000-MWF, 2014 WL 12589113 (C.D. Cal. July 9, 2014) ..............34

*Amgen Inc. v. F. Hoffman-La Roche Ltd*,
    580 F.3d 1340 (Fed. Cir. 2009) ........................................................21

*Apple Inc. v. MPH Techs. Oy*,
    28 F.4th 254 (Fed. Cir. 2022) ..........................................................16

*Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*,
    813 F. App'x 522 (Fed. Cir. 2020) ....................................................17

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
    358 F.3d 1371 (Fed. Cir. 2004) ........................................................25

*Dayco Prod., Inc. v. Total Containment, Inc.*,
    258 F.3d 1317 (Fed. Cir. 2001) ..........................................................5

*Entropic Commc'ns, LLC v. Charter Commc'ns, Inc.*,
    No. 2:22-cv-00125-JRG (E.D. Tex. May 30, 2023)......................................9, 27

*Eon Corp. IP Holdings v. Silver Spring Networks, Inc.*,
    815 F.3d 1314 (Fed. Cir. 2016) ..........................................................2

*Exxon Chem. Patents, Inc. v. Lubrizol Corp.*,
    64 F.3d 1553 (Fed. Cir. 1995) ......................................................2, 33

*Imperium (IP) Holdings, Inc. v. Apple, Inc.*,
    920 F. Supp. 2d 747 (E.D. Tex. 2013)................................................16

*Intex Rec. Corp. v. Team Worldwide Corp.*,
    860 F. App'x 717 (Fed. Cir. 2021) ......................................................6

*JBF Interlude 2009 Ltd. v. Quibi Hldgs, LLC*,
    No 2:20-cv-02299, 2021 WL 1390367 (C.D. Cal. Apr. 12, 2021) ....................34

*Joy Techs., Inc. v. Flakt, Inc.*,
    6 F.3d 770 (Fed. Cir. 1993) ............................................................16

*Krippelz v. Ford Motor Co.*,
    667 F.3d 1261 (Fed. Cir. 2012) ..........................................................6

*Largan Precision Co. v. Genius Elec. Optical Co.*,
No. 13-cv-2502, 2014 WL 5358426 (N.D. Cal. Oct. 20, 2014)........................34

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014)................................................................16

*Nobel Biocare Servs. AG v. Instradent USA, Inc.*,
903 F.3d 1365, 1381 (Fed. Cir. 2018) ............................................20

*Northpeak Wireless, LLC v. 3Com Corp.*,
No. 09-cv-00602, 2015 WL 5117020 (N.D. Cal. Aug. 28, 2015)...............15, 19

*Nystrom v. TREX Co.*,
424 F.3d 1136 (Fed. Cir. 2005) ..............................................11, 14

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008) ................................................3

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed, Cir. 2005) (en banc) ....................................9, 14

*SuperGuide Corp. v. DIRECTV Enters., Inc.*,
358 F.3d 870 (Fed. Cir. 2004) ...............................................1, 18

*Superior Fireplace Co. v. Majestic Prod. Co.*,
270 F.3d 1358 (Fed. Cir. 2001) ................................................17

*SynQor, Inc. v. Artesyn Techs., Inc.*,
709 F.3d 1365 (Fed. Cir. 2013) ................................................20

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015)............................................................28

*TF3 Ltd. v. Tre Milano, LLC*,
894 F.3d 1366 (Fed. Cir. 2018) ................................................6

*TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*,
529 F.3d 1364 (Fed. Cir. 2008) ..............................................1, 20

No. 2:22-cv-07775-JWH-JEM
DEFENDANTS' RESPONSE MARKMAN BRIEF

**TABLE OF ABBREVIATIONS**

| Abbreviation | Term |
|---|---|
| '576 patent | U.S. Patent No. 7,130,576 |
| '715 patent | U.S. Patent No. 7,542,715 |
| '008 patent | U.S. Patent No. 8,792,008 |
| Akl Decl. | Excerpts from the Rebuttal Expert Declaration of Dr. Robert Akl, D.Sc. Regarding Claim Construction |
| Akl Dep. Tr. | Excerpts from Transcript of Deposition of Dr. Robert Akl (April 20, 2023) |
| Defs' Br. | Dkt. No. 234 (Defendants' Opening Brief) |
| Petruzzelli | U.S. Patent No. 5,959,592 to Petruzzelli |
| Pltf's Br. | Dkt. No. 233 (Plaintiff's Opening Brief) |
| POSITA | Person of ordinary skill in the art |
| Steffes Decl. | Expert Declaration of Dr. Paul G. Steffes Regarding Claim Construction |
| Steffes Dep. Tr. | Excerpts from Transcript of Deposition of Dr. Paul G. Steffes (April 18, 2023) |
| Williams | U.S. Patent No. 6,134,419 to Williams |

### Index For Appendix Of Exhibits To Defendants' Opening Markman Brief

| Exhibit | Description |
|---------|-------------|
| A | U.S. Patent No. 7,130,576 ("'576 patent"), Dkt. 234-1 |
| B | U.S. Patent No. 7,542,715 ("'715 patent"), Dkt. 234-2 |
| C | U.S. Patent No. 8,792,008 ("'008 patent"), Dkt. 234-3 |
| D | Excerpts from Reexamination File History for '576 patent, Dkt. 234-4 |
| E | File History for '008 patent, Dkt. 234-5 |
| F | Expert Declaration of Dr. Paul G. Steffes Regarding Claim Construction ("Steffes Decl."), Dkt. 234-6 |
| G | Excerpts from Transcript of Deposition of Dr. Paul G. Steffes (April 18, 2023) ("Steffes Dep. Tr."), Dkt. 234-7 |
| H | Excerpts from the Rebuttal Expert Declaration of Dr. Robert Akl, D.Sc. Regarding Claim Construction ("Akl Decl."), Dkt. 234-8 |
| I | Excerpts from Transcript of Deposition of Dr. Robert Akl (April 20, 2023) ("Akl Dep. Tr."), Dkt. 234-9 |
| J | U.S. Patent No. 5,959,592 to Petruzzelli ("Petruzzelli"), Dkt. 234-10 |
| K | U.S. Patent No. 6,134,419 to Williams ("Williams"), Dkt. 234-11 |
| L | Slattery, B., "Advanced Digital Video Encoders", Analog Dialogue, 30-4 (1996) [DTV_ENTROPIC-0585651 – 0585654], Dkt. 234-12 |
| M | Excerpt from Microsoft Computer Dictionary (5th ed 2002) (Definition of "LAN") [DTV_ENTROPIC-0585659 – 0585661], Dkt. 234-13 |
| N | Excerpt from Microsoft Internet & Networking Dictionary (2003) [DTV_ENTROPIC-0585674 – 0585677], Dkt. 234-14 |
| O | Excerpt from Dictionary of Computer Science, Engineering, and Technology (2001) [DTV_ENTROPIC-0585655 – 0565658], Dkt. 234-15 |
| P | Excerpt from Comprehensive Dictionary of Electrical Engineering (1998) [DTV_ENTROPIC-0585670 – 0585673], Dkt. 234-16 |

**Index For Additional Appendix Of Exhibits To Defendants' Responsive Brief**

| Exhibit | Description |
|---------|-------------|
| Q | Additional Excerpts from Transcript of Deposition of Dr. Paul G. Steffes (April 18, 2023) ("Steffes Dep. Tr.") |
| R | Additional Excerpts from the Rebuttal Expert Declaration of Dr. Robert Akl, D.Sc. Regarding Claim Construction ("Akl Decl.") |
| S | Additional Excerpts from Transcript of Deposition of Dr. Robert Akl (April 20, 2023) ("Akl Dep. Tr.") |
| T | Excerpts from DISH's Petition for *Inter Partes* Review of the '008 Patent (Feb. 6, 2023) |
| U | Excerpt from Newton's Telecom Dictionary (2002) [ENTROPIC_DTV_0010328 – 0010330] |

1

## I. INTRODUCTION

2      Under the guise of advocating for plain and ordinary meaning, Entropic actually

3  appears to be trying to *expand* the scope of claim language beyond any reasonable

4  reading.  Entropic's goal is clear:  if the Court adopts "plain and ordinary meaning,"

5  Entropic  will  then  contend  that  the  Court  endorsed  Entropic's  overbroad

6  characterizations of its claims, which do not reflect the plain and ordinary meaning to a

7  person of ordinary skill in the art.  The Court should reject this strategy, which violates

8  basic tenets of claim construction law.

9      One critical (and repeated) error in Entropic's analysis is its elevation of

10  specification disclosure above express claim language.  Words in a claim are understood

11  in light of the specification, but the specification itself cannot be "a substitute for, nor …

12  used to rewrite, the chosen claim language."  *SuperGuide Corp. v. DIRECTV Enters.,*

13  *Inc.,* 358 F.3d 870, 875 (Fed. Cir. 2004) ("Specifications teach.  Claims claim.").

14  Entropic points to various specification embodiments, including those it describes as

15  "preferred embodiments" (a characterization found nowhere in the patents) to argue that

16  Defendants'  proposed  constructions  are  too  narrow  because  they  exclude  those

17  embodiments.  But "claims need not be construed to encompass *all* embodiments *when*

18  *the claim language is clearly limited* to one or more embodiments."  *TIP Sys., LLC v.*

19  *Phillips & Brooks/Gladwin, Inc.,* 529 F.3d 1364, 1373–75 (Fed. Cir. 2008).[1]  That means,

20  for example, that embodiments in the '715 patent disclosing digital signals do not expand

21  the scope of claim language expressly reciting "RF signals," which are analog.  (Pltf's

22  Br. at 27.)  As is their prerogative, in the asserted claims, applicants frequently claimed

23  less than they disclosed in the specifications, or crafted certain claims to capture one

24  embodiment and other claims to capture a different embodiment.  *See infra, e.g.,* Section

25  V.B.1.  Entropic should not now be able to recapture claim scope deliberately given up

26  during the claim-drafting process, nor argue claims directed to one embodiment covers

27

28  [1]      Emphases added unless otherwise noted.

-1-

different embodiments.

Entropic also improperly tries to broaden several disputed terms by outright ignoring certain words in those terms.  But each and every word in a claim must have meaning, and none can be ignored.  *See, e.g.*, *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1557 (Fed. Cir. 1995).  As Entropic would have it, for instance, a claim limitation in the '008 patent requiring digitization of "a received signal spanning an *entire* television spectrum" is satisfied by digitization of programs from just *two* television channels—*i.e.*, two specific points in the entire spectrum.  (Pltf's Br. at 32.)  Likewise, under Entropic's interpretation, a claim limitation from the '008 patent that requires reporting certain signal characteristics (like signal strength) to "a *source* of [the] received signal" (*e.g.*, to recalibrate signal transmission) can be satisfied if the characteristics are reported to *anything* "under the control" of Defendants.  (*See id.* at 37.)  Its treatment of "RF" in "RF signals" from the '715 patent would also effectively write that term out of the claim.

Finally, Entropic seeks to avoid definitions for certain claim terms, even where Defendants challenge the terms as indefinite.  (*See* Defs' Br. at 1.)  This is improper.  *See Eon Corp. IP Holdings v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1319 (Fed. Cir. 2016).  The disputes between the parties have crystallized, and Defendants ask the Court to now resolve them, so that discovery can proceed based upon a common understanding of the disputed terms.

## II.   ALL DEFENDANTS ARE ALIGNED, AND NONE SUPPORT ENTROPIC'S CONSTRUCTIONS

The DISH and DIRECTV defendants do not have the same accused products or noninfringement positions; consequently, each proposed its own terms for construction in January (*i.e.*, before Defendants agreed to submit a joint brief).  Some of these terms overlapped and some did not.[2]  Entropic repeatedly tries to twist this litigation reality into

---

2   Claim construction is required only for those terms that are the subject of live disputes

1    supposed "admissions" that one Defendant group or the other *agrees* with Entropic's

2    claim construction positions. (*See* Pltf's Br. at 12, 14, 16, 24, 27, 35.) But no Defendant

3    agrees with Entropic. Defendants expressly indicated in their Opening Brief that "DISH

4    joins the arguments made by DIRECTV, and DIRECTV joins in the arguments made by

5    DISH." (*See* Defs' Br. at 12 n.7.)

### III.  U.S. PATENT NO. 7,130,576

7    **A.**     **The '576 Patent[3]**

8       Entropic summarizes how the '576 patent specification describes its alleged

9    novelty (distributing desired television channels on a "single cable"), but prior art that

10    the patent applicant voluntarily cited confirms the alleged innovation was not new. And

11    the Patent Office repeatedly confirmed that the claims of the '576 patent are not an

12    "innovative system where a subset of available signals are chosen," (Pltf's Br. at 2), but

13    a narrower implementation of a known signal selection and distribution system.

14       The '576 patent specification describes prior art patents issued to Petruzzelli (then

15    employed by DISH's predecessor) and Williams (then employed by DIRECTV's

16    predecessor), both of which offered the "single cable" satellite television solutions

17    Entropic asserts were novel. (*See, e.g.*, Ex. J (Petruzzelli) at Abstract ("An arrangement

18    is provided for combining the video and audio signals from a satellite antenna with other

19    auxiliary input signals producing a frequency stacked band arrangement *for transmission*

---

     between the parties, stemming from their particular noninfringement and invalidity arguments. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362–63 (Fed. Cir. 2008).

[3]   Entropic cites repeatedly to the rebuttal declaration of its expert, Dr. Robert Akl, when describing the asserted patents, but the Court should not give weight to that cited testimony. In addition to the reasons previously provided for discounting and/or striking Dr. Akl's opinions (*see* Defs' Br. at 7, 11–12, 38–39), his "overview" testimony is especially flawed as extrinsic evidence. Dr. Akl unambiguously stated that the cited "overview" sections of his declaration were not expert opinions on the specification or the meaning of any claim terms. (Ex. S (Akl. Dep. Tr.) at 119:10–25; *see also id.* at 125:19–23 ("I am providing an overview of the specification and so I am trying to summarize what the specification says. I'm not rendering an opinion on the specification other than providing an overview.").)

-3-

*by a single cable* to a satellite receiver or TV monitor located within a home or structure."); Ex. K (Williams) at 3:37–43 ("A transmodulator transmodulates the broadband signal into a modulated signal having a bandwidth which is smaller than that of the received broadband signal and transmits this transmodulated signal, typically along with standard terrestrial signals, *over a communication channel, such as a cable* … to a number of individual receiver units within an MDU.").)

Additionally, Entropic fails to acknowledge that the Patent Office repeatedly rejected versions of the '576 patent claims providing "single cable" solutions, including during a 2007 reexamination. (*See* Defs' Br. at 10–11.) Entropic's summary of the '576 patent describes the purported need in the art for "single cable" solutions, but leaves out the most critical part of the story: they were already well-known.

Specifically, to keep their patent application alive, the applicants had to narrow the scope of the claims to cover only particular implementations of the known signal selection and distribution method, where the selection is performed on *digital* versions of the received signals. The examiner determined that the process of asserted independent claim 14—selecting signals from various received broadband satellite signals, combining the selected signals, and transmitting them over a single cable to set-top boxes (also called IRDs)—was already known in the art. (*See* Ex. D ('576 Patent File History) at 21–23.) To overcome this art, the applicant *amended* claim 14 to require "digitizing the plurality of satellite broadband signals" from which certain transponder signals are "select[ed] and extract[ed]." (*See* Ex. D ('576 Reexam) at 43; '576 patent, Reexamination Certificate at 1.) The applicants explained that the digitization step involved "digitizing [] complete band[s]" of the received broadband signals, and not any subset of the received signals. (Ex. D ('576 Reexam) at 49, 52–53.) The examiner allowed the claims only *after* receiving the patent owner's amendment and clarifying explanation—a crucial detail Entropic fails to address.

**B.    Disputed Terms Of The '576 Patent[4]**

**1.    "digitizing the plurality of satellite broadband signals" ('576 patent, cl. 14)**

| Defendants' Proposal | Entropic's Proposal |
|---|---|
| "digitizing the complete bands of satellite broadband signals received at the ODU" | Plain and ordinary meaning. No construction necessary. |

Entropic agrees with Defendants that the plurality of satellite broadband signals that are digitized "are the signals that are received by the satellite ODU." (Pltf's Br. at 11.)  Thus, the only dispute on this term left for the Court to resolve is whether, as Defendants propose, the digitization is of the "complete bands."  As discussed below, Defendants' construction is required due to the technical nature of the subject matter as well as compelled by the applicants' own statements in the prosecution history.

Entropic's position that no construction is necessary ignores the intrinsic evidence that "the plurality" in the context of claim 14 means the "complete bands." (Defs' Br. at 13–14.)  Entropic attempts to argue that "plurality" means "two or more" as a matter of law—divorced from the intrinsic record—but Entropic's cited case law does not address the issue in dispute here.  *Dayco*, for instance, merely stands for the noncontroversial proposition that "plurality" may mean "two or more items," but the Federal Circuit specifically noted that this common meaning would only apply "*absent some indication to the contrary*." (*See* Pltf's Br. at 11 (citing *Dayco Prod., Inc. v. Total Containment, Inc.*, 258 F.3d 1317, 1327–28 (Fed. Cir. 2001)).)  Here, there are multiple such indications.

Critically here, the prosecution history demands Defendants' construction.[5]  During reexamination proceedings, and specifically to avoid a prior art rejection,

---

[4]    Defendants present the challenged claim terms in the same order as in the Opening Brief, although Plaintiff arranges the terms in a different order in its Opening Brief.

[5]    Plaintiff does not address the file history at all in its opening brief for this term. (Pltf's Br at 10–11.)

applicants amended claim 14 to add the phrase "digitizing the plurality of satellite broadband signals"—the very phrase Defendants are seeking to construe.  (*See* Ex. D ('576 Reexam) at 43.)  In their accompanying remarks, applicants used "i.e." to provide the examiner with a definition, stating "digitization of the broadband signal—*i.e.*, digitizing a *complete band*."  (*Id.* at 49); *see TF3 Ltd. v. Tre Milano, LLC*, 894 F.3d 1366, 1372 (Fed. Cir. 2018) (stating that the "usage of 'i.e.' ... signals an intent to define the word to which it refers").  Here, applicants used "i.e." to define "digitization of the broadband signal" as "digitizing the complete band."  Thus, it follows that "the plurality" of broadband signals would simply mean the "complete bands," which is exactly what Defendants have proposed.

Applicants added this limitation, and explicitly defined it, to distinguish the prior art cited by the examiner.  Applicants offered multiple reasons why digitizing the complete band was beneficial and constituted a meaningful distinction from the cited references.  The  examiner accepted the applicants' position and issued the reexamination certificate.  (*See* Defs' Br. at 14 (citing Ex. D ('576 Reexam) at 50).)  Defendants' proposed construction simply holds applicants to the positions that they took during reexamination to secure entry of the amendments, to which Entropic is also bound.  *See Intex Rec. Corp. v. Team Worldwide Corp.*, 860 F. App'x 717, 722 (Fed. Cir. 2021) (determining that patentee's definition of a term, accepted by the examiner, can define the claim term); *see also Krippelz v. Ford Motor Co.*, 667 F.3d 1261, 1266 (Fed. Cir. 2012) (holding that a "patentee's statements during reexamination can be considered during claim construction").

The specification of the '576 patent confirms this construction.  The specification discloses "digitiz[ing] the *entire* LNB output signal," which corresponds to the satellite broadband signals received at the ODU, must be done so "*all* transponder channels are available in the sampled data."  (*See* Ex. A ('576 patent) at 7:25–30.)  The complete bands of satellite broadband signals must be digitized so that *all* channels are available

-6-

With this understanding, it is indisputable that the digitizing of the satellite broadband signals must be of the entirety of what was received, namely the complete bands of received satellite broadband signals, which is confirmed in the context of claim 14. Claim 14 recites "digitizing the plurality of satellite broadband signals" *first* and then "selecting and extracting" particular "transponder signals," responsive to transponder "request" signals, from the "digitized" signals. Thus, the claim is written in such a way that the entire band of each received satellite broadband signal must be digitized, so that all of the transponder signals are available in the digitized signal for selecting and extracting whichever of the signals are "responsive to the transponder request signals." Therefore, the Court should adopt Defendants' construction, which is the only proposal consistent with the intrinsic evidence.

### 2. "integrated receiver decoder (IRD)" ('576 patent, cls. 14, 18, 19, 21, 22, 41)

| DIRECTV's Proposal[6] | Entropic's Proposal |
|---|---|
| "device capable of at least receiving and decoding data and generating an output video signal" | Plain and ordinary meaning. No construction necessary. |

As explained in Defendants' opening brief, DIRECTV's proposed construction is consistent with the intrinsic and extrinsic evidence and defines an IRD's functionalities consistent with the applicants' and the industry's understanding of what an IRD is. Instead, DIRECTV's construction specifies the minimum functionality required for an IRD, without precluding other functions ("device capable of *at least*…"). By proposing "no construction," Entropic seeks to avoid even the basic functionality a person of ordinary skill in the art would understand is required of an IRD, in order to accuse devices no skilled artisan would recognize as IRDs. It is Entropic's arguments that selectively focus on irrelevant statements from the experts that were not intended to offer any

---

[6] Although DISH did not originally identify this term, DISH joins DIRECTV in its proposed construction.

1   definition of IRD and would fail to provide a meaningful definition of a technical claim

2   term.

3       In the context of the '576 patent, "IRD" refers to a device capable of receiving and

4   decoding data and generating a video output signal in a form suitable for presentation on

5   a display, such as a TV.  (Defs' Br. at 16–17.)  The '576 patent discloses that an IRD

6   must "decode[] the digital data to produce a *video signal*, and generate[] an RF output to

7   drive a television."  (*See* Ex. A ('576 patent) at 1:29–43; Ex. J (Petruzzelli) at 3:37–41;

8   Ex. K (Williams) at 2:22–40, 7:1–8, 14:27–54; *see also* Defs' Br. at 8 n.5.)



FIG. 2

(Ex. A ('576 patent) at Fig. 2 (annotated).)   Further, the specification states that the

"standard STB [set-top box] hardware can receive the new composite signal and

demodulate and *decode the video and audio signals*."[7]  (*Id.* at 6:62–7:2.)  Moreover, in

discussing the prior art, which applicants "incorporated herein by reference" (*id.* at 2:8–

10), the '576 patent explained that:  "[a]t the set top box (STB) the 128 QAM signal is

demodulated and processed to produce *an NTSC analog video signal sent to a television*

---

7   "IRDs are commonly called set top boxes (STBs) arising from their typical installed location on top of TV sets." (Ex. A ('576 patent) at 1:31–33.)

set." (*Id.* at 2:23–25.)[8]  DIRECTV's proposed construction, which simply articulates the requirements disclosed by applicants, is therefore consistent with the specification.

Entropic ignores the patent and incorrectly relies on statements from the experts made for different purposes—either generic statements made regarding the background of the patent (Dr. Akl) or within the context of another entirely different term of a different patent (Dr. Steffes).  The only thing these statements have in common are they were not made for the purpose of defining what an IRD is.  Dr. Akl's statements were general statements in describing claim 14 of the '576 patent, not attempts to define "IRD." (Pltf's Br. at 12 (citing Ex. R (Akl Decl.) ¶ 41).)  Dr. Steffes's statements regarding the IRD, made in the context of explaining the meaning of another term, were clearly focused on one particular function—the decoding.  (*Id.* (citing Ex. F (Steffes Decl.) ¶ 87).)  This makes sense because the statement was made with respect to the term "decodes specific programs."  These statements were not meant to, and do not, capture the definition of an IRD.  Entropic's arguments relying on statements made for entirely different purposes than defining "IRD" are therefore wholly irrelevant to the "IRD" term at issue.  Moreover, Entropic also improperly ascribes more weight to these extrinsic statements than the intrinsic evidence, contradicting governing law. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317–18 (Fed, Cir. 2005) (en banc).

Entropic further ignores the one extrinsic statement that does describe what an IRD is, which was made by Entropic itself.  In the technical tutorial that Entropic submitted in a related case, Entropic stated that the IRD "receives and decodes a television signal and delivers TV content by selecting the desired channels and *outputting the content for viewing or recording.*" *Entropic Commc'ns, LLC v. Charter Commc'ns, Inc.*, No. 2:22-

---

[8]  Indeed, the specification is replete with references that the patent is directed toward television.  (*See, e.g.*, Ex. A ('576 patent) at 1:37–43 ("The IRD 180 tunes …., demodulates …, provides channel selection, conditional access, decodes the digital data to produce a video signal, and generates an RF output to drive a television."), 3:47–48 ("prior art configuration of a satellite TV installation"), 3:49-50 ("a satellite TV installation according to the present invention"); *see also id.* at 4:7–9, 4:28–29, 6:66–67, 10:53–57.)

cv-00125-JRG, Dkt. 110-4 at 10 (E.D. Tex. May 30, 2023).  Thus, Entropic has conceded an IRD requires the ability to output a video signal.

Furthermore, other relevant extrinsic evidence also supports DIRECTV's proposed construction.  A scientific article published around the time of the '576 patent specified that an IRD "convert[s] the digital data into standard TV signal."  (Ex. L (Analog Dialogue) at 9.)  As the article explains, "[t]he received digitally coded TV signal must first be converted back to the traditional NTSC or PAL signal, capable of being understood by the standard TV," and discloses that the IRD implements this function (*id.*), which is completely consistent with the intrinsic evidence, including as discussed above.  Thus, both the intrinsic and extrinsic evidence supports the construction that the IRD must have the capability to receive and decode data and generate an output video signal.  The Court should therefore adopt DIRECTV's proposed construction

### 3.   "selected [and extracted] transponder channel[s]" ('576 patent, cls. 16, 17, 21, 39, and 41–42)

| Defendants' Proposal | Entropic's Proposal |
| --- | --- |
| Indefinite. | 1. Is not indefinite.<br>2. Plain and ordinary meaning. No construction necessary. |

Entropic's attempt to save ambiguous claims from a finding of indefiniteness is based on a technical inaccuracy that is, unsurprisingly, not supported by the intrinsic evidence—namely, that "selecting signals includes selecting their channels."  Entropic's argument is wrong, and Entropic does not otherwise offer anything to clarify the uncertain scope of the challenged claims.  They are thus indefinite.

At the outset, it is important to note that both parties (and their experts) agree that a transponder signal is different from a transponder channel.  (*See* Defs' Br. at 5, 18–19; Pltf's Br. at 18–19 (referring to selection of signals and channels as "intertwined" and "link[ed]," but not the same); Ex. F (Steffes Decl.) ¶ 81; Ex. S (Akl Dep. Tr.) at 131–38, 149–50)); *see also Nystrom v. TREX Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005) (stating

that when "different words or phrases are used in separate claims, a difference in meaning is presumed").  A selected transponder signal (as in claim 14), which refers to the signal broadcast by the transponder, is not the same as a selected transponder channel (as in the asserted dependent claims), which is a particular frequency channel through which the signal is communicated.  Thus, both sides recognize ambiguity in dependent claims that inexplicably invoke selected transponder channels, or the step of selecting transponder channels, where no such selection occurs in independent claim 14.  As discussed below, the ambiguity rises to the level of indefiniteness.

A POSITA would not be reasonably certain regarding the scope of these method claims because they refer to "selected transponder channels" (or a similar term) without reciting a step for selecting transponder channels—no such step exists.  Nor do the claims otherwise provide an explanation for how selection of transponder *channels* occurs as it is not coextensive with the different actually claimed step of "selecting and extracting … transponder *signals*."  (*See* Defs' Br. at 17–21; '576 patent, cl. 14.)  The issue is not, as Entropic casts, simply whether there is an antecedent basis in the challenged claims for the term "selected [and extracted] transponder channels."  (*See* Pltf's Br. at 18.)  To be clear, there *is no antecedent basis* in half of the challenged claims (claims 16–17, 21), further contributing to ambiguity in those claims.  Here, however, the fundamental issue is whether a POSITA would understand that the claimed transponder *signal* selection in the independent claim implies the selection of a transponder *channel* recited in the dependent claims.  The answer is unequivocally "no."

To help explain these technical communications concepts, Dr. Steffes analogizes the relationship between a channel and a signal as the riverbanks (channel) and what flows between, which may include one or more currents of water (signals), but also logs and debris (noise and other physical effects from transmission).  (*See* Defs' Br. at 19 (citing Ex. F (Steffes Decl.) ¶¶ 81–82; Ex. Q (Steffes Dep. Tr.) at 127).)  Selecting a channel (here, a "transponder channel") might imply the selection of anything communicated through the channel (*i.e.,* at least one "transponder signal").  This is akin

to selecting everything between the riverbanks, which would include potentially multiple different currents, debris, logs, etc.  But the inverse is not necessarily true:  selection of a "transponder signal" (a current of water) does not imply that everything in its "transponder channel" (between the riverbanks) is selected.  (*See id.*)  Thus, selecting particular transponder signals *does not* mean the same thing as selecting particular transponder channels.  And the claims otherwise provide absolutely no explanation regarding any selection of transponder channels (*e.g.*, which are selected? at what point in the claimed method? to what end?).

Entropic does not (and cannot) point to any claim language, other than the step of selecting of transponder signals, that is purportedly relevant to the scope and meaning of "selecting [and extracting] transponder channels."  (*See* Pltf's Br. at 18–19.)  But the claimed selection of transponder *signals* offers no insight into the meaning of selected transponder *channels*.

Entropic then points to the inverse situation and argues that selecting transponder "channels" sufficiently conveys selecting corresponding transponder "signals" (Pltf's Br. at 19.); however, this is the opposite of what is claimed and is therefore irrelevant to the analysis.  For example, Entropic cites to the specification and testimony from its expert, Dr. Akl, that selecting transponder channels leads to an understanding of the corresponding transponder signals that are selected. (*See id.*; Ex. A ('576 patent) at 2:54–60 ("one or more transponder channels are selected … [e]ach selected transponder signal may be translated …"); Pltf's Br. at 21 (citing Ex. R (Akl Decl.) ¶ 51) (stating that "a POSITA understands that by selecting a channel, the signals associated with that channel are also selected").)  These passages may have helped if the claim had recited selection of transponder channels (like claim 1 of the '576 patent) and later recited selected transponder signals.  However, independent claim 14 and the challenged dependent claims present the terms in just the opposite manner, and thus, these statements are irrelevant here.

As a result, a POSITA would not be able to determine what "transponder channel"

in the dependent claims were selected simply by knowing the selected transponder signals from the independent claim. And Entropic fails to provide any clarity on the issue. The challenged claims are accordingly indefinite.

### 4. "transponder request signals" ('576 patent, cls. 14, 19, and 22)

| DISH's Proposal[9] | Entropic's Proposal |
|---|---|
| "a signal identifying and requesting a particular transponder signal" | Plain and ordinary meaning. No construction necessary. |

Although Entropic advocates for "plain and ordinary" meaning of "transponder request signals," a term not found in the specification, it says little about what that meaning is. Entropic does not even acknowledge how the term is used in the asserted claims. Entropic instead focuses on inapplicable specification disclosure that appears to reflect how Entropic *wants* the term to be understood in an effort to support its infringement claim—any information related to television channels desired by an IRD—rather than how a POSITA would understand the term. Meanwhile, DISH's construction gives weight to each word, individually and as a part of the entire phrase, will resolve the parties' dispute about the term's meaning, and also aid lay juror understanding of complex technical subject matter. (*See* Defs' Br. at 21.) The Court should adopt DISH's proposed construction.

Entropic is correct that "[t]he '576 Patent never discusses the generic information content of a 'transponder request signal'" (Pltf's Br. at 17); to be even more precise, the '576 patent specification does not refer to a "transponder request" or "transponder request signal" at all. (*See* Defs' Br. at 21.) But claim 14 makes clear that "a plurality of *transponder signals*"—as distinct from transponder channels and much less "channels" in the colloquial sense (*e.g.*, programming on ESPN)—are what is selected by the claimed method, and further that "the selecting is responsive to the transponder request signals."

---

[9] Although DIRECTV did not originally identify this term in its proposed preliminary constructions, DIRECTV joints DISH in its proposed construction.

(Ex. A ('576 patent), cl. 14.)  Thus, the transponder request signal(s) must:  (1) identify a transponder signal requested by an IRD, and (2) be used to select the transponder signal for distribution.  *See Phillips*, 415 F.3d at 1314 ("[T]he claims themselves" i.e., "the context of the surrounding words of the claim," "provide substantial guidance as to the meaning of particular claim terms.").  The second requirement (transponder request signals are used to select transponder signals) is explicitly covered in other claim language quoted above, so consequently DISH's construction incorporates only the first requirement, *i.e.*, that a transponder request signal is "a signal identifying and requesting a particular transponder signal."  While DISH's proposed construction considers and uses this surrounding claim language for the requisite context, Entropic never addresses it. (*See* Pltf's Br. at 16–17.)

Instead, Entropic cites a few passages from the '576 patent specification that purportedly evidence embodiments excluded by DISH's construction, but none of those passages involves requesting transponder signals for selection as required by claim 14. (*See* Pltf's Br. at 16.)  Instead, what Entropic cites generally describes communication of "information" related to "channel[s]," and mostly without clarification whether the "channel" refers to a transponder channel, a program for a television channel, or something else entirely.  The plain language of claim 14 does not cover transmission of "information" generically—nor even mention "channels"—but instead claims a "transponder request *signal*."  (Ex. A ('576 patent), cl. 14.)  DISH's construction gives weight to the different wordings used throughout the specification and also in the claims, such as in claim 1, where selection of transponder signals is based on "transponder select information."  *See Nystrom,* 424 F.3d at 1143.

Entropic's examples even confirm why DISH's construction is correct.  Entropic quotes the specification, which explains that when an "IRD communicate[s] the channels it needs to receive," and "[t]his information is used to select the transponder channel." (*See id*. (quoting Ex. A ('576 patent) at 3:10–13).)  The communication, of such embodiment, relates to desired channels, and desired channels are selected.  However,

-14-

that is not what is claimed by claim 14.   Because claim 14 requires that desired transponder signals are selected, DISH's construction makes clear what is being requested by the IRDs is an identified transponder signal.

Entropic's remaining criticisms are empty rhetoric.   While raising many questions that DISH's construction supposedly begs, Entropic's undefined plain meaning provides no answers either, and Entropic makes no effort to try—even though the jury will surely be at a loss amongst these highly technical claims if repeatedly told "plain and ordinary meaning."[10]   *See Northpeak Wireless, LLC v. 3Com Corp.*, No. 09-cv-00602, 2015 WL 5117020, at *11 (N.D. Cal. Aug. 28, 2015) (failing to construe a technical claim term that is outside a lay juror's understanding may "risk falling short of the Court's duty to 'ensure that the jury fully understands the court's claim construction rulings and what the patentee covered by the claims'").   DISH's construction straightforwardly clarifies that a "transponder request signal" both identifies and requests a particular transponder signal so that the signal can be selected by the signal selector and provided to the IRD.   The Court should adopt DISH's construction.

**5.**   **"a transponder request [signal] ... the transponder request signals" / "from the IRD ... to the IRDs" / "a plurality of transponder signals ... the transponder signal" ('576 patent, cl. 14)**

| DIRECTV's Proposal[11] | Entropic's Proposal |
|---|---|
| Indefinite | 1. Is not indefinite. |
| | 2. Plain and ordinary meaning. No construction necessary. |

---

[10]   For example, Entropic complains that "DISH's attempt to impose a requirement of 'identifying' is immediately suspicious." (*See* Pltf's Br. at 16.)   Yet, Entropic provides no explanation of why such is the case, especially in the context of the claim which provides that "wherein the selecting [a transponder signal] is responsive to the transponder request signals." (Ex. A ('576 patent), cl. 14.)   It is responsive because the transponder request signal identifies and requests a particular transponder signal, as captured by DISH's proposed construction.

[11]   Although DISH did not originally identify this term, DISH joins DIRECTV in proposing that the term renders claim 14 indefinite.

Independent method claim 14 of the '576 patent contains three instances of ambiguous antecedent basis. (Defs' Br. at 23–24.)  In each instance, the inconsistency between singular and plural renders the scope of the claim not "reasonably certain" to those skilled in the art. *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901, 910 (2014); *Imperium (IP) Holdings, Inc. v. Apple, Inc.*, 920 F. Supp. 2d 747, 759 (E.D. Tex. 2013) (holding a claim indefinite due to a "discrepancy" between "pixel" (singular) and "pixels" (plural) in the same claim).

As noted in Defendants' opening brief, the claim leaves a POSITA with three open and unresolved questions as to what constitutes infringement of this method claim:

1.   Whether one or more than one transponder request signal must be sent to the ODU;

2.   whether one or more than one IRD must communicate a "transponder request" and then receive the final "composite signal"; and

3.   whether all transponder signals are subject to the "modulation" limitation— *i.e.*, whether modulation of all transponder signals must not be altered by the steps of selecting, combining, and transmitting.

Entropic addresses none of these issues.  Instead, Entropic's only response is to invent a new theory of claim interpretation—*i.e.*, that plural claim terms simply cover the "possibility" that there may be more than one of that element. (Pltf's Br. at 14.)  For example, Entropic argues that a reference to plural "IRDs" simply "leave[s] open the possibility that multiple IRDs are connected to the single ODU." (*Id.*)  But claim 14 is a method claim, which requires actual performance of specific steps in order to infringe— it is not drawn to capability. *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993).  Moreover, Entropic does not cite any law supporting the proposition that plural claim terms merely provide for the "possibility" of two or more items, and it has been repeatedly rejected by the Federal Circuit.  For example, in *Apple Inc. v. MPH Technologies Oy*, 28 F.4th 254 (Fed. Cir. 2022), the Federal Circuit held that "[i]n accordance with common English usage, we presume a plural term refers to two or more

-16-

items." *Id.* at 261 ("information fields" required more than one field).  Similarly, in *Superior Fireplace Co. v. Majestic Prod. Co.*, 270 F.3d 1358, 1375 (Fed. Cir. 2001), the Federal Circuit interpreted "rear walls" to require more than one "rear wall."

The same conclusion applies here—"IRDs," "transponder signals," and "transponder request signals" all refer to two or more items.  These plural terms, however, lead to open and unresolvable issues in antecedent basis.  For example, Entropic's arguments do not resolve the issue of whether only one transponder request must be sent for a single IRD, or if multiple transponder request signals come from multiple IRDs with each IRD receiving the composite signal.  If Entropic were correct that the claims simply covered the "possibility" of multiple IRDs, the claim would have been written to recite "transmitting the composite signal over the single cable from the ODU to one or more IRDs."  It does not; rather, it inexplicably jumps between the singular and the plural.  (*See* Defs' Br. at 23.)

Defendants do not dispute, as Entropic argues, that the specification of the '576 patent discloses that more than one IRD *may* be connected to a single ODU.  (*See* Ex. A ('576 patent) at Fig. 2.)  But this disclosure in the specification does not resolve whether claim 14 of the '576 patent requires more than one IRD connected to the ODU or not.

Nor does Entropic's recitation of the axiom that "the words 'a' or 'an' in a patent claim carry the meaning of 'one or more'" resolve the issue.  (*See* Pltf's Br. at 15.)  For example, claim 14 recites "the IRD" (singular) at one point but "the IRDs" (plural) at another signaling a difference in scope.  (*See* Defs' Br. at 23 (annotating claim 14).)

Finally, Entropic does not address the lack of antecedent basis for "the transponder request signals."  As explained in Defendants' opening brief, claim 14 first requires "a transponder request" to be communicated to the ODU.  Yet, later, the claim recites a selecting step, "wherein the selecting is responsive to the transponder request signals." Entropic fails to reconcile the question of how "a transponder request" (singular) provides antecedent basis for "the transponder request *signals*" (plural).  This is an independent basis of indefiniteness.  *See Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*, 813 F. App'x

522, 526 (Fed. Cir. 2020) (holding claim indefinite where multiple issues, individually and collectively, resulted in a "confused claim").

The Court should therefore hold this claim invalid as indefinite.

## IV.   U.S. PATENT NO. 7,542,715

**A.   Disputed Terms Of The '715 Patent**

**1.   "RF signals" ('715 patent, cl. 9)**

| DISH's Proposal[12] | Entropic's Proposal |
|---|---|
| "analog carrier RF signals" | Plain and ordinary meaning.  No construction necessary. |

DISH's proposed construction of "RF signals" reflects the plain meaning of the term in the context of the '715 patent's specification and claims, *i.e.*, an analog signal carrying information (such as transponder signals) in the radio frequency band.  Entropic argues that RF signals may refer to digital signals (Pltf's Br. at 27), but is wrong for a simple reason:  it is irrelevant whether, as Entropic emphasizes, the specification describes "signal processing in the digital domain."  (Pltf's Br. at 24).  That is not what is claimed.  *See SuperGuide Corp.,* 358 F.3d at 875 ("Specifications teach.  Claims claim.").  The claim term at issue is "RF" (radio frequency) signals, and when the specification discusses RF signals, it consistently refers to an analog signal carrying information (such as television programming).  (*See* Defs' Br. at 27–28.)  Although Entropic is correct that the specification describes "*examples* of signal processing in the digital domain" (Pltf's Br. at 24), it also describes signal processing in the analog domain, and the claimed reference to "RF" signals invokes only the analog processing embodiments.  (Defs' Br. at 27–28.)  Entropic accuses DISH of improperly seeking to narrow the claim, but the shoe is really on the other foot:  under auspices of allegedly explaining the "plain meaning," Entropic is trying to improperly *recapture* claim scope

---

[12]  Although DIRECTV did not originally identify this term in its proposed preliminary constructions, DIRECTV joints DISH in its proposed construction.

plainly excluded by reference to "RF signals" in the claim.  To avoid this dispute over claim scope being played out before the jury, and to help lay jurors appreciate the significance of "RF" modifying "signals" in the claims, the Court should adopt DISH's proposed construction.  *See, e.g.*, *Northpeak Wireless*, 2015 WL 5117020, at *11.

There is no dispute that the '715 patent specification proposes performing the steps of selecting, frequency translating, and combining satellite signals in some combination of the "analog" and "digital" domains.[13]  While Entropic (Pltf's Br. at 24) accuses DISH of "ignor[ing]" the digital embodiments, Entropic necessarily admits that there are analog embodiments, also.  It has to:  the specification explains that "[s]pecific functions" for signal processing that are discussed in the patent, such as selecting, frequency translating, and combining satellite signals "can be implemented in the analog or digital domain," and describes embodiments where some or all of these functions are performed in the analog domain.  (*See* Ex. B ('715 patent) at 10:47–48; *see also, e.g.*, *id.* at 5:55–62 ("A low pass filter then passes one transponder channel and removes signal information from the other transponder channels … This signal is *then converted to an analog signal, mixed to a new frequency, and summed with other channels in the analog domain*."), 8:55–9:2 ("FIG. 9 shows another alternative where analog tuners 930 select desired transponder channels …").)  In effect, the specification presents the decision of whether to perform the various functions in the analog or digital domains as a design choice for a person of skill to make when implementing the patent's "single cable" distribution system.

The dispute, therefore, is whether certain of *claim 9's* signal processing steps are performed in the analog domain due to the claim's reference to creating and combining "RF signals."  Specifically, the claim covers "a frequency translator … that is capable of shifting the selected transponder signals to new carrier frequencies to produce RF signals" and a "signal combiner … capable of combining at least two RF signals to produce a composite signal."  Entropic has no answer for why claims for producing and combining

---

[13]  For a more robust description of what it means to process signals in the "analog" and "digital" domains, *see generally* Def's Br. at 6; *see also id.* at 3–5.

"RF signals" must include operating on a digitized signal.  Although Entropic asserts that "[i]n the '715 Patent," signal processing operations, "and the RF signals upon which they are performed, can be digital," none of its cited examples refer to RF signals.  (*See* Pltf's Br. at 25–26.)   The citations simply demonstrate that the '715 patent discloses these operations can sometimes be performed in the digital domain.  But not every embodiment in the specification needs to be incorporated where a claim is "clearly limited" to a subset of the embodiments.  *See TIP Sys.*, 529 F.3d at 1373–75.  Because the discussion of "RF" and "RF signals" in the '715 patent refers to analog signals, a POSITA would understand these claims to cover these embodiments in particular, as reflected in DISH's proposed construction.  (*See* Ex. B ('715 patent) at 1:40–45, 2:12–25, 3:54–58, 6:55–57, 10:55–60.)[14]

Entropic's remaining arguments are also meritless.   Although Entropic characterizes the embodiments DISH purportedly excludes as "preferred embodiments," the word "preferred" is found nowhere in the '715 patent's specification.   The embodiments teaching processing satellite television signals in the digital domain are on equal footing with those in the analog domain.  (*See* Ex. B ('715 patent) at 10:47–48 ("Specific functions can be implemented in the analog or digital domain.").)   Thus, Entropic's reliance on *SynQor, Inc. v. Artesyn Technologies, Inc.* is inapposite, as that case involved a single preferred embodiment that would have been excluded by the appellants' proposed construction, which the Federal Circuit rejected in affirming the district court.  *See* 709 F.3d 1365, 1378–79 (Fed. Cir. 2013).  *Nobel Biocare Services AG v. Instradent USA, Inc.* also does not help Entropic, as the court there rejected a construction that excluded an embodiment where "the claim language [did] not require" the embodiment to be excluded.  *See* 903 F.3d 1365, 1381 (Fed. Cir. 2018). Here, in contrast the claims *do* require excluding embodiments that combine signals in the digital domain, since the claims involve combining "at least two RF signals."  The *Nobel*

---

[14] "RF" does not appear in any of the other independent claims of the '715 patent (nor their dependent claims).  (*See* Ex. B ('715 patent), cls. 1–8, 13–19.)

embodiments were also defined in terms of degree (whole or partial coronal regions), whereas the embodiments here, by contrast, are opposites (*e.g.*, combining in the analog or digital domain).  One necessarily precludes the other.

Entropic also tries to write the term "RF" out of the claim by arguing, for example, "that the RF signals upon which [certain] operations are performed are themselves digital."  (*See* Pltf's Br. at 27.)  But applicants told the Patent Office and the public that claim 9 covers producing and combining not just any signal, but "RF signals."  "RF" must mean something, and weight must be given to the term.  Doing so in light of the specification and the knowledge of a POSITA means that the signals are analog radio frequency signals carrying information (*e.g.*, television programming).

**2.**   **"decodes specific programs" ('715 patent, cl. 9)**

| DISH's Proposal[15] | Entropic's Proposal |
|---|---|
| Indefinite. | 1. Is not indefinite. |
| | 2. Plain and ordinary meaning. No construction necessary. |

This claim term implicates an extremely broad category of signal processing operations ("decod[ing]") performed by a gateway on an unspecified set of television programs ("specific programs").  (Ex. B ('715 patent), cl. 9.)  A POSITA would not understand with reasonable certainty the scope of the claimed specific programs that are decoded by the gateway, so the term renders claim 9 indefinite.

Entropic provides that it can point to specification examples that fall within the claim term "decodes specific programs," but those examples fail to answer the pertinent question:   whether the "boundaries of the claim," in view of this term, would be reasonably certain to a POSITA.  *See Amgen Inc. v. F. Hoffman-La Roche Ltd*, 580 F.3d 1340, 1371 (Fed. Cir. 2009).  Even if Entropic's two specification examples were on

---

[15]   Although DIRECTV did not originally identify this term in its proposed preliminary constructions, DIRECTV joints DISH in its proposed construction.

point (they are not) and provided a clear example of what is within the claim (they do not), the question is whether it is reasonably clear not just what is inside the claim, but what is outside the claim—in other words, where the boundary of the claim lies.  It is not reasonably clear:

1. Which television programs are the "specific programs" that claimed gateway must decode and distribute to STBs, let alone

2. Which one of the myriad signal processing operations that constitutes "decod[ing]" must be performed on each of the "specific programs," or even

3. Whether different types of decoding performed on different "specific programs" falls within the claim.

(*See* Def's Br. at 29–31, Ex. F (Steffes Decl.) ¶¶ 85, 88–89.)  Claim 9 is accordingly indefinite.

As an initial matter, Entropic mischaracterizes DISH's argument.  Specifically, DISH does not argue that "decodes," by itself, renders claim 9 indefinite, as Entropic suggests.  (*See* Pltf's Br. at 28–29 (referencing DISH's purported "alternative ground of indefiniteness—regarding 'which' programs are decoded").)  Instead, it is the ambiguity of what "specific programs" are being decoded, combined with the breadth of "decodes," that forms the basis for DISH's argument.  Entropic cites two "examples of programs being decoded" from the specification (*see id.* at 29), but this misses the point.  Again, DISH never argued that "decodes" by itself is sufficiently ambiguous to render the claim indefinite.

More importantly, Entropic's two specification examples do not provide any clarity about the scope of "decodes specific programs."  DISH already explained why the '715 patent at 9:44–48 provides no clarity:  it merely parrots the claim language, and does not provide any guidance on which programs are the "specific programs," nor which types of decoding are performed.  (*See* Defs' Br. at 30.)  While the example does specify that "program information" is "distributed … in packetized MPEG" (a type of digital

encoding for audio/video content), it is not even clear that "program information" refers to the "specific programs," let alone what the specific programs are.

Entropic's only other specification example (Ex. B ('715 patent) at 9:16–20) has nothing to do with a gateway receiving a composite signal and "decod[ing] specific programs," and is thus irrelevant to clarifying the term's scope.   First, the citation describes the operation of an "MPEG transport stream demultiplexer 1020," which is not otherwise described as being a gateway, let alone part of one.   Second, Entropic conveniently omits that the input to the demultiplexer is the output of "signal selector 1010[, which] selects a transponder channel," and from that transponder channel "extracts a *specific* video program."  (Ex. B ('715 patent) at 9:15–20; *see also id.* at Fig. 9.)  Even if the demultiplexer 1020 were a relevant component in the context of the claimed gateway, this example clearly explains that (1) the selected video program is from a specific transponder channel; and (2) only a single program is selected.  In contrast, while the claimed gateway "receives [a] composite signal," the claim does not limit that the decoded "specific programs" come from that composite signal, as opposed to any other source of video (*e.g.*, local storage), nor any indication of how many such programs are to be decoded.  (*See* Ex. F (Steffes Decl.) ¶ 88 ("[T]he language is unclear regarding whether the specific programs are part of the claimed 'composite signal' or can be anything else such as programs received from a different source or stored in gateway memory.").)  The intrinsic record fails to clarify the latent ambiguity in the term "decodes specific programs."

The only other purported evidence to which Entropic points is Dr. Steffes's deposition testimony, part of which is entirely taken out of context.  While Entropic quotes Dr. Steffes's testimony explaining that "the programs … that are decoded by the gateway are the same ones that are distributed over the LAN," (*see* Ex. Q (Steffes Dep. Tr.) at 95:4–13; Pltf's Br. at 29), neither this testimony (nor any other testimony from Dr. Steffes) provides answers to the three numbered questions posed above by DISH in the beginning of this section (nor similar questions posed by Dr. Steffes in his declaration

(*see* Ex. F (Steffes Decl.) ¶¶ 87–89)).  Dr. Steffes's testimony does not resolve how the programs to be decoded are selected, but only that once decoded, the "specific programs" are distributed.  This still begs the question:  what are the programs that are decoded, *i.e.*, the "specific programs?"

Entropic wrongly claims that Dr. Steffes answers this question in the affirmative, *i.e.*, that the specific programs are all found in the composite signal received by the gateway.  (Pltf's Br. at 29.)  But the context from the deposition makes clear that what Dr. Steffes affirmed was a completely separate issue:  whether Entropic's counsel correctly summarized an opinion offered by an expert in the pending IPR about whether one example in the prior art constituted "decod[ing] specific programs":

> Q.  Okay.  And then in paragraph 137, isn't Dr. Schonfeld saying that those received satellite television programs are the programs that are decoded and contained in the composite signal?
>
> A.  You're referring to paragraph 137; right?
>
> Q.  I think 137 is a continuation of 136, yes.  It contains the relevant part of my question.
>
> A.  Okay. Can you repeat the question?
>
> Q.  Sure.  I think if you take 136 and 137 together, my understanding is that Dr. Schonfeld is saying that the specific programs that are decoded are programs that are contained in the composite signal received at the gateway.  Do you agree or disagree with that?
>
> MR. KEESE:  Objection.  Vague and ambiguous.
>
> THE WITNESS:  They are contained within the composite signal, yes. I believe I've already answered that.
>
> BY MR. ENGEL:  Q.  Okay.  *But isn't that one of your issues with the '715 patent itself is you can't tell if the programs that are decoded are part of the composite signal or not*?
>
> A.  *They're not identified as such.*

(Ex. Q (Steffes Dep. Tr.) at 100:2–101:1.)  As is apparent from the emphasized text, Dr. Steffes never agreed that the decoded programs are received as part of the claimed composite signal.  Entropic's counsel continued to press, yet Dr. Steffes remained steadfast that the claims do not make clear what are the sources of the "specific programs"

to be decoded.  (*See id.* at 101–103.)

Having found no help in the specification, from Dr. Steffes, or from its own expert (who Entropic did not even ask to opine on this term (*see* Ex. S (Akl Dep. Tr.) at 245)), Entropic's last ditch effort to preserve its claim is to volunteer a narrowing of the claim term:  the "specific programs" that are decoded are only those received on the composite signal.  (*See* Pltf's Br. at 29 (it is a "correct conclusion" to say that "the specific programs that are decoded 'are contained within the composite signal'").)  This is obviously no longer "plain and ordinary meaning" that Entropic initially proposed.[16]  In other words, Entropic abandoned its alternative (non) construction.  And in any event, it is not difficult to imagine basic ways to have written claim 9 to capture this voluntary narrowing, if it were what the original applicants intended.  For example, instead of claiming that the gateway "receives the composite signal [and] decodes specific programs," the claim could have said the gateway 'receives the composite signal and decodes *one or more* programs *received on the composite signal*."  But that is not what the claims say.  And it is not in the Court's mandate to redraft for Entropic, even if doing so would "sustain their validity."  *See Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004).  Entropic is stuck with the claim language that it presented to the Patent Office, and that language renders the claims indefinite.

**3.    "local area network" ('715 patent, cl. 9)**

| Defendants' Proposal | Entropic's Proposal |
|---|---|
| "a group of devices at a single site connected by cables that allow a device in the network to interact with any other on the network" | Plain and ordinary meaning.  No construction necessary. |

---

[16] Entropic's narrowing here appears inconsistent with how Entropic is understanding the claim for the purposes of discovery.  For example, Entropic has sought extensive discovery (including source code) about the operation of the DVR functionality in DISH's accused set-top box product, which would only be relevant if the "specific programs" that are decoded and distributed were not necessarily included in the composite signal.

Entropic ignores a POSITA's understanding of "local area network" (or "LAN") to argue for a broad definition that is unsupported by the specification of the '715 patent. As there is a clear dispute between the parties regarding whether LAN must be wired or not, the Court should resolve this dispute now to prevent Entropic from arguing issues of claim construction before a jury.  As explained in Defendants' opening brief, the totality of the intrinsic and extrinsic evidence—including multiple authoritative dictionary definitions unrebutted by Entropic—confirms that at the time of the '715 patent, a LAN was understood by those skilled in the art to be a group of devices at a single site connected *by cables*.  (*See* Defs' Br. at 31–33.)  Entropic offers two rebuttals, neither of which is compelling.

Entropic wrongly contends Defendants' proposed construction "reads in a preferred embodiment (wired connection) while reading out another (wireless connection)."  (Pltf's Br. at 22.)  Entropic's argument is unsupported by, and indeed contradicted by, the intrinsic evidence.  Defendants' construction does not, as Entropic argues, read in a preferred embodiment; rather, it captures the *only* embodiment in the specification, which is consistent with the meaning of the term to one skilled in the art at the filing of the '715 patent.

The only LAN identified in the entire specification that distributes programs to STBs (as claimed) is discussed in connection with the embodiment of Figure 11, which shows a solid line (*i.e.*, wired) connection between the "Server/Gateway" (1160) and the "STBs" (1180).  (Ex. B ('715 patent) at Fig. 11.)  The specification explains that "server/gateway 1160 receives the composite transponder signal, decodes specific programs, and distributes the program information in packetized MPEG over a digital *local area network (LAN)* 1170 to STBs 1180.  *Ethernet or other LAN technology* is suitable for this function."  (*Id.* at 9:44–48.)  Far from disclosing a *wireless* LAN embodiment, the specification discloses *only* a wired LAN technology (Ethernet).[17]  The

---

[17] As explained in Defendants' opening brief (Defs' Br. at 33), the only disclosure of **wireless** communications in the '715 patent relates to communications from an IRD

reference to "other LAN technology"—which, in context, refers to other wired technology besides "Ethernet"—cannot broaden "LAN" to encompass wireless technologies where no such technologies are disclosed in the specification. (*See id.*) And Entropic does not identify a single embodiment in the specification that uses wireless technology to distribute programs. Thus, Defendants' construction is based on the *only* embodiment in the specification (a wired embodiment)—it does not exclude a *wireless* embodiment, because no such embodiment exists.

The fact that early types of wireless technology (such as Wi-Fi) existed at the time of filing of the '715 patent (as Entropic argues) does not mean that "LAN," as used in the '715 patent, includes those technologies. Indeed, Dr. Steffes's testimony shows why "LAN," as used in the claims, cannot refer to wireless technologies. Although Dr. Steffes testified that wireless LAN technology was known in 2001, as Entropic points out (*see* Pltf's Br. at 22–23 (citing Ex. 7)), he gave unrebutted testimony that data rates of wireless LAN technology were insufficient as of the filing of the '715 patent to be able to distribute programs wirelessly (*see id.*, Ex. 7 at 112:13–19, 113:6–8)—testimony Entropic simply ignores. Taken as a whole, Dr. Steffes's testimony only confirms that one skilled in the art would not have considered the '715 patent to disclose wireless LAN technology for distributing programs to STBs.

Entropic also ignores the numerous contemporaneous dictionaries cited by Defendants confirming that a "LAN" as of the filing date of the '715 patent was limited to *wired* connections of devices. (*See, e.g.*, Ex. M (Microsoft Computer Dictionary) at 304; Ex. N (Microsoft Internet & Networking Dictionary) at 15; Ex. O (Dictionary of Computer Science, Engineering, and Technology) at 282; Ex. P (Comprehensive Dictionary of Electrical Engineering) at 377.) Notably, Entropic does not cite any contrary contemporaneous dictionaries that define "local area network" to include a *wireless* network. In fact, Entropic cites from a newer version of the *very same dictionary*

---

or gateway to the ODU, which is unrelated to the "local area network" claimed in claim 9. (Ex. B ('715 patent) at 8:63–66.)

that Defendants use here in its claim construction briefing from a related litigation in support of a different term. *See Entropic Commc'ns, LLC v. Charter Commc'ns, Inc.*, No. 2:22-cv-00125-JRG, Dkt. 110-3 (E.D. Tex. May 30, 2023) (an excerpt from the Microsoft Computer Dictionary).   Thus, even Entropic understands that technical dictionaries may be beneficial in construing technical terms.   Defendants' dictionary definitions—and Entropic's lack of contrary definitions—are particularly salient here where the Court must "look beyond the patent's intrinsic evidence and consult extrinsic evidence in order to understand . . . the meaning of a term in the relevant art during the relevant time period." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015).

Finally, Entropic accuses Defendants of seeking to add additional limitations to the claims, *e.g.*, that a LAN exist at a "single site" and "allow a device in the network to interact with any other on the network." (*See* Pltf's Br. at 22.)  These are not additional limitations at all but are, rather, part of the *definition* of a LAN as understood by those skilled in the art at the filing of the '715 patent. (*See, e.g.*, Ex. M (Microsoft Computer Dictionary) at 304; Ex. N (Microsoft Internet & Networking Dictionary) at 15.)  Entropic does not point to any evidence—intrinsic or extrinsic—that contradicts this understanding of those skilled in the art.   Entropic hypothesizes about how communication restrictions between devices may impact whether there is a LAN under Defendants' construction (*see* Pltf's Br. at 23), but this is pure attorney argument and does not rebut the definitions provided in the patent or the extrinsic evidence submitted by Defendants.  Notably, Entropic itself previously proffered its own extrinsic definition for "LAN" that it ultimately chose *not* to cite in its brief, because that definition turns out to actually support the "single site" aspect of Defendants' construction. (*See* Ex. U (Newton's Telecom Dictionary) at 436 (explaining that a LAN is a "short distance data communications network (typically within a building or campus)".)

The Court should therefore adopt Defendants' proposed construction.

V.   U.S. PATENT NO. 8,792,008

A.   The '008 Patent

When providing its summary of the '008 patent, Entropic twists aspects of the '008 disclosure in an effort to bolster its claim construction positions.  One way Entropic does so is by using disputed terms in a way that the '008 specification itself does not support.  For example, Entropic uses the disputed term "an entire television spectrum" in an effort to explain the composition of a signal.  (Pltf's Br. at 7 ("[T]he front-end 158 … receives a signal that spans an *entire television spectrum*….").)  But the '008 patent never uses the term "entire television spectrum" when describing the composition of a signal in its specification; in fact, outside of the claims and the Abstract, the patent does not use the term at all.

Additionally, although Entropic generally acknowledges the importance of interpreting claim terms in view of the prosecution history (*see, e.g.*, Pltf's Br. at 9), it fails to analyze or even reference the '008 prosecution history, even though this prosecution history is material to the construction of disputed terms.  Indeed, at least the phrase "a source of said received signal" is core to the patentability of the relevant '008 claims and was added to the independent claims to avoid examiner-cited prior art, (*see* Defs' Br. at 45).  Yet Entropic ignored this issue entirely.

B.   Disputed Terms For The '008 Patent

1.   "an entire television spectrum" ('008 patent, cls. 1–2)

| Defendants' Proposal | Entropic's Proposal |
|---|---|
| "all of the one or more television signals received by a front-end" | Plain and ordinary meaning.  No construction necessary. |

Defendants' construction of "an entire television spectrum" is necessary to define a phrase that, as a whole, lacks any intrinsic definition, and to distinguish the language from different signal-characterizing language used in other independent claims (*i.e.*, claims 3 and 11).  While Entropic purports to not construe "an entire television spectrum," in reality, its brief contains multiple constructions that would significantly

broaden the scope of the term.  To prove infringement of claim 1, Entropic will need to establish that Defendants' hardware "*digitize[s]* a received signal spanning an entire television spectrum."  Because the disputed term (entire television spectrum) describes the signal that is to be digitized (received signal), Entropic obviously prefers the disputed term be as broad as possible to give flexibility to its infringement allegations.  But "entire television spectrum" *cannot*, as Entropic suggests, refer to any signal having a bandwidth spanning "from the lowest frequency 'F$_{lo}$' to the highest frequency 'F$_{hi}$'" (*see* Pltf's Br. at 7), as this understanding improperly writes the word "television" out of the claim term.  Nor can "entire television spectrum" be made up of just "two … television channels" (*see id.* at 31), because that writes out the phrase "entire … spectrum."  In contrast, Defendants' construction explains to a lay jury exactly what the term was intended to cover:  all received television signals.  There is a real dispute regarding the meaning of "an entire television spectrum," so the Court should construe the term, and adopt Defendants' proposal to prevent Entropic from expanding its claim under the guise of proposing a plain meaning.

Entropic's opening brief levies various attacks on aspects of Defendants' proposed construction.  In particular, Entropic argues that Defendants' proposed construction:  (1) strips context from the claim language; (2) merely replaces words (*i.e.*, replacing "spectrum" with "signals"); and (3) rewrites the point of reference of the claim.  Each of these criticisms is unfounded.

With respect to point (1), Defendants' construction does not strip context from the claim language, but instead provides much needed context.  The modifier "entire" refers to the whole and necessarily requires some point of reference to understand the bounds of "an entire television spectrum."  As an analogy, if a person refers to the "entire population" in isolation, it would be unclear whether that person is referring to the "entire population" of, for example, California, the United States, the North American continent, or the world.  "Entire population" must include a point of reference for the bounds to be known (*e.g.*, the entire population of California).  As in this analogy, it is necessary to

1   know what is the point of reference for the phrase "entire television spectrum."  In light

2   of the claims and the specification, and as discussed in greater detail below, the point of

3   reference that is most warranted is the front-end at which a signal is initially received, as

4   this is consistent with how the specification uses the term "received signal."

5       With respect to point (2), Defendants are not merely replacing words, but are

6   clarifying the scope of the claims, while giving weight to the meaning of the words in the

7   disputed term itself.   Although Entropic spends significant effort on distinguishing

8   "spectrum" from "signal" (Pltf's Br. at 33–34), no clarity is obtained from Entropic's

9   efforts.  Entropic's ultimate conclusion is that "entire television spectrum" means "entire

10  block of frequency" that contains at least "a plurality of television channels." (*Id*. at 34.)

11  This conclusion only replaces one nebulous phrase ("an entire television spectrum") with

12  another ("an entire block of frequency").  A jury would not find Entropic's replacement

13  helpful.  In contrast, Defendants' proposed construction explains exactly what the *entire*

14  television spectrum references—namely, all of the television signals received at a front-

15  end.  While the specification does not use the term "entire television spectrum," the use

16  of "entire" must be understood to invoke more than just two television signals as Entropic

17  asserts. (Pltf's Br. at 32.)  Accordingly, Defendants' proposed construction provides clear

18  guideposts as to what an infringing system would require (*i.e.*, digitization of all received

19  television signals).

20      With respect to point (3), Entropic's argument finds no support in the claim

21  language or the specification.  Entropic argues that the claimed "received signal" *must* be

22  received at an analog-to-digital converter ("ADC"), rather than at the "front-end"

23  referenced in Defendants' construction. (*See id.*)  While claim 1 has no requirement that

24  the "received signal" be received at any particular location, the '008 patent specification

25  provides context.  When the '008 patent specification uses the phrase "received signal,"

26  it explains that the "received signal" undergoes, not just a digitization process, but also

27  amplification, down-conversion, and filtering. (*See* Ex. C ('008 patent) at 3:16–19 ("The

28  RF front-end 158 may, for example, amplify, down-convert, filter, and/or digitize the

*received signal S* to generate the digital signal D.").)  In other words, the "received signal" S is initially received at a front-end and passes through an amplifier 252, filter 254, and ADC 256 before exiting the RF front-end 158B as a digitized signal D.  Figure 2B, reproduced below with annotations, unambiguously supports this interpretation and clearly shows that signal 'S' (which the '008 specification calls the "received signal") is received at the beginning of the RF front-end 158B.  Defendants' proposed construction ensures that this term is treated consistent with the specification, by requiring that the "entire television spectrum" encompasses the signals received by the front-end.[18]



'008 patent at FIG. 2B (annotated)

Finally, in the few instances where Entropic actually considers what the plain and ordinary meaning of the phrase *should be*, Entropic highlights exactly why Defendants seek to construe the term.  Entropic claims that "entire television spectrum" refers to only "*two or more* television channels."  (Pltf's Br. at 31.)[19]  By offering this interpretation,

---

[18]  Entropic also challenges Defendants' construction to the extent it would exclude any non-television content, such as that included in DOCSIS channels, from the "entire television spectrum."  (*See* Pltf's Br. at 33.)  For avoidance of doubt, Defendants' construction does not exclude non-television content.

[19]  Entropic attempts to redefine the claim by its efforts to diagram the claim.  (Pltf's Br. at 30.)  The claim language plainly provides that "a received signal" which "span[s] an entire television spectrum" is what is run through an "analog-to-digital converter." (Id.).  In other words, Entropic's diagram is misleading at best, as the "analog-to-digital" converter box should be at the bottom and the "entire television spectrum" box should be part of the "received signal" box.

Entropic improperly seeks to read out the word "entire" altogether to apparently just mean a limited subset of more than one received television channel.  *See Exxon Chem. Patents*, 64 F.3d at 1557 ("We must give meaning to all the words in [the patent's] claims."). Entropic attempts to re-write the claim to remove "entire … spectrum" in order to expand its infringement arguments to cover potential products that do not digitize all of the received television signals—so long as "two or more" are.  Entropic also describes "entire television spectrum" in a different but similarly overbroad manner:  a signal having a bandwidth spanning "from the lowest frequency '$F_{lo}$' to the highest frequency '$F_{hi}$.'"  (*See* Pltf's Br. at 7.)  Here, Entropic is attempting to remove "television" from the claim term, so that a signal having no television content at all would still fall within the ambit of its claim.  Entropic's attempt to broaden the scope of the claim should be rejected and Defendants' construction should be accepted.

### 2. "signal having a bandwidth that spans from a first frequency, $F_{lo}$, to a second frequency, $F_{hi}$" ('008 patent, cls. 3, 11)

| DISH's Proposal[20] | Entropic's Proposal |
|---|---|
| Plain and ordinary meaning, which is "a signal that includes all continuous frequencies from $F_{lo}$ to $F_{hi}$" | Plain and ordinary meaning. No construction necessary. |

As an initial matter, in its Opening Brief, Entropic purports not to understand the basis for DISH's proposed construction, and thus provides no substantive response.  But Entropic knows precisely the basis for DISH's proposed construction because DISH already explained the plain meaning of the term as part of its petition for *inter partes* review, which it filed more than four months ago.  (*See generally* Ex. T ('008 IPR Petition) at 11 ("the claim language requires—and a POSITA would have understood— that a received signal '[spanning a bandwidth] from a first frequency $F_{lo}$, to a second frequency, $F_{hi}$' is simply *a received signal consisting of any continuous frequencies*

_____

[20] Although DIRECTV did not originally identify this term in its proposed preliminary constructions, DIRECTV joins DISH in its proposed construction.

1    between a low frequency $F_{lo}$ and a high frequency $F_{hi}$"); see generally id. at 9–12.)[21]

2        Turning to why construction is needed, in its IPR petition, DISH explained the

3    plain meaning for this term (which is found in claims 3 and 11) to distinguish it from "an

4    entire television spectrum" (which is found in claim 1). Clarification is needed because

5    the phrases impart different requirements on the scope of the claimed "signal." DISH

6    explained why a POSITA would understand that this term "consists of any *continuous*

7    frequencies between a low frequency $F_{lo}$ and a high frequency $F_{hi}$" with reference to

8    several passages and examples in the specification overlapping with those that DISH cites

9    here. (*See id.* at 11–12 (citing Ex. C ('008 patent) at 3:12–15, 4:11–15); Defs' Br. at 42–

10   43 (citing Ex. C ('008 patent) at 4:11–15, 5:60–62, 5:62–65).)[22]

11       Consequently, Entropic cannot credibly claim it had no obligation to respond to

12   DISH because the construction was merely a clarification of the term's plain meaning.

13   Courts routinely "construe" claims to explain the plain meaning where it will potentially

14   aid lay jurors or resolve parties' disputes. *See, e.g.*, *JBF Interlude 2009 Ltd. v. Quibi*

15   *Holdings, LLC*, No 2:20-cv-02299, 2021 WL 1390367, at *9–*10 (C.D. Cal. Apr. 12,

16   2021) (construing "resize" "to have its plain and ordinary meaning, which is 'changed in

17   size.'"); *1 Energy Sols., Inc. v. Nicholas Holiday, Inc.*, No. 13-cv-5000-MWF, 2014 WL

18   12589113, at *8 (C.D. Cal. July 9, 2014) (construing term consistently with its ordinary

19   meaning where "the jury may be aided by a clarification"); *Largan Precision Co. v.*

20   *Genius Elec. Optical Co.*, No. 13-cv-2502, 2014 WL 5358426, at *4 (N.D. Cal. Oct. 20,

21   2014) (noting that juries consist of laypersons and that "claim terms written in technical

22

23   [21] If Entropic had any doubts as to DISH's proposed construction, it could have asked
     DISH at the parties' claim construction meet-and-confers, but it did not. The Court
24   should consider Entropic's arguments regarding this term waived and adopt DISH's
     proposed construction, or at a minimum, grant DISH leave to file a reply brief to
25   address whatever Entropic argues in its Response Brief.

26   [22] By not providing a response in its Opening Brief, Entropic gains nearly a month to
     align its strategy on this term between the District Court litigation and the Patent
27   Office proceedings, where its preliminary response to DISH's position will be due not
     long after briefing is finished here. But its non-response contravenes Entropic's
28   obligation to timely brief the issues here, and should not be rewarded.

language may have to be recast in words that non-experts will understand").

DISH's explanation (Defs' Br. at 41–43) of plain meaning in the context of the claims ensures that similar but different terms in different claims receive different meanings, and provides an appropriate meaning for this term. The Court should adopt DISH's unrebutted proposed construction and not reward Entropic for its three sentence non-response.

### 3. "a source of said received signal" ('008 patent, cls. 1, 3, 11)

| DISH's Proposal[23] | Entropic's Proposal |
|---|---|
| "the equipment, *e.g.*, a cable headend or satellite transmitter, that transmitted the received signal" | Plain and ordinary meaning. No construction necessary. |

DISH proposes that this phrase be construed to ensure that the "source of said received signal" is properly limited only to equipment that actually transmits signals downstream (*i.e.*, to customers). Despite arguing that this phrase should be given its "plain and ordinary meaning," Entropic misrepresents the '008 specification in an apparent attempt to have the Court endorse an overly-expansive (and incorrect) understanding of "source" that includes any "equipment under the control of DISH and/or DTV *regardless of whether this equipment had anything to do with the claimed "received signal.*" (Pltf's Br. at 37.) Entropic seeks to read the word "source" so broadly as to include any piece of equipment that could feasibly receive a signal, regardless of where that equipment is located or whether that equipment is the source of any transmitted signal. Because Entropic is improperly attempting to broaden the scope of this term, DISH requests that the Court adopt DISH's proposed construction.

From the intrinsic evidence, it is apparent that "a source of said received signal" refers only to transmitting equipment. The term "source" only appears once within the '008 patent specification in the context of a cable headend. (*See* Ex. C ('008 patent) at

---

[23] Although DIRECTV did not originally identify this term in its proposed preliminary constructions, DIRECTV joints DISH in its proposed construction.

-35-

3:56–57 ("a source of the received signal (e.g., back to a cable headend)").)  The cable headend, as illustrated in Figure 1A of the '008 patent, is described as transmitting signals downstream to customer equipment—operating as a "source" of transmitted signals.



'008 Patent at FIG. 1A (annotated)

The fact that the "source" refers to transmitting equipment is not incident to the alleged invention of the '008 patent, but a core feature.  The '008 patent explains that one of the major purposes of reporting signal characteristics is to assess "characteristics of the transmitter that sent the signal."  (*Id.* at 3:43.)  These "characteristics," in the form of a report, are then sent back to the transmitter so that the transmitter may change aspects of transmitted signals to ensure signal quality remains high at downstream devices.  (*Id.* at 3:48–57.)  The system acts as a feedback loop, where signal quality information at downstream set-top boxes is measured, transmitted back to the source, and used by the source to modify aspects of a transmitted signal.  By interpreting the "source" to include equipment other than the transmitting equipment, the benefits of a feedback loop would be lost.  In accordance with the '008 specification, the claimed "source" must refer to transmitting equipment, and not to any piece of equipment associated with Defendants, as Entropic suggests.

-36-

As support for its overly expansive construction, Entropic takes an out-of-context quote from Dr. Steffes in an attempt to show that any piece of equipment under control of a cable or satellite operation could operate as a "source." But this misinterprets Dr. Steffes's testimony. As the deposition transcripts show, Dr. Steffes made this comment merely to express that cable or satellite operators could implement the system of the '008 patent. (*See* Ex. Q (Steffes Dep. Tr.) at 127:28.) Dr. Steffes was not opining about which particular equipment could be considered a source. In fact, Dr. Steffes's previous testimony about the scope of the term "source" consistently limited the "source" to transmitting equipment. (*See id.* at 116:17–22, 118:11–24, 121:22–25.) Dr. Akl likewise agrees that "source" refers to where there is the "first appearance" of the transmitted signal (*i.e.*, where the source is generated), and any subsequent transmitting equipment on the path to a customer premise. (*See* Ex. S (Akl Dep. Tr.) at 190–91.)

Entropic additionally attacks DISH's proposed construction for purportedly limiting the manner in which certain information (characteristics of a received signal) are transmitted back to a "source" of the received signal. (*See* Pltf's Br. at 35.) It does so by setting up and tearing down a strawman. Specifically, Entropic claims that "DISH … takes the position that if a certain 'satellite transmitter' beams down satellite signals to a customer premises, any monitoring data must be returned back to that satellite equipment." (*Id.* at 35–36.) While DISH's construction certainly considers that possibility, it does not require that the signal characteristic data must be returned only to satellites in a satellite system. Instead, DISH's construction requires that the data must be returned to transmitting equipment—which includes satellites and satellite uplink centers/headends, as Dr. Steffes made clear in his supporting declaration and at his deposition. (*See* Ex. Q (Steffes Dep. Tr.) at 118:11–17 ("Q. Okay. So when you are requiring satellite transmitter to be the source, are you saying it could be the earth transmitter or the one in space or both? A. It could be both. Q. Or either, I guess. A. Either, yes."); *see also* Ex. F (Steffes Decl.) ¶¶ 91, 96–97.)

Entropic additionally relies on Figure 1C of the '008 patent, which is unhelpful to

-37-

understand what the claimed source can (or cannot) be.  (*See* Pltf's Br. at 36.)  Figure 1C shows a customer premises (a house) having both a satellite dish 172 for receiving signals, but also a connection to a wide area network ("WAN") 192 (*e.g.,* the Internet). Even if the specification's discussion of Figure 1C proposed using WAN 192 to transmit the claimed signal characteristic information (which it does not), the embodiment does not explain *where* any such information is transmitted.   The specification's entire description of the WAN is found in a single sentence:  "[t]he gateway and [*sic*] may transmit data onto and receive data from the WAN 192 (via broadband connection 188)." (Ex. C ('008 patent) at 5:7–8.)  This description does not require that signal characteristic information be transmitted to anything in particular, so it provides no insight into the meaning of "source."   Further, DISH's proposed construction is consistent with this embodiment because it does not prohibit the use of a WAN to report signal information to equipment transmitting the television signal that is received at the customer premises. DISH's proposal simply requires that the transmitting equipment (source) be the equipment to which the signal characteristics are reported, regardless of the communication media.

In order to ensure that the proper scope of this phrase is correctly interpreted, the Court should adopt DISH's proposed construction.  To do otherwise would risk confusing the fact-finder and provide an opening for Entropic to attempt to argue against language which is uncontroversial and that was deemed necessary by the Patent Office to issue the '008 patent.

## VI.   CONCLUSION

For the foregoing reasons, the Court should adopt Defendants' proposed constructions or find specified claims to be indefinite.

-38-

1

2

Dated:  June 9, 2023

3

By: */s/ Benjamin Hershkowitz*

By: */s/ Adam G. Hester*

4

Jason C. Lo, SBN 219030
jlo@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue, Suite 5400
Los Angeles, CA  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

5

6

7

MBernstein@perkinscoie.com
PERKINS COIE LLP
11452 El Camino Real, Ste 300
San Diego, California 92130-2080
Telephone: +1.858.720.5700
Facsimile: +1.858.720.5799

8

Benjamin Hershkowitz (*pro hac vice*)
bhershkowitz@gibsondunn.com
Katherine Q. Dominguez (*pro hac vice*)
kdominguez@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:   212.351.4035

9

10

11

Amanda Tessar (*pro hac vice*)
ATessar@perkinscoie.com
Trevor Bervik (*pro hac vice*)
TBervik@perkinscoie.com
PERKINS COIE LLP
1900 Sixteenth Street, Suite 140
Denver, Colorado 80202-5255
Telephone: +1.303.291.2300
Facsimile: +1.303.291.2400

12

13

14

Brian Buroker (*pro hac vice*)
bburoker@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
Telephone: 202.955.8500

15

16

17

Daniel T Keese, Bar No. 280683
DKeese@perkinscoie.com
PERKINS COIE LLP
1120 NW Couch Street 10th Floor
Portland, OR 97209-4128
Telephone: +1.503.727.2000
Fax: +1.503.727.2222

18

Nathan R. Curtis (*pro hac vice*)
ncurtis@gibsondunn.com
Audrey Yang (*pro hac vice*)
ayang@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Ave., Suite 2100
Dallas, TX 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900

19

20

21

Adam G. Hester, Bar No. 311206
AHester@perkinscoie.com
PERKINS COIE LLP
33 East Main Street Suite 201
Madison, WI 53703-3095
Tel: +1.650.838.4311
Fax: +1.650.838.4350

22

23

24

**ATTORNEYS FOR DEFENDANTS DIRECTV, LLC AND AT&T SERVICES, INC.**

25

**ATTORNEYS FOR DEFENDANTS DISH NETWORK CORPORATION, DISH NETWORK L.L.C., AND DISH NETWORK SERVICE L.L.C.**

26

27

28

No. 2:22-cv-07775-JWH-JEM
DEFENDANTS' RESPONSE MARKMAN BRIEF