# EXHIBIT T

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

_____

DISH NETWORK CORPORATION, DISH NETWORK L.L.C., AND DISH NETWORK SERVICE L.L.C.,

Petitioners

v.

ENTROPIC COMMUNICATIONS, LLC,

Patent Owner.

_____

PTAB Case No. IPR 2023-00393

Patent No. 8,792,008

_____

**PETITION FOR *INTER PARTES* REVIEW OF U.S. PATENT NO. 8,792,008**

_____



Figure 1B - The '008 Patent's Spectrum Monitoring System (Ex.1001)

RF receive front-end 158 includes an analog-to-digital converter ("ADC") to digitize the received signal before transmitting the signal to channelizer 152. (Ex.1001-'008 patent, 3:11-16, Figure 2B, element 256.) Upon receving analog signals, the ADC in RF receive front-end 158 converts the signals to a multi-channel digital signal. (Ex.1001-'008 patent, 6:21-27.) Channelizer 152, located at an output of RF receive front-end 158, receives the digitized signal and divides it into a plurality of channels. (Ex.1001-'008 patent, 6:27-28.) Channelizer 152 then selects portions of the channelized signal—specifically $C_{J+1}$ and $C_1$-$C_J$—and transmits a first selected portion ($C_{J+1}$) to monitoring module 154 where it is analyzed to determine signal characteristics, such as signal-to-noise ratio ("SNR"). (Ex.1001-'008 patent, 3:20-23, 3:57-60, 4:26-50, 6:27-31.) Channelizer 152 concurrently transmits a second selected portion ($C_1$-$C_J$) to data processing module 156, where

– 7 –

the second selected portion is processed to recover encoded data. (Ex.1001-'008 patent, 4:45-47, 6:28-30.) Figure 4 of the '008 patent illustrates this process flow.



Figure 4 - The '008 Patent's Spectrum Analysis Process (Ex.1001)

B.  The Prosecution History

Prosecution of the '008 patent was relatively uneventful and has little impact on this Petition. In a non-final Office action, the Examiner found the claims allowable if amended to include the signal analysis and reporting limitations: "*analyzing said first portion to determine a characteristic of said received signal*" and "*reporting said determined characteristic to a source of said received signal.*"

– 8 –

(Ex.1003-FH, 21-25, 62-65, 75-80.) Applicant incorporated the proposed amendments, and the '008 patent then issued.

### C. Priority Date of the '008 Patent

The '008 patent issued from a U.S. patent application filed on September 10, 2012, that claims priority to a provisional application dated September 8, 2011. Petitioners do not concede that the '008 patent is entitled to the September 8, 2011, provisional filing date. However, for purposes of this Petition only, the priority date of the '008 patent is assumed to be September 8, 2011.[1] In the related litigation, Patent Owner contends that the inventors had conceived the invention of the '008 patent as of February 25, 2011. Even if Patent Owner establishes a February 25, 2011, conception date, which Petitioners do not concede, the art relied on in this Petition still applies as all references pre-date February 25, 2011.

### V. CLAIM CONSTRUCTION

Petitioners interpret the claim terms according to their plain and ordinary meaning as understood by a POSITA at the time of the invention in view of the specification and the prosecution history. 37 C.F.R. 42.100(b); *Phillips v. AWH Corp.,* 415 F.3d 1302, 1312-12 (Fed. Cir. 2005). In the co-pending litigation, Patent

---

[1] Petitioners do not concede that the provisional application includes written description necessary to support the challenged claims.

Case 2:22-cv-07775-JWH-KES   Document 252-4   Filed 06/09/23   Page 6 of 10   Page ID #:3023
Petition for *Inter Partes* Review of U.S. Pat. No. 8,792,008
PTAB Case No. IPR 2023-00393

Owner also contends that each claim term deserves its plain and ordinary meaning. Petitioners reserve the right to construe terms in the litigation and/or to respond to any constructions that Patent Owner presents in this proceeding.

Petitioners note, however, that the '008 patent claims recite two terms where clarification is beneficial to avoid confusion. While the terms do not require a construction per se because they can be understood by a POSITA and their meanings are not likely to be disputed, explanation nevertheless may be helpful to the Board.

### A. *"a received signal spanning an entire television spectrum"* (Claim 1) / *"receiving a signal having a bandwidth that spans from a first frequency, $F_{lo}$, to a second frequency, $F_{hi}$"* (Claims 3 and 11)

Independent claim 1 recites digitizing "*a received signal spanning an entire television spectrum*" while independent claims 3 and 11 require digitizing "*a received signal having a bandwidth that spans from a first frequency, $F_{lo}$, to a second frequency, $F_{hi}$.*" Considering the '008 specification, a POSITA would understand that these received signals differ and have different meanings.

In the context of receiving a signal "*spanning an entire television spectrum*," the '008 patent discloses an RF receive front-end that is capable of "full-spectrum" capture, *e.g.*, of <u>all</u> received television signal(s), and that an "RF front-end of a receiver [is] operable to perform spectrum monitoring." (Ex.1001-'008 patent, 5:41-47.) The '008 patent further explains that the received television signal(s) are ultimately provided to an analog-to-digital converter (*e.g.*, ADC 256) and may

– 10 –

comprise the "entire cable downstream," for cable television, or "the received signal at the input of the LNB, and/or the down-converted signal … at the output by an LNB" for satellite television. (Ex.1001-'008 patent, 5:60-65.) A POSITA would have understood that the phrase "a received signal spanning an entire television spectrum" refers to <u>all</u> received television signals. (Ex.1002-Schonfeld, ¶¶99-100.) This interpretation is consistent with the plain and ordinary meaning of the phrase. (Ex.1002-Schonfeld, ¶100.)

In contrast, claims 3 and 11 recite "*a received signal having a bandwidth that spans from a first frequency $F_{lo}$, to a second frequency, $F_{hi}$.*" Unlike claim 1, here the claim language requires—and a POSITA would have understood—that a received signal "*[spanning a bandwidth] from a first frequency $F_{lo}$, to a second frequency, $F_{hi}$*" is simply a received signal consisting of any continuous frequencies between a low frequency $F_{lo}$ and a high frequency $F_{hi}$, and not necessarily all received television signals (Ex.1002-Schonfeld, ¶101.) For example, the '008 patent states that "[i]n an example embodiment, signal S may be a cable television signal with $F_{lo}$=55MHz, $F_{hi}$=1002MHz. In another embodiment, signal S may be a MoCA signal with with [*sic*] $F_{lo}$=1150Mhz and $F_{hi}$ = 2100MHZ." (Ex.1001-'008 patent, 4:11-15.) The '008 specification further explains that the front-end may receive one or more television signals, as well as other signals, including DOCSIS or MoCA signals. (Ex.1001-'008 patent, 3:12-15, 4:11-15.) As such, the "signal S may be the

– 11 –

result of a plurality of television and/or DOCSIS channels being frequency division multiplexed into a signal and that signal S may occupy a frequency range from $F_{lo}$ to $F_{hi}$." (Ex.1001-'008 patent, 3:12-15.) Thus, unlike "*entire television spectrum*" this signal would not necessarily be all received television signals but rather received signal having a continuous range of frequencies from a high frequency to a low frequency—which may include television and/or data signals. (Ex.1002-Schonfeld, ¶101.)

## VI. LEVEL OF ORDINARY SKILL

As of the alleged February 25, 2011 priority date, a POSITA is a person having at least: i) a bachelor-level degree in electrical engineering or a related subject and three or more years of experience working in the field of cable and/or satellite signal processing and communication systems; ii) a master's-level degree in electrical engineering or a related subject and one or more years of experience working in the field of cable and/or satellite television signal processing and communication systems; or iii) a Ph.D.-level degree in electrical engineering or a related subject and at least some experience working in the field of cable and/or satellite television signal processing and or communication systems. Additional education may substitute for professional experience, and significant work experience may substitute for formal education. (Ex.1002-Schonfeld, ¶102.)

## VII. DESCRIPTION OF THE PRIOR ART

### A. Maycock (Ex. 1005)

Maycock addresses and solves the same problem as the '008 patent—how to remotely monitor video signals. (Ex.1005-Maycock, Title, Abstract, 1:6-9, 2:20-23.) But Maycock did it over a decade before the '008 patent.



Maycock - Figure 1 (Ex.1005)

In Maycock's system, received broadband video signals are processed by channel selector 14, labeled in Figure 1 as "channel selection & measurement," which measures parameters of the signals and then selects a channel for further analysis. (Ex.1005-Maycock, 3:9-16, 3:30-50.) A selected channel is transmitted to performance monitoring unit 20, which performs the functionality described below with respect to Figure 3.

– 13 –

Petition for *Inter Partes* Review of U.S. Pat. No. 8,792,008
PTAB Case No. IPR 2023-00393



Maycock - Figure 3 (Ex.1005)

At monitoring unit 20, Maycock explains that a digitized signal is received at receiver 50. (Ex.1005-Maycock, 5:65-6:7.) Receiver 50 outputs the digitized signal to demultiplexer 52, where it separates the digitized signal into three outputs and sends those outputs to computer 58, video digital-to-analog converter 54, and audio digital-to-analog converter 56. (Ex.1005-Maycock, 6:2-7.) The video portion of demultiplexer's 52 output is analyzed—to measure signal quality parameters—at video analyzer 62 and is decoded to demodulate information contained in the video signal. (Ex.1005-Maycock, 6:24-29, 6:38-43.) Similarly, the audio portion of the

– 14 –