Christina Goodrich (SBN 261722)
Christina.goodrich@klgates.com
Connor J. Meggs (SBN 336159)
connor.meggs@klgates.com
K&L Gates LLP
10100 Santa Monica Boulevard
Eighth Floor
Los Angeles, CA 90067
Telephone: +1 310 552 5000
Facsimile: +1 310 552 5001

[*Additional counsel on signature page*]

**ATTORNEYS FOR PLAINTIFF
ENTROPIC COMMUNICATIONS, LLC**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENTROPIC COMMUNICATIONS, LLC, | Civil Action No. 2:22-cv-07775-JWH-JEM |
| Plaintiff, | Case Transferred from E.D. Texas (2:22-cv-75-JRG) |
| v. | **PLAINTIFF'S RESPONSE TO DEFENDANTS' JOINT OPENING CLAIM CONSTRUCTION BRIEF** |
| DIRECTV, LLC and AT&T SERVICES, INC., | |
| Defendants. | **Hearing:     July 11, 2023** |
| ENTROPIC COMMUNICATIONS, LLC, | **Time:        10:00 a.m.** |
| | **Crtrm:       9D (Santa Ana)** |
| Plaintiff, | |
| v. | |
| DISH NETWORK CORPORATION, DISH NETWORK L.L.C., and DISH NETWORK SERVICE L.L.C., | |
| Defendants. | |

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................. 1

II.   ARGUMENT ........................................................................................ 2

    A.    PERSON OF ORDINARY SKILL IN THE ART ................................ 2

    B.    CONSTRUCTIONS OF TERMS ........................................................ 3

        i.    '576 Patent ................................................................................. 3

            1.    "digitizing the plurality of satellite broadband signals" ................................................................................. 3

            2.    "integrated receiver decoder (IRD)" ..................................... 9

            3.    "selected and extracted transponder channel[s]" ............... 11

            4.    "transponder request signals" .............................................. 14

            5.    "a transponder request [signal] . . . the transponder request signals" / "from the IRD . . . to the IRDs" / "a plurality of transponder signals . . . the transponder signal" ........................................................... 15

        ii.   '715 Patent ............................................................................... 16

            6.    "RF Signals" ......................................................................... 16

            7.    "decodes specific programs" ................................................ 17

            8.    "local area network" ............................................................ 18

        iii.  '008 Patent ............................................................................... 20

            9.    "an entire television spectrum" ............................................ 20

            10.   signal having a bandwidth that spans from a first frequency, $F_{lo}$, to a second frequency, $F_{hi}$" .......................... 21

            11.   "a source of said received signal" ....................................... 24

III.  CONCLUSION ................................................................................... 24

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*01 Communique Lab'y, Inc. v. LogMeIn, Inc.*,
   687 F.3d 1292 (Fed. Cir. 2012) ........................................................... 16

*Bose Corp. v. JBL, Inc.*,
   274 F.3d 1354 (Fed. Cir. 2001) ........................................................... 13

*CA, Inc. v. Netflix, Inc.*,
   No. 21-cv-80, 2021 WL 5323413 (E.D. Tex. Nov. 16, 2021) ........................... 13

*Energizer Holdings v. Int'l Trade Comm'n*,
   435 F.3d 1366 (Fed. Cir. 2006) ........................................................... 12

*Finjan LLC v. ESET, LLC*,
   51 F.4th 1377 (Fed. Cir. 2022), *cert. denied*, No. 22-930, 2023 WL
   3046166 (U.S. Apr. 24, 2023) .............................................................. 8

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n*,
   341 F.3d 1332 (Fed. Cir. 2003) ........................................................... 13

*Imperium (IP) Holdings, Inc. v. Apple, Inc.*,
   920 F. Supp. 2d 747 (E.D. Tex. 2013) ................................................... 15

*KCJ Corp. v. Kinetic Concepts, Inc.*,
   223 F.3d 1351 (Fed. Cir. 2000) ........................................................... 16

*In re Moore*,
   439 F.2d 1232 (C.C.A.P. 1971) ........................................................... 12

*Nobel Biocare Servs. AG v. Instradent USA, Inc.*,
   903 F.3d 1365 (Fed. Cir. 2018), *as amended* (Sept. 20, 2018) ............. 17, 23, 24

*Novo Indus., L.P. v. Micro Molds Corp.*,
   350 F.3d 1348 (Fed. Cir. 2003) ........................................................... 13

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc) .............................................. 10

*Slimfold Manufacturing Co. v. Kinkead Industries, Inc.*,
   810 F.2d 1113 (Fed. Cir. 1987) ...................................................... 12, 13

ii

*SynQor, Inc. v. Artesyn Techs., Inc.*,
    709 F.3d 1365 (Fed. Cir. 2013) ................................................................17, 23, 24

*Thorner v. Sony Comput. Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ....................................................................9, 10

*Union Pac. Res. Co. v. Chesapeake Energy Corp.*,
    236 F.3d 684 (Fed. Cir. 2001) ...........................................................................12

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
    442 F.3d 1322 (Fed. Cir. 2006) .........................................................................20

**Other Authorities**

MPEP § 2173.05(e) (8th ed. Rev.2, May, 2004) ......................................................12

# I.   **INTRODUCTION**

After opening briefs, nothing about the parties' strategies is particularly extraordinary. Defendants[1] seek to narrow various claim terms, or argue hopefully for invalidity by indefiniteness for a few terms. Entropic seeks to maintain the plain terms of the claims themselves, relying on plain and ordinary meaning. As noted in Entropic's opening brief, though not itself extraordinary, it should be recognized that this case is ***not*** one where the plaintiff seeks to use "plain meaning" to loosen the claim scope to cover things at the periphery of the claims (or beyond). The Patents-in-Suit were invented at leading companies in the satellite and cable technology market (Entropic and MaxLinear). The infringement in this case rests squarely in the middle of the claims. This presents Defendants with an uphill battle.

Defendants argue that they mean only the best—they intend merely to "simplify" for the jury or define plain meaning terms the POSITA knows but a lay juror probably will not, when first seated for trial. (*See* Defs. Br. (ECF No. 234) at 16, 42.) By means of this excuse, Defendants add words to the well-known terms used in the Asserted Claims. This strategy is especially apparent where the words of the claim being construed are not actually construed—the claim terms are repeated in Defendants' constructions, with additional limiting words inserted. (*See, e.g.*, terms 1, 2, 4 and 6). It is also notable how often Defendants disagree with one another's attempts to redefine terms or argue indefiniteness. Indeed, it is easier to list the terms where they agree—of eleven terms they agree only upon terms 1, 3, 8 and 9. For the remaining seven briefed terms, one defendant takes a position the other does not support. This is reflective of the uphill battle of fighting patents covering inventions so applicable to the industry.

---

[1]   Defendants DirecTV, LLC and AT&T Services, Inc. (together, "DTV"), and DISH Network Corporation, DISH Network L.L.C., and DISH Network Service L.L.C. (collectively "DISH").

**PLAINTIFF'S RESPONSE TO DEFENDANTS' JOINT OPENING CLAIM CONSTRUCTION BRIEF**

## II.   ARGUMENT

### A.   PERSON OF ORDINARY SKILL IN THE ART

Defendants have proposed a requirement upon the definition of a POSITA that does not match the subject matter of the Patents-in-Suit. Each of Defendants' three proffered levels of skill in the art require at least some experience with "television signal processing and satellite communications." (Defs. Br. at 11.) Without question, the Patents-in-Suit relate to television (and other) signal processing. However, "satellite communications"—as Defendants turn around and use the phrase—is not the focus of the patented subject matter for any of the Patents-in-Suit. The '576 and '715 Patents relate to processing signals ultimately coming from satellites, but the subject matter of the '576 and '715 Patents starts after the signals are received and processed by terrestrial receivers. (*See e.g.*, Ex. 1 to ECF No. 233, '576 Patent, 2:54–3:43.) The '576 and '715 Patents are directed to the signal processing, not how the orbiting satellites function. (*Id.*) Likewise, the '008 Patent relates to signal monitoring, and one type of signal that may be monitored may be sourced from a satellite. But other sources include cable television (*see e.g.*, Ex. 3 to ECF No. 233, '008 Patent, 4:16–19), cable modem data a.k.a. DOCSIS (*id.* at 3:12–15, 3:25–28), and MoCA networking (*id.* at 4:12–14). Thus, as Dr. Akl explained in his declaration, a POSITA need not have "satellite communications" specific experience to have ordinary skill in the art of the Patents-in-Suit. (Ex. 5 to ECF No. 233, Akl Decl., ¶ 24.) It is sufficient that a POSITA have knowledge of signal processing and telecommunications systems generally because that is the actual subject matter of the Patents. (*Id.*)

Defendants propose this restrictive qualification in an attempt to generate an argument about expert qualifications. Defendants seek to thread the needle between Dr. Akl's wealth of signal processing experience and the more narrow focus of Defendants' expert, Dr. Steffes. While this bears pointing out, the issue comes to nothing for two reasons. *First*, Defendants are wrong in suggesting that Dr. Akl does not satisfy their narrow proposal as he has a doctoral degree in electrical engineering,

and at least some experience in television signal processing and satellite communications. (*Id.*, ¶ 8; *see also* Ex. 10, Akl Dep. Tr. at 17:24–21:20 (discussing satellite communication courses), 24:1–13 (discussing satellite communication research and work on satellite communication cases), 33:1–18 (discussing research project related to communication between satellites), 35:2–37:4 (discussing experience with television communication systems).) Dr. Akl clearly qualifies as a POSITA under any of Defendants' unreasonably narrow proposals. Any assertion that his opinions are insufficient should be disregarded. *Second*, DISH's expert Dr. Steffes—at least after being deposed—ended up agreeing on all the issues pertinent to claim construction, as discussed below. Accordingly, there is no battle of experts in any meaningful sense.

### B.   CONSTRUCTIONS OF TERMS

#### i.   '576 Patent

##### 1.   *"digitizing the plurality of satellite broadband signals"*

| Claim Term | Entropic's Construction | Defendants' Construction |
|---|---|---|
| "digitizing the plurality of satellite broadband signals" ('576 Patent, cl. 14) | Plain and ordinary meaning. No construction necessary. | "digitizing the complete bands of satellite broadband signals received at the ODU" |

This term is one of two in the case where Defendants have pursued the identical strategy—"defining" a claim term by essentially repeating the words being "defined," but crucially, also tacking onto the end of the definition a short proviso to substantially limit the scope of the definition. Both instances relate to digitizing—this term, and term 9 ("digitize a received signal spanning an entire television spectrum . . ." from the '008 Patent). In each case, Defendants' definitions include a phrase at the end of the construction specifying ***where*** in the chain of signal processing one judges the question. And in both cases, this added phrase is the primary source of disagreement between the parties since it is unsupported by the claims and specification.

Here the crucial phrase is "received at the ODU." It is apparent after the opening briefing that the parties do not truly dispute the meaning of "satellite broadband signals." Defendants argue they mean nothing more by "the complete bands" than is meant by the applicant in discussing digitization of "satellite broadband signals" in the file history. (*See* Defs. Br. at 13–14.) That discussion is consistent with digitizing the blocks of transponder signals illustrated in, *e.g.*, Fig. 5 (showing the four separate broadband signals supplied by LNBs).

However, Defendants did not stop there. Their definition adds the qualifier "received at the ODU," which appears intended to change the meaning of "complete bands." Defendants' definition—at least a plausible reading of it—proffers that the "complete bands" are those signals in whatever condition they are originally "received at the ODU," not the complete bands that are actually digitized. But this cannot be correct, because a lot happens in between. In short, the signals *entering* the ODU can undergo processing (and indeed do) before being provided to the digitizers. Those signals do not reach the digitizers in the same condition they entered the ODU.

To illustrate, we turn to the intrinsic record. Both Fig. 1 (prior art) and Fig. 2 (the invention) show the extent of the ODU. The ODU includes all the outdoor components, including the components that receive signals from satellites (the dish antenna **130** and feedhorns **150**), and the low noise amplifier and block converters ("LNBs") **140** that further process the received signals. ('576 Patent, 1:19–37 (discussing components with reference to Fig. 1); *see also id.* at Fig. 2 (showing same components in context of the invention, shown below).)



FIG. 2

(*Id.* at Fig. 2 (annotated).) Therefore, the signals "received at the ODU" (Defendants' construction) are those received at the dish by the feedhorns, and fed ***into*** the LNBs.

Defendants' construction is therefore directly at odds with the disclosed invention. In the invention the signals being digitized are the ***outputs*** of the LNBs:

> The A/D digitizes the entire LNB output signal; therefore all transponder channels are available in the sampled data. More than one transponder channel may be selected from the A/D data to be combined in the composite signal. When all A/D are powered up any combination of transponder channels from any LNB output can be combined into the composite signal for distribution to the gateway and STBs.

(*Id.* at 7:17–24.) Visually, this is first illustrated in Fig. 2 (*see* image above). The ***outputs*** of the LNBs—the blocks of transponder channels—are fed into the Signal Selector and Combiner **250**, where the digitizer resides (in the digital embodiments; there is no digitizer in analog embodiments).

1

The detail of this arrangement is illustrated in Fig. 3:

2

3

4

5

6

7

8

9

10

11

12

13



FIG. 3

14 ('576 Patent, Fig. 3 (annotated).) Again, the digitizers (A/D converters **330**) operate on

15 the output of the LNBs, not upon what enters the LNBs (nor anything even further

16 upstream like the feedhorns). Indeed, the outputs of the LNBs are themselves processed

17 before being digitized. The LNB outputs are downconverted into quadrature (I/Q) form

18 before being digitized, by mixers **310**. (*Id.* at 4:51–64.) Likewise, Figs. 6, 7, 8 illustrate

19 the same point. The analog-to-digital converters **630** operate on signals output by the

20 LNBs (that in turn are further processed by quadrature downconversion **620**):

21

22

23

24

25

26

27

28

**PLAINTIFF'S RESPONSE TO DEFENDANTS' JOINT OPENING CLAIM CONSTRUCTION BRIEF**



**FIG. 6**

('576 Patent, Fig. 6 (annotated); *see also id.* at Figs. 7, 8). The signals the digitizers operate upon have undergone processing and are not identical to the signals "received at the ODU" as Defendants seek to require with their construction. The digitizers operate on "LNB outputs [that] are quadrature down converted." (*Id.* at 8:45–47.) They do not operate on the signals in the condition they are originally received by the ODU.

In summary, the '576 Patent works by selecting transponders provided by the LNBs. (*See also id.* at Fig. 5.) In the digital embodiments, there is digitization. The digitization operates on signals output by the LNBs, further split into quadrature (I/Q) form as desired. There is no embodiment, no description whatsoever of digitizing any satellite signal *as it was received at the ODU.* Nor is there any such discussion in the file history. Therefore Defendants' construction cannot be correct. Whatever "digitizing the plurality of satellite broadband signals" means, it must include the signals actually digitized.

PLAINTIFF'S RESPONSE TO DEFENDANTS' JOINT OPENING CLAIM CONSTRUCTION BRIEF

At some level, the dispute here may seem strange to the Court. There is no question that the signals received by the satellite dish, comprising blocks of transponder channels, are ultimately the ones that are digitized. Yet those signals go through various processing steps, but they are what is digitized, not something else. Thus, is there truly a dispute? There certainly is, insofar as *Markman* decisions generate phrases which replace the claim language in all the arguments to the factfinder. Constructions which run the risk—depending on how they themselves are interpreted—of being entirely contrary to the disclosed invention invite mischief and should be rejected. Here, "complete bands . . . received at the ODU" presents a very real problem, because the '576 Patent digitizes "satellite broadband signals" that have been processed, not those signals in the exact same form as received by the dish, feedhorns, and LNBs of the ODU. Ultimately they ***are*** the same signal, but "ultimately" is what Defendants' construction is designed to exclude.

As a minor aside, Petruzzelli's incorporation by reference into the background of the '576 Patent and Petruzzelli's description that the "RF signals" are the signals received at the ODU has no bearing on the construction of this term as claimed in the '576 Patent. While "definitions in any incorporated patents or references are a part of the host patent . . . incorporation by reference does not convert the invention of the incorporated patent into the invention of the host patent." *Finjan LLC v. ESET, LLC*, 51 F.4th 1377, 1382 (Fed. Cir. 2022), *cert. denied*, No. 22-930, 2023 WL 3046166 (U.S. Apr. 24, 2023) (citing *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1553 (Fed. Cir. 1996)). Here the claim term refers to digitizing, and thus digitizing in the '576 Patent is the only proper point of reference. If prior art is in conflict, the subject patent obviously wins.

The plain and ordinary meaning of "digitizing the plurality of satellite broadband signals" should be adopted in contrast to Defendants' improper attempt to limit the signals to the "complete bands . . . received at the ODU."

**8**

2.     *"integrated receiver decoder (IRD)"*

| Claim Term | Entropic's Construction | DTV's Construction |
|---|---|---|
| "integrated receiver decoder (IRD)" ('576 Patent, cls. 14, 18, 19, 22, 41) | Plain and ordinary meaning. No construction necessary. | "device capable of at least receiving and decoding data and generating an output video signal" |

DTV (but not DISH) seeks to limit an integrated receiver decoder to the subclass of IRDs that generate an "output video signal." This output video signal requirement is improperly added by DTV to the plain meaning of "integrated receiver decoder." Entropic, DISH, and both technical experts in the case agree they understand an "integrated receiver decoder (IRD)" is simply a device that receives and decodes, in one unit. (*See* Ex. 6 to ECF No. 233, Steffes (DISH expert) Decl., ¶ 87; Ex. 5 to ECF No. 233, Akl (Entropic expert) Decl., ¶ 41.) There is ***no*** requirement relating to any output.

Therefore the only legal path open to DTV winning its restrictive definition is lexicography, which requires something "clear and unmistakable." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). However, the best DTV can do is to argue the specification "consistently" describes IRDs that are capable of generating an output video signal. (Defs. Br. at 16.) Yet DTV's citations to the '576 Patent do not bear this out. *First*, relying on a passage from the Background, DTV mistakenly argues that an IRD ***must*** produce a video signal. (*Id.*) Admittedly, set top boxes (STBs) rely upon one or more IRDs as components to receive and decode signals. But, that reliance does not create equivalence. The relied-upon Background of the '576 Patent is simply noting that because standalone boxes (incorporating IRDs) were often located on top of a TV, the entire box would be called a "set top box." ('576 Patent, 1:31–33.) While an IRD is ***part*** of typical STBs, an IRD is not the STB.

*Second*, DTV's citation to the '576 Patent at 6:62–7:2 is not only focused on an STB (not the IRD it contains), but the passage says nothing about ***outputting*** a video signal. (*See* Defs. Br. at 17.) That passage discusses only the treatment of the received

**PLAINTIFF'S RESPONSE TO DEFENDANTS' JOINT OPENING CLAIM CONSTRUCTION BRIEF**

input, not an output: "standard STB hardware can receive the new composite signal and demodulate and decode the video and audio signals." ('576 Patent, 6:62–7:2.) "Receive," "demodulate and decode"—the passage confirm that is the nature of an IRD, an integrated component that receives and decodes (as Entropic, DISH, and the experts agree). As such, DTV's definition narrows the plain meaning of integrated receiver decoder at odds with the plain meaning to the person of ordinary skill in the art. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc).

Finally, Entropic notes that DTV argues that the claim term must be construed because "it is unlikely that a lay juror has ever heard of an 'IRD,' much less knows what the term means." (Defs. Br. at 16.) But whether a jury already knows, upon seating, the ordinary meaning to the POSITA is no excuse to construe plain terms erroneously. There is nothing difficult in judging whether accused deployments include a device that receives and decodes, in one unit. During trial the jury may have to learn what the POSITA already knows, but there is nothing difficult or confusing about it.

The Court may wonder, if an IRD does not output something, what does it do? The issue is not whether IRD's output anything (they do), it is whether the IRD outputs something particular—an "output video signal" such as that fed to a display. IRDs can output elsewhere, for example, to DVRs for recording channels to a hard drive. DTV's attempt to exclude such IRDs because they are not used to "output [a] video signal" is the issue, and illustrates why the DTV construction is so erroneous.

In summary, nothing in the specification of the '576 Patent indicates the patentee was acting as its own lexicographer by "'clearly set[ing] forth a definition of the disputed claim term' other than its plain and ordinary meaning." *Thorner*, 669 F.3d at 1365. DTV's selective choice from among the various functions a prior art IRD might do, and its confusion of STBs with one component they contain (IRD) do not support DTV's construction.

### 3. *"selected and extracted transponder channel[s]"*

| Claim Term | Entropic's Construction | Defendants' Construction |
|---|---|---|
| "selected and extracted transponder channels" ('576 Patent, cls. 16, 17, 21, 39, 41–42) | 1. Is not indefinite.<br>2. Plain and ordinary meaning. No construction necessary. | Indefinite |

Opening briefing has revealed that Defendants' position is not actually indefiniteness for lack of antecedent basis. Defendants assert indefiniteness even as to claims that have antecedent basis everyone admits is proper (*see* cls. 39, 41, 42; *see also* Entropic Op. Br. at 18). The real argument here is substantive, and Defendants did not make any attempt to engage on that substance.

In opening, Entropic discussed at length the crucial point: the '576 Patent selects a signal ***by*** selecting the channel carrying that signal. (Entropic Op. Br. at 17–21). In the '576 Patent, the two go hand-in-hand. (*See, e.g.*, '576 Patent, 2:54–60, 4:12–13, 6:10–31, 10:27–45, Fig. 16; Ex. 5 to ECF No. 233, Akl Decl., ¶¶ 61–80.) The signals are the contents. The channels are packages that carry the contents. To select/extract the contents, the Patent selects/extracts the packages containing them. Defendants' Opening Brief does not address the details of the specification. Instead, Defendants simply allege that Dr. Steffes (DISH's expert) disagrees with this concept. This cannot possibly overcome the intrinsic record, but it is a moot point. In both his deposition and declaration Dr. Steffes actually agreed with the key substantive point—in the '576 Patent signals are selected by selecting the channels that carry them. (Ex. 7 to Dkt. No. 234, Steffes Tr. at 58:9–17; Ex. 6 to Dkt. No. 234, Steffes Decl., ¶¶ 29–30.)

Thus, in the claims the process of selecting/extracting of transponder "signals" (claims 14–23, 34–42) is the same as the process of selecting/extracting the transponder "channels" that carry those signals. Because the two processes go hand-in-hand, the POSITA is not confused at all that the claims refer to the process in both ways, in terms of signals and channels.

To bolster their arguments, Defendants lean heavily upon the doctrine of antecedent basis, though this is germane only to some of the claims at issue. But even to that subset of claims, legally the antecedent basis challenge reduces to the same substantive question already discussed—whether the disclosure of selecting signals includes the corresponding selection of channels which renders the claims entirely sensible. (*See* Entropic Op. Br. at 18–20 (detailing how the "[s]electing and extracting 'channels' in claim 16 corresponds to selecting and extracting 'signals' in claim 14.").)

To begin, Defendants are wrong that claims lacking antecedent basis are indefinite as a matter of "black letter law." (Defs. Br. at 18.) "[T]he failure to provide explicit antecedent basis for terms does not always render a claim indefinite." *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370 (Fed. Cir. 2006) (quoting MPEP § 2173.05(e) (8th ed. Rev.2, May, 2004)). Claim definiteness is analyzed "not in a vacuum, but always in light of the teachings of the prior art and of the particular application disclosure as it would be interpreted by one possessing the ordinary level of skill in the pertinent art." *In re Moore*, 439 F.2d 1232, 1235 (C.C.A.P. 1971). "The definiteness inquiry focuses on whether those skilled in the art would understand the scope of the claim when the claim is read in light of the rest of the specification." *Union Pac. Res. Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 692 (Fed. Cir. 2001). Although the courts cannot rewrite claims to correct material errors, "the issue here is not correction of error, but understanding of what the claim covers. When the meaning of the claim would reasonably be understood by persons of ordinary skill when read in light of the specification, the claim is not subject to invalidity upon departure from the protocol of 'antecedent basis.'" *Energizer*, 435 F.3d at 1370–71.

The requirement of antecedent basis is a rule of patent drafting, administered during patent examination. The *Manual of Patent Examining Procedure* states that "[o]bviously, however, the failure to provide explicit antecedent basis for terms does not always render a claim indefinite." MPEP § 2173.05(e) (8th ed. Rev.2, May, 2004). In *Slimfold Manufacturing Co. v. Kinkead Industries, Inc.*, the court held that "the

1   missing antecedent clause, the absence of which was not observed by the examiner of

2   the original patent or by Kinkead in its reissue protest documents did not fail to inform

3   the public during the life of the ['274] patent of the limits of the monopoly asserted."

4   810 F.2d 1113, 1117 (Fed. Cir. 1987). The *Slimfold* court held that addition of the

5   missing antecedent basis during reissue was not a substantive change.

6          Therefore the real question is the one Defendants largely avoid: do the claims at

7   issue have a reasonably ascertainable meaning in context? *See, e.g.*, *Bose Corp. v. JBL,*

8   *Inc.*, 274 F.3d 1354, 1359 (Fed. Cir. 2001) ("If the scope of a claim would be reasonably

9   ascertainable by those skilled in the art, then the claim is not indefinite."). A claim that

10  is amenable to construction is not invalid on the ground of indefiniteness. In *Exxon*

11  *Research & Engineering*, the court stated that "if the meaning of the claim is

12  discernible, even though the task may be formidable and the conclusion may be one

13  over which reasonable persons will disagree, we have held the claim sufficiently clear

14  to avoid invalidity on indefiniteness grounds." 265 F.3d 1371, 1375 (Fed. Cir. 2001);

15  *see also Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1353 (Fed. Cir. 2003)

16  (determining whether claim is "amenable to construction"); *Honeywell Int'l, Inc. v. Int'l*

17  *Trade Comm'n*, 341 F.3d 1332, 1338 (Fed. Cir. 2003) (a claim is not indefinite because

18  it is hard to construe). Here, it is apparent that the claim terms would be understood by

19  the POSITA. Selecting and extracting a "channel" (dependent claims at issue) is the

20  same processing that selects/extracts the "signal" (base claim 14) associated with that

21  channel. (Entropic Op. Br. at 18–20.)

22         Finally, as to the claims 39, 41, 42 where all parties agree there is no antecedent

23  basis issue, the Defendants cite to a single Eastern District of Texas decision. (Defs. Br.

24  at 20.) But that case is inapposite[2] because it does not address the core issue—can the

25  POSITA reasonably ascertain what is claimed? Because the answer here is yes for the

26

27  ───────────────────

28  [2]  *CA, Inc. v. Netflix, Inc.*, No. 2:21-cv-80, 2021 WL 5323413 (E.D. Tex. Nov. 16,
    2021) addressed a completely different issue than here—whether a "third system"
    was definite when no "second system" was previously recited. *Id.* at *31–32.

**13**

**PLAINTIFF'S RESPONSE TO DEFENDANTS' JOINT OPENING CLAIM CONSTRUCTION BRIEF**

reasons discussed in Entropic's Opening Brief and above, there can be no finding of indefiniteness.

4.      *"transponder request signals"*

| Claim Term | Entropic's Construction | DISH's Construction |
|---|---|---|
| "transponder request signals" ('576 Patent, cls. 14, 19, 22) | Plain and ordinary meaning. No construction necessary. | "a signal identifying and requesting a particular transponder signal" |

DISH alone proposes that "transponder request signals" should be construed as "a signal identifying and requesting a particular transponder signal." (Defs. Br. at 21.) Notably, both Entropic and DTV believe the term should be given its plain and ordinary meaning. To support its proposal, DISH argues that the term has no common meaning to a POSITA, despite the words "transponder" and "request" and "signal" being quite plain terms in the art. DISH also argues that Entropic's interpretation of the claim "defies any possible 'plain and ordinary meaning' to a POSITA," which is confusing as Entropic's proposal is literally plain and ordinary meaning.

Regardless, the crucial issue remains the one thoroughly discussed by Entropic in its Opening Brief. DISH seeks to import "identifying" into the claim. Nothing DISH has argued overcomes the intrinsic record discussed in Entropic's Opening Brief. (Entropic Op. Br. at 16–17.) Accordingly, for those previously presented reasons, DISH's proposal to narrow the "transponder request signal" to only those which directly identify a transponder is inconsistent with the specification and should be rejected.

5.  *"a transponder request [signal] . . . the transponder request signals" / "from the IRD . . . to the IRDs" / "a plurality of transponder signals . . . the transponder signal"*

| Claim Term | Entropic's Construction | DTV's Construction |
|---|---|---|
| "a transponder request [signal] . . . the transponder request signals"<br><br>"from the IRD . . . to the IRDs"<br><br>"a plurality of transponder signals . . . the transponder signal"<br>('576 Patent, cl. 14) | 1. Is not indefinite.<br>2. Plain and ordinary meaning. No construction necessary. | Indefinite |

DTV alone argues that this set of terms are indefinite because of a purported incongruence between singular and plural references. But as detailed in Entropic's Opening Brief, the context, both of the claim and the specification, provides the clarity DTV asserts is absent. DTV's citation to *Imperium (IP) Holdings, Inc. v. Apple, Inc.*, 920 F. Supp. 2d 747 (E.D. Tex. 2013), is misplaced. (Defs. Br. at 25.) There, the Court was reviewing a claim to a group of pixels that included a red pixel, a blue pixel, and two green pixels. *Imperium*, 920 F. Supp. 2d at 751–52. The claim later described converting the output of the "red pixels," even though the group of pixels include just a single red pixel. *Id.*

Here, the usage of singular and plural is consistently used throughout claim 14 to reflect when the claim refers to something occurring in a particular IRD (singular) versus when the claim refers to ODU functionality that implicates one ***or more*** IRDs (plural). ('576 Patent, cl. 14.) On the one hand, the claim employs the singular noun when referring to the singular IRD. (Entropic Op. Br. at 15.) On the other hand, the

claim employs the plural noun when referring to the ODU functionality as it can be connected to multiple IRDs. (*Id.*) With this context in mind, DTV's indefiniteness position should be rejected. *See KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) (finding singular article may refer to plural forms); *01 Communique Lab'y, Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1297 (Fed. Cir. 2012) (citing *TiVo, Inc. v. EchoStar Commc'ns Corp.*, 516 F.3d 1290, 1303 (Fed. Cir. 2008) ("As a general rule, the words 'a' or 'an' in a patent claim carry the meaning of 'one or more.'")).

### ii.   <u>'715 Patent</u>

#### 6.   *"RF Signals"*

| Claim Term | Entropic's Construction | DISH's Construction |
|---|---|---|
| "RF signals" ('715 Patent, cl. 9) | Plain and ordinary meaning. No construction necessary. | "analog carrier RF signals" |

DISH's attempt to limit the claimed "RF signals" to only ***analog*** carrier RF signals should be rejected because the '715 Patent specification clearly describes signal processing in both the analog domain ***and*** the digital domain. DISH's own expert agrees that the '715 Patent describes signal processing in the digital domain:

> Q.   Figure 17 is an example of tuning and frequency translation and filtering and summing all of the ***digital*** domain?
>
> A.   That is correct.

(Ex. 7 to ECF No. 233, Steffes Tr. at 52:14–17 (emphasis added).)

All the intrinsic evidence is in accord. The claim provides the context: "RF signals" are introduced in the third element, where they are the result of frequency translation. In turn, the specification discloses that frequency translation may be an analog operation, but "[a]lternatively, this can be done by a ***digital*** mixing operation." (Ex. 2 to ECF No. 233, '715 Patent, 5:33–37; *see also id.* at 5:42–49.) In the next (fourth) claim element, "RF signals" undergo combining. For the combining process,

the specification again discloses performance in either analog or "in the **_digital_** domain."
(*Id.* at 5:63–67, 5:67–6:1 (analog example), FIG. 17.) "RF signals" cannot exclude
digital signals on this intrinsic record.

DISH appears to agree that the '715 Patent provides broad disclosure of selecting,
translating, and combining of transponder signals in the digital domain. As DISH
concedes, "[t]his is consistent with the '715 specification, which states that any
combination of these steps **_can be performed in the digital domain_**." (Defs. Br. at 27.)
(emphasis added). Nevertheless, DISH suggests that because the steps need not be
performed digitally, that somehow supports limiting RF signals to analog only. This is
contrary to long-settled claim construction canon, and none of DISH's cited authority
supports the proposition—universally rejected—that it is proper to limit the scope of
claims to a particular embodiment, particularly where, as here, the specification also
discloses an embodiment that DISH seeks to exclude from the scope of the claim. *See
Nobel Biocare Servs. AG v. Instradent USA, Inc.*, 903 F.3d 1365, 1381 (Fed. Cir. 2018),
*as amended* (Sept. 20, 2018) ("There is a strong presumption against a claim
construction that excludes a disclosed embodiment."); *see also SynQor, Inc. v. Artesyn
Techs., Inc.*, 709 F.3d 1365, 1378–79 (Fed. Cir. 2013) ("A claim construction that
'excludes the preferred embodiment is rarely, if ever, correct and would require highly
persuasive evidentiary support.'").

### 7.    *"decodes specific programs"*

| Claim Term | Entropic's Construction | DISH's Construction |
|---|---|---|
| "decodes specific programs" ('715 Patent, cl. 9) | 1. Is not indefinite. 2. Plain and ordinary meaning. No construction necessary. | Indefinite |

DISH (alone) suggests that because "decodes" is broad, "cover[ing] virtually any
signal processing operation," it is somehow indefinite. But a claim term can be both
broad and clear, as is the case with the term "decodes."

Rather than provide any basis from which this Court could conclude "decodes" is indefinite, DISH argues that "specific programs" lacks clarity. But DISH's expert readily conceded that this claim language was clear, undermining any assertion of indefiniteness: "the programs . . . that are decoded by the gateway are the same ones that are distributed over the LAN." (*See* Ex. 7 to ECF No. 233, Steffes Tr. at 95:4–13, 95:21–96:2.) Dr. Steffes also agreed that the specific programs that are decoded "are contained within the composite signal" received by the gateway. (*Id*. at 100:10–19.) This is correct and consistent with the claim structure and the entire disclosure. Nothing in the record approaches providing a clear and convincing basis of indefiniteness.

8. "local area network"

| Claim Term | Entropic's Construction | Defendants' Construction |
| --- | --- | --- |
| "[a digital] local area network" (’715 Patent, cl. 9) | Plain and ordinary meaning. No construction necessary. | "a group of devices at a single site connected by cables that allow a device in the network to interact with any other on the network" |

Defendants seek to limit a well-known term, "local area network," to only wired connections, even though (1) no claim language so limits the network, and (2) wireless local area networks were well-known at the time of the invention.

To support their proposed construction, Defendants primarily rely on the 5th edition Microsoft Computer Dictionary. But that definition actually disagrees with Defendants' position—the definition therein of a LAN is not limited to wired technology. Instead, the definition describes a LAN as connected by a generic "communications link." (Ex. M to ECF No. 234 at 304 (LAN defined as: "[a] group of computers and other devices dispersed over a relatively limited area and ***connected by a communications link*** that enables any device to interact with any other on the network.").) That generic link may, of course, be wired or wireless.

**18**
PLAINTIFF'S RESPONSE TO DEFENDANTS' JOINT OPENING CLAIM CONSTRUCTION BRIEF

Defendants suggest that wireless links (and thus wireless LANs) were not known in the art as of the date of the invention (priority date Nov. 2001). But all evidence is contrary. Defendants' cited dictionary included a definition for the term "wireless LAN," indicting it was quite well-known. (Ex. 11, Microsoft Dictionary, 3rd ed. (1997), 510.) This is unsurprising, as IEEE released the 802.11, 802.11a and 802.11b versions of the Wi-Fi networking standards in 1999, several years before the priority date. (Ex. 8 to ECF No. 233 at 8 (listing previously approved versions of IEEE 802.11, 802.11a, and 802.11b).) Moreover, Apple (and many other vendors) sold computers and base stations using IEEE's Wi-Fi standards as early as 1999. (*See, e.g.*, Ex. 12, AirPort Card Manual at 8, 12 (stating that Apple's AirPort Card was 802.11 compliant in 1999).) Finally, Defendants' only expert conceded at his deposition that wireless LAN technology was a known technology in 2001:

> Q.     Do you agree that [wireless] was a known LAN technology in 2001?
>
> A.     It was a known technology for LANs at extremely low rates.

(Ex. 7 to ECF No. 233, Steffes Tr. at 113:3–13.) A LAN was thus well-understood as including wireless LANs as of the 2001 priority date of the '715 Patent.

As for whether "local area network" should be limited to a group of devices "at a single site," Defendants offer zero support for incorporating this limitation into the claims and so it should be rejected. It is improper as detailed in Entropic's Opening Brief. (Entropic Op. Br. at 22–23.) Because the disclosure of the '715 Patent is consistent with the plain and ordinary meaning of "local area network," no construction is necessary.

### iii.   '008 Patent

9.   *"an entire television spectrum"*

| Claim Term | Entropic's Construction | Defendants' Construction |
|---|---|---|
| "an entire television spectrum" ('008 Patent, cl. 1) | Plain and ordinary meaning. No construction necessary. | "all of the one or more television signals received by a front-end" |

As with term 1, located in the '576 Patent, this term is the second instance of Defendants adding at the end of their construction a proviso in an attempt to limit the nature of signals being digitized. Here, the phrase "received by a front end" is problematic in the same way that "received at the ODU" was problematic for term 1. The dangers of adopting Defendants' construction here parallel those discussed for term 1. (*See supra* at II.B.i.1.)

In opening briefing, Defendants skip past the intrinsic evidence, erroneously beginning their analysis with Entropic's infringement contentions with respect to *different patents*. (Defs. Br. at 39–40.) While Defendants complain that Entropic is relying on the same functionality to satisfy this claim term as it does for other asserted claims of the '576 and '715 Patents (Defs. Br. at 40), Defendants provide this Court with no legal basis upon which to find the term indefinite for this reason. The law is clear that "claims may not be construed with reference to the accused device." *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1330 (Fed. Cir. 2006).

Turning to the intrinsic record of the actual patent at issue, Entropic fully analyzed the record in its Opening Brief. (*See* Entropic Op. Br. at 30–34.) As detailed there, the specification of the '008 Patent fully aligns with the plain meaning of this term.[3] The error is the same one that infects term 1—Defendants attempt to limit the

---

[3] Defendants allege Dr. Akl "equates this term with distinct terms in other asserted claims and was unwilling to explain further at his deposition" (Defs. Br. at 40), while ignoring that Dr. Akl was never asked to opine upon this term, and did not do so in his Rebuttal Expert Declaration. (*See* Ex. 5 to ECF No. 233 (opining on only "a source of said received signal" from the '008 Patent); *see also* Ex. I to Dkt No. 234 at 219:4–7.)

term to its condition when entering "a front-end." But because processing takes place between the time the signal enters the front-end and the time it reaches the disclosed digitizer, this construction cannot be correct. ('008 Patent, 5:50–52; *see also* Entropic Op. Br. at 32 (describing the front-end components).)

Therefore this claim term presents all the same issues as term 1. There is a dispute insofar as Defendants' proviso "received by a front-end" is intended to exclude signals that ultimately are the signals received by the front-end, but processed on their way to the digitizer. For this reason, as well as those stated in Entropic's Opening Brief, the plain claim term should not be abandoned in favor of the Defendants' proposed construction that invites arguments that are directly inconsistent with the functioning of the invention.

> 10.    *signal having a bandwidth that spans from a first frequency, $F_{lo}$, to a second frequency, $F_{hi}$"*

| Claim Term | Entropic's Construction | DISH's Construction |
|---|---|---|
| "signal having a bandwidth that spans from a first frequency, $F_{lo}$, to a second frequency, $F_{hi}$" ('008 Patent, cls. 3, 11) | Plain and ordinary meaning. No construction necessary. | "Plain and ordinary meaning, which is a signal that includes all continuous frequencies from $F_{lo}$ to $F_{hi}$" |

All parties agree that this claim term has a plain and ordinary meaning. DISH, however, goes further. In its Opening Brief, Entropic noted that it could not elucidate what DISH intended with its construction of a term it admits has a plain meaning, and would respond if matters became clear from DISH's Opening Brief. (*See* Entropic Op. Br. at 35) There, DISH represented its construction is meant to "simplif[y] the issue for a potential jury." (Defs. Br. at 42.) It appears, however, this simplification would be achieved because DISH means to deprive the jury of any issue at all, by converting an argument about ***facts***—does a particular accused signal span a bandwidth or not—into a legal question of definitions at *Markman*. In reality DISH's unnecessary construction

**PLAINTIFF'S RESPONSE TO DEFENDANTS' JOINT OPENING CLAIM CONSTRUCTION BRIEF**

1    of the plain and ordinary meaning contains two errors of which the Court should be
2    wary.

3           Before turning to the errors, we begin with the words of the claim and
4    specification. The term at issue is a "signal having a bandwidth…" The bandwidth is an
5    area of frequency with endpoints at $F_{lo}$ and $F_{hi}$—a frequency location that the signal
6    makes home. As the '008 Patent says, "[t]he signal S may occupy a frequency band
7    from $F_{lo}$ to $F_{hi}$." ('008 Patent, 3:15–16.) This signal, in turn, may be divided into many
8    different channels or bands. For example, the signal may comprise satellite-sourced
9    television channels (*id*. at 4:16–19), cable television and/or DOCSIS channels (*id*. at
10   3:12–15, 3:25–28) or even MoCA networking channels (*id*. at 4:12–14). Numerically,
11   for television channels, an example band in a cable deployment might range from
12   55-1002 MHz (*id*. at 4:11–12), containing numerous channels each 6 MHz in size (*id*.
13   at 3:26–28); for MoCA the signal might range between "≈1150 MHz" and
14   "≈2100MHz" (*id*. at 4:12–14). There are a few technological items of note with such
15   channelized signals: (1) not all channels of the band are necessarily used; and (2) such
16   collections of channels are commonly supplied with guard bands where no signal is
17   placed, to prevent interference. (*See e.g.*, Ex. 13, Newton's Telecom Dictionary (2000)
18   at 389 (Guard band defined as: "A narrow bandwidth between adjacent channels which
19   serves to reduce interference between those adjacent channels"); '576 Patent, 1:49–52,
20   cited here solely as representing well-known technological background, ("The 500
21   MHz signal is typically comprised of 16 transponder signals of 24 MHz bandwidth each
22   with a guard band in between each transponder signal."), 10:39–41 ("Suitable guard
23   bands need to be provided to prevent interference, for example 3 transponder channels
24   at 31.25 MHz spacing uses 93.75 MHz.").) To summarize, a channelized signal is not
25   a monolithic item. Because it contains many channels which may sometimes be unused
26   and/or spaced apart with unfilled guard space, the signal may be punctuated with unused
27   frequencies. This is the nature of the various signal types disclosed as suitable for
28   monitoring by the '008 Patent.

With this background in mind, DISH's construction is—depending on how DISH interprets its own interpretation—erroneous in two ways. *First*, DISH may be seeking to disqualify any signal spanning a bandwidth if each and every frequency inside that band is not used. But in channelized signals unused channels or guard bands are common. A signal can span a bandwidth without filling every frequency. This is a typical use of the word "span"—the bison of the Great Plains once spanned from Montana to Texas, but they did not stand upon every linear inch. In the '008 Patent's context, whatever signal meets the claim element must at least start at a frequency $F_{lo}$ and end at a frequency $F_{hi}$. But the signal does not need to fill every frequency inside the band as DISH proposes.

*Second*, DISH may be seeking to exclude a signal occupying $F_{lo}$ to $F_{hi}$ if another signal also resides in some of the same frequency range. This too would be improper because it inverts and changes the claim language. The claim requires the signal span a bandwidth, not the inverse, that the bandwidth is exclusive to a signal.

Because DISH's construction is inconsistent with the specification and the various embodiments disclosed therein, it should be rejected. *See Nobel Biocare Servs.*, 903 F.3d at 1381; *see also SynQor*, 709 F.3d at 1378–79. It may turn out that in the crucible of the *Markman* hearing DISH will retreat and say that its construction is not intended to improperly restrict the claim as argued above. However, reinterpreting language that is plain on its face—that Entropic and DTV believe needs no construction—runs the risk of an erroneous construction. This exercise should be avoided and the plain meaning adopted as the Court's official construction instead.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' JOINT OPENING CLAIM CONSTRUCTION BRIEF**

11.   *"a source of said received signal"*

| Claim Term | Entropic's Construction | DISH's Construction |
|---|---|---|
| "a source of said received signal" ('008 Patent, cls. 1, 3, 11) | Plain and ordinary meaning. No construction necessary. | "the equipment, e.g., a cable headend or satellite transmitter, that transmitted the received signal" |

Turning to the final term, DISH again is alone in proposing a construction for "a source of said received signal," while both Entropic and DTV agree that no construction of this term is necessary. Entropic in its Opening Brief discussed in depth the reasons DISH's construction should be rejected. (Entropic Op. Br. at 35–37.) The claim is not limited to reporting monitoring data solely to the same piece of equipment that sent the signal. Defendants' opening brief makes no substantive arguments that have not already been addressed. Because DISH's proposed construction of "a source of said received signal" is contrary to the plain and ordinary meaning of the phrase, and would exclude embodiments illustrated and disclosed in the '008 Patent, DISH's construction should not be adopted. *See Nobel Biocare Servs.*, 903 F.3d at 1381; *see also SynQor*, 709 F.3d at 1378–79.

## III.   <u>CONCLUSION</u>

Therefore, the plain and ordinary meaning should be adopted for all terms that Defendants propose for construction.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' JOINT OPENING CLAIM CONSTRUCTION BRIEF**

Dated: June 9, 2023

By: */s/ Christina N. Goodrich*
Christina N. Goodrich (SBN 261722)
Connor J. Meggs (SBN 336159)
**K&L GATES LLP**
10100 Santa Monica Blvd., 8th Fl.
Los Angeles, CA 90067
Tel: (310) 552-5547
Fax: (310) 552-5001
christina.goodrich@klgates.com
connor.meggs@klgates.com

James Shimota
(admitted *pro hac vice*)
Jason Engel
(admitted *pro hac vice*)
George Summerfield
(*admitted *pro hac vice*)
Katherine L. Allor
(admitted *pro hac vice*)
**K&L GATES LLP**
70 W. Madison Street, Suite 3300
Chicago, IL 60602
Tel.: (312) 372-1121
Fax: (312) 827-8000
jim.shimota@klgates.com
jason.engel@klgates.com
george.summerfield@klgates.com
katy.allor@klgates.com

Nicholas F. Lenning
(admitted *pro hac vice*)
**K&L GATES LLP**
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
(206) 623-7580
(206) 370-6006 (fax)
nicholas.lenning@klgates.com

**PLAINTIFF'S RESPONSE TO DEFENDANTS' JOINT OPENING CLAIM CONSTRUCTION BRIEF**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Darlene F. Ghavimi (admitted *pro hac vice*)
Matthew Blair (admitted *pro hac vice*)
**K&L GATES LLP**
2801 Via Fortuna, Suite #650
Austin, TX 78746
(512) 482-6919
(512) 482-6859
Darlene.ghavimi@klgates.com
Matthew.blair@klgates.com

**ATTORNEYS FOR PLAINTIFF
ENTROPIC COMMUNICATIONS,
LLC**

**PLAINTIFF'S RESPONSE TO DEFENDANTS' JOINT OPENING CLAIM CONSTRUCTION BRIEF**