# EXHIBIT 10

## Page 1

1         IN THE UNITED STATES DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF CALIFORNIA
2                  SOUTHERN DIVISION
3  ENTROPIC COMMUNICATIONS,   )
   LLC.,                      )
4    Plaintiff,               )
                              )  CA NO.
5  VS.                        )  2:22-cv-07775-JWH-JEM
                              )
6  DIRECTV, LLC and AT&T      )
   SERVICES, INC.,            )
7   Defendants                )
   _____)
8  ENTROPIC COMMUNICATIONS,   )
   LLC.,                      )
9    Plaintiff,               )
                              )  CA NO.
10 VS.                        )  2:22-cv-07959-JWH-JEM
                              )
11 DISH NETWORK CORPORATION,  )
   DISH NETWORK L.L.C. and    )
12 DISH NETWORK SERVICE L.L.C.)
    Defendants.               )
13 ****************************************
14      ORAL, VIDEOTAPED, TELEPHONIC, AND
15         REAL-TIME DEPOSITION OF
16             ROBERT AKL, D.SC.
17               APRIL 20, 2023
18 ****************************************
        ORAL, VIDEOTAPED, TELEPHONIC, AND
19 REAL-TIME DEPOSITION OF ROBERT AKL, D.SC., produced
   as a witness at the instance of the Defendants DISH
20 Network Corporation, DISH Network L.L.C., and Dish
   Network Service L.L.C., and duly sworn by me, was
21 taken in the above-styled and numbered cause on
   APRIL 20, 2023, from 8:56 a.m. to 5:00 p.m., before
22 DIANA BENGS, CSR, RPR, TCRR, CRR, Texas
   Certification No. 4907, in and for the State of
23 Texas, reported by machine shorthand, at the
   offices of Perkins Coie, LLP, 500 North Akard,
24 Dallas, Texas, pursuant to the Federal Rules of
   Civil Procedure and provisions stated on the record.
25

## Page 2

1              A P P E A R A N C E S
2
3  FOR THE PLAINTIFFS:
4    KATHERINE L. ALLOR (Real-time Connection)
        - AND -
5    JASON ENGEL (Telephonic and Real-time Connection)
     K&L Gates
6    70 West Madison Street, Suite 3100
     Chicago, Illinois 60602
7    312.372.1121 (Office)
     katy.allor@klgates.com
8
9
   FOR THE DEFENDANTS DISH NETWORK CORPORATION, DISH
10 NETWORK L.L.C., AND DISH NETWORK SERVICE L.L.C.:
11   ADAM HESTER (Real-time Connection)
     Perkins Coie, LLP
12   33 East Main Street, Suite 201
     Madison, Wisconsin 53703
13   650.838.4311 (Office)
     AHester@perkinscoie.com
14
15 VIDEOGRAPHER:
     KIM BENGS
16
17
18
19
20
21
22
23
24
25

## Page 3

1                      INDEX
2                                           PAGE
3  Appearances                               2
4
5  ROBERT AKL, D.SC.
6  EXAMINATION BY MR. HESTER                  6
7
8  CHANGES AND SIGNATURE                     254
9
10 REPORTER'S CERTIFICATION                  256
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1                    EXHIBITS
2  NO. DESCRIPTION                           PAGE
3
4  1   DISH Defendants' Notice of Deposition of   10
5      Dr. Robert Akl
6  2   Rebuttal Expert Declaration of Dr. Robert  11
7      Akl, D.SC., Regarding Claim Construction
8  3   United States Patent No. 7,130,576 B1,     22
9      Date of Patent:  October 31, 2006
10 4   United States Patent No. 8,792,008 B2,    176
11     Date of Patent:  July 29, 2014
12 5   United States Patent No. 7,542,715 B1,    245
13     Date of Patent:  June 2, 2009
14 6   Expert Declaration of Dr. Paul G. Steffes  247
15     Regarding Claim Construction
16
17
18
19
20
21
22
23
24
25



Page 5

1    P R O C E E D I N G S
2         THE REPORTER:  I am Diana Bengs, Texas
3    Certified Shorthand Reporter, CSR No. 4907, here
4    for the court reporting firm Esquire Deposition
5    Solutions, 1700 Pacific Avenue, Suite 1000, Dallas,
6    Texas 75201.
7         Today's date is April 20, 2023.  The
8    time is 8:56 a.m.  We are in the offices of Perkins
9    Coie, LLP, 500 North Akard, Dallas, Texas.  This is
10   the deposition of Robert Akl in the matter of
11   Entropic Communications, LLP, Plaintiff, versus
12   DirecTV, LLC, and AT&T Services, Inc., Defendants,
13   and Entropic Communications, LLC, Plaintiff, VS
14   Dish Network Corporation, Dish Network, LLC and
15   Dish Network Service, LLC, Defendants, in the
16   United States District Court for the Central
17   District of California, Southern Division, Civil
18   Action Nos. 2:22-cv-07775-JWH-JEM and
19   2:22-cv-07959 [sic].
20        THE VIDEOGRAPHER:  Good morning,
21   everyone.  My name is Kim Bengs.  I'm your
22   videographer today.  Diana and I are here
23   representing Esquire Deposition Solutions.
24        Will counsel please state your
25   appearances and whom you represent, after which the

Page 6

1    court reporter will swear in the witness.
2         MR. HESTER:  Adam Hester, Perkins
3    Coie, counsel for the DISH defendants.
4         MS. ALLOR:  I am Katherine Allor on
5    behalf of Entropic Communications, LLC, with me is
6    Jason Engel; and I represent also the witness,
7    Dr. Robert Akl.
8         ROBERT AKL, D.SC.,
9    having been first duly sworn/affirmed, testified as
10   follows:
11        EXAMINATION
12   BY MR. HESTER:
13   Q.  Good morning, Dr. Akl.
14   A.  Good morning.
15   Q.  I introduced myself off the record; but on
16   the record, I'm Adam Hester; and it is nice to meet
17   you.
18   A.  Nice to meet you, too.
19   Q.  Please state your name for the record,
20   spelling your last name.
21   A.  Robert Akl, A-k-l.
22   Q.  What is your current business address?
23   A.  University of North Texas in Denton,
24   Texas.
25   Q.  Do you -- you have an office on campus?

Page 7

1    A.  Yes.
2    Q.  Okay.  And is the University of North
3    Texas where you are currently employed?
4    A.  Yes.
5    Q.  Do you have any other employment
6    relationships?
7    A.  No.
8    Q.  How long have you been employed at the
9    University of North Texas?
10   A.  This is my 20th year.
11   Q.  And what is your current title at the
12   University of North Texas?
13   A.  Professor, computer science in
14   engineering.
15   Q.  Are you here today in your capacity as a
16   professor of science in computer engineering at the
17   University of North Texas?
18   A.  Yes, although I'm not representing the
19   university.
20   Q.  So I guess more accurately, you are here
21   today as a -- as a consultant on behalf of
22   plaintiff, Entropic.  Is that maybe more accurate?
23   A.  I have been retained by counsel for
24   plaintiff.
25   Q.  And your retention is not through any

Page 8

1    consulting agency.  It is just you personally; is
2    that right?
3    A.  That is correct.
4    Q.  I think you've been deposed before, but I
5    figure I might as well ask.  Have you?
6    A.  Yes.
7    Q.  About how many times?
8    A.  Over 100 times.
9    Q.  Okay.  How recent was your last
10   deposition?
11   A.  Two days ago.
12   Q.  Well, then I won't belabor the rules; but
13   I will go over a few that matter to me.  I'm going
14   to do my best to ask clear questions, but I'm going
15   to mess up probably several times over the course
16   of the day.  So if you don't understand, please let
17   me know; otherwise, I'll assume you understand.  Is
18   that fair?
19   A.  Yes.
20   Q.  And if you need to take a break, let me
21   know.  I like hourly breaks; but if we need to go
22   shorter for any reason, just tell me; and we'll do
23   it, as long as you finish the pending question.  Is
24   that fair?
25   A.  Yes.



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
9–12

Page 9

1    Q.  Is there any reason you cannot give
2  complete and truthful answers today?
3    A.  No.
4    Q.  I see you have your computer open in front
5  of you right now.  What's on the screen of your
6  computer?
7    A.  Currently there is only one program open.
8  It is a PDF viewer, and there is only three files
9  open in that viewer.
10    Q.  What are those three files?
11    A.  U.S. Patent 7,130,576, which we can refer
12  to as the '576; U.S. Patent 9,8- -- sorry -- U.S.
13  Patent 8,792,008, which we can refer to as the '008
14  patent; and my rebuttal expert declaration.
15    Q.  And the copies that are -- are those three
16  files the same that I reviewed before the
17  deposition started?
18    A.  Yes.
19    Q.  Is your laptop connected to the Internet?
20    A.  Yes.
21    Q.  Do you need to have your laptop connected
22  to the Internet for today's deposition?
23    A.  Just so that my e-mail updates throughout
24  the day.
25    Q.  Okay.  You are not going to be reviewing

Page 10

1  e-mail, though, while we're on the record; right?
2    A.  No, but I probably will during breaks.
3    Q.  Okay.  Do you have any problem with
4  turning your Internet off while we're on the record
5  and turning it back on during breaks?
6    A.  It probably might just slow Outlook so
7  that Outlook refreshes in the background.
8    Q.  Okay.  So you would like to keep the
9  Internet on during your deposition?
10    A.  Yeah.  I don't see any harm in doing that.
11    Q.  Let's mark as Exhibit 1 a copy of the
12  deposition notice.
13        (Exhibit No. 1 was marked.)
14        THE REPORTER:  Would you like me to
15  hand this to the witness?
16        MR. HESTER:  Yes, please.  Thank you
17  for asking.
18    Q.  (BY MR. HESTER)  Dr. Akl, have you seen
19  this document before?
20    A.  Yes.
21    Q.  What is this document?
22    A.  My understanding, it is a deposition
23  notice for the deposition that we are doing today.
24    Q.  And you understand that you are here today
25  pursuant to this notice of deposition?

Page 11

1    A.  Yes.
2    Q.  Set it aside.
3        Mark for the record Exhibit 2, a copy
4  of the rebuttal expert declaration.
5        (Exhibit No. 2 was marked.)
6    Q.  (BY MR. HESTER)  Take a second to review
7  it, Dr. Akl; and let me know if this is a true and
8  correct copy of your rebuttal declaration dated
9  April 7, 2023.
10    A.  (Reviewing document.)  Yes, it is.
11    Q.  Is that your signature on page 41 of the
12  rebuttal declaration?
13    A.  Yes.
14    Q.  And I know you've got a digital copy, so
15  feel free to use the digital copy; but I wanted to
16  mark that for the record.
17        Have you reviewed your rebuttal
18  declaration in preparation for today's deposition?
19    A.  Yes.
20    Q.  Is there anything you believe needs to be
21  changed based on that review?
22    A.  There is one typo, and I forgot what
23  paragraph it is.  But there is one place where I
24  say "a an," and this should be one of them.  Let me
25  see if I can find it.

Page 12

1        I can -- I mean, I can try to find it
2  later; but there is only one single, small typo
3  that does not change my opinions.
4    Q.  No other corrections to make the basis on
5  your review in preparation for today's deposition?
6    A.  Correct.
7    Q.  Are you searching for something right now?
8    A.  Yeah.  I was trying to search for the "a
9  an" but --
10    Q.  Okay.
11        MS. ALLOR:  I believe it is in
12  paragraph 41.
13    Q.  (BY MR. HESTER)  Well, we might as well
14  confirm that.  Dr. Akl, do you want to go to
15  paragraph 41?
16    A.  Yes.  Let's go to paragraph 41.
17        (Reviewing document.)  Yes, line 12 in
18  paragraph 41 says "from a an outdoor unit."  That's
19  the only typo that I saw when I reviewed my
20  declaration.
21    Q.  Okay.  When did you first start preparing
22  your rebuttal declaration?
23    A.  Probably a month before it was due.
24    Q.  What information did you consider in
25  preparing your rebuttal declaration?



Page 13

1    A.   I looked at the patents that I was
2  providing opinions on, so the '576 and the '008
3  patent; and I also -- once I received it, I also
4  looked at and reviewed defendants' expert
5  declaration.
6    Q.   Anything else?
7    A.   The file histories, but they weren't as --
8  I did not necessarily cite anything from the file
9  histories, but I had those also available to me.
10    Q.   Anything else?
11    A.   In paragraph 21, I provide a list of
12  materials that I reviewed, which I think we have
13  covered.
14    Q.   When were you retained by plaintiff for
15  the purposes of this case?
16    A.   Early 2022, so -- I think January 2022,
17  sometime around there.
18    Q.   Between the time you were retained in
19  early January 2022 and the time you wrote this
20  declaration, did you review any DISH confidential
21  information?
22    A.   I don't recall.
23    Q.   And I can maybe be more specific.
24         Did you review any documents DISH
25  produced in this litigation that were marked as

Page 14

1  confidential of some kind?
2    A.   I don't recall.
3    Q.   Who authored your rebuttal declaration?
4    A.   I did, in collaboration with counsel.
5    Q.   Who authored the first draft of your
6  rebuttal declaration?
7    A.   I did.
8    Q.   How many hours did you spend drafting the
9  rebuttal declaration?
10    A.   I don't remember exactly.
11    Q.   More than 10?
12    A.   Probably.
13    Q.   More than 20?
14    A.   That would be a good ballpark number.
15    Q.   How many hours did you spend reviewing
16  documents that you mentioned you reviewed as part
17  of preparing your declaration?
18    A.   I don't know exactly; but some
19  documents -- except for the declaration of
20  defendants' expert, like the patents and the file
21  histories, those were reviewed when I was retained
22  at different points in time.
23    Q.   Did you rereview those documents before
24  preparing your declaration or contemporaneous with
25  the preparation?

Page 15

1    A.   Yes.  There are citations, so I went back
2  and looked at the specification to provide
3  citations.
4    Q.   What did you do to prepare for this
5  deposition?
6    A.   I -- over the weekend, I reviewed my
7  declaration.  I reviewed the '576 and the '008
8  patent, and I reviewed the citations that I have in
9  my declaration, and I had a call with counsel
10  yesterday.
11    Q.   You say "counsel."  Are you referring to
12  Ms. Allor or anybody else?
13    A.   There was more than one person on the call
14  from counsel for plaintiffs.
15    Q.   Do you remember who those people are?
16    A.   I don't remember all the names.
17    Q.   Okay.  Which names do you remember?
18    A.   Katie, Liz, Jason, Sam.  I don't remember
19  last names.
20    Q.   And when did you say this call took place?
21    A.   Yesterday.
22    Q.   And how long was the call, approximately?
23    A.   It was under three hours.
24    Q.   In preparing for this deposition, did you
25  meet with any employee of Entropic Communications,

Page 16

1  LLC?
2    A.   No.
3    Q.   In preparing for today's deposition, did
4  you meet with any employee of Fortress Investment
5  Group?
6         MS. ALLOR:  Objection, irrelevant.
7    A.   No.
8    Q.   (BY MR. HESTER)  In preparing for today's
9  deposition, did you meet with any employee of
10  MaxLinear, Inc.?
11         MS. ALLOR:  Objection, form.
12    A.   No.
13    Q.   (BY MR. HESTER)  Your declaration offers
14  opinions regarding the '576 patent; is that
15  correct?
16    A.   Yes, limited opinions regarding one claim
17  term in the '576.
18    Q.   But it is fair to say you've also provided
19  a background of the '576 patent specification;
20  right?
21    A.   Yes.
22    Q.   And your declaration also offers opinions
23  regarding the '008 patent; is that correct?
24    A.   Yes.  There is an overview of the patent,
25  and I discuss only a single term.



Page 17

1    Q.   In preparing for today's deposition, did
2    you review the transcript of the deposition of
3    Dr. Paul Steffes?
4    A.   Bits and pieces.
5    Q.   Okay.  How long did you spend reviewing
6    Dr. Steffes' deposition transcript?
7    A.   Under an hour.
8    Q.   If I could have you turn to Section 2 of
9    your declaration.  I think it starts on page 4.
10   Let me know when you are there.
11   A.   I am there.
12   Q.   Does this section describe your education
13   and work experience that you believe relevant to
14   your opinions in the declaration?
15   A.   Yes.  It's -- I mean, I didn't modify it
16   other than it's the same background and
17   qualifications that I use in all my declarations.
18   So I did not specifically tailor it for this
19   declaration, but I think it is a good overview of
20   my background and qualifications.  I just regularly
21   update it, you know, over the years; but it is the
22   same discussion that I've -- that I have in -- in
23   this and in other expert reports and declarations.
24   Q.   What experience in Section 2 of your
25   declaration related to satellite communication

Page 18

1    systems?
2    A.   So I am a professor.  I've been a
3    professor for 20 years, and I teach courses that
4    cover satellite communication systems.  And we can
5    go to my CV, which is at the end of my declaration;
6    and I can give you examples of courses that would
7    be -- that cover materials related to satellite
8    communication, if you want.
9    Q.   We'll get there, I promise.
10        In the meanwhile, do you discuss the
11   courses you taught in satellite communications in
12   your background and qualifications section?
13   A.   Yes.  So courses that I teach -- I provide
14   in paragraph 12 an overview of courses that I
15   taught.  Those would include networking,
16   telecommunications, antenna design, beam forming,
17   GPS, channel coding, channel estimation, packet
18   networks, wireless communication.  So I provide a
19   list of courses and -- that I taught and research
20   that I've done in those areas.
21        I also do so again in paragraph 17.  I
22   do say that I've taught over 100 courses related to
23   the field of communications and computer systems
24   and several courses on signals and systems,
25   wireless communication, antenna design and beam

Page 19

1    forming, channel estimation.
2        And so -- and I do add that some
3    courses are introductory courses on communication
4    networks and signals and systems and some are more
5    advanced courses on wireless communication.
6        So those courses that I include here
7    and that I've taught -- and I provide a complete
8    list in my CV -- a huge number of them relate to
9    satellite communication.
10   Q.   Which ones specifically relate to
11   satellite communication?
12   A.   So courses on wireless communication,
13   courses on signals and systems.  So I'm going down
14   to my CV, starting with spring 2023 communication
15   systems, signals and systems in fall '22, and then
16   those courses I've taught multiple times.  So you
17   see I've also taught communication systems, signals
18   and systems multiple times.
19        In addition, we have courses like
20   wireless communication, intro to wireless
21   communication, advanced topics in wireless
22   communication.  Those all include -- all would
23   relate to satellite communication.
24   Q.   So they would relate to satellite
25   communication.  In each of the classes you

Page 20

1    mentioned, do you teach your students about
2    satellite communication specifically?
3    A.   Yes.  We discuss wireless communication,
4    and we discuss satellite communication in some
5    aspect.
6    Q.   What do you mean "in some aspect"?
7    A.   So in some courses, we go into more
8    details on the type of satellites, the height of
9    the satellites; and in other courses -- we build on
10   some of the material in other courses.  We don't
11   repeat the same information in different courses.
12   But we do cover other aspects of communicating with
13   the satellite, receiving communication from a
14   satellite, the type of coding, decoding that you
15   would need.
16        So the courses -- students take
17   multiple courses, and the material builds on each
18   other.  So some courses we talk specifically about
19   the different types of satellites, and some courses
20   we talk about the communication to and from
21   satellites.
22   Q.   So is there a reason why you don't
23   reference specifically satellite communications in
24   your section background and qualifications?
25   A.   It is not an exhaustive list, like I said;



Page 21

1  and I do indirectly.  So it's -- it's -- when I
2  talk about wireless communication, it encompasses
3  different types of wireless communication; and
4  satellites is -- is -- would be part of wireless
5  communication.
6        Like I said, I don't -- I don't
7  necessarily change -- my background and
8  qualification section, I kind of -- it's -- I don't
9  necessarily modify or tailor it, other than I think
10  it is a good overview.  And then if there is any
11  questions, I mean, that's why I'm here, is to
12  answer questions related to my background and
13  qualifications.
14        But it would be included -- so, for
15  example, when I discuss GPS -- I mean, satellites
16  are part of a GPS communication.  So when we talk
17  about antenna design, that includes some
18  satellites.  So there are more general terms and
19  narrower terms that do encompass satellites in my
20  background and qualifications section.
21    Q.  You would agree with me that the subject
22  matter of the patents today -- subject matter of
23  the -- let's start with the '576 patent.  The
24  subject matter of the '576 patent is satellite
25  communications?

Page 22

1    A.  I am pulling up the '576 patent.  I don't
2  know if you want to mark it as an exhibit.
3    Q.  I will take my time to get there, but
4  let's -- let's do that.  Let's mark as Exhibit 3 a
5  copy of the '576 patent.
6        (Exhibit No. 3 was marked.)
7        THE WITNESS:  Thank you.
8    Q.  (BY MR. HESTER)  Before we return to the
9  last question, Dr. Akl, is that a true and correct
10  copy of the '576 patent that you reviewed?
11    A.  (Reviewing document.)  Yes.
12    Q.  Put that down and work off your digital
13  copy now.
14        Returning to the question, is it fair
15  to say that the subject matter of the '576 patent
16  is satellite communications?
17    A.  Looking at Column 1 and looking at the
18  first paragraph under background, the patent itself
19  says, (Reading:)  Referring to Figure 1, we have a
20  satellite receiver outdoor unit, which typically
21  comprises dish antenna, one or more antenna feed
22  horns, one or more low noise amplifier and block
23  down converters, and an optional multiport cross
24  point switch...
25        And then it goes on to describe.

Page 23

1        So I would say Figure 1 provides a
2  good -- along with Figure 2, because Figure 1 is
3  prior art.  Figure 2 provides a good overview of
4  the technology that's relevant to the '576 patent.
5    Q.  And would you agree that the technology
6  relevant to the '576 patent is satellite
7  communications?
8    A.  I would agree that's part of it.  I
9  wouldn't say that's the only technology.
10    Q.  What other technologies?
11    A.  I'm sorry.  You spoke over me.  I
12  wasn't --
13    Q.  What other technologies?
14    A.  So like I was stating before, so looking
15  at the relevant technology, I would say looking,
16  for example, at Figure 2, Column 3, Column 3
17  states -- for Figure 2, lines 49 and 50, Figure 2
18  shows a satellite TV installation according to the
19  present invention.  And it goes on to say, "Figure
20  3 shows a block diagram of selector and combiner
21  according to the present invention."
22        And Figure 4 shows a diagram of
23  frequency spectrum.  So I think all of those fall
24  under what the technology in the patent -- or
25  related technology for the patent.

Page 24

1    Q.  Other than the overview of the coursework
2  that -- or the subject matter of the coursework in
3  your role as professor, what other experience
4  described in Section 2 of your declaration relates
5  to satellite communication systems?
6    A.  So my coursework and my research both
7  would fall under that, which is my academic work at
8  UNT.  Additionally I have handled -- I do refer to
9  other litigation experiences that I've done, and a
10  list of them is in my CV.
11        I have handled cases in the past that
12  also relate to satellite communication.  We can go
13  through those if you want.
14    Q.  Let's start -- let's keep here.  We'll go
15  to your CV soon, I promise.
16        So you're a professor -- strike that.
17        The experience described in Section 2
18  of your declaration that relates to satellite
19  communication systems is your teaching and research
20  and your work in prior cases.  Is there anything
21  else?
22    A.  Yes.  I mean, we would start with my
23  education.  The first thing that I describe is my
24  education.  I have a bachelor's in computer
25  science, I have a bachelor's in electrical



Page 25

1 engineering, I have a master's in electrical
2 engineering, and I have a doctorate in electrical
3 engineering.
4        And so starting by the education that
5 I have, that also relates to satellite
6 communication because I took courses on satellite
7 communication as part of my academic work.
8        And later I provide the qualifications
9 of a person of ordinary skill in the art, and so
10 the degrees -- or the degree that would be required
11 for a person of ordinary skill in the art, I have
12 those degrees and more.
13    Q.   What courses did you take regarding
14 satellites in your academic career?
15    A.   The -- similar courses to the ones I'm
16 teaching now, so courses on antenna design, courses
17 on wireless communication, courses on signals and
18 systems.
19        Those courses that I teach now, I took
20 those courses as a student; and those courses cover
21 wireless communication -- I'm sorry -- cover
22 satellite communication.
23    Q.   Is that -- is it maybe fair to say they
24 cover wireless communications, part of which
25 includes satellite communications?

Page 26

1    A.   I wouldn't characterize it that way.
2 Sometimes -- definitely satellite communication is
3 part of wireless communication, but there are
4 courses on telecommunications in general that I --
5 that also cover aspects of like coding and decoding
6 that is used in satellite communication, but it's
7 not limited to wireless communication.
8        So because of that, I wouldn't
9 limit -- definitely wireless communication is a --
10 is a part of satellite communication, but
11 telecommunications in general in coding -- in
12 coding the signal, decoding the signal.
13        So there is other aspects of getting a
14 signal ready for satellite -- for communication
15 over a satellite that would also apply whether it
16 is wireless or not.
17    Q.   Did any of classes you took as a student,
18 were they devoted solely to satellite communications?
19    A.   I don't recall if a class had the title
20 satellite communication or is devoted only to
21 satellite communication.  But there are definitely
22 at least multiple chapters in courses that would be
23 related to satellite communications.  So there
24 would be at least a chapter specifically on
25 satellite communication, but it wouldn't be the

Page 27

1 title of the course.
2    Q.   Do any of the classes that you teach now
3 as a professor or have taught as a professor, are
4 they solely devoted to satellite communications?
5    A.   No.  They would apply not just to
6 satellite communication but they would -- so I
7 don't have a class with a title of satellite
8 communication, but there are chapters on satellite
9 communications.  So there would be a chapter with
10 that title but not a course with that title in the
11 courses that I've taught.
12    Q.   What other kinds of communications other
13 than satellite communications are in the courses
14 that you've taught?
15    A.   Can you repeat the question, please?
16    Q.   Absolutely.
17        What other kinds of communications
18 other than satellite communications have you taught
19 in your coursework as a professor.
20    A.   I mean, I don't have an exhaustive list;
21 so I would say they would fall under two
22 categories, wireless and wireline.
23        Wireless would include -- or can
24 include satellite communication, can include
25 cellular communication, can include like Bluetooth,

Page 28

1 Wi-Fi.  Those are examples of wireless
2 communication.
3        Wireline communication could be part
4 of a cellular network.  I mean, the cellular
5 network or the cellular system isn't just
6 communicating to the satellite and back.  There are
7 wireline components even in a satellite system.
8        But regarding the -- the transmission
9 of packets, we -- I would -- I would look at -- or
10 I've taught courses on optical communication, cable
11 communication, like Ethernet and high speed like
12 cables, switches, routers.  Those are some
13 high-level concepts in -- in the courses.
14    Q.   What year did you start working as a
15 professor at the University of North Texas?
16    A.   2002.  So I've been there exactly 20
17 years.
18    Q.   And were you a professor at any other
19 institution prior to 2002?
20    A.   Yes.
21    Q.   Which institution?
22    A.   I was a professor in the University of
23 New Orleans.
24    Q.   And when did you start as a professor at
25 University of New Orleans?



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023

29–32

Page 29

1    A.  I was there only one semester in early
2  2002, so I joined December of 2021.  I was there
3  for one semester.  They wanted to start computer
4  engineering out of electrical engineering; and with
5  me having both backgrounds, I helped them design
6  courses.  I was only there for one semester.  I --
7  and then I decided I wanted to move back to Dallas.
8    Q.  Prior to your work as a professor at the
9  University of New Orleans, did you serve as
10  professor at any other institution?
11    A.  No, but I did work in the industry before
12  that.
13    Q.  In your work in the industry, what
14  industry are you referring to?
15    A.  So I worked for a company called Comspace
16  Corporation.  That was in -- after -- so I was
17  there for a year and a half here in the Dallas
18  area, and that's partly why I wanted to come back
19  to this area after I joined the University of
20  New Orleans.  And when I saw UNT had an opening to
21  start computer engineering out of computer science,
22  I joined UNT and have been there ever since.
23    Q.  A minute ago you answered my question
24  referencing "the industry," working in the
25  industry.  I want to know what industry you are

Page 30

1  referring to there.
2    A.  Oh, no.  I mean not the industry, working
3  in industry.  So I divide -- as an academic, we
4  divide work as academia or industry.  So either you
5  work for a company or you work as a professor, so
6  that's what I meant.
7    Q.  And what is -- what was Comspace's work
8  when you were there?  What did they do?
9    A.  It related to push-to-talk wireless
10  communication for commercial clients, like public
11  safety, like police, having cellular radios that
12  communicated digitally with a tower that allows
13  fire personnel, police officers, et cetera, to talk
14  to each other using push-to-talk technology.  And
15  what I mean by that is you don't dial.  Kind of
16  like a fancy walkie-talkie.
17    Q.  And so the communications that you were
18  working on for Comspace were between the fancy
19  walkie-talkies and cellular towers; is that -- is
20  that correct?
21    A.  It is related to systems in the -- that
22  communicated in between -- yes, so it did include,
23  you know, the back end and the front end of those
24  communication systems, between a push-to-talk phone
25  and a tower including the core network.

Page 31

1    Q.  Did you have any experience working with
2  satellite communications in your role with
3  Comspace?
4    A.  No, not directly.  So the systems did not
5  use a satellite to relay information, but the
6  experience of encoding and decoding and
7  transmitting over a wireless communication and
8  protecting the data would be applicable also in
9  a -- or could be applicable also in a satellite
10  system.
11    Q.  So if I understand, you had experience in
12  a cellular system that you believe could be
13  applicable in a satellite system, while working at
14  Comspace?
15    A.  Yes.  There is aspects of the cellular
16  system that would carry over also in a satellite
17  environment, in a satellite system.
18    Q.  But to be clear, you were not working
19  specifically on a satellite system at Comspace?
20    A.  That's fair.
21    Q.  What other industry experience do you have
22  other than working for Comspace?
23    A.  That was the main full-time job, and then
24  I've been in academia full-time.  I've taken
25  consulting -- I've done, you know, consulting

Page 32

1  matters over the years; but as far as my full-time
2  job, it is being at UNT for the last 20 years.
3    Q.  Would you agree with me that the word
4  "satellite" doesn't come up at all in your
5  background and qualifications section?
6    A.  Probably not explicitly, that is correct.
7  Like I said, it would appear under -- it would be
8  relevant under different topics.  So when we talk
9  about GPS, GPS appears there.  GPS uses satellites.
10  Some cellular systems use satellites.  But the word
11  "satellite" -- to the extent the word "satellite"
12  does not appear explicitly, I can agree with you if
13  you have done a word search.
14    Q.  With respect to your research as a
15  professor, would it be fair to say that, like, the
16  courses you teach relate generally to wireless and
17  wired communications rather than to satellite
18  communications specifically?
19    A.  I would disagree with that
20  characterization.  Just because when you say
21  "satellite communications specifically," I believe
22  the wireless communications that I do is applicable
23  also to satellite communication; so I -- I would
24  disagree with your characterization.
25    Q.  Did you -- strike that.



Page 33

1     Have you had a research project that
2 was specifically related to satellite communication
3 systems.
4     A.   Yes.
5     Q.   Okay.  What was that project?
6     A.   I was -- I've looked at and I've done a
7 couple of research projects on -- one was supported
8 by McDonnell Douglas, which was later acquired by
9 Boeing; and they funded research related to
10 communication between satellites, because
11 satellites move in a fixed pattern, but they are
12 not all visible at the same time and they aren't
13 all visible to each other.
14     So I was working on a routing program
15 because of how satellites go in and out of view
16 from other satellites, but it is in a deterministic
17 manner.  So that work was funded by McDonnell
18 Douglas and Boeing.
19     Q.   When -- what period of time were you
20 engaged in the research project for McDonnell
21 Douglas and Boeing?
22     A.   That was in the mid '90s, '96, '97.
23     Q.   So you weren't a professor at that point?
24     A.   That's correct.
25     Q.   Okay.  You were -- you were a student?

Page 34

1     A.   Yes.
2     Q.   And how long -- over what period of time
3 were you engaged in that research project?
4     A.   Over two years.
5     Q.   Was that research project through your
6 university while you were a student?
7     A.   Yes.  At the time, I believe McDonnell
8 Douglas wasn't yet -- McDonnell Douglas had a big
9 research facility in St. Louis; and I went to
10 school in St. Louis.  So they were interested in
11 funding the research that I was doing at the time
12 in the field of wireless communication and routing.
13 So that's the time frame that I had an active grant
14 specifically focused and limited to satellite
15 communications.
16     Q.   Any other research projects, as a student
17 or professor, that were specifically limited to
18 satellite communications?
19     A.   No, not specifically limited to satellite
20 communication.  But, like I said, my research is --
21 would be applicable in a satellite system.  And a
22 satellite system encompasses, you know,
23 communication, not just to and from the satellite
24 but also core network that is part of a satellite
25 system.  And a lot of my research focuses on those

Page 35

1 type of networks, also.
2     Q.   What experience described in Section 2 of
3 your declaration relates to cable television
4 communication systems?
5     A.   So there is going to be overlap, also, in
6 a -- in a cable network, the sections that would
7 describe telecommunications.  So I am back on --
8 looking at paragraph -- so we can start with my
9 background, paragraph 8.  My education would
10 cover -- would be -- cover cable networks.
11     Looking at paragraph 12, courses in
12 research related to networking, telecommunications,
13 channel coding, channel estimation, communication
14 interfaces and standards, compression, packet
15 networks.  Those all would cover cable networks.
16     The courses that I've taught, courses
17 on signals and systems, telecommunication systems,
18 channel estimation, source coding, compression,
19 network security would cover cable networks.
20     And I also refer to my CV, and I've
21 handled multiple litigation experience related to
22 cable networks and the DOCSIS standard.
23     THE WITNESS:  DOCSIS, capital D,
24 capital O, capital C, capital S, capital I,
25 capital S.

Page 36

1     Q.   (BY MR. HESTER)  Thank you.
2     Have you ever taught a course
3 dedicated to cable television communication
4 systems?
5     A.   No, not limited to that.  But -- I mean,
6 that's not really a topic on its own.  I teach
7 fundamental technology.  And so the technology that
8 I teach relates to how you can transmit a signal
9 over a cable, how you can repeat the signal,
10 optical communications that is commonly used in
11 cable networks, RF cables that are used in cable
12 networks, how you multiplex signals, how you
13 recover, how you estimate signals, filters that are
14 used.
15     So the different components that
16 would -- that are present in a cable network would
17 be the subjects that I teach; but there would not
18 be a course titled, you know, TV cable networks.
19     Q.   And is it fair to say that when you teach
20 about these components that you just listed off,
21 you are not teaching about them specifically in the
22 context of a cable television communication system?
23     A.   I would.  I mean, we -- we do have
24 projects.  We do homeworks and assignments and
25 the -- the application.  So as I'm teaching those



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
37—40

Page 37

1  concepts, we -- I use examples; and the examples
2  that I use include TV signals, cable networks so
3  that students enjoy more the material rather than
4  understanding it in vacuum.
5      Q.   Have any of your research projects, as a
6  professor or student, related to cable television
7  communication systems?
8      A.   I don't believe any of them were limited
9  to that or were funded by a cable operator, if
10 that's what you are asking.
11     Q.   When you say not "limited," what do you
12 mean?
13     A.   Well, I've -- like I said, I -- I do
14 research and I publish how a signal can be
15 transmitted from an antenna to another antenna, how
16 it can be coded, received.
17         So those research that you would
18 find -- or the research that I've conducted is
19 applicable.  Because if somebody is looking at
20 implementing a -- a wireless connection between a
21 satellite and a -- a dish, the type of signal
22 characteristics, the fading that the signal will
23 have as a result of distance, those all are things
24 that I teach and I've done research on but they are
25 not limited to just between a satellite.  And they

Page 38

1  are applicable to -- they are applicable to not
2  just the satellite antenna.  That's the point that
3  I am making.
4      Q.   So it was general communications research.
5  Is that fair to say?  Or the experience you just
6  described relates generally to communications?
7      A.   Yes.  So it would relate to -- so more
8  recently, my research focused on MIMO, multi-input,
9  multi-output, having multiple antennas at the
10 transmitter or the receiver.
11         I look at relaying information, packet
12 loss, channel quality, how you can do flow control,
13 which is the process of a receiver informing a
14 transmitter of the quality of the communication.
15         So that technology -- and we will see
16 some of that technology in some of the asserted
17 patents.  That's what some of my research has
18 focused on.
19     Q.   And the research that you were doing
20 related to the concepts you just listed, was that
21 in the cellular communications context?
22     A.   I think that's fair.  I -- I do do a lot
23 of work in the cellular field.  I enjoy it; and --
24 like 2G, 3G, 4G, 5G currently.  So I do have
25 extensive publications in the cellular field; but,

Page 39

1  again, my research isn't limited to the cellular
2  field.
3      Q.   What percentage of your publications are
4  in the cellular field?
5      A.   I would say more than 50 percent.  Because
6  as a professor, you need to build a niche for
7  yourself or an area that it is easier to get
8  funding or -- so in that field -- in that sense, I
9  have published extensively in the cellular field.
10         And a lot of my students that
11 I've advised and taught and mentored have gone out
12 and worked for companies like AT&T and Ericsson and
13 Qualcomm, as examples that I -- that I can recall.
14     Q.   So the niche you've kind of carved for
15 yourself is in the cellular field?
16     A.   I would say it is wireless communication,
17 and I have used cellular communication as an
18 example for the applications.  So cellular
19 communication would be the application that I have
20 chosen to demonstrate the technology in the
21 wireless field that I have worked on.
22         But, again, it is also applicable to
23 satellite communication; but I think cellular is
24 more exciting, at least to me, because the
25 technology moves faster when compared to, like,

Page 40

1  cable network standards.
2          So when I compare DOCSIS standards and
3  how they change over time and you compare that with
4  3GPP standards, cellular standards and how those
5  change over time, to me those are more exciting
6  because they evolve faster.  So there are greater
7  opportunities for research in those fields.
8      Q.   Would you say that more than 50 percent of
9  your research is devoted to cellular communication?
10     A.   I would say it is definitely wireless
11 communication with cellular communication being the
12 application of choice.
13     Q.   So more than 50 percent would involve
14 cellular communication as the application of
15 choice, your research, that is?
16     A.   That's fair.
17     Q.   Okay.  Be fair to say more than 75 percent
18 of your research?
19     A.   No, because I also do -- I think 50 is
20 good, unless I go back and -- because there is a
21 lot of research on Wi-Fi.  I've done research on
22 Bluetooth.  I've also written papers on the camps
23 that I've done.  I'm very proud of summer camps to
24 recruit middle school and high school students, and
25 those relate to gaming.



Page 41

1        So there are other aspects of my
2   research; but, you know, over 50 percent is what I
3   would classify my -- my focus using cellular as an
4   application.  I would probably say 7- -- you know,
5   your question, 75 percent would be more general
6   wireless communication, where there is 25 percent
7   that's really focusing on wireless communication
8   without having cellular being the application of
9   choice, like Wi-Fi, like Bluetooth, where I'm
10  looking at those applications specifically.
11      Q.   And other than your research for McDonnell
12  Douglas in the mid '90s, none of your other
13  projects have focused on satellite communications
14  as the application.  Is that fair to say?
15      A.   I have not worked on a specific grant that
16  is limited to satellite communication.  That's how
17  I would phrase it.  But I have worked -- I have
18  received funding and grants that relate to wireless
19  communication that would be applicable.
20       So I've received NSF funding, National
21  Science Foundation.  And because it is not funded
22  by a specific company, you are looking at more
23  fundamental concepts than -- when my work was
24  funded, for example, by McDonnell Douglas, I was
25  specifically looking and researching a problem for

Page 42

1   them versus when the work is funded by the National
2   Science Foundation, it has a broader impact.
3        And you are supposed to also -- and
4   you do -- as part of the grant-writing process, you
5   want to show the broader impact of your research.
6        THE WITNESS:  I don't know if we're
7   running out of tape.  The court -- oh, okay.  You
8   stood up so I thought you were trying to get our
9   attention.  Never mind.
10      Q.   (BY MR. HESTER)  We'll break soon, though.
11      A.   We have been going about an hour, so I
12  don't know if this is a good time for a break
13  anyway.
14      Q.   Pretty soon, I think, if that's okay.
15       Fair to say that in your industry
16  experience, none of your work related
17  to specifically the application of satellite
18  communications.
19      A.   It -- in my work for Comspace, which was
20  only for two years, that was not limited to
21  satellite; but I have done -- I would still
22  consider it industry -- at least litigation related
23  to industry in the last 20 years; and multiple
24  litigation cases have related to cable and
25  satellite.

Page 43

1      Q.   And you referenced the last 20 years.
2   Have you worked as a consultant for litigation only
3   during the last 20 years?
4      A.   I would say even less.  I would say
5   over -- litigation experience has been since 2006.
6   So we're looking at -- my first litigation
7   experience was in 2006, so 17 years, something like
8   that.
9        MR. HESTER:  I would say now is a good
10  time for a break.  Let's go off the record.
11       THE VIDEOGRAPHER:  The time is now
12  10:03 a.m.  We're off the record.
13       (Brief Recess, 10:03 a.m. until
14  10:13 a.m.)
15       THE VIDEOGRAPHER:  We're now on the
16  record.  The time is 10:13 a.m.
17      Q.   (BY MR. HESTER)  Welcome back, Dr. Akl.
18  You understand you are still under oath?
19      A.   Yes.
20      Q.   And you -- on your computer, do you only
21  still have open those three documents we discussed
22  earlier?
23      A.   Yes.
24      Q.   Please turn to Appendix A of your
25  declaration.

Page 44

1      A.   I am there.
2      Q.   Can you confirm for me that this is a
3   relatively recent copy of your CV?
4      A.   Yes.  It is correct as of April 2023.
5      Q.   How long is your CV?  How many pages?
6      A.   50- -- well, 53 pages.  54 doesn't really
7   have anything on it.
8      Q.   In those 53 pages, do you know how many
9   times satellite communications are referenced?
10      A.   No.
11      Q.   Okay.  Would it surprise you to know that
12  the only time satellite is mentioned in your
13  53-page CV is in connection with your work as a
14  consultant in this matter?
15      A.   No.
16      Q.   You mentioned earlier that you had some
17  past case work that related to either satellite
18  and/or cable communications.  Can you show me,
19  using your CV, which cases that includes?
20      A.   Yes.
21      Q.   Thank you.
22      A.   (Reviewing document.)  One example would
23  be L85 on page 15.
24      Q.   Okay.  What was the subject matter --
25  excuse me -- of case L85?



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
45—48

Page 45

1    A.  L85 related to cable networks and
2  distribution of signals in a cable network.
3    Q.  And your work in L85 started in 2018.  Is
4  that -- is your CV correct to reflect that?
5    A.  Yes, that is correct.  And it did go to
6  trial, and I testified.
7         I think we settled right before I was
8  about to take the stand, but I submitted expert
9  reports in that case, and I testified in a
10  deposition -- or multiple depositions.
11    Q.  And did L85 relate to wired cable
12  networks?
13    A.  Yes.
14    Q.  Any other cases in your CV that relates to
15  either satellites or cable communications?
16    A.  Yes.  I'll keep going.
17       (Reviewing document.)  L123.
18    Q.  And what was the subject matter of your
19  work in L123?
20    A.  In L123, I was retained by AT&T; and I was
21  handling -- I was an expert retained in inter
22  partes review.  There were four different petitions
23  where AT&T was the patent owner, and I provided
24  four declarations in that matter.
25    Q.  So your declarations related to -- strike

Page 46

1  that.
2         Your declarations in that matter were
3  offering opinions regarding prior art.  Is that
4  fair?
5    A.  They provided opinions regarding prior art
6  that was presented by petitioner, and I was
7  retained to provide an opinion supporting that
8  those patents were valid.
9    Q.  And the subject matter of L123 was cable
10  networks.  Is that fair?
11    A.  Yes.
12    Q.  And L123, your work on that, did it start
13  in 2016?
14    A.  Yes.
15    Q.  I'd like you to continue to identify any
16  other -- your prior casework that relates to
17  satellite and/or cable communications.
18    A.  L130.
19    Q.  What was the subject matter of your work
20  in case L130?
21    A.  L130 I was also retained by AT&T in --
22  where Cox Communication was the other party, and it
23  also -- it also related to cable networks, and I
24  wrote a declaration regarding claim construction in
25  that matter.

Page 47

1    Q.  Okay.  In your work in case L130, did it
2  start in 2015?
3    A.  Yes.
4    Q.  Please continue in identifying either
5  cases where your work as a consultant related to
6  satellite or cable communications.
7    A.  (Reviewing document.)  Case L156 and L157.
8  Those kind of go together.
9    Q.  What was the subject matter of your work
10  on cases L156 and L157?
11    A.  It related to HDTV transmission and
12  reception, and I was retained by Craig Electronics
13  and Curtis International.  In those cases, the
14  plaintiff was Zenith Electronics.
15    Q.  When you say HDTV transmission and
16  reception, what form of transmission and reception
17  are we talking about:  Wire, wireless, satellite?
18    A.  It was not limited; and my report
19  discussed all three, I believe, or the technology
20  related to all three.
21    Q.  And your work on, looks like, L157 started
22  in 2013; is that right?
23    A.  Yes.  And I believe because of that work,
24  I was then retained in the follow-up matter, L156.
25    Q.  I'd like you to continue to identify any

Page 48

1  other of your prior casework that relates to
2  satellite and/or cable communications.
3    A.  (Reviewing document.)  L177 -- sorry.
4  L171.
5    Q.  If I'm reading your CV right, that also
6  appears to relate to HDTV transmission/reception?
7    A.  Yes.  I was retained by Hitachi.
8    Q.  And your work in that case, L171, began in
9  2012.  Is that fair?
10    A.  Yes.
11    Q.  I'd like you to continue to identify any
12  other of your prior casework that relates to
13  satellite and/or cable communications.
14    A.  (Reviewing document.)  I think that's it
15  for now.
16    Q.  I see you typing.  Are you, like,
17  searching something to help?
18    A.  Yeah.
19    Q.  Okay.
20    A.  I'm -- I'm looking at the word "cable" to
21  kind of see how many hits I'm getting --
22    Q.  Got it.
23    A.  -- in my document, just to make sure I
24  didn't miss anything.
25    Q.  Okay.  So correct me if I'm wrong, but it

ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
49–52

Page 49

1  looks like between 2012 and the present that your
2  work related to your -- cable networks and HDTV
3  transmission/reception is covered -- one, two,
4  three, four, five -- six cases.  Does that sound
5  right?
6      A.  There is one more case that we can add to
7  the list that's more recent.
8      Q.  Okay.  So it was also after 2012, this
9  other case you are thinking of?
10     A.  Yes.  It's L13.
11     Q.  Okay.  So between 2012 and the present,
12  it's -- it's seven cases that relate to cable
13  networks and HDTV transmission/reception.  Is that
14  fair?
15     A.  Yeah, that's -- that's fair.
16     Q.  And before 2012, no such cases, also fair
17  to say?
18     A.  (Reviewing document.)  Yeah, before 2012,
19  I think I only handled like nine cases total.
20          I'm sorry.  I misspoke.  There is L179
21  and L178 in 2010.
22     Q.  And that related -- those cases related to
23  HDTV transmission/reception?
24     A.  Yes.  I was retained by LG Electronics.
25     Q.  And was this specific communication medium

Page 50

1  there for the transmission and reception limited to
2  any particular context, be it wired or wireless or
3  satellite?
4      A.  I don't think so; but, again, it's been
5  like 12 years.
6      Q.  Okay.  So prior to 2012, then, you had
7  experience in two cases related to HDTV
8  transmission and reception.  Is that fair?
9      A.  Yes.  I'm sorry.  We also -- did we
10  include 176?
11     Q.  Not on my list.
12     A.  Okay.
13     Q.  We can add it.
14     A.  That's in 2011.
15     Q.  Also relates to HDTV transmission and
16  reception?
17     A.  Yes.
18     Q.  So to correct our count, that's three
19  cases prior to 2012 where your work related to HDTV
20  transmission and reception; is that right?
21     A.  Yes.
22     Q.  No cases specifically in the satellite
23  communications context prior to 2012?
24     A.  I wouldn't exclude 176, 178, and 179.
25     Q.  And those cases, I think you testified,

Page 51

1  relate generally to transmission and reception of
2  HDTV; right?
3      A.  Yes.  I mean, that's -- I'm reading what I
4  have on my CV.  I don't remember the details.
5      Q.  Okay.  And a similar question regarding
6  cable television communications.  Other than these
7  three cases, 176, 178 and 179, no other casework
8  relating specifically to cable television
9  communications.  Is that fair?
10     A.  Yes.
11         MR. HESTER:  Let's go off the record
12  real quick.
13         THE VIDEOGRAPHER:  The time is now
14  10:30 a.m.  We are off the record.
15     (Brief Recess, 10:30 a.m. until 10:31 a.m.)
16         THE VIDEOGRAPHER:  We're now on the
17  record.  The time is 10:31 a.m.
18     Q.  (BY MR. HESTER)  Dr. Akl, if I could have
19  you turn to paragraph 24 of your declaration.
20     A.  I am there.
21     Q.  Paragraph 24 of your declaration, you
22  opine that a person of ordinary skill in the art
23  would have had, quote, "A bachelor's degree in
24  electrical engineering, computer engineering,
25  computer science, or a related field, and two to

Page 52

1  three years of experience in the design and
2  development of telecommunication systems."
3          Did I quote you correct?
4      A.  Yes, but you didn't finish the paragraph.
5      Q.  Okay.  Specifically about that section,
6  though, what does telecommunication systems mean
7  for you?
8      A.  I'm not sure what you are asking me.
9      Q.  So you use the word "telecommunication
10  systems."  What is that?  What kind of systems does
11  that encapsulate?
12     A.  It would include analog, digital
13  communication between a source and a destination.
14     Q.  So it's your opinion that two to three
15  years of experience -- strike that.
16          It is your opinion that experience in
17  the design and development of telecommunication
18  systems could be satisfied by any experience
19  relating to analog or digital communication between
20  a source and a destination; is that right.
21         MS. ALLOR:  Object to the form.
22     A.  I think you might be mischaracterizing
23  what I said.  So in here, I -- providing the
24  considerations or the factors for what a POSITA
25  would have.  So they would need a bachelor's degree



Page 53

1 and two to three years in the design and
2 development of telecommunication systems.
3        I gave you an example of what I think
4 a telecommunication system can entail.  So the --
5 the requirement that I'm stating is -- the reason I
6 have this requirement is to distinguish where
7 somebody's emphasis might be.
8        So you can have a bachelor's in
9 electrical engineering, for example, and work on
10 power systems; and some people do that.  So that
11 would not be as much relevant experience related to
12 the patents in question.  So when -- when you think
13 of fields that somebody with a bachelor's degree in
14 electrical engineering, computer engineering,
15 computer science would have, there are some terms
16 that we use in terms of where someone could
17 pursue -- or what focus they want to pursue.
18       So telecommunication systems would be
19 such focus; and I think that's the focus for
20 somebody with an EE background that would be
21 relevant to the cases as opposed to, for example,
22 somebody interested in power systems.
23       So that's -- that's the -- that's the
24 point -- or that's the opinion that I'm offering
25 here in terms of -- and then I do add that

Page 54

1 additional graduate education could substitute for
2 professional experience, or significant experience
3 in the field could substitute for a formal
4 education.
5        Because just with the bachelor's, you
6 are taking a few courses in a lot of different
7 fields.  But if you, you know, do a master's, that
8 normally gives you focus or additional focus; so
9 that could substitute for not having industry
10 experience.  So that's the -- that's the opinion
11 that I'm trying to provide here, is provide some
12 focus within those areas of study that would be
13 relevant to the patents at issue.
14    Q.   (BY MR. HESTER)  All I'm trying to figure
15 out is, when you say telecommunication systems --
16 experience in the design and development of
17 telecommunication systems, what kind of work does
18 that involve?
19    A.   It can involve a lot of different types of
20 work.
21    Q.   Such as?
22    A.   So telecommunications can include
23 wireless, can include wireline.  In that field, you
24 look at transmitters and reception.  You can look
25 at analog and digital.  You look at filters, filter

Page 55

1 design, how you transmit a signal, how you receive
2 a signal.
3        Those are all things that somebody in
4 the design and development of a telecommunications
5 system would be looking at.
6    Q.   And it is your opinion that a person of
7 ordinary skill in the art need not have any
8 experience specifically applying the -- or using
9 the telecommunications technologies you just
10 mentioned in the satellite context.  Is that fair?
11       MS. ALLOR:  Object to the form.
12    A.   There is no specific field of study.  Like
13 if you are going to school and -- at least in my
14 department or the departments that I've looked at
15 and I've -- I was associate chair of graduate
16 studies for seven years, and part of my role as
17 associate chair of graduate studies is to propose
18 and look at degrees and emphasis areas for our
19 students.
20       So other than being a professor, I was
21 an administrator in that role at UNT.  So there is
22 not a -- an emphasis that says "satellite
23 communication," or at least I have not seen.  There
24 is an emphasis or you can get certified in
25 telecommunications systems or you can get certified

Page 56

1 in networking systems.
2        So based on those labels -- you can be
3 certified in power systems.  So based on my
4 experience in terms of how -- what a POSITA would
5 have and the sort of qualifications -- or the
6 buckets of qualifications that you can go into,
7 telecommunication systems would be the one most
8 relevant to the patents here when I'm looking at
9 areas that somebody with that degree that they can
10 do an emphasis in their master's or where they
11 would work in industry.  So -- so that's the point
12 of the sentence.
13    Q.   (BY MR. HESTER)  Let's focus there on the
14 industry for a minute.  When you have in your
15 declaration your -- strike the "your" part.
16       But experience in the design and
17 development of telecommunications systems, is that
18 a reference to industry experience?
19    A.   I don't say "industry" here.  It's just --
20 it's experience.  You can get that experience in
21 industry, or you can get that experience in
22 academia.
23    Q.   In industry, there are certainly companies
24 that focus on satellite communications.  Would you
25 agree with that?



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
57–60

Page 57

1   A.  Yes.

2   Q.  But it is your opinion that a person of
3   ordinary skill in the art need not work for or with
4   any of those companies in order to become a person
5   of skill in this case?

6   A.  I didn't explicitly state that; but you
7   don't need to work for a company in satellite if
8   you've worked on -- in a -- in a field that would
9   give you the experience of how the communication
10  systems would work.  Because, again, those patents
11  aren't designing a new satellite, so we're not
12  focusing on satellite design.  This is not a
13  satellite design patent.

14      So based on how you are trying -- or
15  the questions that you are asking me, those areas
16  might be more relevant if this was a satellite
17  design patent, which it is not.

18      So because of that, I need to choose a
19  field that would -- and this is what I do as an
20  expert.  I need to kind of identify a field that
21  would be broad enough that would be relevant to the
22  technology in the patents but narrow enough that at
23  least tries to cover as much as possible.

24      And so when we -- I look at the '576
25  patent and -- the '576 patent, for example, I look

Page 58

1   at Figure 1, Figure 2, Figure 3, Figure 4,
2   Figure 5, Figure 6, Figure 7, Figure 8, Figure 9,
3   Figure 10, Figure 11, 12, 13, 14, 15, 16, 17.  None
4   of those figures have even a picture of a
5   satellite.

6       So the focus is not satellites.  All
7   those pictures -- or all those figures are
8   focusing, at least in part, on the spectrum, on
9   transponders, on filters, on switches, on signal
10  selectors with the application being a satellite.

11      So I think the field that I specified
12  is accurate when I look at those patents; and you
13  take Figure 3, which is somewhat detailed; and it
14  shows analog-to-digital converters, digital
15  filters, summations, digital-to-analog converters.
16  So it's -- that's the technology that I am trying
17  to capture in the qualifications of a POSITA.

18      Q.  But in your opinion, a POSITA need not
19  have worked on any application relating to a
20  satellite in order to qualify as a person of skill
21  in the art?

22      A.  I have not provided that opinion, so I
23  disagree with your characterization.  I don't have
24  the word "satellite," but I'm not -- I haven't
25  stated what -- in a way you are trying to imply

Page 59

1   that I've said.

2       Q.  Well, I'll ask you straight up:  Can a --
3   in your opinion, can a person of skill in the art
4   as to, let's say, the '576 patent, obtain status as
5   a person of skill without working on any
6   application in telecom relating to satellites?

7           MS. ALLOR:  Object to the form.

8       A.  I -- I don't have an answer for you right
9   now.  I haven't looked at that specific scenario.
10  I haven't excluded that specifically, but I haven't
11  stated that opinion one way or the other.

12      Q.  (BY MR. HESTER)  You are unable to give me
13  an answer to that today?

14      A.  Yes, because I have not considered that
15  hypothetical specifically when writing this
16  paragraph.

17      Q.  If I asked you to consider that specific
18  hypothetical in your deposition, would you be able
19  to give me an answer?

20      A.  No.

21      Q.  Why not?

22      A.  Because it is not something I can just
23  give you on the fly.  I would need to think about
24  it, and I -- I don't have the time right now to be
25  able to do that analysis.

Page 60

1       So I don't have -- I don't take my
2   opinions lightly; and I, you know, try to consider
3   different aspects before I render an opinion.  And
4   so I would not be able to, under oath, answer a
5   question accurately by rendering an opinion that I
6   have not provided in my declaration explicitly
7   right now.

8       Q.  In the definition of person of ordinary
9   skill in the art that is in your declaration, you
10  do not reference satellite communications
11  specifically.  Is that fair?

12      A.  The word "satellite" does not appear
13  explicitly.  That -- that -- you know, you can look
14  at those words, and you can verify that.  That is
15  correct.

16      Q.  And the word "cable" or "cable
17  communications" do not appear explicitly in your
18  definition of a person of skill either.  Is that
19  fair to say?

20      A.  Again, that word does not appear; but they
21  fall under telecommunication systems.  So they are
22  there implicitly under the umbrella of what a
23  telecommunication system can encompass.

24      Q.  Can a person of ordinary skill in the art
25  obtain the necessary experience in the design and



Page 61

1  development of telecommunication systems simply by
2  working in the cellular industry?
3      A.  They might.  There is a lot of overlap.
4  You do have wireless communication.  The signal is
5  coming from an antenna instead of coming from -- I
6  mean, they are both coming from an antenna.  It is
7  coming from an antenna on the ground.
8          But even in cellular, you -- we do use
9  satellites; and it is not uncommon in -- even in a
10  cellular environment to sometimes use satellites.
11  Like my Apple Watch can communicate with a
12  satellite.  That was part of the latest iteration.
13          So we had Iridian systems.  We had
14  cellular satellite systems.  Some of them were not
15  commercially successful because of the exuberant
16  costs.  But even if somebody is interested in
17  cellular communication or telephony, there are --
18  there -- you know, phone communications and
19  telephony can traverse satellite communication,
20  also.
21          And we look at low orbit satellite for
22  their latency, and those are things that I've also
23  taught in my courses.  So they all fall under the
24  umbrella of telecommunication systems.
25      Q.  So if I'm looking at the concept of

Page 62

1  telecommunication systems broadly, part of that is
2  cellular, part of that is satellite, part of that
3  is Wi-Fi.  Is that kind of -- and then there are
4  other parts, too.  Is that how you look at it?
5      A.  It depends on how you want to characterize
6  it.  There is definitely overlap.  And so in my
7  class, for example -- in one of my courses, the
8  headings that you just said are chapter titles.
9          In my wireless communication class, in
10  that textbook, there is a chapter called Wi-Fi.
11  There is a chapter called Bluetooth.  There are --
12  there is a chapter called cellular.  There is a
13  chapter called satellite, so -- but that's a single
14  class and a single textbook.  So -- and we cover
15  all of them in that single class, so it depends on
16  how -- it depends on the context.
17          But then in another class, I don't
18  necessarily have those chapter titles; but my
19  students study filters, signal quality that is
20  applicable to all of them.
21          So it depends on how you are
22  presenting the material that you can divide them
23  into buckets or you can present something that
24  would overlap in all those buckets together.
25      Q.  If we turn to paragraph 27 of your

Page 63

1  report -- let me know when you are there.
2      A.  I am there.
3      Q.  I'll just read most of it.  You let me
4  know if I read it correctly.
5          Quote, "I am qualified to provide
6  opinions concerning what a POSITA would have known
7  and understood at that time; and my analysis and
8  conclusions herein are from the perspective of a
9  POSITA as of that date and would apply under either
10  parties' proposed set of qualifications."
11          Did I read that right?
12      A.  Yes.
13      Q.  And when you say "that time" in this
14  paragraph, what time are you referring to?
15      A.  So I am referring to -- my understanding
16  is I'm referring to the priority dates, and so
17  approximately 2002.  I -- I don't render specific
18  opinions here related to priority; but if we look,
19  for example, at the '576 patent and I look at the
20  cover of the '576 patent, it claims priority to
21  February 22, 2002.
22          And if I look at the '008 patent -- so
23  that's -- that would be the date for that patent.
24  So I look at the earliest date, or at least that
25  time period is my understanding from legal

Page 64

1  principles, the period that I need to, as an
2  expert, put myself in the shoes of a POSITA at that
3  point in time and render opinions from that point
4  in time.
5      Q.  Is it my understanding that the word
6  "time" in paragraph 27 is referring to the priority
7  date of each patent respectively?
8      A.  That's fair.
9          And then the earliest would be 2002,
10  for example, for the '576.
11      Q.  Also in that paragraph, you refer to a
12  date.  You say "as of that date."  What date are
13  you referring to?
14      A.  That's the same date that we just
15  discussed.
16      Q.  Okay.  Is it your opinion that the
17  qualifications to be a POSITA are the same with
18  respect to the '576 and '008 patents?
19      A.  For the opinions that I have here today,
20  they are.  I did not provide separate
21  qualifications for these patents.
22          So I looked at -- for a set of
23  qualifications that would apply under both, and I
24  think that is fair.  And like when we look at the
25  actual figures of both patents and the technology



Case 2:22-cv-07775-JWH-KES   Document 253-2   Filed 06/09/23   Page 18 of 66   Page ID
#:3081

ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
65–68

Page 65

1  for both patents, there is enough overlap between
2  the '008 and the '576, at least as far as the
3  high-level technology.  So my qualifications are
4  the same for both.
5      Q.   In response to that question, you began,
6  quote, "For the opinions that I have here today,
7  they are -- they are the same."
8          What do you mean for the opinions that
9  you have here today?
10      A.   Today I am only providing two opinions on
11  two disputed terms regarding claim construction.
12      Q.   So did you form your understanding of what
13  qualifications a POSITA would need to have based
14  only on those two terms?
15      A.   No, that's not what I -- that's not the
16  opinion that I gave.  I formed the qualifications
17  before I went into -- or before I analyzed the two
18  disputed terms, I determined what the
19  qualifications of a POSITA are.
20          But I'm saying today I am -- my
21  understanding is I am here providing opinions only
22  on two disputed claim terms.  Like I'm not here to
23  provide an infringement analysis or a validity
24  analysis or any other type of analysis that I may
25  provide in the future as an expert being retained

Page 66

1  in this matter.
2          Like today my opinions are limited to
3  just the two disputed claim terms, one from each
4  patent.
5      Q.   Do you believe that there is a different
6  POSITA standard applicable to analysis of
7  infringement relating to these patterns?
8      A.   I have not written my infringement report;
9  but, you know, I can tell you that, you know, I
10  expect to use the same qualifications of a POSITA
11  moving forward.
12          But the point that I was making is I
13  have not written that expert report, and so I don't
14  have these opinions of a POSITA in my infringement
15  expert report because that expert report does not
16  exist yet.
17      Q.   So in forming your opinions as to what
18  experience is necessary to become a POSITA, did you
19  study the '576 and '008 patents as a whole?
20      A.   Yes, I considered the specification as a
21  whole.  That is a fair statement.
22      Q.   And considering the specifications of the
23  '576 and '008 patents as a whole, is your opinion
24  that the same qualifications are appropriate as to
25  each patent?

Page 67

1      A.   Yes.  With the caveat that the dates are
2  different, but yes.
3      Q.   In paragraph 28 of your declaration, same
4  page, you state, quote, "As of approximately 2002,
5  I was at least as qualified as the POSITA
6  identified above."
7          And my question is:  What is the
8  POSITA identified above that you are referring to?
9      A.   Both.  So there -- I provide -- there are
10  three definitions in this section.  There --
11  paragraph 24 provides the qualifications of a
12  POSITA that I provide.
13          Paragraph 25, I list the
14  qualifications of a POSITA that DISH proposed for
15  the '715 and '576 patents; and they are the same
16  for both patents.  They share the same
17  specification.
18          Paragraph 26, I provide DISH's
19  proposed qualifications for the '008 patent.
20          So under all three -- regardless -- so
21  regardless of which set of qualifications the court
22  might choose or pick, I would meet at least those
23  qualifications.  And at least here, my opinions
24  would be the same regardless which set of
25  qualifications the court decides to go with or a

Page 68

1  combination thereof.
2      Q.   What is your basis for asserting that you
3  would be a person of ordinary skill in the art
4  under the DISH definition of a POSITA in -- listed
5  in paragraph 25 of your report?
6      A.   I read the definition, and I think we've
7  been discussing my qualifications, and so I meet
8  all of those qualifications at least as of 2002.
9      Q.   As of 2002, what experience did you have
10  in television signal processing and satellite
11  communications?
12      A.   So in 2002, I had a bachelor's in computer
13  science, a bachelor's in electrical engineering, a
14  master's in electrical engineering, a doctorate in
15  electrical engineering; and I had -- I would say I
16  started working since '94, so that would be six
17  years of experience.
18          So looking at -- for example, looking
19  at paragraph 26, it says you need a bachelor's
20  degree, you need a master's degree.
21      Q.   Sorry.  I'm looking at 25.
22      A.   Oh, okay.  Sorry.  Thank you.  So let's go
23  to 25.
24          So 25, it says you need to have a
25  bachelor's degree and three more years; or you have



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
69–72

1  a master's degree and one or more year; or you need
2  to have a doctorate degree and at least some
3  experience.
4       So my bachelor's was in '94, so that
5  gives us six years.  My mast- -- and I have two of
6  those.  My master's was in '96 -- sorry.  That
7  gives us eight years between '94 and 2002.
8       My master's was in '96, and so
9  since -- between my master's and 2002 is six years.
10  My doctorate was in 2000, so that gives us two
11  years; and so that checks all the boxes that's in
12  paragraph 25.
13    Q.   And so your experience in television
14  signal processing and satellite communications is
15  derived from your work -- your educational work?
16    A.   Yes, I think that's fair.  I've done a lot
17  of work -- the focus of my master's and doctorate
18  work related to, really, signal processing and
19  wireless communication.
20       So I think it is more than fair to
21  look at my qualifications and say -- I would say I
22  have eight years of experience in signal
23  processing, which television signal processing and
24  signal processing are very related, and wireless
25  communication or satellite communication, because,

1  again, those are -- are very related.
2       The -- so the requirement would have a
3  doctorate and at least some experience, and I would
4  say I have a doctorate and around eight years of
5  experience.
6    Q.   The experience being derived from your
7  educational coursework from bachelor's through
8  doctorate; is that right?
9    A.   I would not -- also, I would not exclude
10  the work that I worked for Comspace; and I would
11  not exclude my teaching in 2002.
12       So I was a professor in 2002.  I was a
13  professor at the University of New Orleans in 2002,
14  and I designed their computer engineering program
15  out of electrical engineering.
16       So I'm -- I'm not sure why, you
17  know -- so I'm -- I am not limiting my experience
18  to just when I was a student.  I am including my
19  experience up to 2002, which includes my work at
20  Comspace and my work being a professor in 2002.
21    Q.   Between your education and your work in
22  Comspace and your work as a professor in 2002, what
23  specifically did you do that related to satellite
24  communications applications?
25    A.   I think you've already asked me that

1  question, and my answer is on the record.  So we
2  can go back to the record.
3    Q.   So you are not going to answer the
4  question I just asked you?
5    A.   I've already answered that question, so we
6  can move on to another question.
7    Q.   So that is a no, you will not answer my
8  question?
9    A.   I've already answered that question.  We
10  talked about my work for Boeing.  We talked about
11  my work for McDonnell Douglas.  We talked about the
12  courses that I took.  We talked about what I did in
13  industry.  We've covered all of that during that
14  time period, and my answer is on the record.
15       And it definitely meets the language
16  here, which says some experience in television
17  signal processing and satellite communication.  So
18  what we've discussed for over an hour would meet
19  the requirements for the last part of Element 3 in
20  paragraph 25.
21    Q.   What is your basis for asserting that you
22  would apply as a person of ordinary skill in the
23  art under Dr. Steffes' definition of a POSITA for
24  the '008 patent, which is listed in paragraph 26 of
25  your declaration?

1    A.   So it is going to be very similar, but I
2  will go ahead and indulge you and repeat my answer.
3       He provides a bachelor's degree with
4  three or more years of experience, a master's
5  degree in electrical engineering and one or more
6  years of experience, a doctorate degree in
7  electrical engineering or a related field and some
8  experience in cable and/or satellite, television
9  signal processing, and communication systems.
10       And I think for the '008, the priority
11  date goes to 2011.  So for the '008 in 2011, I had
12  two bachelor's, a master's, a Ph.D., and 17 years
13  of experience.  So I definitely more than meet the
14  qualifications of a doctorate degree and at least
15  some experience in cable and/or satellite
16  television signal processing and communication
17  systems using the responses that we discussed
18  extensively in the first hour of our deposition of
19  what I did during that time period.
20    Q.   When you say "17 years of experience," you
21  are counting that in your educational experience;
22  is that right?
23    A.   Yeah, I -- I -- because I -- even when I
24  was a student, I worked.  I talked -- I was a
25  teaching assistant, and I also worked.



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
73–76

Page 73

1    So I started working starting in '96.
2  So I count experience -- I'm not double counting.
3  I am counting -- I count experience in academia,
4  and I count experience from '96 that complemented
5  my academic work working in -- in industry and
6  while I was a student and also being a teaching
7  assistant.
8    So -- and if you want to count after
9  my doctorate, that was in 2000.  So between 2000
10  and 2011 is 11 years, but I count since '96.  When
11  I -- in my introductory paragraph when I state how
12  many years of experience I have, I have over 28
13  years of experience because I am counting since
14  1996 is where I started building experience, in
15  addition to my academic work.
16    Q.  In '96, that experience started with a
17  company called MinMax Corporation; is that right?
18    A.  Yes.
19    Q.  And you were working with MinMax until
20  2000; is that right?
21    A.  Yes.
22    Q.  Is that when you graduated, 2000?
23    A.  Yes.  It is a company in St. Louis.
24    Q.  Did MinMax -- did your work with MinMax
25  involve any satellite communications applications?

Page 74

1    A.  My work with MinMax related to packet
2  network, so it related to -- I did different things
3  with MinMax; but it -- I looked at coding and
4  decoding, which is relative to -- which is
5  applicable to satellite communication; and I looked
6  at routing and packet networks, which is also
7  relevant to satellite communication.
8    Q.  Did you work on any applications of those
9  types of networks and communications specifically
10  related to satellites?
11    A.  I did not focus on any specific
12  application.  I was looking at the technology that
13  would go into any network, including satellite.
14    Q.  Did MinMax Corporation, as part of its
15  business, develop satellite networks at the time
16  you worked there?
17    A.  No.  I think it was a -- what's called a
18  fabless chip manufacturer where they design chips
19  but they don't fabricate chips.  So they -- we --
20  the engineers, we worked on the design of the chips
21  and those would be licensed, but somebody else
22  would fabricate and use those chips.
23    And by "chips," I mean that goes into
24  routers and for aca- -- in telecommunication
25  networks.

Page 75

1    Q.  Do you have any other understanding of
2  whether a design that you worked on was used in
3  satellite communications?
4    A.  I don't know.  I was not privy to that
5  aspect of the business of who the -- who they were,
6  I guess, marketing and selling the chips for.  I
7  mean, I was -- I worked on the technology side, not
8  in the marketing or sales department.
9    Q.  So your job was to design a chip, but you
10  didn't have visibility into its ultimate
11  application?
12    A.  That's fair.
13    MR. HESTER:  I think it is a good time
14  for a break.  Let's go off the record.
15    THE VIDEOGRAPHER:  Time is now
16  11:08 a.m.  We are off the record.
17    (Brief Recess, 11:08 a.m. until
18  11:20 a.m.)
19    THE VIDEOGRAPHER:  We're now on the
20  record.  The time is 11:20 a.m.
21    MR. HESTER:  As we discussed during
22  the break, myself and Ms. Allor, we're going to
23  just use some digital copies of the exhibits today
24  to save everybody and save some trees; and so I
25  will e-mail the digital copies of the exhibits to

Page 76

1  the reporter after the deposition.
2    Q.  (BY MR. HESTER)  Dr. Akl, I have a quick
3  question about that McDougal Douglas -- or what's
4  the name of the company?
5    A.  McDonnell Douglas.
6    Q.  McDonnell Douglas.
7    Is that work on your CV?
8    A.  I don't remember.  It's grants when I was
9  a student.  I don't think those are in my CV.
10    Q.  Again, turn to paragraph 41 of your
11  declaration.
12    A.  I am there.
13    Q.  This paragraph is discussing the '576
14  patent; is that right?
15    A.  Yes.
16    Q.  The third line of the paragraph, line 11,
17  you refer to content.  What do you mean by content?
18    A.  Can you please repeat which line you are
19  at?
20    Q.  11.  Although, I think you use it
21  elsewhere in paragraph 41.
22    A.  Oh, I give examples of content in
23  parentheses, signals and channels.
24    Q.  In what way is a signal content?
25    A.  I don't understand the question enough to



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
77—80

Page 77

1 be able to answer it.
2     Q.  Okay.  Well, you told me you gave examples
3 of content that include signals; and so I'm trying
4 to understand:  How is signals an example of
5 content?
6     A.  It is.  I don't -- I'm not sure how better
7 to explain that a signal is an example of content.
8     Q.  How are channels an example of content?
9     A.  The same thing.  So you have a receiving
10 system and you are receiving content and so you are
11 receiving information.  And so examples of how that
12 content or that information is packaged would be
13 signals and channels.
14         So my answer applies to both, signals
15 and channels would be examples of content in this
16 context of what you would be receiving in the
17 system.
18     Q.  Do signals and channels refer to the same
19 content?
20     A.  No.  I'm looking at -- I pulled up the
21 '576 patent, and the '576 patent -- and I am
22 searching for the word "content."  It appears in
23 the title.
24     Q.  Okay.
25     A.  And it appears really just in the title.

Page 78

1 It appears in Column 1 three times in the paragraph
2 under "related applications."  I'm not getting any
3 hits in the body of the specification of the '576
4 patent.
5     Q.  So if the word is not used other than --
6 if the word "content" is not used other than in the
7 title of this patent and related patents, why did
8 you use it in your declaration?
9     A.  Well, it is in the title; and so it is
10 used; and I provide examples of what content is.
11 So I've clarified that I'm using it in the context
12 of signals and channels.  And those terms are used
13 extensively, I believe, in this -- the word
14 "signals" and the word "channels" are used in the
15 specifications.
16     Q.  If signals and channels are examples of
17 content, what are other examples of content?
18     A.  I haven't rendered an opinion on
19 everything that can be content, so I don't have an
20 answer for you right now.  I don't have an opinion
21 on that.
22     Q.  Can you name anything else, other than a
23 signal or a channel, that is an example of content
24 in this context?
25         MS. ALLOR:  Objection to form.

Page 79

1     A.  Not right now.  I have not provided other
2 examples.
3     Q.  (BY MR. HESTER)  As someone who is
4 representing himself as a person of skill as to the
5 '576 patent, or at least meets the qualifications,
6 are you unable to tell me any other examples of
7 content here today?
8         MS. ALLOR:  Object to the form.
9     A.  In the context of the opinions that I have
10 here, those are the only two examples that I
11 provide.
12     Q.  (BY MR. HESTER)  But you are unable to
13 provide any other examples sitting here today?
14         MS. ALLOR:  Object to the form.
15     A.  That is correct.  I don't have any other
16 opinions regarding what content could be.
17     Q.  (BY MR. HESTER)  And you are unable today
18 to form opinions as to even one other example of
19 what content can be.  Is that fair?
20         MS. ALLOR:  Object to the form.
21     A.  Sure.
22     Q.  (BY MR. HESTER)  On lines 15 and 16,
23 paragraph 41 -- sorry -- yeah, 41 still, you say,
24 quote, "Content can be selected by digitizing the
25 broadband signal then digitally filtering to

Page 80

1 isolate the desired content."
2         What is "desired content" in that
3 sentence?
4     A.  Well, the word "desired" does also appear
5 in the claim language.  So if we actually go back
6 to the '576 patent -- and I am looking at -- under
7 the very end, under the very last Column 3 and
8 Column 4 but at the -- in the reexamination
9 certificate.
10         So Claim 32 uses the word "desired."
11 Claim 41 uses the word "desired."  I have not
12 rendered an opinion on those words, and so I'm not
13 doing claim construction.
14         To the extent it's the same word or
15 not, I don't have an opinion on that.  So I -- I
16 would not be able to answer your question, other
17 than it would have plain and ordinary meaning.
18     Q.  And so in the context of the sentence that
19 you wrote in your declaration, what does the word
20 "desired content" mean?
21     A.  It would have the plain and ordinary
22 meaning.
23     Q.  What is the plain and ordinary meaning of
24 "desired content"?
25     A.  I have not articulated a definition.



Page 81

1    Q.  So you are using a word you cannot
2  articulate a definition for?
3    A.  I am using a word that is understood to
4  have the plain and ordinary meaning by a person of
5  ordinary skill in the art, but I am not
6  articulating a definition.
7    Q.  Are you able to tell me anything more
8  about what desired content means beyond the words
9  "desired" and "content"?
10   A.  I can give you an example.
11   Q.  I'll take an example.
12   A.  An example of desired could be, you know,
13  the one that you want.
14   Q.  Is that how a person of skill would -- one
15  way in which a person of skill would understand the
16  word "desired" in this context?
17   A.  I think that is one example that we --
18  would be consistent with the plain and ordinary
19  meaning.
20   Q.  Is that the example that you intended to
21  invoke when you included the words "desired
22  content" in your declaration?
23       MS. ALLOR:  Object to the form.
24   A.  I didn't really -- I was answering your
25  question on the fly.  I did not precontemplate what

Page 82

1  example to invoke, if asked.
2    Q.  (BY MR. HESTER)  So you're unable to tell
3  me what you meant by using the phrase "desired
4  content" in lines 15 and 16 of paragraph 41 of your
5  declaration?
6    A.  I disagree with that characterization.
7    Q.  Okay.  Can you tell me what you meant by
8  the use of the phrase "desired content" in lines 15
9  and 16 of paragraph 41 of your declaration?
10   A.  Yes.
11   Q.  Okay.  What did you mean?
12   A.  You've asked me that question, and I've
13  answered you.  It's the -- it is the plain and
14  ordinary meaning as understood by a person of
15  ordinary skill in the art.
16   Q.  And what is that plain and ordinary
17  meaning?
18   A.  You have asked me that question, and I've
19  already answered that question on the record.
20   Q.  So the answer is you cannot tell me the
21  plain and ordinary meaning here today?
22   A.  I've already answered that question.  My
23  answer's on the record.
24   Q.  Is that a "yes" or "no"?  If you've
25  answered it, it should be easy to tell me "yes" or

Page 83

1  "no."
2    A.  I have answered that question.  I have not
3  articulated a definition for it.  This is a word
4  that appears in the claims.  I am not doing claim
5  construction on a word, other than the phrase that
6  is disputed that I rendered opinions on.
7        I would not want my claim construction
8  for a word to be too narrow or too broad, and so I
9  can use and apply the plain and ordinary meaning as
10  understood by a person of ordinary skill in the art
11  without articulating a definition for it on the
12  fly.
13   Q.  When you refer to "desired" or "desiring,"
14  what is the actor or thing that is desiring in this
15  sentence?
16   A.  I don't have an opinion on that.
17   Q.  You don't have an opinion on -- strike
18  that.
19        Your declaration uses the word
20  "desire" or "desiring" with respect to content.
21  What do you understand is the thing that is
22  desiring?
23   A.  It is written in passive voice.
24   Q.  So you don't have any examples of things
25  that are desiring in this context?

Page 84

1        MS. ALLOR:  Object to the form.
2    A.  That's fair.
3    Q.  (BY MR. HESTER)  What is it that is being
4  desired when you use the phrase "desired" or
5  "desiring" in this paragraph of your report?
6        MS. ALLOR:  Object to form.
7    A.  Content.
8        THE REPORTER:  Did you say form?
9        MS. ALLOR:  Form, yes.  Sorry.
10   Q.  (BY MR. HESTER)  In paragraph 44 of your
11  report, you state that the signals that are
12  received from the satellites in Earth's orbit are
13  typically carried in a frequency range that cannot
14  be sent through the coaxial cable used to wire
15  homes.  Is that correct?
16   A.  Yes.
17   Q.  What signals are you referring to when you
18  say "signals that are received"?
19   A.  The signals that are transmitted through
20  the air between the satellite and the ground.
21   Q.  In paragraph 41, you use the phrase
22  "satellite broadband signals."  Would that be an
23  appropriate phrase to describe the signals that it
24  received?
25   A.  It may or may not.  I don't have an



Page 85

1   opinion on that.
2           Satellite broadband signals, it may
3   include what's over the air; but I have not thought
4   about whether it is limited to the part that's just
5   transmitted over the air.  So I -- I -- so I'm not
6   limiting it to that sitting here today.
7   Q.   Would you refer to the signals that are
8   received, as the phrase is used in paragraph 44, as
9   satellite broadband signals?
10  A.   Can you repeat your question, please?
11  Q.   Yes.  Would you refer to the signals that
12  are received, as that phrase is used in
13  paragraph 44, as satellite broadband signals?
14  A.   Satellite broadband signals could be an
15  example of what is received.
16          So going back to paragraph 41, I
17  state, "The '576 patent is directed to a satellite
18  receiving system where content (i.e., signals and
19  channels) are selected from satellite broadband
20  signals."
21          So satellite broadband signals could be an
22  example of what is transmitted through the air, but
23  I'm not limiting it only to that.
24  Q.   Okay.  So why is it that the signals that
25  are received through the air cannot be sent through

Page 86

1   a coaxial cable?
2   A.   That's -- that's not exactly what I'm
3   saying here.
4   Q.   What are you saying in paragraph 44 of
5   your declaration?
6   A.   I am saying the combination of the signals
7   on a specific frequency range wouldn't be.  So
8   if -- if -- if you are looking at -- so you look at
9   a signal as both a message and, for example, the
10  carrier; and we can call that a signal.
11          So the carried signal, including the
12  message that's meant for a satellite communication,
13  is operating in a specific frequency range and
14  would have a specific carrier.
15          That, I'm saying, is different than
16  what you would send on a coaxial cable, which may
17  contain the same message.  Like, for example, if
18  you are watching TV, you can receive the same
19  content as in, you know, a TV program through
20  satellite or through cable.
21          But the signal that includes that TV
22  program being modulated on a specific frequency,
23  the signal that is meant for the satellite is
24  carried differently than the signal -- or packaged
25  differently than the signal that is transmitted,

Page 87

1   for example, on a coaxial cable.
2           MR. HESTER:  Can we go off the record
3   for just a second?
4           THE VIDEOGRAPHER:  Yes, sir.
5           Time is 11:37 a.m.  We're off the
6   record.
7           (Brief Recess, 11:37 a.m. until
8   11:40 a.m.)
9           THE VIDEOGRAPHER:  We're now on the
10  record.  The time is 11:40 a.m.
11  Q.   (BY MR. HESTER)  Before the break,
12  Dr. Akl, we were talking about paragraph 44 of your
13  report; and -- and I understand -- and you --
14  strike that.
15          In paragraph 44 of your report when
16  you were discussing that signals that are received
17  from the satellites in Earth's orbit are typically
18  carried in a frequency range that cannot be sent
19  through the coaxial cable, what you mean by that is
20  the frequency of those received signals is an
21  inappropriate carrier frequency for the coaxial
22  cable; is that right?
23  A.   Typically, yes.
24  Q.   So something called an LNB is then used to
25  convert those received signals to a lower frequency

Page 88

1   suitable for transmission through the cable; is
2   that right?
3   A.   Yes.
4           THE WITNESS:  Capital L, capital N as
5   in Nancy, capital B.
6   Q.   (BY MR. HESTER)  Paragraph 47 of your
7   declaration, next page, you state, to start the
8   paragraph, quote, "The '576 patent describes a new
9   system that was revolutionary at its time in which
10  only one cable is needed to connect the outdoor
11  unit to an indoor distribution network."
12          Did I get that right?
13  A.   Yes.
14  Q.   What is revolutionary about the '576
15  patent -- strike that.
16          Is what is revolutionary about the
17  '576 patent that it required only one cable to
18  connect the outdoor and the indoor?
19  A.   That is one example that I describe here,
20  but I'm not rendering an opinion on all of the
21  elements that constitute the invention.  The claims
22  are the invention.
23  Q.   So at least in the context of your report
24  when you have used the word "revolutionary," you
25  are referring only to the use of one cable to



Page 89

1  connect the outdoor and the indoor; is that right?
2      MS. ALLOR:  Object to the form.
3      A.  No.  I would disagree with that
4  characterization.  I would say only in this one
5  sentence.
6      Q.  (BY MR. HESTER)  Okay.  And what other
7  ways -- strike that.
8          Do you have an opinion on the other
9  ways in which the '576 patent was quote/unquote
10  revolutionary at its time?
11      A.  Those are opinions I did not go into in
12  this declaration, so I don't have an answer for
13  you.
14      Q.  But in the context of the sentence that
15  we're discussing when you reference revolutionary,
16  what you are referencing is the one cable from
17  outdoor to indoor; is that right?
18      A.  In this one sentence, I'm giving one
19  example, which is what we -- what you read on the
20  record.
21      Q.  And no other examples at this time?
22      A.  Not in this one sentence.  That is fair.
23      Q.  Are there any other examples in your
24  report of the ways in which the '576 patent is,
25  quote, "Revolutionary at its time"?

Page 90

1      A.  I don't know.  I don't have my report
2  committed to memory, and this report is not
3  providing opinions on what makes the patent new or
4  valid.  So there is probably going to be another
5  report where I discuss the validity of the patent
6  or what makes it new, so -- but that is not today.
7      Q.  Then why did you include an opinion here
8  about it being "revolutionary at its time"?
9      MS. ALLOR:  Object to the form.
10      A.  Because patents are assumed to be valid;
11  and so when something is valid and new, it has an
12  invention and it has value; and I am providing an
13  overview of the patent based -- what the patent is
14  describing in the specification.
15          So this is not as much of an opinion
16  as an overview of what the patent specification
17  itself believes -- or what the patentee believed is
18  new and revolutionary.
19      Q.  (BY MR. HESTER)  Okay.  So it is not your
20  opinion that the patent was revolutionary due to
21  its use of only one cable?
22      A.  I have not rendered an opinion on what is
23  inventive or not.  My understanding -- I have not
24  done such an analysis yet, so I am providing an
25  overview on the patent.

Page 91

1          My understanding from legal principles
2  is that a patent is assumed to be valid; and being
3  valid means that the claims have not been taught in
4  the prior art, which usually means it makes them
5  new.  So -- but I don't have -- I haven't done that
6  analysis, and I'm not rendering opinions on
7  validity today.
8      Q.  When did you first review a copy of the
9  '576 patent?
10      A.  When I was retained.  So usually -- even
11  before I was retained, so probably -- if I was
12  retained early 2022, either early 2022 or late 2021
13  when I was contacted by counsel.
14      Q.  That was over a year ago?
15      A.  Yes.
16      Q.  So in the over a year since you reviewed
17  the '576 patent, am I correct that you have not
18  formed an opinion about the ways in which it is,
19  quote, "revolutionary"?
20      A.  I am not rendering opinions on that here
21  today.
22      Q.  Have you formed those opinions?
23      MS. ALLOR:  Object to the form.
24      A.  I have not formed opinions here today on
25  that.

Page 92

1      Q.  (BY MR. HESTER)  Have you formed opinions
2  at any time since you reviewed the '576 patent
3  regarding its purported novelty?
4      MS. ALLOR:  Object to the form.
5      A.  No, I have not done that analysis yet.
6      Q.  (BY MR. HESTER)  Similar question on the
7  '008.  When did you first review the '008 patent?
8      A.  Before I was officially retained.  I
9  usually like to see a copy of the patents to make
10  sure that the technology falls in my field of
11  expertise.
12      Q.  And that would have been over a year ago
13  when you first reviewed the '008 patent?
14      A.  Yes.
15      Q.  And in the year since, have you formed an
16  opinion as to the novelty of the '008 patent?
17      A.  I have not completed such an analysis, no.
18      Q.  Have you started such an analysis?
19      MS. ALLOR:  Object to the form.
20      A.  I -- I'm not sure how to answer that
21  question because it may be going into privilege
22  work product that's not finished yet, so I would
23  rather not answer that question.
24      Q.  (BY MR. HESTER)  Well, don't tell me
25  anything that you have written or communicated to



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
93–96

Page 93

1  your counsel; but have you thought and formed
2  opinions in your mind about the validity of the
3  '008 patent in the year since you've looked at it?
4          MS. ALLOR:  Object to the form.
5  A.  Your --
6          MS. ALLOR:  Caution the witness not to
7  disclose privileged information.
8  A.  Your question has two parts.  Can you ask
9  me each part separately so I can answer?
10  Q.  (BY MR. HESTER)  Have you formed an
11  opinion in your mind about the validity of the '008
12  patent since you first looked at it over a year
13  ago?
14  A.  No.
15  Q.  Okay.  Do you have an understanding of the
16  state of the art of satellite communications field
17  as of the earliest priority date of the '576
18  patent?
19  A.  Yes.
20  Q.  Have you studied the state of the art in
21  the satellite communications field as of the
22  earliest priority date of the '576 patent?
23  A.  I don't know what you mean by "studied."
24  Q.  Have you done research specifically
25  regarded to the state of the art in the satellite

Page 94

1  communications field as of the earliest priority
2  date of the '576 patent?
3  A.  I have not formed opinions on that here
4  today.
5  Q.  Okay.  But have you done research on that
6  issue?
7  A.  I have thought about it, but I have not
8  formed -- finalized any opinions sitting here
9  today.
10  Q.  Outside of thinking about it, did you do
11  any research such as in, you know, the Internet or
12  in books?
13  A.  I don't recall.
14  Q.  Looking back at paragraph 47 of your
15  declaration, on line 15 -- starting on line 15, you
16  state, quote, "The selected channels are
17  transmitted over a single cable to the IRDs."
18          My first question here is:  What
19  channels are you referring to?
20  A.  Selected.
21  Q.  Okay.  And what are the selected channels?
22  A.  I'm not sure what you are asking me.
23  That's -- I'm basically quoting from the
24  specification.  If we go to the claims, the claims
25  have language regarding selection; but I'm not

Page 95

1  rendering opinions on those claims.
2          So here, again, I'm providing an
3  overview based on what the specification is
4  describing.  So I cannot be any more specific
5  unless we go to the claims, but I'm not rendering
6  opinions on those claims other than the one
7  disputed term.
8  Q.  Okay.  But I'm just asking about the
9  sentence in paragraph 47, which is not in quotes.
10  It says, "The selected channels are transmitted
11  over a single cable to the IRDs."
12          And I want to know when you wrote that
13  sentence, which is not in quotes, what did you mean
14  by "selected channels"?
15  A.  I am referring to the previous sentence,
16  which does have quotes; and it says, "The selected
17  transponder channels."
18  Q.  Okay.  So your reference to selected
19  channels is to selected transponder channels; is
20  that correct?
21  A.  Possibly.  I am trying to answer your
22  question.  I have a sentence in quotes; and then I
23  have another sentence that is not in quotes; but,
24  again, these are not opinions that I have reached.
25  This is an overview of the specification.

Page 96

1  Q.  So you're not adding anything in
2  paragraph 47 to what's in the specification?
3  A.  That's fair.
4  Q.  And the same sentence, it refers to --
5  strike that.
6          Looking at paragraph 48 of your
7  report.  After paragraph 48 is a copy of Figure 2
8  from the '576 patent; is that right?
9  A.  Yes, that I've annotated.
10  Q.  And you've annotated with text and some
11  highlights.  Is that fair to say?
12  A.  Yes.
13  Q.  Okay.  One of the annotations that you
14  added is a gray dotted line; and it is vertical;
15  and it has the word "outside" on the left of the
16  line and "inside" on the right of the line; is that
17  correct?
18  A.  Yes.
19  Q.  Why did you annotate Figure 2 to delineate
20  between what is outside and what is inside?
21  A.  To better explain what the specification
22  is describing.  You see that -- the patent itself
23  does it, and that's what the two squiggly lines on
24  220 mean.  That usually means that this is a very,
25  very long cable.  And so I am merely clarifying



Page 97

1   what Figure 2 and the specification related to
2   Figure 2 are saying.
3       Q.   Is the line that you have added for
4   clarity important to your opinions today?
5       A.   I don't think I used that figure again
6   when I start providing my opinions regarding the
7   disputed claim terms.  So I don't think I
8   specifically relied on that line for the opinions
9   that I have here today.
10      Q.   Okay.  Taking you back up to paragraph 47
11  on the prior page, you used a few times -- excuse
12  me -- the word "outdoor unit."  What are you
13  referring to when you say "outdoor unit"?
14      A.   Outdoor.
15      Q.   Are you searching your report for
16  "outdoor"?
17      A.   No.  I am searching the patent for
18  "outdoor."
19      Q.   Okay.
20      A.   And the '576 patent uses the word "outdoor
21  unit" 26 times.
22      Q.   Okay.
23      A.   So I'm referring to the same outdoor unit,
24  which we have the acronym ODU for the satellite
25  receiver outdoor unit in the patent.

Page 98

1       Q.   Okay.  So turning you back to paragraph 67
2   of your report, what do you mean when you use the
3   term "outdoor unit" in paragraph 47?
4       A.   I'm referring to those words as used in
5   the specification.
6       Q.   And what do those words mean to a person
7   of skill in the art?
8       A.   They would have plain and ordinary
9   meaning.
10      Q.   What is the plain and ordinary meaning of
11  outdoor unit?
12      A.   I have not articulated a definition.
13      Q.   Can you articulate a definition sitting
14  here today as a person of skill in the art?
15      A.   No.
16      Q.   Why not?
17      A.   For the same reason that I'm not
18  articulating any definitions other than -- for any
19  terms other than the terms that are disputed to the
20  extent I have provided a definition.
21           So you will have the same answer for
22  any other set of words that you probably will ask
23  me.  And I can repeat my answer or I can refer you
24  back to my previous response.
25      Q.   When you say that you are not articulating

Page 99

1   any definitions, does that mean that you are
2   incapable of articulating definitions?
3           MS. ALLOR:  Object to the form.
4       A.   It means I am not articulating definitions
5   today.  I don't have opinions, and I'm not going
6   outside the scope of my declaration.
7       Q.   (BY MR. HESTER)  Are you capable of
8   rendering opinions about what certain terms mean to
9   persons of skill in the art?
10          MS. ALLOR:  Object to the form.
11      A.   I am not capable today because I would not
12  have done that analysis; but if I am asked to do
13  such analysis in the future, I may be able to do an
14  analysis and articulate a definition.  But as of
15  today, I don't have opinions.
16      Q.   (BY MR. HESTER)  But I'm asking you to do
17  that analysis today.  Why are you unwilling to do
18  it?
19          MS. ALLOR:  Object to the form.
20      A.   You are mischaracterizing my testimony.  I
21  am not saying I am unwilling to do it.  I am saying
22  I don't have the time bandwidth or -- to be able to
23  render an opinion on the fly for an opinion that is
24  not already in my declaration.  I have -- so as a
25  result, I don't have -- I cannot provide you an

Page 100

1   answer on the fly.
2       Q.   (BY MR. HESTER)  If I were a student of
3   one of your classes and I asked you what an outdoor
4   unit is, what would you tell me?
5           MS. ALLOR:  Object to the form.
6       A.   I don't know.
7       Q.   (BY MR. HESTER)  You don't know how you
8   would teach your student about an outdoor unit?
9           MS. ALLOR:  Object to the form.
10      A.   I don't necessarily recall whether outdoor
11  unit in this context -- what I would have said, so
12  I -- I don't have an answer for you.
13      Q.   (BY MR. HESTER)  When you say "in this
14  context," do you mean in this satellite
15  communications context?
16      A.   No.  I mean in a different setting where I
17  can be describing something in my class versus I'm
18  describing something under oath in a deposition.
19  So the context here I am -- is in a litigation
20  matter where I am under oath and I want to make
21  sure my answers are as accurate as possible.
22           And as such, if I don't have an
23  opinion in my declaration, I am -- I don't know if
24  I am capable or not to be able to come up with an
25  opinion on the fly.  So as such, I don't have an



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
101–104

Page 101

1  answer for you.
2      Q.  So you are -- the reason you don't have an
3  answer for me is simply because you are under oath?
4      A.  No.  You are mischaracterizing what I
5  said.
6      Q.  Can you as accurately possible tell me
7  right now what the plain and ordinary meaning of
8  "outdoor unit" is?
9      A.  No.  I have not articulated a definition
10  for that term, and that is a term that also appears
11  in the claims, and I'm not doing claim construction
12  on those words.
13      Q.  Right.  But I'm not asking you to claim
14  construct.  I'm asking you to give me plain and
15  ordinary meaning as accurately as you can.  Can you
16  do that?
17      A.  No.
18      Q.  How much time do you think it would take
19  for you to come up with an accurate explanation of
20  what an outdoor unit is to a person of skill?
21          MS. ALLOR:  Object to form.
22      A.  Days.
23      Q.  (BY MR. HESTER)  In Figure 2 of the '576
24  patent, a copy of which is in your report following
25  paragraph 48, is the Signal Selector 250 part of

Page 102

1  the outdoor unit?
2      A.  I don't have an opinion on that.
3      Q.  I'm not asking you to construe or give me
4  the plain meaning of outdoor unit.  I'm just asking
5  you whether in the context of this one specific
6  figure signal selector is in the outdoor unit?
7      A.  Okay.  So I can tell you that the Figure 2
8  in the patent draws a satellite outdoor unit with,
9  like, a bracket to 10, which seems to include
10  signal selector and combiner as drawn in the
11  figure.  But I don't have an opinion other than
12  what I see in the figure.
13      Q.  And when you say you don't have an
14  opinion, you mean you haven't formed an opinion
15  yet?
16      A.  That's fair.
17      Q.  Can I ask you to form that opinion for me
18  now?
19      A.  You can ask.
20      Q.  Is the Signal Selector 250, as shown in
21  Figure 2 of the '576 patent, part of the outdoor
22  unit?
23      A.  I don't know.  I have not formed an
24  opinion.
25      Q.  Can you form an opinion on it now?

Page 103

1      A.  No.
2      Q.  Why not?
3      A.  Because I would need to do an analysis,
4  and it would take me days to do such an analysis.
5      Q.  Days to answer that one question?
6          MS. ALLOR:  Object to the form.
7      A.  Days to do the analysis.  I take my work
8  very seriously.  I'm not providing opinions that I
9  have not done an analysis on in advance on the fly.
10      Q.  (BY MR. HESTER)  Do you remember when we
11  were talking about how long it took you to draft
12  your declaration and we arrived at something around
13  20 hours?
14      A.  Yes.
15      Q.  Why is it that helping me understand one
16  sentence would take days when drafting your whole
17  report took 20 hours?
18      A.  Well, the 20 hours aren't in one day.  The
19  20 hours were over multiple days, and so I'm
20  counting hours over multiple days because I like to
21  sleep on things and think about it.
22      Q.  Okay.  On the far left of Figure 2, top
23  left maybe more accurately, there are feed horns
24  that are part of a satellite dish; is that correct?
25      A.  Yes, I see those words.

Page 104

1      Q.  And those are your words; right?
2      A.  Yes.  They are part of my annotation.
3      Q.  Okay.  Feed horns are used to receive
4  satellite signals transmitted by a satellite; is
5  that correct?
6      A.  That's fair.
7      Q.  And there may be multiple satellite
8  signals received by the feed horns of a given
9  satellite dish.  Is that fair to say?
10      A.  Yes.
11      Q.  It is maybe even typical in the satellite
12  television context where you've got so many
13  television channels that you are dealing with that
14  you might be receiving signals from multiple
15  satellites?
16      A.  I don't know.  I don't have an opinion on
17  that.
18      Q.  Okay.  I think I'll try and clarify that
19  last question.
20          So in practice, in the real world of
21  satellite communications, is it typical to have
22  multiple satellites transmitting and having signals
23  received by a single satellite dish?
24          MS. ALLOR:  Object to the form.
25      A.  I don't have an opinion on that today.



Page 105

1    Q.  (BY MR. HESTER)  Why do you not have an
2    opinion on that today?
3    A.  Because I don't have an answer for you
4    based on memory, unless you want to direct me
5    somewhere in my declaration where I've addressed
6    that.
7    Q.  Are you unable to tell me, based on your
8    memory and experience, whether it is typical that
9    satellite television systems received signals from
10   multiple satellites?
11        MS. ALLOR:  Object to the form.
12   A.  I don't have an opinion on that based on
13   memory.
14   Q.  (BY MR. HESTER)  Do you have an
15   understanding of how many television channels are
16   typically transmitted from one satellite at a time?
17   A.  I don't have an opinion on that today.
18   Q.  Do you have an understanding of how many
19   satellites a company like DISH, for example, uses
20   to provide its television services?
21   A.  I don't have an opinion on that today.  I
22   don't have a number that I can give you based on
23   memory.
24   Q.  Okay.  When you say "based on memory,"
25   that just means you don't know; right?  You can't,

Page 106

1    like, off the top of your head recall an answer?
2    A.  It means I -- I don't want to guess or
3    recall an answer under oath, and this is not a
4    memory test.  So I'm not relying on memory to
5    answer a question if I'm not sure or recall exactly
6    what the answer is.
7    Q.  But if you guessed and you told me you
8    were guessing, that would be totally consistent;
9    right?
10        MS. ALLOR:  Object to the form.
11   Q.  (BY MR. HESTER)  Being truthful?
12   A.  I'm not comfortable guessing under oath.
13   Q.  And in order to answer this question, you
14   would have to guess.  Is that what you are saying?
15   A.  I am saying I don't recall, so I can't
16   answer the question.
17   Q.  The signals that are received from a given
18   satellite, as discussed in the '576 patent, are
19   typically characterized as broadband signals; is
20   that correct?
21   A.  Can you point me somewhere specific to
22   better answer your question?
23   Q.  Paragraph 41 of your report.
24   A.  Yes, I use that term in paragraph 41.
25   Q.  What do you understand the term

Page 107

1    "broadband" to refer to?
2    A.  Broadband is a term that also appears in
3    the patent.
4    Q.  Okay.
5    A.  I'm giving it its plain and ordinary
6    meaning.  I'm not rendering -- or articulating a
7    definition for it.
8    Q.  Without articulating a definition, can you
9    tell me what are the properties of -- what can be
10   the properties of a broadband signal?
11        MS. ALLOR:  Object to the form.
12   A.  It is fast.  That could be an example.
13   Q.  (BY MR. HESTER)  Does the term "broadband"
14   have to do with the range of carrier frequencies
15   that are used?
16   A.  I don't have an opinion on that today.
17   Q.  Can you form an opinion on that for me
18   right now?
19        MS. ALLOR:  Object to form.
20   A.  No.  It is a term that appears in the
21   claims, and I'm not providing claim construction on
22   that term.
23   Q.  (BY MR. HESTER)  How long would it take
24   you to come up with an explanation for whether
25   broadband relates to the range of carrier

Page 108

1    frequencies?
2    A.  Days.
3    Q.  At least in paragraph 41 you use the term
4    "broadband" three times.  Do you see that,
5    lines 10, 11, and 15?
6    A.  Yes.
7    Q.  When you use the word "broadband" three
8    times in paragraph 41, what information were you
9    intending to convey by the use of the term
10   "broadband"?
11   A.  Plain and ordinary meaning.
12   Q.  Okay.  And you are not going to -- you are
13   refusing to provide for me what the plain and
14   ordinary meaning is?
15        MS. ALLOR:  Object to the form.
16   A.  I disagree with that characterization.
17   Q.  (BY MR. HESTER)  What is the plain and
18   ordinary meaning of broadband?
19   A.  I don't have an opinion other than I have
20   not articulated a definition.  This is a word that
21   appears in the claim.
22        I wouldn't want to do a claim
23   construction on the fly.  I wouldn't want my
24   definition to be too narrow or too broad.  I would
25   need to do an analysis.



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
109–112

Page 109

1    And so I disagree that you are saying I am
2 refusing to answer a question. I am providing you
3 a response. I just don't have a response. I don't
4 have a definition that I can give you on the fly.
5    And that's going to be my response. I
6 mean, we can keep doing this all day; and I'm happy
7 to. It is your seven hours, but it is going to get
8 old after a while.
9    Q. Can you tell me anything about the plain
10 and ordinary meaning of broadband on the spot right
11 now as a person of skill?
12    A. I gave you an example. I said it's
13 usually fast.
14    Q. Okay. So other than that it is usually
15 fast, can you give me any more information about a
16 broadband signal, the plain and ordinary meaning of
17 broadband signal?
18    A. No.
19    Q. And you only use the word "broadband" in
20 the context of paragraph 41 because that's the word
21 used in the patent. Is that fair to say?
22    A. Yes. And in the claims.
23    Is this a good time to break for
24 lunch? I don't know if lunch is here or not but --
25    Q. Awfully close. It got here literally two

Page 110

1 seconds ago. I saw the delivery. A couple of
2 minutes, if that's okay?
3    A. That's fine.
4    Q. Okay.
5    A. I don't want Katie's salad to get cold.
6    Q. Is it supposed to be hot?
7    A. It is a joke.
8    Q. So looking back at Figure 2 of your
9 report, which is Figure 2 of the '576 patent, which
10 is after paragraph 48 of your report, the feed
11 horns output receive satellite signals to one or
12 more LNBs. Yes?
13    A. Yes.
14    Q. Okay. And we use the term "LNB" a lot,
15 and you spelled it earlier. Thank you. But does
16 that term stand for low noise amplifier and block
17 down converter?
18    A. Yes.
19    Q. The LNBs then convert the received signal
20 to intermediate frequency for transmission through
21 a coaxial cable; is that right?
22    A. I don't have an opinion on that unless you
23 want to direct me somewhere.
24    Q. Do you have an understanding of what LNBs
25 are used for in the satellite communication

Page 111

1 context?
2    A. I have an understanding --
3    MS. ALLOR: Object to form.
4    A. -- that they are a low noise amplifier and
5 block converter.
6    Q. (BY MR. HESTER) But sitting here today,
7 you are unable to tell me what LNBs are used for in
8 the context of, let's say, Figure 2 of the '576
9 patent?
10    MS. ALLOR: Object to the form.
11    A. I can go through the specification and
12 walk you through what the specification is
13 describing, if that's what you are asking me to;
14 and I'm happy to do that.
15    Q. (BY MR. HESTER) But you wouldn't be able
16 to tell me anything more than what the
17 specification says?
18    A. I am not rendering opinions beyond what's
19 in the specification today. On --
20    Q. Are you able to render those opinions
21 today?
22    A. I'm sorry. I wasn't done. It is better
23 if we don't speak over each other --
24    Q. Okay.
25    A. -- for the court reporter.

Page 112

1    Q. I got a period on your sentence, but
2 please go.
3    A. A period on a sentence, does that mean I
4 finished my opinion?
5    Q. Go right ahead.
6    A. I forgot my line of thought. Can you
7 repeat the question, please?
8    Q. Yep. Are you able to render an opinion
9 today on what the LNB in Figure 2 is used for
10 beyond what is written in the specification of the
11 '576 patent?
12    A. No.
13    Q. If the signal output from the feed horns,
14 that is the received satellite signal, is a
15 broadband signal, is the LNB going to change the
16 broadband nature of the signal as a result of its
17 processing?
18    A. I don't have an opinion on that today.
19    Q. Are you able to form an opinion on that
20 for me today?
21    A. No.
22    Q. That one would take you days, too?
23    A. Yes.
24    Are you ready for lunch?
25    Q. The -- not yet.



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
113–116

1    The LNB output signal in Figure 2 goes
2 into the Signal Selector 250; is that right?
3    A.  Yes.
4    Q.  And you've indicated with your annotations
5 that the inputs to Signal Selector 250 are
6 transponder channels; is that right?
7    A.  Yes.  The specification does, so I'm
8 annotating the figure based on what's in the
9 specification.
10    Q.  You don't have an independent opinion as
11 to whether those inputs are -- or reflect
12 transponder channels?
13        MS. ALLOR:  Object to form.
14    A.  I'm not providing an opinion other than in
15 this section what the specification is stating, and
16 I am using the specification to provide an overview
17 based on what's in the specification.
18    Q.  (BY MR. HESTER)  So the reason that you
19 use the words "transponder channels" to refer to
20 these inputs is simply because that's what the '576
21 specification refers to them as?
22    A.  That's fair.
23        MR. HESTER:  Now is a good time for
24 lunch.  Let's go off the record.
25        THE VIDEOGRAPHER:  The time is now

1 12:16 p.m.  We're off the record.
2        (Lunch Recess, 12:16 p.m. until
3 1:00 p.m.)
4        THE VIDEOGRAPHER:  We're now on the
5 record.  The time is 1:00 o'clock p.m.
6    Q.  (BY MR. HESTER)  Welcome back from lunch,
7 Dr. Akl.
8    A.  Thank you.
9    Q.  You still got your report open?
10    A.  Yeah, I have my declaration.
11    Q.  Declaration.  Sorry.
12        Do you want to go to paragraph 49 of
13 your declaration?
14    A.  I'm there.
15    Q.  Okay.  Paragraph 49, second sentence -- I
16 can't tell what line it is, 16 or 17 -- says, "The
17 signal selector extracts the needed transponder
18 signals and channels from each of the LNB outputs
19 and combines them into one composite signal
20 transmitted on cable 220."
21        What do you mean when you say that the
22 signal selector extracts the needed transponder
23 signals and channels?
24    A.  I'm using plain and ordinary meaning.
25 Those are -- I'm referring to Column 4, lines 30 to

1 34; so we can go to the specification in Column 4,
2 lines 30 to 34.
3        The patent says, referring to
4 Figure 2, (Reading:)  A satellite TV installation
5 according to the present invention is shown.
6 Signal Selector 250, part of satellite outdoor unit
7 210, extracts the needed transponder channels from
8 each of the LNB outputs and combines the channels
9 into one composite signal transmitted on cable 220.
10    Q.  So with respect to what's in your
11 report on your declaration, paragraph 49, what do
12 you understand the phrase "the signal selector
13 extracts the needed transponder signals and
14 channels" to mean?
15    A.  Those words would have the plain and
16 ordinary meaning.
17    Q.  And what is the plain and ordinary meaning
18 of those words?
19    A.  I have not articulated a definition for
20 those words.
21    Q.  Could you articulate a definition here
22 today?
23        MS. ALLOR:  Object to the form.
24    A.  No, I could not.
25    Q.  (BY MR. HESTER)  Why not?

1    A.  Because I would have to think about how
2 to -- what that definition is.
3    Q.  Are you planning to -- strike that.
4        You understand that there's going to
5 be a technology tutorial presented to the court in
6 this case?
7    A.  Okay.
8    Q.  Do you have an understanding of that?
9    A.  I mean, that's usually the case; but I --
10 I don't -- I'm not aware of the -- the one specific
11 to this case, if that's what you are asking me.
12    Q.  So you have no current plans to appear at
13 the technology tutorial in this case?
14    A.  I don't know.  I have not been asked right
15 now.
16    Q.  So no -- no plans right now?
17    A.  That is correct.
18    Q.  Okay.  Have you appeared at technology
19 tutorials before?
20    A.  Yes.
21    Q.  Have you appeared at technology tutorials
22 where the court asks you questions about what you
23 are presenting?
24    A.  Yes.
25    Q.  How often do you tell a court that you



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
117–120

Page 117

1  need days to answer one of its questions at a
2  technology tutorial?
3       MS. ALLOR:  Object to the form.
4    A.  I don't know if I've said that before; but
5  sometimes I can say, "I don't have an answer."
6    Q.  (BY MR. HESTER)  Okay.
7    A.  And the preparation that I do for a
8  technology tutorial is different than the
9  preparation that I did today for this declaration.
10  So if you are asking me have I prepped today to
11  answer questions regarding the technology, that is
12  not my understanding of my charge as today.
13       I am here today to answer questions
14  regarding two claim construction terms that are
15  being disputed.  And so far, we've spent over three
16  hours; and we have yet to ask me a single question
17  on the opinion that, my understanding, I'm here
18  today to answer.
19    Q.  The sentence I just read, the term
20  "transponder channels" are there; right?
21  Paragraph 49, it says "transponder signals and
22  channels" but --
23    A.  Yes, that is correct.
24    Q.  Okay.  And one of the terms you are
25  opining about is transponder channels; right?

Page 118

1    A.  In the context of claim language.  And I
2  am not providing an opinion on what those words
3  mean.  I think there is not a dispute that those
4  words have plain and ordinary meaning.
5       There is a dispute regarding
6  antecedent basis.  So you are not asking me on
7  antecedent basis.  You are asking me on the plain
8  and ordinary meaning, which is not even disputed.
9    Q.  So all right.  In response to a question a
10  couple minutes ago, you said, "So if you are asking
11  me have I prepped today to answer questions
12  regarding technology, that is not my understanding
13  of my charge as today."
14       Does that mean you are not able to
15  provide me with answers about the technology
16  disclosed in the '576 patent?
17       MS. ALLOR:  Objection to form.
18    A.  I am trying to; but to the extent you are
19  asking me to do claim construction on the fly, that
20  is not something I can do.  So I have been trying
21  to answer questions to the best of my ability, but
22  you're -- you are comparing -- you provided me a
23  hypothetical comparing what I'm ans- -- how I'm
24  answering you today to how I would answer questions
25  in front of a court in a technology tutorial.

Page 119

1       So this is not a technology tutorial
2  presentation.  So to the extent I would answer
3  questions in front of the court for a technology
4  tutorial, that is not the prep that I did for
5  today.
6       So those are separate, I guess,
7  situations.  And I am trying to answer your
8  questions to the best of my ability, but this is
9  not a technology tutorial presentation.
10    Q.  (BY MR. HESTER)  Right.  But you provide a
11  summary of, for example, the '576 patent in this
12  declaration; right?
13    A.  I have.  I've summarized the
14  specification.  I have not added my own opinions to
15  what the specification means, and you've asked me
16  that multiple times.
17    Q.  So if -- strike that.
18       So in the entire section you have here
19  on the overview of the '576 patent, which is
20  several pages long, nothing in here reflects an
21  opinion of yours separate from what the '576 patent
22  says.  Is that fair?
23    A.  That is fair.  And I include a figure that
24  is actually annotated by your expert, but that's --
25  that's fair.

Page 120

1    Q.  That figure is the exception?
2    A.  That figure is the exception.  But I like
3  the annotations, and I've used that figure instead
4  of making my own annotations.  I would have
5  annotated it in a similar way.  And so as far as
6  the annotations, they were fine for the purpose
7  that I used them later; and that's why I included
8  it.  And you will see that figure used later when
9  I'm discussing my opinions.
10    Q.  Okay.  And paragraph 51 of your
11  declaration starting line -- between 17 and 18, the
12  sentence that reads, "Each IRD may communicate the
13  channels 'it needs to receive, directly or
14  indirectly, to the signal selector.'"
15       I'm going to stop there with a quick
16  question.
17       What does "the channels it needs to
18  receive" refer to in that sentence?
19    A.  That's a direct quote from the
20  specification.
21    Q.  Can you help me understand what that quote
22  means or is referring to, separate from the words
23  on the page?
24    A.  Sure.  We can go back to that section of
25  the specification.  So we can go to Column 3,

ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
121–124

Page 121

1 lines 1 through 19.  And so maybe -- because that's
2 the middle of -- so we are -- starting bottom of
3 Column 2, we have -- a channel translation mapping
4 table is used to coordinate the channel assignment
5 between the original channels and new channels.
6 And let me see where the quote is.
7 In another alternative embodiment, the
8 gateway transmits the video information.  Then the
9 spec goes on, (Reading:)  LNB outputs can be
10 sampled by a broadband analog-to-digital converter
11 and filtered with a digital filter to select a
12 transponder channel.
13 Alternatively, a tuner can select a
14 transponder channel.  The selecting process
15 extracts from the wideband LNB output a narrow band
16 transponder channel.
17 And then we get to the -- I think the
18 sentence you are asking me about, (Reading:)  Each
19 IRD communicates the channel it needs to receive,
20 directly or indirectly, to the signal selector.
21 Q.  So that -- yeah, looks like that's the
22 sentence that you quoted.  Is that fair to say?
23 A.  Yes.
24 Q.  Can you tell me what "needed transponder
25 signals and channels" means -- strike that.

Page 122

1 Can you tell me what "channel" refers
2 to in the sentence you are quoting beyond just
3 reading to me what the patent says?
4 A.  I'm not sure what you are asking me.  I
5 have not specifically rendered an opinion on that.
6 So I can -- I've read -- I've read to you the
7 section and the previous sentences that do describe
8 a channel followed by the sentence that I quote,
9 which says "the channels."
10 And so grammatically, usually it would
11 be referring back to a channel in the previous
12 paragraph; and the previous paragraph provides a
13 couple of alternatives.  So that's my explanation
14 to your question.
15 Q.  And the only channel referenced in the
16 previous paragraph is a transponder channel; is
17 that right?
18 A.  I do see the words "a transponder channel"
19 three times.
20 Q.  And you don't see the word "channel" used
21 outside of the context of transponder channel in
22 that paragraph?
23 A.  Between lines 5 and 10, that is fair, of
24 Column 3.
25 Q.  So in paragraph 51 of your declaration

Page 123

1 when you state that "Each IRD may communicate 'the
2 channels it needs to receive,'" you are referring
3 to the transponder channels; is that right?
4 A.  I'm sorry.  Can you slow down just when
5 you are reading?  It helps.
6 Q.  Sure.
7 It's the same quote we've been talking
8 about.  But when you state that "Each IRD may
9 communicate 'the channels it needs to receive,'"
10 you are referring to transponder channels there; is
11 that right?
12 A.  I am quoting from the sentence which says
13 "the channel."
14 Q.  And your understanding of that channel is
15 a transponder channel; right?
16 A.  I have not rendered an opinion on that.  I
17 am -- I answered your question that the previous
18 paragraph mentions a transponder channel, but I am
19 not providing an opinion agreeing or disagreeing
20 with you right now today.
21 But I explained what the previous
22 sentence -- or I read to you what the previous
23 sentence in the '576 patent states.
24 Q.  And based on reading that previous
25 sentence, can you tell me whether channels in the

Page 124

1 sentence you quoted refers to transponder channels?
2 A.  I don't have an opinion on that.
3 Q.  Okay.  Can I ask you to form an opinion on
4 that right now?
5 MS. ALLOR:  Objection, form.
6 A.  Yes, you can ask.
7 Q.  (BY MR. HESTER)  Does the meaning -- does
8 the channel -- the word "channel" in your quote in
9 paragraph 51 refer to a transponder channel?
10 A.  I don't have an answer for you.
11 Q.  Okay.  How long would it take for you to
12 come up with an answer to my question?
13 A.  Days.
14 Q.  How many hours?
15 A.  I don't know.
16 Q.  More than one?
17 A.  Probably.
18 Q.  More than two?
19 A.  Maybe.
20 Q.  More than three?
21 A.  I don't know.  I need to do an analysis.
22 And I'm not doing an analysis in vacuum, so I don't
23 have an estimate for you at this time.
24 Q.  Okay.  Paragraph 52 of your declaration,
25 first sentence reads, "Each selected transponder



Page 125

1 signal may be translated to a new channel
2 frequency."
3         Can you explain for me what this
4 sentence means, beyond quoting the patent, which
5 this sentence is a quote of the patent?  So I'm
6 going to strike that and rephrase it.
7         Can you tell me what "Each selected
8 transponder signal may be translated to a new
9 channel frequency" means?
10    A.   To the extent you are asking me about an
11 opinion that is not in my declaration and you
12 want -- you don't want me to go back to the
13 specification and provide you what's in the
14 specification and render an opinion outside of the
15 specification, then the answer is no.
16    Q.   Why did you include that quote in this
17 declaration?
18         MS. ALLOR:  Object to the form.
19    A.   Because I am providing an overview of the
20 specification and so I am trying to summarize what
21 the specification says.  I'm not rendering an
22 opinion on the specification other than providing
23 an overview.
24    Q.   (BY MR. HESTER)  How does the quote at the
25 beginning of paragraph 52 provide an overview of

Page 126

1 what's in the '576 patent?
2    A.   It is part of the specification; and it is
3 part of Column 2.  And Column 2, lines 58 to 59, is
4 under summary of the invention.  So it is part of
5 the specification providing a summary of the
6 invention.
7    Q.   And so other than the fact that this quote
8 is from the summary of the invention, do you have
9 any other reason for why it appears in your report?
10    A.   It is providing an overview -- at least in
11 paragraph 52, the answer is no.  To the extent I
12 use it later in the section on my opinions, then we
13 can go there.
14         But for this section of my report, I
15 am providing an overview of the patent.  I have not
16 started providing my opinions regarding the
17 disputed claim term.
18    Q.   It is fair to say you are not providing
19 any opinions at all in the overview section, other
20 than summarizing what's in the patent?
21    A.   That's fair.
22    Q.   If I can have you grab a copy of the
23 patent or pull it up digitally.  The '576 patent is
24 Exhibit 3.  Let me know when you have got the '576
25 patent up.

Page 127

1    A.   I have it.
2    Q.   So can I have you turn to the
3 second-to-last page of the '576 patent?
4    A.   Okay.
5    Q.   And do you understand that the page
6 includes claims of the '576 patent issued after a
7 reexamination?
8    A.   I do see the words "reexamination," but I
9 don't have an opinion on that.  My understanding,
10 it is a legal thing.
11    Q.   Did you study the claims that are on this
12 page in forming your opinions?
13    A.   I considered claim language for at least
14 the term that I'm rendering an opinion on.
15    Q.   Okay.  Did you consider the claim language
16 across all claims of the '576 patent?
17    A.   I read the entire specification and
18 patent, so I would agree that I considered -- I may
19 not have relied on; but I have considered, by
20 reading the specification and the claims, the
21 entire patent.
22    Q.   In considering the patent, did you give
23 different weight to what is in the specification
24 versus what is in the claims?
25    A.   I don't understand the question.

Page 128

1    Q.   Okay.  Let me try again.
2         Did you -- did you analyze the
3 language of the claims any differently than how you
4 analyzed the specification of the '576 patent?
5    A.   My understanding of legal principles are
6 that the claims are read in light of the
7 specification, or POSITA understands the claims in
8 light of the specification.
9    Q.   So did you analyze the claims any
10 differently than how you analyzed the specification
11 in the '576 patent?
12    A.   I analyzed -- I put myself in the shoes of
13 a person of ordinary skill in the art and analyzed
14 the claims in light of the specification.
15    Q.   On page -- the second-to-last page of the
16 '576 patent, do you understand that language in
17 italics refers to language that was added as a
18 result of the reexamination?
19    A.   I see those words in Column 1, line 10 on
20 this page.
21    Q.   And when you analyzed the claims, did you
22 have that understanding of what the italics meant?
23    A.   That's -- yes, that's fair.
24    Q.   Okay.  And you understand that the
25 bracketed language refers to language that was



Page 129

1  removed during the reexam?
2      A.  I see those instructions in Column 1,
3  lines 7 and 8 and 9; so that is my understanding,
4  also.
5      Q.  And was that your understanding when you
6  reviewed the claims of the '576 patent in preparing
7  your report?
8      A.  Yes.
9      Q.  Where in Claim 14 in the '576 patent does
10  it reference transponder channels?
11      A.  Can you be more specific, or do you want
12  me to answer your question generally?  Because
13  I'm -- I'm -- I want to make sure I am answering
14  the question you are asking.
15      Q.  Do you see the words "transponder channel"
16  referenced anywhere in Claim 14 of the '576 patent?
17      A.  The words "transponder channel" I don't
18  think appear in Claim 14.  Transponder signal --
19  signals, plural, does appear; and I provide
20  opinions how the two relate to each other; and I
21  can -- I'll be happy to go into that opinion if
22  asked.
23          So if -- but as far as does the words
24  in vacuum "transponder channel" appear in Claim 14,
25  no, the words "transponder signal" and "signals"

Page 130

1  do.
2      Q.  Transponder channel does not appear in the
3  language of Claim 14?
4      A.  The words themselves do not, that is
5  correct.
6      Q.  Do the words "selecting a transponder
7  channel" appear in Claim 14 of the '576 patent?
8      A.  Well, your question is derivative because
9  if -- again, if the words "transponder channels" do
10  not appear, adding another word is still not going
11  to appear.
12          But it is my opinion that a POSITA
13  would understand what's in Claim 14 is referring to
14  a transponder channel; but that's a separate
15  question than what you are asking me, if what you
16  are asking me specifically to look at and compare
17  words, not meaning.
18      Q.  I'm asking you for words.  Are the words
19  "selecting a transponder channel" found in
20  Claim 14?
21      A.  No, the words in vacuum are not.
22      Q.  Are the words "selecting and extracting a
23  transponder channel" found in Claim 14?
24      A.  The words in vacuum are not.
25      Q.  Do you have an understanding of what it

Page 131

1  means to extract a transponder channel versus what
2  it means to select a transponder channel?
3      A.  I have not rendered an opinion on that
4  here today.
5      Q.  Can you render an opinion for me right
6  now?
7      A.  No.
8      Q.  Why not?
9      A.  Because I have not done an analysis on
10  those differences between selecting and extracting,
11  and those are terms that appear in the claim.  My
12  understanding is those words would have a plain and
13  ordinary meaning.  So beyond the plain and ordinary
14  meaning, I do not have a -- I have not articulated
15  a definition for the claims.
16      Q.  With respect to extracting, what is the
17  plain and ordinary meaning of extracting a
18  transponder channel?
19      A.  I have not articulated a definition for
20  it.
21      Q.  Can you explain for me what it means to
22  extract a transponder channel separate from
23  defining it?
24      A.  No.  It would be difficult to -- to do so
25  in vacuum without articulating some sort of

Page 132

1  definition or construction, and I am not providing
2  claim construction on extracting in vacuum or
3  extracting a transponder signal or extracting a
4  transponder channel as a phrase other than
5  disagreeing with regard to indefiniteness.
6          But I -- but my understanding is those
7  words have plain and ordinary meaning and the
8  parties have agreed -- or at least there is not a
9  dispute from either party that the words have their
10  plain and ordinary meaning.
11      Q.  And what is your basis for saying that
12  there is a not a dispute between the parties that
13  the words transponder -- "selecting and extracting
14  a transponder channel" have their plain and
15  ordinary meaning?
16      A.  I think there is a quote, based on my
17  understanding, and it is somewhere in my
18  declaration, that defendants' expert is also not
19  disputing that.
20          And I would be happy to try to -- it
21  is in -- let's see.  I can -- I can find you where
22  that quote is, if you want.
23      Q.  It is a quote from you, though; right?
24  You are the one who is saying you understand there
25  is no dispute; right?



Case 2:22-cv-07775-JWH-KES   Document 253-2   Filed 06/09/23   Page 35 of 66   Page ID
#:3098

ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
133—136

Page 133

1    A.   Paragraph 59.  So in paragraph 59, I
2  provide an opinion saying, "In addition, the term
3  'selecting and extracting' appears elsewhere in the
4  claims, such as in Claim 14, which recites
5  'selecting and extracting a plurality of
6  transponder signals.'  I understand that neither
7  DISH nor Dr. Steffes" -- capital S-t-e-f-f-e-s --
8  "contends that this phrase requires construction."
9    Q.   I was referring to selecting and
10 extracting transponder channels, not signals.  The
11 sentence you just read refers to transponder
12 signals.
13         I'm asking for the plain meaning of
14 selecting and extracting a transponder channel.
15   A.   It would still have the plain and ordinary
16 meaning.
17   Q.   And what is the plain and ordinary
18 meaning?
19   A.   I have not articulated a definition.
20   Q.   Is there a definition?
21   A.   I don't know.  I have not been asked to
22 articulate a definition.
23   Q.   You mean by counsel you haven't been asked
24 to articulate a definition?
25         MS. ALLOR:  Objection, form.

Page 134

1    A.   I've not been charged and I don't believe
2  there is dispute in terms of what those words mean,
3  is my understanding in this matter.
4    Q.   (BY MR. HESTER)  How do you know there is
5  no dispute if you haven't articulated what you
6  believe it means and you haven't seen what
7  Dr. Steffes articulates it means?
8    A.   That is my understanding from counsel that
9  the dispute is not with regard to that those words
10 require construction.
11         The dispute is with regard to if there
12 is antecedent basis and whether, in the absence,
13 they may or may not be indefinite to a POSITA when
14 we get to the dependent claims.  So that is my
15 understanding of the dispute from counsel.
16   Q.   Okay.
17   A.   And because of that, my charge from
18 counsel was to provide an opinion whether those
19 words are indefinite or not.  My charge was not to
20 provide or articulate a construction but to use the
21 plain and ordinary meaning of those words.
22   Q.   I'm not asking you to articulate a
23 construction, but I am going to ask you this:  Can
24 you tell me what the plain meaning of the phrase
25 "selected transponder channels" is?

Page 135

1    A.   No, because --
2         MS. ALLOR:  Object to form.
3    A.   -- as now I have answered such a question
4  many times, and I will continue to provide a
5  similar response if asked a similar question.
6         I would be doing claim construction,
7  and those words would have the plain and ordinary
8  meaning, and claim construction is not something
9  that I take lightly.  I would not want the
10 definition to be too narrow or too broad.
11         It is not something I can do on the
12 fly and that was not something that I was asked to
13 do today, or for my declaration that I am answering
14 questions on today.
15   Q.   (BY MR. HESTER)  In your declaration,
16 above paragraph 57, there is a section heading,
17 "Selected [and extracted] transponder channel[s]."
18         What is the plain and ordinary meaning
19 of that phrase in quotes that's in your
20 declaration?
21   A.   I have not rendered such an opinion.
22   Q.   Why not?
23   A.   Because I was not asked to.  I don't
24 believe there is a dispute on the plain and
25 ordinary meaning.

Page 136

1         I -- under that section heading, I
2  provide -- it is my understanding that DISH asserts
3  that the term is indefinite because the phrase
4  lacks antecedent basis.  It is not my understanding
5  that there is a dispute on what the plain and
6  ordinary meaning is.
7    Q.   Okay.  And can you tell me what the plain
8  and ordinary meaning is today?
9         MS. ALLOR:  Object to the form.
10   A.   No, because I was not asked to do so and
11 because I would be doing claim construction.  And I
12 don't take claim construction lightly, and I would
13 not want -- that my construction to be too narrow
14 or too broad.  And so because of that, I would not
15 be able to provide you a construction on the fly.
16   Q.   (BY MR. HESTER)  Would you be able to tell
17 me a plain and ordinary meaning today?
18         MS. ALLOR:  Object to the form.
19   A.   You just asked me that question, and my
20 answer is on the record.
21   Q.   (BY MR. HESTER)  You didn't actually use
22 the word "plain and ordinary meaning" in your
23 answer, so that's why I'm asking for some clarity.
24         Would you be able to tell me the plain
25 and ordinary meaning today?  It is either, "Yes, I



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
137—140

Page 137

1   can tell you the plain and ordinary meaning"; or
2   "No, I cannot tell you the plain and ordinary
3   meaning." Which is it?
4          MS. ALLOR: Object to the form.
5      A.   No, I would not be able to provide a
6   definition of what the plain and ordinary meaning
7   for the reason that I gave previously, which is
8   that I would be doing claim construction; and I
9   would not want the claim construction to be too
10  narrow or too broad.
11         And because of that, I cannot sit here
12  today and articulate a definition or give you a
13  definition of what the plain and ordinary meaning
14  because I would be doing claim construction.
15     Q.   (BY MR. HESTER)  In your more than one
16  year since you looked at the '576 patent, have you
17  considered what the plain and ordinary meaning of
18  selected and extracted transponder channels is?
19     A.   I gave them the plain and ordinary
20  meaning.
21     Q.   When you say "them," who is them?
22     A.   The words "selected and extracted
23  transponder channels."  So the individual words, I
24  gave those words plain and ordinary meaning.
25     Q.   Okay.  And when you say you gave them

Page 138

1   plain and ordinary meaning, what plain and ordinary
2   meaning did you give them?
3      A.   I can put myself in the shoes of a
4   POSITA -- and we can do this all day -- and provide
5   an opinion without articulating a definition of the
6   plain and ordinary meaning.
7          So to the extent you are asking me to
8   articulate a definition, I cannot do that today
9   because I would be doing claim construction.  And I
10  don't take this task lightly, and I wouldn't want
11  my analysis to be too broad or too narrow with
12  regard to what the claim construction is for those
13  words.
14     Q.   If you are asked at the technology
15  tutorial to provide a plain and ordinary meaning of
16  selected and extracted transponder channels, will
17  you have an opinion then?
18         MS. ALLOR: Object to the form.
19     A.   I -- I don't know.  If counsel asks me to
20  think about examples or then -- between now and
21  then, I might do that analysis; but as of now, I
22  have not been asked to do so; and I have not
23  articulated or was -- or determined what that
24  definition is.
25     Q.   (BY MR. HESTER)  And sitting here today,

Page 139

1   you will not determine what that definition is
2   either?
3          MS. ALLOR: Object to the form.
4      A.   Sitting here today, I cannot do that on
5   the fly.
6          And I do say that also in
7   paragraph 58.  I -- in paragraph 58, I provide an
8   opinion saying, "I do not see any disagreement from
9   Dr. Steffes that the terms 'selected [and
10  extracted] transponder channel' has a plain and
11  ordinary meaning."
12         And so I -- my understanding is there
13  is not a dispute, that those words have a plain and
14  ordinary meaning.  I do not believe either party
15  have proposed what is the plain and ordinary
16  meaning.
17         I have not been asked to articulate a
18  definition on what the plain and ordinary meaning.
19  And my understanding is the dispute is not related
20  to the plain and ordinary meaning.  There is a
21  dispute related to whether or not there is a lack
22  of antecedent basis for the phrase "transponder
23  channels," and that's what I am providing opinions
24  on.
25     Q.   So do you agree with Dr. Steffes' opinions

Page 140

1   regarding the terms "selected and extracted
2   transponder channels"?
3          MS. ALLOR: Object to form.
4      A.   No.  I agree that they don't need
5   construction.  I agree that they should have the
6   plain and ordinary meaning, and I disagree that
7   those words are indefinite or lacking in antecedent
8   basis.
9          So it is not a "yes" or "no."  We have
10  an agreement on things, and there is disagreement
11  on things, and it is always good to start with some
12  agreement.
13     Q.   (BY MR. HESTER)  And so when Dr. Steffes
14  discusses a transponder channel in his declaration,
15  you agree with what he's saying about transponder
16  channels, then, don't you?
17         MS. ALLOR: Object to form.
18     A.   I disagree with his opinion that they lack
19  an antecedent basis, and I provide an analysis why
20  I disagree with his opinions.  So we can go to
21  specific opinions, but I do not believe there is a
22  dispute on the fact that those words have a plain
23  and ordinary meaning.
24     Q.   (BY MR. HESTER)  So I should look to
25  Dr. Steffes' discussion of transponder channel to



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
141–144

Page 141

1  understand what the plain and ordinary meaning is.
2  Is that fair?
3      A.  No, that is -- you are mischaracterizing
4  what I said.
5      Q.  How do you -- can you sit --
6      A.  I'm sorry.  I wasn't done with my
7  answer --
8      Q.  Hold on.
9      A.  -- so please wait.
10     Q.  You were.  You said I mischaracterized, so
11  I'm asking you a question about --
12         MS. ALLOR:  I think you need to let
13  him finish his statements.  Your --
14         MR. HESTER:  I let him finish a lot of
15  his --
16     A.  No.  Your -- I have not finished my
17  thought.  You jumped --
18     Q.  (BY MR. HESTER)  Okay.  Finish your
19  thought.
20     A.  Let's not do this to the court reporter.
21  Please stop.
22     Q.  She got everything.
23         MS. ALLOR:  You need to take a breath,
24  let him finish, and then you can go.
25     A.  Let's --

Page 142

1         MR. HESTER:  I need to take a breath.
2      Q.  (BY MR. HESTER)  All right.  Finish your
3  answer.
4      A.  I lost my train of thought.  Can you
5  repeat the question?
6      Q.  Let me ask you a new one that you
7  hopefully won't tell me I am mischaracterizing.
8         When you say there is -- you don't see
9  any disagreement from Dr. Steffes that the term
10  "selected and extracted transponder channel" has a
11  plain and ordinary meaning, is it your
12  understanding, then, that Dr. Steffes' discussions
13  of selected and extracted transponder channel are
14  consistent with the plain and ordinary meaning?
15     A.  I don't believe either party put forth an
16  analysis on what that plain and ordinary meaning
17  is.  There is a dispute regarding whether the term
18  is indefinite or not for lacking in antecedent
19  basis.
20         I disagree that those terms lack an
21  antecedent basis.  It is my opinion that
22  transponder channels is not indefinite and would be
23  referring back to -- a POSITA would understand when
24  Claim 14 describes transponder signals, that you
25  have transponder channels, that those transponder

Page 143

1  signals are on.
2         So the dispute is regarding an
3  antecedent basis, and I provide opinions on why I
4  disagree regarding whether those terms are
5  indefinite or not.
6      Q.  So can you look at Claim 8 of the '576
7  patent?  And I'm specifically talking about the
8  version on the second-to-last page, the
9  reexamination claims.
10         MS. ALLOR:  Objection, outside the
11  scope.
12     A.  Can you repeat your question, please?
13     Q.  (BY MR. HESTER)  I was asking you to look
14  at Claim 8.
15         MS. ALLOR:  I'm objecting to outside
16  the scope of his declaration.
17     A.  Okay.  What about Claim 8 would you like
18  me to look at?
19     Q.  (BY MR. HESTER)  Have you reviewed Claim 8
20  before?
21     A.  I read it when I was first given the
22  patent.
23     Q.  Okay.  So a year ago or more?
24     A.  About a year ago, yes.
25     Q.  Did you consider Claim 8 as part of your

Page 144

1  analysis regarding the '576 patent?
2         MS. ALLOR:  Objection, outside the
3  scope of his declaration.
4      A.  I considered it, but I don't believe I
5  rely -- relied on Claim 8.  I considered it to the
6  extent I considered the entire patent.
7      Q.  (BY MR. HESTER)  Claim 8 begins,
8  (Reading:)  A signal distribution system for
9  distributing signals comprising a plurality of
10  satellite transponder channels of a broadband
11  signal from a plurality of sources.
12         Did I read that language right?
13         MS. ALLOR:  Same objection, outside
14  the scope.
15     A.  I think so.
16     Q.  (BY MR. HESTER)  Okay.  And the second
17  paragraph, so line, I think it's 59, reads:  "Means
18  in the first unit responsive to information
19  transmitted by the second unit for extracting
20  selected channels from..."
21         And there are marks to indicate that
22  certain text had been edited out, but then it
23  continues:  "...from the digitized broadband
24  signals in the digital demand."
25         Did I read that right?

ESQUIRE
DEPOSITION SOLUTIONS

ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
145–148

Page 145

1      MS. ALLOR:  Same objection.
2      A.  I think so.
3      Q.  (BY MR. HESTER)  Here the applicant for
4  the '576 patent was able to communicate that its
5  claims covered selected and extracted transponder
6  channels, wasn't it?
7      MS. ALLOR:  Objection, outside the
8  scope.
9      A.  I don't have an opinion on that.
10     Q.  (BY MR. HESTER)  So you haven't considered
11  whether the use of the phrase "transponder channel"
12  in Claim 8 --
13     MS. ALLOR:  Objection, outside the
14  scope.
15     MR. HESTER:  I'm not done.
16     Q.  (BY MR. HESTER)  You haven't considered
17  whether the use of the phrase "transponder channel"
18  in Claim 8 has any impact on the use of transponder
19  channel in other claims?
20     MS. ALLOR:  Same objection.
21     A.  I considered it, but I did not rely upon
22  it.
23     Q.  (BY MR. HESTER)  So you specifically
24  considered that Claim 8 recites selecting and
25  extracting channels in your analysis?

Page 146

1      MS. ALLOR:  Same objection.
2      A.  Same response.  I considered it, but I did
3  not rely upon it.
4      Q.  (BY MR. HESTER)  Why didn't you rely upon
5  it?
6      MS. ALLOR:  Same objection.
7      A.  It was -- it was -- it is a separate,
8  independent claim; and I did not rely upon it for
9  another independent claim, which is Claim 14.  And
10  Claim 14 has its own dependent claims.  So I did
11  not find it necessary to quote or rely upon Claim 8
12  for my opinions regarding Claim 14 and their
13  dependent claims.
14     Q.  (BY MR. HESTER)  Claim 8 does not
15  reference either selecting or extracting
16  transponder signals, does it?
17     MS. ALLOR:  Same objection, outside
18  the scope.
19     A.  Are -- can you be more specific?  If what
20  you are asking me, just to determine whether those
21  words appear together if -- if -- or -- or what
22  exactly are you asking me?  If you could repeat the
23  question, please.
24     Q.  (BY MR. HESTER)  Does Claim 8 recite the
25  words either "selecting" and/or "extracting

Page 147

1  transponder signal"?  Are either of those concepts
2  recited in Claim 8?
3      MS. ALLOR:  Same objection.
4      A.  I see the words -- so the answer is in
5  part.  I see where it is extracting selected
6  channels.  So the word "extracting," the word
7  "selected" is there.  The word "channels" is there.
8  The word "signal" is there.  So it says "satellite
9  transponder channels of a broadband signal."
10     So -- so, again, I'm trying to answer
11  your question.  If you are asking me, you know, to
12  play word match, the words are there.
13     If you are asking me do they appear in
14  a specific order, then the answer is no; but the
15  words appear separately.  Again, I'm not sure
16  exactly what you are asking; but I see those words
17  in some capacity in Claim 8.
18     Q.  (BY MR. HESTER)  So looking at Claim 14,
19  there are the words "selecting and extracting a
20  plurality of transponder signals" around line 15.
21  Do you see that?
22     A.  Yes.
23     Q.  Okay.  Do you see those words "selecting
24  and extracting a plurality of transponder signals"
25  or anything similar to those words in Claim 8?

Page 148

1      MS. ALLOR:  Same objection, outside
2  the scope.
3      A.  So, again, it's -- it's a long phrase.  So
4  maybe -- I don't know if you are asking me to
5  identify that phrase verbatim or to identify
6  individual words in the phrase, because my answer
7  might not be the same based on how -- what you want
8  me to do.  So if -- can you clarify --
9      Q.  (BY MR. HESTER)  Let's start verbatim,
10  yeah.
11     A.  Okay.
12     MS. ALLOR:  Same objection.
13     A.  I don't see the phrase verbatim in
14  Claim 8.
15     Q.  (BY MR. HESTER)  Do you see in Claim 8 any
16  discussion of selecting transponder signals --
17     MS. ALLOR:  Same objection.
18     Q.  (BY MR. HESTER)  -- those three words?
19     A.  Do you want those three words next to each
20  other or just those three words?  Am I looking at
21  three words separately or in that order together?
22     Q.  The word "selecting" acting on the words
23  "transponder signal" or "selected," one of the two.
24     MS. ALLOR:  If we can just put a
25  continuing objection from me until he moves on from

Page 149

1 Claim 8.
2     A.   So I see the word "selected," I see the
3 word "signal," I see the word "transponder"; but I
4 don't see them in that specific order.
5     Q.   (BY MR. HESTER)  Do you see the words
6 "transponder signal" at all?
7     A.   I see the word "transponder" and I see the
8 word "signal" but I don't see them next to each
9 other.
10     Q.   What is the difference between selecting
11 transponder channels and selecting transponder
12 signals?
13         MS. ALLOR:  Object to the form.
14     A.   This is not a simple "yes" or "no."  I
15 mean, there are similarities; and there are
16 differences; and I would be happy to go through;
17 but this is going to be a long answer.
18         So I just want to -- because I
19 describe those and the similarities and differences
20 in how a POSITA would understand that over multiple
21 pages, so --
22     Q.   (BY MR. HESTER)  Can I ask a narrower
23 question, then?
24     A.   Yes.
25     Q.   You would agree with me that they have

Page 150

1 differences, though -- right? -- between selecting
2 transponder signals and selecting transponder
3 channels?
4     A.   Well, I agree that the words are different
5 and there might be nuances to those phrases that
6 are different; but there is also a lot that is in
7 common.  And a POSITA would understand that signals
8 in this context or in this claim language, you
9 know.  The signals are on channels, so there is an
10 inherency of you do need to have channels if you
11 have signals.
12         And I can stop here, but I can expand
13 depending on what your follow-up questions are.
14     Q.   I actually want you to tell me more about
15 the nuances to those phrases that are different.
16 What are those nuances?
17     A.   Sure.
18     Q.   And if you are looking at a part of your
19 report, let me know.
20     A.   Yes, I am.  So I'm going through --
21 because I spent multiple pages describing the --
22 how the phrases are understood by a person of
23 ordinary skill in the art.  So I am trying to
24 find -- so a good place to start would be
25 paragraph 63.

Page 151

1     Q.   I don't see the words "transponder signal"
2 referenced in paragraph 63.
3     A.   It is --
4     Q.   Oh, I do.  Yeah, yeah.
5     A.   -- on line 18.
6     Q.   Yeah, you are right.
7         So how does paragraph 63 explain the
8 nuances between selecting transponder signals and
9 selecting transponder channels?
10     A.   So, again, paragraph 63 is describing the
11 process of selecting and extracting transponder
12 channels; and each channel is depicted that
13 includes a transponder signal.
14         And so you have this relationship
15 where -- looking at Figure 5, you have four LNBs,
16 with a little S, like plural.  Each LNB has 16
17 channels.  You can select and extract a channel or
18 a signal on that channel and you extract the
19 signal.
20         And Figure 5 is showing, for example,
21 how Channel 2 is selected and the signal is
22 extracted and becomes part of the composite signal.
23 Similarly, for example, Channel 14; and it goes on.
24         This is followed in my declaration by
25 referring back to the patent and referring back to

Page 152

1 Figure 13.  And Figure 13 starts out by showing you
2 the original spectrum and then how the original
3 spectrum is translated, how it is filtered, and
4 then how it is combined.
5         So at this point, it's good to -- I'm
6 going to go to Column 6 of the '576 patent, and
7 specifically if you look at the discussion of
8 Figure 13, that starts on line 19 to line 30.
9         But to give it context, I want to
10 start by -- to answer your question, I look at --
11 the top of the columns.  So it starts by, "Two
12 basic approaches to combining are possible.  One
13 approach is to combine digitally filtered signals
14 in the digital domain.  This can be achieved with
15 all filtered transponder channels to be combined,
16 presented at a sample rate equal to the composite
17 output rate.
18         "The other approach is to combine the
19 selected signals in the analog domain.  This leads
20 to two possible approaches to filtering.  One is to
21 implement filters with the same input and output
22 sample rate.  The other approach is to filter with
23 an output sample rate that differs from the input
24 sample rate.
25         "An example of a digital combining



Page 153

1  embodiment, a 500 msps broadband sampling of the
2  LNB output could be filtered to produce a 500 msps
3  output stream representing one or more transponder
4  channels.
5         "Each transponder channel may be
6  frequency translated to the desired new carrier
7  frequency, then filtered to produce a single
8  transponder signal that can be combined with other
9  similarly selected transponder channels."
10        So I think this is a very good example
11 that answers your question in terms of the
12 similarity and the differences and the nuances
13 between what is a selected channel and what is a
14 selected signal and how a transponder signal is
15 selected as -- as the -- as you start and filter a
16 channel.
17    Q.  Can you tell me what of the 18 lines you
18 just read from Column 6 is -- relates to a
19 difference between selecting transponder signals
20 and selecting transponder channels?
21    A.  Yes.  I read those, and the section
22 themselves is describing the nuances of the
23 differences.  A POSITA reading these two paragraphs
24 understands that the patentee is switching between
25 the word "channel" and the word "signal."

Page 154

1         They are interrelated.  One inherently
2  implies the other.  Like if you have a channel, you
3  have a signal on that channel that -- or if you
4  have a signal, you know, that signal is not coming
5  from nowhere.  That signal is on a channel.  So a
6  signal implies a channel.
7         Now, you can have a channel defined
8  that may or may not, you know, have a signal on it;
9  but -- so the -- those -- so in that sense, the
10 channel relates to the physical frequency that are
11 assigned.
12        And those specific channels -- and when we
13 go to Figure 13, those channels have a width in
14 frequency.  When we go to Figure 5, we are looking
15 at examples of 16 channels with a specific
16 frequency range.
17        And each one of those channels is as a
18 result of selecting and extracting that channel and
19 going through a filter like what's shown in
20 Figure 13 and follows the discussion that I wrote,
21 you end up -- you can produce a -- for each
22 channel, you can produce -- and I'm reading
23 directly -- you can produce a single transponder
24 signal.
25        So if -- a key sentence -- or one key

Page 155

1  sentence example is -- if I narrow what I read to
2  Column 6, lines 14 to 18, "Each transponder channel
3  may be frequency translated..."
4         And if you look at Column -- sorry --
5  Figure 13, that's the second item in the figure.
6  So the first item in Figure 13 is the original
7  spectrum, which I show in paragraph 66 -- after
8  paragraph 66.
9         The first line after it is the
10 translation, which is described here.  So it says
11 the -- the freq- -- "Each transponder channel may
12 be frequency translated" -- so that's the second
13 row of Figure 13 -- "to the desired new carrier
14 frequency, then filtered" -- that is the third row
15 of Figure 13; and it says it's filtered to produce
16 a single transponder figure.
17        And Figure 13 shows you a filter.  It is
18 filtering Channel B.  You see little Xs on other
19 channels in the fourth and fifth row.  So you are
20 filtering a channel.  You are producing, as a
21 result of the filtering, a single transponder
22 signal, which then you can take that signal and you
23 can combine it with similarly selected transponder
24 channels that can now be filtered and that are
25 going to produce single transponder signals.

Page 156

1         And when you combine those signals, you
2  are going to go back to Figure 5; and you are going
3  to see those combined into the composite signal
4  that is shown in the middle.
5    Q.  So if I wanted to understand the
6  differences in the nuances between selecting
7  transponder signals and selecting transponder
8  channels, the disclosure in Column 6 that you read
9  is what I would refer to?
10   A.  I would say I -- this is one example that
11 answers your question.  I present in my
12 declaration, I spent, for this section -- I start
13 in paragraph 57 and go to paragraph 95.
14        So I am not excluding any parts of my
15 declaration.  My declaration speaks for itself.
16 But instead of just reading 40-something
17 paragraphs, I tried to, as concisely as possible,
18 summarize and answer your question regarding how
19 the relationship between a transponder channel
20 that, once filtered, will produce a transponder
21 signal, at least as described in Column 6.
22        And then, of course, Column 6 goes on
23 to describe Figure 13 in more detail; and I cite to
24 that; and we talk about that.  I'm just -- my point
25 isn't to just read everything in the spec.



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
157–160

1        But at least Column 6 from line 1 to
2  line 32 is a good example of where you would look
3  at, including what's in my declaration describing
4  those in more detail regarding the similarities and
5  differences between transponder channel and
6  transponder signal.
7        And with that, we've exactly hit one hour;
8  so if you want to --
9    Q.  I have just like one or two more
10  questions; but yes, we can break soon.
11    A.  Perfect.
12    Q.  So in your last question, you talked
13  about --
14    A.  Sorry.  Let me stop you there.  I did not
15  ask a question.
16    Q.  That's a good point.  In your last answer,
17  you talked about a transponder that, once filtered,
18  will produce a transponder signal.
19        So in that sense, you filter a
20  transponder channel to get a transponder signal.
21  Is that your --
22    A.  I was reading words from the spec.  So --
23    Q.  Okay.
24    A.  -- the specification, Column 6, lines 16,
25  17 say each transponder channel may be -- after

1  being frequency translated to the desired new
2  carrier frequency, it says, "...then filtered to
3  produce a single transponder signal that can be
4  combined with other similarly selected transponder
5  channels."  And -- and it goes on.
6        So that is described in a little bit
7  more detail in the following passage, which says,
8  "Figure 13 shows the frequency spectrum of a sample
9  stream as it is processed.  The original Spectrum 1
10  is frequency translated to locate the selected
11  transponder channel at the desired frequency, as
12  shown in Spectrum 2."
13        And so this is, again, referring back
14  to the second row of Figure 13 if we -- the rows
15  are numbered on the left 1, 2, 3, 4, 5.  So we
16  start out with 1, which is the first row.  The
17  second row you are doing frequency translation.
18        Then it continues -- I'm on line 22 of
19  Column 6 -- (Reading:)  A bandpass filter then
20  passes one transponder channel and removes signal
21  information from the other transponder channels
22  shown in Spectrum 3.  The filtering operation
23  selects one transponder.
24        And it stops there.
25        "In this example, Transponder Channel

1  B is selected.  The sample stream of the selected
2  channel is added to the sample stream from other
3  filtering sections, represented in Spectrum 4, to
4  produce a composite sample stream in Spectrum 5.
5  Other selected channels are represented by channels
6  labeled X."
7        So at least with respect to Figure 13,
8  it is describing the process focusing on the words
9  "transponder channel"; and it is using the term
10  "transponder signal" to refer to the result after
11  you filter -- and after you translate and then
12  filter using a bandpass filter, the transponder
13  channel -- you get the signal.
14        And in the two paragraphs before it, it is
15  referring to those signals that are filtered that
16  then can combine with the signals from other
17  channels that are also filtered in a similar way;
18  and those signals can be combined to produce a
19  composite signal.
20        That process is described in more
21  detail when we're looking at the bigger picture of
22  multiple channels and signals with regard to
23  Figure 5.
24        But with regard to a single channel
25  being translated, filtered to get a signal, that's

1  what we're focusing on here.
2    Q.  Can you get a signal without filtering a
3  channel?
4        MS. ALLOR:  Object to the form.
5    A.  Your question is too broad.
6        So in -- you know, not looking at
7  those patents and not looking at this specific
8  claim language, I don't have the answer to your
9  question; but that may be possible because signals
10  is a fairly generic term that -- you can have
11  analog signals, you can have digital signals.  My
12  voice is an example of an analog voice signal, so
13  it exists.  I mean, there is not a channel right
14  now that I am producing an analog voice.
15        So the -- your question is too broad,
16  and -- and those are exactly the sort of things
17  that I teach in one of my classes, signals and
18  systems, where we describe signals, we describe
19  systems, we describe filtering.
20        And in the -- you know, the input to a
21  system is a signal.  The output is also a signal;
22  and the system, you know, can have different
23  components, including filters, that -- whose result
24  give you signals.
25        So, again, the question is -- is very



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
161–164

Page 161

1    broad, that the answer may be "yes" or "no"
2    depending on the context that we're looking at.
3        Q.   In the context of processing satellite
4    signals, can you get a signal without filtering a
5    channel?
6        A.   At least with regard to Figure 5 -- so,
7    again, there are different embodiments in this
8    patent; and even when we start out with the top of
9    Column 6, it starts out by two approaches to
10   combining are possible.
11       One approach is to combine digitally
12   filtered signals in the digital domain; and so when
13   you are digitally filtering the signal -- and it
14   says this can be achieved with all filtered
15   transponder channels.
16       So that is an example where the patent
17   is describing having filtered transponder channels
18   that give you digitally filtered signals.  But this
19   is starting by saying this is only one approach.
20       So at least for one example, the
21   patent describes that you do need to have a
22   transponder channel that is filtered to give you a
23   digitally-filtered signal in the digital domain and
24   then you can use it to combine.  So at least for
25   that example, that is the case.

Page 162

1        But it does go on to say the other
2    approach is to combine the selected signals in the
3    analog domain.  This leads to two possible
4    approaches, and then -- so it's describing multiple
5    embodiment.
6        So, again, the answer to your question is
7    not a simple "yes" or "no" because there are, even
8    within the patent itself, multiple ways of
9    describing different embodiment.
10       Q.   As a person of skill in the art regarding
11   telecommunications, which includes satellite
12   communications, can you extract -- strike
13   "extract" -- can you get a signal from a satellite
14   signal without filtering a channel?  This is
15   drawing on your expertise and knowledge, not what's
16   in the patent.
17       MS. ALLOR:  Object to the form.
18       A.   The way I want to try to answer your
19   question, and I hope it does answer your question,
20   is the way I can frame it more precisely.
21       If I look at maybe Claim 14.  Claim 14
22   starts out by describing selecting and extracting
23   plurality of transponder signals.  At least with
24   regard to Claim 14, I believe a POSITA would
25   understand that those transponder signals that are

Page 163

1    being -- that you are selecting and extracting, you
2    are doing it by filtering a transponder channel.
3        And to me, this is, at least in part,
4    consistent with what I see, for example, in the
5    dependent claims where they do discuss the
6    transponder -- the selected transponder channel in
7    some of the dependent claims where the selected
8    transponder channel is corresponding to the channel
9    that the selected and extracted transponder signal
10   would have been located on and produced as a result
11   of that filtering.
12       So that is one interpretation that I
13   can provide you how, at least with regard to
14   Claim 14, when it is describing digital --
15   digitized satellite broadband signals when we are
16   selecting -- or the claim requires selecting a
17   transponder signal, that transponder signal was --
18   I mean, if it existed, it existed and was produced
19   or extracted as a result of the filtering done on
20   that transponder channel just like Figure 5 shows
21   and just like Figure 13 shows as an example of how
22   you get a filtered signal from filtering the
23   transponder channel.
24       That wraps up my answer.
25       Q.   (BY MR. HESTER)  Last question before we

Page 164

1    go to break.
2        Can you filter a transponder signal?
3        A.   I don't believe I rendered an opinion on
4    that.  But a signal -- so you can have a signal.
5    And if the question is can I filter a signal and,
6    you know, if I label that signal.
7        So, for example, if your hypothetical
8    is -- let's look at Figure 13.  And in Figure 13, I
9    start out with Channels A, B, C, D; and I translate
10   those channels.  And then I filter a channel, and I
11   get a signal B.
12       Can I further decide to filter that
13   signal?  The answer is yes, it's possible.  You can
14   further filter a signal to clean it up additionally
15   if you want or operate on it.
16       So the -- so the -- the filtering of
17   that signal is -- or may be a different type of
18   filtering that you did on the -- so the
19   specification describes filtering like using a
20   bandpass filter.  You filter a channel, a bandpass
21   filter has a lower cutoff, a higher cutoff.  So you
22   have -- you normally want it to be flat on top, and
23   it allows you to select and extract a signal.  So
24   that's one type of filtering.
25       Then once we have that signal, I can



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
165–168

Page 165

1  decide to maybe do additional operations on that
2  signal.  So I can take that signal, and I can
3  further do digital signal processing on it, and I
4  can do additional filtering.  I'm not rendering an
5  opinion with regard to that.  At least I don't
6  immediately see that as part of the opinion that I
7  have here.
8          But in vacuum, it is possible to have
9  a cascade of filters.  We teach that to my
10  students, having filters in series, filters in
11  parallel, having more than one filter, what the
12  equivalent filter is.  So that is possible.
13          MR. HESTER:  Now let's take that
14  break.
15          THE VIDEOGRAPHER:  Time is now
16  2:13 p.m.  We're off the record.
17          (Brief Recess, 2:13 p.m. until
18  2:23 p.m.)
19          THE VIDEOGRAPHER:  We're now on the
20  record.  The time is 2:23 p.m.
21      Q.  (BY MR. HESTER)  Dr. Akl, if I can have
22  you turn to paragraph 76 of your declaration.
23      A.  I'm there.
24      Q.  Okay.  The sentence starting on line 18
25  reads, "The transponder signals are the physical

Page 166

1  instantiation of a payload, not payload/information
2  in the abstract."
3          My question is:  Can you explain in
4  greater detail the distinction that you are trying
5  to make here?
6      A.  I just want to make sure I understand your
7  question.  Paragraph 76, lines 17 and 18?
8      Q.  Lines 18 and 19.
9      A.  Okay.  So I am providing a rebuttal
10  opinion to defendants' expert who states -- or at
11  least my understanding is he states that
12  transponder signals are solely the payload of the
13  transponder channels.  And I provide an opinion
14  that I don't -- that this is not technically
15  accurate based on the '576 patent and the
16  transponder signals are the physical instantiation
17  of the payload, not payload/information in the
18  abstract.
19          Is that the phrase you want me to
20  explain?
21      Q.  Yes.
22      A.  So -- so this is what I mean by that:  So
23  you -- when we talk about a payload, or at least
24  when POSITAs talk about a payload, sometimes the
25  word "payload" means the -- the message.

Page 167

1          So you can -- in packets, we have a
2  header, we have a payload.  So normally the payload
3  is the message.  So suppose I want to write a
4  message.  I can write the message on a piece of
5  paper.  I can put the paper in an envelope, and I
6  mail it.
7          So the analogy would be the -- the
8  information on the piece of paper is an example of
9  the payload because that's the message.
10          Now, to the extent we can think of
11  that analogy where the signal is the paper itself,
12  so the signal is what has that message, then I am
13  saying here that the signals are the physical
14  instantiations of the payload.
15          So a signal, like a paper, is a
16  physical thing.  So a signal where the payload
17  itself can refer to the content or the
18  information -- and that's not exactly accurate or
19  equating it to the signal because the signal may
20  have that information, but the signal is a physical
21  instantiation.
22          So it can have an amplitude, it can
23  have a phase, it can have an amount of power
24  associated with it, versus the content or the
25  payload or information that maybe, for example, a

Page 168

1  message or a TV program that you get after you
2  additionally work on that signal.  That's -- that's
3  the point here.
4      Q.  Okay.  So it is not just the words on --
5  it is the paper and the words on the paper is the
6  signal, not just one of the two?
7      A.  I mean, it's just an analogy I came up
8  with on the fly.  If we think of the payload as the
9  message, then the signal are the physical
10  instantiations of the payload, not the
11  payload/information in the abstract.
12          So the message would be the
13  information and the abstract, and the signal is an
14  actual physical instantiation.  So it would be a
15  physical signal that, you know, I can see in the
16  lab, for example.  I can measure.  I can display on
17  a scope.
18          That would be an example of how a
19  signal is a physical instantiation where I can
20  increase, for example, its magnitude, increase its
21  power, and I can visually see that.  That's what
22  makes it more physical than something in the
23  abstract.
24      Q.  Okay.  But from that signal, you can
25  deduce the information in the abstract?  You can



Page 169

1 deduce the information?
2     A.  Yes, you could, if the signal is received
3 correctly and it has that information and you were
4 able to extract it correctly.  So that is
5 definitely the end result, or that's probably what
6 you want to do in the end because you are
7 interested, probably, in the payload and that
8 content or that information as the -- as the end of
9 the process.
10     Q.  And then the next sentence in
11 paragraph 76, you state, "However, the important
12 point is that the '576 patent describes a method of
13 selecting and extracting a transponder signal by
14 selecting and extracting the associated transponder
15 channel, which carries the 'payload' (including the
16 physical instantiation of that payload in the EM
17 spectrum)."
18         Did I read that right?
19     A.  Yes.
20     Q.  Setting aside what the '576 patent
21 describes, does a person of skill understand that
22 there are ways of selecting and extracting
23 transponder channels without selecting and
24 extracting the associated transponder channel?
25         MS. ALLOR:  Object to the form.

Page 170

1     A.  I don't understand the question.  I think
2 you said "channel" twice.
3     Q.  (BY MR. HESTER)  I sure did.  Try it
4 again.
5         Setting aside what the '576 patent
6 describes, does the person of skill in the art
7 understand that there are ways of selecting and
8 extracting transponder signals without selecting
9 and extracting the associated transponder channel?
10     A.  So I'm not sure how to answer your
11 question, because to me it is a little vague
12 because you are using the word "transponder."  So I
13 am assuming you are putting it in this context.
14         But if you are asking me specifically
15 to, like, one embodiment, and the embodiment that
16 I've been describing you have to -- or at least the
17 embodiment as described in the spec, you need to
18 select the channel first and you filter the channel
19 and you get the signal.  So at least that is one
20 example of the process.
21         There may be other ways of doing it,
22 but I'm not sure if those are specifically related
23 to this specific claim or not or other embodiments
24 that may or may not be in the spec that might
25 relate to other claims.  So, again, I'm not sure of

Page 171

1 the context so I can answer your question.
2     Q.  When you say in your answer that there may
3 be other ways of doing it, you are referring to a
4 POSITA may know of ways to select and extract
5 signals, transponder signals that aren't
6 necessarily described in the '576 patent?
7     A.  No, that's not what I meant.  I am
8 referring back to Column 6 that we read earlier
9 where it is describing different ways, and the top
10 of Column 6 describes two basic approaches.
11         And it says one approach is to combine
12 digitally filtered signals in the digital domain.
13 This can be achieved with all filtered transponder
14 channels to be combined and presented in a sample
15 rate equal to the composite output rate.  The other
16 approach is to combine the selected signals in the
17 analog domain.
18         So I'm not sure -- and, again, I don't
19 necessarily go into that opinion in detail, or at
20 least maybe at all with regard to the disputed
21 term; but the specification itself contemplates
22 ways.
23         But at least with regard to Claim 14
24 when you are dealing with a digitally filtered
25 signal, those digitally filtered signal that appear

Page 172

1 in Column -- sorry -- in Claim 14 is informing me
2 that, at least in part, it is referring to the
3 embodiment where you are doing filtering of a
4 transponder channel and you are selecting and
5 extracting transponder channels.
6         When I look, for example, at Claim --
7 dependent Claim 16, which says, "...frequency
8 translating the selected and extracted transponder
9 channel..." that sentence, at least in part, is
10 informing me that -- or inform a POSITA.
11         We talked about the translating step
12 in Figure 13; and the translating step in Figure
13 13, at least one example would be the second row
14 where Figure 13 shows the first row, which is the
15 spectrum and the second row where you are
16 translating.
17         So the -- figure -- Claim 14 is
18 describing the signal, which the specification
19 supports by, for example, describing the filtering
20 step on the third line.  So at least in part, I
21 see -- which it is common to have an independent
22 claim and a dependent claim and they are narrowing
23 down and claiming different aspects.
24         So at least one way is to -- at least
25 here, I am seeing Claim 14 relates more to Step 3



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
173–176

1  or Row 3 where you are filtering and you are
2  getting that signal and the discussion associated
3  with it while Claim 16 is relating to the second
4  row.
5        So they are both relating to Figure 13
6  but different steps of Figure 13.  So in this
7  context, your signal that is being selected and
8  extracted is coming from a selected transponder
9  channel, at least for the embodiment that's
10  described in Figure 13 and in the spec in Column 6.
11     Q.   You mentioned the concept of filtering
12  with respect to Claim 14.  Can you tell me where in
13  Claim 14 there's reference to filtering?
14     A.   I'm not sure if Claim 14 uses the word
15  "filtering"; but, again, let me -- I'm just typing
16  in the word "filter" --
17     Q.   Okay.
18     A.   -- to see if it pops up.
19     Q.   Okay.
20     A.   So I see filtering in Claim 15.  So
21  Claim 15 -- sorry.  I'm making the life of our
22  videographer harder because I'm moving.
23        So Claim 15 also depends on Claim 14.
24  So Claim 15 says, "...the step of selecting and
25  extracting a transponder signal comprises the step

1  of:  filtering..."
2        So that's what I mean, is -- Claim 14
3  is describing more generally -- or could be
4  describing more generally the third row of
5  Figure 13.
6        And Claim 15, which depends on
7  Claim 14, is referring to those words "selecting
8  and extracting a transponder signal" that appear in
9  Claim 14 and says comprising the step of filtering;
10  and that's what the specification is describing in
11  terms of filtering the channel to get the signal
12  that you want in the third row.
13        Claim 16 talks -- or what I would
14  relate to frequency translating, which would refer
15  to the second row where you are frequency
16  translating the selected and extracted transponder
17  channel.
18        Because in the second row, you're --
19  you're working on the channel, you are translating
20  that channel.  In the third row, you are filtering
21  the channel, and you end up with the signal -- you
22  are producing the signal in the third row.
23        So at least 15 seems to be focusing on
24  narrowing down, at a high level, the step that's
25  described in 14 but uses filtering for the step of

1  selecting and extracting the transponder signal,
2  which corresponds as an example to the third row of
3  Figure 13, while Claim 16 would be the translating
4  step, which would correspond to the second row of
5  as an example of Figure 13.
6     Q.   Doesn't Claim 16 reference the step of
7  combining?
8     A.   16 said, "The method of Claim 14 wherein
9  the step of combining comprises..."  So I do see
10  the word "combining."
11     Q.   And I just want to -- one more check.  In
12  Figure 13, the word "combined" is on line 5; right?
13     A.   Yes, the last step is the combining.
14  So -- so combining is on line 5, I agree, in
15  Figure 13.  And that's really the -- like the final
16  step while the translating in -- so if you think of
17  all of Figure 13 ultimately leading to the
18  combination of multiple selected and extracted
19  signals that are coming from selected and extracted
20  channels, and those selected and extracted signals
21  make the composite signal, that's, at a high level,
22  what Figure 5 is showing.
23        But the -- following a single selected
24  and extracted channel that is translated, filtered,
25  and then -- that's what Figure 13 is -- is looking

1  at, what -- one series of steps that you will do
2  for every one of the colored arrows in Figure 5
3  that defendants' experts highlighted.
4     Q.   Can I take you to paragraph 100 of your
5  declaration?
6     A.   Yes.
7        MR. HESTER:  Before we dig in, let's
8  mark Exhibit 4, I believe, a copy of the '008
9  patent, and we're going to digitally mark those
10  eventually but...
11        (Exhibit No. 4 was marked.)
12     A.   And for the record, now I have two files
13  open, the ones that you saw earlier this morning
14  with Exhibit 4, which is the '008, and my
15  declaration in front of me.
16     Q.   (BY MR. HESTER)  Anything else open on
17  your computer?
18     A.   No.
19     Q.   So you have paragraph 100 of your
20  declaration open?
21     A.   Yes.
22     Q.   Okay.  Below paragraph 100 is a copy of
23  Figure 1A from the '008 patent; is that right?
24     A.   Yes.
25     Q.   And is -- just to go back to the exhibit,



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
177–180

Page 177

1   is Exhibit 4 a true and correct copy of the '008
2   patent that you reviewed?
3       A.   Yes, I believe so.
4       Q.   Okay.  You've annotated Figure 1A in your
5   declaration by adding a yellow box corresponding to
6   Headend 108; is that right?
7       A.   Yes.
8       Q.   What is a headend?
9       A.   I am searching for the word "headend" in
10  the '008 patent.
11      Q.   Are you able to answer that without
12  looking at the patent, though, just like what does
13  a POSITA understand a headend to be?
14          MS. ALLOR:  Object to the form.
15      A.   I -- I don't believe I specifically
16  provide an opinion.  But a headend generally is
17  kind of like the headquarters of the cable company
18  or the satellite company.  I mean, that's an
19  example of a headend without articulating a
20  definition.  And what I mean by that, the technical
21  headquarters; not, for example, where the CEO is,
22  not the administrative.
23          But that's where you have your --
24  that's where the cable feed or the television feed
25  or the programming feed originates, in a cable

Page 178

1   network or a satellite network, that's normally
2   what's referred to as the headend.
3       Q.   (BY MR. HESTER)  And so when you say
4   origin of the cable network, is that the point at
5   which the signal is being broadcast to all of the
6   many users, that they can, you know, select from
7   certain channels?
8       A.   That's where the signal is first being
9   produced, is what I would say.  The first
10  appearance of the signal starts there.
11      Q.   Okay.
12      A.   That's before it is -- I mean, those
13  locations, you know, are usually -- or can be
14  pretty far from the market that they serve; and
15  these days, you know, we can have networks and
16  internets and fiber and different types of
17  intermediate networks.  But that's where the first
18  appearance of the signal that a customer is going
19  to receive.
20          And then that signal is going to -- or
21  can be, you know, relayed, repeated, transmitted on
22  different types of networks, maintained, make sure
23  that it is still a viable network up to the end
24  where it is received by the customer in their
25  premise.

Page 179

1       Q.   Within the Box 108 for headend in
2   Figure 1A, there is reference to a Switch 110?
3       A.   Yes.
4       Q.   What do you understand Switch 110 -- what
5   is its function in the headend?
6       A.   So the --
7       Q.   Are you searching for "switch"?
8       A.   Yes, I'm looking at the patent; and the
9   word "switch" appears three times.
10          So looking at Column 2 and looking at
11  lines -- in Column 2, lines 46 and 47, the
12  specification states, "The Switch 110 may convey
13  the television signals to the Video Modulator 112
14  and the data to the CMTS."
15      Q.   Is a switch, in the context of something
16  like a headend, a component or a functionality that
17  you are familiar with, as a person of skill?
18          MS. ALLOR:  Object to the form.
19      A.   A switch is a communication network -- or
20  is a node or could be a node or could be a box.  So
21  there are different entities that may or may not be
22  referred to as a switch or different components.
23          If you recall in the morning, you were
24  asking me on cases that I served on.  When I was
25  labeling -- or going over those cases, there were

Page 180

1   cases, for example, like the GENBAND matter that
2   specifically related to switches; and there are
3   components of switches that they sell.  Cisco, you
4   know, makes switches.  GENBAND makes switches.
5   Metaswitch makes switches.
6           I did not call out those cases because
7   you were asking -- limiting to satellite or
8   wireless.  But those, again, would be an example of
9   cases that I provided expert opinion on; and it was
10  a component that would go into a satellite network;
11  but it is not specifically the satellite aspect of
12  it.
13          But that's -- that is my understanding
14  of what a switch is.
15      Q.   (BY MR. HESTER)  What is the function of
16  The video Modulator 112 within the Headend 108?
17      A.   So I am -- I don't think -- the
18  specification in Column 2 mentions Video
19  Modulator 112; and it says, "The Video Modulator
20  112" -- I'm sorry.  I'm on line 47 -- "may modulate
21  the received television signals on to a carrier."
22      Q.   Is a video modulator something that's
23  typically used at a headend?
24      A.   I don't have an opinion on that today.
25      Q.   Do you have any knowledge of whether video



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
181—184

Page 181

1 modulators are used at headends?
2 　　　　MS. ALLOR:  Object to the form.
3 　　A.  I mean, the specification here is
4 providing an example; and I don't have a reason to
5 disagree; but I'm not rendering an opinion on that.
6 　　Q.  (BY MR. HESTER)  I'm asking in your
7 personal experience, do you have knowledge of the
8 use of video modulators at headends?
9 　　A.  I don't recall one way or the other.  Like
10 I don't remember.
11 　　Q.  Have you worked at a headend before?
12 　　A.  Me personally?
13 　　Q.  Yes.
14 　　A.  No.  I've been a professor for 20 years.
15 But some of my students have.
16 　　Q.  When you read that the Video Modulator 112
17 may modulate the received television signals on to
18 a carrier, is modulating the received signals on to
19 a carrier something that is done in the process of
20 a satellite cable -- or satellite television?
21 　　　　MS. ALLOR:  Object to the form.
22 　　A.  Modulating a signal on to a carrier is
23 something that is done in different types of
24 communication systems, so it can be done in
25 satellite.  It is done in cellular.  It is done in

Page 182

1 telephony.  There are many examples of how
2 modulation works and what modulation is.
3 　　　　And it's -- I first teach modulation
4 to my students in their junior year at UNT.  So
5 undergraduates see it, I think, for the first time
6 in their junior year.
7 　　Q.  (BY MR. HESTER)  In the context of
8 satellite television system, do you know where
9 modulation is performed, by what components?
10 　　　　MS. ALLOR:  Object to the form.
11 　　A.  Can you repeat the question, please?
12 　　Q.  (BY MR. HESTER)  Let me -- I'll come back
13 to that.  I'll come back to that.
14 　　　　What is the function of the CMTS 114
15 within Headend 108?
16 　　A.  So a CMTS just means it's the cable modem
17 termination system.
18 　　　　And what is interesting, and sometimes
19 confuses my students when I explain this, when I
20 say "termination," they normally think of the other
21 end; but it is actually the termination at the
22 headend --
23 　　Q.  Okay.
24 　　A.  So...
25 　　Q.  From, like, uplink termination?

Page 183

1 　　A.  Yes.  I mean, it is a common term; and it
2 refers to -- so you can use cable networks for, of
3 course, television signals.  You can use cable
4 networks for data signals.
5 　　　　And when we're looking at cable
6 networks, if we start with the cable at the
7 customer premise and we go through the multiple
8 networks all the way to the headend, that's where
9 the CMTS usually is.  That's the other end of
10 the -- that's -- that's the other end where the
11 CMTS is going to be.
12 　　Q.  And then what is the function of Splitter
13 Combiner 116 within Headend 108?
14 　　A.  So here when I -- when you look at
15 Figure 112, you see you have a video modulator.
16 You have a CMTS that are going into a splitter
17 combiner and then that are going -- you have a
18 single output.  You have two inputs.
19 　　　　And so the splitter combiner is -- may
20 convey the message, you know, to and from the CMTS
21 or may convey or take the message from the video
22 modulator and send it downstream.  So it's -- it
23 has the ability to kind of decide what it feeds the
24 hybrid fiber cable network.
25 　　Q.  And the hybrid fiber cable network, 118

Page 184

1 is --
2 　　A.  I'm sorry.  I think I misspoke.  It is
3 hybrid fiber-coaxial network, but just to be
4 precise.
5 　　Q.  And so the hybrid fiber-coaxial network is
6 the network through which the -- the -- the
7 splitter combiner is distributed to customer
8 premises.  Is that fair?
9 　　A.  In this example that's what's shown in --
10 in Figure 1A.  That's the example of the embodiment
11 shown here that we're looking at.
12 　　Q.  Are you aware of other communication media
13 that would communicate from a headend to a customer
14 premises in a cable setting?
15 　　　　MS. ALLOR:  Object to the form.
16 　　A.  I am not rendering opinions on that.  I'm
17 just answering your question.  Well, I mean, all
18 the questions that you are asking me, at least with
19 regard to Figure 1A, I'm answering in the context
20 of Figure 1A and the specification of the '008.
21 　　Q.  (BY MR. HESTER)  So as a person of skill,
22 you can't explain or identify other ways in which
23 cable television is distributed from a headend to
24 customer premises?
25 　　　　MS. ALLOR:  Object to the form.



Page 185

1   A. I am not rendering opinions on that today.

2   Q. (BY MR. HESTER) Okay. But I'm asking if

3   you can name from your personal knowledge some of

4   those examples.

5       MS. ALLOR: Object to the form.

6   A. Different types of core networks can

7   include optical components, they can include

8   microwave components, they can include coaxial

9   fiber.

10      So there -- you know, generally

11  there's different -- so that's the answer to your

12  question, is -- is there are different examples

13  that can exist in terms of different types of

14  networks for different sections.

15      And it depends on sometimes the

16  terrain, if you are going across, you know, a body

17  of water, if you are going across a mountain, if

18  you have a line of sight.

19      A lot of times with the railroads,

20  they can lay down fiber. That's partly the huge

21  benefit of railroads, when we stopped using trains

22  as much, you had the right-of-way. So it

23  allowed -- like Sprint was -- as an example from

24  years ago, can use the right-of-way of railroads to

25  lay down fiber.

Page 186

1       So what constitutes the intermediate

2   network can be different things depending on the

3   environment and the terrain and the population that

4   you are going to be serving.

5   Q. (BY MR. HESTER) If I understand your

6   opinion correctly regarding Figure 1A, it's

7   describing a cable television embodiment; is that

8   right?

9   A. Well, we can go to the specification which

10  says Figure 1A -- so I am in Column 1, lines 66 and

11  78. It says Figure 1A depicts an example cable

12  system in accordance with an example embodiment of

13  the invention.

14      And then it goes into more details,

15  starting on Column 2, lines 34 and on, where it

16  says Figure 1A depicts an example communication

17  system in accordance with an example embodiment of

18  the invention. And it describes different parts,

19  including a Terrestrial Television Antenna 102, a

20  Satellite Dish 104, and Internet Protocol

21  Network 106, and so on.

22  Q. So do you agree with Column 1, lines 66

23  and 67 in the specification that Figure 1A refers

24  to a cable television network?

25  A. I haven't rendered an opinion on that; but

Page 187

1   I -- I mean, sitting here today, I don't have a

2   reason to disagree with what's in the spec. But it

3   is not an opinion that I'm offering today.

4   Q. Can I take you to paragraph 108 of your

5   report, please?

6   A. I'm sorry. Can you repeat the paragraph

7   again?

8   Q. 108.

9   A. I am there.

10  Q. Okay. On line 26, you state, "Figure 1A

11  shows the cable embodiment."

12      Did I read that correctly?

13  A. Yes.

14  Q. So is that simply reciting what's in

15  Column 1 of the specification, or is that an

16  opinion by you of what Figure 1A shows?

17  A. I am -- here I am reciting what the

18  specification is saying; and I add that, for

19  example, Figure 1C would be the satellite

20  embodiment. So I'm referring to the patent's

21  description of its embodiments.

22      But, again, I don't have a reason to

23  disagree with it; but that's not -- I mean, I'm --

24  I'm just stating what the specification is labeling

25  those figures.

Page 188

1   Q. Okay. So if we go to Figure 1C, then, of

2   the '008 patent --

3   A. I'm there.

4   Q. -- that you referred to as a satellite

5   embodiment, what is Item 182 on Figure 1C of the

6   top left corner?

7   A. So if we go to Column 4, in Column 4,

8   lines -- starting on line 51, it says Figure 1C

9   depicts an example satellite system; and it goes on

10  to line 54, which says a feed horn 182.

11  Q. So the feed horn, I think as we discussed

12  earlier, is part of the satellite dish on a

13  customer premises?

14  A. That's fair.

15  Q. Okay. So Figure 1C, then, is only showing

16  the system in a satellite embodiment from the

17  perspective of the customer premises site?

18      Are you running a search for 1C?

19  A. No. I'm scrolling up to --

20  Q. Okay.

21  A. -- Figure 1C to go back to because I was

22  in the specifications.

23  Q. Okay.

24  A. So I am -- can you repeat your question

25  now that I'm looking at Figure 1C?



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
189–192

Page 189

1   Q.   Yeah.
2       Fair to say that Figure 1C is only
3   showing the system in a satellite embodiment from
4   the perspective of the customer premises site?
5   A.   I would disagree with that because of the
6   bottom part.  It shows WAN 192.
7   Q.   Okay.
8   A.   So I agree that the top right part -- and
9   it is interesting that this is not drawn proportion
10  to scale, because the top part is huge and it's
11  more of a blowup.  It is bigger than the house.
12      But the house would be the customer.
13  But to the left of the house in 1C, you have 188
14  and 192; and those -- 192 would be the WAN --
15  Q.   Okay.
16  A.   -- which an example would be like the
17  Internet, so it is not just the house.
18  Q.   But the feed horn is not receiving signals
19  over the WAN, is it?
20  A.   No.  The 182 would be receiving a signal
21  from a satellite.
22  Q.   Okay.
23  A.   But a user can transmit -- so, for
24  example, the user isn't going to transmit a signal
25  back to the satellite.  Like you can receive a

Page 190

1   signal from the satellite, but it is very expensive
2   to transmit to the satellite.
3       So what this figure is showing -- and
4   you can see the thick line on the left part and
5   going out 188.  So it is not uncommon to receive a
6   signal from the satellite and transmit a signal
7   back to the headend using the Internet.
8       So it is in a way not showing -- it is
9   showing both received communication and transmitted
10  communication from the house where the received
11  communication comes from the satellite and the
12  transmitted communication would go over the
13  Internet or over a wide area network.
14  Q.   Over the Internet to the headend?
15  A.   Yes.
16  Q.   Okay.  So and then the headend is the
17  source of the signals that the satellite is
18  rebroadcasting to the end user.  Is that fair?
19  A.   The headend is where the first appearance
20  of the signal appears.  I know you used the word
21  "source," and that is a disputed term.  So the
22  dispute here is, what is the source of said
23  received signal?
24      And my understanding is that's --
25  we're going into now my opinion that defendants

Page 191

1   have a narrow construction of what that is.  And I
2   disagree that that should be -- I agree that the
3   headend would be an example of a source; but I
4   don't believe the construction should be limited,
5   when we look at the source, to the headend.  That's
6   why those words would have a plain and ordinary
7   meaning, because the signal itself is going to be
8   repeated and relayed at different points.
9       So it's my opinion that it should not
10  be limited to the construction that was proposed by
11  defendants where it says the equipment, example, a
12  cable headend or satellite transmitter, that
13  transmitted the received signal to be the
14  definition of a source of said received signal.
15  Q.   Coming back a bit to my question, though.
16  If we kind of imagine at a high level, you've got
17  your customer premises; and a satellite is
18  broadcasting a signal to the premises.  You agree
19  to that?
20  A.   Yes.
21  Q.   And in the context at least of satellite
22  television and Internet, that satellite is getting
23  the signal originally from some headend on the
24  ground?
25  A.   Or some device or some other satellite

Page 192

1   dish that is connected directly or indirectly to
2   the headend.
3   Q.   Okay.  So something that the headend is
4   using to broadcast to the satellite, whether it is
5   a dish or something else?
6   A.   Well, it may not be in the headend.  So
7   the headend, it could be in communication with an
8   Earth station that has a satellite that would be
9   transmitting sig- -- sorry -- that has a dish that
10  is transmitting a signal to the satellite.
11      So the first appearance of the signal
12  is coming from the headend, but that signal can be
13  repeated and replicated at different points.
14      So I wouldn't -- when we look at the
15  claim language which refers to a source, a source,
16  I wouldn't limit the source to the very beginning
17  of the signal.  Which an example of that would be
18  the headend, because, like I said, the signal is
19  going to be replicated and relayed at different
20  stages.
21      So it can go from the headend to an
22  Earth station to a satellite dish up to the
23  satellite, or it could go through intermediate
24  networks.  But there is a satellite at some
25  point -- there is a satellite dish at some point



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
193–196

Page 193

1  that's going to send it to the satellite.  And
2  there is a satellite dish at another point that's
3  going to receive it from the satellite that
4  normally -- the receiving satellite's small.  It
5  sits on the customer's roof or somewhere, and the
6  satellite dish that's sending the signal is much
7  larger with a lot more power.
8      Q.  Okay.  I believe you mentioned that one
9  way in which a customer premises site can
10  communicate with a headend is over a wide area
11  network, such as 192; is that right?
12     A.  Yes.
13     Q.  Okay.  Can a customer premises communicate
14  with a headend via the satellite dish that's on its
15  roof?
16     A.  I don't think so.  I don't think the
17  satellite dish on the roof transmits to the
18  satellite in the sky.
19     Q.  How does satellite Internet work, then?
20     A.  Satellite Internet works in an asymmetric
21  way.  I actually had satellite Internet in the '90s
22  with Hughes.  And you receive the -- you receive
23  your downlink from a satellite.
24     Q.  Okay.
25     A.  So I had a satellite dish outside my

Page 194

1  house; and it can receive Internet on the dish,
2  which was fast.  And it used a phone line to --
3  so -- because normally your downlink is more than
4  your uplink, like you click to -- you know, you
5  want to go to a web page, you send control
6  information; but the -- you're downloading a video.
7  And it's still today that the uplink and downlink
8  aren't symmetric.
9        So your downlink is through a
10  satellite; and we call it a satellite Internet
11  connection even though the uplink is through a
12  terrestrial network, but that's still a satellite
13  network because the downlink is coming from a
14  satellite.
15     Q.  And you -- you aren't aware of any
16  satellite Internet, for example, networks where the
17  uplink -- where the return to the headend uses the
18  satellite dish to communicate?
19     A.  My most recent -- I'm trying to think.  I
20  don't think -- I think that may have changed.
21  I'm -- so I have installed a network using Elon
22  Musk's satellite; and you buy the satellite, which
23  you put like out in an RV or, you know, in -- in a
24  field where you don't have -- and you definitely
25  receive a signal through the satellite.

Page 195

1        And I'm trying to think of how you
2  transmit.  I think you may also transmit through
3  some satellite network or -- I don't recall, but I
4  know we're not using a phone line.
5        So Elon Musk's Internet -- I mean,
6  that's why the satellite is like $700, I think
7  because there might be some two-way communication,
8  and also the satellite can self adjust.  So you put
9  it, and it can rotate on its own, but I think it is
10  downlink and uplink.
11        So but that's -- that is -- that's not
12  what I had in the '90s, but that is something that
13  I installed two years ago.
14     Q.  Okay.  If I could take you to
15  paragraph 113 of your declaration.
16     A.  Yes.
17     Q.  In paragraph 113, you describe, starting
18  in line 6, "...a satellite system has an uplink
19  center located on the ground, which receives
20  content, processes the content, and then transmits
21  those signals via an uplink channel to the
22  satellite transmitters in orbit" -- there's a
23  semicolon.
24        But did I read the first part of the
25  sentence right?

Page 196

1      A.  Can you -- I'm sorry.  Where in
2  paragraph 113?
3      Q.  Yeah, line 6.
4      A.  Okay.  You can go -- I'm there now.  So if
5  you can repeat your question, please.
6      Q.  Okay.  At that point, I just read a
7  sentence in the record; but I'll ask a specific
8  question about that sentence.
9        We've talked about headend so far
10  today.  How does an uplink center differ from a
11  headend?
12     A.  So a headend is normally used in the cable
13  system, and a CMTS in a cable system is referred to
14  as a headend -- or is referred to as a component
15  that is in the headend.  That's what I'm seeing in
16  the previous sentence.
17     Q.  Okay.
18     A.  Figure 1C, as you asked me earlier, there
19  is no headend shown in Figure 1C because we are --
20  we have the -- the -- and I said that you can have
21  a satellite operator use an uplink center that's
22  located on the ground that can send information to
23  the satellite.
24        And so, for example, I am -- you know,
25  somebody who is a subscriber of a satellite network



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
197—200

Page 197

1 and they are not paying for a channel but they
2 decide, you know, they want to get HBO.  So the
3 one -- you know, to the extent that we want to say
4 that now -- I mean, in reality the signal is there.
5 It is just going to be extracted.
6        But suppose you are going to send a
7 signal to the satellite like an HBO signal, then
8 the information going to -- at least in this
9 context, there is no -- the satellite dish at the
10 user's house is not going to send the signal to the
11 satellite saying, "I want HBO."
12        The -- there is going to be a signal sent
13 over the network to the uplink center on the ground
14 that's going to say, "Okay.  I am -- I now want
15 HBO."  And then that content, or whatever set of
16 channels you are going to receive, is -- is -- is
17 going to be relayed up the satellite and then down
18 to the user.
19        So the sentence here says, "...a POSITA
20 would not consider a satellite system as disclosed
21 in Figure 1C to have a 'headend' in the same sense
22 that a cable system has a 'headend.'  Rather, a
23 satellite system has an uplink center located on
24 the ground, which receives content, processes the
25 content, and then transmits those signals via an

Page 198

1 uplink channel to the satellite transmitters in
2 orbit; the satellite transmitters then transmit
3 signals to the customer premises."
4        So there is an asymmetry between the
5 embodiments of a cable network where both the
6 uplink and the downlink, or the link from the
7 user's to the headend and the headend to the user,
8 all is coming on a terrestrial network.  Granted
9 some part of it may be wireless, but generally
10 that's what he we're referring to as a cable
11 network.
12        While in a satellite network, there is
13 this component that you don't need in a cable
14 network, which would be -- well, two components.
15 One would be the satellite in the sky or multiple
16 satellites.
17        And two, an uplink center that is going to
18 send the signal from Earth to the satellite that
19 the satellite dish at the user's house will
20 receive.
21 Q.   So the asymmetry is the difference, that
22 there's an asymmetry as between the cable network
23 and the satellite network?
24 A.   I wouldn't say it's the difference, the
25 difference.  I would say one difference is a

Page 199

1 satellite network needs to have a satellite.
2        A cable network may not have a
3 satellite.  Like traditionally, a cable network is
4 called a cable network because it is made up of
5 cables.
6        Now, the term may have evolved where
7 you could have a cable network with a portion of it
8 is coming from a satellite; but I think the
9 distinction, at least as far as the patent itself,
10 is you can have a -- a cable network where you can
11 send over a hybrid fiber-coaxial network up and
12 down, you can send over in a cable network using
13 local antennas.
14        So like a station, downtown Dallas can
15 have an antenna on the top of a building; and you
16 can receive channels over the air.  But they are
17 not coming from a satellite.  They are coming from
18 an antenna.  And that's like Example 102 in
19 Figure 1A and 118 in Figure 1A.
20        And then the third would be a
21 satellite where you can -- you would need to have a
22 satellite dish at the user's, a satellite in the
23 sky, and -- and an uplink center that's going to
24 send the signal to the satellite.
25        But to the extent, you know, there is

Page 200

1 an uplink and downlink in a traditional cable
2 network; but the user does not use a satellite
3 dish, like the user isn't receiving a satellite
4 signal directly.
5        That doesn't change my opinion that I
6 would consider that a satellite network even -- there
7 might be a microwave link or a satellite link in
8 some aspect of it.  But normally when we talk about
9 a satellite network in this context, the user is
10 the one receiving a signal from a satellite using a
11 satellite dish.
12 Q.   And when you talk about "in this context,"
13 you mean of the context of the '008 patent?
14 A.   Yes.
15 Q.   Okay.  Are there satellite networks that
16 are not within the context of the '008 patent that
17 you are familiar with?
18 A.   Yes.
19 Q.   Okay.  Did you consider those satellite
20 networks in reaching your understanding of the
21 claim in dispute, claim limitation dispute?
22 A.   I mean, I -- they are -- they're part of
23 my experience; and I rely -- and I consider, you
24 know, my experience in the field; but I did not
25 necessarily rely on anything that I did not cite



Page 201

1  to.
2        So I looked at the descriptions in the
3  specification of the '008 to render the opinion
4  that I have related to the '008, which is really
5  only a single opinion regarding the claim
6  construction of the words "a source of said
7  received signal."
8     Q.  So you didn't go outside the specification
9  to render your opinions regarding the term "source
10  of the received signal."  Is that fair to say?
11    A.  I did not go beyond the intrinsic
12  evidence, because I believe the file history is
13  part of the intrinsic evidence.  I looked at
14  defendants' expert report or declaration, and I
15  provided rebuttal opinions.  But everything that I
16  relied upon for my opinion on pages 35 through 39,
17  I think falls within the '008 patent.
18    Q.  Would a person of skill from 2011, I
19  think -- yeah, let's start with that.
20        Is a person of skill date for the '008
21  patent 2011?
22    A.  That would be the earliest.  So the patent
23  was filed in 2012, and it claims priority to 2011.
24    Q.  Okay.  So working off that, would a person
25  of skill in 2011 have understood that there are,

Page 202

1  like you've identified, other satellite systems
2  that aren't like the one in the '008 patent?  Would
3  that have been known to a person of skill at the
4  time?
5     A.  I don't know.  I don't have an answer to
6  your question now.  I would need to kind of mull it
7  over, so I don't -- I don't -- I don't have an
8  opinion on that today.
9     Q.  But you did analyze the claim from the
10  perspective of a person of skill in 2011; right?
11    A.  Yes.
12    Q.  Okay.  So when you were analyzing the
13  claim from the perspective of a person of skill,
14  did you consider the other satellite systems that
15  aren't like the one disclosed in the '008 patent?
16    A.  To the extent I did, because they are part
17  of my experience, I did not rely on something that
18  is not in the '008 to render the opinion of how
19  that term in the claims -- because, again, my
20  understanding of legal principles is the claims are
21  read in light of the specification and more weight
22  is given to intrinsic evidence.
23        I know courts sometimes can use expert
24  testimony and extrinsic evidence, like dictionaries
25  and so on; and I have provided such opinions in the

Page 203

1  past.
2        But here I'm not relying on any extrinsic
3  evidence or dictionaries, which would be examples
4  of extrinsic evidence.  I am relying on intrinsic
5  evidence.  I am relying on the specification.  And
6  based on that, the -- my opinion is just --
7  those -- the disputed terms should have its plain
8  and ordinary meaning.
9        So for that, I'm -- I am -- it shouldn't
10  be limited to the construction given by defendants
11  and defendants' expert but should just be -- should
12  just be plain and ordinary meaning.
13        And for that, I am relying on how a POSITA
14  would understand that term in light of the
15  specification.
16        THE WITNESS:  We've been going about
17  an hour.  Is this a good time for a break?
18        MR. HESTER:  It is.
19        Let's go off the record.
20        THE VIDEOGRAPHER:  The time is now
21  3:25 p.m.  We're off the record.
22        (Brief Recess, 3:25 p.m. until
23  3:35 p.m.)
24        THE VIDEOGRAPHER:  We're now on the
25  record.  The time is 3:35 p.m.

Page 204

1     Q.  (BY MR. HESTER)  You still got
2  paragraph 113 of your declaration open, Doctor.  I
3  want to --
4     A.  I'm there.
5     Q.  Okay.  On lines 6 and 7, which I think we
6  discussed before, "a satellite system has an uplink
7  center located on the ground which receives
8  content."
9        What do you mean by "receives
10  content"?
11    A.  This is content as in information or
12  signals that's going to be transmitted.  So I
13  define how it receives content, processes the
14  content, and then trans- -- and then transmits
15  those signals via an uplink channel to the
16  satellite transmitter.
17    Q.  So in the context of the cable system, the
18  headend is also receiving content, I think we saw,
19  from either an antenna or a satellite dish or the
20  Internet, in Figure 1A?
21    A.  Yes.  I mean, I think the word "content"
22  would have plain and ordinary meaning.  It is a
23  word that appears in the claims of the '008 patent.
24  It appears, at least, in Claim 1, line 26.
25    Q.  When you say to the "uplink center," next



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
205—208

Page 205

1  on line 7, "processes the content," what do you
2  mean by that?
3      A.  So processes the content, so any
4  processing on a -- whether it is analog or digital
5  on a signal that contains content or that carries
6  information is -- those would be examples of what
7  I'm saying here.
8      Q.  In the context of the cable system, the
9  headend is also processing content.  For example,
10  we saw Video Modulator 112; right?
11      A.  Let me go back to -- 112 would be an
12  example, yes.
13      Q.  What is the source of a signal received by
14  a customer in a satellite communications network?
15          When I say "received," I'm referring
16  to by the satellite dish.
17          MS. ALLOR:  Object to the form.
18      A.  So that's -- so the word -- or the term "a
19  source of said received signal," so when you are
20  talking about a source, I believe there is a
21  dispute of what that source is.
22      Q.  (BY MR. HESTER)  Okay.
23      A.  And those are the opinions that I have in
24  106 through 119.  I just want to make sure -- do
25  you want me to go into those opinions?  Or are we

Page 206

1  talking about the disputed claim terms or are we
2  talking more general?
3      Q.  I'm talking about in a satellite system
4  where you have a satellite dish receiving a signal,
5  what is the source of that signal?
6      A.  Okay.  So I'm still not clear how to
7  answer your question because there -- the word "a
8  source of said received signal" appears in the
9  claim.  So are we talking claim construction, or
10  are we talking something else?
11          Because with regard to claim
12  construction, I provide -- I say that those words
13  need to have plain and ordinary meaning; and the
14  construction proposed by defendants is too narrow.
15      Q.  What is the plain and ordinary meaning of
16  source of -- a source of the received satellite
17  signal?
18      A.  I don't propose a construction.  I just
19  say it is too narrow, the construction that is
20  proposed by defendants.  You can have -- and I give
21  examples of what it can be.
22          So I don't propose a construction, but
23  I do say that a source -- because the signal is
24  relayed and repeated at different nodes in the
25  network, when the claims talk about a source, it's

Page 207

1  not necessarily referring to the very origin of the
2  signal.
3          So I think -- so when -- when
4  defendants go with -- or proposes a construction
5  that says "headend," even though that is an example
6  of a source, it is too limiting because it excludes
7  any repeaters along the way, it excludes relays
8  along the way, and it is really not consistent with
9  the claim language where -- when we look at the
10  other language in the claims where we're looking at
11  what we're doing with the signals.
12          So it's -- there's language that says
13  characteristics of a source of said -- and we're
14  going to report.  So, for example, I am in the
15  '008; and Claim 1 mentions source on line 23.  But
16  it says, (Reading:)  And report said determined
17  characteristics to a source.
18          Claim 3 says one or more
19  characteristics to a source.  So, again, you are
20  reporting things to a source.  And 11 says --
21  Claim 11 uses also report said determined one or
22  more characteristics to a source.
23          So the way networks work and the way a
24  POSITA would understand, that you have signals; and
25  you acknowledge reception of a signal; and you want

Page 208

1  to make sure your links are receiving that
2  information correctly in different stages of the
3  network.
4          So when Claim 11 or Claim 1 or Claim 3
5  uses the term "a source of said received signal,"
6  it may not be referring back to the very origin of
7  the signal because, one, there is, you know, a huge
8  amount of distance.  And that's not really going to
9  be as helpful.
10          It may be an example, but more likely
11  what you are reporting is the last leg or you are
12  reporting, you know, the last connection, because
13  that's something you can address quickly.
14          So when I -- when a receiver is
15  looking at that received signal and there is issues
16  with that signal, it can go back to the last link
17  or the last repeater or the last switch.  It can go
18  back further.
19          So the opinion that I have is a source
20  should not be limited to what defendants say but
21  should have the plain and ordinary meaning which
22  would include what defendants say.  But it would
23  also include elements or nodes that are part, for
24  example, of WAN 192.
25          So that's -- that's the -- you know,



Page 209

1  a -- you have a broadband connection 188 to
2  WAN 192.  And you have links; and there is
3  monitoring; and -- and elements in WAN 192 would
4  benefit from knowing, you know, the characteristics
5  of the last signal.
6        So the word "a source" would not be
7  limited to the very origin of the -- you know, the
8  first instance of the signal.  That's -- that's
9  what the dispute -- I believe, at least in my
10  understanding, is where the dispute lies.
11     Q.   Is a satellite transmitter a source -- the
12  original source of the satellite signal?
13     A.   No.
14     Q.   Okay.  Where is that in the process?
15     A.   So when you are saying "original," are you
16  saying -- are you defining -- so I need to
17  understand what you mean by that.  To the extent it
18  means the very -- the very first instance where a
19  signal appeared, you go back all the way, for
20  example, to the headend.  That's the very first
21  instance where it appeared as part of the network.
22        But that signal gets processed and
23  gets transmitted on different aspects.  It can go
24  through different links along the way to reach its
25  destination.  And so when we look at the

Page 210

1  destination and we look at the source of the signal
2  at the destination, the -- the last link or couple
3  links along the way, those all are sources because
4  they receive, they regenerate, they can correct
5  along the way, and they send.
6        So my opinion is that a source -- any
7  source along the way of the signal would meet the
8  claim language of a source.  And this is why it
9  should have a plain and ordinary meaning and it
10  would not -- it should not be limited to the
11  equipment; example, a cable headend or satellite
12  transmitter that transmitted the received signal.
13        Because, I mean, again, the satellite
14  transmitter is in the sky.  So the -- in any of
15  these situations here, you are not sending the
16  signal back to the satellite transmitter.  You
17  don't have the capability.
18     Q.   Why do you say that?
19     A.   The -- the -- I'm sorry?
20     Q.   I said why do you say that you don't have
21  the capability?
22     A.   The -- the -- any of the equipment in this
23  setting, you know, the little satellite dish that
24  users put on their houses that is being described
25  in the '008 for television, those do not have the

Page 211

1  capability to transmit to the satellite.
2        So saying the satellite transmitter is
3  the source, that would -- would not be how a POSITA
4  would understand because you cannot transmit to the
5  satellite transmitter the characteristics from
6  the -- that's received by the satellite dish.
7        So there would be embodiments that
8  would not make sense if that is the construction
9  that's given.
10     Q.   Is there something in the '008 patent that
11  tells you that the satellite equipment that's
12  described in the '008 patent does not have the
13  ability to transmit to the satellite?
14     A.   A POSITA would understand looking at a
15  system and the examples of the cable systems in
16  2011 time frame.  And what's being shown, for
17  example, in Figure 1C as a -- so when we go to
18  Figure 1C, there are descriptions of what's in
19  Figure 1C.  And if you look at Figure 1C, there is
20  no description that 174 or anything in Figure 1C
21  can transmit to the satellite.
22     Q.   So it is the lack of a description that
23  you are relying on to say that it would not be
24  possible in this context?
25     A.   The absence of any embodiments or

Page 212

1  discussion of a scenario that's being proposed by
2  defendants while there is ample embodiments and
3  scenarios discussed that are being limited or read
4  out by defendants' experts is why I disagree with
5  his opinion.
6        So it is twofold.  One, the -- it is
7  proposing a construction that would not read on
8  what's in the spec and it is reading out
9  descriptions that is in the spec.
10     Q.   And when you talk about reading things
11  out, I believe you mentioned repeaters and relays
12  as examples of things that are, in your view, read
13  out by Dr. Steffes' construction?
14     A.   You are reading out anything in WAN 192
15  that is shown in Figure 1C in that embodiment.  So
16  it is cutting completely out 192; and it is
17  proposing an embodiment where what's on the roof,
18  174, would need to communicate with the satellite
19  up.  And that's not described as embodiment
20  anywhere here.  174 can receive only.  It cannot
21  transmit.
22        So looking at 1C, it is proposing a
23  construction that doesn't make sense; and it would
24  be inconsistent with the specification.  And it is
25  reading out WAN 192, which would make sense, and is



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
213—216

Page 213

1  described in the specification.
2     Q.  Could WAN 192 be connected to an uplink
3  center?
4     A.  Yes, it is possible to -- to have an
5  indirect connection, because WAN can be broad
6  enough that at some point you can get to -- from
7  the WAN to the headend to the uplink center
8  indirectly, so --
9     Q.  Or even skipping the headend just directly
10  from the Gateway listed on 196 to the uplink
11  center, is that a viable -- or a communication path
12  a person of skill would understand?
13        And I'm referring to Figure 1C here.
14     A.  Yes.  The uplink center isn't shown in
15  Figure 1C, but your question is:  Could a WAN be
16  connected to an uplink center that's not shown in
17  1C?
18        And the answer is, possible, yes.  I
19  mean, I -- I wouldn't rule it out.
20     Q.  Okay.  Would a person of ordinary skill in
21  the art understand source in the context of the
22  claim to refer to, like, the production company
23  that creates a television program, like the ESPN?
24     A.  I don't think that makes sense as much
25  because -- not because of the word source in

Page 214

1  vacuum, but how it is used in the context of the
2  claim.
3        What you are doing is -- again, as an
4  example, so I am looking at --
5        I'm sorry.  I don't want to go out of
6  focus or out of frame.  I can zoom in.
7        So, for example, you are -- in
8  Claim 1, you -- so looking at Claim 1, you have an
9  analog-to-digital converter, then you have a signal
10  monitor.  And the signal monitor is operable to
11  analyze said digitized signal, determine a
12  characteristic, and report said received
13  characteristics.
14        So it is -- it wouldn't make sense
15  that you are going to be reporting it back to -- I
16  mean, the person who made the video -- you know,
17  unless you are filling out a survey later asking
18  the user, did you like the video or was the signal
19  received -- did you -- you know, that's just not, I
20  think, what's in the spec of this.  This is not a
21  customer survey type of report.
22     Q.  Can you pull up the '008 patent?
23  Although, I believe you --
24     A.  I have it open.
25     Q.  Okay.  If I can have you go to Column 3,

Page 215

1  and I'm going to ask you some questions about
2  lines 5 through 10.  So you might want to read
3  them.
4     A.  (Reviewing document.)
5     Q.  Let me know when you have read them.
6     A.  I have.
7     Q.  Okay.  Column 3, lines 5 through 10 are
8  discussing Figure 1B from the '008 patent; is that
9  right?
10     A.  Yes.
11     Q.  And I think you have Figure 1B in your
12  report -- declaration, excuse me, on page 32.
13     A.  Yes.
14     Q.  Okay.  And you've annotated and shaded the
15  figure from the patent.  Is that fair?
16     A.  Yes.
17     Q.  Do you have an understanding of what RF --
18  I'm trying to read that -- "receive front end 158"
19  is referring to?
20     A.  Yes.
21     Q.  Okay.  And what is it referring to?
22     A.  So that would be paragraph 102, lines 3
23  through 8.  I say, "As shown above in red, a full
24  spectrum signal that spans an entire television
25  spectrum is received (example, signal 'S,'

Page 216

1  comprising the entire signal from the lowest
2  frequency 'Flo' to the highest frequency 'Fhi') by
3  the analog-to-digital converter and digitized into
4  a fully digital, full spectrum signal."
5        And I provide multiple citations to
6  the patent.
7     Q.  So if we go back one page to the figure, S
8  is the -- is the character to designate the input
9  signal; is that right?
10     A.  Yes, which I label "full spectrum received
11  input signal."
12     Q.  And then that signal is a -- is a -- an RF
13  signal, it's a -- let me use the right words here.
14        It's a -- it's an analog radio frequency
15  signal; is that correct?
16     A.  It could be.  So I provide an example
17  where it is an analog signal, and it is going to go
18  through an analog-digital converter so that you get
19  a fully digital signal at the output.
20     Q.  Fully digital means that the input analog
21  signal is now in the digital domain at the output?
22     A.  That's fair.
23     Q.  Okay.  As I believe you've noted, you've
24  annotated S with the words "full spectrum received
25  input signal"; is that right?



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
217–220

Page 217

1    A.   Yes.
2    Q.   Why did you annotate S so that it says
3  "full spectrum received input signal"?
4    A.   I'm using language from the patent.
5    Q.   Okay.
6    A.   So this is what -- the patent is
7  describing the input.  Those are words from the
8  specification.
9    Q.   Do you have an understanding of what those
10  words mean to a person of ordinary skill?
11    A.   They would have plain and ordinary
12  meaning.
13    Q.   And what is the plain and ordinary meaning
14  of "full spectrum received input signal"?
15    A.   So spectrum refers to bandwidth.  And full
16  spectrum would be -- you know, you are looking at
17  an entire bandwidth.  So this is not -- so this is
18  the -- the signal with all its components in a
19  way -- or an example would be a signal having --
20  that has not been truncated or you have not removed
21  some frequency from it, as an example.
22        It is like whole -- whole -- whole
23  milk.  You haven't skimmed it, yes.  It's --
24  it's -- it has all the frequencies in it.
25    Q.   And that whole-milk signal, so to speak,

Page 218

1  is what gets digitized by the RF receive front
2  end 158?
3    A.   Yes.  And I also rely on Figure 4, which
4  is just below it; and I highlight two steps, 404
5  and 406.  And those two steps are being carried in
6  Block 158, as an example.
7    Q.   Are there other steps being carried out in
8  158 that you are aware of?
9    A.   Those are the two that I also annotate --
10  or highlight in red as I try to map Figure 4 to --
11  as steps to the blocks in Figure 1B --
12    Q.   Okay.
13    A.   -- and I map all four colors in both
14  cases.
15    Q.   In paragraph 102A, which I think you
16  pointed me to a minute ago, there's reference to
17  spanning an entire television spectrum -- strike
18  that.  Let me go back a little bit.
19        There is reference to a full spectrum
20  signal that spans an entire television spectrum is
21  received.  What do you mean by the phrase "spans an
22  entire television spectrum"?
23    A.   I think those words are -- they would have
24  their plain and ordinary meaning.  Those are words
25  that appear in the claim.

Page 219

1        I'm not rendering opinions on them.
2  And they also appear, I think, partly in the spec.
3  So they would have the plain and ordinary meaning.
4    Q.   And what is the plain and ordinary meaning
5  of "spans an entire television spectrum"?
6    A.   I have not provided a construction for the
7  reasons we've discussed multiple times before.
8    Q.   Can you provide for me an explanation
9  today of what the plain and ordinary meaning of
10  "spans and entire television spectrum" is?
11        MS. ALLOR:  Object to the form.
12    A.   No.
13    Q.   (BY MR. HESTER)  How long would it take
14  you to form an opinion regarding the plain and
15  ordinary meaning of that term?
16        MS. ALLOR:  Object to the form.
17    A.   Days.
18    Q.   (BY MR. HESTER)  Multiple hours?
19    A.   Yes.  Well, I mean, multiple days where I
20  think about it and I sleep on it and I think about
21  it.  That's kind of my process.
22    Q.   And you think that process collectively
23  might take a couple of hours?
24    A.   Over multiple days, I think that's -- that
25  could be an estimate.  I don't know.  I mean, I

Page 220

1  haven't -- I have not been asked to carry out that
2  process; but --
3    Q.   When you saw -- sorry.
4    A.   Sorry.  I mean, looking at my declaration,
5  my declaration has two opinions; and it took me
6  about 20 hours for two opinions.  So, you know, it
7  does have an introduction but -- so we're looking
8  at around, you know, 10 hours per opinion, on
9  average.
10    Q.   When you reviewed the -- when did you
11  first review the '008 patent?  Was that also about
12  a year ago?
13    A.   Yes.
14    Q.   Okay.  In the year since you first
15  reviewed the '008 patent, have you had any thoughts
16  about the plain and ordinary meaning of "spans an
17  entire television spectrum"?
18        MS. ALLOR:  Objection --
19    A.   Probably.
20    Q.   (BY MR. HESTER)  Okay.
21        THE REPORTER:  What was your
22  objection?
23        MS. ALLOR:  Form.
24    Q.   (BY MR. HESTER)  Do you recall any of
25  those thoughts as you sit here today?



Page 221

1    A.  No.
2    Q.  The sentence, again -- and I'll read it so
3    we can ask more questions about it -- or I'll read
4    the clause that says, "...a full spectrum signal
5    that spans an entire television spectrum is
6    received."
7          And my question is:  Do you have -- do
8    you believe there is a difference between the term
9    "full spectrum" and the term "spans an entire
10   television spectrum"?
11          MS. ALLOR:  Object to the form.
12   A.  I -- I don't know.
13   Q.  (BY MR. HESTER)  Did you just use those
14   terms because that's how they are used in the
15   patent?
16   A.  That's fair.
17   Q.  And you don't have an independent view of
18   the differences between those terms, if any?
19   A.  Correct.  And this is in the overview
20   section.  So I know we've discussed the section
21   where I present my opinions, and now we're back to
22   an overview section.
23          And just like the overview of the
24   other patent, I am not providing opinions here.
25   I'm merely trying to provide an overview of the

Page 222

1    spec without injecting opinions one way or the
2    other.
3    Q.  Do you have opinions about the '008 patent
4    separate from your opinion regarding the claim term
5    "source of received signal"?
6          MS. ALLOR:  Object to the form.
7    A.  I do not as of today.
8    Q.  (BY MR. HESTER)  So if I can have you turn
9    back to the '008 patent.  This time we're going to
10   go to Column 5, and I'm going to point you to
11   lines 41 through 57.  So please take a second to
12   look at lines 41 through 57.
13   A.  (Reviewing document.)
14   Q.  Let me know when you are done.
15   A.  I've read it.  Thank you.
16   Q.  Okay.  Do you understand that lines 41
17   through 57 are describing Figure 2B of the '008
18   patent?
19   A.  Yes.
20   Q.  And Figure 2B is an embodiment of an RF
21   front end 158 like we were just discussing in the
22   context of Figure 1B?
23   A.  That's fair.  That's the beginning of the
24   sentence.  It says, "Figure 2B depicts another
25   example RF front end of a receiver operable to

Page 223

1    perform spectrum monitoring in accordance with an
2    example embodiment of the invention."
3    Q.  Now, on line 48, the patent describes,
4    quote, "In the front end 158B, the entire bandwidth
5    from Flo to Fhi of the Signal S may be amplified by
6    the Amplifier 252 to generate S, apostrophe."
7          Did I read that right?
8    A.  Yes, it's S prime, but --
9    Q.  S prime.  Perfect.  That was my next
10   question.
11          So amplifying here, do you understand
12   this to refer to the amplifying that is performed
13   by an LNB, or at least the same kind of
14   amplification?
15          MS. ALLOR:  Objection, outside the
16   scope of his declaration.
17   A.  I don't provide opinions on what an
18   amplifier is.  An amplifier generally is a signal
19   that provides an output that imparts some gain on
20   the signal.
21   Q.  (BY MR. HESTER)  And an LNB includes an
22   amplifier that's part of the name.  Is that fair?
23   A.  And there is a low noise amplification,
24   but I wouldn't -- at least I don't have any
25   opinions whether they are the same in vacuum.  They

Page 224

1    may share a component that imparts gain on to a
2    signal.
3    Q.  So signal S goes into the Amplifier 252;
4    and as a result, Amplifier 252 generates S prime;
5    is that correct?
6          MS. ALLOR:  Objection, outside the
7    scope of his declaration.
8    A.  Looking at Figure 2B, I do see -- I don't
9    think this is a figure that I produced in my
10   declaration; but I see an S on the left.  I see a
11   symbol of 252, and I see an S prime on the -- as an
12   output.
13   Q.  (BY MR. HESTER)  So the output S prime is
14   a different signal as indicated by its different
15   name.  Is that fair to say?
16          MS. ALLOR:  Objection to the scope.
17   A.  I don't have an opinion whether S prime is
18   different or not.  Sometimes you go through a
19   system and you may have a system that doesn't
20   modify but -- so I wouldn't necessarily assume
21   that.
22          It's just -- because you can have an
23   amplification of one.  So as such, I can think of
24   an example where S prime and S would be the same if
25   you are imparting a gain of one.



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
225—228

Page 225

1    Q.  (BY MR. HESTER)  Okay.
2    A.  So I wouldn't generalize and say they have
3  to be different.
4    Q.  Okay.  So if the gain is anything other
5  than one, there is a difference then?
6        MS. ALLOR:  Objection, form.
7    A.  To the extent you are doing a gain and --
8  but then, whether you would refer to the signals as
9  the same or different is also a separate issue,
10  because I don't have an opinion whether, even if we
11  change the gain of the signal -- for example, if we
12  change the amplitude of the signal, if we're still
13  calling them the same or not, because it's -- you
14  know, the content might be the same; but the
15  amplitude is different.  So I don't have an opinion
16  here on that aspect because that's not an analysis
17  that I've done.
18    Q.  (BY MR. HESTER)  In this section, I
19  believe, specifically on Row 48, there is reference
20  to the entire bandwidth.  Do you see that?
21    A.  I am sorry.  I was at the figure.  Now I'm
22  going back to the specification.  Where are we in
23  the specification?
24    Q.  Column 5, line 48.
25    A.  Okay.  I'm there.

Page 226

1    Q.  And so do you see the reference to the
2  entire bandwidth on line 48?
3    A.  Yes, I see those words.
4    Q.  Does that mean something similar to the
5  term "full spectrum," as you used in discussing one
6  of the earlier figures, I think 1B?
7        MS. ALLOR:  Objection, outside the
8  scope.
9    A.  I don't have an opinion on that.
10    Q.  (BY MR. HESTER)  And that's another one
11  where it might take you days to form an opinion?
12    A.  It might.  I -- at least this sentence
13  says the entire spectrum -- sorry -- the entire
14  bandwidth from Flo to Fhi.
15        So the sentence itself is clarifying
16  from Flo to Fhi, at least looking at that language
17  around the entire bandwidth.
18    Q.  If I could take you back up to line --
19  Column 4, line 7; and I'm going to look at lines 7
20  through 10.  Please give those a review, and let me
21  know when you are done.
22    A.  (Reviewing document.)  I have read them.
23    Q.  Okay.  Starting in line 7, there is
24  reference to, quote, "A parallel arrangement of the
25  Monitoring Module 154 and Data Processing

Page 227

1  Module 156."
2        Do you see that?
3    A.  Yes, I see those words.
4    Q.  Do you have an understanding of the
5  parallel arrangement, what that means in the
6  context of this sentence?
7        MS. ALLOR:  Objection, outside the
8  scope.
9    A.  I don't have an opinion on that.
10    Q.  (BY MR. HESTER)  Whether you have an
11  opinion on the specific words "parallel
12  arrangement," do you have an understanding of what
13  is being conveyed in the sentence beginning on
14  Column 4, line 7 and ending on line 10?
15    A.  If we look at those words and we look at
16  Figure 1B, Figure 1B shows, at least visually,
17  Monitoring Unit 154 and Data Processing Unit 156.
18  And they are placed one above each other with
19  inputs feeding both and outputs coming out of both
20  separately.
21    Q.  Would you call that a parallel
22  arrangement, what we're looking at on Figure 1B?
23    A.  I think it is consistent with the
24  description, but I don't have an opinion on it.
25    Q.  And the specification of the '008 patent

Page 228

1  after introducing parallel arrangement, same
2  Column 4, lines 7 through 10 range, says, quote,
3  "May enable determination of signal and/or channel
4  characteristics without having to interrupt service
5  to user equipment 126 and 128."
6        Do you see that in Column 4?
7    A.  Yes.
8    Q.  Do you agree that the parallel arrangement
9  described in Column 4, lines 7 through 10, may
10  enable determination of signal and/or channel
11  characteristics without having to interrupt service
12  to user equipment 126 and 128?
13    A.  I -- I don't have an opinion on it.  I
14  don't have reason to disagree with it, but I have
15  not provided an opinion whether that's correct or
16  not.
17    Q.  Okay.  And if we go back to Figure 1B,
18  just an example, it is consistent with the parallel
19  arrangement.
20        Is it your understanding from
21  Figure 1B that data processing can take place on
22  the signal input to data processing as monitoring
23  is taking place on the signal in which monitoring
24  is being input?
25        MS. ALLOR:  Object to the form.



Page 229

1    A.   That's fair.
2    Q.   (BY MR. HESTER)  Okay.  If I can take you
3  back to your declaration, paragraph 113.  Let me
4  know when you are there.
5    A.   I am there.
6    Q.   You state in the first sentence of 113,
7  (Reading:)  Second, Dr. Steffes' opinion is based
8  on his inaccurate statement that the -- quote, the
9  '008 patent describes transmitting equipment, i.e.,
10  a cable or satellite headend as, quote, again, a
11  source of the received signal, end quote, that can
12  receive messages from a monitoring module, end
13  quote.
14         Did I read that correctly?
15    A.   Yes.
16    Q.   What you believe is inaccurate about
17  Dr. Steffes' sentence that you are quoting is the
18  use of the term "satellite headend"; is that right?
19         MS. ALLOR:  Object to form.
20    A.   Not just that.  It's the -- that the cable
21  or satellite headend would be the source of the
22  received signal or would be the construction that
23  would limit a source of the received signal to just
24  those things and in addition to the words
25  "satellite headend."

Page 230

1         So there is two disputes.  One, a
2  general dispute throughout the section related to
3  his narrow construction that I disagree with; and,
4  then, an additional dispute here focused on the
5  word "satellite headend" that I disagree that
6  Figure 1C has a headend -- or shows a headend.
7    Q.   Can we agree, though, that in Dr. Steffes'
8  construction of the term in dispute, he does not
9  use the word "satellite headend"?
10    A.   Yes.
11    Q.   And can we also agree that in the sentence
12  that you are quoting from Dr. Steffes in
13  paragraph 113, he refers to a source of received
14  signal and not the source of received signal?
15    A.   Yes, we can agree to that because the
16  disputed term is "a source of said received
17  signal"; but he has those words in quotes.  So I
18  took that so -- to mean he's referring to claim
19  language.
20    Q.   Okay.  And do you agree that a cable
21  headend can be a source of the received signal?
22    A.   Yes, it can be an example.
23    Q.   And can you agree that a satellite headend
24  can be a source of a received signal?
25         MS. ALLOR:  Object to the form.

Page 231

1    A.   I don't specifically -- I don't believe I
2  specifically state that opinion.  Because, like you
3  said, those words aren't in the construction.
4         So as far as the construction, which
5  doesn't use those words, I agree that those are
6  examples but the construction should not be limited
7  to that.
8    Q.   (BY MR. HESTER)  Would you say that a
9  satellite headend is a source of received signal,
10  setting aside how you are looking at his
11  construction?
12    A.   I would agree -- or I would say that's --
13  that would be the original -- we can think of that
14  as the original source or the first instance of the
15  signal -- or the first instance of the source -- or
16  of a source.
17    Q.   Okay.  Look down at paragraph 114.  You
18  state, quote, line 10, "Third, and most
19  importantly, the '008 patent discloses alternatives
20  excluded by the DISH-Steffes' limitation."
21         I assume here you actually meant
22  construction, not limitation; right?
23    A.   Oh, yes.  Thank you.
24    Q.   Okay.  So we'll go forward with it
25  assuming that it says "construction."

Page 232

1         What alternatives are excluded by the
2  DISH-Steffes' construction?
3    A.   The alternatives that I discussed
4  previously when we look at Figure 1C and we show --
5  or Figure 1C shows WAN 192; Figure 1A shows
6  HFC 118.  Those, HFC 118 and WAN 192, include hops
7  and nodes that would be -- or could be a source;
8  and so those would be the examples that are being
9  excluded, which I describe in paragraph 114.
10         So I state, "The patent discloses the
11  monitoring information may be sent upstream to the
12  operator by Broadband Connection 188."
13         And -- and so I refer to Figure 1C.
14         At the time on the invention and
15  today, the broadband connection most commonly known
16  and the one that a POSITA would understand is being
17  referred to is the Internet.
18         For cable-only embodiments where there
19  exists an HFC hybrid fiber-coaxial network, the HFC
20  might be included as an interface with the
21  Internet.  Figure 1A shows an example connecting to
22  the Internet 106 through HFC 118.
23         So having a source be in WAN 192 or be
24  a node in HFC is what, in my opinion, is being
25  excluded by defendants' construction.



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
233—236

Page 233

1    Q.  If the nodes and switches and the other
2  equipment in HFC fall within Dr. Steffes'
3  construction, then would you agree with
4  Dr. Steffes' construction?
5        MS. ALLOR:  Objection, form.
6  A.  I don't --
7        THE REPORTER:  What was the objection?
8  MS. ALLOR:  Form.
9  A.  I don't see how I would agree with that.
10  So -- I mean, you are asking me a hypothetical that
11  I don't see how I can even agree with because his
12  construction is very limiting.
13        So that's why I am proposing that the
14  construction should be plain and ordinary meaning,
15  which would include what defendants have proposed
16  but would not be limited to what defendants have
17  proposed.
18        And it is easier to not have to list
19  everything and not necessarily dispute what it can
20  be by just giving it the plain and ordinary
21  meaning, and a POSITA would understand what that
22  plain and ordinary meaning without having to
23  provide a limited construction that I think is
24  incorrect -- or I should say I disagree with.
25    Q.  (BY MR. HESTER)  What language in

Page 234

1  Dr. Steffes' construction do you believe excludes
2  communication via the HFC?
3    A.  So a cable headend is to the left of the
4  HFC.  So looking at Figure 1A, it is separate than
5  the HFC; so I don't believe his construction
6  includes the HFC.
7    Q.  But we would agree, then, in the context
8  of the cable headend, for example, the
9  communication from the user premises to the cable
10  headend are traversing the HFC, or may traverse the
11  HFC?
12        MS. ALLOR:  Object to the form.
13    A.  Yes, I do agree that it does traverse the
14  HFC.  This is why the HFC should be included as a
15  possible source and not excluded, to jump over it
16  or ignore it completely and have to limit it to the
17  cable headend.
18    Q.  (BY MR. HESTER)  So if Dr. Steffes'
19  construction were simply hardware that can be a
20  source of the received signal, would you agree with
21  it?
22        MS. ALLOR:  Object to the form.
23    Q.  (BY MR. HESTER)  Omitting the two examples
24  that are in Dr. Steffes' construction.
25        MS. ALLOR:  Object to the form.

Page 235

1    A.  That was not a construction that I
2  contemplated.
3    Q.  (BY MR. HESTER)  Okay.
4    A.  So I'm not comfortable giving -- agreeing
5  or disagreeing.  To the extent it is consistent
6  with the plain and ordinary meaning or is an
7  example of the plain and ordinary meaning, my
8  opinion today is to go with the plain and ordinary
9  meaning.
10    Q.  But you are unable to tell me what the
11  plain and ordinary meaning is, as you sit here
12  today?
13        MS. ALLOR:  Objection, form.
14    A.  I have not articulated a definition of the
15  plain and ordinary meaning, but I have given you
16  examples of what the plain and ordinary meaning.
17        And if your construction is an example
18  of something that can be as part of the plain and
19  ordinary meaning, that's fine.  So why not just go
20  with the plain and ordinary meaning?
21        It's always easier -- well, it's
22  usually easier to have a plain and ordinary meaning
23  than try to articulate an example, because with
24  a -- with a specific definition, you want to be
25  careful that that is not too narrow or too broad.

Page 236

1  But if you go with the plain and ordinary meaning,
2  in a way you are not hindering that understanding
3  to be too narrow or too broad by articulating a
4  definition.
5    Q.  (BY MR. HESTER)  Have you ever articulated
6  a definition of a plain and ordinary meaning in
7  your work as an expert witness?
8        MS. ALLOR:  Object to the form.
9    A.  I don't think I have.  I have been
10  retained in cases where it's -- there's been an
11  alternate construction.  So a side -- you know, a
12  party, I should say, would say plain and ordinary
13  meaning or alternatively some definition.
14        And I think I might have seen
15  constructions from a court where they would say
16  plain and ordinary meaning and provide assistance
17  by providing examples.
18        But I -- I don't recall where it says
19  plain and ordinary and also provides a definition
20  without using alternatively or examples at the same
21  time.  But, again, I'm -- I can't recall right now
22  if that has happened.
23    Q.  (BY MR. HESTER)  So if I understood,
24  you've seen instances where the court will say
25  plain and ordinary meaning where the plain and



Page 237

1  ordinary meaning is and then words?
2     A.  No.
3     Q.  Okay.
4     A.  I'm saying -- sorry.  I am saying I do
5  recall constructions being proposed where a party
6  would say plain and ordinary meaning or
7  alternatively --
8     Q.  Okay.
9     A.  -- they would provide where they are
10  asking the court to either go with plain and
11  ordinary meaning or adopt a construction that they
12  believe is consistent with the plain and ordinary
13  meaning.  That is one example.
14        And I've also seen construction from
15  the court where they -- the judge ordered a plain
16  and ordinary meaning but might have also provided,
17  like, some examples to assist or some examples not
18  to exclude.
19        But they did not articulate a
20  definition but made sure, like, the plain and
21  ordinary mean includes A or does not include B to
22  the extent that there was a dispute during Markman
23  and the judge wants to make sure that his or her
24  opinion is being captured but still falling under
25  plain and ordinary meaning.

Page 238

1     Q.  But as far as you can remember, you do not
2  remember offering an opinion about what the plain
3  and ordinary meaning of a specific term is?
4        MS. ALLOR:  Object to the form.
5     A.  That is fair.  Because that's the point of
6  the plain and ordinary meaning is you -- you have
7  an understanding, but you are not articulating a
8  definition where that definition might be too
9  narrow or too broad, and that's not something I can
10  come up with on the fly.
11     Q.  (BY MR. HESTER)  But is it something that
12  you intend to come up with in the future?
13     A.  I have not been asked in this case to do
14  that, at least as of today.
15     Q.  Would you try and come up with a plain and
16  ordinary meaning even if you are not asked?
17        MS. ALLOR:  Object to the form.
18     A.  Usually not.  I don't recall where I did
19  that.  I recall where sometimes I might provide an
20  example or I would say something is consistent, but
21  I don't recall where I would articulate a
22  definition at the same time where there is
23  construction that is plain and ordinary meaning.
24     Q.  (BY MR. HESTER)  Again, I'll have you turn
25  to paragraph 117 of your declaration.

Page 239

1     A.  Okay.  I'm there.
2     Q.  Paragraph 117, first line reads, "On the
3  contrary, the specification confirms that broadband
4  connection 188 is a pathway available for upstream
5  reporting to the source."
6        And my question for you is:  What are
7  you -- what is the source you are referring to
8  here?
9     A.  The source that the patent is claiming.
10     Q.  So are you able to provide me with any
11  information about what the source is when you say
12  here "the source"?
13     A.  Yes, it's the source as it appears in the
14  claim language.
15     Q.  But didn't we agree that the claim
16  language refers to a source?
17     A.  Yes, that's why I'm using the source --
18     Q.  Okay.
19     A.  -- that is the "a source" in the claim
20  language.
21     Q.  Okay.  So is that the only source?
22     A.  Yes, that's the -- with regard to my
23  opinion here, that's -- I'm providing an opinion
24  regarding a source as it appears in the claim
25  language.

Page 240

1        And because I don't have it in quotes,
2  I called it the source.  That's the dispute -- the
3  disputed source.
4     Q.  But I think we've agreed that there are
5  sources other than those connected to the broadband
6  connection -- is that right? -- for example, the
7  satellite transmitter?
8        MS. ALLOR:  Object to the form.
9     A.  The satellite transmitter can be an
10  example of the source in vacuum, but it cannot meet
11  the "a source" in the claim language because you
12  can't send back to the satellite.
13        So it wouldn't make sense to say
14  that's -- when you look at the surrounding claim
15  language where you are sending something back to
16  the transmitter, the user and the satellite dish in
17  the user's -- or, you know, at the user's premises
18  cannot communicate uplink to the satellite dish.
19  So the satellite's transmitter cannot be a source
20  as required by the claim.
21     Q.  Okay.
22        MR. HESTER:  Let's go off the record.
23        THE VIDEOGRAPHER:  The time is now
24  4:32 p.m.  We're off the record.
25        (Brief Recess, 4:32 p.m. until



Page 241

1  4:39 p.m.)
2      THE VIDEOGRAPHER:  We're now on the
3  record.  The time is 4:39 p.m.
4      Q.  (BY MR. HESTER)  Dr. Akl, can I have you
5  pull back up your copy of the '576 patent and go to
6  the very last page?
7      A.  I'm there.
8      Q.  Okay.  Do see Claim 39 on the right-hand
9  side of the page?
10     A.  Yes.
11     Q.  Okay.  You understand that Claim 39
12  depends from Claim 38?
13     A.  Yes.
14     Q.  And then Claim 38 depends from independent
15  Claim 14?
16     A.  Yes.
17     Q.  Independent Claim -- sorry.  Strike that.
18     Dependent Claim 38 refers to, quote,
19  "selecting and extracting transponder signal," end
20  quote.
21         Do you see that?
22     A.  Yes.
23     Q.  Claim 38 does not refer to selecting or
24  extracting a transponder channel?
25     A.  I agree that the word "signal" and that

Page 242

1  the word "channel" is there, if we're looking at
2  just words.
3      Q.  And specifically the word "signal" is
4  there with respect to selecting and extracting
5  transponder signal.  Yeah?
6      A.  Yes.
7      Q.  So now go to Claim 39.  Claim 39 does
8  reference a selected transponder channel; is that
9  right?
10     A.  Yes, because it's -- I mean, yes, that's
11  your question.
12     Q.  So what in Claim 39 tells you how the
13  transponder channel is selected?
14     A.  Well, it's -- I don't -- Claim 39 states,
15  "The method of Claim 38, wherein frequency
16  translating comprises translating the original
17  digitized broadband signal to locate a selected
18  transponder channel at baseband."
19         So the claim language around the
20  phrase you asked me about is explaining what
21  Claim 39 requires.
22     Q.  Sure.  But with respect to the words
23  "selected transponder channel," is there anything
24  in Claim 39 that tells you how to determine which
25  transponder channels are selected?

Page 243

1      A.  I don't have an opinion on that.
2      Q.  Okay.  Do you see anything, looking at the
3  three lines of Claim 39, that tells you which
4  transponder channels are selected in Claim 39?
5      A.  I guess because it says "a" -- I mean,
6  there is no antecedent basis requirement because it
7  uses "a" and not "the."  So I don't see anything --
8  any issues related to this claim, because even this
9  claim language is different than the other claim
10  languages where they had "the."  And the fact that
11  it says "a," it would preclude even any confusion
12  because there is no antecedent basis requirement.
13         So I'm not sure what you are asking
14  me.  I don't -- I don't think there is anything --
15  any issues with this claim from -- at least in the
16  opinions that I've rendered on this claim language
17  because it says "a" instead of "the."
18     Q.  I understand that you rendered opinions on
19  the distinction between "a" and "the," but I want
20  to ask you:  What in Claim 39 tells you which
21  transponder channels are going to be selected?
22         MS. ALLOR:  Object to the form.
23     A.  I don't know if I have an answer to that
24  question because I am not sure I have done that
25  analysis, other than the rest of the claim language

Page 244

1  would be what you would look at; but I have not
2  done an analysis on the rest of the claim language.
3         But I am saying that's what I would
4  start with, the three lines in 39.  And 39 depends
5  on 38, so you may want to go to 38.  And 38 depends
6  on 14, but that's the process.  But I have not
7  walked through the process; and I would not be able
8  to, like, right now.
9      Q.  (BY MR. HESTER)  Do you believe a person
10  of skill, looking at Claim 39, would understand
11  which transponder channels to select and which
12  transponder channels to not select?
13     A.  I haven't done that analysis, so I don't
14  have an answer for you.
15     Q.  Can I ask you to do that analysis now?
16     A.  Yes.
17     Q.  Okay.  Please do the analysis, and tell me
18  what in Claim 39 would inform a POSITA of which
19  transponder channels are selected versus those that
20  are not selected.
21     A.  I would not be able to do the analysis
22  right now because I don't have enough time, so --
23     Q.  How long would that analysis take you?
24     A.  Days.
25         MR. HESTER:  Let's mark as Exhibit 5 a



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
245—248

Page 245

1  copy of the '715 patent.
2         (Exhibit No. 5 was marked.)
3         MS. ALLOR:  I'm going to object to
4  scope.  He hasn't opined on this patent.
5         MR. HESTER:  Okay.
6     Q.  (BY MR. HESTER)  Dr. Akl, have you
7  reviewed, at some time prior to today, the
8  U.S. Patent No. 7,542,715?
9     A.  Yes.
10    Q.  Okay.  When did you first review this
11 patent?
12    A.  About a year ago.
13    Q.  Similar time with the other patents?
14    A.  Yes.
15    Q.  Okay.  And you have, of course, reviewed
16 Dr. Steffes' declaration related to claim
17 construction.  Yes?
18    A.  I've -- I've read his declaration.  I am
19 providing opinions only on two claim terms.
20    Q.  Okay.  So your declaration is a rebuttal
21 to Dr. Steffes' declaration; is that right?
22    A.  It is a rebuttal to two opinions that
23 counsel asked me to rebut.  That doesn't mean I
24 agree with other stuff in it.  It just means that I
25 am only providing an opinion regarding two terms.

Page 246

1  The lack of rebuttal of other terms should not be
2  taken as an indication of agreement.
3     Q.  Well, do you have opinions about the terms
4  to which you did not rebut?
5         MS. ALLOR:  Object to the form.
6     A.  Can you repeat the question?
7     Q.  (BY MR. HESTER)  Yes.  Let me -- let's
8  take a step back.
9         So Dr. Steffes offered an opinion
10 regarding the term "decode specific programs" in
11 the '715 patent.  Do you understand that?
12    A.  I understand there's a dispute.  There is
13 dispute with other terms in this matter.  I don't
14 have opinions on those other terms.
15    Q.  Well, let's just start with the term I
16 read.
17        Do you understand that Dr. Steffes
18 offered opinions regarding the term "decode
19 specific programs" of the '715 patent?
20    A.  I don't recall.
21        MS. ALLOR:  Objection, form.
22    Q.  (BY MR. HESTER)  You don't recall reading
23 that in his declaration?
24    A.  I don't -- I did not review it recently,
25 and so I don't recall.  I might recall that there

Page 247

1  is a dispute to other terms, but I don't have
2  opinions on that term or that dispute.
3         MR. HESTER:  Let's mark as Exhibit 6
4  Dr. Steffes' declaration.
5         (Exhibit No. 6 was marked.)
6     Q.  (BY MR. HESTER)  Dr. Akl, do you recognize
7  Exhibit 6 as a copy of Dr. Steffes' declaration
8  regarding claim construction?
9     A.  Yes.
10    Q.  And if I can have you turn to page 32 of
11 Dr. Steffes' declaration.
12    A.  Okay.
13    Q.  Do you see on line 14, Section B -- or it
14 may be Subsection B, it is entitled "'715 Patent,
15 Claims 9 through 13," quote, "decodes specific
16 programs"?
17    A.  Yes, I see those words.
18    Q.  Do you remember reading this section when
19 you reviewed Dr. Steffes' declaration previously?
20    A.  No.
21        MS. ALLOR:  Objection, form.
22    Q.  (BY MR. HESTER)  Did you skip this
23 section?
24    A.  Yes.
25    Q.  Okay.  Why did you skip this section?

Page 248

1         MS. ALLOR:  Objection, form.
2  I'll caution the witness not to expose
3  privileged information.
4     A.  I can't answer your question.
5     Q.  (BY MR. HESTER)  But it is your testimony
6  under oath that you did not read, ever, Section B
7  related to the term "decodes specific programs"?
8         MS. ALLOR:  Objection,
9  mischaracterizes his testimony.
10    A.  What is the question again?
11    Q.  (BY MR. HESTER)  Have you ever read the
12 section of Dr. Steffes' report, this Subsection B
13 regarding "decodes specific programs"?
14        MS. ALLOR:  Objection, asked and
15 answered.
16    A.  I don't recall.
17    Q.  (BY MR. HESTER)  Do you want to read it
18 right now?
19    A.  No.
20    Q.  I'd like to ask you to read it right now.
21 It is three pages.
22        MS. ALLOR:  Counsel, I'll object to
23 the scope on this.  He didn't give an opinion on
24 this section.  This is inappropriate.
25        MR. HESTER:  I'm just asking him to



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
249–252

Page 249

1  read it.
2        MS. ALLOR:  You are wasting everyone's
3  time asking him to read something he is not going
4  to give an opinion on.  He stated that.
5        MR. HESTER:  I'd like to have him read
6  it real quick first.
7     A.  What page are we on?
8     Q.  (BY MR. HESTER)  So it starts on page 32,
9  about halfway down, and ends at the top of page 35.
10       MS. ALLOR:  I'm going to say this is
11  outside the scope of his declaration; and I'll
12  object to this, you know, making him read this
13  section while we sit here.
14    A.  (Reviewing document.)
15       Are you asking me to read it on the
16  record?
17    Q.  (BY MR. HESTER)  No.  Just read it in your
18  head.
19    A.  (Reviewing document.)  Okay.
20    Q.  Okay.  Did reading it right now refresh
21  your recollection one way or the other whether you
22  had seen this and read this before?
23    A.  No.
24    Q.  Do you have any opinions in response to
25  the content of what you just read?

Page 250

1     A.  No.
2        MS. ALLOR:  Objection, outside the
3  scope of his declaration.
4     Q.  (BY MR. HESTER)  Have you formed any
5  opinions, in the one year since you first reviewed
6  the '715 patent, about the patent or its claims?
7        MS. ALLOR:  Objection, scope.
8     A.  Can you repeat the question?
9     Q.  (BY MR. HESTER)  Yeah, and probably ask it
10  better.
11       Have you -- strike that.
12       You first reviewed the '715 patent
13  about a year ago.  I think we've agreed on that?
14    A.  Yes.
15    Q.  Since then, have you formed any opinions
16  regarding the claims of the '715 patent?
17    A.  No.
18       MS. ALLOR:  Objection, outside the
19  scope of his declaration.
20    Q.  (BY MR. HESTER)  Have you formed any
21  opinions regarding the specification of the '715
22  patent?
23       MS. ALLOR:  Objection, scope.
24    A.  Well, not directly because it shares
25  specification with the other patents.  So to the

Page 251

1  extent the similarities because of the '576 patent,
2  not because of this patent, I have -- there is this
3  overlap in the specification.
4     Q.  (BY MR. HESTER)  But you haven't, for
5  example, considered the claims of the '715 patent
6  in light of that specification?
7        MS. ALLOR:  Objection, scope.
8     A.  That's fair.
9        MR. HESTER:  Okay.  Let's go off the
10  record.
11       THE VIDEOGRAPHER:  Time is now
12  4:54 p.m.  We're off the record.
13       (Brief Recess, 4:54 p.m. until
14  4:57 p.m.)
15       THE VIDEOGRAPHER:  We're now on the
16  record.  The time is 4:57 p.m.
17    Q.  (BY MR. HESTER)  Dr. Akl, since you were
18  retained by plaintiff, have you undertaken any
19  analysis of the alleged infringement by DISH of the
20  asserted patents?
21       MS. ALLOR:  I'm going to object and
22  caution the witness not to disclose any privileged
23  information.
24    A.  Yes.
25    Q.  (BY MR. HESTER)  Okay.  About how much

Page 252

1  time have you spent performing that analysis?
2        Don't tell me anything you did.  Just
3  tell me about how much time.
4     A.  I don't know.  I don't recall.
5     Q.  Okay.  How long ago did you first start
6  performing that analysis?
7        MS. ALLOR:  I'm going to object to the
8  scope.  This is outside the declaration of claim
9  construction and inappropriate.
10       MR. HESTER:  Okay.
11    Q.  (BY MR. HESTER)  You can answer.
12    A.  What was the question?
13    Q.  How long ago did you first start
14  performing that infringement analysis?
15       MS. ALLOR:  Objection, outside the
16  scope.
17    A.  I have seen infringement contentions.
18  That's the extent of what I have seen and done.
19    Q.  (BY MR. HESTER)  Okay.  Do you know if the
20  infringement contentions you have reviewed were the
21  initial infringement contentions served earlier
22  last year or the supplemented contentions served
23  late last year?
24       MS. ALLOR:  Objection.  This is
25  calling for privileged information.



Page 253

1    A.  I don't know.
2    Q.  (BY MR. HESTER)  Okay.  In your review of
3 the infringement contentions, did you form any
4 opinions regarding the alleged infringement by
5 DISH?
6         MS. ALLOR:  Objection, outside the
7 scope, requesting privileged information.
8    A.  No, not yet.
9    Q.  (BY MR. HESTER)  Not yet.  Okay.
10         MR. HESTER:  All right.  I will pass
11 the witness.
12         MS. ALLOR:  I have no questions.
13         MR. HESTER:  You're free.
14         Go off the record.
15         THE VIDEOGRAPHER:  The time is now
16 5 o'clock p.m.  We're off the record.
17         (Proceedings Concluded at 5:00 p.m.)
18
19
20
21
22
23
24
25

Page 254

1             CHANGES AND SIGNATURE
2 DEPOSITION OF:  ROBERT AKL, D.SC.
3 APRIL 20, 2023
4 PAGE  LINE  CHANGE              REASON
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 Signature: _____ Date: _____

Page 255

1 THE STATE OF TEXAS:
2 COUNTY OF _____:
3
4         I, ROBERT AKL, D.SC., hereby certify
5 that I have read the foregoing transcript of my
6 testimony given in the foregoing numbered and
7 styled case, and that same is true and correct to
8 the best of my knowledge and belief.
9         I further certify that any and all
10 corrections have been made on a separate page and
11 initialed by me.
12
13         This _____ day of _____, 2023.
14
15
16         _____
17                ROBERT AKL, D.SC.
18
19
20         SWORN TO AND SUBSCRIBED BEFORE ME this
21 _____ day of _____, 2023.
22
23         _____
24                NOTARY PUBLIC
25

Page 256

1         IN THE UNITED STATES DISTRICT COURT
        FOR THE CENTRAL DISTRICT OF CALIFORNIA
2              SOUTHERN DIVISION
3 ENTROPIC COMMUNICATIONS,  )
  LLC.,                     )
4   Plaintiff,              )
                            )
5 VS.                       ) CA NO.
                            ) 2:22-cv-07775-JWH-JEM
6 DIRECTV, LLC and AT&T     )
  SERVICES, INC.,          )
7   Defendants              )
  _____ )
8                           )
  ENTROPIC COMMUNICATIONS,  )
9 LLC.,                     )
   Plaintiff,              )
10                          ) CA NO.
  VS.                       ) 2:22-cv-07959-JWH-JEM
11                          )
  DISH NETWORK CORPORATION, )
12 DISH NETWORK L.L.C. and   )
  DISH NETWORK SERVICE L.L.C.)
13  Defendants.
14 ******************************************
15         REPORTER'S CERTIFICATION
16    DEPOSITION OF ROBERT AKL, D.SC.
17            APRIL 20, 2023
18 ******************************************
19    I, DIANA BENGS, CSR, RPR, TCRR, CRR,
20 Certified Shorthand Reporter in and for the State
21 of Texas, hereby certify to the following:
22    That the witness, ROBERT AKL, D.SC.,
23 was duly sworn by the officer and that the
24 transcript of the oral deposition is a true record
25 of the testimony given by the witness;



ROBERT AKL D.SC.
ENTROPIC COMM. vs DIRECTV

April 20, 2023
257

Page 257

```
1           I further certify that pursuant to
2    FRCP Rule 30(f)(1) that the signature of the
3    deponent:
4           XXX was requested by the deponent or a
5    party before the completion of the deposition and
6    that the signature is to be before any notary
7    public and returned within 30 days from the date of
8    receipt of the transcript.  If returned, the
9    attached Changes and Signature Pages contains any
10   changes and the reasons therefore;
11          ___ was not requested by the deponent
12   or a party before the completion of the deposition.
13          I further certify that I am neither
14   counsel for, related to nor employed by any of the
15   parties or attorneys in the action in which this
16   proceeding was taken, and further that I am not
17   financially or otherwise interested in the outcome
18   of the action.
19          SWORN TO AND SUBSCRIBED by me in
20   Tarrant County, Texas, on this 5th day of May, 2023.
21          _____
            DIANA BENGS, CSR, RPR, TCRR, CRR
22          Texas CSR No. 4907
            Certification Expires:  1-31-24
23          Esquire Deposition Solutions
            Firm Registration No. 286
24          1700 Pacific Avenue, Suite 1000
            Dallas, Texas 75204
25          214.257.1436 (Office)
```

