1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE JOHN W. HOLCOMB, JUDGE PRESIDING

ENTROPIC COMMUNICATIONS,        ) CERTIFIED TRANSCRIPT
                   Plaintiff,   )
       vs.                      )
                                ) LACV-22-07775-JWH-JEM
DIRECTV, LLC, et al.,           )
                   Defendants.  )
-----------------------------)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

June 27, 2023


SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(612) 804-8655

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

2

```
 1    APPEARANCES OF COUNSEL:

 2    For the Plaintiff:

 3    JAMES A. SHIMOTA
      K&L GATES, LLP
 4    70 West Madison Street, Suite 3100
      Chicago, IL  60602
 5    (312) 807-4299

 6    JASON A. ENGEL
      KATHERINE L. ALLOR
 7    K&L GATES, LLP
      70 West Monroe Street, Suite 3100
 8    Chicago, IL  60602
      (312) 807-4236
 9
      CHRISTINA N. GOODRICH
10    K&L GATES, LLP
      10100 Santa Monica Boulevard, 8th Floor
11    Los Angeles, CA  90067
      (310) 552-5000
12

13    For the DISH Defendants:

14    MATTHEW C. BERNSTEIN
      PERKINS COIE, LLP
15    1888 Century Park East, Suite 1700
      Los Angeles, CA  90067-1721
16    (858) 720-5751

17    TREVOR BERVIK
      PERKINS COIE, LLP
18    1900 Sixteenth Street, Suite 140
      Denver, Colorado  80202-5255
19    (303) 291-2300

20    For Defendants DIRECTV and AT&T:

21    JASON LO
      GIBSON DUNN & CRUTCHER, LLP
22    200 Park Avenue
      New York, NY  10166-0193
23    (212) 351-2338

24

25
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 12:52 | 1 | SANTA ANA, CALIFORNIA; TUESDAY, JUNE 27, 2023; 1:00 P.M. |
| 01:00 | 2 | THE CLERK:  Calling Item No. 1, |
| 01:00 | 3 | LACV-22-07775-JWH(EMx), Entropic Communications, LLC, versus |
| 01:00 | 4 | DIRECTV, LLC, et al. |
| 01:00 | 5 | Counsel, would you please state your appearances |
| 01:00 | 6 | for the record beginning with the plaintiff. |
| 01:00 | 7 | THE COURT:  And please have a seat after your |
| 01:00 | 8 | appearances.  I mean, everybody else can sit down.  Go ahead |
| 01:00 | 9 | when you're ready. |
| 01:00 | 10 | MR. SHIMOTA:  Thank you, Your Honor.  Good |
| 01:00 | 11 | afternoon.  Jim Shimota appearing on behalf of plaintiff, |
| 01:00 | 12 | Entropic, LLC. |
| 01:00 | 13 | THE COURT:  Mr. Shimota, good to see you. |
| 01:00 | 14 | MR. SHIMOTA:  You as well, Your Honor. |
| 01:00 | 15 | MR. ENGEL:  Jason Engel also on behalf of |
| 01:00 | 16 | plaintiff, Your Honor. |
| 01:00 | 17 | THE COURT:  Mr. Engel. |
| 01:00 | 18 | MS. GOODRICH:  Good afternoon, Your Honor. |
| 01:00 | 19 | Christina Goodrich on behalf of plaintiff. |
| 01:00 | 20 | THE COURT:  Ms. Goodrich, good to see you. |
| 01:01 | 21 | MR. BERNSTEIN:  Good afternoon, Your Honor. |
| 01:01 | 22 | Matthew Bernstein for the DISH defendants.  I have with me |
| 01:01 | 23 | my colleague, Trevor Bervik.  We're both from Perkins Coie. |
| 01:01 | 24 | Also at the table with us is Dr. Paul Steffes, our technical |
| 01:01 | 25 | expert, who is going to be putting on our technology |

4

01:01   1   tutorial.  And also back here we have Mr. Jim Hanft and

01:01   2   Mr. Larry Katzin, in-house counsel for DISH.

01:01   3          THE COURT:  All right.  Counsel and Dr. Steffes,

01:01   4   welcome.  Good afternoon.

01:01   5          MR. LO:  Good afternoon, Your Honor.  Jason Lo

01:01   6   from Gibson, Dunn & Crutcher on behalf of DIRECTV and AT&T.

01:01   7   Also present in the courtroom today is a representative from

01:01   8   DIRECTV, Melinda Green.

01:01   9          THE COURT:  Ms. Green, good afternoon.  And, Mr.

01:01  10   Lo, good afternoon to you as well.

01:01  11          All right, we're here for our tech tutorial.  So

01:01  12   I've reviewed the patents, and I am eager to have the

01:01  13   parties teach me about the technology.

01:02  14          I have received your joint report.  Shockingly,

01:02  15   each of you want wanted to go first, but I think I'll let

01:02  16   plaintiff go first, and I think we're going to talk about

01:02  17   the '008 Patent first.  Is that the plan?

01:02  18          MR. SHIMOTA:  That's correct, Your Honor.

01:02  19          THE COURT:  Okay.  And thank you for the hard

01:02  20   copies.  I think you heard that maybe I said at some point I

01:02  21   prefer these as opposed to looking at the screen, which

01:02  22   isn't all that convenient for me because it's over there.

01:02  23          And one other note, let's try to keep it to an

01:02  24   hour per side.  Can the two sets of defendants -- does that

01:02  25   work for you?  Have you coordinated your presentation?

| | | |
|---|---|---|
| 01:02 | 1 | MR. BERNSTEIN:  It does, Your Honor. |
| 01:02 | 2 | THE COURT:  Okay.  So we'll try to keep it to an |
| 01:02 | 3 | hour per side with perhaps a short break in between and |
| 01:02 | 4 | maybe a quick rebuttal response from each side.  That's what |
| 01:03 | 5 | I'm thinking.  I think you told me three hours total, but I |
| 01:03 | 6 | think if we move quickly -- I'll let you know if I've got |
| 01:03 | 7 | questions as we're going along, I mean, if I don't |
| 01:03 | 8 | understand what you're saying.  But if I don't stop you, |
| 01:03 | 9 | just keep going because I think I'm getting it. |
| 01:03 | 10 | All right, plaintiff, go ahead. |
| 01:03 | 11 | MR. SHIMOTA:  Thank you, Your Honor.  Two |
| 01:03 | 12 | housekeeping things just before we start.  Number one, just |
| 01:03 | 13 | we wanted to apprise you that, you know, as we were looking |
| 01:03 | 14 | to narrow and focus the case, we've dropped Claims 1 and 2 |
| 01:03 | 15 | of the '008 Patent.  We're no longer asserting those against |
| 01:03 | 16 | either of the defendants.  As such there's one term, the |
| 01:03 | 17 | entire television spectrum, which we don't want to have you |
| 01:03 | 18 | burden yourself with reviewing that further, and we'll |
| 01:03 | 19 | get -- |
| 01:03 | 20 | THE COURT:  So which are the asserted claims of |
| 01:03 | 21 | the '008? |
| 01:03 | 22 | MR. SHIMOTA:  The asserted claims are Claim 3 and |
| 01:04 | 23 | independent sub Claim 3.  I don't believe there are any -- |
| 01:04 | 24 | THE COURT:  I'm not holding you to this for all |
| 01:04 | 25 | time, but -- |

01:04  1        MR. SHIMOTA:  Yes, it's Claims 3, 4, 5, 7, 9, 10,
01:04  2  11, 12, 13, 15, 17, and 18.
01:04  3        THE COURT:  And did I understand you to say in
01:04  4  terms of disputed limitations this knocks out a few?
01:04  5        MR. SHIMOTA:  Just one, Your Honor.
01:04  6        THE COURT:  Okay.
01:04  7        MR. SHIMOTA:  In addition to that, we wanted to
01:04  8  apprise you that yesterday there's a sister case in the
01:04  9  Eastern District of Texas in which we're suing Charter
01:04  10  Communications, and the '008 Patent is at issue there.
01:04  11  Judge Gilstrap issued his claim construction opinion
01:04  12  yesterday.  There aren't any crossover terms at issue, but
01:04  13  we wanted to apprise you of that, and we'll provide that to
01:04  14  Your Honor for background -- or for your review.
01:05  15        THE COURT:  I assume that defendants here are
01:05  16  aware of that development.
01:05  17        MR. BERNSTEIN:  Yes, we are, Your Honor.
01:05  18        THE COURT:  Okay.  That sounds good.  Thank you.
01:05  19  Go ahead when you're ready.
01:05  20        MR. SHIMOTA:  Yes, we're ready.  We, too, have Dr.
01:05  21  Robert Akl, our expert, who is going to present the tutorial
01:05  22  today.
01:05  23        THE COURT:  Welcome, Dr. Akl.
01:05  24        THE WITNESS:  Thank you, Your Honor.
01:05  25        MR. SHIMOTA:  Thank you again for taking the time

01:05  1   today to listen to us.  We appreciate it.

01:05  2           THE COURT:  What's happening?

01:05  3           MR. SHIMOTA:  What would you -- do you want him to

01:05  4   sit in the stand?

01:05  5           MR. AKL:  Where would you like me, Your Honor?

01:05  6           THE COURT:  What are you going to do?

01:05  7           MR. SHIMOTA:  Well, I was going to direct him and

01:05  8   go through -- he has prepared a presentation and just walk

01:05  9   him through his presentation and let him, you know, speak to

01:05  10  it and talk through the testimony.

01:05  11          THE COURT:  Shouldn't he be at the lectern?  Isn't

01:05  12  that the best place?

01:05  13          MR. SHIMOTA:  Well, I was going to direct him as

01:05  14  -- I was going to ask him questions and direct him as a

01:06  15  witness or just walk him through the tutorial but whatever

01:06  16  is your preference.

01:06  17          THE COURT:  Oh, so you want him in the witness

01:06  18  box.

01:06  19          MR. SHIMOTA:  Yes, that was my preference, Your

01:06  20  Honor.

01:06  21          THE COURT:  Okay.  Go ahead.

01:06  22          MR. AKL:  Thank you, Your Honor.

01:06  23          THE COURT:  Any objection to doing it that way?

01:06  24          MR. BERNSTEIN:  No objection, but we're not

01:06  25  planning on doing it that way.

01:06  1           THE COURT:  That's fine, too.  Okay.

01:06  2           MR. BERNSTEIN:  Thank you, Your Honor.

01:06  3           THE COURT:  Sorry, Dr. Akl.  I didn't understand

01:06  4  what was happening.

01:06  5           MR. SHIMOTA:  Yes, I'm sorry.  We've also prepared

01:06  6  some slides which go through Dr. Akl's credentials that you

01:06  7  have, Your Honor.  The credentials of both parties' experts

01:06  8  actually are provided in their declarations which are

01:06  9  available to you, so it's up to you whether we go through

01:06  10  those for you or we just move to the technology itself.

01:06  11           THE COURT:  I think let's just move to the

01:06  12  technology.  You said those declarations are available to

01:06  13  me.  Where are they?

01:06  14           MR. SHIMOTA:  They're exhibits to the claim

01:06  15  construction briefing.

01:06  16           THE COURT:  Got it.  Okay.

01:06  17           MR. SHIMOTA:  Okay.

01:06  18           THE COURT:  Unless there's going to be an

01:07  19  objection to the experts -- I wouldn't anticipate one here

01:07  20  for the tutorial.

01:07  21           Any objection to Dr. Akl for the purposes of the

01:07  22  tech tutorial?

01:07  23           MR. BERNSTEIN:  None, none.  He's here to present

01:07  24  the tutorial, and our expert is here to present ours, Your

01:07  25  Honor.

| | | |
|---|---|---|
| 01:07 | 1 | THE COURT:  And Entropic has no objections to the |
| 01:07 | 2 | defendants' expert, correct? |
| 01:07 | 3 | MR. SHIMOTA:  No, we don't object to Dr. Steffes |
| 01:07 | 4 | presenting today either, Your Honor. |
| 01:07 | 5 | THE COURT:  Just jump into the tutorial. |
| 01:07 | 6 | MR. SHIMOTA:  All right. |
| 01:07 | 7 | THE COURT:  I'm eager to hear it. |
| 01:07 | 8 | MR. SHIMOTA:  Bear with us, Your Honor.  We're |
| 01:08 | 9 | just working through the technology. |
| 01:08 | 10 | Okay.  Why don't we just proceed on the papers.  I |
| 01:08 | 11 | think that's easier than working through this. |
| 01:08 | 12 | BY MR. SHIMOTA: |
| 01:08 | 13 | Q   Good afternoon, Dr. Akl. |
| 01:08 | 14 | A   Good afternoon. |
| 01:08 | 15 | Q   Dr. Akl, have you prepared a tutorial for the Court |
| 01:08 | 16 | today? |
| 01:08 | 17 | A   Yes. |
| 01:08 | 18 | THE COURT:  We don't need to do it that formally. |
| 01:08 | 19 | Just talk to me like I was a student. |
| 01:08 | 20 | MR. SHIMOTA:  Okay.  All right. |
| 01:08 | 21 | BY MR. SHIMOTA: |
| 01:08 | 22 | Q   Dr. Akl, have you reviewed the patents-in-suit? |
| 01:08 | 23 | A   Yes. |
| 01:08 | 24 | Q   And could you turn to slide 8? |
| 01:08 | 25 | A   I'm there. |

| | | |
|---|---|---|
| 01:08 | 1 | Q    And broadly speaking -- |
| 01:08 | 2 | THE COURT:  Can you get the microphone closer to |
| 01:08 | 3 | you, Dr. Akl, so the court reporter can hear you? |
| 01:08 | 4 | MR. AKL:  Yes. |
| 01:08 | 5 | THE COURT:  Thank you. |
| 01:08 | 6 | BY MR. SHIMOTA: |
| 01:08 | 7 | Q    Broadly speaking, would you describe the |
| 01:08 | 8 | patents-in-suit to the Court? |
| 01:09 | 9 | A    Yes, so the '008, which will focus on remote |
| 01:09 | 10 | monitoring; the '576, which will focus on digital channel |
| 01:09 | 11 | stacking; and the '715, which will focus on an advanced |
| 01:09 | 12 | gateway. |
| 01:09 | 13 | Q    And turning to slides 9 and 10 -- I guess we now are |
| 01:09 | 14 | ready to go.  Let's see. |
| 01:09 | 15 | Before we turn to the patents-in-suit, I'd like to |
| 01:09 | 16 | just talk about -- you know, this case is about satellites, |
| 01:09 | 17 | and just help the Court -- you know, provide an overview of |
| 01:09 | 18 | just satellite technology in general.  I see here you've |
| 01:09 | 19 | prepared a slide showing an exemplary satellite system.  On |
| 01:09 | 20 | the left of the slide, there is a -- |
| 01:09 | 21 | THE COURT:  I think you can skip that.  Just get |
| 01:09 | 22 | to the real technology. |
| 01:09 | 23 | MR. SHIMOTA:  Okay. |
| 01:09 | 24 | BY MR. SHIMOTA: |
| 01:09 | 25 | Q    Turn to the next slide.  You've got a slide there |

01:10  1   regarding modulation and demodulation.  What is modulation?
01:10  2   A    Modulation is taking a message or a signal, in this
01:10  3   case, the future signal on the left, and modulating it onto
01:10  4   an RF carrier.  So we can think of modulation as a plane and
01:10  5   the signal the passenger.  So you want to transmit people
01:10  6   from one location to another, and this is where the RF
01:10  7   carrier is going to carry our picture signal up to the
01:10  8   satellite and from the satellite to the user's premises.  So
01:10  9   that's modulation.
01:10  10          And demodulation is what happens on the receiving
01:10  11  end where the modulated signal is going to be received and
01:10  12  demodulated and then the original transmitted message will
01:10  13  be extracted.
01:10  14  Q    Thank you.  So these satellites are in outer space.
01:11  15          Why is modulation necessary?
01:11  16  A    For a couple reasons.  One, we want -- the original
01:11  17  signal will not have the power or the frequency.  We want to
01:11  18  have it modulated onto a carrier to have a higher frequency
01:11  19  and power so that it can actually reach the satellite and go
01:11  20  from also the satellite to the user.  So the main reason for
01:11  21  modulation is to be able to transmit the signal at a
01:11  22  specific carrier frequency.
01:11  23          THE COURT:  The RF carrier in your modulation
01:11  24  piece here, what band is that?
01:11  25          MR. AKL:  This can be different bands for

01:11  1   satellite communications, so they can be a very high

01:11  2   frequency, and that's going to be for a specific type of

01:11  3   satellite.  Whether it's local orbit or medium orbit or geo

01:11  4   orbit, it's going to be at a specific frequency for that

01:11  5   specific satellite.

01:11  6           THE COURT:  Okay, that's satellite specific.  The

01:11  7   '576 Patent talks about C or Ku bands.

01:11  8           MR. AKL:  Yes.

01:11  9           THE COURT:  Is that typical?

01:12  10          MR. AKL:  Yes.

01:12  11          THE COURT:  Now, I think that was in the

01:12  12  background section of the specification for '576.  Is that

01:12  13  true for the patented technology?

01:12  14          MR. AKL:  I have not looked at the accused

01:12  15  products yet, so I have no opinions on infringement or what

01:12  16  the accused products do at this time.

01:12  17          THE COURT:  And I'm not looking for that.  I'm --

01:12  18  again, just deep background on the technology.

01:12  19          MR. AKL:  Yes.

01:12  20          THE COURT:  Okay, so it's that range C/Ku-band --

01:12  21          MR. AKL:  Yes.

01:12  22          THE COURT:  -- for the RF's carrier signal?

01:12  23          MR. AKL:  Correct, and the FCC is the one that

01:12  24  gives these labels.

01:12  25          THE COURT:  The FCC?

01:12    1              MR. AKL:  The FCC.

01:12    2              THE COURT:  I just want to make sure I got the

01:12    3   agency right, Federal Communications Commission.

01:12    4              MR. AKL:  Correct.

01:12    5              THE COURT:  Okay.  Got it.  I interrupted you.

01:12    6   Please proceed.

01:12    7              MR. SHIMOTA:  You had my next question, Your

01:12    8   Honor, so thank you.

01:12    9   BY MR. SHIMOTA:

01:12   10   Q    So moving on to the next slide, one of the topics that

01:12   11   comes up in the parties' claim construction briefing is the

01:13   12   distinction between analog and digital signals.

01:13   13              Can you describe for the Court what is the

01:13   14   difference between analog and digital signals?

01:13   15   A    Analog signals are continuous signals, like my voice

01:13   16   would be an example of an analog signal.  And as people --

01:13   17   you know, we speak in analog signal.  We hear in analog

01:13   18   signal through our ears, and so on.

01:13   19              Digital signals are very helpful in computers

01:13   20   because we can convert an analog signal to a digital signal.

01:13   21   We can then operate, manipulate, error correct, and so on in

01:13   22   the digital domain and use digital filters, which makes it

01:13   23   much easier than in the analog domain.  So we're going to be

01:13   24   looking at converting an analog signal to a digital signal

01:13   25   and back to an analog signal at the very end.

01:13   1   Q    When I started this case, I thought of channels sort of

01:13   2   as like, you know, channels I watch when I'm flipping around

01:13   3   with my kids, but, you know, we're disputing quite a bit

01:13   4   about communication channels.

01:14   5        Can you describe for the Court what is meant by

01:14   6   communication channels in the context of this case?

01:14   7   A    Yes.  Here, a communication channel is a range of

01:14   8   frequencies.  So in this example, we have ten communication

01:14   9   channels, and each channel has a width of 25 MHz, and those

01:14   10  channels can carry one or more signals.  So you can think of

01:14   11  the channel as the pipe and the signals.  You know, whether

01:14   12  you have lanes on a highway and the signals are the cars,

01:14   13  whether you have cars or not, you still have the structure

01:14   14  of lanes.  In this case, each is in this example 25 MHz.

01:14   15       THE COURT:  You said each channel can carry one or

01:14   16  more signals.

01:14   17       MR. AKL:  Yes.

01:14   18       THE COURT:  Would each signal pertain to, say, a

01:14   19  TV channel or station that one wants to watch?

01:14   20       MR. AKL:  Yes, Your Honor.

01:14   21       THE COURT:  So signal equals what I'm thinking of

01:15   22  as a TV channel.

01:15   23       MR. AKL:  Yes, as service provider content.

01:15   24       THE COURT:  How many signals can you get on a

01:15   25  channel?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

01:15   1              MR. AKL:  It depends.  In this case, we're going

01:15   2   to have 16 transponders, and each transponder in the example

01:15   3   here can have one or more.  But we're going to have

01:15   4   either -- in this tutorial, it's just one signal per

01:15   5   transponder channel, but you can have more than one or you

01:15   6   can have none.

01:15   7              THE COURT:  Okay.  This slide in your comments

01:15   8   pertain to channels and signals in a channel.  You just

01:15   9   introduced transponder.  What's the relationship there?

01:15  10              MR. AKL:  The term "channel" as used in the patent

01:16  11   is called a transponder channel.  And the word "transponder"

01:16  12   just comes from in aerospace where we have a transmitter and

01:16  13   responder.  So the satellite --

01:16  14              THE COURT:  Transmitter and receiver?

01:16  15              MR. AKL:  It's actually transmitter and responder

01:16  16   for the word "transponder."  You're going to also have

01:16  17   receivers, but the transponder is what's going to take a

01:16  18   transmitted signal and respond with another signal.  That's

01:16  19   why it's called a transponder.  So the satellites will have

01:16  20   transponders that are going to receive the transmitted

01:16  21   signal and then respond or retransmit the signal to a

01:16  22   consumer premises.

01:16  23              THE COURT:  In lay person's terms, is it the case

01:16  24   that signals -- people refer to the signal being bounced off

01:16  25   a satellite.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

01:16   1              MR. AKL:  Yes.

01:16   2              THE COURT:  But in reality, it's received --

01:16   3              MR. AKL:  It's received and retransmitted, yes,

01:16   4    Your Honor.  We call that channel a transponder channel.

01:17   5    That's all it is.

01:17   6              THE COURT:  Okay.  I understand.

01:17   7    BY MR. SHIMOTA:

01:17   8    Q    And just on that note, Dr. Akl, would it be fair to

01:17   9    describe a satellite as a repeater?

01:17   10   A    Yes.

01:17   11   Q    Okay.  Turning to the next slide, there is shown a

01:17   12   figure from the '576 Patent.  I mean, one of the things

01:17   13   we're just talking about here is the dishes that we all see

01:17   14   around on people's houses.

01:17   15              Could you describe generally for the Court what is

01:17   16   depicted in that figure?

01:17   17   A    Yes.  So you're going to have a satellite dish at, you

01:17   18   know, a user's roof usually, and that's going to be shown in

01:17   19   the arc 150.  So that's the Dish 150.  And the signal coming

01:17   20   from the satellite is going to be focused from that dish

01:17   21   onto what we call antenna feed horns, and you can have one

01:17   22   or more.  In this example, there are two.  They're labeled

01:17   23   130.  Then those are going to be coupled to an LNB, which is

01:17   24   a low noise amplifier, and a block converter.

01:18   25              So those are going to receive the signal, and

01:18   1   they're going to basically convert it to a lower

01:18   2   intermediate frequency that's going to be transmitted on A

01:18   3   or B.  The reason we have A and B coming out of 140 and

01:18   4   another A and B is it is fairly common to have different

01:18   5   polarizations, so you can have two signals kind of like

01:18   6   overlapping.  But because they have different polarizations,

01:18   7   they don't interfere with each other, so you can extract

01:18   8   both polarized signals on A and B.  So in this example, the

01:18   9   satellite dish can receive simultaneously and extract and

01:18   10  convert four signals, A and B on the top one and A and B on

01:18   11  the bottom LNB.

01:18   12              THE COURT:  This is prior art technology, correct?

01:19   13              MR. AKL:  Yes, Your Honor.

01:19   14              THE COURT:  And 130 -- reference number 130, the

01:19   15  feed horns --

01:19   16              MR. AKL:  Yes.

01:19   17              THE COURT:  Each feed horn corresponds to a

01:19   18  different satellite signal?

01:19   19              MR. AKL:  Yes, Your Honor.

01:19   20              THE COURT:  Okay.  And what part of the signals

01:19   21  are digital versus analog?

01:19   22              MR. AKL:  This is going to be all analog at this

01:19   23  point.

01:19   24              THE COURT:  All right.  Thank you.

01:19   25  BY MR. SHIMOTA:

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

01:19  1    Q    Just one thing, Dr. Akl, why does the LNB convert to a

01:19  2    lower intermediate frequency?

01:19  3    A    Because the signal is already at a very high frequency

01:19  4    from the satellite, so it's going to do its first

01:19  5    intermediate -- to an intermediate frequency, and then it's

01:19  6    going to convert it again, and we're going to look at that

01:19  7    further signal processing that is going to happen next.

01:19  8             THE COURT:  Say that last part again, please.

01:19  9             MR. AKL:  Yes.  So after the intermediate

01:19  10   frequency conversion, then there's going to be additional

01:19  11   signal processing that is going to happen, and we're going

01:19  12   to have slides later on those today.

01:20  13            THE COURT:  Okay.  So the LNBs -- each LNB

01:20  14   converts the signal received from the satellite, which is at

01:20  15   that extremely high frequency, correct?

01:20  16            MR. AKL:  Yes, Your Honor.

01:20  17            THE COURT:  Down to an intermediate frequency.  I

01:20  18   think the '576 Patent referred to perhaps the L-band.

01:20  19            MR. AKL:  Yes.

01:20  20            THE COURT:  950 to 1450 MHz?

01:20  21            MR. AKL:  Yes.  You can further move it to what we

01:20  22   would call baseband, which is like the original content,

01:20  23   which is going to be like centered around zero.  That's

01:20  24   baseband frequency.  But we can operate at this level at the

01:20  25   intermediate frequency before we go to baseband frequency.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

01:20   1                   THE COURT:  Okay.  Again, this is all prior art?

01:20   2                   MR. AKL:  Yes, Your Honor.

01:20   3                   THE COURT:  Okay.  Got it.  Thank you.

01:20   4                   MR. SHIMOTA:  Thank you, Dr. Akl.

01:20   5       BY MR. SHIMOTA:

01:20   6       Q    Turn to the next slide.  We talked about the outdoor

01:20   7       unit shown in the figure.  There is another figure from the

01:20   8       patent.

01:20   9                   Can you describe for the Court what is depicted

01:20   10      here?

01:20   11      A    Yes.  This figure is now showing 16 transponder

01:21   12      channels, and they're labeled 1 to 16.  They're all on the

01:21   13      cable coming out, for example, of LNBA.  And between each

01:21   14      channel, we have a little bit of a guard band.  A guard band

01:21   15      is just like isolation so that the channels don't interfere

01:21   16      with each other.

01:21   17                  THE COURT:  What is the width of each of these --

01:21   18      did you called them channels?

01:21   19                  MR. AKL:  The width of the transponder channels?

01:21   20                  THE COURT:  Yes, so LNB A-1 is a transponder

01:21   21      channel?

01:21   22                  MR. AKL:  Yes, Your Honor.

01:21   23                  THE COURT:  And that's at 950 to what, 975?

01:21   24                  MR. AKL:  Yes.  They're around 24 MHz.

01:21   25                  THE COURT:  24 MHz.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

20

01:21   1              MR. AKL:  Yes.

01:21   2              THE COURT:  Is the guard band about 1?

01:21   3              MR. AKL:  Yes.  So if you count the guard band,

01:21   4    too, it's around 25 MHz.  So we have a total of -- you know,

01:21   5    that's where -- you can choose to count the guard band or

01:21   6    not.  It just adds a little bit to the width of the channel.

01:22   7              THE COURT:  Okay.  I understand.

01:22   8    BY MR. SHIMOTA:

01:22   9    Q    And at the time of the filing of the '576 Patent, were

01:22   10   guard bands well-known in the technology?

01:22   11   A    Yes.

01:22   12   Q    Thank you.

01:22   13        All right, onto the specifics.  So I'm handling

01:22   14   the '008 Patent.  If you would turn to the next slide, we

01:22   15   see a picture of the satellite and a house and a received

01:22   16   signal.

01:22   17        Can you describe what's depicted on this slide?

01:22   18   A    This is describing the situation before the '008 Patent

01:22   19   where users would receive a signal and, you know, the

01:22   20   technician would have been out there, set up the satellite,

01:22   21   set up the satellite dish, and everything is working.  Then

01:22   22   after they leave, if the signal degrades or something

01:22   23   happens, the service provider doesn't know.  So the

01:22   24   condition of the received signal after installation is done

01:22   25   is not known.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

01:23   1   Q    I mean, I suppose you don't need to be an expert for
01:23   2   this, but, you know, waiting for the technician in that
01:23   3   block between 1:00 and 4:00, 9:00 and noon, that's
01:23   4   inconvenient, right?
01:23   5   A    Right.  If something goes wrong -- and we can look at
01:23   6   the next slide -- then you call the cable company, and they
01:23   7   schedule an appointment.  You know, it is expensive to have
01:23   8   trucks go out, to pay a technician to go out.  But the
01:23   9   technician will come with a spectrum analyzer and will be at
01:23  10   your house, will measure the signal, and hopefully will be
01:23  11   able to fix the issue.  So that's what happens -- or what
01:23  12   used to happen at least before the '008.
01:23  13        THE COURT:  In Fig. 1C, where is the technician
01:23  14   measuring the signal?
01:23  15        MR. AKL:  The technician can measure a signal in a
01:23  16   couple of different places.  They can measure it right
01:23  17   before the gateway.  Sometimes they measure it, you know, at
01:23  18   the output of the LNBs.  So they're measuring the received
01:24  19   signal from the satellite dish and seeing what those values
01:24  20   are.
01:24  21        THE COURT:  So you're using reference numbers.
01:24  22   What are you talking about?
01:24  23        MR. AKL:  In this case, you would be looking at
01:24  24   184, like that's the cable coming into the gateway, or they
01:24  25   can look at 186.  We're going to look at an example where

01:24  1  right outside the gateway the '008 is going to measure and
01:24  2  relay that information.
01:24  3         THE COURT:  Okay.
01:24  4  BY MR. SHIMOTA:
01:24  5  Q    Moving to the next slide, how did the '008 Patent step
01:24  6  in to save us from waiting for technicians for four hours?
01:24  7  A    The '008 describes being able to do signal analysis and
01:24  8  having that equipment in one of two locations, either
01:24  9  outdoors, which is what I highlighted in yellow on top, so
01:24  10  this is part of the ODU unit; or being able to do signal
01:25  11  analysis indoors inside the gateway, which I highlighted as
01:25  12  item 196.
01:25  13  Q    So now we've talked about just broadly speaking what
01:25  14  happens, you know, at the house, the consumer premises.
01:25  15         Let's look to this figure in the patent, which I
01:25  16  think shows more of the granular details, and can you
01:25  17  describe for the Court broadly what's depicted in this
01:25  18  picture?
01:25  19  A    Yes.  The signal is received from the satellite dish on
01:25  20  the left, and it goes through the LNB, and this is still an
01:25  21  analog signal at this point.  Then it goes through the
01:25  22  front-end 158.  That's going to convert it to a digital
01:25  23  signal, and that's going to be labeled "D" in this figure.
01:25  24  Then it goes through a channelizer, which is going to create
01:25  25  portions of the signal.  Those portions are going to go to

01:25  1   two units.  One is the monitoring unit, 154, and one is the

01:25  2   data processing unit, 156.

01:26  3   Q    And turning to the monitoring unit, can you describe

01:26  4   exactly what the function of that block is?

01:26  5   A    Yes.  The monitoring unit is what's new or part of

01:26  6   what's inventive.

01:26  7          THE COURT:  And that's reference number 154?

01:26  8          MR. AKL:  Yes, Your Honor.

01:26  9          So the monitoring unit is going to look at signal

01:26  10  characteristics, like signal strength or signal to noise

01:26  11  ratio, and be able to do that concurrently while the other

01:26  12  portions of the signal are being processed by the data

01:26  13  processing unit.  So there is not going to be interruption

01:26  14  to users watching TV, which is going to be the output of the

01:26  15  data processing, but the monitoring unit will calculate and

01:26  16  determine characteristics of the signal and then send it --

01:26  17  in the top row in this example, the output will go back to

01:26  18  the service provider.

01:26  19         THE COURT:  The signal is coming from the

01:27  20  channelizer, reference number 152, to the monitoring unit,

01:27  21  154, and the data processing unit, 156.  The signal going to

01:27  22  the monitoring unit is designated CJ+1, and then the signal

01:27  23  going to data processing is C1-CJ.  Can you explain what

01:27  24  CJ+1 and C1-CJ mean?

01:27  25         MR. AKL:  Yes, Your Honor.  This is just indices.

01:27  1   What it's saying is we are going to take the total channel
01:27  2   and we are going to split it up into sub-channels.  So the
01:27  3   labeling is C1 to CJ, where J is just a number, so C1, C2,
01:27  4   C3 up to some number J.  So suppose J is 15.  We're going to
01:27  5   have C1 through C15 on the bottom and then C16 on top.  So
01:27  6   this is just an index for labeling.  It's giving an example
01:28  7   of the labeling of dividing the channel into sub-channels
01:28  8   where you're going to have, say, C16 on top being monitored
01:28  9   and C1 to C15 going to the data processing unit.
01:28  10      THE COURT:  In the example that you just stated,
01:28  11  you have 15 channels.  So what is this 16th channel that's
01:28  12  going to the monitoring unit?
01:28  13      MR. AKL:  In my example, there are 16.  So 15 of
01:28  14  them are going to go to the data processing, and one of the
01:28  15  16 is going to go to the monitoring.  So you take a sample,
01:28  16  for example, of the channel where you are going to monitor
01:28  17  one of them, and the rest are going to contain the content
01:28  18  that's going to go to the data processing.
01:28  19      THE COURT:  This may be a dumb question, but does
01:28  20  that mean that the homeowner does not get to see the content
01:28  21  that happens to be on in this example, channel 16?
01:28  22      MR. AKL:  That is correct at that point in time.
01:29  23  Now, the channelizer can rotate and can pick different ones.
01:29  24  But you are absolutely right in terms of the concurrency is
01:29  25  you can data process say C1 through 15 while monitoring

01:29    1    channel 16, and then you can rotate the process.

01:29    2                THE COURT:  Got it.  Thank you.

01:29    3                MR. AKL:  You're welcome.

01:29    4    BY MR. SHIMOTA:

01:29    5    Q    Turning to the next slide which goes back to the block,

01:29    6    there's discussion in the briefing and in the patent about

01:29    7    the front end.

01:29    8                Can you describe for the Court how what is

01:29    9    depicted as the front end digitized the signal from the LNB?

01:29   10    A    Yes.  The analog signal will span certain frequencies,

01:29   11    and here it's going from F lo to F hi, and it's going to go

01:29   12    through an analog to digital converter.  An analog digital

01:29   13    converter is going to take an analog signal and convert it

01:29   14    to a digital signal, and there's a few ways different ways

01:30   15    of doing it.

01:30   16                One example is where you sample a -- you know, you

01:30   17    measure the value, and then you hold those values, or you

01:30   18    can interpolate those values, but we're going to end up with

01:30   19    a specific number of values, and those are shown on the

01:30   20    right.  Then those values, those numbers, are going to be

01:30   21    converted to, say, a real number, 1.5, 2.5, or something to

01:30   22    a digital representation, to bits.  Then when you combine

01:30   23    all those bits, you can now have a digital signal

01:30   24    representing those bits.  We would call that a digital

01:30   25    representation of the analog signal that you sampled and you

01:30    1    converted to the digital domain.

01:30    2            THE COURT:  What's the advantage of having a

01:30    3    digital signal?  Is it more efficient to transmit?

01:30    4            MR. AKL:  Yes.  It's more efficient to work in the

01:31    5    digital domain.  It's easier.  It's less complicated, and

01:31    6    digital filters are much less complex in the digital domain

01:31    7    than in the analog domain.

01:31    8            THE COURT:  Okay.

01:31    9    BY MR. SHIMOTA:

01:31    10   Q    Now let's move back to the measured characteristics we

01:31    11   talked about earlier.  Once you're going through those

01:31    12   channels and you're rotating through it and you're measuring

01:31    13   one of the channels, what does the invention in the '008

01:31    14   Patent do with the measured characteristics?

01:31    15   A    It needs to be sent back to the service provider.  So

01:31    16   in this example, the measured signal data on the right is

01:31    17   transmitted on a broadband connection, and that's shown as

01:31    18   188.  This is the broadband connection to a wide area

01:31    19   network, and this is shown as 192 where the service provider

01:31    20   is.

01:31    21           So in layman's terms, you're transmitting it over

01:31    22   the internet.  It's going to go to the service provider

01:32    23   through the internet the way, you know, you send an e-mail

01:32    24   or something or you transmit a file through the internet.

01:32    25   That data is going to know to make its way back to the

01:32    1    service provider through a broadband connection in the
01:32    2    internet.
01:32    3             THE COURT:  So the signal is received by
01:32    4    satellite?
01:32    5             MR. AKL:  Yes.
01:32    6             THE COURT:  But the monitoring takes place over
01:32    7    the internet.  I know there are some providers -- I'll call
01:32    8    them retail service providers -- that offer both services.
01:32    9    How does -- if the homeowner has, say, one provider for
01:32   10    satellite TV and a different provider for the internet, how
01:32   11    does the monitoring take place?
01:32   12             MR. AKL:  We're going to actually have a slide on
01:32   13    that.  The very next slide is exactly that.  That's going to
01:32   14    be just like you said.  The signal is going to be received
01:33   15    by satellite.  Then if the service provider is providing
01:33   16    internet service also, then it can use those lines to get
01:33   17    the signal back.
01:33   18             If it is not, as part of the installation of the
01:33   19    satellite dish, it can piggyback off the user's internet.
01:33   20    So the user would need to have some sort of broadband
01:33   21    connection or internet connection if the signal is going to
01:33   22    go back, whether that is provided by the same service
01:33   23    provider or not, but it can piggyback off of that to get to
01:33   24    the service provider.
01:33   25             THE COURT:  Okay.  Is that the next --

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 01:33 | 1 | MR. AKL:  This is what's shown on this slide.  The |
| 01:33 | 2 | input is coming from the satellite, and the output from the |
| 01:33 | 3 | gateway takes a different path.  It goes through the |
| 01:33 | 4 | internet to the service provider. |
| 01:33 | 5 | BY MR. SHIMOTA: |
| 01:33 | 6 | Q   So when you're talking about going through the |
| 01:33 | 7 | internet, it's just the regular way in which we send e-mails |
| 01:34 | 8 | and files and things like that.  I mean, would you send it |
| 01:34 | 9 | back over the internet through the uplink? |
| 01:34 | 10 | A   You wouldn't send it back -- I mean, it's possible to |
| 01:34 | 11 | use your satellite dish to send it back to the satellite, |
| 01:34 | 12 | but that's really prohibitive.  One, you don't have the |
| 01:34 | 13 | power, and you don't have the equipment.  It would be way |
| 01:34 | 14 | too complicated to actually use the satellite dish itself to |
| 01:34 | 15 | transmit back to the satellite, so that usually never |
| 01:34 | 16 | happens.  You would send it back through the internet |
| 01:34 | 17 | connection at the home. |
| 01:34 | 18 | THE COURT:  So another dumb question, there are |
| 01:34 | 19 | satellite internet providers, correct? |
| 01:34 | 20 | MR. AKL:  Yes. |
| 01:34 | 21 | THE COURT:  So how does that connection -- how are |
| 01:34 | 22 | those signals transmitted back and forth? |
| 01:34 | 23 | MR. AKL:  They actually work in a very similar way |
| 01:34 | 24 | where when you're getting internet from a satellite |
| 01:34 | 25 | provider.  You're actually getting the downlink from the |

01:34  1    satellite, and the uplink goes through a LAN line.

01:35  2            So in the 90's, you would use like dial-up.  I

01:35  3    actually had a Hughes system that I was getting satellite

01:35  4    internet, and I had a satellite dish.  You would get the

01:35  5    signal from the satellite because you're upload is going

01:35  6    through the LAN line, because a lot of times it's

01:35  7    asymmetric.

01:35  8            The whole point, you know, is you're clicking on a

01:35  9    web page.  What you're transmitting is a small amount, but

01:35  10   what you're downloading is a lot more.  So the downlink

01:35  11   comes from the satellite, but the uplink goes through -- we

01:35  12   used to go through it a telephone line, and now it goes

01:35  13   through just a LAN line or the internet.

01:35  14           THE COURT:  So in that latter circumstance --

01:35  15   we're no longer in the dial-up age -- you've got a homeowner

01:35  16   is receiving internet service downloads through the

01:35  17   satellite and uploads through a LAN line.  Why not use the

01:35  18   LAN line for downloads as well?

01:36  19           MR. AKL:  Because of the asymmetry because the

01:36  20   line itself -- this could be a rural area where the last

01:36  21   mile will not give you high speeds.  So you actually get

01:36  22   higher speeds downloading through a satellite, but you can

01:36  23   still upload at lower speeds through a traditional public

01:36  24   switch telephone system or LAN lines.

01:36  25           THE COURT:  Okay.

01:36    1    BY MR. SHIMOTA:

01:36    2    Q    Even for the uplink, it would be cost prohibitive to

01:36    3    send the data back up through a satellite either for the

01:36    4    home or through, you know, the uplink center?

01:36    5    A    That is correct.

01:36    6            MR. SHIMOTA:  Thank you.  My colleague Jason Engel

01:36    7    is going to handle the next two patents.

01:36    8            Thank you, Your Honor.

01:36    9            THE COURT:  Thank you.

01:36    10           MR. ENGEL:  Good afternoon, Your Honor.

01:36    11           THE COURT:  Good afternoon.

01:36    12   BY MR. ENGEL:

01:36    13   Q    Professor Akl, did you also prepare slides on the '576

01:36    14   Patent today?

01:37    15   A    Yes.

01:37    16   Q    What does the '576 Patent relate to generally?

01:37    17   A    Digital channel stacking.

01:37    18   Q    What is digital channel stacking?

01:37    19   A    It's taking digital channels and combining them or

01:37    20   stacking them and transmitting them on a composite signal.

01:37    21   Q    Does the '576 Patent talk about the benefits of digital

01:37    22   channel stacking over the prior art?

01:37    23   A    Yes.

01:37    24   Q    Did you prepare some slides to discuss that?

01:37    25   A    Yes.

01:37  1   Q    Is slide 25 one of those slides?

01:37  2   A    Yes.  So this is an example of the prior art where you

01:37  3   have what we've been looking at the outdoor unit with the

01:37  4   satellite dish.  You have the LNBs, and you have four analog

01:37  5   signals coming out, and then you have the multi-port switch,

01:37  6   and then you have four cables, in this example, that are

01:37  7   going to four different IRDs, and those are integrated

01:37  8   receivers.  So as an example, if this is sitting on top of

01:37  9   the TV, this could be the satellite top box.

01:38  10             THE COURT:  Set-top?

01:38  11             MR. AKL:  Yes, set-top box.  Exactly.

01:38  12             So in this prior art, the switch is what allows a

01:38  13   specific IRD to connect to a specific signal, and you can

01:38  14   only receive one signal from out of the four at its -- at

01:38  15   one IRD at a time.

01:38  16             THE COURT:  Say that last part again, please.

01:38  17             MR. AKL:  So each IRD in this example can receive

01:38  18   one signal from one of the four on the left, and the

01:38  19   multi-port switch is what manages that connection.  So the

01:38  20   top IRD can receive one of the four on the left through the

01:38  21   cable on the right, which is 170, and that connection takes

01:38  22   place inside the multi-port switch.

01:38  23             THE COURT:  And that signal that's coming from the

01:38  24   multi-port switch to a particular IRD, what is that?  What's

01:38  25   contained in that signal?

32

| | | |
|---|---|---|
| 01:38 | 1 | MR. AKL:  This is basically the analog signal |
| 01:38 | 2 | that's received from the satellite and then moved to an |
| 01:39 | 3 | intermediate frequency out of the LNB, then sent to the IRD |
| 01:39 | 4 | for processing and further display, then to a TV. |
| 01:39 | 5 | THE COURT:  So it's still analog? |
| 01:39 | 6 | MR. AKL:  Yes.  In this example, it is. |
| 01:39 | 7 | THE COURT:  In this example, is anything ever |
| 01:39 | 8 | converted to digital? |
| 01:39 | 9 | MR. AKL:  Not in this example, no. |
| 01:39 | 10 | BY MR. ENGEL: |
| 01:39 | 11 | Q   Kind of capitalizing on the question there, do you |
| 01:39 | 12 | recall in slide 15 we had the 16 transponder channels out of |
| 01:39 | 13 | one LNB with the guard band labeled? |
| 01:39 | 14 | A   Yes. |
| 01:39 | 15 | Q   So is that basically that 16 channels from one LNB |
| 01:39 | 16 | that's what is being provided by the switch to one IRD at a |
| 01:39 | 17 | time? |
| 01:39 | 18 | A   Yes. |
| 01:39 | 19 | Q   So if the IRD wants to watch a channel on one of the |
| 01:39 | 20 | other LNB's outputs, does the switch have to completely |
| 01:39 | 21 | switch the LNB? |
| 01:39 | 22 | A   To the entire set of 16 transponder channels from a |
| 01:39 | 23 | different LNB. |
| 01:39 | 24 | Q   Is that why there's four cables there because you would |
| 01:40 | 25 | switch it for all of them if they were on the same cable? |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

01:40   1   A     Yes.

01:40   2            THE COURT:  So let me make sure I understand that.

01:40   3   In this prior art technology, you're saying that the IRD,

01:40   4   which I'm thinking of as a set-top box -- if the set-top box

01:40   5   user wants to watch Channel 4, the only signal that's going

01:40   6   to the set-top box is the Channel 4 signal?  The IRD has

01:40   7   told the multi-port switch send me this signal that

01:40   8   corresponds to service provider content Channel 4, correct?

01:40   9            MR. AKL:  No, not necessarily.  You are receiving

01:40   10  actually the 16 transponder channels because those are all

01:40   11  coming out of the one LNB.  So LNB A/B at the top or A/B at

01:40   12  the bottom.  And it knows -- the multi-port switch will know

01:40   13  that the channel that you want corresponds to a specific

01:41   14  transponder channel, so it's going to send those transponder

01:41   15  channels to the IRD.  The IRD itself will be able to extract

01:41   16  that signal and display it.

01:41   17           THE COURT:  We've been talking about 16 channels.

01:41   18           Are the LNBs limited to the number of channels

01:41   19  that they can handle?

01:41   20           MR. AKL:  That depends on the -- the 16 is an

01:41   21  example of how much this uplink and downlink from the

01:41   22  satellite can handle.  That's the limitation in this

01:41   23  example.

01:41   24           THE COURT:  And why is that the limitation in this

01:41   25  example?  Was that a limitation in the prior art, the stated

01:41  1   technology?

01:41  2         MR. AKL:  It depends on a couple of things.  One,

01:41  3   the bandwidth that's allocated for the uplink and downlink

01:41  4   and part of what the FCC will allocate for a specific link.

01:41  5   So the modulation and the channels for a specific satellite

01:41  6   up and down is going to be fixed.

01:41  7         Now, that can change, but whether it's 16 or less

01:42  8   or more, it doesn't change the aspect of the invention.  The

01:42  9   inventions that we're going to be talking about and what

01:42  10  happens with the receiver is not dependent on that aspect of

01:42  11  the technology, like the -- whether -- the limitation of how

01:42  12  many channels other than there is a fixed number of

01:42  13  transponder channels that you're going to extract a signal

01:42  14  from.

01:42  15        THE COURT:  Okay.  And one more question on your

01:42  16  presentation of the prior art technology before the '576

01:42  17  Patent.  Today one can have access to hundreds and maybe

01:42  18  even thousands of service provider content channels.

01:42  19        MR. AKL:  Yes.

01:42  20        THE COURT:  This prior art technology, could it

01:42  21  handle that number of service provider content channels?

01:42  22  Sorry.  I'm just getting stuck on the 16 channels.

01:43  23        MR. AKL:  The 16 channels doesn't mean you're only

01:43  24  receiving 16 channels.  It just means you have 16 pipes that

01:43  25  you can have multiple signals on those pipes, and each

01:43   1   signal will correspond to a channel.  So depending on how

01:43   2   good the compression is and what's happening before those

01:43   3   are transmitted, you can have multiple signals be

01:43   4   transmitted onto a transponder channel, which are still

01:43   5   going to get received at the satellite dish, which is then

01:43   6   going to know to extract the right signal from a transponder

01:43   7   channel to display it on a TV.

01:43   8           THE COURT:  Okay.

01:43   9           MR. AKL:  That's part of what the IRD is doing

01:43   10   when you're selecting, you know, a specific channel on your

01:43   11   remote.  It's going to know which transponder channel and

01:43   12   which signal to go to to extract that signal.

01:44   13           THE COURT:  Understood.  Okay, thank you.

01:44   14   BY MR. ENGEL:

01:44   15   Q    Professor Akl, focusing in on kind of the discussion

01:44   16   you just had, in this example, there are four LNB outputs

01:44   17   each with, you know, 16 transponder channels, right?

01:44   18   A    Yes.

01:44   19   Q    And if the IRD wants to watch the content on let's say

01:44   20   transponder Channel 1 on the first LNB output, the switch

01:44   21   would give it that, and it would watch that signal on that

01:44   22   transponder channel, correct?

01:44   23   A    Yes.

01:44   24   Q    Now, if it wanted the 64th transponder channel, what

01:44   25   would the switch have to do?

01:44  1    A    The switch would have to look at which transponder

01:44  2    channel carries that, and it will have to transmit or

01:44  3    connect the cable coming out of the multi-port switch to the

01:44  4    input from the LNB that actually is carrying that signal.

01:44  5    This is why we have all these cables coming out of the

01:44  6    multi-port switch, because in a way it's -- if you can think

01:45  7    of the old, you know, Lily Tomlin commercials where she

01:45  8    would connect wires.  That's really what's happening in this

01:45  9    multi-port switch.  So we have Lily Tomlin that's just

01:45  10   connecting those cables together.

01:45  11          What the '576 is going to look at is a way to

01:45  12   instead of having four cables on the right have a single

01:45  13   cable that's going to carry a composite signal for all the

01:45  14   required or requested signals.

01:45  15          THE COURT:  Okay.  You're dating us with that Lily

01:45  16   Tomlin reference.  I think we've lost everybody at the table

01:45  17   over there, but I understand.

01:45  18          MR. AKL:  Thank you, Your Honor.

01:45  19   BY MR. ENGEL:

01:45  20   Q    Now, we've discussed, you know, the problems with the

01:45  21   multi-cable prior art solution.

01:45  22          Are there single cable prior art solutions that

01:45  23   are discussed in the '576 Patent?

01:45  24   A    Yes.  The background describes two, and I'll walk

01:45  25   through both of them.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

01:45   1   Q    Okay, and I think you have one of them on slide 26; is

01:45   2   that correct?

01:45   3   A    Yes.

01:46   4   Q    Could you please describe what is depicted here?

01:46   5   A    So the background of the '576 Patent itself describes

01:46   6   Petruzzelli, which I believe got assigned to DISH, and this

01:46   7   prior art describes band stacking.  So the difference here

01:46   8   is it is an analog solution, and I just want to go through

01:46   9   the diagram fairly quickly.

01:46   10          You have on the left your satellite dish.  You

01:46   11   have your low-noise amplifiers like 44 and 60.  And then you

01:46   12   have your band pass filters.  And then you're going to move

01:46   13   to a specific intermediate frequency on 56.  So we're like

01:46   14   in the middle.  And then you have the power combiner, 72,

01:46   15   which is going to combine --

01:46   16          THE COURT:  Okay, hold on.  You lost me.  I was on

01:46   17   48 and 62.

01:46   18          MR. AKL:  Yes, this is a band pass filter, so it's

01:46   19   going to extract a band.  Then that signal is going to be

01:47   20   mixed, preamplified, and then move to another band pass

01:47   21   filter.  So you're basically isolating a band, and this is

01:47   22   why this approach is called band stacking.

01:47   23          A band is like a range of frequency, but

01:47   24   everything here is in the analog domain.  So either you have

01:47   25   a bigger pipe and you're going to a smaller and smaller

01:47    1    pipe, or we're extracting an analog signal from an analog

01:47    2    signal basically, and then we combine those two bands.

01:47    3    That's 72.  Then those two bands are now combined into a

01:47    4    wide band IF amplifier.  So you have now a band -- a wider

01:47    5    band in this example made up of two bands in this

01:47    6    intermediate frequency, and then the output can be sent on a

01:47    7    single cable.  So this design allows you to band stack in a

01:48    8    way two bands onto a single cable, but it does it all in the

01:48    9    analog domain.

01:48   10    BY MR. ENGEL:

01:48   11    Q    Are there any issues identified in the '576 Patent with

01:48   12    this approach?

01:48   13    A    Yes.  As the number of transponder channel increases or

01:48   14    the number that you want to display -- it doesn't scale.

01:48   15    This suffers from scaling issues, and it suffers from

01:48   16    complexity.  So that's the issue with this prior art design.

01:48   17    Q    All right.  Does slide 27 describe another prior art

01:48   18    approach to the single cable solution?

01:48   19            THE COURT:  Hold on one second.  The Petruzzelli

01:48   20    reference, what's the date of that patent, the date of

01:48   21    issuance roughly?

01:48   22            MR. ENGEL:  This was in the background.  I don't

01:48   23    know off the top of my head.

01:48   24            MR. ENGEL:  It's before 2003, Your Honor.

01:48   25            THE COURT:  Before 2003?

39

| | | |
|---|---|---|
| 01:48 | 1 | MR. ENGEL:  The priority date for the '576 Patent |
| 01:49 | 2 | is 2003. |
| 01:49 | 3 | THE COURT:  Hold on one second. |
| 01:49 | 4 | MR. ENGEL:  I can have one of my colleagues pull |
| 01:49 | 5 | up the exact date. |
| 01:49 | 6 | THE COURT:  I thought '576 claims priority to |
| 01:49 | 7 | provisionals as early as '01. |
| 01:49 | 8 | MR. ENGEL:  Yes, I guess that is right, Your |
| 01:49 | 9 | Honor. |
| 01:49 | 10 | Ms. Allor, do you have the issuance date for |
| 01:49 | 11 | Exhibit J? |
| 01:49 | 12 | MS.  ALLOR:  The issuance is September 28th, 1999. |
| 01:49 | 13 | MR. ENGEL:  September of '99. |
| 01:49 | 14 | THE COURT:  Got it.  Thank you. |
| 01:49 | 15 | BY MR. ENGEL: |
| 01:49 | 16 | Q    Turning to slide 27, which is Williams, Exhibit K, |
| 01:49 | 17 | could you describe what is depicted in this single wire |
| 01:49 | 18 | solution? |
| 01:49 | 19 | A    Yes.  It's also looking to do a single cable, and the |
| 01:49 | 20 | way it does it is through bandwidth reduction.  So what that |
| 01:49 | 21 | means -- so in the example here, you have a satellite dish. |
| 01:49 | 22 | It's receiving two signals.  And you have a transmodulater, |
| 01:49 | 23 | and a transmodulater is just going to convert from one |
| 01:50 | 24 | modulation scheme to another modulation scheme that reduces |
| 01:50 | 25 | the bandwidth.  You may lose a little bit of the fidelity |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

01:50  1   also, but it reduces the bandwidth.  Then both of these

01:50  2   reduced signals can then be put onto a single cable.

01:50  3         So, again, this is taking place in the analog

01:50  4   domain, and the patent itself says you're going to have

01:50  5   scaling issues and circuit complexity issues if you try to

01:50  6   scale this solution.

01:50  7         THE COURT:  Okay.

01:50  8         MR. ENGEL:  And for the record, Your Honor, this

01:50  9   is a filed in '98 and issued in 2000 patent, the Williams

01:50  10  patent, which is Exhibit K to defendants' filings.

01:50  11        THE COURT:  Got it.

01:50  12  BY MR. ENGEL:

01:50  13  Q    Are there disadvantages to changing the modulation of

01:50  14  the incoming signal as you put it onto the output signal?

01:50  15  A    Yes.  By changing the modulation, you're reducing the

01:51  16  bandwidth, but you're also reducing some of the fidelity.

01:51  17  So you could lose information, and you get not as good of a

01:51  18  signal.  So that is also a possibility.

01:51  19  Q    All right.  Now that we've discussed prior art, turning

01:51  20  to slide 28 --

01:51  21        THE COURT:  I'm sorry.  Forgive me for

01:51  22  interrupting you.  One off-the-wall question, how well known

01:51  23  was conversion of analog signals to digital signals in this

01:51  24  timeframe of, you know, 20, 25 years ago?

01:51  25        MR. AKL:  It is -- I mean, we've been converting

01:51   1   analog to digital during that timeframe.

01:51   2           THE COURT:  That's been known for a long time?

01:51   3           MR. AKL:  Yes, the ability to convert from analog

01:51   4   to digital is known.

01:51   5           THE COURT:  But it wasn't commonly being done at

01:51   6   that time.  Why is that?

01:51   7           MR. AKL:  The solution there wasn't doing it.  It

01:51   8   was still working with an analog signal and wasn't looking

01:51   9   at what better ways if we go to the digital domain we could

01:51   10  better manipulate and do signal processing if we move from

01:52   11  analog to digital.  So they were providing solutions in the

01:52   12  analog domain but not looking at digital domain solutions,

01:52   13  which is what the '576 does.

01:52   14          THE COURT:  So that's part of the novelty,

01:52   15  nonobviousness of the '576?  I'm not stating this in very

01:52   16  precise patent terms.  Let me state it in very non-patent

01:52   17  terms.  Part of the gee whiz of '576 is going from analog to

01:52   18  digital?

01:52   19          MR. AKL:  Yes, Your Honor, and I'll talk about

01:52   20  that in the very next slide.

01:52   21          THE COURT:  Okay.  Go ahead then, please.

01:52   22  BY MR. ENGEL:

01:52   23  Q    I think you were going to talk about the benefits of

01:52   24  digital channel stacking as described in the '576.

01:52   25  A    On the left is the prior art example that we discussed.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

01:53  1    On the right is the signal cable solution, and the first

01:53  2    thing we're going to see -- or I'm going to discuss is what

01:53  3    happens in this green box, the 250.  This is the signal

01:53  4    selector and combiner.  Then out of it, we're going to have

01:53  5    a composite signal that's going to go in a single cable,

01:53  6    220, to a gateway and then be distributed.  So --

01:53  7          THE COURT:  When you say -- forgive me for

01:53  8    interrupting you.  What do you mean by composite signal?

01:53  9          MR. AKL:  The composite signal is what this patent

01:53  10   and the prior art is trying to do where -- so if we look at

01:53  11   the cables on the left, you know, you have four separate

01:53  12   cables, and those just carry the signal.  If we want to try

01:53  13   not to have a multi-cable system and have a single cable,

01:53  14   that single cable would need to carry both signals if you

01:53  15   have, for example, two receivers that are requesting two

01:53  16   separate channels.

01:53  17          So the composite signal is the signal that has

01:54  18   both contents that both set-top boxes are requesting from

01:54  19   the satellite.  They're going to be transmitted on the

01:54  20   single cable.  So you're putting two signals or more in this

01:54  21   example, and this is what we're going to call the composite

01:54  22   signal.  It means both requested signals that are going to

01:54  23   be watched, say, on two TVs at the same time.

01:54  24          THE COURT:  So it's a signal that contains a lot

01:54  25   more information.

01:54   1               MR. AKL:  It's a signal that's going to contain

01:54   2   more than one signal coming from the satellite.  That's

01:54   3   correct.

01:54   4               THE COURT:  And the signal that's passing through

01:54   5   reference number 220, that wire, is that a digital or analog

01:54   6   signal?

01:54   7               MR. AKL:  This is going to be a digital signal,

01:54   8   and I'm going to have two slides on that because that's

01:54   9   exactly what we're going to go over in detail.

01:54  10               THE COURT:  Okay.  Please, go ahead.

01:55  11   BY MR. ENGEL:

01:55  12   Q    Is the modulation altered at all in the '576 embodiment

01:55  13   that you're describing?

01:55  14   A    No, the modulation is not altered.

01:55  15   Q    Okay.  I think you said that the composite signal is

01:55  16   digital.

01:55  17   A    I think it's analog, sorry.  We're going to talk about

01:55  18   going to digital and then going to analog, so I think I

01:55  19   misspoke for a second.

01:55  20   Q    All right.  And I think you've prepared some slides

01:55  21   that talk about an example of the signal selector and

01:55  22   combiner; is that correct?

01:55  23   A    Yes.

01:55  24   Q    And that would be on slide 29.

01:55  25   A    Yes.

01:55  1  Q    Can you please describe this exemplary signal selector

01:55  2  and combiner?

01:55  3  A    Yes.  So the invention starts by taking the received

01:55  4  analog signals from the LNB on the left and then converting

01:56  5  them from analog to digital, and that's what's happening in

01:56  6  330, and then having digital filters and tuners.  And those

01:56  7  are going to be -- the next slide will work in tandem with

01:56  8  this slide to kind of show exactly what's happening.

01:56  9        So we have the transponder channels coming in from

01:56  10  the left.  You're going to convert them to digital.  You're

01:56  11  going to pick a specific transponder channel, and then

01:56  12  you're going to tune it to be able to put it in the right

01:56  13  location.  Then at some point on the right -- so in this

01:56  14  example, 350 will convert them back to an analog signal, and

01:56  15  the output 380 is going to be the analog composite signal on

01:56  16  the right.

01:56  17        Now, this is an example in the patent.  The output

01:56  18  will be analog, and the input is analog, and at some point

01:56  19  in the process, you're going to go from analog to digital.

01:57  20  That's the very beginning, but then later you're going to go

01:57  21  from digital back to analog.  It doesn't really -- you're

01:57  22  not fixed where you go back as long as 380 ends up being

01:57  23  analog.

01:57  24        THE COURT:  Why does the ultimate output 380 need

01:57  25  to be analog?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

01:57   1            MR. AKL:  To maintain the form of the signal where

01:57   2       we started with an analog signal so that you minimize at

01:57   3       this point the other hardware that's going to already be

01:57   4       employed.  So --

01:57   5            THE COURT:  Is the set-top box expecting an analog

01:57   6       signal?

01:57   7            MR. AKL:  It's expecting an analog signal coming

01:57   8       from the satellite that's been down converted to an

01:57   9       intermediate frequency, but it's still an analog signal that

01:57  10       it is expecting, yes, Your Honor.

01:57  11            THE COURT:  So what's the advantage of taking that

01:57  12       analog signal from the satellite, converting it to digital,

01:57  13       and then converting it back from digital to analog?  Why do

01:58  14       that?  Why is that a good thing?

01:58  15            MR. AKL:  That is a good thing because of the

01:58  16       ability to do the digital filters and modify the signal to

01:58  17       be able to create this composite signal that's not going to

01:58  18       have the limitations that the prior art does, where if we

01:58  19       don't go to the digital domain and we're just working with

01:58  20       analog signals, we're limited by the bands that we can

01:58  21       stack.

01:58  22            If we go to the next slide, I can walk through the

01:58  23       advantage of now going to the digital domain.  This is

01:58  24       basically a pictorial of what is happening in those boxes.

01:58  25       We have four LNBs, two on the top, two on the bottom.  Each

01:58   1   one has 16 transponder channels, and you want to, for

01:58   2   example, select transponder channel 2.  This is coming from,

01:59   3   you know, in purple on the top left, and this is going to

01:59   4   go, say, in the first slot in the composite signal.  Then we

01:59   5   want transponder channel 14, and that's going to go in the

01:59   6   second slot in the composite signal.

01:59   7           So going from the analog to the digital domain, we

01:59   8   can digitize these signals on top and the bottom and be able

01:59   9   to have these digital filters that are going to precisely

01:59   10  extract and select the transponder signals, tune them into

01:59   11  the form that's in the middle as the composite signal, and

01:59   12  then output them as an analog signal that now has the

01:59   13  selected transponder channels and the selected signals that

01:59   14  you want in this single cable instead of having the multi

01:59   15  cables.

01:59   16          It's kind of like going to an ice-cream shop, and

02:00   17  you have all the flavors on the top and the bottom, and you

02:00   18  know which ones you want.  So the middle composite signal is

02:00   19  your ice-cream cone with the scoops of the flavors that you

02:00   20  want, and you just have a single one, a single composite

02:00   21  signal with all the signals that are going to go to the

02:00   22  different set-top boxes.  In this case, they're going to go

02:00   23  to a gateway that's going to distribute them to the set-top

02:00   24  boxes.

02:00   25          THE COURT:  And what is distributed is these 15 or

02:00  1   16 channels that are part of the composite signal, correct?

02:00  2          MR. AKL:  Yes, Your Honor.  So a single cable

02:00  3   carrying this composite signal will have the requested

02:00  4   signals instead of needing four cables because you have four

02:00  5   LNBs in this example.

02:00  6   BY THE COURT:

02:00  7   Q    So in this example of this composite signal where there

02:00  8   are 16 channels that could each carry a signal, could you

02:00  9   theoretically deliver 16 different television channels to 16

02:01 10   different, you know, television decoders in a house?

02:01 11   A    Yes.  We're using a single cable.  That's one benefit.

02:01 12          THE COURT:  Now, forgive me, one more question.

02:01 13   Let's say the homeowner wants to watch -- well, let me take

02:01 14   a step back.  We're talking about actually 15, not 16,

02:01 15   because of the one MHz gap.

02:01 16          MR. AKL:  Correct.

02:01 17          THE COURT:  Okay, so we've got 15 channels that

02:01 18   are being fed in an ultimately analog composite signal to

02:01 19   the set-top box?

02:01 20          MR. AKL:  Yes.

02:01 21          THE COURT:  But each one of these 15 channels can

02:01 22   contain multiple signals, multiple TV channels, multiple

02:01 23   service provider content channels?

02:01 24          THE WITNESS:  Correct.

02:02 25          THE COURT:  All right.  I think I understand.  Go

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:02  1   ahead.  It sounded like you were going to expound on

02:02  2   something.

02:02  3            MR. AKL:  Yes.  So now this is going to go to a

02:02  4   gateway, which is going to distribute to the -- just like

02:02  5   you were asking me like how do they end up on these set-top

02:02  6   boxes.  So the next slide is basically a recap where the

02:02  7   composite signal is going to a gateway, and we end up with

02:02  8   the distributions.  This is where this patent really focuses

02:02  9   on the digital channel stacking.  And then I'm going to be

02:02  10  talking about an advanced gateway for the next patent.

02:02  11           THE COURT:  Okay.

02:02  12  BY MR. ENGEL:

02:02  13  Q    If there's no further questions, we will go to the '715

02:02  14  Patent which you previewed, Professor Akl, as an advanced

02:02  15  gateway.

02:02  16           Does this share anything in common with the '576

02:03  17  Patent?

02:03  18  A    Yes.

02:03  19  Q    And have you prepared some materials to walk through

02:03  20  that?

02:03  21  A    Yes.

02:03  22  Q    Let's go to slide 33, and if you could explain what's

02:03  23  shown here.

02:03  24  A    So the '715 patent is a continuation of the '576.  They

02:03  25  have a common specification.  It's going to build on the

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 02:03 | 1 | stacking technology in the composite signal, and it's going |
| 02:03 | 2 | to add an advanced gateway that's going to decode and |
| 02:03 | 3 | distribute content over a local area network. |
| 02:03 | 4 | THE COURT:  '715 is a continuation, not a |
| 02:03 | 5 | continuation in part? |
| 02:03 | 6 | MR. ENGEL:  That's correct, Your Honor. |
| 02:03 | 7 | THE COURT:  Okay.  Got it. |
| 02:03 | 8 | BY MR. ENGEL: |
| 02:03 | 9 | Q    So when you say common specification, that means that |
| 02:03 | 10 | the disclosure and the figures are the same between the two, |
| 02:03 | 11 | correct? |
| 02:03 | 12 | A    Yes. |
| 02:03 | 13 | Q    All right.  Let's go to slide 34.  Here we have Fig. |
| 02:03 | 14 | 11, which has some similarities with Fig. 2, but it's set |
| 02:03 | 15 | out a little bit differently. |
| 02:03 | 16 | Could you explain the differences and what's shown |
| 02:03 | 17 | in Fig. 11? |
| 02:03 | 18 | A    Yes.  So what we're looking at here is the same outdoor |
| 02:03 | 19 | unit.  In the top left, we have the dish.  We have the LNBs, |
| 02:04 | 20 | and then we have the signal selector that's going to do what |
| 02:04 | 21 | -- create the composite signal, and that's going to go onto |
| 02:04 | 22 | the orange line.  And this patent, the '715, is now going to |
| 02:04 | 23 | focus on this advanced gateway, which is shown in the lower |
| 02:04 | 24 | part of the figure. |
| 02:04 | 25 | So we have the gateway 1160, and I'm showing part |

02:04    1   of the specification that's describing what this gateway is

02:04    2   going to do.  So this gateway is going to receive this

02:04    3   composite transponder signal, and it's going to decode the

02:04    4   specific programs that you want to watch, and it's going to

02:04    5   distribute them -- and in this example, it's going to use

02:04    6   MPEG -- over a local area network.  And it gives two

02:04    7   examples of Ethernet or other LAN technology.

02:04    8           THE COURT:  Hold on a second.  When you say in

02:05    9   packetized MPEG, is that an analog or digital signal, or is

02:05   10   it something else?

02:05   11           MR. AKL:  You can have an analog signal carry

02:05   12   digital packets.  So this -- the signal itself is going to

02:05   13   be analog, and it's going to carry MPEG, which is in a way a

02:05   14   digital representation of the video.  It's a type of

02:05   15   compression of like the channel that you're watching.

02:05   16           THE COURT:  Okay.

02:05   17   BY MR. ENGEL:

02:05   18   Q    Now, you had mentioned Ethernet or other LAN

02:05   19   technology, and I think that's the focus of the next slide,

02:05   20   slide 35.

02:05   21           Ethernet is cable technology, correct?

02:05   22   A    Yes.  Ethernet is a type of twisted pair that, you

02:06   23   know, you --

02:06   24           THE COURT:  I don't think we got that.  Ethernet

02:06   25   is what?

51

02:06   1              MR. AKL:  Oh, it's a type of twisted pair.  It
02:06   2    looks like a phone jack, but it's a little bit bigger
02:06   3    because you have more twisted pair lines in it.
02:06   4    BY MR. ENGEL:
02:06   5    Q    And you had mentioned other LAN technology.
02:06   6              What are other LAN technologies at the time that
02:06   7    the '715 Patent was filed at the priority date of that
02:06   8    patent?
02:06   9    A    So like Wi-Fi 802.11 is an example of a local --
02:06   10             THE COURT:  So let's slow down just a little bit.
02:06   11   And LAN, just to be clear, that's LAN, Local Area Network,
02:06   12   and you're calling that LAN?
02:06   13             MR. AKL:  Yes, Local Area Network.
02:06   14             THE COURT:  And 802.11?
02:06   15             MR. AKL:  Yes.  So a type of local area network is
02:06   16   what we call Wi-Fi.  That Wi-Fi has a specific number like a
02:06   17   standard.  It's 802.11.  This is just an IEEE designation
02:07   18   for that standard.  So when we talk about Wi-Fi, it's like a
02:07   19   marketing term, but the standard itself has a specific
02:07   20   standard number issued by the IEEE.
02:07   21             THE COURT:  I asked you to slow down just because
02:07   22   I wanted to make sure that we got it on the record, so you
02:07   23   said 802.11 really quickly and IEEE.
02:07   24             MR. AKL:  Yes, sorry.
02:07   25             THE COURT:  We know what those are, but I just

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:07   1    want to make sure the record reflects it accurately.

02:07   2            MR. AKL:  Thank you, yes.

02:07   3            THE COURT:  Okay.  So let me focus on the content

02:07   4    of what you just said.  The server gateway can spit out the

02:07   5    signal in these different formats.  Is that what you said?

02:07   6            MR. AKL:  Yes.  So the server gateway can send out

02:07   7    MPEG over a local area network, and a local area network is

02:07   8    basically like your house, you know, the different set-top

02:07   9    boxes that are connected in your house.  They can be

02:07   10   connected together through an Ethernet, or they can be

02:08   11   connected wirelessly through, you know, a Wi-Fi hub.  And

02:08   12   the gateway can send out the MPEG signal in this example to

02:08   13   the set-top boxes using either an Ethernet or other LAN

02:08   14   technology, which is what the patent describes.

02:08   15           THE COURT:  Okay.

02:08   16           MR. AKL:  And that basically concludes my

02:08   17   presentation unless there are any questions from anybody.

02:08   18           THE COURT:  Give me one second.

02:08   19           (Pause in proceedings)

02:08   20           THE COURT:  No, I didn't have any follow-up

02:08   21   questions right now.  I may after I hear from defendants.

02:09   22           You're done with your psuedo-examination of Dr.

02:09   23   Akl?

02:09   24           MR. ENGEL:  I am, Your Honor.

02:09   25           THE COURT:  Okay.  Thank you.

02:09  1          Dr. Akl, thank you very much.  You may step down.

02:09  2          MR. AKL:  Thank you, Your Honor.

02:09  3          THE COURT:  Let's take a short break.  Let's try

02:09  4   to keep it to five minutes just to stretch our legs a little

02:09  5   bit and give the court reporter a break, and then I'll hear

02:09  6   from the defendants.  I'm eager to hear how much of that you

02:09  7   agree with and how much you disagree with and what twists

02:09  8   you have.

02:09  9          Okay, let's take a break.  Thank you.

02:09  10          (Recess)

02:23  11          THE COURT:  Okay, are the defendants ready to go?

02:23  12          MR. BERNSTEIN:  We are with Dr. Paul Steffes.

02:23  13          THE COURT:  Dr. Steffes, go ahead please when

02:23  14   you're ready.

02:23  15          MR. STEFFES:  Thank you, Your Honor.  Good

02:23  16   afternoon.

02:23  17          As you've probably heard, I'm a professor emeritus

02:23  18   of the School of Electrical Computer Engineering at Georgia

02:23  19   Tech, and I've been working in space communications,

02:23  20   satellite communications, and this area for most of my

02:23  21   career for more than 40 years, and I created and taught the

02:24  22   course in Satcom at Georgia Tech many years ago.

02:24  23          Today I'll be presenting this technology tutorial

02:24  24   on behalf of the defendants.  This case involves three

02:24  25   patents, all which relate to satellite or cable television,

02:24   1   but all the accused products are satellite products, so

02:24   2   we're going to focus on, you know, the satellite products or

02:24   3   the satellite aspects rather than anything that would be

02:24   4   related to cable, and the '008 Patent is where we'll start.

02:24   5          THE COURT:  So a couple of questions.  And,

02:24   6   counsel, feel free to jump in if this is more legal and more

02:24   7   in your field than Dr. Steffes's.  Do defendants agree with

02:24   8   the characterizations of the patents that plaintiffs

02:24   9   provided, that is, '008, remote monitoring; '576, digital

02:25  10   channel stacking; and '715, advanced gateway?

02:25  11          MR. BERNSTEIN:  Our characterizations, Your

02:25  12   Honor -- he's going to get into this right away.  There is

02:25  13   aspects that we do agree with, but I think there are some

02:25  14   things we actually do not, which Dr. Steffes will describe

02:25  15   right now actually.

02:25  16          THE COURT:  I'm sure there are some things you

02:25  17   don't agree with, but I was asking a little higher level

02:25  18   question just the labels.

02:25  19          MR. BERNSTEIN:  For the '008, it is spectrum

02:25  20   monitoring.  It is the monitoring aspect that's -- we agree

02:25  21   at a high level with that.

02:25  22          THE COURT:  They called it remote monitoring.  The

02:25  23   reason I'm asking is not to pin somebody down on technology

02:25  24   or establish an infringement position or anything like that.

02:25  25   It's just to attach a label.  So if we say we're talking

02:26  1    about the remote monitoring patent, does everybody agree

02:26  2    that's the '008, or do you say, no, we'd be prejudiced if

02:26  3    that label were attached?

02:26  4              MR. BERNSTEIN:  No, I don't think we'd be

02:26  5    prejudiced, Your Honor.

02:26  6              THE COURT:  How about '576 and '715?

02:26  7              MR. BERNSTEIN:  For the '576, they use --

02:26  8              THE COURT:  Digital channel stacking.

02:26  9              MR. BERNSTEIN:  That's not a term from the patent,

02:26  10   Your Honor.

02:26  11             THE COURT:  Well, I understand that.  The question

02:26  12   is are you happy -- are you comfortable with that label, or

02:26  13   is it a problem for defendants for some reason?

02:26  14             MR. BERNSTEIN:  Yes.  We consider this more signal

02:26  15   combination patents, the '576 and the '715, signal

02:26  16   combination.  That's how we would characterize both of those

02:26  17   patents.

02:26  18             THE COURT:  Okay.  Thank you.

02:26  19             Dr. Steffes, I'm sorry to interrupt you.  Please

02:27  20   pick up when you're ready.

02:27  21             MR. STEFFES:  Certainly.  Again, we'll start, you

02:27  22   know, with the '008 Patent, which is the method in an

02:27  23   apparatus for concurrent spectrum monitoring.  The other

02:27  24   patents, '576 and '715, we'll discuss later.  Just as kind

02:27  25   of a, you know, beginning statement, the discussion of

02:27   1   the -- all these discussions involve the existence of an

02:27   2   outdoor unit, which you've heard about already, and

02:27   3   connection to a customer premises through the outdoor unit

02:27   4   and then a cable coming from the outdoor unit to the

02:27   5   interior.  Again, those connection patents we'll call signal

02:28   6   combiner patents.

02:28   7        You know, all three patents talk about or discuss

02:28   8   concepts related to television distribution and reception.

02:28   9   And the term "distribution" refers to satellite service

02:28   10   providers.  So in other words, the satellite service

02:28   11   providers are the ones that are distributing this television

02:28   12   content.  My plan here is to discuss the core concepts of

02:28   13   the distribution systems so that this would be helpful in

02:28   14   understanding the subject matter here at issue.

02:28   15        Obviously, distributing television content has

02:28   16   existed for years and years and years.  You know, it's been

02:28   17   more than 60 years since the first television transmission

02:28   18   through satellite.

02:28   19        THE COURT:  You saw the last presentation, and I

02:28   20   get a lot of this.  I need you to focus on the technology

02:28   21   pertaining to the patents, and in particular, if you

02:28   22   disagree with how things have been characterized or

02:29   23   otherwise presented to me by plaintiff, please tell me that.

02:29   24        MR. STEFFES:  Certainly.  Thank you, Your Honor.

02:29   25        THE COURT:  You're probably not used to -- being a

02:29   1   professor, you're not used to somebody telling you how to

02:29   2   profess, are you?

02:29   3          MR. STEFFES:  Well, hopefully all recommendations,

02:29   4   especially from students, are well accepted and make things

02:29   5   improve.

02:29   6          But to go forward, you know, we've mentioned

02:29   7   already that the concepts of ground stations -- or, you

02:29   8   know, I guess I'll go ahead -- I'm going to kind of go ahead

02:29   9   on my presentation.  We're going to something called the

02:29   10  overview of the '008 Patent as you've requested.

02:30   11         You know, the discussion will be set up in a way

02:30   12  that the monitoring system, which we're going to discuss,

02:30   13  allows television providers to see whether customers are

02:30   14  getting high quality signals.  If there is some deficiency

02:30   15  in the quality, the technique or the material provided --

02:30   16  the claims provided in the '008 Patent provide a way for the

02:30   17  satellite uplink to improve the customer experience by

02:30   18  adjusting -- it actually allows for adjustments by sending

02:30   19  the signal back to the -- or sending the information back to

02:30   20  the source of the signal.  That's the words in the patent.

02:30   21         The '008 Patent -- you know about the issuance --

02:31   22  dates back to February 2011 in terms of a priority date, and

02:31   23  that's the date I've considered when considering the state

02:31   24  of the art.

02:31   25         Again, what you're seeing here, of course, is in

58

02:31   1    early 2001 signal systems were commonplace -- signal

02:31   2    monitoring systems I should say.  This again is referring to

02:31   3    the '008 Patent.  Signal monitoring systems were

02:31   4    commonplace.  In fact, I can remember using systems in the

02:31   5    '90's, even in the '80's, when I, you know, was either at

02:31   6    MIT while I was monitoring data from meteorological

02:31   7    satellites or during the -- when I was at Georgia Tech in

02:31   8    the '80's and '90's where I was responsible for developing

02:31   9    systems that, you know, signal monitoring systems were, you

02:31   10   know, commonplace.

02:32   11        The background section of the '008 Patent supports

02:32   12   my experience and, of course, as you can see from these

02:32   13   highlighted sections, there was significant prior art in the

02:32   14   area of signal monitoring.  Even today companies still look

02:32   15   at ways, you know, to monitor signal quality and

02:32   16   continuously seek to improve the customer experience.

02:32   17        Now, this diagram from the '008 Patent that you

02:32   18   see here, you know, shows -- you know, there are several

02:32   19   approaches that companies and equipment manufacturers or

02:32   20   builders or system builders can take to ensure that their

02:32   21   customers are happy with their television quality.  These

02:32   22   include things like just simply taking customer surveys --

02:32   23   you know, how do you like what you're getting? -- performing

02:32   24   automated schedule checks using software, and then having

02:32   25   on-call service representatives available.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:32   1           The '008 Patent chose to come up at the problem

02:33   2   with a different way by adding specialized circuitry,

02:33   3   specifically a monitoring module, that would replace one of

02:33   4   the tuners in a customer's STB, you know, their set-top box

02:33   5   or collection of set-top boxes, so it would measure one or

02:33   6   more characteristics such as signal-to-noise ratio.  That's

02:33   7   the wording.

02:33   8           So the idea is that this approach for determining

02:33   9   quality of service or determining performance or, you know,

02:33  10   verifying performance in fact comes at a price, which is

02:33  11   using data capacity or capacity of bandwidth in order to

02:33  12   verify performance of the link.

02:34  13           THE COURT:  That's what I was talking about with

02:34  14   Dr. Akl when I said in essence, gee, one of your 16 channels

02:34  15   is going to be spent doing monitoring.  He said, yes, but

02:34  16   that channel can jump around.  That is, if the user wants to

02:34  17   watch something that happens to be on the channel that's

02:34  18   being monitored, the monitoring unit, reference number 154

02:34  19   in Fig. 1B, can jump to a different channel and use that

02:34  20   other channel for monitoring.  Are you saying the same

02:34  21   thing?

02:34  22           MR. STEFFES:  What I'm saying is that the overall

02:34  23   capacity of the satellite -- you know, the combined

02:34  24   downlinks from the satellite are sacrificed by taking this

02:34  25   approach because you are using bandwidth that could be

02:34   1   carrying programming.  Instead, you're using it to do

02:34   2   checking or monitoring of performance.

02:35   3          THE COURT:  Okay.  I understand.

02:35   4          MR. STEFFES:  So now I'll discuss, you know, the

02:35   5   patented approach of Entropic to signal monitoring in the

02:35   6   claims of the '008 Patent and with respect specifically to

02:35   7   Claim 3.  I'm aware that, you know, some of the

02:35   8   constructions of some of the terms are disputed between the

02:35   9   parties.  This is not a hearing on claim construction, so

02:35  10   I'm not focusing on construction of any particular term.

02:35  11   I'll not be addressing each and every limitation of this

02:35  12   claim, only those I believe that are necessary to understand

02:35  13   the technology at issue.

02:35  14          THE COURT:  I was going to say, yes, I'm not --

02:35  15   the purpose of this proceeding, this technology tutorial, is

02:35  16   not to get into the claims and certainly not thinking about

02:35  17   claim construction or infringement or invalidity.  It's

02:35  18   really to understand the background of the technology in a

02:36  19   general way so that when I jump into those analyses I will

02:36  20   be better equipped to do that.  So I'm not sure I need to

02:36  21   get into any weeds on a particular claim, but I'm interested

02:36  22   in the next slide and the diagram.

02:36  23          MR. STEFFES:  Yes, and this is, you know, at the

02:36  24   beginning of Claim 3.  What we show here is -- this is from

02:36  25   obviously the patent.  You know, what they -- it's discussed

02:36  1  on how a signal is received by the set-top box.  Of course,

02:36  2  the set-top box discussed in the '008 Patent used circuitry

02:36  3  called -- there's a front-end to receive the incoming

02:36  4  signals, and the front-ends are a necessary part of the

02:36  5  set-top boxes and certainly were as of 2011 or the priority

02:36  6  date of this patent, and they provide the circuitry to

02:36  7  receive the signals.

02:36  8       So in Fig. 2B, which is shown here, we see an RF

02:37  9  front-end that receives a signal S, and then the received

02:37  10  signal described as an analog signal in the body of the '008

02:37  11  Patent and explained in the claim language itself carrying a

02:37  12  plurality of channels which carry television content.

02:37  13       THE COURT:  So in Fig. 2B here, there is a signal

02:37  14  coming in, S, to reference number 252.  Is this all

02:37  15  happening on the set-top box, or is S an output for the

02:37  16  set-top box?

02:37  17       MR. STEFFES:  S is the input to the set-top box.

02:37  18       THE COURT:  Okay.  So coming in the set-top box is

02:37  19  -- are we talking monitoring now, or are we talking just the

02:37  20  signal for purposes of watching content?

02:37  21       MR. STEFFES:  This is the -- what's coming into

02:37  22  the front-end is -- all of -- everything basically.  So it

02:38  23  would include the television material and anything else that

02:38  24  would be carried, including verification information -- or,

02:38  25  rather, the information on signal verification.

| | | |
|---|---|---|
| 02:38 | 1 | THE COURT:  What's the relationship between Fig. |
| 02:38 | 2 | 2B on your slide 12 and Fig. 1B from the '008 Patent on your |
| 02:38 | 3 | slide 10?  Fig. 2B seems to be a subset of some component. |
| 02:38 | 4 | I'm not sure if it's a component that's on. |
| 02:38 | 5 | MR. STEFFES:  Yes, it's the left most -- it is the |
| 02:38 | 6 | front-end component, so I'm trying to think -- |
| 02:38 | 7 | THE COURT:  Okay.  So your slide 12 is just |
| 02:38 | 8 | showing me there's a signal coming in to something called |
| 02:39 | 9 | the RF front-end, and the output is going to be D? |
| 02:39 | 10 | MR. STEFFES:  That's correct. |
| 02:39 | 11 | THE COURT:  Do I care what's happening within |
| 02:39 | 12 | components 252, 254, and 256, and signals S prime and S |
| 02:39 | 13 | double prime? |
| 02:39 | 14 | MR. STEFFES:  Only in that they represent the |
| 02:39 | 15 | description consistent with Claim 3, but no.  I mean, you |
| 02:39 | 16 | know, we're just stating that there is a received signal, |
| 02:39 | 17 | and it has a finite bandwidth, and it is processed.  So, no, |
| 02:39 | 18 | there's not. |
| 02:39 | 19 | THE COURT:  Okay.  I understand.  So a signal |
| 02:39 | 20 | comes in, and it gets modified by components, and that may |
| 02:39 | 21 | be very significant for the purposes of infringement and |
| 02:40 | 22 | invalidity.  I don't know at this point.  And then the |
| 02:40 | 23 | output is D. |
| 02:40 | 24 | MR. STEFFES:  Yes. |
| 02:40 | 25 | THE COURT:  Okay, next. |

02:40    1            MR. STEFFES:  Well, the digitized signaled D then

02:40    2    goes out to something called a channelizer.  The channelizer

02:40    3    puts out two different signals, and one --

02:40    4            THE COURT:  Forgive me.  I'm going to back up.

02:40    5    Maybe I minimized or misunderstood your slide 12.  This is

02:40    6    where the digitization takes place?

02:40    7            MR. STEFFES:  Correct.

02:40    8            THE COURT:  From analog to digital?

02:40    9            MR. STEFFES:  That's correct.

02:40   10            THE COURT:  Okay.  That I understand.

02:40   11            MR. STEFFES:  Yes, that is correct.

02:40   12            THE COURT:  Okay.  So digitized signal D is the

02:40   13    output.  So now we're on slide 13.  Forgive me.

02:40   14            MR. STEFFES:  Correct.  No, no forgiveness needed.

02:40   15            Anyway, what I was going to say was that the

02:41   16    output as you mentioned from the RF front-end is the digital

02:41   17    stream, and it goes forward to a channelizer.  And the

02:41   18    channelizer puts out two signals, one which goes to the data

02:41   19    processor.  The data processor in this case is in the '008

02:41   20    Patent, also called a tuner.  So that is the signals that

02:41   21    are carrying video information.  The first part of the first

02:41   22    portion of the signal is delivered to the monitoring module,

02:41   23    which monitors the quality of the provided information or

02:41   24    provided service.

02:41   25            THE COURT:  Got it.

02:41  1          MR. STEFFES:  Again, you know, this channelizer is

02:41  2    digital.  It has a digital input, and, you know, it

02:42  3    channelizes.  It's all a digital process.

02:42  4          What I was going to kind of just hint on or

02:42  5    comment on was that I've personally used digital

02:42  6    channelizers since the '90's in my work as part of the NASA

02:42  7    ACTS program, the Advanced Communications Technology

02:42  8    Satellite, so this is a well-understood technology.  You

02:42  9    know, as part of my work on ACTS, I worked with wide band

02:42  10   digitizers to create multi-channel digital signals using a

02:42  11   custom channelizer, and we did this to study signal

02:42  12   propagation effects in satellite communication systems.  So

02:42  13   that's just a context for the fact that the technology for

02:42  14   digital channelizers is quite mature.

02:42  15         THE COURT:  Satellites typically operate using --

02:42  16   or communicate using analog or digital signals?

02:43  17         MR. STEFFES:  What is transmitted through the

02:43  18   transponder, which we heard a nice definition of earlier --

02:43  19   what is transmitted through the transponder is an analog

02:43  20   signal.  In many cases, they're bearing digital information

02:43  21   that is in the digital format, but there is a continuity in

02:43  22   the voltage values and the accompanying current values that

02:43  23   are being carried that are continuous.  They're not

02:43  24   discrete.  So it is an analog signal that is actually being

02:43  25   transmitted through the transponder.

02:43  1                    THE COURT:  Got it.  Okay.

02:43  2                    So the signal that is designated as C coming out

02:43  3      of the channelizer, component 152, are those digital?

02:43  4                    MR. STEFFES:  Yes, they -- well, in the -- let me

02:44  5      see this here for a second.

02:44  6                    THE COURT:  Well, maybe the answer is it doesn't

02:44  7      matter.

02:44  8                    MR. STEFFES:  Well, it doesn't have to be.  If the

02:44  9      tuners that are already existent are of a format that they

02:44 10      are looking for an analog signal, it could be in that form,

02:44 11      too, but it can in fact be digital.  So to my mind, it's not

02:44 12      required in the specification as to which it has to be.

02:44 13      Again, it could be either.  I mean, again, generally if

02:44 14      existing or legacy tuners are being used as the data

02:44 15      processors, you would want them to be analog.

02:44 16                    THE COURT:  Okay.  So the channelizer is spitting

02:45 17      out different signals, one being used by the monitoring

02:45 18      equipment -- monitoring module and the other being used by

02:45 19      the data processing, which goes ultimately to the consumer

02:45 20      so you can watch TV.

02:45 21                    MR. STEFFES:  Right.

02:45 22                    THE COURT:  Okay.  Got it.

02:45 23                    MR. STEFFES:  I was going to mention that also

02:45 24      over the years I've been involved quite a bit with, you

02:45 25      know, evaluating signal quality and channel evaluators.  We

02:45   1   did this extensively again with the NASA Advanced

02:45   2   Communications Technology Satellite project.

02:45   3          The next thing I wanted to address on the '008

02:45   4   Patent was the illustration of the -- as you can see from

02:46   5   the drawing here from the patent, there's an image of a --

02:46   6   you know, head-end is I believe what they call that.  I

02:46   7   can't see unfortunately.

02:46   8          THE COURT:  There's a monitor to your left which

02:46   9   may not be all that easy to see.  There is also a microphone

02:46   10  right in front of you.

02:46   11         MR. STEFFES:  I see that.  Thank you very much.

02:46   12         As you can see, there is in a cable system a

02:46   13  source which is known as a head-end, which takes television

02:46   14  signals that are coming from terrestrial satellite and

02:46   15  internet and delivering those to the individual in-home --

02:47   16  or, rather, indoor units, you know, set-top boxes of the

02:47   17  individual subscribers.  Again, this is for the cable

02:47   18  system, though.

02:47   19         Now, for a satellite system, as you've seen

02:47   20  previously -- this figure is from the patent -- there is a

02:47   21  satellite dish, of course, which receives with the help of

02:47   22  the feed horns the signal from the satellite, and then that

02:47   23  is provided to the individual set-top box within the house,

02:47   24  and then also information regarding the performance of the

02:47   25  link is sent.

02:47   1          You asked about this earlier, the wide area
02:47   2   network, which is really essentially internet, is used to
02:48   3   provide feedback to the satellite uplink source regarding
02:48   4   the performance of the link.
02:48   5          THE COURT:  Understood.
02:48   6          I think you made reference to corrections.  This
02:48   7   is a little bit beyond the tech tutorial perhaps, but do the
02:48   8   claims of the '008 Patent pertain in any way to corrections
02:48   9   other than that's why the signal 188 to 192 is provided?
02:48  10          MR. STEFFES:  Yes.  The information that is
02:48  11   provided with regard to performance could be used to adjust
02:48  12   the uplink, which is the uplink source, so as to -- you
02:48  13   know, just as in the head-end of a cable system that was
02:49  14   shown previously.
02:49  15          THE COURT:  And that's in the claims?  There are
02:49  16   limitations that pertain to that?  It may be beyond the
02:49  17   scope of what you've been asked to do, and maybe it doesn't
02:49  18   matter.  I'm just curious.  That's okay.  We can go on.
02:49  19          MR. STEFFES:  Okay.  I apologize.  I don't have
02:49  20   '008 right in front of me.
02:49  21          THE COURT:  It's fun to stump the professor.
02:49  22          MR. STEFFES:  That's a good point.
02:49  23          Anyway, what we're getting back to is that there
02:49  24   is a feedback loop here where information about the quality
02:49  25   of service provided is returned to the signal source, which

02:49  1    in this case, of course, because it's a satellite would be

02:49  2    at the uplink center.  And, you know, if the monitoring

02:50  3    analysis is not received, then no corrections can be made in

02:50  4    the uplink signal.

02:50  5           One other aspect I wanted to bring up was with

02:50  6    regard to the approach of using, you know, automated

02:50  7    information or rather performance information, verification

02:50  8    of the performance from a grouping of remote receivers,

02:50  9    grouping of customers.  While, you know, the information

02:50  10   provided through the link back to the source might allow

02:50  11   adjustments to be made to improve quality of service, it

02:51  12   would potentially be not scalable because there would be,

02:51  13   you know, portions of the country or certain, you know,

02:51  14   receiver sites that would be exhibiting maybe a problem with

02:51  15   the signal-to-noise or bit error rates or whatever you want

02:51  16   to characterize your performance as.

02:51  17          And that could in fact change the, you know,

02:51  18   result in a modification of the transmission, which would

02:51  19   harmfully affect potentially other users if there were, you

02:51  20   know, a broad range of users.  So that is something that,

02:51  21   you know, changing parameters, for example, might improve

02:51  22   the signal quality in one location and not improve it in

02:51  23   another.

02:51  24          Now, of course, there's the traditional

02:51  25   approaches.  You know, we already have talked initially

02:51   1   about the approach that is given here for the '008 where

02:52   2   continuous monitoring occurs.  Of course, if the customer or

02:52   3   the dish owner or the receiver owner is not getting the

02:52   4   quality of service they want, they can always, you know,

02:52   5   seek support from an on-site technician.

02:52   6           But another approach is the scheduled monitoring

02:52   7   approach where rather than using capacity that is

02:52   8   potentially of use to the consumers is it's possible to

02:52   9   actually have the set-top box evaluate quality while it's

02:52   10  not being used.  In other words, when somebody's not

02:52   11  watching or when it's at night or when there's another

02:52   12  period when it's not active, it could evaluate performance

02:52   13  then as well.  So there are other choices for monitoring

02:53   14  performance.

02:53   15          THE COURT:  Are they claimed?

02:53   16          MR. STEFFES:  No.  There's no claim of those in

02:53   17  this patent to my knowledge.

02:53   18          THE COURT:  Okay.

02:53   19          MR. STEFFES:  Now, one more thing is that the '008

02:53   20  Patent, you know, discusses sending the second portion of

02:53   21  the channelizer up into a tuner and, you know, undergoes a

02:53   22  data recovery process to recover the channel content.  You

02:53   23  know, that technology is essentially just the same

02:53   24  technology as tuners.  So it's -- that technology is --

02:53   25          THE COURT:  Well known in the art.

02:53   1           MR. STEFFES:  Yes, exactly.

02:53   2           THE COURT:  Got it.  Okay.

02:53   3           MR. STEFFES:  So, you know, in summary, these are

02:54   4   the key points about the system contained within the '008

02:54   5   Patent:  receiving an analog signal at the front-end,

02:54   6   separates via a channelizer the process signal, sends one

02:54   7   portion to a tuner and the other portion to a signal

02:54   8   monitor, and then reports the characteristics of the signal

02:54   9   monitoring to a source.

02:54   10          So at this point, we're going to switch to the

02:54   11  overview of the '576 and '715 Patents, which are ones that

02:54   12  we kind of refer to as being --

02:54   13          THE COURT:  Signal combination patents?

02:54   14          MR. STEFFES:  Exactly.  Thank you, Your Honor, the

02:54   15  signal combination patents.  I can't read my own writing.

02:55   16          What I'd like to first talk about is some of the

02:55   17  terminology, because the terminology in signal propagation

02:55   18  is important for understanding the claims of the patents and

02:55   19  also the technology that accompanies those claims.  Again,

02:55   20  I'm not trying to construct any claims here.  This is just

02:55   21  talking about technology.

02:55   22          There are a whole number of terms like

02:55   23  "transponder signal, transponder channel, satellite

02:55   24  broadband signal, radio frequency signal, and television

02:55   25  channel," all of which are used in the asserted claims.

02:55   1   Again, Dr. Akl made a good effort at trying to give

02:55   2   demonstrations of what was what.  It's very easy to confuse

02:55   3   these, so it's necessary that we just repeat one more time

02:55   4   what's meant by these.

02:55   5          You know, the first thing is that a lot of those

02:55   6   terms up there have the word "transponder" in them.  As was

02:55   7   mentioned, it's necessary to understand what the transponder

02:56   8   is.  It is in fact a repeater.  It consists of hardware that

02:56   9   will receive and process signals from the uplink and then

02:56   10  retransmit them on the downlink usually on a different

02:56   11  frequency.

02:56   12         The television satellites typically have somewhere

02:56   13  between 24 and 56 transponders, so there's no fixed number.

02:56   14  I know we were quoting for a while there 16 transponders,

02:56   15  but there are a whole range of satellites, a whole range of

02:56   16  designs, and there can be ones with far more transponders

02:56   17  and far less.

02:56   18         THE COURT:  How many satellites roughly are there

02:56   19  out there that are providing this transponder service for

02:56   20  television content?

02:56   21         MR. STEFFES:  Right now -- again, I know there's

02:56   22  digital streaming that people are doing via Viasat and other

02:56   23  services, but for traditional television carrier services,

02:56   24  it's on the order of 50.  It's not a huge number.  And most

02:57   25  of those are in geostationary orbits.  But, you know, we're

02:57   1   in a state right now of changes of technology, so everything

02:57   2   you say changes.

02:57   3           Now, again, the capacity of the transponders on

02:57   4   these spacecraft typically will range, you know, depending

02:57   5   on what you're trying to carry.  If you're carrying kind of

02:57   6   digitized video signals -- again, they're analog signals,

02:57   7   but they're carrying a digital form of video -- they'll

02:57   8   typically be able to handle, you know, maybe four --

02:57   9   anywhere between three and six carriers on each transponder

02:57   10  for each -- four or six signals on each transponder.  But if

02:57   11  you want to use, you know, 4K super high definition, you're

02:57   12  going to have smaller capacity.

02:57   13          Now, let's go back to the concepts in the clouds.

02:58   14  The first term -- and these are very similar to what Dr. Akl

02:58   15  discussed, the term "transponder channel" and "transponder

02:58   16  signal."  They are very similar, but they, you know, refer

02:58   17  to different concepts.  Again, the transponder channel is,

02:58   18  you know, the width, if you will, the entire bandwidth that

02:58   19  a transponder is capable of retransmitting.  And that

02:58   20  channel, you know, again, could have one or more signals in

02:58   21  it.  It can have some non-signal components.  It can have

02:58   22  noise in it.  There are just different things that can be

02:58   23  part of that.

02:58   24          The transponder signal, of course, is the

02:58   25  information that's encoded onto the radio frequency carrier.

02:58  1   That information encoded onto that carrier, that's what the

02:59  2   transponder signal is.  You know, to use another analogy, a

02:59  3   transponder channel is more like the glass that you see

02:59  4   there, and the transponder signal is the water in the glass.

02:59  5   So the channel is literally like a channel in an ocean or in

02:59  6   an inlet.  It's the width of the spectrum in which you can

02:59  7   send information.  Whereas, the information itself, which

02:59  8   is, you know, in this case the transponder signal, is a

02:59  9   different concept.

02:59  10          THE COURT:  So the transponder channel may be a --

02:59  11  would a better analogy be a pipe?

02:59  12          MR. STEFFES:  Correct.  A pipe is a terrific

02:59  13  parallel.

02:59  14          THE COURT:  Got it.  Okay.

02:59  15          MR. STEFFES:  So next on the list here we want to

03:00  16  talk about the term "satellite broadband signal."  You know,

03:00  17  as we mentioned, there are multiple transponders on a

03:00  18  satellite.  So when their signals are coming down, you know,

03:00  19  the devices -- or, you know, each transponder will have a

03:00  20  transponder signal, but that signal might include multiple

03:00  21  video programs in it, and the satellite can contain, you

03:00  22  know, dozens of transponders.  So the satellite, you know,

03:00  23  can be transmitting dozens of transponder signals

03:00  24  simultaneously.  But on the ground, the dish receives

03:00  25  signals from multiple satellites possibly and certainly

03:00   1   multiple polarizations and multiple transponders.  So that

03:00   2   means the dish is receiving lots of different transponder

03:00   3   signals coming from one or more satellites.

03:00   4         So constantly referring to the signals received as

03:01   5   multiple transponder signals from one or more satellites is

03:01   6   kind of clunky, so instead we use the term "satellite

03:01   7   broadband signal."  That refers to the aggregate of all the

03:01   8   transponder signals that are received coming down and being

03:01   9   carried by the multiple transponder channels.

03:01   10   And last but not least is the term "radio

03:01   11   frequency signal."  As you can see, similar to Dr. Akl's

03:01   12   evaluation, you know, the radio frequency signal is a

03:01   13   sinusoidal electromagnetic wave at a given frequency, and

03:01   14   then modulation of information onto that electromagnetic

03:01   15   wave is imparted using modulation.

03:02   16   So, you know, at the center of the uplink

03:02   17   channel -- or I should say the uplink signal -- sorry, at

03:02   18   the center of the transponder signal, there is a center

03:02   19   frequency which corresponds to this sinusoid, and then the

03:02   20   RF signals exist in a portion of the electronic spectrum

03:02   21   called the radio spectrum.

03:02   22   So, you know, even though they may be carrying

03:02   23   digital signals, they are in fact analog.  They're

03:02   24   continuous in time.  They're not digitized, or they're not

03:02   25   discrete.  Digital signals, you know, are 1's and zeroes as

03:02  1    was shown, and the digital signal would have so many

03:02  2    spectral components that it would not be directly

03:02  3    transmissible through any sort of wireless system.

03:03  4         Last but not least is something that all of us

03:03  5    old-timers understand, and that's the concept of a

03:03  6    television channel.  The television channel is, you know,

03:03  7    the easiest to understand.  It's just really a colloquial

03:03  8    definition that refers to a programming source.  So again,

03:03  9    you know, I like ESPN.  That's my favorite channel.  Well,

03:03  10   the term "television channel" is a colloquialism.  It's not

03:03  11   referring to the specific spectral location.  It's just the

03:03  12   idea or the -- back in the old days, you know, you would

03:03  13   tune the knob, and you would select the channel which

03:03  14   corresponded to the programming you wanted to see.  A

03:03  15   transponder channel is much different than a television

03:03  16   channel.

03:03  17        Now, one thing about the background I wanted to

03:03  18   mention about the signal-combining patents is that the two

03:04  19   patents, the '576 and '715 -- again, they share the

03:04  20   specification.  The two patents, you know, are discussing

03:04  21   combining signals and carrying them over a single cable.

03:04  22   Now, prior art does exist for that information, and it's in

03:04  23   the background section of those patents.  It was also

03:04  24   addressed by Dr. Akl.  So there is significant prior art to

03:04  25   the concept of combining signals and carrying them over a

03:04   1    single cable.

03:04   2            With regard to the '576 Patent, I think it's

03:04   3    important to remember that it was just -- everyone knows

03:04   4    that there was a re-exam and that there were new claims on

03:04   5    that patent that were defined in 2009.

03:05   6            I'll start with discussing the '576 Patent, and

03:05   7    specifically, you know, the '576 Patent claim is one

03:05   8    approach for a single cable solution.  It's not the only

03:05   9    one.  You know, I showed claim 14 here.  The idea is that it

03:05   10   is -- it's one approach.  It's not necessarily the only

03:05   11   way that -- I mean, there have been lots and lots of

03:05   12   approaches for multiplexing.

03:05   13           Now, one thing I will mention is that the '576

03:05   14   Patent discusses distributing a collection of signals

03:05   15   received at the outdoor unit.  You know, you get all of

03:05   16   those -- that collection, that broadband set of signals, and

03:05   17   you send them to one of the cable set-top boxes -- or I

03:05   18   shouldn't say cable -- the satellite set-top boxes through a

03:06   19   cable.  As you can see here in the image in red, there are

03:06   20   many ways to transmit signals over a cable in various prior

03:06   21   art.  The approach, again, by '576 is just one example of

03:06   22   how to do that.

03:06   23           THE COURT:  Your slides 34 and 35, this is prior

03:06   24   art technology that's depicted, correct?

03:06   25           MR. STEFFES:  Well, these pictures are actually

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

03:06  1    from the patent itself.  This is --

03:06  2            THE COURT:  Right, but aren't they prior art?  The

03:06  3    patent admits --

03:06  4            MR. STEFFES:  Yes.

03:06  5            THE COURT:  -- concedes that this is prior

03:06  6    technology listed in its Fig. 2, correct?

03:06  7            MR. STEFFES:  Correct.  So, you know, again, the

03:06  8    main issue is just to remind that this is not a breakthrough

03:06  9    that is the only solution for an unknown problem.

03:07  10           Now, of course in Claim 14, we discuss that when

03:07  11   the transponder requests access to a channel, the outdoor

03:07  12   unit uses the request to select the transponder signals so

03:07  13   that it can, you know, distribute the requested transponder

03:07  14   signal downstream to the set-top boxes.  And the portion of

03:07  15   the '576 Patent's teachings which selected signals for

03:07  16   distribution based on requests from set-top boxes was known

03:07  17   in the art.  You know, the idea of boxes requesting access,

03:07  18   that was known in previous art.

03:07  19           Now, the other comment I will make, though, is

03:07  20   that since '576 focuses on a digital representation, we need

03:08  21   to just quickly review, which I know we've already discussed

03:08  22   this with the previous presenter, the idea of converting

03:08  23   analog to digital.  It's a very, very straightforward

03:08  24   process.  As you can see here, it's simply a matter of

03:08  25   sampling the continuous time or the analog signal and then

03:08  1  representing the value as a string of bits.  It could be

03:08  2  8-bit quantization or 16 bits or whatever, but the idea is

03:08  3  that the A to D converter is a key aspect of the '576

03:08  4  Patent.

03:08  5       Again, signal extraction is also one of the most,

03:08  6  you know, important aspects of this patent, extracting the

03:08  7  signal so that they can be combined.  You know, that is

03:08  8  very, very common.  Signal extraction is a long-standing

03:09  9  technology.  We're not talking about something that's new

03:09  10  that -- nearly every communication system has some kind of

03:09  11  circuitry designed to hone in on a particular signal and

03:09  12  extract the noise or the fluctuations so as to provide a

03:09  13  good signal.

03:09  14       In the analog domain, I personally worked on many

03:09  15  signal extraction schemes back in the 90's and in the '80's,

03:09  16  when we were developing an analog network for the National

03:09  17  Technological University.  And then with the NASA Acts

03:09  18  Satellite, we did it in the digital domain.  We actually

03:09  19  were able to sample at very high data rates even in the 90's

03:09  20  these signals and were able to extract them.  We were able

03:09  21  to do that quite successfully.  We had some great technology

03:09  22  provided to us by L-3 Communications, an analog devices

03:09  23  corporation, to make that work.

03:10  24       So the '576 Patent does use similar principles to

03:10  25  extract similar components.  You know, the individual

03:10   1    channels -- the extraction of the individual transponder

03:10   2    signals is, you know, done in the same way as described in

03:10   3    the '576 Patent.

03:10   4          Now, in the last step of the '576 claims, the

03:10   5    composite signal, which is formed by mixing and matching

03:10   6    different transponder signals to form this single cable --

03:10   7    or this single output, you know, the step that specifies

03:10   8    that the modulation -- it says:  "The modulation of the

03:10   9    original transponder signal is not altered throughout the

03:10  10    signal selection combining and transmitting process."  This

03:10  11    was already understood.  This was something that we had done

03:11  12    regularly when implementing signal processing and signal

03:11  13    retrieval techniques.

03:11  14          So I just wanted to make it clear that in 14[d]

03:11  15    when we're talking about and "not altered by the steps of

03:11  16    selecting, combining, and transmitting," this is very, very

03:11  17    common in order to maintain compatibility with preexisting

03:11  18    hardware.

03:11  19          So the summary for the '576 Patent that you see

03:11  20    here -- you know, again, the transponder requests a

03:11  21    particular transponder signal.  The extracted signal is then

03:11  22    brought up from a digitized broadband signal, and it

03:11  23    combines multiple transponder signals into a composite and

03:11  24    then transmits the composite to the set-top box or the IRD

03:12  25    through the single cable.

03:12   1          THE COURT:  Hold on one second.  Let me make sure

03:12   2   I understand slide 40.

03:12   3          Now, you've got your written summary of the '576

03:12   4   Patent, and you've depicted it through using Fig. 2 from the

03:12   5   '576 Patent, correct?

03:12   6          MR. STEFFES:  That's correct.

03:12   7          THE COURT:  But I'd wager that plaintiff does not

03:12   8   concur with this summary and, in particular, its depiction

03:12   9   of what the '576 Patent claims -- or its claims claim

03:12  10   through Fig. 2 because that's prior art, correct?

03:13  11          MR. STEFFES:  I think I misstated earlier.  Fig. 2

03:13  12   is used to describe the invention.

03:13  13          THE COURT:  Oh, did you make a mistake?  Fig. 2 is

03:13  14   not prior art?

03:13  15          MR. STEFFES:  Right.  No, it is not.  It is part

03:13  16   of the invention.

03:13  17          THE COURT:  I'll have that question for the

03:13  18   plaintiff, but we'll wait.  Okay.

03:13  19          MR. STEFFES:  Okay.

03:13  20          THE COURT:  Okay.  So defendants' position is Fig.

03:13  21   2 does not depict the state of the prior art that's the core

03:13  22   of the '576 Patent?

03:13  23          MR. STEFFES:  Yes, that's correct.

03:13  24          THE COURT:  Okay.  That's defendants' position.

03:13  25   All right.  Thank you.  Okay, I understand up through slide

03:13    1    40.

03:13    2              MR. STEFFES:  Okay.  Well, we'll now switch to the

03:13    3    '715 Patent which is very similar to the '576.  It was

03:13    4    issued about the same time as the reexamined '576 claims

03:13    5    were released in 2009.

03:14    6              You know, I'll discuss one approach of the '715

03:14    7    Patent which is included in Claim 9, and that is involving

03:14    8    the gateway.  The claims in this patent, of course, are

03:14    9    similar to the claims in the '576 Patent, except it adds the

03:14   10    gateway to control downstream flow of television programming

03:14   11    to the set-top boxes, so that's the big step in the '715.

03:14   12              Now, unlike the '576 claims, the outdoor units in

03:14   13    the '715 selects transponder signals based on information

03:14   14    received externally, so the information is provided to the

03:14   15    ODU via a gateway rather than directly from the IRDs or the

03:14   16    set-top boxes.

03:14   17              THE COURT:  I didn't understand.  Say that again,

03:15   18    please.

03:15   19              MR. STEFFES:  Well, when the outdoor unit is

03:15   20    trying to decide which combination of signals to deliver,

03:15   21    it's not getting that information from the set-top boxes.

03:15   22    Instead, it's getting that information from the gateway.

03:15   23    That gateway is what is actually sending to the outdoor unit

03:15   24    the requests, so it's handling that, if you will.

03:15   25              THE COURT:  So there's information passing both

03:15   1   ways as between the controller, reference number 250, and

03:15   2   gateway 230, correct?

03:15   3           MR. STEFFES:  That's correct.

03:15   4           THE COURT:  Okay.  Got it.

03:15   5           MR. STEFFES:  Now, another aspect to this Claim 9

03:15   6   illustration, we're just -- to draw a little bit of a

03:16   7   difference, you know, unlike the '576 Patent, the '715

03:16   8   patent discusses forming a composite signal in the analog

03:16   9   domain.  Remember, in the '576, it was all in the digital

03:16   10  domain, and that was of course driven by the modification of

03:16   11  the claims after reexamination.

03:16   12          So in this patent, there is a difference in that

03:16   13  analog signal combination is one of the aspects of the

03:16   14  claim.  And I just wanted to make it clear that, you know,

03:16   15  this is a commonly used process in many modern systems.

03:16   16  Even though many have moved to the digital domain, combining

03:16   17  frequency, combining in the analog domain, is still present.

03:16   18          Another aspect is that the portion of the claim --

03:17   19  this is 9E -- specifies certain functionality of the

03:17   20  gateway, which as claimed includes decoding specific

03:17   21  programs and distributing the programs over a local area

03:17   22  network to the set-top boxes.  But again, I'm confused here

03:17   23  because in my 40 years I understand that the signals, not

03:17   24  the programs, are what get decoded.  So I'm not quite sure

03:17   25  why you'd pass a program to the set-top boxes and then have

03:17  1    them decoded.  I'm having a little trouble with the wording

03:17  2    on this.  I just want to make that statement.

03:17  3            THE COURT:  Hold on a second.  So we have the

03:18  4    glossary that you provided, and you talked about it had five

03:18  5    different terms.  I don't see program within the glossary.

03:18  6    Is that kind of what you're saying?  It's a little unclear

03:18  7    what program means?

03:18  8            MR. STEFFES:  Correct.

03:18  9            THE COURT:  Whether it's a television program or

03:18  10   whether it's something else?

03:18  11           MR. STEFFES:  Yes.

03:18  12           THE COURT:  Some sort of composite signal or who

03:18  13   knows what?  Is that kind of where you're coming from?

03:18  14           MR. STEFFES:  Right.  Yes, sir.

03:18  15           THE COURT:  Okay.  Got it.

03:18  16           MR. STEFFES:  So the summary of the '715 Patent

03:18  17   from my point of view, of course, is that it uses a gateway

03:18  18   as an intermediary between the outdoor unit and the tuners

03:18  19   or the IRDs, the set-top boxes.  It creates a composite

03:18  20   signal in the analog domain from frequency translation, and

03:19  21   then uses the gateway to decode the composite signal and

03:19  22   send programming to the STBs in a digital format.

03:19  23           THE COURT:  And this whole -- all of these

03:19  24   processes take place in the analog domain.  That's what the

03:19  25   '715 Patent deals with exclusively.  Is that what you're

03:19  1  saying?

03:19  2          MR. STEFFES:  Well, no.  Certainly the

03:19  3  transmission from the gateway to the set-top boxes is done

03:19  4  digitally in this case.  At least it's articulated as being

03:19  5  done digitally.

03:19  6          THE COURT:  Okay.  But as between the controller

03:19  7  and the gateway, that's all analog.

03:19  8          MR. STEFFES:  That's my reading, yes.

03:19  9          THE COURT:  Okay.

03:19  10          MR. STEFFES:  Your Honor, I really appreciate your

03:19  11  patience, and we'd be happy to answer any additional

03:19  12  questions.

03:19  13          THE COURT:  No, thank you.  We've got to come back

03:19  14  to Course 1 and Course 6.  What did you do at MIT?  Forgive

03:20  15  me for not knowing more about your background.  I haven't

03:20  16  deeply delved into the claim construction briefing yet.

03:20  17          MR. STEFFES:  I did a Bachelor's and Master's

03:20  18  there in radio science in Course 6, which was electrical

03:20  19  engineering and computer science, and David Staelin was my

03:20  20  mentor, a terrific person.

03:20  21          THE COURT:  What year?  Undergrad?

03:20  22          MR. STEFFES:  '76, '77, so I'm a very fortunate

03:20  23  person.

03:20  24          THE COURT:  Okay.  No, I don't have any more

03:20  25  questions about the technology.  Thank you very much.

03:20   1              And I want to make sure I pronounce your name

03:20   2   right.  I was kind of stumbling through it.  Steffes?

03:20   3              MR. STEFFES:  Right.

03:20   4              THE COURT:  Dr. Steffes, thank you very much.

03:20   5              MR. STEFFES:  Thank you very much.

03:20   6              THE COURT:  I enjoyed it, and I appreciate it.

03:20   7              Okay, back to the plaintiff, I don't know if

03:20   8   Dr. Akl wants to respond or counsel, how you want to do

03:20   9   this.  I don't know if you have anything you want to in the

03:21   10  context of the tutorial sort of take issue with or respond

03:21   11  to a question that I posed to defendants or to Dr. Steffes.

03:21   12             MR. ENGEL:  Your Honor, I think we have a couple

03:21   13  of points that will involve first attorney argument and then

03:21   14  perhaps a response from Dr. Akl.  Do you care if we go in

03:21   15  reverse order?

03:21   16             THE COURT:  Oh, I don't care what order you go in

03:21   17  as long as it's understandable.

03:21   18             MR. ENGEL:  Sure.  On the '576 and '715, Your

03:21   19  Honor, I think we have a couple of rebuttal points.  I think

03:21   20  the most notable one is for the '576.  If you go to the

03:21   21  description of the drawings --

03:21   22             THE COURT:  Should I look at your PowerPoint or

03:21   23  defendants' PowerPoint?

03:21   24             MR. ENGEL:  If the document camera works, we can

03:22   25  look at that.

86

03:22    1                THE COURT:  Was the answer defendants' PowerPoint?

03:22    2                MR. ENGEL:  I don't think it's going to be either

03:22    3    of them.  It's going to be the patent itself.

03:22    4                THE COURT:  Oh, the patent, okay.  Well, I've got

03:22    5    that.

03:22    6                MR. ENGEL:  Okay.

03:22    7                THE COURT:  Tell me what to look at.

03:22    8                MR. ENGEL:  Sure.  If we go to Col. 3 --

03:22    9                THE COURT:  So '576, Col. 3.

03:22   10                MR. ENGEL:  Correct.  If you go down to line 45,

03:22   11    which is a brief description of the drawings, it describes

03:22   12    Fig. 1.  It shows a prior art configuration of a satellite

03:22   13    TV installation.  So Fig. 1 is the prior art figure, and

03:22   14    that was the one with the multiple cables.

03:22   15                THE COURT:  Bottom line, Fig. 2 is not prior art?

03:22   16                MR. ENGEL:  Fig. 2 is not prior art.

03:22   17                THE COURT:  Got it.  I understand your position.

03:22   18                MR. ENGEL:  Dr. Steffes admitted that.

03:22   19                We did hear some argument on the '715, which I

03:22   20    think delved somewhat into the indefiniteness arguments

03:23   21    surrounding specific programs, but I'll just point out for

03:23   22    the Court that that --

03:23   23                THE COURT:  Was that the '576?

03:23   24                MR. ENGEL:  That was the '715.

03:23   25                THE COURT:  '715, okay.

03:23  1          MR. ENGEL:  So in the '715 -- this was on our

03:23  2    slides, and it's also an excerpt from the patent itself, but

03:23  3    if you go to slide 34 of our presentation, there's an

03:23  4    excerpt from Col. 9, lines 44 to 48, of the '715 Patent

03:23  5    where it's talking about the gateway decoding specific

03:23  6    programs.  So that is in the specification.  It's not

03:23  7    something that just appears in the claims out of nowhere.  I

03:23  8    think if you look at the briefing and specifically our

03:23  9    reference to Dr. Steffes's deposition, he essentially

03:23  10   admitted he understood exactly what was said there.

03:24  11         THE COURT:  Well, this may be a little bit beyond

03:24  12   the tutorial, but it's plaintiff's position that programs as

03:24  13   used in the claims of '715 relies on this quoted language

03:24  14   from the specification, which also uses the word "program"

03:24  15   or "programs."  And bottom line is it refers to a TV

03:24  16   program, ESPN Sports Center.

03:24  17         MR. ENGEL:  Yes, Your Honor, there are --

03:24  18         THE COURT:  And the point is it's talking about

03:24  19   packaging it in packetized MPEG.

03:24  20         MR. ENGEL:  That's correct.  There has been

03:24  21   content that was selected and put on the composite signal.

03:24  22   When that's received at the gateway, the gateway is

03:24  23   responsible for decoding specific programs as requested by

03:24  24   the set-top boxes and sending those over the network.

03:25  25         THE COURT:  In this particular way.

03:25  1            MR. ENGEL:  I think the specification says

03:25  2    packetized MPEG.  The claims don't require a specific format

03:25  3    for how it's sent over the LAN.

03:25  4            THE COURT:  Okay.  Well, thank you.  We'll get

03:25  5    into that more at the appropriate time.

03:25  6            MR. ENGEL:  The only other comment that I had is

03:25  7    we heard a discussion that the analog domain is what the

03:25  8    '715 is specific to.  I'll just point out that Fig. 17 of

03:25  9    the '715 is an example of frequency translation in the

03:25 10    digital domain.  So if you look at Fig. 17 of the '715, it

03:25 11    contradicts the assumption that Dr. Steffes made about it

03:25 12    being limited entirely to the analog domain.

03:25 13            That's all I have on the '576 and the '715.

03:25 14            THE COURT:  Hold on.  Let me make sure I

03:25 15    understand that.

03:25 16            MR. ENGEL:  Sure.

03:25 17            THE COURT:  So help me put Fig. 17 of the '715

03:26 18    Patent in context.  What am I looking at here?

03:26 19            MR. ENGEL:  Sure.  Fig. 17 is an example of

03:26 20    frequency translation.  So if you see the actual title

03:26 21    that's listed with Fig. 17, it says "Digital frequency

03:26 22    translator and filter with summer."  And when Dr. Steffes

03:26 23    was talking about frequency translation, he was saying that

03:26 24    the '715 is limited to the analog domain for the frequency

03:26 25    translation element.  This is pointing out that there are

03:26   1   analog and digital examples of doing frequency translation.

03:26   2   So I think saying that the '715 is limited to the analog

03:26   3   domain is -- we would disagree with that, Your Honor.

03:26   4            THE COURT:  So if we look at Fig. 2 of the '715

03:26   5   Patent, I understood Dr. Steffes to say that the

03:27   6   communication between the controller, reference number 250,

03:27   7   and the gateway -- it's not labeled here in Fig. 2, but I

03:27   8   think it's reference number 230 -- that communication

03:27   9   happening along pathway 220 I understood him to say is

03:27  10   analog only.

03:27  11            Are you telling me that you don't agree with that

03:27  12   characterization or that position?

03:27  13            MR. ENGEL:  That is an analog signal because it's

03:27  14   coaxial cable, so I agree with that.  But inside of the

03:27  15   signal selector and combiner -- you know, Fig. 2 does have a

03:27  16   signal selector and combiner.  Fig. 11 is probably the one

03:27  17   that's more germane to the '715 claims, but inside of that

03:27  18   signal selector and combiner in the digital domain, you can

03:27  19   do frequency translation, which is what is shown in Fig. 17.

03:27  20            THE COURT:  So I understand you to be saying now

03:27  21   that to the extent that Dr. Steffes left me with the

03:27  22   impression that the '715 Patent deals only with analog

03:28  23   signals, that is incorrect.  The '715 Patent also deals with

03:28  24   digital signals because, for example, within the controller

03:28  25   signals are digitized and undigitized.

03:28  1          MR. ENGEL:  Yes, they can be digitized in the

03:28  2    outdoor unit portion.  I think all parties agree that the

03:28  3    transmission from the outdoor unit to the indoor unit over

03:28  4    the coaxial cable is an analog transmission.

03:28  5          THE COURT:  Okay.  Got it.  Thank you.  That's

03:28  6    '576 and '715.  Is somebody going to talk to me about '008?

03:28  7          MR. ENGEL:  I'll turn it over to my colleague, Mr.

03:28  8    Shimota.

03:28  9          MR. SHIMOTA:  Very briefly, Your Honor.  I don't

03:28  10   think this is really a rebuttal, but it's just more of a

03:28  11   clarification.  If you could turn to slide 20 of our

03:28  12   presentation.

03:29  13          THE COURT:  I'm there.

03:29  14          MR. SHIMOTA:  You had questions for both Dr. Akl

03:29  15   and Dr. Steffes regarding the output of the channelizer 152.

03:29  16   I think, if you recall, you were discussing with Dr. Akl the

03:29  17   fact that you had the 16 channels and you might have one --

03:29  18   you know, it might be rotating.  You have Channel 16 and 1

03:29  19   through 15.

03:29  20          If I could just direct your attention to Col. 4,

03:29  21   line 39 to 51, of the '008 Patent.

03:29  22          THE COURT:  Wait for a second, please.

03:29  23          MR. SHIMOTA:  Yes, absolutely, Your Honor.

03:29  24          THE COURT:  Col. 4.  Which lines?

03:29  25          MR. SHIMOTA:  It's line 39 -- excuse me.  It's 50.

03:29   1   My eyes are bad.

03:29   2          THE COURT:  So which lines?

03:29   3          MR. SHIMOTA:  It's Col. 4, lines 39 through 50.

03:29   4          THE COURT:  I'm there.

03:29   5          MR. SHIMOTA:  If you read there -- I can just read

03:29   6   it all for the record.

03:29   7          THE COURT:  No, don't do that.

03:29   8          MR. SHIMOTA:  Okay.  Fair enough.  What it says

03:29   9   there is that the channelizer can output the entire

03:30   10  bandwidth of the signal or a part of it.  What it says is

03:30   11  that you can be doing that concurrently, and the output can

03:30   12  be both to the monitoring module and the data processing

03:30   13  unit.  So the point there is that you can be doing less, but

03:30   14  clearly what the patent is describing is that if you're

03:30   15  providing the entire signal to both the monitoring module

03:30   16  and the data processing module concurrently, you're

03:30   17  replicating the signal.  That was the only point of

03:30   18  clarification.  It's not a dispute with Dr. Steffes.

03:30   19          THE COURT:  Okay.  To the extent that that's

03:30   20  disputed, I'll take that up with you at the appropriate

03:30   21  time.

03:30   22          MR. SHIMOTA:  Okay.  Thank you, Your Honor.

03:30   23          THE COURT:  Thank you for explaining your

03:30   24  position.

03:30   25          MR. SHIMOTA:  Thank you.

| | | |
|---|---|---|
| 03:30 | 1 | THE COURT:  So that's it in rebuttal? |
| 03:30 | 2 | MR. SHIMOTA:  It is, Your Honor. |
| 03:30 | 3 | THE COURT:  Any surrebuttal response to those |
| 03:30 | 4 | points? |
| 03:30 | 5 | MR. BERNSTEIN:  No.  I mean, Dr. Steffes pointed |
| 03:30 | 6 | out that he made a mistake with respect to Fig. 2, so -- |
| 03:30 | 7 | THE COURT:  Yes, I got it, and I appreciate that. |
| 03:31 | 8 | Okay, counsel, thank you very much.  I thoroughly |
| 03:31 | 9 | enjoyed it.  I'm not sure everybody else did, but I |
| 03:31 | 10 | certainly did, and I learned a lot.  I appreciate the time |
| 03:31 | 11 | that you have spent and the resources that you've expended |
| 03:31 | 12 | in preparing this for me.  Thank you very much for doing |
| 03:31 | 13 | that and coming here. |
| 03:31 | 14 | Anything else we need to accomplish today? |
| 03:31 | 15 | Plaintiff? |
| 03:31 | 16 | MR. SHIMOTA:  Nothing from us, Your Honor. |
| 03:31 | 17 | THE COURT:  Okay. |
| 03:31 | 18 | Defendants? |
| 03:31 | 19 | MR. BERNSTEIN:  Nothing from -- |
| 03:31 | 20 | MR. SHIMOTA:  Oh, I apologize. |
| 03:31 | 21 | THE COURT:  Hold on one second.  Let's go back to |
| 03:31 | 22 | Mr. Shimota. |
| 03:31 | 23 | MR. SHIMOTA:  Sorry.  Yes, we just today -- this |
| 03:31 | 24 | is from the prior hearing.  You had a question -- there was |
| 03:31 | 25 | an outstanding issue as to whether or not all the parties |

| 03:31 | 1 | had approved Mr. Kaiser as a Special Master. |

03:31  1     had approved Mr. Kaiser as a Special Master.

03:31  2              THE COURT:  Oh, yes.  Thank you for reminding me.

03:31  3              MR. SHIMOTA:  We just handled that today.  So he's

03:31  4     approved in all the cases, and we'll submit the paperwork so

03:31  5     that he can formally be appointed in this matter.

03:32  6              THE COURT:  Good.  I look forward to doing that

03:32  7     and getting that order issued in all the cases.

03:32  8              MR. SHIMOTA:  Okay.

03:32  9              THE COURT:  Thank you.

03:32  10             MR. SHIMOTA:  Thank you, Your Honor.

03:32  11             THE COURT:  Anything else from the plaintiff?

03:32  12             Hearing nothing, okay.

03:32  13             Anything from DIRECTV, AT&T?

03:32  14             MR. LO:  No.  Thank you, Your Honor.

03:32  15             THE COURT:  All right.  Counsel, Dr. Akl,

03:32  16    Dr. Steffes, thank you very much.  As I said, I appreciate

03:32  17    it.  Thanks for traveling here and doing this for me.  It

03:32  18    was very helpful.  I look forward to seeing you July 11 at

03:32  19    our next get together.

03:32  20             (Whereupon, the proceedings were concluded.)

03:32  21                        *    *    *

03:32  22

03:32  23

03:32  24

03:32  25

CERTIFICATE


          I hereby certify that pursuant to Section 753,

Title 28, United States Code, the foregoing is a true and

correct transcript of the stenographically reported

proceedings held in the above-entitled matter and that the

transcript page format is in conformance with the

regulations of the Judicial Conference of the United States.


Date:  July 5, 2023



                         /s/   Sharon A. Seffens  7/5/23
                         _____
                         SHARON A. SEFFENS, U.S. COURT REPORTER