UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE JOHN W. HOLCOMB, JUDGE PRESIDING

ENTROPIC COMMUNICATIONS,    ) CERTIFIED TRANSCRIPT
LLC,                        )
                Plaintiff,  )
     vs.                    )
                            )  LACV-22-07775-JWH
DIRECTV, LLC, et al.,       )
                Defendants. )
--------------------------)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

July 11, 2023

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(612) 804-8655

2

1   APPEARANCES OF COUNSEL:

2   For the Plaintiff:

3   JAMES A. SHIMOTA
    NATHAN J. FULLER
4   K&L GATES, LLP
    70 West Madison Street, Suite 3100
5   Chicago, IL  60602
    (312) 807-4299
6
    JASON A. ENGEL
7   K&L GATES, LLP
    70 West Monroe Street, Suite 3100
8   Chicago, IL  60602
    (312) 807-4236
9
    KENNETH H. BRIDGES
10  KIRKLAND ELLIS, LLP
    555 California Street, 27th Floor
11  San Francisco, CA  94104
    (650) 681-4484
12
    For the DISH Defendants:
13
    AMANDA TESSAR
14  TREVOR BERVIK
    PERKINS COIE, LLP
15  1900 Sixteenth Street, Suite 140
    Denver, Colorado  80202-5255
16  (303) 291-2300

17  ADAM G. HESTER
    PERKINS COIE, LLP
18  33 East Main Street, Suite 201
    Madison, WI  53703-3095
19  (650) 838-4311

20  For Defendants DIRECTV and AT&T:

21  JASON LO
    BENJAMIN HERSHKOWITZ
22  KATHERINE DOMINQUEZ
    GIBSON DUNN CRUTCHER, LLP
23  200 Park Avenue
    New York, NY  10166-0193
24  (212) 351-4000

25

10:01  1  SANTA ANA, CALIFORNIA; TUESDAY, JULY 11, 2023; 10:01 A.M.

10:01  2  THE CLERK:  Calling Item No. 1, LACV-22-07775-JWH,

10:01  3  Entropic Communications, LLC, versus DIRECTV, LLC, et al.

10:01  4  Counsel, would you please state your appearances

10:01  5  for the record beginning with plaintiff.

10:01  6  MR. SHIMOTA:  Good morning, Your Honor.  James

10:01  7  Shimota appearing on behalf of plaintiff Entropic.  I'm

10:01  8  joined by my colleague Nathan Fuller, and Jason Engel, and

10:01  9  there will also be my colleague Ken Bridges who will be

10:01  10  speaking on behalf of Entropic today as well.

10:01  11  THE COURT:  Okay.  So Mr. Bridges, Mr. Shimota,

10:01  12  Mr. Engel, and --

10:01  13  MR. SHIMOTA:  Mr. Fuller will be driving the

10:01  14  computer for us.

10:01  15  THE COURT:  Mr. Fuller.  Got it.  Okay.

10:02  16  MS. TESSAR:  Good morning, Your Honor.  Amanda

10:02  17  Tessar from Perkins Coie on behalf of the Dish defendants.

10:02  18  I have with me Trevor Bervik and Adam Hester, also at

10:02  19  Perkins Coie, and Jim Hanft, who is the in-house attorney

10:02  20  from Dish.

10:02  21  THE COURT:  Okay.  Counsel, good morning to all of

10:02  22  you.

10:02  23  MR. LO:  Good morning, Your Honor.  Jason Lo of

10:02  24  Gibson, Dunn & Crutcher on behalf of DIRECTV and AT&T.  With

10:02  25  me today are Ben Hershkowitz and Kate Dominguez, and also

10:02   1   present again this morning is Melinda Green from DIRECTV.

10:02   2           THE COURT:  Okay.  Good morning, counsel.  Good to

10:02   3   have all of you here.

10:02   4           All right, we're here for a Markman hearing.  I

10:02   5   assume all of you received my tentative.  I see nods all

10:02   6   around, so I'm going to take that as a yes.  The real

10:02   7   question is have you had enough time to look at it because

10:02   8   it is, what, 29 pages, something like that?

10:03   9           Entropic, have you had enough time?

10:03   10          MR. SHIMOTA:  Yes, we have, Your Honor.  We're

10:03   11  prepared to respond with any questions you have and address

10:03   12  it.

10:03   13          THE COURT:  Because if you haven't had enough time

10:03   14  to look at it, I'm happy to give you some more minutes, but

10:03   15  you're good?

10:03   16          MR. SHIMOTA:  We are, Your Honor.  Thank you.

10:03   17          THE COURT:  Ms. Tessar.

10:03   18          MS. TESSAR:  We're ready to proceed.

10:03   19          MR. HERSHKOWITZ:  Your Honor, Dish and AT&T are

10:03   20  ready, too.  Thank you.

10:03   21          THE COURT:  Okay.  Good.  I wish I got it out to

10:03   22  you quicker, but it was a lot to go through.  I will say

10:03   23  what I always say when I have tentatives.  I think you've

10:03   24  heard this before.  It is truly a tentative.  If I had

10:03   25  finally made a decision on these issues, we wouldn't be

5

| | |
|---|---|
| 10:03 | 1 |
| 10:03 | 2 |
| 10:03 | 3 |
| 10:03 | 4 |
| 10:04 | 5 |
| 10:04 | 6 |

10:03    1    here.  I wouldn't waste your time and your client's money to

10:03    2    bring you in for a needless hearing.  So please feel free to

10:03    3    push back respectfully and tell me where -- what's wrong,

10:03    4    where I've misunderstood, where I've gotten the law wrong,

10:04    5    where I've misunderstood your arguments, please, because I

10:04    6    want to get it right.

10:04    7            Okay, I would like to wrap this up by noon, this

10:04    8    hearing, so I'm thinking start with Entropic and go about 45

10:04    9    minutes and then turn it over to defendants.  I'm not sure

10:04   10    how you want to argue these issues, but perhaps 45 minutes

10:04   11    for you collectively.  Does that work?

10:04   12            MR. HERSHKOWITZ:  Your Honor, that should work on

10:04   13    behalf of DIRECTV and the AT&T defendants.  Just one

10:04   14    question.  Are you planning on going term by term, or is it

10:04   15    your thought to have them go and we go or vice-versa?

10:04   16            THE COURT:  I'm saying all them and then all you.

10:04   17            MR. HERSHKOWITZ:  That's fine by us.

10:04   18            MS. TESSAR:  I would suggest it might be easier

10:04   19    for the Court to follow if we complete one term before

10:04   20    moving on to the next but whatever you prefer.

10:05   21            THE COURT:  I fear it's going to go too long if we

10:05   22    do it that way.  Let's try it all them and then all you, and

10:05   23    if it's just going to be a mess, then we'll reassess.

10:05   24            MS. TESSAR:  Thank you.

10:05   25            THE COURT:  Okay.  So let's not waste anymore

10:05   1   time.  On behalf of Entropic, start wherever you want.

10:05   2   There are a couple of indefinites there that you're probably

10:05   3   not going to like but start wherever you want.

10:05   4              MR. SHIMOTA:  That will be my colleague in one

10:05   5   second.  Your Honor, our intention would be to proceed

10:05   6   through your opinion term by term for our order.  Some of

10:05   7   them we obviously agree with, so we won't have a lot to say

10:05   8   in the first instance.  Others -- I agree on the

10:05   9   indefiniteness one we certainly do have plenty to say.

10:05   10             THE COURT:  Okay.  Well, I'm listening.  Go for

10:05   11  it.

10:05   12             MR. SHIMOTA:  Okay.  Thank you.

10:05   13             MR. ENGEL:  It's Jason Engel again, Your Honor, on

10:05   14  behalf of Entropic.  I'm going to be addressing the first

10:06   15  two terms starting with Slide 5, please.  The first one is

10:06   16  "digitizing the plurality of satellite broadband signals."

10:06   17  Entropic agrees with the Court's tentative construction on

10:06   18  that, so rather than argue why that's correct, can we

10:06   19  reserve rebuttal time to address if necessary?

10:06   20             THE COURT:  Yes.

10:06   21             MR. ENGEL:  Okay.  The second topic that I was

10:06   22  going to address is the integrated receiver decoder or IRD,

10:06   23  which is Slide 10.  Again, Entropic agrees with the Court's

10:06   24  tentative construction on this, so we'll reserve on this one

10:06   25  to the extent there's argument from the defendants.

| | | |
|---|---|---|
| 10:06 | 1 | THE COURT:  Okay.  So I received late yesterday |
| 10:06 | 2 | the second amended joint claim construction chart where I |
| 10:06 | 3 | think Entropic updated Entropic's proposed constructions on |
| 10:07 | 4 | a couple of these limitations.  These first few may have |
| 10:07 | 5 | been among those. |
| 10:07 | 6 | MR. ENGEL:  Correct. |
| 10:07 | 7 | THE COURT:  I did my best to update the tentative |
| 10:07 | 8 | to reflect that, but it's possible I didn't get everything |
| 10:07 | 9 | updated, so let me know if there is something in the text of |
| 10:07 | 10 | the tentative that doesn't accurately reflect plaintiff's |
| 10:07 | 11 | position. |
| 10:07 | 12 | MR. ENGEL:  For those first two, I believe that |
| 10:07 | 13 | they are reflective.  Let me double-check. |
| 10:07 | 14 | THE COURT:  Well, we can come back to that. |
| 10:07 | 15 | MR. ENGEL:  Those both are reflected in there, and |
| 10:07 | 16 | we submitted that in an effort to try to narrow the |
| 10:07 | 17 | disputes. |
| 10:07 | 18 | THE COURT:  I appreciate that, but my point is I'm |
| 10:07 | 19 | not sure that those efforts which are appreciated as I said |
| 10:08 | 20 | are memorialized or reflected in the text of my tentative. |
| 10:08 | 21 | MR. ENGEL:  I think that they made it into the |
| 10:08 | 22 | table of terms, but perhaps the text doesn't fully reflect |
| 10:08 | 23 | that.  But again, for at least these first two, we are -- |
| 10:08 | 24 | THE COURT:  Bottom line, you're good? |
| 10:08 | 25 | MR. ENGEL:  We're good on those first two. |

8

| | | |
|---|---|---|
| 10:08 | 1 | THE COURT:  Okay.  Let's keep going. |
| 10:08 | 2 | MR. ENGEL:  All right.  I'm going to turn it over |
| 10:08 | 3 | to Mr. Bridges. |
| 10:08 | 4 | MR. BRIDGES:  Good morning, Your Honor. |
| 10:08 | 5 | THE COURT:  Good morning. |
| 10:08 | 6 | MR. BRIDGES:  Again, Kenneth Bridges on behalf of |
| 10:08 | 7 | the plaintiff Entropic.  I'm going to be addressing the set |
| 10:08 | 8 | of claims that are all related to the selected and extracted |
| 10:08 | 9 | transponder channels issue. |
| 10:08 | 10 | THE COURT:  Okay. |
| 10:08 | 11 | MR. BRIDGES:  And we've received Your Honor's |
| 10:08 | 12 | tentative on this.  And, of course, Your Honor will have |
| 10:08 | 13 | expected that a number of slides we prepared were prepared |
| 10:09 | 14 | before that, so if you'll bear with me, there may be some |
| 10:09 | 15 | things that are not entirely germane to the argument on |
| 10:09 | 16 | there, but I think we have the material we need.  I'll also |
| 10:09 | 17 | want to switch perhaps back and forth to the document camera |
| 10:09 | 18 | to Your Honor's tentative to take us to some places. |
| 10:09 | 19 | So the first thing I would like to do switching |
| 10:09 | 20 | over to the ruling is to just note at the top of page 19 |
| 10:09 | 21 | Your Honor is addressing our arguments regarding the |
| 10:09 | 22 | interchangeability of the terms.  And one thing that's very, |
| 10:09 | 23 | very important that I want to point out to the Court is that |
| 10:09 | 24 | the argument here is not that the terms "signals" and"" |
| 10:09 | 25 | channels" in the abstract are interchangeable in this |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:10 | 1 | context.  The argument is the claim terms "transponder |
| 10:10 | 2 | signal" and "transponder channel" are the items that are |
| 10:10 | 3 | interchangeable in the patent specification and in the |
| 10:10 | 4 | claims. |
| 10:10 | 5 | And that's a very important difference, because as |
| 10:10 | 6 | we move downward in the tentative ruling, Your Honor notes |
| 10:10 | 7 | that an awful lot of the specification sure does seem as |
| 10:10 | 8 | though transponder signals and transponder channels are |
| 10:10 | 9 | being treated interchangeably, but then we reach the |
| 10:10 | 10 | discussion at the bottom paragraph on page 19 of your |
| 10:10 | 11 | ruling:  "On the other hand, Claims 39 and 41 appear to |
| 10:10 | 12 | account for the differentiation between 'signals' and |
| 10:10 | 13 | 'channels.'"  What I want point out is that we're talking |
| 10:11 | 14 | about transponder signals and transponder channels, so it's |
| 10:11 | 15 | a different than signals and channels in the abstract, and |
| 10:11 | 16 | I'm going to illustrate that with Your Honor by walking |
| 10:11 | 17 | through Claims 39, 42, and the accompanying description. |
| 10:11 | 18 | Switching back, Nathan, if you could, would you go |
| 10:11 | 19 | ahead and proceed to Slide 19, please. |
| 10:11 | 20 | So here -- |
| 10:11 | 21 | THE COURT:  I should pause here.  These slides, |
| 10:11 | 22 | defendants have them, correct? |
| 10:11 | 23 | MR. BERNSTEIN:  Correct. |
| 10:11 | 24 | THE COURT:  Okay.  When did you get them? |
| 10:11 | 25 | MR. BERNSTEIN:  We received them this morning when |

10:11  1   we came into court, and we also provided them with a copy of

10:11  2   our slides this morning.

10:11  3            THE COURT:  Oh, okay.

10:11  4            MR. BERNSTEIN:  We are available to pass up our

10:11  5   slides to the Court now if it's helpful.  We brought extra

10:11  6   copies.

10:11  7            THE COURT:  When it's time.

10:11  8            MR. BERNSTEIN:  Fair enough.

10:11  9            THE COURT:  When it's your turn, we can do it

10:12  10  then.  And I think you should both probably lodge your

10:12  11  PowerPoint presentations after this hearing with the Court,

10:12  12  so they're a part of the docket.

10:12  13           MR. BRIDGES:  Absolutely, Your Honor.

10:12  14           THE COURT:  Okay, sorry to interrupt.

10:12  15           MR. BRIDGES:  Oh, no problem.

10:12  16           So on Slide 19, we see the first of the three of

10:12  17  the six dependent claims where the transponder channels are

10:12  18  at issue, and we've highlighted "transponder channel" where

10:12  19  there is the use of the past tense in the claims, which is

10:12  20  pretty important.  If you take a look at Claim 16, for

10:12  21  instance, Your Honor, you'll see in blue highlighting "the

10:12  22  selected and extracted transponder channels."

10:12  23           So the person of skill looking at this says

10:12  24  selected and extracted is past tense.  Let's see what that

10:12  25  refers to.  You go back to the independent claim, and if

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:12    1    you're working your way upward from the bottom, you will
10:12    2    find the blue highlighted section of the independent claim
10:13    3    combining "extracted selected transponder signals."  So,
10:13    4    again, past tense.  So you look up further, and finally in
10:13    5    the yellow, we see the gerund form for present, "selecting
10:13    6    and extracting a plurality of transponder signals."
10:13    7            So the structure of the claim language itself
10:13    8    gives you the traceability.  You can trace the transponder
10:13    9    signals to the transponder channels and vice-versa.  That's
10:13   10    just more of the same linkage that we've identified.  The
10:13   11    really crucial point I wanted to make here is notice that
10:13   12    the claims are very specific every time.  It's transponder
10:13   13    signal and transponder channel.
10:13   14            Why is that so important?  Well, if we go forward
10:13   15    to Slide 22, please, this is a figure.  It's Fig. 5 from the
10:13   16    patent that Your Honor has seen many times already.  The
10:14   17    transponder, Your Honor, is the atomic unit which the patent
10:14   18    transacts in.  If you take a look at Fig. 5, every one of
10:14   19    these signals or channels, all of them on the LNBs and each
10:14   20    one of the individual ones that is folded into the composite
10:14   21    signal, those are transponders.  Whether you call them
10:14   22    transponder signals or you call them transponder channels
10:14   23    doesn't matter to the patent, because for the patented
10:14   24    process steps, a frequency translating and combining, they
10:14   25    are in fact the same thing.  It is simply how the patent

10:14    1    works.

10:14    2            So if we could go forward to Slide 23.

10:14    3            THE COURT:  Hold on one second.  Please make that

10:15    4    last point again.

10:15    5            MR. BRIDGES:  Of course.

10:15    6            THE COURT:  You used the word "atomic."  What did

10:15    7    you mean by atomic?

10:15    8            MR. BRIDGES:  Well, what we're talking about, Your

10:15    9    Honor --

10:15   10            THE COURT:  You took me to nuclear science, and

10:15   11    this isn't nuclear science.

10:15   12            MR. BRIDGES:  It is the fundamental unit in which

10:15   13    the patent is dealing with moving signals around and

10:15   14    combining them.  Remember that what we're talking about

10:15   15    here --

10:15   16            THE COURT:  What's the "it"?

10:15   17            MR. BRIDGES:  I'm sorry?

10:15   18            THE COURT:  You used a pronoun "it."  "It is the

10:15   19    fundamental unit."  What's "it"?

10:15   20            MR. BRIDGES:  Oh, the transponder.

10:15   21            THE COURT:  The transponder.

10:15   22            MR. BRIDGES:  So transponders are the fundamental

10:15   23    unit.  Sometimes the patent calls those transponder signals.

10:15   24    Sometimes it calls them transponder channels.  Notice that

10:15   25    that's different than signal and channel in the abstract

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | |
|---|---|
| 10:15 | 1 |
| 10:15 | 2 |
| 10:15 | 3 |
| 10:16 | 4 |
| 10:16 | 5 |

because we have after all a composite signal.  The composite
signal, which is the middle of Fig. 5 there, is composed of
lots of transponder channels or, if you like, lots of
transponder signals.  So it's composed of A14, C3, et
cetera, as you can see in the figure.

What the patent is doing in the claim steps of
selecting and extracting is it's selecting and extracting
what?  Transponders.  Whether they're transponder signals or
transponder channels, the patent doesn't really care because
the mechanism how this is done doesn't care.

The patent offers you a number of different ways
that it can be done, but all of them involve the same thing.
If I know that I need a particular transponder that sits at
a channel and maybe that channel to use an FM analogy might
be 101.5, what I do is I go and I select for that frequency.
I get whatever is there.  Whether you call that the channel
or the signal doesn't matter.  The point is it's the same
unit.  And the patent and in every single figure deals with
the atomic unit of transponder signal or transponder
channel.

As Your Honor rightly notes in the tentative, the
patent uses those terms interchangeably all over the
specification.  The reason it's doing so is because it is in
fact describing the same thing in these processes as it
picks up and moves each one of these either transponder

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:17  1   signals or transponder channels.

10:17  2        If I could go to Slide 23, I can illustrate for

10:17  3   Your Honor an example of this.  This happens to be Fig. 13,

10:17  4   which is an example of doing this digitally.  Here, we're

10:17  5   after transponder channel or transponder signal B.  So what

10:17  6   the patent is having to do is decide where am I going to end

10:17  7   up locating B because, remember, my composite signal has

10:18  8   limited space?  So the patent has to decide upon a

10:18  9   destination, and it says, okay, I'm going to locate B at a

10:18  10  certain frequency.  So in this example, what we do is we

10:18  11  take the whole spectrum.  It's translated, which is the

10:18  12  second step, to put B in the place where we ultimately want

10:18  13  it.  Then we filter it.

10:18  14       And then what we're going to do in Step 4 is all

10:18  15  the other channels.  We're going to have done this for the

10:18  16  other transponder channels, and then we'll bring them all

10:18  17  together.  We add them up, and what we get is the combined

10:18  18  result at the bottom.

10:18  19       So when I say the atomic unit, I mean each of

10:18  20  these little blocks, Your Honor, like B.  That's what the

10:18  21  patent is dealing in.  And you'll notice that Fig. 13 is not

10:18  22  the only disclosure of this.  We're also going to be talking

10:18  23  about Fig. 14 in a minute.  There is another example, but

10:18  24  they're all the same.  And then what the patent is doing is

10:19  25  going out and isolating this transponder signal or

10:19   **1**    transponder channel, putting it where it needs it to be, and

10:19   **2**    then adding it together with all of the others.

10:19   **3**        So that's where the equivalence comes in.  It's

10:19   **4**    not signals in the abstract because, of course, what you

10:19   **5**    generate at the bottom is a composite signal, and that's got

10:19   **6**    lots of transponders in it.  So it's very important that the

10:19   **7**    claim language at issue here is transponder signal and

10:19   **8**    transponder channel.  And that, we submit, is a very clear

10:19   **9**    signal to the person of ordinary skill that we are in fact

10:19  **10**    talking about the same thing.

10:19  **11**        Now, Your Honor had also noted -- I think in the

10:19  **12**    tentative it looked as though Your Honor was certainly

10:19  **13**    leaning in that direction, but then this issue of Claim 39

10:19  **14**    comes up.  So if I could take a jump to Claim 39, which is

10:19  **15**    Slide 28, let's take a look at what Claim 39 says.

10:19  **16**        You'll notice in the tentative ruling, Your Honor,

10:20  **17**    you mention that while Claim 39 seems to differentiate

10:20  **18**    between signal and channel -- and Your Honor is absolutely

10:20  **19**    correct that it does, but the reason it does is because it's

10:20  **20**    not differentiating between transponder signal and

10:20  **21**    transponder channel.  It's differentiating between a

10:20  **22**    broadband signal and a transponder channel.

10:20  **23**        What's the broadband signal?  The broadband

10:20  **24**    signal, remember, is the whole thing that comes in from the

10:20  **25**    LNB, broadband.  We can see that if we turn to the

| | |
|---|---|
| 10:20 | 1 |
| 10:20 | 2 |
| 10:20 | 3 |
| 10:20 | 4 |
| 10:20 | 5 |
| 10:20 | 6 |
| 10:20 | 7 |
| 10:21 | 8 |
| 10:21 | 9 |
| 10:21 | 10 |

description that supports Claim 39.  So what we're doing
here is we're frequency translating to locate a selected
transponder at baseband.  Your Honor can see that
highlighted in yellow in the claim.

     So if we go into the specification and we locate
the corresponding description, an example of that -- I don't
believe that it's the only one, but an example of that is at
Col. 5, starting at line 47.  We can see in the description
here the patent says:  "Alternatively, a single transponder
channel can be selected by translating the spectrum down in
frequency to place the selected channel" -- again,
transponder channel -- "at baseband, then applying a low
pass filter transfer function to isolate a single channel."
And so then it refers to Fig. 14 to show what is going on.

     So if we could go to Slide 29 so that Your Honor
can see Fig. 14.  What are we doing?  Again, we are after
transponder channel B.  So the first thing that we do, as
highlighted in yellow, is we have to translate the spectrum
down in frequency to place the selected channel at baseband.
So we slide the entire broadband signal to the left.  Then
we low pass filter it.

     A low pass filter, Your Honor, is just one as you
almost certainly know that gets rid of everything except
stuff that's near zero frequency, and that's why it's low.
So this is why we're using a low pass filter because we've

10:22    1    moved what we want down to baseband, which is zero

10:22    2    frequency.  We apply the low pass filter, and then what

10:22    3    we're going to do is mix the signal back up to radio

10:22    4    frequency.  So in other words, you're going to put it back

10:22    5    up there into higher frequencies where it will eventually be

10:22    6    transmitted.

10:22    7              But the really important point that I want to

10:22    8    drive home to Your Honor here is just that difference

10:22    9    between the broadband signal of Claim 39 and what the patent

10:22   10    is referring to everywhere else as transponder signals.

10:22   11    Claim 39 and the fact that it treats broadband signal

10:22   12    differently than transponder channel does not at all disturb

10:23   13    the person of skill's conclusion.  The transponder signal

10:23   14    and transponder channel are interchangeable.  That word

10:23   15    "transponder" makes all the difference.

10:23   16              THE COURT:  Okay, hold on one second.  Let me

10:23   17    reread Claim 39.

10:23   18              MR. BRIDGES:  Yes, and if we could go back to

10:23   19    Slide 28, please, Mr. Fuller.

10:23   20              THE COURT:  So dependent Claim 39 talks about

10:23   21    precisely how the invention --

10:23   22              MR. BRIDGES:  Well, I would say that dependent

10:23   23    Claim 39 claims one of the ways where the invention can hunt

10:23   24    down and grab signal B and put it where it wants, that is,

10:24   25    and by signal B, I mean the transponder channel.

10:24  1          THE COURT:  Out of curiosity, what are the other

10:24  2  ways?

10:24  3          MR. BRIDGES:  The other ways, for example, are

10:24  4  Fig. 13 which we showed a little while ago when we don't

10:24  5  move down to baseband.  So in that case, you apply a filter

10:24  6  at the radio frequency that you happen to already be at.  So

10:24  7  if you'll remember, Your Honor, in Fig. 13, which we can

10:24  8  bring back up, if you would, Slide 23 -- there's another

10:24  9  alternative Your Honor where what's happening here is notice

10:24  10  that we don't bring transponder signal/transponder channel B

10:24  11  down to baseband.  Instead, when we translate it in

10:24  12  frequency, we simply move it to where we want it to end up

10:24  13  right out of the box.

10:24  14          THE COURT:  And the Step 3 filter is accomplished

10:24  15  in some different manner?

10:24  16          MR. BRIDGES:  Yes.  In this instance, since you're

10:24  17  doing it digitally, you can just apply a higher frequency

10:24  18  digital filter, which is just a bunch of mathematics that

10:24  19  gets rid of all the -- you know, Your Honor probably may

10:24  20  have some flashbacks to Fourier transforms.  That's

10:25  21  basically what's happening here.

10:25  22          THE COURT:  And then back to Slide 29 and Fig. 14,

10:25  23  going from Step 1 to Step 2, that's a translation?

10:25  24          MR. BRIDGES:  Yes, Your Honor, and the key is

10:25  25  that's a translation of the broadband signal, so the whole

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:25    1    thing gets slid down.

10:25    2         THE COURT:  As opposed to the Fig. 13 translation?

10:25    3         MR. BRIDGES:  Well, in Fig. 13, the broadband

10:25    4    signal is also being translated.  In both of those cases,

10:25    5    the entire broadband signal is being translated.

10:25    6         THE COURT:  Okay.  Where I was going was in Fig.

10:25    7    14, between Steps 3 and 4, it's not a translation.  Does

10:26    8    translation only refer to -- is that only necessary when

10:26    9    you've got broadband?

10:26   10         MR. BRIDGES:  No.  Translation, Your Honor --

10:26   11    there's a step of translation in Fig. 14 that there's not in

10:26   12    Fig. 13, and the reason is because we brought the signal we

10:26   13    wanted down to baseband so that we could use a low pass

10:26   14    filter, and now we have to bring it back up.  Whereas, in

10:26   15    Fig. 13, we directly put it where we wanted it from the

10:26   16    beginning.

10:26   17         THE COURT:  In Fig. 14 -- this is probably beyond

10:26   18    what we need to do, but out of curiosity, between Steps 3

10:26   19    and 4, is that a translation?

10:26   20         MR. BRIDGES:  You could refer to it that way

10:26   21    absolutely.  People often will refer to it as mixing, but it

10:26   22    means the same thing.  You're simply shifting it in

10:26   23    frequency.  To go really too far, Your Honor, they call it

10:26   24    mixing because you actually do it by multiplying numbers

10:26   25    because of the way the trigonometry works.  Sines and

10:27  1    cosines, that's actually how you shift things in frequency.

10:27  2    You multiply them.  So people call that mixers, but you can

10:27  3    also call it translation.  The idea is you're picking it up

10:27  4    and you're moving it.

10:27  5          THE COURT:  This broadband translation, is that

10:27  6    also done trigonometrically?

10:27  7          MR. BRIDGES:  Well, you -- typically speaking,

10:27  8    that's what you're going to be doing is using a mixer

10:27  9    because you're just multiplying it.  So it turns out the way

10:27  10   this is actually done, Your Honor, is if you've got a signal

10:27  11   at a thousand MHz, if you multiply it by just a pure sine

10:27  12   wave, say 800 MHz, you get a new signal at the difference

10:27  13   between those two frequencies, the output, so you get a new

10:27  14   signal at 200.  So if I want to move down from a thousand to

10:27  15   200, I just multiply it by an 800 MHz signal, and what drops

10:27  16   just because of the way the math works is 200.

10:27  17         You also get one at the sum of the two frequencies

10:28  18   because that's just the way the math works, but you can just

10:28  19   get rid of the one you don't want with a filter.  That's

10:28  20   just the practical way of how it's done, but none of that is

10:28  21   salient, you know, to the particular issue.

10:28  22         THE COURT:  Okay.  So back to your point,

10:28  23   transponder makes all the difference?

10:28  24         MR. BRIDGES:  Transponder makes all the

10:28  25   difference, Your Honor, absolutely.  We would not take the

| | |
|---|---|
| 10:28 | 1 |
| 10:28 | 2 |
| 10:28 | 3 |
| 10:28 | 4 |
| 10:28 | 5 |
| 10:28 | 6 |

10:28   1    position that signal and channel in the abstract are the

10:28   2    same thing.  Now, I will apologize to the Court that perhaps

10:28   3    in briefing because parties do sometimes adopt brevity,

10:28   4    transponder signal and transponder channel may very well not

10:28   5    have been repeated every single time in the briefs and the

10:28   6    slides, et cetera.

10:28   7            But when we get down to the business of actually

10:28   8    deciding the validity of the claims, we have to be very

10:28   9    specific, and that is the language that's at issue.

10:28  10    Transponder signal and transponder channel, are those things

10:29  11    interchangeable?  That's why in Claim 39 the reference to

10:29  12    the "broadband signal" does not disturb the conclusion that

10:29  13    they are.

10:29  14            THE COURT:  Okay.

10:29  15            MR. BRIDGES:  Thank you, Your Honor.

10:29  16            THE COURT:  I think I understand.  So bottom line,

10:29  17    again, Entropic's proposed construction of this limitation

10:29  18    is of course that it's not indefinite, and the plain and

10:29  19    ordinary meaning is fine?

10:29  20            MR. BRIDGES:  It's fine, and if Your Honor wanted

10:29  21    to say in this case that because of the way that they're

10:29  22    treated equivalently that you can refer to transponder

10:29  23    signal in the dependent claims, that's fine, because in this

10:29  24    case because of the disclosure, you've seen that they are

10:29  25    linked together.  They're the same thing.

| | |
|---|---|
| 10:29 | 1      THE COURT:  Okay.  I understand your argument. |
| 10:29 | 2  Thank you. |
| 10:29 | 3      What's next? |
| 10:29 | 4      MR. SHIMOTA:  Decodes specific programs, Your |
| 10:29 | 5  Honor. |
| 10:29 | 6      And one thing, just -- I think we got a little bit |
| 10:29 | 7  ahead of ourselves here.  I just want to make clear that, |
| 10:29 | 8  you know, my colleague, Mr. Engel, started with Terms 1 and |
| 10:30 | 9  2, but for Terms 3, 4, 6, and 7, we agree with your |
| 10:30 | 10  construction and your opinion.  And similarly, we'd just |
| 10:30 | 11  like to reserve time to address any arguments brought up by |
| 10:30 | 12  the defendants.  But with that, we can proceed on "decodes |
| 10:30 | 13  specific programs." |
| 10:30 | 14      THE COURT:  I'm ready.  Thank you. |
| 10:30 | 15      MR. SHIMOTA:  All right.  Mr. Fuller, could you |
| 10:30 | 16  pull up Fig. 11 of the '715 Patent.  Great. |
| 10:30 | 17      So we received your opinion this morning, Your |
| 10:30 | 18  Honor, and thank you for providing that.  I think that's |
| 10:30 | 19  really helpful to narrow and focus the issues for us. |
| 10:30 | 20      And, you know, I'd also like to apologize because |
| 10:30 | 21  I think in the briefing we actually -- the parties, as they |
| 10:30 | 22  often do, kind of just by the nature of the briefing started |
| 10:30 | 23  talking past each other.  We focused a lot on the term |
| 10:30 | 24  "decodes," and then the tutorial ended up being on |
| 10:30 | 25  "programs."  But as your opinion correctly acknowledges, all |

10:30  1    the experts agree that decoding -- everyone knows what

10:30  2    decoding is.  That's a term that's -- it's fine.  It might

10:30  3    be broad, but breadth doesn't equal indefiniteness or

10:31  4    invalidity.

10:31  5           Programs, at the tutorial, we learned that

10:31  6    programs means the TV programs.  This is about asking a

10:31  7    satellite TV so you can watch ESPN or whatever you want to

10:31  8    watch at a given time.  Your opinion we agree with a hundred

10:31  9    percent.

10:31  10          Then the next question is -- then you said, well,

10:31  11   but the word "specific," as I understand your opinion,

10:31  12   that's the part that is indefinite.  We don't know what are

10:31  13   the specific programs, and that's why I apologize because I

10:31  14   don't think the parties actually really addressed this for

10:31  15   you.

10:31  16          I think if you look -- and your opinion properly

10:31  17   identifies Fig. 11 as the preferred embodiment directed at

10:31  18   what is described in the claims as a signal distribution

10:31  19   system.  This is a system for distributing signals, and Fig.

10:31  20   11 shows the preferred embodiment of that.

10:31  21          And what you see there in Fig. 11 at the top are

10:31  22   the legacy set-top boxes.  Those, as you've seen -- I won't

10:31  23   put the figure up for you again, but the point of this

10:31  24   invention is to create an outdoor unit to create a composite

10:32  25   signal.  It can put together the requested signals and make

10:32    1    the composite.

10:32    2         The legacy set-top boxes can't handle that, and

10:32    3    then what you see at the bottom in this embodiment is what

10:32    4    this invention is directed to.  What you see then is the

10:32    5    line with communication there.  That's the composite signal.

10:32    6    And the composite signal then is going to two places.  It's

10:32    7    going to box 1150, and box 1150 is a splitter.  And the

10:32    8    description of that is at Col. 9, lines 23 to 48.

10:32    9         THE COURT:  Hold on one second.  Backing up, you

10:32   10    said communication there.  That line, that's the composite

10:32   11    signal?

10:32   12         MR. SHIMOTA:  That's the composite signal.

10:32   13         THE COURT:  Coming out of what?

10:32   14         MR. SHIMOTA:  Out of the ODU.  The IRD's, as we've

10:32   15    seen in the other claims, are requesting the channels that

10:32   16    they want.  And then the ODU is putting together extracting

10:32   17    the channels and making the composite signals, and it's

10:32   18    sending it out on that line, which is shown as

10:33   19    communication.

10:33   20         THE COURT:  Okay.  So picking up where you left

10:33   21    off, 1150, and then look at where in the patent?

10:33   22         MR. SHIMOTA:  So that would be at Col. 9, lines 23

10:33   23    to 48.  That's the description.  We focused a lot on the

10:33   24    description of the MPEG decoding and, you know, for

10:33   25    programs, but as you rightly know, that's -- people know

10:33  1   what that is, so let's talk about what came there just in

10:33  2   general.

10:33  3          So at that line at box 1150, that's just a

10:33  4   splitter.  That's not the gateway that's talked about in

10:33  5   those claims.  So the composite signals provided to those

10:33  6   set-top boxes in that scenario, those set-top boxes need to

10:33  7   do the decoding on their own.  So those set-top boxes need

10:33  8   to have the ability to figure out what program they need and

10:33  9   decode -- each IRD can only decode a particular channel at a

10:33  10  particular time, so it's going to decode those set-top boxes

10:33  11  and IRDs which are going to tune to the right channel and

10:34  12  decode them.

10:34  13          THE COURT:  And this is 1140?

10:34  14          MR. SHIMOTA:  Well, that's with the 1140, those

10:34  15  set-top boxes.  You're 100 percent correct, Your Honor.

10:34  16          THE COURT:  That's what you're talking about,

10:34  17  though?

10:34  18          MR. SHIMOTA:  That's what I'm talking about, yes,

10:34  19  100 percent.

10:34  20          THE COURT:  Okay.

10:34  21          MR. SHIMOTA:  If you move down then from there,

10:34  22  then you see at 1160 the server and the gateway.  In that

10:34  23  embodiment at the same time, the server and the gateway,

10:34  24  it's receiving the same composite signal.  So what is this

10:34  25  gateway going to do with it, this signal?  Well, that

| | | |
|---|---|---|
| 10:34 | 1 | gateway is then going to -- its job is to decode the |
| 10:34 | 2 | specific programs and distribute the programs to those |
| 10:34 | 3 | set-top boxes. |
| 10:34 | 4 | So what does that mean? What can you see from |
| 10:34 | 5 | that figure? What would one of ordinary skill in the art be |
| 10:34 | 6 | able to understand? What they understand is that the |
| 10:34 | 7 | specific programs are the channels associated with the |
| 10:34 | 8 | set-top boxes connected to that gateway. |
| 10:34 | 9 | THE COURT: When you say channels, TV channels? |
| 10:34 | 10 | MR. SHIMOTA: Right, TV programs. So the |
| 10:35 | 11 | composite signal -- you'd have like -- you know, let's say |
| 10:35 | 12 | you have ten channels, Channels 1, 2, 3, 4 through 10. And |
| 10:35 | 13 | let's assume set-top boxes at the bottom there, 1160 -- you |
| 10:35 | 14 | see they're there on the bottom of the figure, 1160. They |
| 10:35 | 15 | need Channels 3, 7, and 10. Well, then the gateway -- |
| 10:35 | 16 | rather than the set-top boxes needing to do that, the |
| 10:35 | 17 | gateway would decode Channels 3, 7, and 10 and distribute |
| 10:35 | 18 | those channels, those programs, to those TVs on the gateway. |
| 10:35 | 19 | That's the point, that this is a flexible |
| 10:35 | 20 | architecture where you can add and subtract. You can use |
| 10:35 | 21 | this gateway. You could have two gateways in this -- |
| 10:35 | 22 | instead of having at 1150 just having a splitter there, you |
| 10:35 | 23 | could have a second gateway. This could be an apartment |
| 10:35 | 24 | building then and that the gateway -- the specific programs |
| 10:35 | 25 | would then be whatever programs are associated with the |

10:35  1    set-top boxes that that gateway services.

10:35  2            I mean, if you wanted to have a construction that

10:35  3    clarified that -- we've proposed plain and ordinary meaning.

10:36  4    If you wanted to say decodes specific programs, it would be

10:36  5    decodes the programs, but that for the IRD's or set-top

10:36  6    boxes associated with the gateway, we would be fine on that.

10:36  7    But what we think, Your Honor, is that Fig. 11 makes it very

10:36  8    clear what the answer to your question of what specified

10:36  9    means.

10:36  10           THE COURT:  So let's look at Claim 9 itself.

10:36  11           MR. SHIMOTA:  Absolutely.  Would you pull up Claim

10:36  12   9, Mr. Fuller.

10:36  13           THE COURT:  Which page of your slide deck?

10:36  14           MR. SHIMOTA:  Well, we're at the patent part of

10:36  15   the slide deck so at page 58.

10:37  16           THE COURT:  Okay.  You walked me through Fig. 11.

10:37  17   I think I understand your argument there, but let's map that

10:37  18   onto Claim 9, please.

10:37  19           MR. SHIMOTA:  Yes.  So if you look at -- so the

10:37  20   preamble -- again, the preamble, what is this patent about?

10:37  21   The preamble is that this is a signal distribution system.

10:37  22   How does that work?  Well, in the first element, you see a

10:37  23   gateway in communication with the ODU and at least one

10:37  24   set-top box.  So referring back to Fig. 11, that's the

10:37  25   situation where you've got that gateway, which is in between

10:37   1   the ODU and the set-top box.

10:37   2             THE COURT:  Understood.

10:37   3             MR. SHIMOTA:  All right.  Then let's take it to

10:37   4   the final element to the language in question.  Now, the

10:37   5   first part of it, "wherein the modulation of the composite

10:37   6   signal is the same as the modulation of the broadband LNB

10:37   7   signals," that's another part of the invention where you're

10:37   8   not changing the modulation on the single wire.

10:38   9             So let's get to the language at the end, wherein

10:38  10   the composite signal is transmitted to the gateway, so you

10:38  11   can see that in Fig. 11 that that was the line, that

10:38  12   communication line, which is going to both the splitter and

10:38  13   to the gateway -- the splitter is not described here, but

10:38  14   the gateway -- and the gateway receives the composite

10:38  15   signal, decodes specific programs.  Again, the specific

10:38  16   programs are going to be the programs that were requested by

10:38  17   the set-top boxes connected to or serviced by that gateway.

10:38  18   And then the gateway distributes -- there's the antecedent

10:38  19   back -- these programs over a digital LAN to the set-top

10:38  20   boxes.

10:38  21             THE COURT:  So program and specific program is,

10:38  22   for example, ESPN?

10:38  23             MR. SHIMOTA:  Correct.  That's right.  So you've

10:38  24   got three set-top boxes, so on one of them, you want ESPN.

10:38  25   On the other one, someone wants to watch HBO, so the gateway

| | | |
|---|---|---|
| 10:38 | 1 | is going to decode those specific programs.  Now, somewhere |
| 10:39 | 2 | else in either an apartment complex or perhaps in your |
| 10:39 | 3 | garage maybe you've got a different IRD which is not |
| 10:39 | 4 | connected to that gateway.  Well, the gateway isn't going to |
| 10:39 | 5 | pull down the channel for that other box which is connected |
| 10:39 | 6 | in a different manner.  That's what's shown in Fig. 11. |
| 10:39 | 7 | That's the point, that the gateway is not going to be |
| 10:39 | 8 | decoding programs that are unnecessary.  It's a point of |
| 10:39 | 9 | efficiency. |
| 10:39 | 10 | THE COURT:  Okay.  Hold on one second.  Looking at |
| 10:40 | 11 | my tentative, I was critical that the specification doesn't |
| 10:40 | 12 | provide much explanation for specific programs the way you |
| 10:40 | 13 | just walked me through looking at the figure.  Was I wrong |
| 10:40 | 14 | in any way?  Should I look at some other area in the |
| 10:40 | 15 | specification to learn more about what specific programs is |
| 10:40 | 16 | supposed to mean? |
| 10:40 | 17 | MR. SHIMOTA:  Yes.  I think you should look at |
| 10:40 | 18 | Fig. 11 and what I've directed you to.  I think in addition |
| 10:40 | 19 | to that -- well, Fig. 11 and the description associated with |
| 10:40 | 20 | that.  And you could look at Fig. 16 as well if you wanted |
| 10:40 | 21 | which shows -- again, that doesn't show the particular |
| 10:41 | 22 | architecture, but what it shows in that instance is you've |
| 10:41 | 23 | got the signal that would be associated with both the legacy |
| 10:41 | 24 | set-top boxes and the composite signal where for the |
| 10:41 | 25 | legacy -- |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:41  1          If you could turn to Fig. 16, Mr. Fuller.

10:41  2          THE COURT:  So Fig. 16 refers in the middle text I

10:41  3  think to reference numbers 1450 and 1550.  It says selected

10:41  4  and combined transponder channels.  Are you saying that's

10:41  5  equivalent to specific programs?

10:41  6          MR. SHIMOTA:  No, no, Your Honor.  What I want to

10:41  7  be clear on is that in Fig. 11 what you'll see is that the

10:41  8  selected and combined transponder channels will be provided

10:41  9  to all the new set-top boxes.  What is shown in Fig. 16 is

10:42  10  that -- what you see in Fig. 11 is that there's the

10:42  11  old legacy set-top boxes.  And in that instance, the LNB

10:42  12  output A and the LNB output B are provided entirely to the

10:42  13  legacy set-top boxes, which will tune to the correct

10:42  14  channel.  It was the old and inefficient way.

10:42  15          My point is that in Fig. 16 it shows that you've

10:42  16  gone through the process of creating this combined channel,

10:42  17  which is specific to each IRD's request for channels.  And

10:42  18  then Fig. 11 takes it a step further and shows that the

10:42  19  set-top box is going to decode the particular channels

10:42  20  requested by the set-top boxes associated with that gateway.

10:42  21          So looking at them together, it's our position

10:42  22  that one of ordinary skill in the art would be very clear on

10:42  23  what the specific programs are.  And the specific

10:42  24  programs -- that the programs distributed on the LAN are the

10:42  25  programs for the -- are the programs asked for by the

10:42  1   set-top boxes associated with that gateway.

10:42  2          We think it's very simple, and we think it's just

10:43  3   unfortunate that the parties talked past each other and

10:43  4   didn't really address this issue for Your Honor.  We spent a

10:43  5   lot of time talking about decoding and programs, and those

10:43  6   are words that just weren't very clear.

10:43  7          THE COURT:  Okay.  I understand your argument.

10:43  8          MR. SHIMOTA:  We've received your construction.

10:43  9   There's one term for the '008 Patent, the "source of said

10:43  10  received signal," and we've received your opinion.  On this,

10:43  11  I think our only point that we would just like to understand

10:43  12  better what defendants' position is -- we agree with your

10:43  13  opinion insofar as there must be some equipment ultimately

10:43  14  that receives the measured characteristic, you know, the

10:43  15  feedback, in order -- because the whole point of the

10:43  16  invention is that the provider is able to get useful

10:43  17  information.

10:43  18         But the question we have then is your construction

10:43  19  says it's got to be equipment at the uplink center.  Our

10:43  20  question then is, well, what does that mean?  Does it

10:43  21  actually literally mean have to be where the large satellite

10:44  22  dish is?  There needs to be some box?  Because the source of

10:44  23  the signal that -- when your watching television, even that

10:44  24  large dish that's sending it up into outer space, that's

10:44  25  really not the source of ESPN.  There's a whole collection

| | |
|---|---|
| 10:44 | 1 |
| 10:44 | 2 |
| 10:44 | 3 |
| 10:44 | 4 |
| 10:44 | 5 |
| 10:44 | 6 |
| 10:44 | 7 |
| 10:44 | 8 |
| 10:44 | 9 |
| 10:44 | 10 |
| 10:44 | 11 |
| 10:44 | 12 |
| 10:44 | 13 |
| 10:44 | 14 |
| 10:44 | 15 |
| 10:45 | 16 |
| 10:45 | 17 |
| 10:45 | 18 |
| 10:45 | 19 |
| 10:45 | 20 |
| 10:45 | 21 |
| 10:45 | 22 |
| 10:45 | 23 |
| 10:45 | 24 |
| 10:45 | 25 |

of boxes which may be in -- they have a facility in Denver.
There's something in Wyoming.  There's a lot of equipment.

I think as long as your construction doesn't
say -- you know, as long as the point is that the signal is
going back to equipment associated with the provider such
that they can use it, we don't have a problem with that.  We
just don't think that to have a restriction such that it
needs to literally go back to some link in the chain that
actually transmitted the source in the first instance -- we
think that's too restrictive, and it doesn't comport with
the point of the invention, which is simply to enable a
provider, either satellite or cable, to be able to receive
realtime feedback concerning, you know, the operation of
their network at a given place.

THE COURT:  So what's better than "equipment that
transmitted the received signal?"

MR. SHIMOTA:  What --

THE COURT:  If I agreed with you a hundred
percent, what language provides the flexibility I think that
you're looking for there?

MR. SHIMOTA:  We proposed a compromised
construction for you, and it would be the plain and ordinary
meaning is:  "the entity responsible for providing the
received signal, including any of its equipment."

THE COURT:  So after reviewing my tentative and

10:45  1    understanding kind of where I was coming from, what my
10:45  2    analysis is, you're still sticking with your proposed
10:45  3    construction?  I'm not criticizing.  I'm just trying to
10:45  4    understand what your position is.
10:45  5          MR. SHIMOTA:  Well, either it's plain and ordinary
10:45  6    meaning or the proposal that we proposed yesterday to Your
10:45  7    Honor, yes, which is just any equipment.  It doesn't need to
10:45  8    literally be the satellite uplink there because it just
10:45  9    isn't consistent with the purpose of the invention or,
10:45  10   frankly, the text.  There's no description of that at all in
10:46  11   the '008 Patent where the signal is transmitted back to the
10:46  12   satellite uplink, the actual large antenna.
10:46  13         THE COURT:  Okay.  I understand.  I received a lot
10:46  14   of information sort of at the last minute, and maybe I'm
10:46  15   misremembering.
10:46  16         Are you asserting the '008 Patent against any of
10:46  17   these defendants?  Any other claims?
10:46  18         MR. SHIMOTA:  Yes, we are, Claim 3.  We've
10:46  19   withdrawn Claims 1 and 2, but Claim 3 and some of its
10:46  20   dependents are asserted against the defendants in this
10:46  21   matter, yes.
10:46  22         THE COURT:  Okay.  So this still matters?
10:46  23         MR. SHIMOTA:  Yes.
10:46  24         THE COURT:  Okay.  Thank you.  I think I
10:46  25   understand your position on all those points, and I also

| 10:46 | 1 | understand depending on what defendants say, if anything, |
| 10:46 | 2 | on -- well, as to the limitations that we did not discuss |
| 10:47 | 3 | here, I'm happy to hear you give me your thoughts on those |
| 10:47 | 4 | as well. |
| 10:47 | 5 | MR. SHIMOTA:  Thank you, Your Honor.  Right now we |
| 10:47 | 6 | agree with it.  We're happy with your constructions on this, |
| 10:47 | 7 | so thank you. |
| 10:47 | 8 | THE COURT:  All right.  Who wants to go first from |
| 10:47 | 9 | defendants? |
| 10:47 | 10 | MR. HERSHKOWITZ:  Your Honor, Benjamin Hershkowitz |
| 10:47 | 11 | on behalf of DIRECTV and AT&T.  I will be speaking on behalf |
| 10:47 | 12 | of the defendants for the first two claims.  We did make |
| 10:47 | 13 | extra copies of the slides if it's helpful for you, the |
| 10:47 | 14 | court reporter, and anybody else, and I can certainly pass |
| 10:47 | 15 | those out. |
| 10:47 | 16 | THE COURT:  Yes, please, hard copies for my law |
| 10:47 | 17 | clerk and for me would be good. |
| 10:47 | 18 | Madam Clerk, can you help out here?  Thank you. |
| 10:47 | 19 | Mr. Hershkowitz, is this for both defendants? |
| 10:48 | 20 | MR. HERSHKOWITZ:  It is, Your Honor. |
| 10:48 | 21 | THE COURT:  Okay. |
| 10:48 | 22 | MR. HERSHKOWITZ:  So we've divided it up.  We will |
| 10:48 | 23 | respect the Court's time here. |
| 10:48 | 24 | What I'd like to do is just go to "digitizing the |
| 10:48 | 25 | plurality of satellite broadband signals."  As Your Honor |

10:48   1   noted in your tentative on page 12, you know, Entropic seems

10:48   2   to have raised an issue for the first time in its responsive

10:48   3   brief.  So we'd like to address that, because if you look at

10:48   4   its opening brief, what it said was we agree with defendant

10:48   5   that it's the signal received at the ODU, and I'll get to

10:48   6   that in a moment.  They said the real issue is complete

10:48   7   bands.  Well, Your Honor has already decided complete bands.

10:48   8   As a matter of fact, yesterday submitted a further

10:48   9   submission acknowledging that it had to be complete bands,

10:49   10  but somehow they spent their entirety of their responsive

10:49   11  brief focusing on at the ODU.  It was curious to us in light

10:49   12  of their admission.

10:49   13          If we could go, please, to Slide 2.

10:49   14          So, you'll see, Your Honor, there were two issues

10:49   15  that were inherent in our construction.  One is that the

10:49   16  digitizing must apply to those satellite broadband signals

10:49   17  received at the ODU, not some other signal but those very

10:49   18  signals that were received at the ODU, and it must be the

10:49   19  complete bands, which Your Honor has done.  So we'll be able

10:49   20  to skip that second issue for right now.  It doesn't appear

10:49   21  to be challenged.

10:49   22          If we could go to Slide 4, please.

10:49   23          Let's start with the claims, you know, as we must.

10:49   24  What you'll see, Your Honor, is when you take a look at the

10:49   25  claim, what we're talking about is the italicized term

10:49  1   that's in that second yellow highlight.  And the reason it's

10:49  2   italicized is remember this patent, the '576 Patent,

10:49  3   underwent reexamination.  This was the limitation that was

10:50  4   added to overcome the prior art in that reexamination.  If

10:50  5   we take a look at the top, the antecedent basis for

10:50  6   "digitizing the plurality of satellite broadband signals"

10:50  7   occurs in that preamble, and it's highlighted, "a satellite

10:50  8   outdoor unit that receives a plurality of satellite

10:50  9   broadband signals."  That's what it says, and it's those

10:50  10  very signals that are digitized.

10:50  11         I heard counsel, albeit on a different term, say,

10:50  12  Judge, you have to look at when something goes now to the

10:50  13  past tense as opposed to the present tense.  Well, if we

10:50  14  take a look at the preamble, what does it say?  It says, "a

10:50  15  satellite outdoor unit that receives a plurality of

10:50  16  satellite broadband signals."  You then digitize the

10:50  17  plurality of satellite broadband signals.  And then in

10:50  18  green, it says, "selecting and extracting a plurality of

10:50  19  transponder signals [extracted] from the received digitized

10:51  20  satellite broadband signals."

10:51  21         The only time you perform an operation on the

10:51  22  broadband signals is after they have been digitized, and

10:51  23  we'll talk about that a little bit more in a moment, but

10:51  24  look at what the antecedent basis for received is.  It's

10:51  25  back into the preamble receives.  In other words, it's those

10:51  1   varied satellite broadband signals that are digitized, and
10:51  2   only then do you do any type of operation on it.
10:51  3           As a matter of fact, what was interesting is when
10:51  4   talking about selected and extracted, counsel for Entropic
10:51  5   said something very interesting.  It said when you mix a
10:51  6   signal, when you do something to it, you get a new signal at
10:51  7   a different frequency.  You get a new signal.  Exactly.  It
10:51  8   is a different signal.  It is no longer the satellite
10:51  9   broadband signal.
10:51  10          As a matter of fact, one of the things --
10:51  11          If we go to the next slide, please.
10:51  12          One of the things is if -- the reason this issue
10:52  13  wasn't joined is let's look at their opening brief:  "As an
10:52  14  initial matter, starting with Claim 14, the term 'the
10:52  15  plurality of satellite broadband signals' derives its
10:52  16  antecedent basis from the preamble, which states in part, 'a
10:52  17  satellite outdoor unit (ODU) that receives a plurality of
10:52  18  satellite broadband signals.'  The disputed 'satellite
10:52  19  broadband signals' therefore are the signals that are
10:52  20  received by the satellite ODU."
10:52  21          It's the very signals, not some other signal, not
10:52  22  some signal that's been operated on.  It's those very
10:52  23  signals that were received.
10:52  24          As a matter of fact, here's where the issue didn't
10:52  25  get joined.  If we could go to the next slide.

10:52    1            THE COURT:  Hold on one second.

10:52    2            MR. HERSHKOWITZ:  Yes, Your Honor.

10:53    3            THE COURT:  Okay.  I think I've caught up to you.

10:53    4    Go ahead.

10:53    5            MR. HERSHKOWITZ:  All right.  Next slide, please.

10:53    6            So, Your Honor, here's where it didn't get joined

10:53    7    because we didn't understand that they were now arguing you

10:53    8    could do something to those satellite broadband signals in

10:53    9    light of their admission in their opening brief.

10:53    10           Let's take a look at Claim 1 in the very same

10:53    11   patent.  What does it claim?  It does not claim a plurality

10:53    12   of satellite broadband signals or digitizing the plurality

10:53    13   of satellite broadband signals.  It claims a different

10:53    14   embodiment.  It says receiving a plurality of broadband LNB

10:53    15   signals and then digitizing the received broadband LNB

10:53    16   signals.  That's what they're trying to capture here.

10:54    17           By not agreeing now -- and they spent five pages

10:54    18   in their responsive brief -- what they're trying to capture

10:54    19   now is digitizing an LNB signal, in other words, a modified

10:54    20   satellite broadband signal, which we just heard counsel say

10:54    21   when you modify it it's a new signal.  That's what they're

10:54    22   trying to capture here.  As a matter of fact, if you look at

10:54    23   the spec, it calls an LNB signal an intermediate frequency.

10:54    24   It calls it other things.  What it doesn't say is it's

10:54    25   equivalent to the satellite broadband signal because these

10:54  1   terms are not used synonymously, so they claimed different

10:54  2   embodiments.

10:54  3          If we can go just for a minute to Slide 14,

10:54  4   please.

10:54  5          As the Federal Circuit has acknowledged:  "A claim

10:54  6   need not cover all embodiments.  A patentee may draft

10:54  7   different claims to cover different embodiments."  As a

10:54  8   matter of fact, this case which we did not have an

10:54  9   opportunity to cite in the briefing but is in response to

10:55  10  their new argument -- what you'll see is in Intamin --

10:55  11  Intamin argues much as Entropic does here in it's five pages

10:55  12  that it spent in its opposition brief or responsive brief,

10:55  13  that our interpretation would not permit the claim to read

10:55  14  on an embodiment of the invention specifically mentioned in

10:55  15  the spec.  What did the Federal Circuit say?  "Nonetheless,

10:55  16  this Court has acknowledged a claim need not cover all

10:55  17  embodiments.  A patentee may draft different claims to cover

10:55  18  different embodiments."

10:55  19         So going back if we could to Slide 6 --

10:55  20         THE COURT:  I think what might help me understand

10:55  21  your position -- you're saying the way plaintiff wants me to

10:55  22  construe this limitation and in fact the way I've

10:55  23  tentatively construed it actually makes it much broader than

10:55  24  it's actually claimed.  Can you show me that through

10:56  25  figures?

10:56  1              MR. BERNSTEIN:  Yes, I can.  So if we go now --

10:56  2              THE COURT:  Show me a figure that --

10:56  3              MR. HERSHKOWITZ:  All right.

10:56  4          If we could go to Slide 8, please.

10:56  5          What you can see, Your Honor, is this is the

10:56  6   embodiment that is directed to Claim 1.  This is their

10:56  7   annotation of Fig. 2 in their responsive brief.  And I

10:56  8   believe if you look at the slide deck, they have the same

10:56  9   thing, although they didn't present it.

10:56  10         What you can see is where is the satellite

10:56  11  broadband signal is actually received.  Well, actually, it's

10:56  12  in that upper left that they've conveniently grayed out.

10:56  13  It's those feed horns.  That's the satellite broadband

10:56  14  signal.  Those are the signals coming down.  That's where

10:56  15  it's ingested.  In this embodiment, which is directed to

10:56  16  Claim 1 and what the figures depict, is it would then go

10:56  17  through something called an LNB, but an LNB is not required.

10:56  18  It is not claimed in Claim 14.  It is claimed in Claim 1.

10:56  19         As a matter of fact, in the '715 Patent, which

10:56  20  we'll get to in a moment which is a continuation, they also

10:57  21  don't claim a satellite broadband signal.  They again claim

10:57  22  the LNB signal.  They knew how to claim an LNB signal, that

10:57  23  output, which as you see they've labeled transponder

10:57  24  channels and the spec calls it intermediate frequency, it is

10:57  25  not the satellite broadband signal.  It is not the signal

| | | |
|---|---|---|
| 10:57 | 1 | that was received that's mentioned in the preamble that is |
| 10:57 | 2 | the antecedent basis which they've acknowledged that is what |
| 10:57 | 3 | is digitized. |
| 10:57 | 4 | THE COURT:  Okay.  So Fig. 2 is the embodiment |
| 10:57 | 5 | that's claimed in -- |
| 10:57 | 6 | MR. HERSHKOWITZ:  Claim 1. |
| 10:57 | 7 | THE COURT:  Claim 1, so -- |
| 10:57 | 8 | HERSHKOWITZ:  Right.  They do not have a figure |
| 10:57 | 9 | that's specifically directed to Claim 14.  Remember, this |
| 10:57 | 10 | was added by reexam. |
| 10:57 | 11 | But if we take a look at the next slide, Slide 9, |
| 10:57 | 12 | Your Honor, what they talk about -- and this is the prior |
| 10:57 | 13 | art, but it's also what's shown in Fig. 2.  They say:  "A |
| 10:57 | 14 | satellite receiver outdoor unit (ODU) typically" -- not must |
| 10:57 | 15 | but typically -- "has a dish antenna, one or more feed |
| 10:57 | 16 | horns, one or more low noise amplifier and block down |
| 10:58 | 17 | converters (LNB)."  But look at what they said later on: |
| 10:58 | 18 | "Several variations in architecture are possible." |
| 10:58 | 19 | In fact, what they claim is a variation in the |
| 10:58 | 20 | architecture that does not have that LNB.  That's what Claim |
| 10:58 | 21 | 14 is claiming.  They don't get to rewrite the claims. |
| 10:58 | 22 | There's a reason they didn't assert those other claims |
| 10:58 | 23 | because they have other issues with respect to infringement |
| 10:58 | 24 | there.  So they're now trying to shoehorn in and hoping to |
| 10:58 | 25 | win on this very limitation in order to try to concoct an |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | |
|---|---|
| 10:58 | 1 |
| 10:58 | 2 |
| 10:58 | 3 |
| 10:58 | 4 |
| 10:58 | 5 |
| 10:58 | 6 |
| 10:58 | 7 |
| 10:58 | 8 |
| 10:58 | 9 |
| 10:58 | 10 |
| 10:58 | 11 |
| 10:58 | 12 |
| 10:59 | 13 |
| 10:59 | 14 |
| 10:59 | 15 |
| 10:59 | 16 |
| 10:59 | 17 |
| 10:59 | 18 |
| 10:59 | 19 |
| 10:59 | 20 |
| 10:59 | 21 |
| 10:59 | 22 |
| 10:59 | 23 |
| 10:59 | 24 |
| 10:59 | 25 |

infringement argument.  As a matter of fact, we see that in
their infringement contentions.

          If we go to the next slide --

          THE COURT:  I think I understand your argument
with respect to this limitation.

          MR. HERSHKOWITZ:  Thank you.

          The last thing I'd say is there's more support for
that in there, Your Honor, which is you can see that on
Slide 10, which is incorporated in the background.  It's the
Petruzzelli art, which is in fact a predecessor of Dish.
And what does it say?  It says if the frequency of the
incoming RF signal is downconverted -- in other words,
they're talking about if it's done.  You don't actually have
to do it, and that's what they've claimed here.

          So let me pause there unless you have any
questions, and I would just add if we could just go to the
next term if you have no questions, Your Honor.

          THE COURT:  No questions right now.  I think I
understand your argument on this one.

          MR. HERSHKOWITZ:  Thank you, Your Honor.

          If we go now to the next term, IRD, here, Your
Honor, I think you hit the nail on the head with the
statement that you made in your tentative, which is on
page 14, which you say, "neither party argues -- and the
specification does not suggest -- that the IRD of Claim 14

10:59   1   is in any way different from prior art IRD's."  We agree

10:59   2   completely.

10:59   3          But what was a fundamental characteristic of a

10:59   4   set-top box, which is an IRD, back in 2002?  Well, the issue

10:59   5   is you had to output a video signal to a TV.  We're not

11:00   6   saying you can't have other things.  You can't output audio.

11:00   7   We're not saying that.  We're not saying you can't have

11:00   8   other things that come out of there.  But what is

11:00   9   fundamental for an IRD for a set-top box and the whole

11:00   10  purpose of this -- you heard them talking about ESPN and

11:00   11  everything else -- is so you can watch a video, so it has to

11:00   12  have that video output.

11:00   13         If we go, Your Honor, to Slide 3, all we're saying

11:00   14  is that there has to be that output of a video signal to a

11:00   15  TV.  It's 2002, and you must be able to connect that to the

11:00   16  TV and display it.

11:00   17         As Your Honor notes in the tentative, it does talk

11:00   18  about an IRD generates an RF output.

11:00   19         If we could go to Slide 5, please.

11:00   20         What you'll see is, you're right.  IRDs are

11:00   21  commonly called set-top boxes despite protestations from

11:01   22  Entropic that somehow it's different.  They appear to have

11:01   23  abandoned that.  But if you look at what it says is it sits

11:01   24  on top of the TV, and then further down, "The IRD 180, dot,

11:01   25  dot, dot, "decodes the digital data to produce a video

11:01  1    signal and generates an RF output."  It's all about watching
11:01  2    TV, not that it can't do other things, but a fundamental
11:01  3    characteristic is that ability to put out that video output
11:01  4    to a TV so that it can be understood back in 2002.
11:01  5          If we go so Slide 6, this spec is complete with a
11:01  6    statement that this is about TV, about television.  If we
11:01  7    look at the second one on the left-hand side:  "At the
11:01  8    set-top box, QAM signal is demodulated and processed to
11:01  9    produce an NTSC analog video signal."
11:01  10         NTSC is the North America Television Standards
11:01  11   Committee, and what it is is that is the standard by which
11:02  12   TVs can understand that TV output.  We're fine if you want
11:02  13   to put in NTSC.  There's also a competing one called Powell
11:02  14   that operates in Europe, but this is a U.S. TV, so that's
11:02  15   kind of irrelevant here.  This is what it is all about.  It
11:02  16   is all about the capabilities, the ability to output that
11:02  17   video signal to the TV or to a VCR, you know, so you can
11:02  18   record it, but it's to output that video signal.
11:02  19         If we go to Slide 7, again, in the background,
11:02  20   they talk not only about a prior art Dish patent, which
11:02  21   they've incorporated by reference, but also a prior art
11:02  22   DIRECTV patent, the one on the right, that they've also
11:02  23   incorporated by reference, laid out that fundamental
11:02  24   background of what's there.  And what does that say on the
11:02  25   left?  It says, "a plurality of IRDs which, in turn, are

11:02   1   connected to a TV receiver or monitor.," again, the video

11:02   2   output to the TV.

11:02   3          On the right-hand side, you have the same thing

11:02   4   where "Each of the IRDs then provides the demodulated

11:03   5   user-selected signals to an output device or processor, such

11:03   6   as a television set (not shown), for display."  The whole

11:03   7   idea is you're outputting a video signal.  It's the final

11:03   8   step, Your Honor, before you're hitting the TV.  You're

11:03   9   outputting that video signal.

11:03   10          If you turn to the next --

11:03   11          THE COURT:  Well, just a minute.  The whole -- I

11:03   12   mean, you want the word "video" shoved into the

11:03   13   construction?  I don't mean to -- shoved was --

11:03   14          MR. HERSHKOWITZ:  Shoved is an appropriate

11:03   15   adjective of what we would like to done.

11:03   16          THE COURT:  You want "video" shoved into the term?

11:03   17          MR. HERSHKOWITZ:  "Video" or the ability to output

11:03   18   that video to the television set, right.  I mean, this is

11:03   19   all about video TV.  It's that final step.  It's got to be

11:03   20   connected to the TV.

11:03   21          THE COURT:  Okay.  Hold on one second.  This last

11:03   22   reference that you've directed me to here on Slide 7 -- to

11:03   23   be clear, you've restarted your slide numbers.  You're under

11:04   24   Section 2.

11:04   25          MR. HERSHKOWITZ:  Correct.  This is by tab.  So

11:04      1    this would be Tab 2 of our slide deck and Slide No. 7.

11:04      2            THE COURT:  So where I'm going is you've got this

11:04      3    highlighted language, "demodulated user-selected signals to

11:04      4    an output device or processor, such as a television set."

11:04      5    Doesn't that undercut that it's got to be a video signal

11:04      6    because it is to be outputted to a device for watching

11:04      7    television?

11:04      8            MR. HERSHKOWITZ:  Right.  It's connected to the

11:04      9    TV.  That is what that is saying, Your Honor.  And

11:04     10    remember --

11:04     11            THE COURT:  My point is it says "such as."  It

11:04     12    doesn't say --

11:04     13            MR. HERSHKOWITZ:  Right.  You could connect to a

11:04     14    monitor.  You could connect to a VCR to record it, but it's

11:05     15    still a video output that is going to that VHS tape to

11:05     16    record.  It is that final step.  The whole idea of a set-top

11:05     17    box at the time is -- remember, it sat on top of the TV

11:05     18    because we didn't have these flat screens.  You know, if you

11:05     19    were lucky, you had a rear projection.  It is that final

11:05     20    connection.  It has to have the ability to have that final

11:05     21    connection to the TV.

11:05     22            We're not saying it can't have other things, too,

11:05     23    but it has to have that.  The reason this is important is

11:05     24    some of what they are accusing does not actually connect to

11:05     25    a TV.  It doesn't have the video output.  There's some stuff

| 11:05 | 1 | that does, but there's some stuff that doesn't.  And they |
| 11:05 | 2 | are trying to capture a 2023 product when, in fact, that was |
| 11:05 | 3 | not what a set-top box was and IRD was in 2002. |
| 11:05 | 4 | THE COURT:  Let me play devil's advocate with you. |
| 11:05 | 5 | Claim 14 is broader in the sense that Claim 14 uses the term |
| 11:05 | 6 | "integrated receiver decoder, IRD" -- |
| 11:06 | 7 | MR. HERSHKOWITZ:  Absolutely. |
| 11:06 | 8 | THE COURT:  -- that limitation that we're |
| 11:06 | 9 | discussing right now, but Claim 14 doesn't say anything |
| 11:06 | 10 | about video.  To read that limitation in here requires a lot |
| 11:06 | 11 | of parsing of the specification and figures like you have |
| 11:06 | 12 | done here. |
| 11:06 | 13 | MR. HERSHKOWITZ:  Your Honor, the idea is what is |
| 11:06 | 14 | a set-top box?  The set-top box -- they did not invent a new |
| 11:06 | 15 | set-top box.  There's no claim here that they've invented a |
| 11:06 | 16 | new set-top box or IRD. |
| 11:06 | 17 | THE COURT:  Well, I'm focusing on the claim, and |
| 11:06 | 18 | the claim doesn't say set-top box. |
| 11:06 | 19 | MR. HERSHKOWITZ:  No, it says IRD, but the spec |
| 11:06 | 20 | also says an IRD is a set-top box.  So we have this is what |
| 11:06 | 21 | an IRD is.  But let's go to what they actually said during |
| 11:06 | 22 | the reexam. |
| 11:06 | 23 | If we go to Slide 8, Your Honor, the next slide, |
| 11:06 | 24 | this is an office action.  This is the examiner's statement. |
| 11:06 | 25 | And what does he say?  He said, "sent preferably over a |

11:06    1    single cable, and tunes its requested transponder signal for

11:07    2    decoding and display on a television connected to the IRD."

11:07    3    That's what he's saying.  A television connects to the IRD.

11:07    4    He's talking about the same claims.  There's no TV claimed

11:07    5    in the claims, but that is a fundamental characteristic.

11:07    6            Now, you're saying, well, that's just what the

11:07    7    examiner said --

11:07    8            THE COURT:  Was there a response to this office

11:07    9    action where the applicant said, oh, by the way, it's

11:07   10    broader than just TVs?

11:07   11            MR. HERSHKOWITZ:  No, but look at what the

11:07   12    applicant said.  The reason it says "See:  Amendment

11:07   13    arguments," what he's doing is actually quoting the

11:07   14    applicant back to them.  So this is the office action where

11:07   15    the examiner has the same understanding that we do

11:07   16    because -- and why does he have that understanding?  Because

11:07   17    he's quoting the applicant back to himself saying this is

11:07   18    what you told me.  So it is a fundamental characteristic of

11:07   19    a set-top box, an IRD, that it has this video output

11:07   20    capability.  That's what it is.

11:07   21            So, Your Honor, this is consistent with what was

11:08   22    known at the time.  Look at the first sentence there.  This

11:08   23    is extrinsic evidence:  "The received digitally coded TV

11:08   24    signal must first be converted back to the traditional NTSC

11:08   25    or PAL signal" -- that's what a set-top box did.  That is

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:08  1    the video -- "capable of being understood by the standard
11:08  2    TV.  The set-top box, or IRD" -- because they're the same
11:08  3    thing -- "implements these functions."  And once there, it
11:08  4    would "convert the digital data into standard TV signal,"
11:08  5    the ability to output that standard TV signal.  That is what
11:08  6    we are talking about here.
11:08  7           As a matter of fact, if we go to Slide 24, before
11:08  8    Judge Gilstrap talking about the '008 Patent which was
11:08  9    asserted there, they put on a tutorial much like they did
11:08  10   for you.  This is Entropic's tutorial.  And what did they
11:08  11   say?  "A set-top box receives and decodes a television
11:08  12   signal and delivers TV content by selecting the desired
11:08  13   channels and outputting the content."  We're talking about
11:09  14   outputting the video, the TV channels.  We're talking about
11:09  15   outputting.  That was a fundamental characteristic in 2002
11:09  16   of a set-top box.
11:09  17          THE COURT:  I understand.
11:09  18          MR. HERSHKOWITZ:  Thank you, Your Honor.
11:09  19          THE COURT:  Okay.  Good.  That was helpful.  What
11:09  20   do you have next?
11:09  21          MS. DOMINGUEZ:  Good morning, Your Honor.  Kate
11:09  22   Dominguez for DIRECTV and AT&T.  I'm going to be addressing
11:09  23   the indefiniteness dispute for Claim 14 of the '576 Patent.
11:09  24   It's Tab 6 in the binder that we've provided.
11:09  25          THE COURT:  Oh, that's RF signals.

11:09   1            MS. DOMINGUEZ:  This is the -- I'll call it the

11:10   2    singular/plural issue.  There were three instances.  I'm

11:10   3    sorry.  It's Tab 5.

11:10   4            THE COURT:  Tab 5.  Hold on a second.  Let me

11:10   5    catch up with you.

11:10   6            MS. DOMINGUEZ:  And if it helps, Your Honor, your

11:10   7    tentative -- this is page 15 of your tentative, your

11:10   8    construction order.

11:10   9            THE COURT:  Okay.  Now, I'm caught up with you.

11:10   10           MS. DOMINGUEZ:  So we obviously have your

11:10   11   tentative, and we saw that Your Honor in the tentative did

11:10   12   not go with indefiniteness.  I'd like to just address some

11:10   13   of the case law that defendants cited in their briefing

11:10   14   which was not addressed in the tentative because I think

11:10   15   it's instructive on the problems here.

11:10   16           So I'll skip ahead.  We have the claim language on

11:10   17   the next slide.  We have some color-coded underlining on

11:11   18   Slide 2 here to identify the three different instances of

11:11   19   the two problems we've identified.  First, it's a lack of

11:11   20   antecedent basis.  But then separate -- interrelated but

11:11   21   separate is in each of those instances a singular/plural

11:11   22   mismatch.  I think Your Honor has that.  That's clear from

11:11   23   the tentative.

11:11   24           So what I really want to address is how the case

11:11   25   law is instructive on the indefiniteness problems that are

11:11   1   created when you have these dual problems of lack of

11:11   2   antecedent basis and the singular/plural mismatch.  If we go

11:11   3   to the next slide.

11:11   4          So we cited two cases.  One was the Bushnell case

11:11   5   out of the Federal Circuit which dealt with this problem of

11:11   6   lack of antecedent basis followed by a singular/plural

11:11   7   mismatch.  We also cited the Imperium Holdings case out of

11:11   8   the Eastern District of Texas.  I'm going to focus on the

11:11   9   first case because I do think it has a really instructive

11:11   10  discussion on the problems that arise when you have this

11:12   11  kind of a mismatch.

11:12   12         THE COURT:  That's a federal appendix decision.

11:12   13  Is it binding on me?

11:12   14         MS. DOMINGUEZ:  As to the Federal Circuit, it

11:12   15  wouldn't be binding on panels of the Federal Circuit.  What

11:12   16  the applicable rule says is it's instructive.  I think the

11:12   17  District Court can treat it also, you know, for its

11:12   18  persuasive value.

11:12   19         I would note, though -- so I was a Federal Circuit

11:12   20  clerk.  When there's a decision made as to whether a

11:12   21  decision is going to be precedential or non-precedential,

11:12   22  one reason it would be non-precedential is it's just settled

11:12   23  law with the -- if you look to the rules, it's that it

11:12   24  doesn't raise any sort of new questions.  It doesn't break

11:12   25  new ground.  So I think from the District Court perspective,

11:12  1  perhaps it -- you can look to the persuasive value even more

11:12  2  strongly because of the fact that it's not setting new law.

11:12  3  It's settled law.

11:12  4        THE COURT:  If that were true, though, wouldn't

11:13  5  you cite the earlier case that settled that law?

11:13  6        MS. DOMINGUEZ:  That would be an option, and

11:13  7  certainly the Bushnell case has other citations in it, but I

11:13  8  think it just has a very helpful discussion that's

11:13  9  instructive for the particular problem that we have here.

11:13  10        THE COURT:  Well, is Bushnell the best case?

11:13  11        MS. DOMINGUEZ:  I think both of the cases that

11:13  12  we've cited are very helpful, but I think that the Bushnell

11:13  13  case is more instructive just because there's a more

11:13  14  thorough discussion of the problem.

11:13  15        THE COURT:  Okay.  Sorry to interrupt.  Go ahead.

11:13  16        MS. DOMINGUEZ:  No problem.

11:13  17        So if we go to the next slide, the problem in

11:13  18  Bushnell -- and I've just focused on one of the three

11:13  19  instances of this problem just to avoid too many colors and

11:13  20  too much underlining.  So on this slide, I've identified one

11:13  21  of these instances of the plural/singular mismatch and want

11:13  22  to just discuss how that lines up with the Bushnell

11:13  23  discussion.

11:13  24        So in Bushnell, there was really a parallel

11:13  25  problem, which is that at a certain point in the claim, the

| | |
|---|---|
| 11:14 | 1 | claim recited said different IP address.  And that had two |
| 11:14 | 2 | problems.  One, lack of antecedent basis.  There never was |
| 11:14 | 3 | introduced a quote/unquote "different IP address."  But the |
| 11:14 | 4 | Court said, okay, well, we can try to find an antecedent |
| 11:14 | 5 | basis because there are IP addresses recited earlier in the |
| 11:14 | 6 | claim, but now we have a different problem or an additional |
| 11:14 | 7 | problem, which there's multiple IP addresses.  They are |
| 11:14 | 8 | plural IP addresses recited earlier in the claim. |

11:14      9          So the problem that this leaves a POSA is -- and
11:14     10    the exact wording that's on the slide there -- the POSA is
11:14     11    left to wonder which of the earlier --
11:14     12          THE COURT:  Hold on one second.  For the court
11:14     13    reporter, POSA is what you're -- when you say POSA --
11:14     14          MS. DOMINGUEZ:  Oh, yes, and I'm sorry.  The case
11:14     15    actually uses the POSA initialism.
11:14     16          THE COURT:  Right.  I just want to make sure it's
11:14     17    rendered properly in the record.  We all know what you mean,
11:14     18    but you said it fast, and it's an odd word.  So, anyway --
11:15     19          MS. DOMINGUEZ:  Sure.  I appreciate that.
11:15     20          THE COURT:  Please keep going.
11:15     21          MS. DOMINGUEZ:  Okay.
11:15     22          THE COURT:  A little more slowly.
11:15     23          MS. DOMINGUEZ:  Sure.  So on the right side of the
11:15     24    slide, you can see the quote from Bushnell, and what the
11:15     25    quote is identifying is that for a person of ordinary skill

11:15   1   in the art, that person, or POSA, is left to wonder which of

11:15   2   the multiple recited IP addresses, the plural IP addresses,

11:15   3   would be the said different one.

11:15   4           So looking to the left side of the claim with the

11:15   5   green underlining, we have actually exactly the same

11:15   6   problem.  Down in the last limitation underlined in green,

11:15   7   there's a reference to the transponder signal.  And that's a

11:15   8   pretty important limitation because it says, "the modulation

11:15   9   of the transponder signal is not altered by the steps

11:15   10  selecting, combining, and transmitting."

11:15   11          Now, but looking back up, there is no antecedent

11:15   12  basis for the transponder signal, singular.  The closest is

11:16   13  previously recited in Step 2 a plurality of transponder

11:16   14  signals.  So you've got exactly the same problem that the

11:16   15  Court faced in Bushnell, which is from the perspective of a

11:16   16  POSA, from the perspective of a person of ordinary skill in

11:16   17  the art, that person is left to wonder which one of the

11:16   18  plurality of transponder signals that was previously recited

11:16   19  is the one wherein the modulation is not altered by the

11:16   20  steps of selecting, combining, and transmitting.

11:16   21          Now, I reviewed Your Honor's tentative, and Your

11:16   22  Honor, I think, does some work for the patentee here, and it

11:16   23  takes a couple of steps.  So, one, I understood Your Honor's

11:16   24  tentative to align or equate the transponder signal with the

11:16   25  composite signal.  I'd note that that's one step of

11:16  1  rewriting for the patentee because it doesn't actually refer

11:16  2  to the composite signal there.  It refers to the transponder

11:17  3  signal.  So from the perspective of a POSA, Your Honor is

11:17  4  saying, well, one reasonable interpretation is that it could

11:17  5  -- instead of the transponder signal, what it's really

11:17  6  referring to is the composite signal.  Maybe, Your Honor.

11:17  7  But an equally reasonable interpretation from a POSA is that

11:17  8  it refers back up to one of the plurality of transponder

11:17  9  signals that was recited in Step 2, but now we don't know.

11:17  10  Is it one of them?  If so, which particular one, or is it

11:17  11  all of them?

11:17  12        So I think that actually leaves three equally

11:17  13  plausible interpretations for a POSA:  Your Honor's

11:17  14  interpretation that it refers to the composite; an

11:17  15  alternative, that it refers to the plurality but which one;

11:17  16  and is it one or all?

11:17  17        The reason this creates indefiniteness is those

11:17  18  are all equally plausible.  So a POSA has to arbitrarily

11:18  19  select among them to figure out what the scope of the claim

11:18  20  is.  And what the Federal Circuit case but also the Imperium

11:18  21  Holdings case we cited shows is that doesn't give reasonable

11:18  22  certainty about the scope of the claim.

11:18  23        So I'll just pause there in case Your Honor has

11:18  24  any questions on the argument so far.

11:18  25        THE COURT:  I'm thinking about the parallelism

11:18  1   between the circumstance we have here and Bushnell.  In

11:18  2   Bushnell, the problem seemed to be -- there's a reference in

11:18  3   the claim to a different IP address, said different IP

11:18  4   address, and because there was more than one -- other IP

11:18  5   addresses other than the one that it was being compared to,

11:19  6   that's where the uncertainty arose.

11:19  7           Here, we don't quite have exactly that

11:19  8   parallelism, do we?

11:19  9           MS. DOMINGUEZ:  I think we do, Your Honor.  So in

11:19  10  the Bushnell case, there was a first -- or a prior -- it was

11:19  11  a fifth limitation actually.  But prior to the said

11:19  12  different IP address, there was a limitation that offered up

11:19  13  three different alternatives, and they all arguably in the

11:19  14  context of that patent were quote/unquote "different IP

11:19  15  addresses."

11:19  16          So it was I think the same problem of, sure, we

11:19  17  have multiple different IP addresses.  And I think what I'm

11:19  18  getting from Your Honor's tentative order is, well, sure, it

11:19  19  could just be any of them, all of them.  It doesn't matter.

11:19  20  And you could have said the same thing about the claim in

11:19  21  Bushnell.  Just any of those that are introduced in the

11:19  22  fifth limitation, or all of them, it doesn't matter.  Any

11:19  23  one of them is a said different IP address.  But that's not

11:20  24  what the Court went with.  The Court said from the

11:20  25  perspective of a POSA -- it's not okay to put on the POSA to

11:20  1  make an arbitrary decision.  So it could be any of them, but

11:20  2  that's not actually fair in terms of setting out with

11:20  3  reasonable certainty the scope of the claim.

11:20  4       I think we have the same problem.  Again, I'm

11:20  5  highlighting one example here for the Court, but it's for

11:20  6  all three.  What we're putting on POSA, a person of ordinary

11:20  7  skill in the art, is to make an arbitrary decision among

11:20  8  equally reasonable options.  That's why the scope of the

11:20  9  claim is not reasonably certain.

11:20  10       THE COURT:  Okay.  And those three options are set

11:20  11  forth on Slide 5 of Tab 5?

11:20  12       MS. DOMINGUEZ:  Yes.  So if you go to the next

11:20  13  slide, I won't belabor it for Your Honor, and I know we have

11:20  14  limited time, but in each of three instances, there are then

11:20  15  different alternatives that the POSA could equally select.

11:20  16  So this problem is actually presented three times over.  I

11:21  17  can go into the other examples if it's helpful to Your

11:21  18  Honor, but in the interest of time --

11:21  19       THE COURT:  No, I think I understand them.

11:21  20       MS. DOMINGUEZ:  Okay.  So then the only other

11:21  21  thing I wanted to clarify or discuss with Your Honor is I

11:21  22  understood from Your Honor's tentative order that Your Honor

11:21  23  was in agreement that plural means plural.  Plural means two

11:21  24  or more.  There was I think a typo in the tentative where in

11:21  25  the key sentence just before the citation to the Apple v.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

```
11:21    1   MPH case --
11:21    2              THE COURT:  What page?
11:21    3              MS. DOMINGUEZ:  On page 16 of Your Honor's
11:21    4   tentative.
11:21    5              THE COURT:  It's certainly possible, in fact
11:21    6   likely, that there are errors like that.  Okay, just before
11:21    7   the citation to Apple?
11:21    8              MS. DOMINGUEZ:  Yes.  I believe this is just a
11:21    9   mistake, but it says, "a plural article refers to one or
11:21   10   more."
11:21   11              THE COURT:  More than one.
11:21   12              MS. DOMINGUEZ:  More than one.  Okay.  So we're on
11:22   13   the same page.
11:22   14              I did see from the slide deck that plaintiff
11:22   15   handed over that they seemed to be pressing this idea that
11:22   16   plural could be fewer than two, that it could -- it just
11:22   17   leaves open the possibility of one or more.  That is
11:22   18   completely legally erroneous, and I'm ready to discuss that.
11:22   19   But if Your Honor -- if we're already on the same page, I
11:22   20   don't need to.  I could discuss it if plaintiff stands up
11:22   21   and push that point, however Your Honor wants to proceed.
11:22   22              THE COURT:  I'm pretty sure I meant more than one
11:22   23   and just, yes, got those words wrong.  Okay.
11:22   24              MS. DOMINGUEZ:  Okay.  Then I think that's all for
11:22   25   this claim, Your Honor.
```

| | | |
|---|---|---|
| 11:22 | 1 | THE COURT:  Okay. |
| 11:22 | 2 | MS. DOMINGUEZ:  Unless the Court has questions. |
| 11:22 | 3 | THE COURT:  Not right now. |
| 11:22 | 4 | Next claim. |
| 11:22 | 5 | MS. TESSAR:  Good morning, Your Honor.  The next |
| 11:22 | 6 | claim we're going to talk about is transponder request |
| 11:22 | 7 | signals.  And this argument assumes that unfortunately Ms. |
| 11:23 | 8 | Dominguez was not able to persuade you on indefiniteness. |
| 11:23 | 9 | We do need to construe that term because you'll note some |
| 11:23 | 10 | overlap between her argument on terms that are indefinite |
| 11:23 | 11 | and my argument here as to the meaning of transponder |
| 11:23 | 12 | request signal. |
| 11:23 | 13 | THE COURT:  What tab should I look at? |
| 11:23 | 14 | MS. TESSAR:  This is Tab 4, and I had prepared |
| 11:23 | 15 | these slides before we had the benefit of your tentative, so |
| 11:23 | 16 | I'm actually going to skip over a great deal of this. |
| 11:23 | 17 | We heard this morning for the first time |
| 11:23 | 18 | Mr. Bridges argue very persuasively that a transponder |
| 11:23 | 19 | channel and a transponder signal could be the same thing, |
| 11:23 | 20 | and that was the first time that we had ever heard that |
| 11:23 | 21 | argument.  It's not consistent with what the experts have |
| 11:23 | 22 | said and submitted in their declarations and their |
| 11:23 | 23 | depositions, and Mr. Hester is really going to address that |
| 11:24 | 24 | issue.  But I bring it up first to make this point that it |
| 11:24 | 25 | took all of us who are steeped in this technology a good |

11:24    1    deal of time to understand the points that he was trying to

11:24    2    make.

11:24    3             When we get to transponder request signals, what

11:24    4    we see is that it's undisputed -- or so far we've heard no

11:24    5    dispute and it's our understanding that a television channel

11:24    6    is different than either a transponder signal or a

11:24    7    transponder channel.  I don't believe that that's debated.

11:24    8             And if there's any question as to that, I would

11:24    9    refer you actually to the Williams patent.  As Your Honor

11:24   10    probably knows, when you incorporate by reference another

11:24   11    patent, that means that all of the disclosures in it become

11:24   12    part of the intrinsic record for your own patent.  So here

11:24   13    for the '576 Patent, that means Williams is part of the

11:24   14    intrinsic record.  And there's discussion at Col. 1,

11:25   15    line 67, to Col. 2, line 4, that really drives home this

11:25   16    point that television channel is different.

11:25   17             THE COURT:  And you were citing the Williams

11:25   18    patent?

11:25   19             MS. TESSAR:  That's correct.

11:25   20             THE COURT:  Okay.

11:25   21             MS. TESSAR:  When you look at the asserted

11:25   22    independent claim here, the word "signals" appears nine

11:25   23    separate times in it, and the word "transponder" appears six

11:25   24    separate times in it.  "Request" is in it twice.  These

11:25   25    terms are being used and thrown about in varying ways.

11:25  1          The tentative rules that the jury should be told
11:25  2   to apply the plain and ordinary meaning.  We think that that
11:25  3   causes problems, because if all of us in this room who are
11:25  4   steeped in these patents and these technologies are
11:25  5   struggling to look at this specification, which is sometimes
11:26  6   sloppy and imprecise in how it uses these terms, and
11:26  7   understand and tie these concepts to these claims, we think
11:26  8   we're giving the jury too hard of a job, and we're leaving
11:26  9   open that the parties are just going to argue later about
11:26  10  what the plain and ordinary meaning is.
11:26  11          I will give you a spoiler alert here because the
11:26  12  parties do not agree on what the plain and ordinary meaning
11:26  13  is.  I want to tie this a little bit to some real-world
11:26  14  context.  So, you know, I want you to imagine that you're at
11:26  15  home sitting on your couch watching your favorite TV
11:26  16  program.  Maybe that's on Bravo, and it's The Real
11:26  17  Housewives of New Jersey, or maybe it's ESPN and it's the
11:26  18  Sports Center.  But when you hit your remote control to go
11:26  19  to -- let's say you're going to the Comedy Channel.  You hit
11:26  20  the channel number, and you type it in.  What the IRD sends
11:26  21  upstream is a request for that television channel.
11:27  22          What the plaintiffs here are doing is trying to
11:27  23  have transponder request signals construed broadly enough so
11:27  24  that a transponder request signal is effectively the same
11:27  25  thing as a television channel.  That's what they need to do

11:27   1    in order to prevail on infringement.

11:27   2            And the briefs here I think are a little bit

11:27   3    unhelpful to the Court because we didn't understand they're

11:27   4    -- the new construction that they proposed.  We didn't have

11:27   5    the benefit of that.  People were really focused on arguing

11:27   6    about whether or not the transponder request signal had to

11:27   7    identify the transponder signal that was being requested.

11:27   8    That verb hung people up.  We think, yes, it absolutely has

11:27   9    to, and now Entropic has agreed.  When they submitted their

11:27   10   new proposed construction, which is up on the screen, they

11:27   11   include that term.

11:27   12           THE COURT:  The term, verb term?  What term?

11:28   13           MS. TESSAR:  "Identifying."

11:28   14           THE COURT:  Got it.

11:28   15           MS. TESSAR:  So there's no longer a dispute that

11:28   16   "identifying" needs to be part of the construction.  The

11:28   17   bulk of the dispute now instead is whether or not this

11:28   18   "directly" or "indirectly" language can be inserted in.

11:28   19           There is language in the patent, and I can

11:28   20   absolutely walk you through it in the slides, but every

11:28   21   instance where they talk about a signal directly or

11:28   22   indirectly requesting a transponder signal, it's in the

11:28   23   context of the path that it takes.  Can it go through a

11:28   24   splitter?  Can it not go through a splitter?  It's those

11:28   25   type of issues.  Whereas, what we're talking about here is,

| | | |
|---|---|---|
| 11:28 | 1 | hey, can you actually read transponder request signal to |
| 11:28 | 2 | mean ESPN?  That doesn't seem right to us.  It seems an |
| 11:28 | 3 | issue that's going to challenge the jury. |
| 11:29 | 4 | And I just want to make one more point on this |
| 11:29 | 5 | issue, which is really a claim differentiation argument. |
| 11:29 | 6 | Trevor, could you go to Slide 9. |
| 11:29 | 7 | So what I've put up here is the claim language |
| 11:29 | 8 | from Claim 14, which is the asserted independent claim in |
| 11:29 | 9 | this patent.  And you can see that it talks about |
| 11:29 | 10 | communicating a transponder request to the ODU from the IRD. |
| 11:29 | 11 | And then it tells us also what the ODU does.  It selects |
| 11:29 | 12 | some information that's responsive to the transponder |
| 11:29 | 13 | request signal. |
| 11:29 | 14 | Now, when the patentee wanted to say something |
| 11:29 | 15 | more specific or more broad, it did so.  So here if it |
| 11:29 | 16 | wanted to be clear, if it wanted to cover that the request |
| 11:29 | 17 | that was going to come was a request for a television |
| 11:29 | 18 | channel, it certainly could have done that. |
| 11:29 | 19 | If you'd turn to Slide 13, what's being compared |
| 11:30 | 20 | here is '576 Patent Claim 1 where instead of talking about a |
| 11:30 | 21 | transponder request signal the claim is talking about |
| 11:30 | 22 | transponder select information.  Now, the parties might |
| 11:30 | 23 | argue about whether transponder select information is broad |
| 11:30 | 24 | enough to include a television channel request.  And Claim 1 |
| 11:30 | 25 | isn't asserted, so we don't have to have that argument.  But |

11:30    1    my point for you on this claim right now is that there were

11:30    2    other ways to say this.  If what the patentee was trying to

11:30    3    do in Claim 14 was saying, yes, you, Your Honor, you're

11:30    4    sitting on the couch, and you're pressing your remote

11:30    5    control, and the IRD is communicating upstream to the rest

11:30    6    of the system that you want ESPN, they could have said that,

11:30    7    and they didn't.

11:30    8            So just to sum up for Your Honor, we think saying

11:31    9    plain and ordinary meaning does a disservice to the jury in

11:31   10    this instance because these are hard terms.  They are being

11:31   11    used in sloppy and imprecise ways in this patent.  So we

11:31   12    need to help the jury understand.  There is a live dispute,

11:31   13    and really that dispute relates to the question of directly

11:31   14    and indirectly rather than the question of whether we need a

11:31   15    construction at all.

11:31   16            THE COURT:  Okay.  So bottom line on this

11:31   17    limitation is does the construction include "directly" or

11:31   18    "indirectly" or not?

11:31   19            MS. TESSAR:  That's the key issue.

11:31   20            THE COURT:  That's the key issue.

11:32   21            MS. TESSAR:  And now that you've got that, maybe

11:32   22    actually I will ask to turn to -- so just sort of look real

11:32   23    quickly at the specification language.  This is Slide 10.

11:32   24            THE COURT:  Okay.

11:32   25            MS. TESSAR:  So these are the two places in the

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:32   1   specification where the patentee is talking about whether or

11:32   2   not a connection is direct or indirect.  What you'll see in

11:32   3   both of these, which come close together in the

11:32   4   specification so that the second one really follows after

11:32   5   the first one, is that when you're talking about this

11:32   6   request that's being made to the ODU by the IRDs, whether or

11:32   7   not -- the direct/indirect relates to the path, whether or

11:32   8   not you're going through a splitter or not.  It really

11:33   9   doesn't address this issue of whether the transponder

11:33   10  request signal -- whether that can be a television channel

11:33   11  and can have an indirect relationship with its content.

11:33   12          THE COURT:  So if I go with defendants' proposed

11:33   13  construction here and I do not include the "directly" or

11:33   14  "indirectly" piece of the construction, does that mean it's

11:33   15  necessarily got to be directly?  I mean, would your --

11:34   16          MS. TESSAR:  I mean, I'm sure they'll continue to

11:34   17  argue about it.  My preference would be that we would build

11:34   18  in something to the construction that would say "directly"

11:34   19  or that would have another clause.  I'd have to think about

11:34   20  how to phrase it.

11:34   21          THE COURT:  Well, wouldn't you say "a signal

11:34   22  directly identifying or requesting," et cetera.

11:34   23          MS. TESSAR:  That would be perfect.

11:34   24          THE COURT:  That's what you really want.

11:34   25          MS. TESSAR:  Yes.

| | | |
|---|---|---|
| 11:34 | 1 | THE COURT:  Okay.  And you think that's |
| 11:34 | 2 | appropriate because, among other things, if you look at the |
| 11:34 | 3 | specification as you just directed me to here in your Slide |
| 11:34 | 4 | 10, when the specification refers to "indirectly," it's not |
| 11:34 | 5 | referring to the transponder request signal?  It's referring |
| 11:34 | 6 | to something else? |
| 11:34 | 7 | MS. TESSAR:  Yes, it's not referring to the |
| 11:34 | 8 | content of how the request is made.  It's referring to the |
| 11:34 | 9 | path. |
| 11:34 | 10 | THE COURT:  Okay.  I think I understand. |
| 11:34 | 11 | MS. TESSAR:  Thank you, Your Honor. |
| 11:35 | 12 | THE COURT:  I think there's five others we haven't |
| 11:35 | 13 | talked about. |
| 11:35 | 14 | MR. HESTER:  I'll have two of them for you, Your |
| 11:35 | 15 | Honor. |
| 11:35 | 16 | THE COURT:  Okay.  Do you want a break?  I think |
| 11:35 | 17 | we are going to go past noon.  Let me know if you need a |
| 11:35 | 18 | break, please, because we can take it now and then press on. |
| 11:35 | 19 | No?  Okay.  Raise the white flag if you need to. |
| 11:35 | 20 | MR. SHIMOTA:  Just one question, Your Honor.  If |
| 11:35 | 21 | we are going to go over on time, just in the interest of |
| 11:35 | 22 | fairness, can we have an idea of what the allocation of time |
| 11:35 | 23 | will be? |
| 11:35 | 24 | THE COURT:  Well, I'm trying to make it about |
| 11:36 | 25 | even.  You were pretty good about sticking to 45 minutes. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

```
11:36    1    We're now at I think 15 minutes for defendants, and they
11:36    2    have at least two more that they want to talk to me about,
11:36    3    so I'm going to try to make it fair time-wise.
11:36    4              MR. SHIMOTA:  Okay.  Thank you, Your Honor.
11:36    5              THE COURT:  But that doesn't mean you need to
11:36    6    expand to fill the available space.
11:36    7              MR. SHIMOTA:  No, no, we'll try to be brief.  I
11:36    8    just have to ask.
11:36    9              THE COURT:  Okay.  Thank you.
11:36   10              Okay, Mr. Hester.
11:36   11              MR. HESTER:  Your Honor, I'm going to be arguing
11:36   12    as I mentioned two claim terms.  I'm going to start with the
11:36   13    '576 Patent since that's where we've been and finish it out
11:36   14    with the term we've called "selected [and extracted]
11:36   15    transponder channels."  If you have your slide book open,
11:36   16    that's going to be Tab 3.  Although, I'll note, as
11:36   17    Ms. Tessar previewed, the argument we heard today from
11:36   18    Entropic is pretty different than the briefing, so I'm going
11:36   19    to be going a little off slides.
11:36   20              I want to start by making three points today.
11:37   21    First, the word "transponder" according to Entropic does no
11:37   22    work in the claim -- well, strike that.  Transponder does
11:37   23    everything in the claim, but in reality, a transponder is
11:37   24    simply hardware.  It's just describing the source of the
11:37   25    signal or the channel.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | |
|---|---|
| 11:37 | 1 |
| 11:37 | 2 |
| 11:37 | 3 |
| 11:37 | 4 |
| 11:37 | 5 |
| 11:37 | 6 |
| 11:37 | 7 |

THE COURT:  Well, that's not what I understood
Entropic to be arguing.  I thought Entropic was telling me
that transponder equals -- is what I've been thinking of as
a transponder signal or a transponder channel.

MR. HESTER:  Well, Your Honor, I can help.

THE COURT:  Am I misunderstanding?  Who told me
about that, Mr. Bridges?

MR. BRIDGES:  Yes, Your Honor.

THE COURT:  What is a transponder in your
parlance?  Is it a piece of hardware, or is it a signal?

MR. BRIDGES:  A transponder in the abstract can
mean a whole number of different things.

THE COURT:  Not in the abstract.  Specifically,
with respect to --

MR. BRIDGES:  Transponder signal, what it means is
the signal which comes from a transponder.  So if they want
to go all the way back and talk about hardware, it's the
signal that comes from that.  Transponder channel is the
same thing.  There's hardware here which supplies each of
these signals in the LNBs, et cetera --

THE COURT:  Okay.  Hold on a second.  What I
understood you to say is transponder makes all the
difference.  We can't talk about signal and channel because
those are different.  Is it signal and channel?  When you
say transponder signal and transponder channel, those are

| | | |
|---|---|---|
| 11:38 | 1 | equivalents, and then you started just referring to them as |
| 11:38 | 2 | transponder.  We're requesting a transponder here you said. |
| 11:38 | 3 | So I'm thinking you've collapsed transponder signal and |
| 11:38 | 4 | transponder channel into just transponder.  And when I heard |
| 11:38 | 5 | you say transponder, I was thinking of the signal/channel, |
| 11:38 | 6 | the information. |
| 11:38 | 7 | MR. BRIDGES:  Yes, Your Honor, sometimes -- |
| 11:38 | 8 | THE COURT:  And now you're telling me, no, it's a |
| 11:39 | 9 | piece of hardware.  Which is it? |
| 11:39 | 10 | MR. BRIDGES:  No, what I'm telling you, Your |
| 11:39 | 11 | Honor, is often people will refer as a shorthand matter to |
| 11:39 | 12 | the transponder signal or transponder channel as a |
| 11:39 | 13 | transponder.  So you might say I need transponder A23.  What |
| 11:39 | 14 | you really mean is I need transponder signal A23.  And how |
| 11:39 | 15 | do we know that?  Well, because the context is we're not |
| 11:39 | 16 | talking about a piece of hardware.  I don't see some piece |
| 11:39 | 17 | of hardware that's the transponder.  I need the signal. |
| 11:39 | 18 | If in my argument I did sometimes shorten that to |
| 11:39 | 19 | transponder alone, what I assure Your Honor is I always mean |
| 11:39 | 20 | transponder signal or transponder channel, not transponder |
| 11:39 | 21 | alone, so I'm sorry about that confusion. |
| 11:39 | 22 | THE COURT:  I understand now.  Thank you. |
| 11:39 | 23 | Sorry, Mr. Hester, for the aside there.  Pick up |
| 11:39 | 24 | where you were. |
| 11:39 | 25 | MR. HESTER:  That's good.  I'm going to use the |

11:40    **1**    Elmo real quick.

11:40    **2**          Okay, Your Honor, so to get back to the discussion

11:40    **3**    of what work transponder is doing and the terms "transponder

11:40    **4**    signal" and "transponder channel," I'll go to the tech

11:40    **5**    tutorial.

11:40    **6**          THE COURT:  I remember this.

11:40    **7**          MR. HESTER:  Yes, and you asked Dr. Akl, and Dr.

11:40    **8**    Akl said it's part of the satellite.  It's a transmitter and

11:40    **9**    it's a responder.  It's the thing that sends the signal.

11:40   **10**          THE COURT:  Right, it's hardware.  Got it.

11:40   **11**          MR. HESTER:  Yes.  So if we're modifying the word

11:40   **12**    "signal" or "channel" with the piece of hardware, all we're

11:40   **13**    doing is saying where did it come from, what made it, not

11:40   **14**    what it is.

11:40   **15**          So if you take that as a given, that all the word

11:40   **16**    "transponder" does there is tells you here's where I got the

11:40   **17**    signal from, Entropic basically has to argue that the

11:40   **18**    applicant in the patent in the specific context has defined

11:40   **19**    these two terms to mean, as they said today, the same thing

11:40   **20**    to the patent.  But in Entropic's own brief for a different

11:40   **21**    term, Entropic set forth the definition for "lexicography,"

11:41   **22**    and this clearly doesn't mean that there's no express

11:41   **23**    definition deviating from the plain meaning, and they've

11:41   **24**    never argued lexicography here.

11:41   **25**          THE COURT:  I understand your argument.

11:41   1              MR. HESTER:  Okay.  So that's point one.

11:41   2          So now let's talk to point two, which is that both

11:41   3   experts agreed that there's differences between transponder

11:41   4   signal and transponder channel, which is contrary again to

11:41   5   the point Entropic made today.

11:41   6          Mr. Bervik, can I have you go to Slide 4, please.

11:41   7          Now, in Slide 4, I've repeated the declaration

11:41   8   testimony of Dr. Paul Steffes, again, just reminding the

11:41   9   Court he firmly believes that they're different, and that a

11:41  10   selection of one is not -- does not imply the selection of

11:42  11   the other.

11:42  12          Dr. Akl when I deposed him was asked to give the

11:42  13   plain meaning of each of those terms.  I wanted to know what

11:42  14   is the plain meaning of transponder signal, and what is the

11:42  15   plain meaning of transponder channel?  I didn't get a

11:42  16   response.  And if the Court is interested in that part of

11:42  17   the deposition transcript, the Court can find it at

11:42  18   Defendants' Exhibit I to the opening brief, 131 through 138.

11:42  19          But the good news is the tech tutorial is once

11:42  20   again instructive.  So on the same page of the transcript

11:42  21   that we were on, page 15 -- and I'll see if I can zoom out a

11:42  22   bit.  Here again you had asked the question about the number

11:42  23   of transponders, I believe, or a number.  Dr. Akl said,

11:42  24   look, in this case, to have 16 transponders, each is -- in

11:43  25   the example, there's one or more signals.  He goes on to

11:43     1    say, in this tutorial, it's one signal per transponder

11:43     2    channel, but you can have more than one.

11:43     3         And then later on, the Court was again discussing

11:43     4    with Dr. Akl about the number of transponder channels and

11:43     5    the number of channels in the transponder signal, and

11:43     6    Dr. Akl was explaining with the pipe analogies.  And you've

11:43     7    got 16 pipes there with these 16 transponder channels, but

11:43     8    you can have multiple signals on those pipes.  Again, a

11:43     9    recognition that there is a difference in the abstract, and

11:43    10    it's a difference that is not resolved by the specification

11:43    11    in the claims.

11:43    12         And then just to reiterate, that very next page of

11:43    13    the transcript, page 35, same answer, highlighted here:

11:43    14    "You can have multiple signals be transmitted on a

11:44    15    transponder channel."  So I think both experts are pretty

11:44    16    clear on what they agree on, that there is a difference, and

11:44    17    that if there is any relationship, a transponder channel is

11:44    18    broader and the signal is narrower.

11:44    19         Now, if we kind of set aside that they aren't the

11:44    20    same thing, which is the thrust of Entropic's argument

11:44    21    today, I want to give the Court one more ground or reason to

11:44    22    find these terms indefinite that does relate to the

11:44    23    briefing.

11:44    24         So if I could have Mr. Bervik go to Slide 12,

11:44    25    please.

11:44    1              In the briefing, Entropic's focus was the idea

11:44    2    that when you are selecting a signal you have to do

11:44    3    something first.  You have to select the channel.  That was

11:44    4    the thrust of the briefing, but it fails really in two ways.

11:45    5              The first way that it fails -- next slide

11:45    6    Mr. Bervik -- is that the '576 applicant knew how to claim

11:45    7    selecting transponder channels.  I've got on the slide Claim

11:45    8    8 from the '576 Patent.  Here, there is a signal

11:45    9    distribution system concerned with distributing a plurality

11:45   10    of transponder channels.  And then in the body of the claim,

11:45   11    there is a discussion of selecting channels based on

11:45   12    information provided by a second unit.  Second unit, think

11:45   13    set-top box, so kind of like Claim 14, except the focus here

11:45   14    is transponder channels.  Again, the patentee knew what it

11:45   15    was claiming.

11:45   16              One more point I'd like to make with respect to

11:45   17    knowing what you claim.  A lot of the discussion from

11:45   18    Mr. Bridges in trying to make transponder channel the same

11:45   19    thing as transponder signal was in the context of frequency

11:45   20    translation.  I think the Court will acknowledge that most

11:45   21    of the challenged dependent claims are talking about

11:46   22    frequency translating to locate a channel.  But, again, the

11:46   23    patentee knew how to claim frequency translating of signals

11:46   24    versus channels.

11:46   25              Mr. Bervik, can I have you go to the '715 Patent

| | | |
|---|---|---|
| 11:46 | 1 | if you have it open.  If not, I can pull it up.  It's going |
| 11:46 | 2 | to be page 24. |
| 11:46 | 3 | THE COURT:  So what column? |
| 11:46 | 4 | MR. HESTER:  It's going to be Claim 9, so Col. 12 |
| 11:46 | 5 | and we're going to start around line 25, I think. |
| 11:46 | 6 | THE COURT:  Okay, I'm there, Claim 9. |
| 11:46 | 7 | MR. HESTER:  Great. |
| 11:46 | 8 | So Mr. Bervik, if you'd hold tight there. |
| 11:46 | 9 | So this is Claim 9.  This is asserted Claim 9 in |
| 11:46 | 10 | the '715 Patent.  But here around line 20 there's a |
| 11:46 | 11 | reference to a signal selector selecting transponder signals |
| 11:46 | 12 | just like Claim 14.  But Claim 9 is a little different than |
| 11:46 | 13 | Claim 14 in that it includes a frequency translation step. |
| 11:47 | 14 | So if I can have the Court look at around line 25, there's |
| 11:47 | 15 | reference to, "a frequency translator coupled to the signal |
| 11:47 | 16 | selector that is capable of shifting the selected |
| 11:47 | 17 | transponder signals to new carrier frequencies." |
| 11:47 | 18 | So we've got a situation here where if the concern |
| 11:47 | 19 | is you have to frequency shift to get what you want, the |
| 11:47 | 20 | patentee is explaining clearly that you can frequency shift |
| 11:47 | 21 | a transponder signal to get what you want. |
| 11:47 | 22 | Mr. Bervik, if I could have you go back to the |
| 11:47 | 23 | PowerPoint presentation to Slide 15. |
| 11:47 | 24 | As he's pulling that up, Your Honor, I'll just |
| 11:47 | 25 | conclude by noting that we agree the specification is not |

11:47  1   consistent with its use of transponder signals and

11:47  2   transponder channels.  But if there is any through line in

11:47  3   most of the citations, it's reference to selecting a

11:47  4   transponder channel and then having selected transponder

11:47  5   signals.  So think about it like --

11:47  6              THE COURT:  Sorry.  Slow down and say that last

11:47  7   part again.

11:47  8              MR. HESTER:  I'd be happy to do both of those

11:47  9   things.

11:47  10             If there is a through line in the examples, the

11:48  11  majority of them, it's that first you discuss as you can see

11:48  12  in the first example on the screen there selecting

11:48  13  transponder channels.  And after that, you have selected

11:48  14  transponder signals.  And the question is why?  Well, the

11:48  15  channel is broader, and the signal is narrower.  If you're

11:48  16  going to select a channel, you're going to get all the

11:48  17  signals with it.  Again, not entirely consistent, but I can

11:48  18  point to most of the examples in the spec that Entropic

11:48  19  discusses are going to have this relationship, reference to

11:48  20  a selected channel, followed by discussion of a selected

11:48  21  signal within said channel.

11:48  22             So with that, I have nothing else unless the Court

11:48  23  has any questions.

11:48  24             THE COURT:  No, I think I understand your

11:48  25  argument.  Thank you.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:48    1           MR. HESTER:  Your Honor, give me just a second to

11:48    2    switch over to the '715 Patent now.  We're going to look at

11:48    3    "decodes specific programs," and that's going to take you to

11:48    4    Tab 7.

11:48    5           THE COURT:  Okay, I'm there.

11:49    6           MR. HESTER:  We're just resolving something

11:49    7    technically.  Let me see if I can preview anything for you

11:49    8    without the PowerPoint.

11:49    9           Looks like I'll need the PowerPoint, so give me

11:49   10    just a second, Your Honor.

11:49   11           Permission to grab my paper copy, and then we can

11:49   12    talk paper copies.

11:49   13           THE COURT:  Of course.

11:49   14           MR. HESTER:  Okay.  So we're going to go to Tab 7,

11:49   15    and I'm going to start, Your Honor, on Slide No. 9.  It's

11:50   16    got pictures of two people you recognize.

11:50   17           THE COURT:  I'm there.

11:50   18           MR. HESTER:  Okay.  So the first point I'd like to

11:50   19    make is that during Mr. Shimota's testimony you heard a lot

11:50   20    about what a person of skill would understand.  There was a

11:50   21    person of skill would understand this is the selected

11:50   22    channels, and this is what's distributed, and this is what

11:50   23    is decoded.

11:50   24           So Dr. Steffes opined -- Dr. Steffes says, no,

11:50   25    there's no clarity here.  There's not the clarity needed for

11:50   1   this claim to be definite, and I've got that on the slide.

11:50   2          Dr. Akl has no response, literally no response.

11:50   3   Dr. Akl was not even asked to consider Dr. Steffes' opinions

11:50   4   on the "decode specific programs."  Dr. Steffes submitted

11:50   5   his declaration.  A couple weeks later Dr. Akl submitted

11:50   6   his.  He had ample time to respond to everything Dr. Steffes

11:51   7   said.  Dr. Akl did not respond to one term, "decode specific

11:51   8   programs."  Dr. Akl actually testified at his deposition he

11:51   9   had no opinions whatsoever about the '715 Patent but

11:51  10   certainly not here.

11:51  11          So Entropic had its chance to help explain how a

11:51  12   person of skill would or would not understand Claim 9 and

11:51  13   the term that's in dispute.  They did not get that

11:51  14   testimony.  They didn't even bother to ask, and the silence

11:51  15   is damning.

11:51  16          The next slide I'd like to discuss, next issue, is

11:51  17   how Entropic is trying to thread the needle and clarify the

11:51  18   claim.

11:51  19          Mr. Bervik, if I could have you go to Slide 6.

11:51  20          In defendants' brief, we posed a number of

11:51  21   questions.  We said these are questions that the term

11:51  22   "decodes specific programs" raises but does not answer.  The

11:51  23   primary question is the primary focus of Your Honor's

11:51  24   tentative, which is what are the specific programs?

11:51  25          Entropic's response today -- next slide,

11:52   1   Mr. Bervik -- is that those are the programs that are on the

11:52   2   composite signal, but that's backwards because you have to

11:52   3   choose the programs before deciding what goes out on the

11:52   4   composite signal.  You can't say here is the book I gave

11:52   5   you.  What you have there is -- you know, I'm trying to

11:52   6   think of a circular, and I'm struggling because it is

11:52   7   frankly circular.  The idea that specific program means

11:52   8   whatever you distribute doesn't answer the question how do

11:52   9   you pick what is decoded so that it is distributed?

11:52   10          It's supporting "decodes specific programs," the

11:52   11  idea of the programs that are distributed, not the other way

11:52   12  around.  If there's anything we need to identify what the

11:52   13  programs are that are distributed, it's to understand what

11:52   14  are the specific programs decoded?  Entropic does not have

11:52   15  an answer for that.

11:52   16          My third point today relates to what Entropic does

11:52   17  without that answer.  It tries to rewrite the claim.

11:52   18          Mr. Bervik, if I could have you go to Slide 13.

11:53   19          So in its brief, Entropic tried to argue that the

11:53   20  specific programs are the ones on the composite signal.

11:53   21  That's the quote from their brief at the top.  Here, we

11:53   22  heard a similar explanation from Mr. Shimota, but the

11:53   23  problem is it would not have been hard to claim that.  It

11:53   24  really wouldn't have.  In our brief, we provide an example,

11:53   25  and I've repurposed that example here.  You could simply

| | | |
|---|---|---|
| 11:53 | 1 | replace the term "decodes specific programs" with "decodes |
| 11:53 | 2 | one or more programs received on the composite signal." |
| 11:53 | 3 | And that's pretty similar to the construction |
| 11:53 | 4 | Mr. Shimota advocated for, but that's not construing the |
| 11:53 | 5 | term.  That's rewriting it, Your Honor.  It could have been |
| 11:53 | 6 | written clearly, and it wasn't.  That's unfortunate, but |
| 11:53 | 7 | that's how it is.  It was issued from the Patent Office that |
| 11:53 | 8 | way, and the Federal Circuit is clear that when you have a |
| 11:53 | 9 | claim that can't be construed like this, it's indefinite. |
| 11:54 | 10 | So unless Your Honor has any questions, I will sit |
| 11:54 | 11 | down. |
| 11:54 | 12 | THE COURT:  No, I understand your argument.  Thank |
| 11:54 | 13 | you. |
| 11:54 | 14 | Ms. Tessar, are you going to talk about some more? |
| 11:54 | 15 | MS. TESSAR:  I'm going to talk some more.  I am |
| 11:54 | 16 | going to talk about RF signals, but I'm going to make it |
| 11:54 | 17 | very quick because I'm cognizant that the court reporter |
| 11:54 | 18 | probably needs a break, and we want to get through our |
| 11:54 | 19 | presentation before that. |
| 11:54 | 20 | THE COURT:  Okay, RF signals. |
| 11:54 | 21 | MS. TESSAR:  Yes. |
| 11:54 | 22 | So Trevor, if I could have you go to Slide 4. |
| 11:54 | 23 | THE COURT:  Which tab? |
| 11:54 | 24 | MS. TESSAR:  This is Tab No. 6.  Notwithstanding |
| 11:54 | 25 | the fact that this slide says I'm going to make two |

11:55  1    arguments, I'm actually going to make three points that will

11:55  2    be shorter.

11:55  3              Are you with me?  I don't want to get ahead.

11:55  4              THE COURT:  I am.  Go ahead.

11:55  5              MS. TESSAR:  Okay.  So the first point is -- it's

11:55  6    a very simple one that is recited in almost every claim

11:55  7    construction decision including Phillips, and that's the

11:55  8    idea that you have to construe claims from the perspective

11:55  9    of a person of ordinary skill in the art at the time of the

11:55  10   invention.  Here we're talking quite a long time ago, 22

11:55  11   years ago, for the '715 Patent which claims back to 2001.

11:55  12             At the time, you know, this was before we were all

11:55  13   buying digital televisions.  There was some digital TV in

11:55  14   terms of programs being encoded, but recall that the

11:55  15   plaintiff's position or the patentee's position during the

11:55  16   reexamination was that what was novel about these claims and

11:55  17   about their invention was digitizing full band, doing the

11:55  18   whole thing that way.

11:55  19             So what we see consistently throughout all of the

11:56  20   materials is drawing a distinction between digital on the

11:56  21   one hand and RF on the other, RF meaning analog.  So our

11:56  22   construction, which includes the analog carrier explanation,

11:56  23   goes back in time to 2001 where that was the understanding

11:56  24   of people.  And you can actually even just see it in the

11:56  25   claim language.

| | |
|---|---|
| 11:56 | 1 |
| 11:56 | 2 |
| 11:56 | 3 |
| 11:56 | 4 |
| 11:56 | 5 |
| 11:56 | 6 |
| 11:56 | 7 |
| 11:56 | 8 |
| 11:56 | 9 |
| 11:57 | 10 |
| 11:57 | 11 |
| 11:57 | 12 |
| 11:57 | 13 |
| 11:57 | 14 |
| 11:57 | 15 |
| 11:57 | 16 |
| 11:57 | 17 |
| 11:57 | 18 |
| 11:57 | 19 |
| 11:57 | 20 |
| 11:57 | 21 |
| 11:57 | 22 |
| 11:57 | 23 |
| 11:57 | 24 |
| 11:57 | 25 |

So if I could have you go to Slide 5.

This is the single asserted independent claim of the '715 Patent, which is Claim 9, and the highlighting shows the two places where RF signals appear. If you look at the first one specifically, it's talking about shifting transponder signals to new carrier frequencies to produce RF signals. So it seems pretty clear from that carrier frequency language that the patentee was contemplating that this is an analog embodiment of their invention. And then when you go on in the last section to talk about combining those signals to produce a composite signal, again, that is reinforcing the analog nature.

Now, when you look at the claim language, which is on page 6, this compares not Claim 9 but other claims where the patentee when it wanted to -- when it wanted to claim digital, it knew how do to do that. So we see over and over again when it's claiming digital it includes the word "digital" in its claims, and those claims do not have the RF signals language.

The specification -- you discuss it in your tentative, and we think that all of the references to RF call for analog. But what I want to do is skip ahead and talk about the prosecution history because you do not discuss that in your tentative, and it again really reinforces this dichotomy where things could be done in

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 11:58 | 1 | analog -- and RF was the shorthand for that -- or digital. |
| 11:58 | 2 | So if I could have you turn to Slide 10. |
| 11:58 | 3 | THE COURT:  You made the point that when the |
| 11:58 | 4 | applicant -- well, when Entropic wanted to claim digital it |
| 11:58 | 5 | knew how to do that.  You referred, though -- you jumped |
| 11:58 | 6 | over to a different patent, the '576, right? |
| 11:58 | 7 | MS. TESSAR:  Well, one of the claims shown on that |
| 11:58 | 8 | slide is the one on the left.  So let's go back to Slide 6. |
| 11:58 | 9 | The one on the left is the '715 claim.  The one on the right |
| 11:58 | 10 | is the '576 Patent after reexam.  But these are related. |
| 11:58 | 11 | They share a specification.  So as a matter of law -- |
| 11:58 | 12 | THE COURT:  That's right.  The '008 is the one |
| 11:58 | 13 | that's -- |
| 11:58 | 14 | MS. TESSAR:  Exactly.  The '008 is the outlier. |
| 11:58 | 15 | THE COURT:  I got you.  Okay. |
| 11:58 | 16 | MS. TESSAR:  Yes, so it's absolutely fine for you |
| 11:58 | 17 | to look at the related patent, which is part of the |
| 11:58 | 18 | intrinsic record. |
| 11:58 | 19 | I'm going back to Slide 10 now, which is -- this |
| 11:58 | 20 | is, again, the reexam history in the context of the '576 |
| 11:59 | 21 | Patent because that's where most of the discussion was had |
| 11:59 | 22 | but, again, part of the intrinsic record of the '715.  What |
| 11:59 | 23 | we see the patentee doing here over and over again is |
| 11:59 | 24 | distinguishing between digitizing the broadband signal on |
| 11:59 | 25 | one hand and RF and IF, which are analog -- radio frequency |

11:59  1   and intermediate frequency -- on the other hand.  We see

11:59  2   that in the first highlighted sentence.

11:59  3          And then specifically in the next highlighted

11:59  4   part, there is discussion of how their invention, this

11:59  5   digitization, is substantially different than what could be

11:59  6   achieved through the prior art.  And then they go on to talk

11:59  7   about the Eutelsat reference where again what they're

11:59  8   talking about is that Eutelsat doesn't suggest or teach

11:59  9   broadband digitization because what they are doing is

11:59  10  selecting and combining in the RF domain.

12:00  11         So to us, this point is actually extremely clear

12:00  12  from we think the specification, the claim language, and the

12:00  13  prosecution history.  So to say to a jury plain and ordinary

12:00  14  meaning when a jury isn't likely to understand what radio

12:00  15  frequency signals are --

12:00  16         THE COURT:  So if I agree with your argument 100

12:00  17  percent, why aren't you arguing for a construction that RF

12:00  18  signals means analog signals?

12:00  19         MS. TESSAR:  Rather than the analog carrier

12:00  20  signals?

12:00  21         THE COURT:  Or analog (not digital) signals.  Why

12:00  22  do you need carrier in there, and why do you need RF in

12:00  23  there?

12:00  24         MS. TESSAR:  I think -- I mean, just in the

12:00  25  interest of retaining credibility here, I think that there

12:00    1    is some disclosure of having digital data traveling on an

12:00    2    analog wave.  So that representation, the analog carrier, I

12:00    3    think needs to be in there to be true to the patent.

12:00    4    Obviously, what you're suggesting would be a better

12:01    5    construction for us that we would prefer, but I want your

12:01    6    decision here to be defensible.

12:01    7            THE COURT:  What about analog carrier signals?

12:01    8    Why do you need RF?

12:01    9            MS. TESSAR:  Well, RF is actually in the claim

12:01   10    term, so I do think they need to be radio frequency.  If

12:01   11    your point is that the juror might be confused by including

12:01   12    radio frequency and analog carrier, I think that that would

12:01   13    work.

12:01   14            THE COURT:  What's other than a radio frequency

12:01   15    signal that could be in here?

12:01   16            MS. TESSAR:  I mean, physical -- can I think about

12:01   17    that one and get back to you?

12:01   18            THE COURT:  Sure.

12:01   19            MS. TESSAR:  I'm having to do claim construction

12:01   20    on the fly when Dr. Akl told us it would take him days to

12:01   21    tell us what an outdoor unit is.

12:01   22            THE COURT:  Yes, I'm obviously playing devil's

12:01   23    advocate to a certain extent here -- reverse devil's

12:01   24    advocate.

12:01   25            MS. TESSAR:  Yes.  And the other point I would

| | | |
|---|---|---|
| 12:01 | 1 | make to you, though, Your Honor, is for both this term and |
| 12:01 | 2 | LAN, you've -- so far in your tentative, you've said plain |
| 12:02 | 3 | and ordinary meaning.  At the end of the day, though, if |
| 12:02 | 4 | you're finding the only asserted independent claim of the |
| 12:02 | 5 | '715 Patent to be indefinite, are these constructions ever |
| 12:02 | 6 | going to matter? |
| 12:02 | 7 | THE COURT:  It's redundant. |
| 12:02 | 8 | MS. TESSAR:  A little bit.  So if you also just |
| 12:02 | 9 | want to focus on the indefiniteness issue and you find |
| 12:02 | 10 | indefiniteness, we may be able to save you some work here by |
| 12:02 | 11 | just not having you construe these terms now. |
| 12:02 | 12 | THE COURT:  Although others may be looking at this |
| 12:02 | 13 | and may disagree on certain points, so -- |
| 12:02 | 14 | MS. TESSAR:  There is always that possibility, |
| 12:02 | 15 | although we hope that won't happen. |
| 12:02 | 16 | THE COURT:  Okay. |
| 12:02 | 17 | MS. TESSAR:  Thank you. |
| 12:02 | 18 | THE COURT:  Well, thank you.  I understand your |
| 12:02 | 19 | arguments.  So does that -- |
| 12:02 | 20 | MS. TESSAR:  We've got two more, but they'll be |
| 12:02 | 21 | fast ones. |
| 12:02 | 22 | THE COURT:  Let's try to wrap it up as quickly as |
| 12:02 | 23 | possible. |
| 12:02 | 24 | MS. DOMINGUEZ:  Sure, Your Honor. |
| 12:02 | 25 | I'm not going to actually use the slide deck, so |

12:03     1   you don't have to worry about it.  I put up the one slide

12:03     2   that has the claim language, but I think it's faster if we

12:03     3   don't use the slides.

12:03     4              THE COURT:  Which limitation are we on?

12:03     5              MS. DOMINGUEZ:  This is for "local area network."

12:03     6   If it helps Your Honor, it was --

12:03     7              THE COURT:  I'm there.

12:03     8              MS. DOMINGUEZ:  Oh, okay.  Great.  Yes, page 21 of

12:03     9   the tentative.

12:03    10              So we have your tentative.  I understand Your

12:03    11   Honor is saying that a LAN at the time could have been

12:03    12   either wireless or wired.  Your Honor noted the factual

12:04    13   dispute about data rates.  I would point out that that is

12:04    14   setting up a lack of enablement problem.  Certainly if the

12:04    15   claims are construed to cover wireless LANs, then there will

12:04    16   be an enablement problem, but I don't think the claims need

12:04    17   to be or should be construed in a way that would create an

12:04    18   enablement problem.

12:04    19              The reason is there is no disclosure in the entire

12:04    20   patent anywhere of a wireless LAN.  That is significant

12:04    21   because wireless LANs were known.  Entropic's whole point is

12:04    22   wireless LANs were known, so this term should include

12:04    23   wireless LANs.  Actually, the opposite.  Because of the fact

12:04    24   that wireless LANs at the time the patent was written were

12:04    25   known but they were never disclosed in the specification,

12:04   1   the specification never discusses the use of wireless in

12:04   2   this context.  That strongly tells a POSA that LAN is not

12:04   3   meant to include wireless.

12:05   4            The extrinsic evidence also supports that.  Again,

12:05   5   I would point to Entropic's evidence.  Entropic introduced a

12:05   6   dictionary definition for "wireless LAN."  Well, I would

12:05   7   point out to Your Honor that we submitted several

12:05   8   dictionaries with definitions of "LAN" referring to cable,

12:05   9   and those dictionaries also had entries for "wireless LAN."

12:05   10   What does that say?  Those are two different things.  And a

12:05   11   POSA would understand that if one were referring to

12:05   12   wireless, one would use the modifier wireless, and that's

12:05   13   never used in the patent.

12:05   14            That's all unless Your Honor has questions.

12:05   15            THE COURT:  Your proposed construction is kind of

12:05   16   long and a bit unwieldy, but -- the word "interact," would

12:05   17   "communicate" be better?

12:05   18            MS. DOMINGUEZ:  I think "communicate" would work

12:05   19   equally well, Your Honor.

12:06   20            THE COURT:  Does "at a single site" introduce some

12:06   21   ambiguity in and of itself?

12:06   22            MS. DOMINGUEZ:  I don't think that part is

12:06   23   important because I don't think there's a dispute there.

12:06   24   Dr. Akl testified it could be your house.  I think there's

12:06   25   an understanding that it's a limited site.  So we chose

12:06  1   those words based on some of the definitions that we had,

12:06  2   but there, I don't think there is actually a dispute.

12:06  3              THE COURT:  All right.  Okay.  Those were my

12:06  4   questions there.

12:06  5              MS. DOMINGUEZ:  Thank you, Your Honor.

12:06  6              THE COURT:  Was anybody going to talk about

12:06  7   "source of said received signal"?

12:06  8              MS. TESSAR:  Briefly.  In your tentative order,

12:06  9   you went with the defendants' construction on this one.  We

12:06  10  think that's right.  When Mr. Shimota stood up, he said he

12:06  11  agreed with the tentative, but he just wanted you to go with

12:06  12  their construction instead.  He really just reargued the

12:06  13  issues that had already been decided in the brief.  So

12:07  14  unless there's something new, we can rest on our papers.

12:07  15             THE COURT:  I'm obviously going to think about

12:07  16  this a bit more, but for now, that's good.

12:07  17             All right, let's take our break now.  We've got,

12:07  18  what, six or seven minutes after 12:00 according to the

12:07  19  clock on the wall.  Let's take ten minutes and then come

12:07  20  back.

12:07  21             And then, Mr. Shimota, how much time do you think

12:07  22  you need to respond?

12:07  23             MR. SHIMOTA:  I think probably 20 minutes would be

12:07  24  fine, Your Honor, if that would work for you.

12:07  25             THE COURT:  Okay.  I told you I'd make it about

| | | |
|---|---|---|
| 12:07 | 1 | even. |
| 12:07 | 2 | MR. SHIMOTA:  I think that's about even.  Is that |
| 12:07 | 3 | right?  I think it was like 25 minutes.  I guess my |
| 12:07 | 4 | colleague tells me it's 34 minutes over. |
| 12:07 | 5 | THE COURT:  Well, if we say 20, then you'll go 25, |
| 12:08 | 6 | not you, but that's the inescapable law of lawyers. |
| 12:08 | 7 | Okay, let's take ten minutes.  And then when we |
| 12:08 | 8 | come back, I'll hear some rebuttal from Entropic.  Thank |
| 12:08 | 9 | you. |
| 12:08 | 10 | (Recess) |
| 12:21 | 11 | THE COURT:  All right, good afternoon everybody. |
| 12:21 | 12 | Please have a seat. |
| 12:21 | 13 | We do not need to call the case or take |
| 12:21 | 14 | appearances.  Let's just go straight to Entropic. |
| 12:21 | 15 | MR. SHIMOTA:  Thank you, Your Honor.  My colleague |
| 12:21 | 16 | will start. |
| 12:21 | 17 | MR. ENGEL:  I apologize, Your Honor.  We were not |
| 12:21 | 18 | able to get the video to work after the break, so I'm going |
| 12:21 | 19 | to go old school on you. |
| 12:21 | 20 | THE COURT:  What should I look at, your PowerPoint |
| 12:21 | 21 | presentation? |
| 12:21 | 22 | MR. ENGEL:  Yes, our PowerPoint presentation. |
| 12:22 | 23 | We'll start there. |
| 12:22 | 24 | THE COURT:  What page? |
| 12:22 | 25 | MR. ENGEL:  We're going to go to Slide 9, and this |

12:22  1   is going to be the first term, digitizing the complete

12:22  2   bands.  If you look at Slide 9 on the left-hand side, you

12:22  3   see what the defendants' proposed construction -- which is

12:22  4   basically digitizing at that antenna.  That's where they're

12:22  5   saying that the signal is received.  But there is not a

12:22  6   single embodiment in the patent that discloses that you can

12:22  7   do that or how you would do that.  And counsel is not able

12:22  8   to point you to a single embodiment where that's done.

12:22  9           There was a discussion that the figures there were

12:22  10  the embodiment of Claim 1.  I would disagree and say they

12:22  11  are entirely the embodiment of Claim 14.  If you look at the

12:22  12  right-hand side of Slide 9, you'll see where digitization

12:22  13  takes place.  This is one example circuit.

12:22  14          Actually, if we skip back to Slide 8, there are

12:23  15  two example circuits shown here.  In both of these,

12:23  16  digitization takes place downstream of the antenna and

12:23  17  downstream of the LNBs, and there is processing that takes

12:23  18  place.  It's still the same signal that's digitized, but

12:23  19  it's been processed as it goes through the ODU and arrives

12:23  20  at the analog-to-digital converter.

12:23  21          And one of the things to keep in mind is these

12:23  22  satellite signals as we read in the background typically

12:23  23  have different polarizations.  You have two left and

12:23  24  right-hand satellite signals stacked over each other.  Those

12:23  25  have to be separated before you can digitize them.  That has

| | | |
|---|---|---|
| 12:23 | 1 | to happen.  That's disclosed in the patent.  So I think any |
| 12:23 | 2 | construction where you're digitizing the signal as it's |
| 12:23 | 3 | received at the antenna of the satellite is just not tenable |
| 12:23 | 4 | in view of the specification itself. |
| 12:23 | 5 | The next term -- |
| 12:23 | 6 | THE COURT:  Hold on one second. |
| 12:23 | 7 | MR. ENGEL:  Sure. |
| 12:24 | 8 | THE COURT:  Okay. |
| 12:24 | 9 | MR. ENGEL:  The next term is the "IRD" term, and I |
| 12:24 | 10 | heard from counsel that it's a video output.  But what we |
| 12:24 | 11 | really heard from counsel is that there has to be a cable |
| 12:24 | 12 | connected to some box that's then connected to a TV and only |
| 12:24 | 13 | a TV.  That's not in the claims, and it's also contradicted |
| 12:24 | 14 | by the intrinsic evidence that counsel relied upon. |
| 12:24 | 15 | I'm going to put up -- let's try to put up here -- |
| 12:24 | 16 | this would be from their Tab 2, Slide 7, and I'll put it up |
| 12:24 | 17 | on the Elmo so you can see it.  This is some of the |
| 12:24 | 18 | intrinsic evidence that they relied on to say that an IRD |
| 12:25 | 19 | has to go to a television.  I think Your Honor hit it on the |
| 12:25 | 20 | head where it says the IRD provides the signal to an output |
| 12:25 | 21 | device or processor, such as a television set -- that's an |
| 12:25 | 22 | example -- for display or processing. |
| 12:25 | 23 | And why does processing matter?  Well, one of the |
| 12:25 | 24 | examples of output that's given in the '576 Patent is a |
| 12:25 | 25 | personal video recorder or a PVR.  So if you're outputting |

12:25   1   to that, you're not outputting a television signal.  You're

12:25   2   outputting to a recording device so that it can later be

12:25   3   output to a TV.

12:25   4           THE COURT:  But it's still a video signal, is it

12:25   5   not?

12:25   6           MR. ENGEL:  If video signal is some type of data

12:25   7   representing video, then correct.  Our issue with video

12:25   8   signal was if it's data representing video, we're in

12:25   9   agreement, but if it's a signal that can drive a television

12:26   10   set, we disagree with that.

12:26   11           THE COURT:  Okay.

12:26   12           MR. ENGEL:  For example, you can store on a video

12:26   13   recorder as MPEG, but you still need to put it into a TV

12:26   14   format like NTSC when you later display it on the TV.

12:26   15           Now, one thing to note -- the example of the

12:26   16   personal video recorder is at Slide 13 of our presentation,

12:26   17   and there's a cite to where that is mentioned in the '576 as

12:26   18   well.  But the last thing I will hit on the IRD is there was

12:26   19   some mention to a concession by Entropic in the Charter case

12:26   20   that an IRD must output to a TV.  Well, first off, the IRDs

12:26   21   were not at issue in the Charter case.  IRDs are a

12:26   22   satellite-specific term.  The set-top boxes we were talking

12:26   23   about there are cable set-top boxes, and so our tutorial

12:26   24   focused on that.

12:27   25           Moreover, if you look at the actual evidence

12:27   1   itself, it says nothing about IRDs.  And the examples that

12:27   2   it gives completely show consistency.  So I'll put this up.

12:27   3   It's our Slide 15, Your Honor.

12:27   4           Now, again, this is not an IRD.  This is a set-top

12:27   5   box.  You know, a set-top box can include an IRD, but not

12:27   6   all set-top boxes are IRDs.  The examples we gave here were

12:27   7   displaying TV content, providing signal monitoring, or being

12:27   8   part of the whole home DVR.  Again, if it's part of a DVR,

12:27   9   it's going to a hard drive.  It's not going to a television.

12:27  10   So this idea that this is somehow a concession we would

12:27  11   disagree with.

12:27  12           The last issue that I'm going to hit was the

12:27  13   "transponder request signal."  So this would be Term 4.

12:27  14           THE COURT:  Yes.

12:27  15           MR. ENGEL:  Specifically, our Slide 33 I think is

12:28  16   the one that addresses this issue probably the best.  I

12:28  17   heard counsel explain that, you know, it must be something

12:28  18   specific to a transponder, and I don't think the patent says

12:28  19   that.  I think the patent claimed it broadly.  When it talks

12:28  20   about this, it talks about channel information, channel

12:28  21   selection information, channel select information.  But if

12:28  22   you look at the passage that follows -- this is at the

12:28  23   bottom of Slide 33, it says:  "Each IRD communicates the

12:28  24   channels it needs to receive, directly or indirectly, to the

12:28  25   signal selector."

12:28 1           Now, counsel told you that that was only about the

12:28 2    path.  I disagree.  I don't think it says anything about the

12:28 3    path right there.  It says it communicates to the channels

12:28 4    it needs to receive, directly or indirectly.  But it goes on

12:28 5    to say:  "This information is used to select the transponder

12:28 6    channel."  So it doesn't say the transponder channel, you

12:29 7    know, identifier is used to select the transponder channel.

12:29 8    It says "This information."

12:29 9           So can you ask for ESPN?  Sure.  Can you ask for

12:29 10   the channel you expect ESPN to be at?  Can you use some

12:29 11   proxy and have it look up?  Sure.  All of those are ways

12:29 12   that you can request it.  This idea that you have to request

12:29 13   a specific transponder signal I don't think is supported by

12:29 14   the patent and I think is contradicted by the specification.

12:29 15          With that, I will turn it over to my colleague,

12:29 16   Mr. Shimota.

12:29 17          THE COURT:  Okay.  Thank you.

12:29 18          MR. SHIMOTA:  Thank you, Your Honor.

12:29 19          I'll try to be brief as well and then turn it over

12:29 20   to my colleague, Mr. Bridges.  Again, thank you for going

12:29 21   over today.  We very much appreciate it.

12:29 22          First, I'll go in order, you know, of how it

12:29 23   appeared from the defendants' presentation, the

12:29 24   plural/singular issue, the transponder request signal, et

12:29 25   cetera.

12:29   1          Counsel focused on the Bushnell case, and we're
12:30   2   not particularly hung up on whether or not that case is
12:30   3   published or not, but the issue there is each patent needs
12:30   4   to be considered on its own merits.  They're all unique.
12:30   5   That's the whole point of inventions.
12:30   6          If you look at the Bushnell case, I was just
12:30   7   reading it over again, the point there -- and this is at --
12:30   8   it's unpublished, so it's not at an appendix page, but -- so
12:30   9   it would be at page 8 in the Lexis opinion and at the end at
12:30   10  pages 12 to 13.  The point there is that both the District
12:30   11  Court and the Federal Circuit both said, well, this claim
12:30   12  wasn't drafted that well, so let's look to the specification
12:30   13  and try to figure out if the specification helps out.
12:30   14         What they found in that instance was, well, no.
12:30   15  In both spaces, both the District Court and the Federal
12:30   16  Circuit said, you know, there is just no guidance at all, so
12:31   17  we don't know what to do with this claim.  I can just put
12:31   18  up -- if you just look -- this would be page 36 of our
12:31   19  presentation.  I won't belabor the point, but you've seen
12:31   20  this figure, Fig. 2, from the '576 Patent now many, many
12:31   21  times during this presentation today and during the
12:31   22  technology tutorial.  The one thing that was clear from the
12:31   23  technology tutorial is that our experts were -- both
12:31   24  parties' experts were in violent agreement as to how this
12:31   25  basically works.

12:31  1      So there's no lack of clarity as to what's

12:31  2  happening with this, that there's a single ODU which is

12:31  3  receiving multiple request signals and that it's

12:31  4  distributing that signal to all these ODUs.  In that regard,

12:31  5  your opinion properly held that the parallelism between the

12:31  6  singular and the plural was no problem at all.  For that

12:31  7  reason, the claim, you know, when considered in light of the

12:31  8  specification is not unclear.

12:31  9      Just two other clarification points, the first of

12:31 10  which is that there was some suggestion that we take the

12:32 11  position that the term "plural" means only one or more.  To

12:32 12  the extent that that came through, it was not our intent,

12:32 13  and we have no intention of arguing that to Your Honor.

12:32 14      I think there was also a suggestion that your

12:32 15  opinion equates the transponder signal and the composite

12:32 16  signal.  I don't read your opinion as saying that at all.  I

12:32 17  think you properly have recognized that they are separate

12:32 18  items, that the transponder signal is something different,

12:32 19  and the composite is a combination of those.  So all your

12:32 20  opinion holds is, again, that the final element is written

12:32 21  in the singular form.  So I don't believe there is any issue

12:32 22  or ambiguity there as well.

12:32 23      THE COURT:  Okay.

12:32 24      MR. SHIMOTA:  Turning to "decodes specific

12:32 25  programs," we heard a lot, again, about the experts,

| | | |
|---|---|---|
| 12:32 | 1 | Dr. Steffes and Dr. Akl.  It's true that we didn't present, |
| 12:33 | 2 | you know, Dr. Akl on this issue, and indefiniteness is not |
| 12:33 | 3 | our burden of proof.  There's no requirement under the law |
| 12:33 | 4 | that you need to provide an expert on an issue. |
| 12:33 | 5 | To be clear, if you read the briefing again, the |
| 12:33 | 6 | point that Dr. Steffes was making was that, number one, that |
| 12:33 | 7 | the word "decode" is extremely broad.  It could be |
| 12:33 | 8 | scrambling.  It could be multiplexing, et cetera.  You've |
| 12:33 | 9 | properly held that that's not an indefinite term. |
| 12:33 | 10 | When he was asked at his deposition about the term |
| 12:33 | 11 | the specific programs -- if you see there -- this is his |
| 12:33 | 12 | deposition at pages 95 through 96.  My colleague asked him |
| 12:33 | 13 | if you agree that the programs, whatever they are, that are |
| 12:33 | 14 | decoded by the gateway are the same ones -- |
| 12:33 | 15 | THE COURT:  What page are you on? |
| 12:33 | 16 | MR. SHIMOTA:  Oh, it's page 61 of our slide |
| 12:33 | 17 | presentation. |
| 12:33 | 18 | THE COURT:  Sorry, one second.  Let me -- |
| 12:33 | 19 | MR. SHIMOTA:  Certainly. |
| 12:33 | 20 | THE COURT:  Okay.  I'm there.  Go ahead. |
| 12:34 | 21 | MR. SHIMOTA:  Sure.  My colleague, Mr. Engel asked |
| 12:34 | 22 | Dr. Steffes:  "I'm just asking if you agree that the |
| 12:34 | 23 | programs, whatever they are, that are decoded by the gateway |
| 12:34 | 24 | are the same ones that are distributed over the LAN?  Is |
| 12:34 | 25 | that your understanding of Claim 9? |

12:34  1            "A.  Yes, it is."

12:34  2            So there was no expert testimony concerning

12:34  3    whether or not the specific programs were, you know,

12:34  4    ambiguous or not.  It was all focused on the term

12:34  5    "decoding."

12:34  6            As I said to you this morning, it's unfortunate I

12:34  7    think the parties talked past each other and didn't focus on

12:34  8    the language specific, and that was the point of emphasis in

12:34  9    your opinion.  And as I showed you today and Fig. 11 makes

12:34  10   it quite clear, when it's talking about the specific

12:34  11   programs, it's the programs that are associated with the

12:34  12   set-top boxes or IRDs that are connected to the gateway.

12:34  13   That's the point of the invention, so it would be very

12:34  14   clear.

12:34  15           We don't need an expert to see that.  You can just

12:35  16   see that from the intrinsic record.  I don't think that's

12:35  17   been contradicted at all today.  So I respectfully submit

12:35  18   that the claim should be held to have its plain and ordinary

12:35  19   meaning, or if you wanted to address it to say that the

12:35  20   specific programs are the programs associated with the

12:35  21   set-top boxes connected to or associated with the gateway,

12:35  22   that would be fine.  But we think that's clear from the

12:35  23   record itself.

12:35  24           Finally, the term "LAN," and I'll handle this

12:35  25   briefly.  If you could turn to page 69 of our slide

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

12:35    1    presentation, and I'll just put it up on the Elmo again,

12:35    2    too.

12:35    3          You know, after the briefing -- you know, after we

12:35    4    took Dr. Steffes' deposition, and as your opinion correctly

12:35    5    held, I mean, it's very clear that wireless LANs or LANs --

12:35    6    both wired and wireless LANs were known by 2001 and in fact

12:36    7    well before that.  Counsel came today and said, look, if you

12:36    8    adopt the construction that you've proposed, Your Honor,

12:36    9    there's going to be an enablement fight.  Well, the answer

12:36   10    here is that we welcome that fight.  We're going to --

12:36   11    Dr. Steffes made some statements about when things were

12:36   12    available that we're more than happy to address it when the

12:36   13    time comes.

12:36   14          When looking and preparing for this, we found a

12:36   15    case, and, interestingly, it literally is the exact same

12:36   16    issue that we have here.  The Federal Circuit held there

12:36   17    that -- this is the Hill-Rom Services case, and that's at

12:36   18    755 F.3d 1367.  It's a 2014 case.  There, too, the defendant

12:36   19    argued, well, look, if you construe this term -- I think it

12:36   20    was the data link.  If you construe that as including

12:36   21    wireless, well, then that would be invalid as indefinite, so

12:36   22    you shouldn't do that -- or invalid as not enabled, so you

12:36   23    should construe it the way we want so it's limited to wired

12:36   24    embodiment.

12:37   25          The Federal Circuit said, no, you don't get to do

12:37   1    that.  You address enablement later.  But where the term has

12:37   2    plain and ordinary meaning, you don't rewrite the claim to

12:37   3    preserve its validity for an enablement argument.  So we

12:37   4    think this case is directly on point, and it strongly

12:37   5    supports your opinion.

12:37   6           The only last point I would make is that counsel

12:37   7    said, well, there actually is no explicit disclosure of a

12:37   8    wireless embodiment in the patent, so that's another reason

12:37   9    why you should limit it to wired.  I don't have a case for

12:37   10   this now, but I think it's very well known that patents are

12:37   11   not limited to a preferred embodiment.  As long as things

12:37   12   are known, you don't need to literally disclose every

12:37   13   embodiment.

12:37   14          If you want to get very, very hypertechnical,

12:37   15   802.11, Wi-Fi wireless, that's under 802, and that's at IEEE

12:37   16   standards.  Wired Ethernet is 802.3.  If you talked with

12:37   17   many experts, they'd say that 802.11 is just a form of

12:37   18   wireless Ethernet.  It's just a version of Ethernet but in

12:38   19   the wired context.  So if we wanted to be hypertechnical, I

12:38   20   could say that wireless LANs were disclosed in the patent.

12:38   21   But in all events, legally it's not necessary.  They were

12:38   22   known at the time.  Wireless LANs were known, and your

12:38   23   opinion is exactly correct.

12:38   24          And with that, unless you have any further

12:38   25   questions, Your Honor, I will sit down.  Thank you.

| | | |
|---|---|---|
| 12:38 | 1 | THE COURT:  That's good.  Thank you. |
| 12:38 | 2 | MR. BRIDGES:  Good afternoon, Your Honor. |
| 12:38 | 3 | Unfortunately, it did change from morning to afternoon.  I |
| 12:38 | 4 | have the luxury of going last.  Therefore, I'm the most |
| 12:38 | 5 | favored because I get to end. |
| 12:38 | 6 | So just very briefly, I'll only cover two terms. |
| 12:38 | 7 | Very briefly, the first term is our favorite from this |
| 12:38 | 8 | morning, the transponder signals and transponder channels |
| 12:38 | 9 | issue.  Two points here, Your Honor. |
| 12:38 | 10 | First of all, you were shown very rapidly some |
| 12:38 | 11 | testimony excerpts from the technology tutorial.  And Robert |
| 12:39 | 12 | Frost, again, Your Honor.  That "transponder" word makes all |
| 12:39 | 13 | the difference because we saw a lot of quotes from Dr. Akl |
| 12:39 | 14 | talking about the difference between signals in the abstract |
| 12:39 | 15 | and transponder channels. |
| 12:39 | 16 | See, what that's actually referring to, Your |
| 12:39 | 17 | Honor, is that within a transponder signal or a transponder |
| 12:39 | 18 | channel it carries digital data.  So can you with encoding |
| 12:39 | 19 | and all of those methods put more than one data stream |
| 12:39 | 20 | there?  For instance, could you fold together more than one |
| 12:39 | 21 | television program?  Could you fold together television with |
| 12:39 | 22 | some other data?  That's possible.  It is possible to put |
| 12:39 | 23 | signals in the abstract onto a single transponder signal |
| 12:39 | 24 | because any signal can have within it more than one, quote, |
| 12:40 | 25 | "signal worth of data." |

12:40    1          So when Dr. Akl is talking about different

12:40    2    signals, just note -- Your Honor will probably have to go

12:40    3    back through the tutorial transcript to look at those

12:40    4    quotations if you want to rely on them -- just note whether

12:40    5    or not there is any testimony that actually addresses the

12:40    6    salient issue.  Did Dr. Akl or anyone else say that

12:40    7    transponder signals are not transponder channels?  That's

12:40    8    the question, not whether signals in the abstract are

12:40    9    transponder channels.

12:40    10          The second major point on this, Your Honor, is we

12:40    11   heard a lot of this discussion about, oh, well, there could

12:40    12   be multiple signals.  Therefore, that means that transponder

12:40    13   signal is less than transponder channel, et cetera.  But I

12:40    14   would encourage Your Honor on that simply to stick to the

12:40    15   intrinsic record because the intrinsic record doesn't

12:41    16   disclose such a thing.

12:41    17          In all of the many references that we pointed to

12:41    18   in our briefing -- and, Your Honor, if you look at our

12:41    19   slides, will see even more -- there are a lot of references

12:41    20   in this patent where transponder signals and transponder

12:41    21   channels are intermixed.  They're being treated as the same

12:41    22   thing.  But where is the intrinsic record saying what the

12:41    23   defendants are having to bring in through extrinsic opinion

12:41    24   at the tutorial?  Where is the intrinsic record telling us

12:41    25   that a single transponder channel is actually many

| | | |
|---|---|---|
| 12:41 | 1 | transponder signals?  We didn't hear any.  There isn't any. |
| 12:41 | 2 | We can't find it when we look at the patent, and it hasn't |
| 12:41 | 3 | been shown to Your Honor.  So between the choice of some |
| 12:41 | 4 | nebulous extrinsic evidence and the intrinsic record, I |
| 12:42 | 5 | would submit that that choice is clear. |
| 12:42 | 6 | Turning to the last term, Your Honor, "RF |
| 12:42 | 7 | signals," obviously we agree with Your Honor's tentative |
| 12:42 | 8 | construction on this.  And Your Honor actually asked a very |
| 12:42 | 9 | salient question.  Why do they need in their construction |
| 12:42 | 10 | "RF signals" to be repeated?  I mean, the strange thing |
| 12:42 | 11 | about their construction is they say RF signals is just |
| 12:42 | 12 | analog carrier RF signals apparently acknowledging the fact |
| 12:42 | 13 | that RF means something.  It's important.  It is.  RF means |
| 12:42 | 14 | radio frequency as opposed to baseband. |
| 12:42 | 15 | Your Honor will remember our discussion this |
| 12:42 | 16 | morning with respect to Fig. 14 and how you can do |
| 12:42 | 17 | processing if you want to by moving something to zero |
| 12:42 | 18 | frequency as opposed to radio frequencies where it will |
| 12:43 | 19 | eventually be transmitted.  The point, Your Honor, is the |
| 12:43 | 20 | claim term "RF signal" is concerned with frequency, not |
| 12:43 | 21 | format, not digital or analog. |
| 12:43 | 22 | If Your Honor could turn to our slide deck -- |
| 12:43 | 23 | again, we apologize for the computer problem, but if you |
| 12:43 | 24 | could turn to our Slide 44 Your Honor.  This is just a |
| 12:43 | 25 | visual representation of what's an analog signal and a |

12:43    1    digital signal.  An analog signal is represented by some

12:43    2    physical quantity, and a digital signal is represented by

12:43    3    samples of that physical quantity.  It's just numbers.  So

12:43    4    it may look a little more jagged depending upon, you know,

12:43    5    how good the resolution is.  But, Your Honor, it's the same

12:43    6    signal.  It still has the same frequency.

12:44    7           The signal on the left and the signal on the right

12:44    8    have the same frequency.  If we went back to our friend, the

12:44    9    Fourier transform, for the signal on the right, it would

12:44   10    still spit out the same frequency because it's still a wave.

12:44   11    It's just a wave that has been represented differently, by

12:44   12    digital data instead of by analog signals.  It's the same

12:44   13    signal.

12:44   14           The point, Your Honor, is this.  Frequency is a

12:44   15    different issue than format.  Digital and analog are a

12:44   16    question of format.  How do we represent the signal?  How do

12:44   17    we store it?  How do we manipulate it?  Whereas, frequency

12:44   18    is a question of, well, if we do that mathematical analysis

12:44   19    on the signal, what kinds of frequencies will it have within

12:44   20    it?

12:44   21           And if we could go to the next --

12:44   22           THE COURT:  Pausing for a second, radio frequency

12:45   23    that means -- what is the range of frequencies that

12:45   24    constitute radio frequency?

12:45   25           MR. BRIDGES:  It's a really great question, Your

12:45    1    Honor, and you can have experts debate that in the same way

12:45    2    of when does red begin and when does blue begin in the

12:45    3    spectrum.

12:45    4            So radio developed because, you know, going all

12:45    5    the way back to Marconi, we're going to use certain types of

12:45    6    radiation, relatively low frequency stuff.  So that over

12:45    7    time became known as radio frequencies.  Then you have

12:45    8    microwaves, and you have, you know, visible spectrum,

12:45    9    ultraviolet, et cetera.  So there are undoubtedly textbooks

12:45   10    that could give us sort of soft boundaries, at least as good

12:45   11    as physicists could.  But it's roughly going to be

12:45   12    something, you know, outside of the range -- it depends on

12:45   13    the context that you're talking about.  I don't actually

12:45   14    think that part is in dispute here.

12:45   15            For this case, what Your Honor will see disclosed

12:45   16    in the intrinsic record are examples of, for example, 950 to

12:46   17    1450 MHz.  Radio frequencies, the physicists are much

12:46   18    broader than that.  They go much further.  After all, your

12:46   19    FM radio is only down in the megahertz.  Your AM radio is

12:46   20    down in the kilohertz.  Those are all radio frequencies,

12:46   21    too.

12:46   22            But if Your Honor is sticking to the intrinsic

12:46   23    record, in general for these systems, we're talking about

12:46   24    things such as you'll see in Fig. 5.  If you'll notice the

12:46   25    little notations --

| | | |
|---|---|---|
| 12:46 | 1 | THE COURT:  Fig. 5 of the -- |
| 12:46 | 2 | MR. BRIDGES:  Of the '576 Patent.  If Your Honor |
| 12:46 | 3 | wants to just turn to Slide 46, you'll see there composite |
| 12:46 | 4 | signal.  And I'm sorry it's a bit small, but if you look |
| 12:46 | 5 | down at the left and the right -- if you look in the orange |
| 12:46 | 6 | rectangle, and down at the bottom in the left and the right, |
| 12:46 | 7 | you'll see 950 and 1450.  That's, again, the example.  But |
| 12:47 | 8 | those are the radio frequencies.  And Your Honor can see |
| 12:47 | 9 | that point laid out a little bit more clearly for you on |
| 12:47 | 10 | Slide 51, which just puts some dotted lines around those. |
| 12:47 | 11 | THE COURT:  Got it.  Okay. |
| 12:47 | 12 | MR. BRIDGES:  Again, to physicists, it's a much |
| 12:47 | 13 | broader range, but Your Honor gets the point. |
| 12:47 | 14 | We also heard a lot about, well, look, if the |
| 12:47 | 15 | claim meant digital, it had to say digital.  Why?  The |
| 12:47 | 16 | claims of the '715 Patent, Your Honor, are not the claims of |
| 12:47 | 17 | the '576 Patent.  They're related.  That's true.  The |
| 12:47 | 18 | intrinsic record, it's part of it, that's true.  But they're |
| 12:47 | 19 | different claims because they're different inventions. |
| 12:47 | 20 | The '715 Patent, unlike the '576 Patent which went |
| 12:47 | 21 | through reexam, concerns different subject matter.  The '576 |
| 12:47 | 22 | Patent is about the outdoor unit.  The '715 Patent is an |
| 12:48 | 23 | architecture, including the gateway, distributing signals to |
| 12:48 | 24 | LANs, et cetera, so these are considerably different claims. |
| 12:48 | 25 | Although the claims of the '576 Patent went |

12:48    1    through reexamination and emerged with limitations

12:48    2    explicitly to digital to distinguish the prior art, the '715

12:48    3    Patent did not because it did not need to.  The architecture

12:48    4    of the '715 Patent is novel and nonobvious on its own where

12:48    5    it is agnostic about digital and analog.  The reason the

12:48    6    claim doesn't say digital or analog is that it doesn't need

12:48    7    to because the plain meaning simply doesn't exclude either

12:48    8    one, and the patent goes to great lengths in order to

12:48    9    disclose both embodiments.

12:48   10        So the very last point on that, Your Honor, is

12:48   11    that I would note -- well, two points.  Relatedly, when you

12:49   12    were shown the file history on this patent and a lot of talk

12:49   13    of digitization, I will remind Your Honor that was the file

12:49   14    history of the reexamination of the different patent.  Your

12:49   15    Honor will be live to that.  I don't mean to belabor it.

12:49   16        The last point, though, is that, again, in the

12:49   17    '576, the digitizing step actually refers to a different

12:49   18    step than the ones that are at issue here.  The digitizing

12:49   19    in the '576 Patent is on the front-end when the signal comes

12:49   20    in.  We digitize it so that we have it in digital form and

12:49   21    we can work with it.

12:49   22        Here, the relevant claim steps where RF signals

12:49   23    appear are down in that processing.  And if Your Honor wants

12:49   24    to refer to that, most simply, it's at our Slide --

12:49   25        THE COURT:  I'm looking at it.

12:49   1          MR. BRIDGES: Okay. You can also see this called

12:49   2   out at Slide 45, for instance. It's the frequency

12:50   3   translation and the combining steps, not digitization on the

12:50   4   front-end. So we would say that great care should be

12:50   5   exercised in going into the different patent and using that

12:50   6   to try to construe the terms of this one.

12:50   7          Well, with those points, I mean, we certainly

12:50   8   agree with Your Honor's tentative that RF signals on its own

12:50   9   would be a plain meaning. And since the issue of format is

12:50   10   not something that resides in the plain meaning of RF

12:50   11   signals, we think Your Honor got it right because you will

12:50   12   notice, Your Honor, that actually the defendants don't

12:50   13   propose that the plain meaning of RF signals is analog.

12:50   14   They don't.

12:50   15          In their briefing if you pull it apart carefully,

12:50   16   they don't actually do that. What they do instead is they

12:50   17   say, well, RF signals are mentioned with respect to some

12:50   18   analog embodiments. Therefore, you have to limit it. But

12:50   19   they don't argue as to plain meaning, and they don't argue

12:51   20   lexicography.

12:51   21          Thank you very much, Your Honor. Have a good

12:51   22   afternoon.

12:51   23          THE COURT: Okay. Rebuttal from defendants,

12:51   24   please.

12:51   25          MR. HERSHKOWITZ: Your Honor, Benjamin

12:51  1    Hershkowitz.  Two quicks points.

12:51  2         With respect to the first term, which is behind

12:51  3    Tab 1, which is the digitizing, we heard from opposing

12:51  4    counsel that they say, look, it doesn't say digitizing at

12:51  5    the antenna, and that's what you would somehow need.  Take a

12:51  6    look at the Claim.  It says, "at the ODU digitizing."  The

12:51  7    input is the antenna.  The input to the ODU is at the

12:51  8    antenna, and the digitizing takes place in the ODU.  So that

12:51  9    point that they make is simply a non sequitur and irrelevant

12:51  10   to what the claim actually says.

12:51  11        Pivoting to the --

12:51  12        THE COURT:  Well, hold on one second.  I have a

12:52  13   follow-up question there.  So for that limitation,

12:52  14   defendants -- let's see -- for "digitizing the plurality of

12:52  15   satellite broadband signals," defendants want "digitizing

12:52  16   the complete bands," and that piece seems to not be in

12:52  17   dispute.

12:52  18        MR. HERSHKOWITZ:  Correct, Your Honor.

12:52  19        THE COURT:  "Digitizing the complete bands of

12:52  20   satellite broadband signals."  So you want "received at the

12:52  21   ODU."

12:52  22        MR. HERSHKOWITZ:  Right.

12:52  23        THE COURT:  But immediately before that limitation

12:52  24   in the claim are the words, "in the ODU, digitizing."

12:52  25        MR. HERSHKOWITZ:  Correct.  And the point is that

| | | |
|---|---|---|
| 12:52 | 1 | what they were saying is because the signal is received at |
| 12:53 | 2 | the antenna horns that somehow the claim therefore suggests |
| 12:53 | 3 | that there can be this intermediate processing to the claim |
| 12:53 | 4 | because it then says in effect -- it doesn't say digitizing |
| 12:53 | 5 | at the antenna. |
| 12:53 | 6 | Well, in fact, if you take a look at the figures, |
| 12:53 | 7 | it includes the antenna as part of the outdoor unit.  So, |
| 12:53 | 8 | yes, receiving at the antenna, but it can be digitized |
| 12:53 | 9 | anyplace within the outdoor unit.  It just must be the |
| 12:53 | 10 | digitization of those received satellite broadband signals. |
| 12:53 | 11 | As a matter of fact, one case that Your Honor's |
| 12:53 | 12 | tentative did not address, which I just want to point out, |
| 12:53 | 13 | is I would urge the Court to review the Intel v. Qualcomm |
| 12:53 | 14 | case, because a similar issue confronted the Patent Office |
| 12:53 | 15 | and then the Federal Circuit there where what happened is, |
| 12:53 | 16 | much like Entropic is trying to do here, they were trying to |
| 12:53 | 17 | argue that actually you can do an operation on a |
| 12:54 | 18 | downconverted signal. |
| 12:54 | 19 | In fact, the Federal Circuit said, well, no, |
| 12:54 | 20 | that's a different signal.  It said specifically the term |
| 12:54 | 21 | had to be read in the context of the claim, which we have |
| 12:54 | 22 | here and which used radio frequency input signal, much like |
| 12:54 | 23 | we have the input to the ODU here, to reference the carrier |
| 12:54 | 24 | frequency signal received at the antenna.  As a result, the |
| 12:54 | 25 | Court concluded that the phrase referenced incoming carrier |

12:54    1    signals before downconversion, not as the output of the

12:54    2    downconversion.

12:54    3              It's the same issue that we are dealing with here.

12:54    4    A downconverted signal is not the signal that was received

12:54    5    at the ODU.  So I'd urge the Court to review that Intel case

12:54    6    which actually appears on Slide 15.

12:54    7              THE COURT:  Okay.

12:54    8              MR. HERSHKOWITZ:  And just the last minor point,

12:54    9    on IRD, you heard them mention MPEG.  That's not mentioned

12:55   10    anywhere in the spec.  What is mentioned is NTSC which was

12:55   11    at the time and still today is the output that is the video

12:55   12    signal that is connected to the TV.

12:55   13              Thank you.

12:55   14              THE COURT:  Okay.  Thank you.

12:55   15              MS. TESSAR:  Just very quickly on RF signals, we

12:55   16    heard a brand new argument about RF signals just now.

12:55   17    There's absolutely no support in the briefs or the record

12:55   18    for any of it.  There's no expert testimony on it.

12:55   19              THE COURT:  So you're referring to plaintiff's

12:55   20    Slide 44, correct?

12:55   21              MS. TESSAR:  Exactly.  But more importantly than

12:55   22    that, it misses the point.  Entropic is right that there's

12:55   23    not really a dispute here that the satellite signals that

12:55   24    are in that 900, 950 to 1450 range are RF signals.  The

12:55   25    fight here is about whether or not the RF signals have to be

12:56    1    analog carrier signals or whether they can be purely digital

12:56    2    signals.

12:56    3           And the file history is clear here.  If you would

12:56    4    like us to submit a cite for the idea that you can look to

12:56    5    the '576, the related patent, which becomes part of the

12:56    6    intrinsic record for the '715 Patent, we're more than happy

12:56    7    to do that.

12:56    8           But when you read through the claim language, the

12:56    9    claim differentiation arguments, the specification, the

12:56   10    prosecution history, every single one of those, the patentee

12:56   11    is using RF to mean analog, and it's using digital to mean

12:56   12    digital.  And that's just a relic of the time and the need

12:56   13    to understand these claims from the perspective of how

12:56   14    people thought about analog and digital at the time.

12:56   15           THE COURT:  So let's say for the sake of argument

12:56   16    I thought it was important for me to look and consider when

12:57   17    you're talking about the reexamination file history for the

12:57   18    '576, correct?

12:57   19           MS. TESSAR:  Correct.

12:57   20           THE COURT:  And this is in connection with

12:57   21    construction of RF signals in the '715?

12:57   22           MS. TESSAR:  Correct.

12:57   23           THE COURT:  Timing-wise, does it matter?  I

12:57   24    probably ought to know the answer to this.  We're talking

12:57   25    about Claim 9 of the '715?

| | | |
|---|---|---|
| 12:57 | 1 | MS. TESSAR:  Yes.  Since they all -- everything |
| 12:57 | 2 | we're talking about, whether it's the '576 original claims, |
| 12:57 | 3 | reexam claims, the '715 claims, they all claim priority back |
| 12:57 | 4 | to November of 2001, so you have to judge everything from |
| 12:57 | 5 | the perspective of a person in November of 2001. |
| 12:57 | 6 | THE COURT:  Right, but you want me to look at what |
| 12:57 | 7 | the applicant and the Patent Office said in the |
| 12:57 | 8 | reexamination in the '576 to help construe limitations in |
| 12:57 | 9 | the '715. |
| 12:58 | 10 | MS. TESSAR:  That's correct. |
| 12:58 | 11 | THE COURT:  When did the reexamination for the |
| 12:58 | 12 | '576 take place roughly? |
| 12:58 | 13 | MS. TESSAR:  It was later.  I think it was 2007, |
| 12:58 | 14 | 2008, in that timeframe, but -- |
| 12:58 | 15 | THE COURT:  And the '715 issued in? |
| 12:58 | 16 | MS. TESSAR:  2009 I think. |
| 12:58 | 17 | THE COURT:  2009.  So after that reexamination |
| 12:58 | 18 | took place for the '576. |
| 12:58 | 19 | MS. TESSAR:  Yes.  We don't have any indication of |
| 12:58 | 20 | whether or not the examiner looked at the record of the |
| 12:58 | 21 | reexam.  You know, it's PTAB that's administering the |
| 12:58 | 22 | reexam, and then the examiners handle the prosecution.  So |
| 12:58 | 23 | as far as I'm aware, I don't believe that we know whether it |
| 12:58 | 24 | was before the examiner or the examiner considered it. |
| 12:58 | 25 | THE COURT:  Does that matter? |

| | | |
|---|---|---|
| 12:58 | 1 | MS. TESSAR:  I don't think so here it does. |
| 12:58 | 2 | THE COURT:  Okay.  Sorry I interrupted you.  Go |
| 12:58 | 3 | ahead. |
| 12:58 | 4 | MS. TESSAR:  Well, the last point I was just going |
| 12:58 | 5 | to make is earlier when I stood up and presented, you asked |
| 12:58 | 6 | whether it mattered whether "RF" was in the construction and |
| 12:59 | 7 | whether we could drop that or whether there was a good |
| 12:59 | 8 | synonym.  I don't think there's a synonym here that helps |
| 12:59 | 9 | the jury understand.  I mean, we could define "RF."  There's |
| 12:59 | 10 | all kinds of things we could do. |
| 12:59 | 11 | At the end of the day, nobody is disputing what |
| 12:59 | 12 | falls within that, you know, that something that falls |
| 12:59 | 13 | within that particular MHz range is radio frequency.  So our |
| 12:59 | 14 | suggestion is let's focus the construction on the dispute |
| 12:59 | 15 | here and have it focus just on it being "analog carrier |
| 12:59 | 16 | signals," and we can drop the "RF." |
| 12:59 | 17 | THE COURT:  So in response to my question from the |
| 12:59 | 18 | previous round, you would be okay with the construction |
| 12:59 | 19 | "analog carrier signal"? |
| 12:59 | 20 | MS. TESSAR:  Correct. |
| 12:59 | 21 | THE COURT:  Drop "RF."  No need even to reference |
| 12:59 | 22 | a specific frequency range. |
| 12:59 | 23 | MS. TESSAR:  Correct. |
| 12:59 | 24 | THE COURT:  Okay.  It's all about whether it's an |
| 01:00 | 25 | analog signal or a digital signal.  It's all about |

01:00  1   plaintiff's Slide 44.

01:00  2          MS. TESSAR:  Well, I would say it's not at all

01:00  3   about Slide 44, but other than that, you had it exactly

01:00  4   right.

01:00  5          THE COURT:  Plaintiff's Slide 44 makes the

01:00  6   argument that either type of signal -- and plaintiff

01:00  7   referred to it as form or property as opposed to frequency

01:00  8   -- either form, either format is fine.  The claim refers to

01:00  9   an RF signal.  The RF signal could be in the format of

01:00 10   analog or digital.

01:00 11          MS. TESSAR:  Yes -- no, sorry, now I understand

01:00 12   your question.  We don't agree with their point, though,

01:00 13   that we don't need a construction.  That's where we differ.

01:00 14          THE COURT:  Okay.

01:00 15          MS. TESSAR:  And just so everyone can plan for the

01:01 16   court reporter and everyone else for their lunch, Mr. Hester

01:01 17   is just going to make a few points on the indefiniteness

01:01 18   issues, and then I believe we will be done.

01:01 19          THE COURT:  Okay.

01:01 20          MR. HESTER:  Hello, again, Your Honor.  Adam

01:01 21   Hester.  I'll start with the "decodes specific programs"

01:01 22   term.  I'll make two quick points.  This is from the '715

01:01 23   Patent.

01:01 24          During his argument, Mr. Shimota indicated that

01:01 25   neither party really briefed the specific program issue, or

01:01   1    it was something that was somehow lost.  He also said that

01:01   2    no expert opined on it or didn't address it directly.

01:01   3            As to whether the parties briefed it, I can

01:01   4    confirm that we did.  Particularly in response brief of

01:01   5    Defendants' 22 through 25, we talk about it at length.

01:01   6    Whether an expert opined on it, the answer is yes.  The

01:01   7    expert opinion was so clear.  Entropic's counsel asked the

01:01   8    expert about it at the expert's deposition, and defendants'

01:02   9    quoted that exchange in our brief.  I'll put it up on the

01:02   10   Elmo right now.

01:02   11           So this is page 24 of defendants' responsive

01:02   12   brief.  There's a fairly long quote from Dr. Steffes'

01:02   13   deposition.  The first half was there to correct a

01:02   14   misstatement or a mischaracterization by Entropic in their

01:02   15   brief, but the part we care about here is highlighted.

01:02   16           Mr. Engel, counsel for Entropic says:  "Isn't that

01:02   17   one of your issues with the '715 Patent itself is you can't

01:02   18   tell if the programs that are decoded are part of the

01:02   19   composite signal or not?"  And Dr. Steffes said:  "They're

01:02   20   not identified as such."

01:02   21           And then we quote in the rest of the brief a

01:02   22   couple more pages from the deposition that Mr. Steffes

01:02   23   maintained it was not certain what programs were decoded,

01:02   24   what are the specific programs.

01:02   25           So we have both briefing and we have expert

01:02  1  opinion, both of which are in accord with Your Honor's

01:02  2  tentative, which we believe should be adopted.

01:02  3          THE COURT:  Okay, I understand.

01:02  4          MR. HESTER:  And the only other point I'll make

01:03  5  with respect to the transponder channel limitation is that

01:03  6  different words in claims are presumed to have different

01:03  7  meaning, and Entropic has done nothing to override that

01:03  8  presumption.  The intrinsic record provides no help, and the

01:03  9  extrinsic record speaks volumes, that they are in fact

01:03  10  different concepts, the transponder signals and the

01:03  11  transponder channels.  Thank you.

01:03  12          THE COURT:  I understand.  Okay.  Thank you.

01:03  13          Counsel, thank you very much, all of you, for your

01:03  14  presentations, and your briefs, your responses to my

01:03  15  questions.  I appreciate all of it.  I've got a lot to go

01:03  16  back and think about.

01:03  17          One sort of housekeeping question, we have a new

01:03  18  case that has joined us, 23-05253, Entropic against the

01:03  19  DIRECTV entities.  It joins our MoCA cases I think, so we

01:04  20  have now have four MoCA cases.

01:04  21          MR. HERSHKOWITZ:  That's correct, Your Honor.

01:04  22  That case was filed.  I'm not aware if there's any service

01:04  23  effectuated of it yet, but obviously DIRECTV will respond in

01:04  24  due course.  We note there are some issues with the

01:04  25  Complaint which we have started to address with opposing

01:04    1    counsel.  We think it was improperly filed.  We also think
01:04    2    it violated an NDA, but we will address that in due course
01:04    3    in whatever necessary briefing.
01:04    4              THE COURT:  Okay.  I guess I appreciate knowing
01:04    5    about all those issues.  I was raising it for a couple
01:04    6    reasons.  One is I like to try to impose some order on the
01:04    7    chaos, and I'm kind of thinking about three different types
01:04    8    of cases.  As we've discussed, I think a few times at status
01:04    9    conferences we've got the satellite cases we're dealing with
01:04   10    here.  We've got the MoCA cases, and we've got the cable
01:04   11    cases.  So I see it as a new Moca case.
01:05   12              Assuming that it moves forward, Mr. Hershkowitz,
01:05   13    you're suggesting perhaps it will not or should not.  But
01:05   14    putting that aside, if it moves forward, you know, I'd like
01:05   15    to slot it in with those other MoCA cases, and we'd talked
01:05   16    about consolidation.  I haven't received proposed orders to
01:05   17    consolidate either the MoCA cases or the cable cases yet.  I
01:05   18    think you're holding off on that because I think you told me
01:05   19    you wanted -- did plaintiff want answers on all of them?
01:05   20              MR. SHIMOTA:  We now have responses to everything,
01:05   21    and the parties are working on -- I mean, there's a lot of
01:05   22    parties and a lot of lawyers, but the proposed order
01:05   23    concerning consolidation is coming your way.
01:05   24              And then to answer your question if we would
01:05   25    oppose having DIRECTV consolidated with that, the answer is

01:05  1  no, Your Honor.

01:06  2          MR. HERSHKOWITZ:  Your Honor, obviously I think

01:06  3  it's premature for us to have a position --

01:06  4          THE COURT:  Can you get closer to a microphone?  I

01:06  5  do want to hear you.

01:06  6          MR. HERSHKOWITZ:  Normally, I'm told I speak too

01:06  7  loud, but it's nice to know I've attenuated.

01:06  8          Your Honor, I think it's premature.  I don't know

01:06  9  that there's been service yet.  Obviously there are a lot of

01:06  10  issues.  And we're theoretically several -- four, six months

01:06  11  behind those other cases.  So obviously I would say it would

01:06  12  be prejudicial to accelerate that case.  But to the extent

01:06  13  that it goes the opposite direction, obviously we can

01:06  14  address that at the appropriate time.

01:06  15          THE COURT:  Okay.  I'm not going to prejudge it,

01:06  16  but I just like to have some order to these cases.

01:06  17          Okay, we'll get to that when we get to it.  Again,

01:06  18  if it does move forward, I think my thought is the same that

01:06  19  a special master should be appointed for that case, but

01:06  20  we'll hold off on all that to see if it's going to move

01:07  21  forward.  I understand that the defendants think there are

01:07  22  some infirmities -- defendants who haven't even apparently

01:07  23  been served yet think there may be some infirmities.

01:07  24          MR. SHIMOTA:  We have.  We have served.  We'll

01:07  25  file those papers with the Court, and then we can address

01:07  1    with counsel, you know, the issues they have.  We have been

01:07  2    talking to them, Your Honor.

01:07  3               THE COURT:  Okay.  So that was one question.

01:07  4               The second question, Mr. Shimota, is are there

01:07  5    going to be more?

01:07  6               MR. SHIMOTA:  There's no intention to file any

01:07  7    more at present, Your Honor.

01:07  8               THE COURT:  To the extent that you can tell me.

01:07  9               MR. SHIMOTA:  I'm not aware of it.  There's no

01:07  10   more cases coming at present.

01:07  11              THE COURT:  Okay.

01:07  12              MR. SHIMOTA:  If I may, one further point, Your

01:07  13   Honor.

01:07  14              THE COURT:  Go ahead.

01:07  15              MR. SHIMOTA:  At the original scheduling

01:07  16   conference of this matter back in December, we basically cut

01:07  17   the schedule off at the Markman hearing, and you said that

01:07  18   you'd revisit things.  Then here we are.

01:07  19              So we've proposed a schedule to opposing counsel.

01:07  20   They've taken the position that you ruled that you weren't

01:07  21   going to -- that we shouldn't address the remainder of the

01:08  22   schedule until your actual Markman order had issued.  We

01:08  23   didn't read it that way.  So we'd just like some guidance

01:08  24   from you on how you'd like the parties to proceed.

01:08  25              THE COURT:  My thought was I'll issue a Markman

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

01:08   1   order when I'm ready.  I've got to process all of this new

01:08   2   information and think about things.  I'm not sure how long

01:08   3   it's going to take.  I'm going to try to get it out as

01:08   4   quickly as I can, but I don't know when that will be.

01:08   5          My thought was I do that, and in that order, it

01:08   6   will also say, okay, you've got your claim constructions,

01:08   7   parties.  Put your heads together and see how you would like

01:08   8   to proceed and give me a proposed case schedule or, if you

01:08   9   can't agree, competing case schedules.  And come back -- and

01:08  10   do that by X date and come back on Y date.  We'll have a

01:08  11   scheduling conference and talk about how we're going to go

01:09  12   forward.  That was my thought, so I guess more along the

01:09  13   lines of what defendants' position was.

01:09  14          MR. SHIMOTA:  Okay.  I understand then, Your

01:09  15   Honor.  Thank you.

01:09  16          THE COURT:  Okay.  That having been said, I am

01:09  17   eager to get this case to trial as soon as we can.

01:09  18          MR. SHIMOTA:  That's what we think, Your Honor.

01:09  19          THE COURT:  I do not want to delay.  Let's go, go,

01:09  20   go.

01:09  21          All right, so those were the questions there.  And

01:09  22   I wanted to make sure everybody saw we were scheduled to

01:09  23   have a pretty significant hearing or set of hearings and

01:09  24   scheduling conferences I think -- was it next Friday, the

01:09  25   21st?  I moved that date back for my purposes to whatever it

01:09  1    was, August 9, I think.  I wanted to make sure everybody saw

01:09  2    that.  If there's a problem with that date because I picked

01:09  3    it -- it was good for me.  If there's a problem with that

01:09  4    date, put all your heads together, and hopefully you won't

01:10  5    need to do this but suggest an alternate date.

01:10  6            MR. SHIMOTA:  The only thing I would say in that

01:10  7    regard, Your Honor, is that I think -- I believe for the

01:10  8    issues there I don't think counsel in this matter are

01:10  9    handling any of those issues.  So I will take it upon

01:10  10   ourselves -- we'll reach out to opposing counsel to raise

01:10  11   that issue and ask them if that date is good.  It's great

01:10  12   for us.

01:10  13           THE COURT:  Thank you.  You make a very good

01:10  14   point, and, that is, Entropic has a crossover between this

01:10  15   hearing and the issues that are -- were supposed to be

01:10  16   discussed on the 21st.  Those were in the MoCA and cable

01:10  17   cases I believe.

01:10  18           MR. SHIMOTA:  That's correct, Your Honor.

01:10  19           THE COURT:  So none of defendants' counsel here

01:10  20   are involved in those cases?  I thought there was some

01:10  21   overlap.

01:10  22           MS. TESSAR:  There's overlap with Dish, but we

01:10  23   don't -- we, Perkins Coie, don't represent Dish in that

01:10  24   case, so we will pass along the word to Fish & Richardson to

01:10  25   coordinate on that issue.

01:11  1            THE COURT:  Okay.

01:11  2            MR. SHIMOTA:  Oh, the more informed counsel just

01:11  3   told me that DIRECTV is actually set for status on August 9,

01:11  4   so I guess I misspoke.  So my understanding is that --

01:11  5            THE COURT:  So I'm sort of previewing the

01:11  6   conversation that I was going to have on August 9.  I did

01:11  7   set the new case 5253 for a status conference on August 9,

01:11  8   so -- well, that is what it is.

01:11  9            Mr. Hershkowitz, you look perplexed or --

01:11  10            MR. HERSHKOWITZ:  No, no, no.  Your Honor, because

01:11  11   that case was just filed, if you notice, there have been no

01:11  12   appearances that have been made on behalf of DIRECTV or

01:11  13   AT&T.

01:11  14            THE COURT:  So you may not have known.

01:11  15            MR. HERSHKOWITZ:  We did not know about the

01:11  16   hearing.  Obviously we will check with the client and figure

01:11  17   it out, and if not, we will come back to the Court.

01:12  18            THE COURT:  Right.  So that's why I did that.

01:12  19   That's why I set a status conference in 5253 because I

01:12  20   wanted to at least talk about keeping everything together.

01:12  21   And your position may very well be don't do that, and here

01:12  22   are good reasons, and I'll listen to that at the time.

01:12  23            MR. HERSHKOWITZ:  Understood, Your Honor.

01:12  24            THE COURT:  Okay.  I believe that covers

01:12  25   everything that is on my agenda for this hearing.  What else

124

01:12  1   do we need to do?

01:12  2           Mr. Shimota.

01:12  3           MR. SHIMOTA:  I have nothing today.  We appreciate

01:12  4   your time, Your Honor.

01:12  5           MS. TESSAR:  Nothing else from Dish.

01:12  6           MR. HERSHKOWITZ:  The same, Your Honor.

01:12  7           THE COURT:  Counsel, again, thank you very much.

01:12  8   Thanks for showing up.

01:12  9           The additional folks we have, they're also working

01:12  10  on Entropic's side?

01:12  11          MR. SHIMOTA:  Yes.  We brought a number of summer

01:12  12  associates to hopefully put on a good show.

01:13  13          THE COURT:  That's what I thought.  That's who I

01:13  14  thought they were.

01:13  15          Welcome.  Very happy to have you here.  You saw

01:13  16  some very good lawyering go on here today.  So welcome and

01:13  17  thank you.

01:13  18          Have a good rest of the day everybody.  I'll see

01:13  19  some of you perhaps on that August date.  Thank you.

01:13  20          MR. SHIMOTA:  Thank you.

01:13  21          MR. HERSHKOWITZ:  Thank you.

01:13  22          (Whereupon, the proceedings were concluded.)

01:13  23                    *   *   *

01:13  24

01:13  25

**CERTIFICATE**


          I hereby certify that pursuant to Section 753,

Title 28, United States Code, the foregoing is a true and

correct transcript of the stenographically reported

proceedings held in the above-entitled matter and that the

transcript page format is in conformance with the

regulations of the Judicial Conference of the United States.


Date:  September 16, 2023


                    /s/   Sharon A. Seffens  9/16/23
                    _____
                    SHARON A. SEFFENS, U.S. COURT REPORTER