# Exhibit B

REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL

Page 1

1                   UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3

4        ENTROPIC COMMUNICATIONS,
         LLC,

5
                       Plaintiff,

6
          vs.

7                                        Case No.
         DIRECTV, LLC AND AT&T           2:22-cv-07775-JWH-

8        SERVICES, INC.,                 KES

9                  Defendants.
         _____

10

         ENTROPIC COMMUNICATIONS,

11       LLC,

12                 Plaintiff,

13          vs.

14       DISH NETWORK CORPORATION,
         DISH NETWORK, LLC, AND DISH

15       NETWORK SERVICE, LLC,

16                 Defendants.
         _____/

17

18

19

20           VIDEOTAPED DEPOSITION OF

21               ITZHAK GURANTZ

22            San Diego, California

23              July 31, 2023

24

         Job No. CS5993830

25       Reported by:  Sharon Sherr Remy CSR, RPR
                        California License No. 7247

Page 46

1 how it was originally funded?
2    A. Yes.
3    Q. How?
4    A. Through the years, I got to know a gentleman by
5 the name of John Walecka, okay, from Redpoint Ventures.
6 It's a venture capital firm in the Bay Area.
7    Q. So was Redpoint Ventures your only investor?
8    A. No.  Let me give the whole story.
9    Q. Perfect.
10    A. So we became acquainted.  And every now and
11 then he would call me, let's say if he came down to
12 San Diego.  And one time when the whole development at
13 ComStream was happening, I showed him what we were doing
14 in the lab, okay?  We were developing a front end for
15 cable.
16     And he was very impressed and he told me that
17 if I ever need money to start a company, he will look
18 favorably.  So when we left -- when we wanted to start
19 the company, I called him.  And at the time, don't
20 forget there was a lot of money.
21     So he -- and again, everything I'm telling you
22 is kind of -- maybe I don't have all the details, but
23 it's in high level.  And he told me that he would give
24 me half a million or a million.  I don't remember.  I
25 think it was probably a million dollars, okay, to write

Page 47

1 a business plan.  And if they like the business plan,
2 they will fund it.  SSA, one of the fund -- funder.
3 That's the way we started.
4    Q. So were they your primary funder?
5    A. They were the lead funder.
6    Q. And, at the outset, how much money did they put
7 in?
8    A. I cannot -- I don't remember.  They put a
9 million just --
10    Q. For the plan.
11    A. -- for the plan, until we came up with a
12 business plan, okay?  And I don't recall -- I think we
13 raised around maybe 20 mil.  And I think he -- from
14 several companies -- or from several VCs.  And he put --
15 I don't remember, actually.  5 or whatever.  You should
16 be able to find it somewhere.  I have no recollection.
17    Q. Who were the other funders at the outset?
18    A. I -- you know what?  That's another thing I
19 don't.  But I remember it was CNEA Ventures I remember
20 one of them.
21    Q. And you think --
22    A. And there was a local -- a San Diego company
23 with -- Leo Spiegel was -- I don't remember the name,
24 okay?  So we had about six, seven investors -- five to
25 seven investors.  I don't remember whether any company

Page 48

1 was involved.  Maybe Intel.  It's such a long time ago.
2 And since we had additional investment, I don't remember
3 exactly who it was.
4    Q. Did you put any of your own money in?
5    A. No.
6    Q. Did the other three founders put any of their
7 money in?
8    A. No.  That wasn't very common in the high-tech
9 industry at that time.
10    Q. How long did that initial $20 million last you?
11    A. I can't tell you.
12    Q. At some point, did you need to raise additional
13 funding?
14    A. Yes.
15    Q. Yes.

13 (Pages 46 - 49)

Veritext Legal Solutions

800-567-8658                973-410-4098



Page 50

1  BY MS. TESSAR:

2      Q. And then eventually, old Entropic acquired

3  RF Magic.

4      A. That's correct.

Page 51

Page 52

Page 53

4      Q. When did Entropic first turn a profit?

5      A. I don't recall.

6      Q. Do you recall what drove old Entropic's

7  profits?

8      A. I would say probably what they call MoCA

9  product.

10      Q. MoCA products.

11         Who was old Entropic's biggest customer?

12         MR. SHIMOTA:  Objection; form.

13         THE WITNESS:  I assume it was Motorola.

14  BY MS. TESSAR:

15      Q. But not positive.

16      A. I would speculate it was Motorola.

17      Q. Did it vary over time?

18      A. I think so.

19      Q. Do you recall whether there were other

20  companies that at some points in time would have been

21  the primary profit-driver?

22         MR. SHIMOTA:  Objection; form.

23         THE WITNESS:  I would say after the acquisition

24  of RF Magic, it could have been EchoStar and DirecTV.

25  /////

14 (Pages 50 - 53)

Page 66

1  way that the specifications are different.
2      A. I don't dispute.  I just don't know.
3      Q. Okay.  Do you see that the '576 patent -- well,
4  first of all, let me ask you this:  If I refer to
5  Exhibit 3 as the '576 patent, you'll understand what I
6  mean?
7      A. Yes, I do.
8      Q. Those are the last three digits of the patent
9  number?
10      A. Yeah.
11      Q. And if I refer to Exhibit 4 as the '715 patent,
12  you'll understand what I mean?
13      A. Yes, I do.
14      Q. Do you see that the '576 claims priority back
15  to a provisional application filed in November 2001?
16      A. I don't remember.  It says that, but -- in the
17  document.
18      Q. Okay.  So do you understand that to mean that
19  the priority date of the '576 patent is in November of
20  2001?
21      A. I assume.  I -- you're asking me a question
22  about patents, you know, a legal issue.  I can't assert
23  it, but I don't dispute it.
24      Q. Okay.  So on the '715 patent, do you see that
25  it also claims priority back to a provisional

Page 67

1  application dated November 7, 2001?
2      A. Yes.
3      Q. Yes.
4       It's the same provisional application as the
5  '576?
6      A. Yes.  Now I caught it.  Okay.
7      Q. Does the date November 7, 2001, or just
8  November 2001 generally, trigger any recollections about
9  what you were working on during that time period?
10      A. We were not working on anything besides -- it
11  wasn't -- let me kind of put it in perspective.
12       When we started the company, we were looking --
13  as I told you before, we were looking what I'm going to
14  do.  That's -- my commitment was to John that within
15  some period of time, we'll provide a business plan.
16       [Reporter clarification of the record.]
17       My commitment to John Walecka or to Redpoint
18  Venture was that we -- I don't remember exactly the
19  time, but he gave us an investment.  So within a given
20  time, we'll come with a business plan.
21       So when we started the company, we had no clear
22  idea what we're gonna do.  But we knew that the
23  technology that we worked before.  So as we were
24  discussing potential businesses and we felt we had a
25  good idea, okay, we thought we'll patent it.  And that

Page 68

1  was -- so even though this never end up even being a
2  product, that was the genesis of this patent.
3      Q. So, I'm sorry, what was the genesis of this
4  patent?
5      A. Is the fact that we were sitting and discussing
6  various potential businesses.  This was one on a
7  satellite -- trying to solve problems, okay, for
8  customers.  This was one of them.  And later on, we
9  decided to focus just on MoCA, and that will be the
10  business plan for the company.
11      Q. So did Entropic never create a product that
12  used --
13      A. Never.
14      Q. Let me finish my question.
15       So did Entropic never create a product that
16  used the inventions of the '576 and '715 patents?
17      A. That's correct.
18      Q. They never did.
19      A. Never did.
20      Q. Okay.  Well, let me ask you this first:  Are
21  you a named inventor on the '576 and '715 patents?
22      A. Yes, I am.
23      Q. Who are the other named inventors?
24      A. Ladd El Wardani and Michael Landry.
25      Q. We've talked about Ladd's role.

Page 69

1       Who is Michael Landry?
2      A. Michael Landry is the gentleman that -- an
3  engineer that we knew locally.  And I don't -- he wasn't
4  a founder.  And I don't even remember whether he was an
5  employee or a consultant that we employed in this
6  process of trying to figure out a business plan, okay?
7  So he's a guy that we knew from before, the
8  technologies.  And we probably needed additional help
9  trying to figure out -- he was a very smart engineer.
10      Q. Was he also the lawyer who prosecuted this
11  patent?
12      A. He could have been, because he later on became
13  a patent attorney.
14      Q. And so you see on the first page of the '576 in
15  the right-hand column where it says "Attorney, Agent, or
16  Firm," Michael W. Landry?
17      A. Yes.
18      Q. And that's the same Michael Landry that's
19  listed as an inventor?
20      A. Yes.
21      Q. And earlier, you said that when Entropic was
22  first founded, there were only four employees?
23      A. That's correct.
24      Q. So does that mean that Mr. Landry was likely a
25  consultant?

18 (Pages 66 - 69)

Page 78

1 concept that you associated with band stacking?
2     A. No.  It was -- band stacking -- the concept --
3 again, the concept of band stacking was very similar to
4 what is described in a patent, okay, except that
5 RF Magic did it -- in a patent, we never implemented it,
6 okay?  RF Magic did it inexpensively in an analog
7 fashion.  We describe here digital implementation.
8     Q. I'm sorry.
9         Are you saying -- when you say we described
10 here, are you saying the '576 patent and the '715
11 patent?
12     A. Both of them describe, okay -- the way we
13 described the implementation of the patent, we described
14 it in a digital -- in a digital fashion.  Essentially,
15 we digitized the signal in outdoor and choose the
16 transponders, okay?  Choose them in a digital domain
17 with digital filters, and then put it on a -- on a cable
18 after it's been reorganized and send it down again in
19 analog form.
20     Q. So -- so is it your position that the '576
21 patent and the '715 patent describe a form of band
22 stacking?
23     A. That's correct.
24     Q. Okay.  Do you believe that they describe a form
25 of channel stacking?

Page 79

1     A. Yes.
2     Q. What's the difference between band stacking and
3 channel stacking?
4         MR. SHIMOTA:  Objection; form, foundation.
5         THE WITNESS:  To me they are the same.
6 BY MS. TESSAR:
7     Q. So to you channel stacking and band stacking
8 are synonymous.
9     A. Yes.  To me, the best I can recall.
10     Q. Is band translation also synonymous?
11     A. Yes.
12     Q. So no difference between those three terms:
13 band translation, band stacking, and channel stacking?
14     A. If you ask me for the terminologies, I will not
15 be able to tell you the difference.  There may be a
16 difference, but I...
17     Q. Do you recall how long before November 2001
18 that you started working on the invention in the '576
19 and '715 patents?
20     A. No, I don't recall.
21     Q. Do you recall a particular meeting where the
22 ideas of the '576 and the '715 patent were discussed?
23     A. No.
24     Q. How did Entropic work at that time?
25     A. When you say Entropic, after we left or --

Page 80

1     Q. Old Entropic.
2     A. Old.
3     Q. So in 2001, around the time of your founding,
4 when you said you didn't have products yet --
5     A. Yes.
6     Q. -- and you were thinking about problems and
7 solutions for patents, but you hadn't decided what you
8 were going to work on --
9     A. That's correct.
10     Q. -- how did you work?  Did you get together and
11 have meetings?
12     A. We were sitting in an office and talking about
13 it.
14     Q. So you had brainstorming sessions?
15     A. Yes.
16     Q. And did, generally, all four of the founders
17 participate in those brainstorming sessions?
18     A. I don't recall.
19     Q. Did Mr. Landry often participate in those
20 brainstorming sessions?
21     A. I assume in some of them he did.
22     Q. Why did old Entropic want patents?
23        MR. SHIMOTA:  Objection; form.
24        THE WITNESS:  It's -- whenever you develop any
25 product, you feel like you have something which is

Page 81

1 innovative, then we always encourage, in all the
2 companies I worked, to file a patent.
3 BY MS. TESSAR:
4     Q. But you said here that old Entropic never had a
5 product on this invention?
6     A. That's correct.
7     Q. That's correct.
8        So why did old Entropic want patents that
9 didn't relate to any products it had?
10     A. Because as we were sitting and figuring out
11 what product to develop, we thought we came up with a
12 neat idea even though it may not necessarily be a
13 product we'll develop, and we decide to patent it.
14     Q. But why did you want a patent on the idea?
15        MR. SHIMOTA:  Objection; form.
16        THE WITNESS:  It's just because we felt it was
17 an innovative idea.  And we were -- for years and years
18 as engineers, we almost like were trained to think
19 through.  And if we felt we had an interesting,
20 innovative idea, all the company I work for encourage us
21 to patent.
22 BY MS. TESSAR:
23     Q. Did the venture capitalists who had invested in
24 Entropic want Entropic to get a lot of patents?
25     A. I don't recall them ever telling us, but I

21 (Pages 78 - 81)

Page 86

1 BY MS. TESSAR:
2     Q. In 2001, what would a company have had to do to
3 make the ideas in the '576 patent commercially viable?
4     MR. SHIMOTA: Objection; form, foundation.
5     THE WITNESS: In 2001, it would have been
6 difficult, okay, to make it into a viable commercial --
7 at least the way we described the implementation.
8 BY MS. TESSAR:
9     Q. Why?
10     A. Because you require a very high-speed
11 analog-to-digital converter. You require a highly
12 integrated semiconductor that draws -- that don't draw a
13 significant amount of power, okay, to be -- to put in an
14 outdoor unit.
15     Q. So the first thing you mentioned was high-speed
16 analog-to-digital converters?
17     A. That's correct.
18     Q. And that was not Entropic's focus; correct?
19     A. The technology at the time in the market was
20 available, but it would have been very expensive.
21     Q. Was it -- you finish.
22     Sorry. Were you done?
23     A. (Nods head.)
24     Q. I didn't mean to interrupt.
25     Okay. So the technology was available for

Page 87

1 specialized defense applications, for instance.
2     A. Potential defense applications.
3     MR. SHIMOTA: Objection; form.
4 BY MS. TESSAR:
5     Q. But that technology wasn't available for
6 consumer applications and consumer technologies?
7     MR. SHIMOTA: Objection; form, foundation.
8     THE WITNESS: Again, I would say my best
9 recollection, that it wasn't yet available for consumer
10 application. It was too expensive.
11 BY MS. TESSAR:
12     Q. Does the '576 or the '715 patents -- do they
13 have any discussion of how you could make high-speed
14 analog to digital converters cheap enough for satellite
15 applications?
16     A. No.
17     Q. You also mentioned the need for highly
18 integrated semiconductor chips?
19     A. (Nods head.)
20     Q. Why were those needed for the invention?
21     A. Because as you do the digital filtering
22 required of the channel, what you call channel stacking,
23 move a what I call transponder for one satellite to --
24 with another transponder from another satellite and put
25 them together, it will require some digital filtering in

Page 88

1 very high speed. Also, digital-to-analog converter,
2 okay, to put them back on a cable.
3     So I don't think -- and this is a really high
4 speed. I don't think the technology -- at the time, it
5 was available. No doubt about it; it was available.
6 But it probably would have taken a lot of power. But
7 this is less of an issue. If I --
8     Q. Than the first issue.
9     A. Than the analog to digital, correct.
10     Q. Does the patent describe how you could create a
11 highly integrated semiconductor that would have the
12 necessary power and other attributes for the invention
13 to work?
14     A. No. But let me just put one more thing.
15     When we saw -- it wasn't just a pie in the sky.
16 When we saw the rate of development of digital
17 technologies, okay, of semiconductor, both analog to
18 digital, and -- and semiconductor, we could see it being
19 viable in very few years.
20     Q. So you could see that if other people solved
21 those aspects --
22     A. Yes.
23     Q. -- then at some point your ideas in the future
24 could come into play.
25     A. That's correct.

Page 89

1     MR. SHIMOTA: Objection; form.
2 BY MS. TESSAR:
3     Q. You may have already answered this, but old
4 Entropic didn't conduct any kinds of experiments or
5 tests to make sure that the technologies described in
6 the '576 patent would work at this time in 2001?
7     A. We were sure absolutely it's going to work.
8 It's not -- you don't need to test it because we were so
9 familiar with digital signal processing. It's just the
10 technologies was not yet mature enough in terms of the
11 pure silicon, okay? But you don't need to make a --
12     Q. So if you had the highly integrated
13 semiconductor chip --
14     A. Yes.
15     Q. -- and if you had the right high-speed --
16     [Reporter clarification of the record.]
17 BY MS. TESSAR:
18     Q. So if you had the highly integrated
19 semiconductor chip and if you had the high-speed
20 analog-to-digital converter, then you were confident it
21 would work.
22     A. 100 percent.
23     Q. Okay. You just didn't have those two
24 components yet.
25     A. That's correct.

23 (Pages 86 - 89)

Page 130

1     Do you see that these are amendments to the
2 original claims of the '576 patent?
3       MR. SHIMOTA:  Objection; form.
4       THE WITNESS:  Yes.
5 BY MS. TESSAR:
6     Q. And do you see that the underlining indicates
7 what matter is being added to narrow the claims?
8       MR. SHIMOTA:  Same objection.
9       THE WITNESS:  I don't know what it means.
10 BY MS. TESSAR:
11     Q. But do you understand that the underlining is
12 the added matter?
13       MR. SHIMOTA:  Same objection.
14       THE WITNESS:  I assume that's something you
15 say.  You know, I'm not familiar with it.
16 BY MS. TESSAR:
17     Q. Okay.  And are you familiar with the convention
18 where deleted text is shown with brackets?
19     A. No.
20       MR. SHIMOTA:  Same objection.
21 BY MS. TESSAR:
22     Q. No.
23       Okay.  Let's go back to the '576 patent and the
24 reexamination certificate that we had up a minute ago.
25       So I'm looking at Page -- the page that ends in

Page 131

1 No. 560.
2     A. Okay.
3     Q. At the top of Column 1, right underneath where
4 it says "Ex parte reexamination certificate issued under
5 35 U.S.C. 307," do you see it says, "The patent is
6 hereby amended as indicated below"?
7     A. Yes.
8     Q. And then it says, "Matter enclosed in heavy
9 brackets [] appeared in the patent, but has been deleted
10 and is no longer part of the patent"?
11     A. Yes.
12     Q. And then do you see after that it says, "Matter
13 printed in italics indicates additions made in the
14 patent"?
15     A. Yes.
16     Q. Yes.
17       And then if you turn back to the original
18 patent, do you see that the original claims still appear
19 so that if you needed to, you could do a comparison
20 between the original and amended claims to see what has
21 changed?
22     A. I don't --
23     Q. So, for instance --
24     A. I don't know where it is.
25     Q. Yeah.  Claim 14 is in Column 13 on the page

Page 132

1 ending in -558.
2     A. Okay.  Yeah.
3     Q. And then you can compare that to the amended
4 Claim 14 that is on -- in Column 2 on Page 560?
5     A. Okay.
6     Q. And so if you wanted to, you could confirm that
7 the italics show what was added during the
8 reexamination?
9     A. Okay.
10     Q. And the brackets show what was deleted.
11     A. Okay.
12     Q. And if we turn to Exhibit 7 --
13     A. Okay.
14     Q. -- and specifically the page ending in -146 so
15 that we can keep looking at Claim 14 --
16     A. Okay.
17     Q. -- here what is added is shown in underlining
18 and then corresponds to what's italicized in the
19 reexamination certificate.
20       Do you see that?
21     A. Okay.
22     Q. So do you see that as part of the
23 reexamination, Entropic added the requirement of
24 digitizing the plurality of satellite broadband signals?
25     A. I don't remember that and so-and-so.  I assume

Page 133

1 the document is the document.
2     Q. So you don't remember having any discussions --
3     A. No.
4     Q. -- about adding that?
5     A. No.
6     Q. If someone had asked you if you had invented
7 digital -- digitizing the plurality of the satellite
8 broadband signals, would you have said yes?
9       MR. SHIMOTA:  Objection; form, incomplete
10 hypothetical.
11       THE WITNESS:  I can't even, you know, start to
12 speculate.
13 BY MS. TESSAR:
14     Q. Okay.  Sitting here today, do you think you
15 came up first with the idea of digitizing the plurality
16 of satellite broadband signals?
17     A. Again, I cannot comment on anything because
18 you're bringing so much stuff here, that I need to read
19 and figure it out.
20     Q. And I understand it is a lot of material, so
21 maybe we can take a little bit of time this afternoon to
22 sort through --
23     A. I want to get it over with.
24     Q. Well, it's important that we get your answers,
25 and I know it is hard to remember.

34 (Pages 130 - 133)



Page 154

Page 156

1 Entropic?

2     MR. SHIMOTA:  Objection; form.

3     THE WITNESS:  No.

4 BY MS. TESSAR:

5     Q. Was the '715 patent particularly important to

6 Entropic?

7     MR. SHIMOTA:  Same objection.

8     THE WITNESS:  No.

9 BY MS. TESSAR:

10     Q. Why not?

11     A. Because that wasn't our main business.

Page 155

Page 157

16 BY MS. TESSAR:

17     Q. At the end of that first e-mail it says,

18 "Perfect timing given that we're currently,"

19 capital L -- excuse me -- capital S, capital L, capital

20 R, capital P, ing -- "SLRPing."

21      Do you know what that means?

22     A. No.

23     Q. Do you know what the acronym SLRP stands for?

24     A. No.

25     Q. Was the '576 patent particularly important to

40 (Pages 154 - 157)

Page 218

1 shifted in frequency, some of the service information
2 delivered to the user will be inappropriate for the
3 delivery network," what do they mean by the frequency
4 shifting there?
5      MS. TESSAR:  Objection; foundation.
6      THE WITNESS:  I don't -- I don't know.
7 BY MR. SHIMOTA:
8      Q. Okay.  Do you know if that's done analog --
9 done in analog domain or the digital domain?
10      A. I can't -- I can't -- it seems to me like
11 analog, but I can't figure it out.
12      Q. Why would you say it seems to like -- it seems
13 like it would be analog?
14      A. Because they say -- the moment they say they
15 are simply shifted in frequency.  That's the only
16 reason, okay?  And the shifting frequency is usually the
17 easiest way to do it, is in the analog RF domain.
18      Q. So that would be done -- you think that would
19 be done in the analog domain?
20      A. I think so.  Not that it cannot be done in a
21 digital domain, okay.  It doesn't exclude it.  But
22 that's what it looks to be.
23      Q. So you haven't read this at all.
24      A. No.
25      Q. And I think what you told me, that this was not

Page 219

1 clear to you; right?
2      A. Yeah.  I've never seen this document before.
3      Q. So do you have any idea whether this discloses
4 digital channel stacking or not?
5      A. I think they are not talking about the
6 implementation here.  They're just talking about the
7 concept.
8      Q. Okay.  But do you even know whether it has a
9 concept of digit channel stacking at all or --
10      MS. TESSAR:  Object to form.
11      THE WITNESS:  It seems to me when they talk
12 about IF-to-IF, they probably thought about doing it in
13 RF domain, in analog domain.  That's what it looks to me
14 in this particular document.
15 BY MR. SHIMOTA:
16      Q. So it's probably an analog implementation?
17      A. I think so.
18      MS. TESSAR:  Objection; leading.
19      THE WITNESS:  It looks to me.  But again, I --
20 you know, I need to -- it's almost like if I were to get
21 something like this, I would ask the guy that wrote it
22 what exactly he meant.
23 BY MR. SHIMOTA:
24      Q. Yeah.  I want to ask you; right?
25      A. Yeah, but I...

Page 220

1      Q. I guess earlier in the day counsel asked you
2 some questions about my employer, the current -- you
3 know, the company Entropic, the company bearing the name
4 Entropic now.
5      A. Yeah.
6      Q. Do you have any negative feelings about that
7 company?
8      A. No.
9      Q. Okay.  So you're not angry at Entropic for
10 enforcing the patents; correct?
11      A. Absolutely.
12      Q. And I think you had a lawsuit earlier against
13 someone where you thought they owed you money; correct?
14      A. Yes.
15      Q. And you ultimately were successful at trial and
16 obtained money; correct?
17      A. Yes.  Yes.  Even though I'm sorry that we did
18 it.
19      [Reporter clarification of the record.]
20      I said that I'm sorry -- at the end of it, even
21 though we won, okay, I felt that it was -- it wasn't
22 worth it.

Page 221

1

56 (Pages 218 - 221)

Page 226

1      THE WITNESS:  That's correct.
2      MR. SHIMOTA:  That's all I have.  Thank you.
3      THE WITNESS:  Okay.  Thank you.
4      MR. SHIMOTA:  Appreciate it.
5      MS. TESSAR:  And I don't have anything further;
6  so we can go off the record.
7      THE WITNESS:  Thank you.
8      MS. TESSAR:  Thank you very much for your time.
9      THE VIDEOGRAPHER:  That concludes today's
10  deposition.  Time off the record is 2:50 p m.
11          ---o0o---
12      (Whereupon, the deposition was
13          concluded at 2:50 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 227

1      DECLARATION UNDER PENALTY OF PERJURY
2
3      I, ITZHAK GURANTZ, the witness herein, declare
4  under penalty of perjury that I have read the foregoing
5  in its entirety; and that the testimony contained
6  therein, as corrected by me, is a true and accurate
7  transcription of my testimony elicited at said time and
8  place.
9
10      Executed on this_____day of_____.
11
12
13

      _____
14      ITZHAK GURANTZ
15
16
17
18
19
20
21
22
23
24
25

Page 228

1 STATE OF CALIFORNIA.   )
              ) SS.
2 COUNTY OF SAN DIEGO.   )
3
4      I, Sharon Sherr Remy, Certified Shorthand
5 Reporter No. 7247, for the State of California, do
6 hereby certify:
7      That, prior to being examined, the witness
8 named in the foregoing deposition was duly sworn to
9 testify to the truth, the whole truth, and nothing but
10 the truth;
11      That said deposition was taken down by me in
12 shorthand at the time and place therein named and was
13 thereafter reduced by me to typewritten form, and that
14 the same is a true, correct, and complete transcript of
15 said proceedings;
16      Before completion of the deposition, review of
17 the transcript was not requested.
18      I further certify that I am not interested in
19 the outcome of the action.
20      IN WITNESS WHEREOF, I have this date subscribed
21 my name.  Date:  August 18, 2023
22
23
24

              SHARON SHERR REMY, CSR 7247
25

58 (Pages 226 - 228)