# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENTROPIC COMMUNICATIONS, LLC,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>DIRECTV, LLC and<br>AT&T SERVICES, INC.,<br><br>　　　　Defendants. | Case No. 2:22-cv-07775-JWH-KESx<br>Case No. 2:22-cv-07959-JWH-KESx<br><br>**CLAIM CONSTRUCTION ORDER** |
| ENTROPIC COMMUNICATIONS, LLC,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>DISH NETWORK CORPORATION,<br>DISH NETWORK L.L.C., and<br>DISH NETWORK SERVICE L.L.C.,<br><br>　　　　Defendants. | |

# I.  SUMMARY OF DECISION

In these actions, Plaintiff Entropic Communications, LLC asserts that the activities of Defendants DirecTV, LLC and AT&T Services, Inc. (jointly, "DirecTV") and Defendants Dish Network Corporation, Dish Network L.L.C., and Dish Network Service, L.L.C. (collectively, "Dish") concerning their respective satellite technology products and services infringe Entropic's U.S. Patent Nos. 8,792,008 (the "'008 Patent");[1] 7,130,576 (the "'576 Patent"); and 7,542,715 (the "'715 Patent") (collectively, the "Asserted Patents").[2]  The Asserted Patents relate to systems and methods for distributing and monitoring satellite broadband signals.

This matter presently before the Court is claim construction.  The parties present to the Court eight limitations for construction.[3]  The Court conducted a claim construction hearing in July 2023.  After considering the parties' opening and responsive claim construction briefs, as well as the argument of counsel at the hearing, the Court construes the disputed terms as follows:

| Limitation | Construction |
|---|---|
| "digitizing the plurality of satellite broadband signals" | "digitizing the complete bands of satellite broadband signals" |
| "integrated receiver decoder (IRD)" | "a device that, in one unit, receives and decodes data and generates an output signal" |
| "transponder request [signal] . . . the transponder request signals" "from the IRD . . . to the IRDs" "a plurality of transponder signals . . . the transponder signal" | Plain and ordinary meaning. |
| "transponder request signals" | Plain and ordinary meaning. |
| "selected [and extracted] transponder channel[s]" | Indefinite. |

---

[1]      The parties later agreed to dismiss their claims involving the '008 Patent.  *See* Order Granting Stipulation of Dismissal [ECF No. 294].

[2]      *See generally* First Am. Compl. (the "Amended Complaint") [ECF No. 20].

[3]      Joint Claim Construction Chart ("JCCC") [ECF No. 255].

| Limitation | Construction |
|---|---|
| "local area network" | Plain and ordinary meaning. |
| "RF Signals" | Plain and ordinary meaning. |
| "decodes specific programs" | Not indefinite.  Plain and ordinary meaning. |

## II.  THE ASSERTED PATENTS

### A.    The '576 Patent

The '576 Patent—entitled "Signal Selector and Combiner for Broadband Content Distribution"—issued on October 31, 2006.[4]  It claims priority to several provisional patent applications filed in November 2001 and February 2002.  The '576 Patent was the subject of reexamination proceedings, and it issued with amended claims on August 11, 2009.  At a high level, the '576 Patent teaches systems and methods for allowing multiple integrated receiver decoders ("IRDs") to receive a composite signal via a single cable from an outdoor unit ("ODU").[5]  Prior art systems typically required multiple cables running from each IRD to the ODU, because the signals contained too much information to be transmitted via a single cable.[6]

The '576 Patent teaches generating a composite signal by selecting a subset of signals of interest received at the satellite dish, extracting the selected signals from the broadband spectrum, translating the signals to distinct frequencies (if necessary), and then combining the selected signals into the composite signal to be output to the IRDs.[7] The composite signal includes programming of interest, but it contains less information

---

4      Amended Complaint, Ex. A ('576 Patent) [ECF No. 20-1].

5      *Id.*, Abstract.

6      *Id.* at 1:55-62.

7      *Id.* at 2:54-3:32.

than in prior art systems, making the signal suitable for transmission over a single cable.[8] Figure 5 of the '576 Patent shows an example of a composite signal, as described:



As shown, the composite signal includes transponder channels made up of transponder signals.[9]  The transponder signals form the composite signals, after translation to ensure the correct frequency range.[10]  The '576 Patent discloses performing the above-described systems and methods in a combination of analog and digital domains.[11]

Claim 14 of the '576 Patent is representative, and it discloses:

14.  A method of communicating a plurality of transponder signals from a satellite outdoor unit (ODU) that receives a plurality of satellite broadband signals to an <u>integrated receiver decoder (IRD)</u> over a single cable connected to the ODU, the method comprising the steps of:

communicating a transponder request to the ODU from the <u>IRD</u>;

in the ODU, *digitizing the plurality of satellite broadband signals,* selecting *and extracting* <u>a plurality of transponder signals</u> **[extracted]** from the

---

[8]      *Id.*

[9]      *Id.* at 2:60–63.

[10]     *Id.*

[11]     *Id.* at 10:60-11:2.

received *digitized* satellite broadband signals, wherein the selecting is
responsive to the transponder request signals;

combining *extracted* selected transponder signals into a composite signal;

transmitting the composite signal over the single cable from the ODU to
the IRDs, wherein the modulation of the transponder signal is not
altered by the steps of selecting, combining, and transmitting.[12]

## B.    The '715 Patent

The '715 Patent—also entitled "Signal Selector and Combiner for Broadband
Content Distribution"—issued on June 2, 2009. It is a continuation of the application
that issued as the '576 Patent, and it shares a specification with the '576 Patent. At a high
level, the '715 Patent discloses a signal distribution system for distributing output signals
from an ODU to customer equipment.[13] As discussed above with respect to the
'576 Patent, prior art systems required the use of multiple cables.[14] The signal
distribution system of the '715 Patent involves a gateway that controls the ODU by
sending transponder selection information that determines the placement of signals into
the composite signal.[15] The gateway then decodes program information from the
composite signal and sends that information to customer devices, including set top boxes
("STBs").[16] As discussed above, the use of the composite signal allows for transmission

---

[12]    *Id.*, Claim 14 (underlining added to show disputed claim limitations). The matter
enclosed in heavy brackets appeared in the original patent, but it was deleted during the
reexamination proceeding, and it is no longer a part of the patent. The matter printed in italics
indicates additions made to the patent during reexamination.

[13]    Amended Complaint, Ex. B ('715 Patent) [ECF No. 20-2], Abstract.

[14]    *Id.* at 1:56-62.

[15]    *Id.* at 2:53–55, 2:62–63, & 3:18–25.

[16]    *Id.*

with merely one cable from the ODU to the gateway.[17]  Figure 11 of the '576 Patent shows an example of the gateway, as described:



Claim 9 of the '715 Patent is representative, and it discloses:

9.  A signal distribution system for distributing a plurality of low noise amplifier and block converter (LNB) output signals from a satellite outdoor unit (ODU) comprising:

a gateway in communication with the ODU and at least one set top box (STB):

a signal selector that receives a plurality of broadband LNB signals comprising a plurality of transponder signals, the signal selector is responsive to transponder select information transmitted by the gateway and selects a plurality of transponder signals from at least one broadband LNB signal based on the transponder select information;

---

[17]     *Id.* at 3:26–42.

a frequency translator coupled to the signal selector that is capable of shifting the selected transponder signals to new carrier frequencies to produce *RF signals*; and

a signal combiner coupled to at least one frequency translator capable of combining at least two *RF signals* to produce a composite signal;

wherein the modulation of the composite signal is the same as the modulation of the broadband LNB signals and wherein the composite signal is transmitted to the gateway and the gateway receives the composite signal, *decodes specific programs*, and distributes the programs over a digital *local area network (LAN)* to STBs.[18]

## III.  LEGAL STANDARDS

The task of claim construction involves determining the meaning of a word or a group of words—which is known as a "limitation"—in a patent claim.  Claim construction "'is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims.'"  *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1339 (Fed. Cir. 2001) (quoting *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000)).  Construing the meaning of patent claims is an issue for the Court to decide as a matter of law.  *See Markman v. Westview Instr., Inc.*, 517 U.S. 370, 387-91 (1996).  "When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."  *O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  The task of claim construction always begins with the claim language.  *See Innova*, 381 F.3d at 1116.  Indeed, "the proper construction of any claim language must, among other things, 'stay[] true to the claim language.'"  *Straight Path IP Group v. Sipnet EU S.R.O.*, 806 F.3d 1356, 1361 (Fed. Cir. 2015) (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).  Claim terms "are generally given their ordinary and customary meaning," *Phillips*, 415 F.3d at 1312 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)), which is "the meaning that the term would have to a person of ordinary skill in the art," *id.* at 1313.  The terms must be read in the context of the

---

[18]    *Id.*, Claim 9 (emphasis added to show disputed claim limitations).

entire patent, however. *See id.* at 1314. In interpreting a limitation, the Court must focus primarily on the intrinsic evidence of record, including the claims themselves, the specification, and, if in evidence, the prosecution history. *See id.* at 1312-20; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005).

Among the intrinsic evidence, the "specification is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. "The specification is, thus, the primary basis for construing the claims." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985). It is "entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." *Phillips*, 415 F.3d at 1317. The Federal Circuit has recognized that an inventor may invoke a particular definition of a term in her specification, or otherwise use a term in the specification in a manner that differs from the term's ordinary usage. *See id.* at 1316. "In such cases, the inventor's lexicography governs." *Id.*

In addition to the specification, the Court should also consider the prosecution history (if it is in evidence), consisting of "the complete record" of the patent. *Id.* If, within the prosecution history, an applicant clearly and unmistakably disavowed a claim construction, then the applicant disclaimed that construction. *See SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1287 (Fed. Cir. 2005); *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003). Because the prosecution history often lacks the clarity of the specification, however, it is less useful for claim interpretation purposes. *See Phillips*, 415 F.3d at 1317.

Although the Court may also consider extrinsic evidence, including expert testimony, dictionaries, and learned treatises, such evidence is generally viewed as less reliable than intrinsic evidence. *See id.* at 1317-18. Therefore, the Court must use its discretion in admitting and weighing extrinsic evidence, keeping in mind the inherent flaws in that type of evidence. *See id.* at 1319.

## IV.  AGREED-UPON CLAIM CONSTRUCTION

The parties agree upon the following construction:[19]

---

[19]    JCCC A-10; First Amended JCCC [ECF No. 264] A-10.

| Limitation: | Parties' Agreed Construction: |
| --- | --- |
| "original channel locations"/"new channels locations"<br><br>('715 Patent, Claim 10) | plain and ordinary meaning |

The Court accepts the parties' agreed construction of the above limitation, and it is binding. *See MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1377–78 (Fed. Cir. 2007) (rejecting an appellate challenge to a claim construction agreed to by a party in district court).

## V.  DISPUTED CLAIM LIMITATIONS

### A.    Meaning of "Digitizing the Plurality of Satellite Broadband Signals"

| Limitation at Issue: | |
| --- | --- |
| "digitizing the plurality of satellite broadband signals" ('576 Patent, Claim 14) | |
| Entropic's Proposed Construction | Defendants' Proposed Construction |
| Plain and ordinary meaning, which means "digitizing the complete bands of satellite broadband signals" | "digitizing the complete bands of satellite broadband signals received at the ODU" |

Entropic argues that the language "complete bands" in Defendants' proposed construction is unnecessary and is unsupported by the specification of the '576 Patent.[20] Entropic asserts that "complete bands" is inaccurate because the term "plurality" refers to two or more signals but not necessarily all signals.[21] Entropic further contends that the language "received at the ODU" is superfluous in view of the rest of the claim language.[22]

Defendants contend that Claim 14 the '576 Patent itself requires the digitization of the "complete bands" because it teaches the selection and extraction of transponder signals, which, per Defendants, can occur only with the digitization of all signals.[23]

---

[20]    Entropic's Opening Claim Construction Br. ("Entropic's Opening Brief") [ECF No. 233] 10:13-11:2.

[21]    *Id.* at 11:10-19.

[22]    *Id.* at 11:3-9.

[23]    Defs.' Opening Claim Construction Br. ("Defendants' Opening Brief") [ECF No. 234] 13:13-18.

Defendants further assert that the specification discloses "digitizing the entire LNB output signal" because "all transponder channels are available in the sampled data."[24] Defendants note that during the reexamination proceeding, the patentee defined "digitization of the broadband signal" as "digitizing a complete band" to distinguish prior art.[25] Defendants also argue that the preamble of Claim 14 supports the "received at the ODU" language.[26]

In its response, Entropic contends that the combination of "complete bands" and "received at the ODU," as Defendants propose, impermissibly changes the scope of Claim 14 to limit "complete bands" to unprocessed signals.[27] Entropic argues that Defendants' construction is incorrect because the '576 Patent teaches that signals output from the LNBs—as opposed to signals entering the LNBs—are digitized and that those output signals may undergo prior processing.[28]

First, the Court addresses the "received at the ODU" language. The parties agree that the preamble of Claim 14 provides antecedent basis for "the plurality of satellite broadband signals."[29] Claim 14 discloses "[a] method of communicating a plurality of transponder signals from a satellite outdoor unit (ODU) that receives a plurality of satellite broadband signals" and "in the ODU, digitizing the plurality of satellite broadband signals."[30] Thus, Claim 14 itself requires that the satellite broadband signals in the limitation at issue are the signals received at the ODU. *See Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) (claim construction "begins and ends" with the words of the claims). A construction that includes the language "received at the ODU" offers no additional clarity. *See United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (claim construction "is not an obligatory exercise in redundancy").

Second, the Court addresses the "complete bands" language. The prosecution history supports Defendants' proposed construction. During reexamination, the patentee argued, "the digitization of the broadband signal—*i.e.*, digitizing a complete band—is not

---

[24]   *Id*. at 13:19-24 (citing '576 Patent 7:25-30).

[25]   *Id*. at 14:1-3 & 14:13-27; *id.*, Ex. D ('576 Patent File History ("'576 FH")) [ECF No. 234-4] 43 & 49.

[26]   *Id*. at 15:4-8.

[27]   Entropic's Responsive Claim Construction Br. ("Entropic's Responsive Brief") [ECF No. 253] 4:8-15.

[28]   *Id*. at 6:14-18.

[29]   Entropic's Opening Brief 11:6-8; Defendants' Opening Brief 15:4-8.

[30]   '576 Patent, Claim 14.

obvious in light of the prior art because broadband digitization results in an architecture that is substantially different from that achievable through conventionally known technologies such as those found in the cited art."[31]  The patentee detailed the differences between the invention and conventional systems.[32]  The patentee expressly defined "digitizing a broadband signal" as "digitizing a complete band."  *See TF3 Ltd. v. Tre Milano, LLC*, 894 F.3d 1366, 1372 (Fed. Cir. 2018) (holding that the applicant's use of "*i.e.*" suggested the intent to define a term).  Moreover, the fact that the patentee provided that definition to distinguish the prior art demonstrates a disclaimer in claim scope and supports a construction consistent with the disclaimer.  *See SanDisk Corp.*, 415 F.3d at 1287.  Further, in its responsive brief, Entropic appears to acknowledge that the "complete bands" construction is appropriate and instead shifts its argument to dispute the correctness of Defendants' construction under a different interpretation, discussed below.[33]  Accordingly, the Court adopts the "complete bands" language in its construction for "digitizing the plurality of satellite broadband signals."

Finally, the Court need not address Entropic's argument regarding unprocessed and processed signals because the Court declines to include in its construction the language "received at the ODU."  Additionally, Defendants do not address Entropic's argument regarding processed and unprocessed signals, which Entropic raised for the first time in its responsive brief.  Thus, it does not appear that there is an actual dispute over that issue, and, further, it is unclear that adopting the construction that Defendants propose would even give rise to such a dispute.  Still, to the extent that a dispute exists, the Court determines that its construction is consistent with the specification.  Although Claim 14 requires that the satellite broadband signals in the limitation at issue are the signals that are received at the ODU, the claim is silent regarding any intermittent processing.  Thus, the signals may undergo additional processing prior to digitization.  The claim does not rule out that possibility, but it also does not require it.

For the foregoing reasons, the Court construes "digitizing the plurality of satellite broadband signals" as "digitizing the complete bands of satellite broadband signals."

---

[31]     '576 FH 49.

[32]     *Id*. at 49-50.

[33]     Entropic's Responsive Brief 4:3-7.

**B.    Meaning of "Integrated Receiver Decoder (IRD)"**

| Limitation at Issue: | |
|---|---|
| "integrated receiver decoder (IRD)" ('576 Patent, Claims 14, 18, 19, 21, 22, & 41) | |
| **Entropic's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning, which means "device capable of receiving and decoding data and generating an output" | "device capable of at least receiving and decoding data and generating an output video signal" |

The parties agree that an IRD is "a device that receives and decodes, in one unit."[34]  The parties dispute whether the IRD also "generat[es] an output video signal.[35] Entropic argues that Defendants improperly import that function from a prior art IRD.[36] Entropic contends that that language unduly narrows the meaning of "IRD" because some IRDs—but not all IRDs—may have that capability.[37]  Defendants argue that that construction is necessary not because the parties disagree regarding the plain and ordinary meaning of "IRD," but because a lay jury would likely not be familiar with the term.[38]  Defendants maintain that the specification explains that an IRD must "decode[] the digital data to produce a video signal, and generate[] an RF output to drive a television."[39]  In response, Entropic clarifies that a STB may include an IRD but that STBs and IRDs are not equivalent.[40]  Entropic further explains that an IRD may output a video signal only in certain contexts—*e.g.*, when connected to a display—which cuts against Defendants' proposed construction.[41]

Here, the specification discloses connecting IRDs by tuning to selected transponder channels.[42]  It further discloses the following:

> The cross point switch **160** allows connection of the outdoor unit **110** to more than one integrated receiver decoder (IRD) **180** located inside the building.

---

[34]    Entropic's Opening Brief 12:2-5.

[35]    *Id.* at 12:6-8.

[36]    *Id.* at 12:18-27.

[37]    *Id.* at 13:1-10 (citing '576 Patent 2:65–67, 6:67–7:2, & 9:20–22.).

[38]    Defendants' Opening Brief 16:6-15.

[39]    *Id.* at 16:23-17:13 (citing '576 Patent 1:29-43, Fig. 2, & 6:62-7:2.)

[40]    Entropic's Responsive Brief 9:25.

[41]    *Id.* at 10:15-20.

[42]    *See* '576 Patent 2:65–67, 6:67–7:2, & 9:20–22.

IRDs are commonly called set top boxes (STBs) arising from their typical installed location on top of TV sets.  The LNB **140** converts the signal transmitted by a satellite in Earth orbit, for example C band, Ku band, or another frequency band, to a lower intermediate frequency (IF) suitable for transmission through coax inside a building.  For example, L band IF (950 to 1450 MHZ) with RG-6 or RG-11 coax cable is commonly used.  The IRD **180** tunes one transponder channel, demodulates the IF signal from the LNB down to base band, provides channel selection, conditional access, decodes the digital data to produce a video signal, and generates an RF output to drive a television.[43]

While that discussion concerns prior art IRDs, neither party argues—and the specification does not suggest—that the IRD of Claim 14 is in any way different from prior art IRDs.  Rather, the invention largely concerns a single cable connection.[44]  The '576 Patent also refers to demodulating and decoding video and audio signals.[45]

Thus, the specification appears to teach that the IRD outputs a signal.  Indeed, neither party disputes that the IRD outputs a signal.[46]  However, the specification does not support limiting the output signal to only a video signal.  For instance, as discussed above, the specification discloses receiving and decoding both video and audio signals.  The specification further provides that the IRD generates an RF output.  That RF output could be a video signal, but it is not necessarily limited to only a video signal.  Accordingly, the Court will not limit the output signal to only a video signal, as the specification does not clearly support such a narrowed scope.  Still, in view of the parties' dispute and likely jury confusion regarding  the meaning of "IRD," the Court concludes that some construction is appropriate here.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).

For the foregoing reasons, the Court construes "IRD" as "a device that, in one unit, receives and decodes data and generates an output signal."

---

[43]     *Id*. at 1:29-43.

[44]     *See id*. at 1:55-62 & 2:60-63.

[45]     *Id*. at 6:62-7:2.

[46]     *See* Entropic's Responsive Brief 10:15-20.

C.    **Meaning of "Transponder Request Signal"**

| Limitation at Issue: | |
| --- | --- |
| "transponder request [signal] . . . the transponder request signals" "from the IRD . . . to the IRDs" "a plurality of transponder signals . . . the transponder signal" ('576 Patent, Claim 14) | |
| **Entropic's Proposed Construction** | **Defendants' Proposed Construction** |
| 1. Is not indefinite. <br><br> 2. Plain and ordinary meaning. No construction necessary. | Indefinite. |

The parties dispute whether a singular-plural mismatch with respect to several claim limitations renders the claim indefinite.

Defendants argue that the limitations "transponder request signal[s]," "transponder signal[s]," and "IRD[s]" are indefinite due to mismatched single and plural usage throughout Claim 14.[47] Defendants acknowledge that a person having ordinary skill in the art could infer that the term "the transponder request signals" refers to the term "a transponder request," especially in view of the reexamination history of the '576 Patent.[48] Defendants further acknowledge that the term "modulation of the transponder signal" refers to the term "a plurality of transponder signals," despite the singular-plural mismatch.[49] The same notion applies to the term "IRD[s]."[50] Defendants assert that it is unclear whether modulation applies to merely one transponder signal, and, if so, to which one.[51] Defendants contend that the specification does not resolve the issue because it teaches embodiments with both plural and singular numbers of the components at issue.[52]

Entropic argues the claim is not indefinite in view of the context of the invention. For instance, the claim refers to an IRD in the singular when the context is individual, but it uses a plural form when discussing how the ODU will respond, since many IRDs may

---

[47]    Defendants' Opening Brief 23:2-8.

[48]    *Id.* at 23:11-24:3.

[49]    *Id.* at 24:4-11.

[50]    *Id.*

[51]    *Id.* at 24:17-18.

[52]    *Id.* at 24:23-25:3.

be attached to the same ODU.[53] Entropic asserts that the same logic applies to the remaining terms. Claim 14 uses the singular to refer to a particular transaction and uses the plural to discuss the ODU response.[54]

A patent challenger must prove indefiniteness by clear and convincing evidence. *See Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1377 (Fed. Cir. 2015) ("*Biosig*"). First, with respect to the term "modulation of the transponder signal," in the singular, Claim 14 teaches, in the same clause, "transmitting the composite signal."[55] Thus, the singular form is correct because at that point in the disclosed method, there is a singular composite signal. The plural forms—*i.e.*, "selected transponder signals" and "a plurality of transponder signals"—precede the combination step.[56] Thus, the term is not indefinite when considered in the full context of the claim.

With respect to the "transponder request" limitation, the Court does not attach significance to the omission of the term "signal," as the reexamination history provides the necessary context.[57] Additionally, in view of the specification, the limitation with the singular form, "communicating a transponder request to the ODU," could be performed multiple times depending upon the number of IRDs. Thus, the later plural usage—"the transponder request signals"—discussed in a step occurring within the ODU, does not render the term indefinite.[58] Given the later singular usage, the Court concludes that Claim 14 is directed to an embodiment with at least two IRDs connected to the ODU. While a singular article may refer to multiple signals, a plural article refers to one or more. *See, e.g.*, *Apple Inc. v. MPH Technologies Oy*, 28 F.4th 254 (Fed. Cir. 2022) (concluding that the plural usage refers to two or more). The singular and plural uses of the term "IRD[s]" parallel the singular and plural uses of the term "transponder request signal[s]" and confirm that understanding. To the extent that the specification discloses embodiments referring to an IRD in the singular, those references appear to be directed to subcomponents of the total invention, which contemplates multiple IRDs.

For the foregoing reasons, the disputed terms do not render Claim 14 indefinite. Plain and ordinary meaning governs, with the understanding that Claim 14 teaches a multiple IRD embodiment. Further construction is unnecessary.

---

[53]    Entropic's Opening Brief 14:13-15:7.

[54]    *Id*. at 15:8-22.

[55]    '576 Patent, Claim 14.

[56]    *Id*.

[57]    *See id*. (before and after reexamination).

[58]    *Id*., Fig. 2 (showing multiple IRDs connected to a single ODU).

### D.    Meaning of "Transponder Request Signals"

| Limitation at Issue: | |
| --- | --- |
| "transponder request signals" ('576 Patent, Claims 14, 19, & 22) | |
| **Entropic's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning, which means "a signal directly or indirectly identifying and requesting a transponder" | "a signal identifying and requesting a particular transponder signal" |

Defendants argue that the specification does not use the term "transponder request" or "transponder request signal."[59] Defendants seek a clarifying construction due to their concern about an embodiment directed to extracting a video program.[60] Defendants contend that the signal at issue here is distinct from the program discussed in the specification.[61] Entropic argues that Defendants' proposed construction is confusing, unnecessary, and unsupported by the specification.[62] Entropic asserts that the specification describes the "transponder request signals" only as containing generic information.[63]

Nothing in the specification supports Defendants' proposed construction. At best, the specification discusses "selection of the transponder channel," "channel information," and "channel select information," which, in Entropic's view, relates to the "transponder request signal" limitation.[64] The Court finds no basis to adopt Defendants' proposed construction. The Court regards Defendants' proposed construction as unhelpful because the specification does not clarify the criteria for identifying a "particular" signal.

For the foregoing reasons, plain and ordinary meaning governs. Construction is unnecessary.

---

[59]    Defendants' Opening Brief 21:15-17.

[60]    *Id.* at 29:13-20.

[61]    *Id.*

[62]    *See* Entropic's Opening Brief 16:7-17:17.

[63]    *Id.* at 16:20-27.

[64]    '576 Patent 3:10-17, 4:45-47, 9:6-13, & 9:31-33. Indeed, that disclosure reveals a greater problem, as discussed in the following section.

E.    **Meaning of "Selected Transponder Channel"**

| Limitation at Issue: | |
|---|---|
| "selected [and extracted] transponder channel[s]" ('576 Patent, Claims 16, 17, 21, 39, 41, & 42) | |
| **Entropic's Proposed Construction** | **Defendants' Proposed Construction** |
| 1. Is not indefinite.<br><br>2. Plain and ordinary meaning. No construction necessary. | Indefinite. |

The parties dispute whether "selected transponder signals" in independent Claim 14 provides sufficient support for "selected transponder channels" in several dependent claims.

Defendants argue that the term "selected and extracted transponder channels" is indefinite due to lack of antecedent basis.[65] Specifically, Defendants contend that Claim 14 discloses selecting and extracting only transponder *signals* but not transponder *channels*.[66] Defendants assert that signals and channels are not the same because a signal includes only some of the information contained in a channel.[67] In other words, a channel may encompass a signal, but the inverse is not necessarily true.[68] Defendants further argue that the difference in word choice, in both Claim 14 and in other claims of the '576 Patent, suggests that the applicant intended those terms to have distinct meanings.[69] Defendants also assert[70] that the '576 Patent specification distinguishes the terms "channel"[71] and "signal."[72]

Entropic argues that the limitation at issue is not indefinite because the '576 Patent selects a signal by choosing a channel that carries the selected signal.[73] In other words, the two terms are related because "signals" are the contents and "channels" are the

---

[65]    Defendants' Opening Brief 18:1-3.

[66]    *Id.* at 18:4-11.

[67]    *Id.* at 18:12-13.

[68]    *Id.* at 18:17-20.

[69]    *Id.* at 19:27-20:5.

[70]    *Id.* at 20:12-20.

[71]    '576 Patent 6:11-19.

[72]    *Id.* at 5:55-62.

[73]    Entropic's Responsive Brief 11:12-15.

packages that carry the contents.[74]  In view of that relationship between the two terms, the use of "channels" as opposed to "signals" does not render the limitation indefinite.[75]  In response, Defendants maintain their position that a person of ordinary skill in the art would not understand that the claimed transponder signal selection in independent Claim 14 implies the claimed transponder channel selection of the dependent claims.[76]

Independent Claim 14 teaches "selecting and extracting a plurality of transponder signals."[77]  Claim 14 does not teach "transponder channels."  Claims 16, 17, 21, 39, 41, & 42 each depend, directly or indirectly, from independent Claim 14.[78]  Those dependent claims teach "selected transponder channel[s]."[79]  At first glance, it appears that the '576 Patent uses the terms "signals" and "channels" interchangeably in those claims.  For instance, Claim 16 discloses:  "[t]he method of claim 14 wherein the step of combining comprises frequency translating the selected and extracted transponder channels to a variable frequency before combining"; however, Claim 14 discloses only "selecting and extracting transponder signals."  Embodiments in the specification support that interpretation.[80]

Generally, the use of different claim terms—i.e., "signals" and "channels"—suggests different meanings.  See Phillips, 415 F.3d at 1314.  However, "[c]laim differentiation is a guide, not a rigid rule.  If a claim will bear only one interpretation, similarity will have to be tolerated."  Laitram Corp. v. Rexnord, Inc., 939 F.2d 1533, 1538 (Fed. Cir. 1991) (internal citation omitted).  In view of Claim 16, the "signals" and "channels" issue may present a situation in which interchangeability must be tolerated.

On the other hand, Claims 39 and 41 appear to account for the differentiation between "signals" and "channels" as separate entities.  For instance, Claim 39 provides: "[t]he method of claim 38, wherein frequency translating comprises translating the original digitized broadband signal to locate a selected transponder channel at baseband."  Since a signal makes up part of a channel, the method could potentially select a channel based upon a selected signal.  In other words, although the term "channel" is more

---

[74]     Id. at 11:13-16.

[75]     Id. at 11:24-28.

[76]     Defs.' Responsive Claim Construction Br. ("Defendants' Responsive Brief") [ECF No. 252] 11:18-21.

[77]     '576 Patent, Claim 14.

[78]     Id., Claims 16, 17, 21, 39, 41, & 42.

[79]     Id.

[80]     Id. at 2:54-63 (referring indiscriminately to transponder signals and transponder channels).

expansive than "signal," signals and channels necessarily correspond. The specification includes embodiments that support that interpretation.[81] Still, nothing in the specification or in Claims 39 or 41 suggests that the terms "signal" and "channel" may be used interchangeably. Additionally, though Claims 39 and 41 account for the relationship between signals and channels, the claims ultimately require a "selected transponder channel." Even if the applicant intended to disclose that the claimed method could potentially select a channel based upon a selected signal, the specification does not include any corresponding disclosure.

To satisfy the definiteness requirement of 35 U.S.C. § 112(b), a patent claim must, in view of the specification and prosecution history, "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014) ("*Nautilus*"). Patents are presumed valid under 35 U.S.C. § 282. *See Biosig*, 783 F.3d at 1377. Thus, a patent challenger must prove invalidity by clear and convincing evidence. *See id.* Consistent with that presumption and evidentiary burden, a court should construe ambiguous claims, if possible, to uphold their validity. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 911 (Fed. Cir. 2004). However, a court may not force a validity-preserving construction when that construction is not permissible. *See id.*

As used throughout the specification and claims, "signal" and "channel" have different meanings, even though the terms are related. With respect to Claims 16, 17, 21, 39, 41, and 42, it is not clear whether the applicant accidentally used the terms "signal" and "channel" interchangeably, inconsistent with the specification, or whether the applicant attempted to capture the relationship between those terms. That lack of clarity renders those claims indefinite. *See Media Rts. Techs., Inc. v. Cap. One Fin. Corp.*, 800 F.3d 1366, 1371 (Fed. Cir. 2015) ("[A] claim is indefinite if its language 'might mean several different things and no informed and confident choice is available among the contending definitions.'" (quoting *Nautilus*, 572 U.S. at 911 n.8)).

For the foregoing reasons, the Court concludes that Claims 16, 17, 21, 39, 41, and 42 are indefinite.

---

[81]   *Id.* at 5:55-63 & 6:11-19 (disclosing locating a transponder channel based upon the frequency spectrum of a selected signal).

### F.    Meaning of "Local Area Network"

| Limitation at Issue: | |
|---|---|
| "local area network" ('715 Patent, Claim 9) | |
| **Entropic's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning.  No construction necessary. | "a group of devices at a single site connected by cables that allow a device in the network to interact with any other on the network" |

The parties dispute whether local area network ("LAN"), within the context of the '715 Patent, contemplates only a wired connection.  Entropic argues that Defendants' proposed construction is improper because the specification includes embodiments with both wired and wireless LAN.[82]  Entropic further contends that the remainder of Defendants' proposed language is inaccurate and confusing.[83]  Defendants assert that nothing in the language of Claim 9 itself suggests that LAN can be wireless.[84]  Defendants further contend that the specification discusses only wired connections.[85]  Defendants add that the only discussion of wireless transmission is with respect to the RF link, not LAN.[86]

The parties also disagree on the state of the art at the time of the filing of the application for the '715 Patent.  Entropic argues that wireless LAN was known at that time and that the dictionary that Defendants cite even includes a definition for wireless LAN.[87]  Defendants maintain that LAN referred to groups of devices at a single site connected by cables.[88]  Defendants further assert that even though wireless LAN was known, it could not support the data rates required to carry out the inventions of the '715 Patent.[89]

---

[82]    Entropic's Opening Brief 22:16-19 & 23:8-9 (citing '715 Patent 9:44-48 & Fig. 11.).

[83]    *Id.* at 23:10-23.

[84]    Defendants' Opening Brief 32:13-15.

[85]    *Id.* at 32:16-33:18 (citing '715 Patent 3:18-22, 4:7-9, 9:44-48, & Fig. 11).

[86]    *Id.* at 33:19-28 (citing '715 Patent 3:11-25).

[87]    Entropic's Responsive Brief 19:2-5.

[88]    Defendants' Responsive Brief 26:5-9.

[89]    *Id.* at 27:11-16.

Here, the claims and the specification do not reveal an express definition for "LAN." The specification does provide, however, that "Ethernet or other LAN technology is suitable for this function."[90] Figure 11 of the '715 Patent shows an embodiment having a wired connection.[91] While the specification does not mention wireless LAN, it also does not teach that LAN is limited to only wired connections. Accordingly, Defendants' full proposed construction is unsupported. Still, the Court must resolve the parties' dispute regarding whether LAN, within the meaning of the '715 Patent, should be limited to a wired connection. *See O2 Micro Intern. Ltd.*, 521 F.3d at 1362. Because the intrinsic evidence does not resolve that issue, the Court turns to extrinsic evidence.

Defendants cite two dictionaries that define "LAN" and provide for connection "by a communication link," yet they also state that "nodes are connected by cables."[92] Defendants cite two more dictionaries that also define "LAN" and state that connections "are direct cables (such as UTP or optical fiber)." Entropic cites a deposition transcript in which DISH's expert witness, Dr. Paul G. Steffes, testified that wireless LAN was a known technology, but Dr. Steffes disagreed that it would support the data rates needed to perform the claimed invention.[93] Entropic also refers to IEEE standards discussing wireless LAN at the time of the filing of the application for the '715 Patent.[94] Entropic also cites a definition for wireless LAN from one of the same dictionaries that Defendants cite.[95] Thus, the extrinsic evidence appears to corroborate both possibilities, with some dispute regarding the supported rates. The supported-rates issue is a fact dispute, or a potential fact dispute, that the Court can evaluate, if necessary, at a later stage of the case. Resolving this issue now, absent additional evidence, is premature.

Accordingly, the Court declines to construe the term "local area network" and declines to conclude that the term is limited to wired connections. Plain and ordinary meaning governs.

---

[90]     '715 Patent 9:47-48.

[91]     *Id.*, Fig. 11.

[92]     Defendants' Opening Brief, Exs. M & N [ECF Nos. 234-13 & 234-14] (technical dictionaries).

[93]     Decl. of Katherine Allor in Supp. of Entropic's Opening Brief (the "Allor Declaration") [ECF No. 233-1], Ex. 7 (Dep. Tr. of Dr. Paul G. Steffes, Ph.D. (the "Steffes Deposition")) [ECF No. 233-8] 113:3-13.

[94]     Allor Declaration, Exs. 8 & 9 [ECF No. 233-9 & 233-10] (IEEE Standards).

[95]     Decl. of Katherine Allor in Supp. of Entropic's Responsive Brief [ECF No. 253-1], Ex. 11 [ECF No. 253-3] (Microsoft Press Computer Dictionary).

### G.    Meaning of "RF Signals"

| Limitation at Issue: | |
|---|---|
| "RF signals" ('715 Patent, Claim 9) | |
| **Entropic's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning.  No construction necessary. | "analog carrier RF signals" |

The parties dispute whether the RF signals disclosed in the '715 Patent can be digital as well as analog.  Entropic argues that the specification discloses digital RF signals.[96]  Defendants acknowledge that the '715 Patent discloses that the selecting, translating, and combining of a transponder signal can be performed in the digital domain.[97]  However, Defendants argue that because Claim 9 is specific to RF signals, only the analog embodiments from the specification are relevant.[98]  Defendants further contend that "RF signals" must be analog and that any other interpretation would read "RF" out of the claim.[99]

Here, the '715 Patent provides, "[t]wo basic approaches to combining are possible. One approach is to combine digitally filtered signals in the digital domain. . . .  The other approach is to combine the selected signals in the analog domain."[100]  Thus, the '715 Patent discloses digital signals.  However, the parties' dispute is specific to "RF signals," as opposed to other types of signals.  Claim 9 discloses "a frequency translator coupled to the signal selector that is capable of shifting the selected transponder signals to new carrier frequencies *to produce RF signals*" and "a signal combiner coupled to at least one frequency translator capable of combining *at least two RF signals* to produce a composite signal."[101]

The limitation "RF signal" appears in only two portions of the '715 Patent specification, neither of which resolves the parties' dispute.[102]  The specification also

---

[96]    Entropic's Opening Brief 25:1-27:2 (citing '715 Patent, Claim 9, 5:26-49, 5:63-67, & Fig. 17).

[97]    Defendants' Opening Brief 27:11-16 (citing '715 Patent 8:55-92 & 11:23-32).

[98]    *Id.* at 27:16-21 (citing '715 Patent 5:59-62, 8:55-9:2, & Figs. 6-9).

[99]    *Id.* at 29:5-7.

[100]    '715 Patent 5:63-6:2.

[101]    *Id.*, Claim 9 (emphasis added).

[102]    *Id.* at 3:22-25 & 3:54-57.

refers to an RF output, which is presumably analog in view of the technological context.[103] Thus, the specification does not support the addition of the language "analog carrier" in front of "RF signal," even though an RF (radio frequency) signal is presumably an analog signal.

Additionally, with reference to Figure 3 of the '715 Patent, the specification explains:

> [T]he selected transponder channel is then frequency translated to a new carrier frequency. The selected and frequency translated digital signal is converted to an analog signal using a D/A converter for the I and Q components. One approach is to convert the digitally filtered signal to the analog domain using a D/A converter **350**, then using a quadrature modulator with mixers **360**, phase splitter **388**, LO **386**, and summer **380**. Alternatively, this can be done by a digital mixing operation where a rotating phasor is multiplied by the data samples to translate their frequency, then converting the frequency shifted digital signal to an analog signal with a D/A.[104]

Although that portion of the specification does not expressly mention RF signals, it appears relevant to Claim 9 in view of the overlap in subject matter. It teaches signal combination in both the digital and analog domain. While RF signals are initially analog signals, the specification contemplates converting digital signals to analog signals and then summing the analog signals. Thus, producing RF signals may involve conversion and, prior to conversion, operations in the digital domain. Accordingly, given the digital and analog disclosure in the specification and the lack of any express intent to define "RF signal" as "analog carrier RF signal," the Court declines to construe the term. Consistent with that conclusion, DISH's expert also agreed that Figure 17 of the '715 Patent, which shows a frequency translator and filter, is an example of tuning and frequency translation and filtering and summing in the digital domain.[105]

For the reasons set forth above, plain and ordinary meaning governs. Construction is unnecessary.

---

[103]   *See, e.g., id.* at 1:40-45.

[104]   *Id.* at 5:26-37.

[105]   Steffes Deposition 52:14-17.

## H.    Meaning of "Decodes Specific Programs"

| Limitation at Issue: | |
|---|---|
| "decodes specific programs" ('715 Patent, Claim 9) | |
| **Entropic's Proposed Construction** | **Defendants' Proposed Construction** |
| 1. Is not indefinite.<br><br>2. Plain and ordinary meaning. No construction necessary. | Indefinite. |

Defendants argue that the limitation "decodes specific programs" is indefinite both because "decodes" contemplates a broad set of operations and because the specification does not identify, with sufficient clarity, any "specific" programs to decode.[106] Entropic responds that a person having ordinary skill in the art would readily understand the term "decode" and would understand the scope of specific programs.[107]

First, broad claims are not necessarily indefinite. *See, e.g., Cap. Sec. Sys., Inc. v. NCR Corp.*, 725 F. App'x 952, 957 (Fed. Cir. 2018). Rather, the definiteness inquiry focuses on whether the claim "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901. Here, both parties appear to agree that a person of ordinary skill in the art would understand the term "decode" to refer to "descrambling, demodulating, and demultiplexing" within the signal processing context.[108] Accordingly, the Court does not find the term "decode"—as used in Claim 9 of the '715 Patent—indefinite.

Second, with respect to the "specific programs," the Court turns to the specification. The parties suggest that two portions of the specification bear on this dispute. The '715 Patent teaches:

> Also in FIG. 11, server/gateway 1160 receives the composite transponder signal, decodes specific programs, and distributes the program information in packetized MPEG over a digital local area network (LAN) 1170 to

---

[106]    Defendants' Opening Brief 29:26-30:7.

[107]    Entropic's Opening Brief 29:5-18.

[108]    *See* Allor Declaration, Ex. 6 [ECF No. 233-7] (Expert Declaration of Dr. Paul G. Steffes Regarding Claim Construction) ¶ 87.

> STBs **1180**.   Ethernet or other LAN technology is suitable for this function.[109]

That portion of the specification simply restates the claim language; it is not helpful in understanding the meaning of "specific programs."  The '715 Patent also teaches:

> MPEG transport stream demultiplexer **1020** extracts a specific video program that is combined by data combiner **1030**.  Several MPEG streams are multiplexed as needed, and packets are formatted for transmission on a digital network.  A digital LAN **1040** connects directly to the ODU.  Channel information is communicated to the ODU through the LAN.[110]

That portion suggests that a specific video program, which appears related to the "specific programs," is part of the composite signal.  However, the specification still does not identify the "specific programs" with any specificity.  Elsewhere, the term "program" is used as a verb and is not immediately relevant.

> In another portion, the specification explains:

> New STBs **1140** will be supplied with a composite signal according to the present invention comprising all the transponder channels that are selected; the new STB **1140** will tune and decode the requested channel.[111]

Thus, a person of skill in the art may understand "program" to refer to television programs and may understand "specific" to refer only to certain, identified programs.  The '715 Patent potentially suggests that those "specific programs" are "requested channel[s]."

The definiteness requirement calls for a "delicate balance."  *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (citing *Nautilus*, 572 U.S. at 909).  It must "allow for a modicum of uncertainty" to motivate innovation, but it still requires "clear notice of what is claimed" to apprise the public of what is still open to them."  *Id.*  Here, the '715 Patent appears to identify the "specific programs" as "requested channel[s]," which resolves some uncertainty regarding how to identify the "specific programs."  For at least that reason, the Court concludes that Defendants have not established indefiniteness by clear and convincing evidence.  *See Young v. Lumenis, Inc.*, 492 F.3d 1336, 1345 (Fed. Cir. 2007).

---

[109]   '715 Patent 9:44-48.

[110]   *Id.* at 9:16-20.

[111]   *Id.* at 9:28-32.

For the foregoing reasons, the term "specific programs" not indefinite. Plain and ordinary meaning applies.

## VI.  DISPOSITION

For the foregoing reasons, the Court construes the disputed limitations as follows:

| Limitation | Construction |
|---|---|
| "digitizing the plurality of satellite broadband signals" | "digitizing the complete bands of satellite broadband signals" |
| "integrated receiver decoder (IRD)" | "a device that, in one unit, receives and decodes data and generates an output signal" |
| "transponder request [signal] . . . the transponder request signals" "from the IRD . . . to the IRDs" "a plurality of transponder signals . . . the transponder signal" | Plain and ordinary meaning. |
| "transponder request signals" | Plain and ordinary meaning. |
| "selected [and extracted] transponder channel[s]" | Indefinite. |
| "local area network" | Plain and ordinary meaning. |
| "RF Signals" | Plain and ordinary meaning. |
| "decodes specific programs" | Not indefinite.  Plain and ordinary meaning. |

**IT IS SO ORDERED.**

Dated:  July 29, 2024

John W. Holcomb
UNITED STATES DISTRICT JUDGE

-26-